1  Gary S. Lincenberg - State Bar No. 123058
       glincenberg@birdmarella.com
2  Naeun Rim - State Bar No. 263558
       nrim@birdmarella.com
3  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
4  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
5  Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
6
   Attorneys for Defendant Petr Pacas
7
   *Additional counsel on next page*
8

9                    UNITED STATES DISTRICT COURT

10                  SOUTHERN DISTRICT OF CALIFORNIA

11

12 UNITED STATES OF AMERICA,            Case No. 18-cr-04683-GPC

13              Plaintiff,              **MOTION TO DISMISS NO. 1**

14        v.                           **MEMORANDUM OF POINTS AND
                                        AUTHORITIES IN SUPPORT OF
15 JACOB BYCHAK, MARK                   DEFENDANTS' MOTION:**
   MANOOGIAN, MOHAMMED
16 ABDUL QAYYUM, and PETR              **(1) TO DISMISS THE
   PACAS,                              INDICTMENT BASED ON THE
17                                     GOVERNMENT MISADVISING
              Defendants.             THE GRAND JURY ON THE LAW;
18                                     (2) IN THE ALTERNATIVE, FOR
                                      DISCLOSURE OF GRAND JURY
19                                     MATTERS**

20                                     Hearing Date:  April 19, 2019
                                       Hearing Time:  1:00 p.m.
21                                     Department:  Courtroom 2D

22                                     Hon. Gonzalo P. Curiel

23

24

25

26

27

28

4672.2 3557387.2                                    Case No. 18-cr-04683-GPC
   MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS NO. 1

David W. Wiechert - State Bar No. 94607
    dwiechert@aol.com
Jessica C. Munk - State Bar No. 238832
    jessica@davidwiechertlaw.com
William J. Migler - State Bar No. 318518
    william@davidwiechertlaw.com
LAW OFFICE OF DAVID W. WIECHERT
27136 Paseo Espada, Suite B1123
San Juan Capistrano, California 92675
Telephone: (949) 361-2822

*Attorneys for Defendant Jacob Bychak*


Randy K. Jones - State Bar No. 141711
    rkjones@mintz.com
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
Telephone: (858) 314-1510

*Attorney for Defendant Mark Manoogian*


Whitney Z. Bernstein - State Bar No. 304917
    wbernstein@bmkattorneys.com
Thomas H. Bienert, Jr. - State Bar No. 135311
    tbienert@bmkattorneys.com
James Riddet - State Bar No.39826
    jriddet@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700

*Attorneys for Defendant Mohammed Abdul Qayyum*

1

2

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................5

II.   LEGAL STANDARD GOVERNING ERRORS IN GRAND JURY
      PROCEEDINGS ........................................................................................7

      A.    The Indictment Must Be Dismissed If the Government
            Misadvised the Grand Jury In a Manner Prejudicial to
            Defendants..............................................................................................7

      B.    The Court Should Order Disclosure of Grand Jury Materials
            Where There Is Evidence That the Grand Jury Was Misadvised..........8

III.  SIGNIFICANT CIRCUMSTANTIAL EVIDENCE SHOWS THAT
      THE GRAND JURY WAS MISADVISED ON THE LAW ..........................9

      A.    The Record Strongly Suggests That the Grand Jury Was
            Misadvised .........................................................................................10

      B.    Commercial Emails and the Use of DBAs and Multiple Domain
            Names Do Not Violate the CAN-SPAM Act or California Law..........12

      C.    Unsolicited Commercial Email Practices Are Protected under the
            First Amendment.................................................................................18

IV.   CONCLUSION ........................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Balsam v. Trancos, Inc.*,
  203 Cal. App. 4th 1083 (2012)............................................................................16

*Dennis v. United States*,
  384 U.S. 855 (1966) .............................................................................................9

*Facebook v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016)............................................................................15

*FDIC v. Ernst & Whinney*,
  921 F.2d 83 (6th Cir. 1990) .................................................................................9

*Gordon v. Virtumundo, Inc.*,
  575 F.3d 1040 (9th Cir. 2009) ......................................................................10, 15

*Hoang v. Reunion.com, Inc.*,
  No. C-08-3518 MMC, 2010 WL 1340535 (N.D. Cal. Mar. 31, 2010)...............15

*Kleffman v. Vonage Holdings Corp.*,
  49 Cal. 4th 334 (2010).......................................................................................16

*Metro Lights, L.L.C. v. City of Los Angeles*,
  551 F.3d 898 (9th Cir. 2009) .......................................................................19, 20

*Omega World Travel, Inc. v. Mummagraphics, Inc.*,
  469 F.3d 348 (4th Cir. 2006) .............................................................................16

*Pan American v. Municipality of San Juan, Puerto Rico*,
  Civil No. 18-1017 (PAD), 2018 WL 6503215 (D.P.R. Dec. 10,
  2018) ...................................................................................................................19

*Rosolowski v. Guthy-Renker, LLC*,
  230 Cal. App. 4th 1403 (2014)...........................................................................16

*Silverstein v. Keynetics, Inc.*,
  727 Fed. Appx. 244 (9th Cir. 2018) ...................................................................15

*United States v. Bravo-Fernandez*,
  239 F. Supp. 3d 411 (D.P.R. 2017) ......................................................................9

*United States v. Cerullo*,
   No. 05–cr–1190, 2007 WL 2683799 (S.D. Cal. Sept. 7, 2007) ............................ 8

*United States v. Cwibeker*,
   No. 12-CR-0632 (JS) (ARL), 2015 WL 459315 (E.D.N.Y. Feb. 2,
   2015) .............................................................................................................. 7

*United States v. D'Alessio*,
   822 F. Supp. 1134 (D.N.J. 1993) ........................................................................ 8

*United States v. Ho*,
   No. 08–00337, 2009 WL 2591345 (D. Haw. Aug.20, 2009) ................................ 9

*United States v. Hoey*,
   No. S3 11–cr–337 (PKC), 2014 WL 2998523 *(S.D.N.Y. July 2,
   2014)* ............................................................................................................... 7

*United States v. Kilbride*,
   507 F. Supp. 2d 1051 (D. Ariz. 2007), *aff'd*, 584 F.3d 1240 (9th Cir.
   2009) ............................................................................................................... 16

*United States v. Navarro*,
   608 F.3d 529 (9th Cir. 2010) ................................................................................ 7

*United States v. Peralta*,
   763 F. Supp. 14 (S.D.N.Y. 1991) ......................................................................... 8

*United States v. Pickard*,
   100 F. Supp. 3d 981 (E.D. Cal. 2015) ................................................................. 12

*United States v. Plummer*,
   941 F.2d 799 (9th Cir. 1991) ................................................................................ 9

*United States v. Stevens*,
   771 F. Supp. 2d 556 (D. Md. 2011) ..................................................................... 8

*United States v. Twombly*,
   475 F. Supp. 2d 1019 (S.D. Cal. 2007) .............................................................. 16

*United States v. Welch*,
   201 F.R.D. 521 (D. Utah 2001) ............................................................................ 8

*United States v. Williams*,
   504 U.S. 36 (1992) ............................................................................................. 7

*Zoobuh, Inc. v. Better Broadcasting, LLC*,
    No. 2:11CV00516-DN, 2013 WL 2407669 (D. Utah May 31, 2013) ................. 16

**Statutes**

15 U.S.C. § 7701 ........................................................................................................ 6

15 U.S.C. § 7702 ............................................................................................. 6, 13, 14

18 U.S.C. § 1037 ......................................................................................... 5, 13, 14, 17

**Other Authorities**

First Amendment ............................................................................................. *passim*

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) ..................................................... 8

Federal Rule of Criminal Procedure 12(b) .......................................................... 7, 13

Business & Professions Code § 17952.5 ................................................................ 16

CAN-SPAM Act ............................................................................................... *passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case is about email advertising.  The Government is not prosecuting scammers and fraudsters seeking to bilk unwary consumers with pitches for bogus supplements or penny stocks or distributors of pornography that could reach minors. Instead, the emails that are the subject of this case are advertisements for legitimate goods and services, such as those offered by banks and insurance companies. Although the Government has fashioned this case as one about the alleged misappropriation of "inactive" Internet Protocol ("IP") addresses, there is substantial evidence in the record indicating that this case is really an attack on *unsolicited commercial email advertising itself*.  In parts of the Indictment and various statements made to the Court, the Government has expressed the view that unsolicited commercial emailing is criminal.  That is an incorrect understanding and recitation of the law.  Unsolicited commercial emailing is legal and regulated in the United States.  To the extent that the Government told the grand jury otherwise (and circumstantial evidence indicates that it did), the Government is misapplying the law in a way that not only conflicts with the CAN-SPAM Act and tramples First Amendment protections afforded to commercial speech, but would also, as a practical matter, shut down email advertising in contravention of Congressional intent to regulate—not prohibit—both solicited and unsolicited email advertising.

The Government's misunderstanding of the law surrounding commercial emails pervades the Indictment.  The Indictment alleges that in furtherance of a criminal conspiracy to send "commercial email," which the Indictment pejoratively defines as "spam," Defendants "concealed" their use of "inactive" Internet Protocol ("IP") addresses.  *See* Indictment ¶¶2.c., 5 & 8.  First, regardless of how the Government characterizes it, unsolicited commercial emailing is not illegal in the United States.  It is regulated at the federal level primarily by the CAN-SPAM Act ("the Act").  *See* 15 U.S.C. § 7701, et seq. (civil provisions) and 18 U.S.C. § 1037

(criminal provisions).[1]  Perhaps the Government wishes that the Act prohibited unsolicited commercial email in its entirety,[2] but using this criminal case to distort the Act in furtherance of that desire is improper.  Second, the Government's allegation that Defendants "concealed" their use of IPs is based on the false premise that using "doing business as" or "dba" names to register multiple domain names[3] associated with IP addresses is illegal.  *See* Indictment ¶8.  But the use of dbas is a routine part of legitimate business practices, and the use of multiple domain names—including to send commercial emails—has been held permissible in civil cases brought under the Act and analogous California law.

The aforementioned language in the Indictment, along with statements the Government has made on the record, strongly suggests that the Government misstated the law to the grand jury.  But it is not the province of aggressive prosecutors to re-write the law—that is properly left to legislators—or to advise the grand jury on what the law should be.  If the Government erroneously stated or even implied to the grand jury that unsolicited commercial emailing and the use of dbas and multiple domain names was illegal, then the Indictment should be dismissed, since the grand jury decision to indict most likely was based on this very prejudicial

---

[1] The Act does not use the term "spam," but uses the term "commercial electronic mail message" to refer to "any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service," with the exclusion of "transactional or relationship messages." 15 U.S.C. § 7702(2)(A) & (B) & (17).

[2] In this regard, the Government appears to be aligned with Spamhaus, a foreign non-profit organization whose stated mission is to eliminate **all** "spam" regardless of whether it is legal in the United States.  As discussed in Defendant's concurrently-filed motion for informant discovery, the Government was working closely with an employee of Spamhaus throughout the investigation of this case.  The Government's close relationship with an organization that seeks to eliminate unsolicited commercial email, legal or otherwise, is further evidence that the Government views unsolicited commercial emailing itself to be criminal.

[3] The CAN-SPAM Act defines "domain name" as "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." 15 U.S.C. § 7702(4).

1   misstatement of the law.  There is no way to un-ring that bell.  At the very least, this

2   Court should exercise its discretion to order that any grand jury instructions and the

3   Government's argument and colloquy with the grand jury regarding "spam,"

4   commercial emails, and the use of dbas and multiple domain names be disclosed.

## II.      LEGAL STANDARD GOVERNING ERRORS IN GRAND JURY PROCEEDINGS

### A.      The Indictment Must Be Dismissed If the Government Misadvised the Grand Jury In a Manner Prejudicial to Defendants

9   The purpose of grand jury review is to provide a buffer between overreaching

10  Government prosecutors and the citizenry.  *United States v. Williams*, 504 U.S. 36,

11  47 (1992).  A district court may dismiss an indictment for errors made by the

12  Government in grand jury proceedings that "prejudice" the defendant.  *United States*

13  *v. Navarro*, 608 F.3d 529, 538-39 (9th Cir. 2010).[4]  "[F]or errors brought to the

14  district court's attention 'prior to the conclusion of the trial,' dismissal of the

15  indictment 'is appropriate only if it is established that the violation substantially

16  influenced the grand jury's decision to indict or if there is grave doubt that the

17  decision to indict was free from the substantial influence of such violations.'"  *Id.*, at

18  539 (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988), in turn

19  quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986) (internal quotation marks

20  and footnotes omitted).  Under this standard, "an indictment may be dismissed

21  where the Government's instruction on the applicable law was false or misleading."

22  *United States v. Cwibeker*, No. 12-CR-0632 (JS) (ARL), 2015 WL 459315, at *5

23  (E.D.N.Y. Feb. 2, 2015); *United States v. Hoey*, No. S3 11–cr–337 (PKC), 2014 WL

24  2998523, at *3 (S.D.N.Y. July 2, 2014) ("courts have found error where the

25

26  ───────────────

27  [4] Federal Rule of Criminal Procedure 12(b) allows consideration at the pretrial stage of "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue."  Errors in grand jury proceedings fall into this

28  category.

1   government incompletely or erroneously provides legal instruction to the grand

2   jury").  This is not surprising, since grand jury instructions are "intimately

3   associated with the deliberation and judgment aspects of the grand jury function."

4   *United States v. Welch*, 201 F.R.D. 521, 523 (D. Utah 2001).

5          District courts, including in the Southern District of California, have

6   dismissed indictments based on misstatements of the law to the grand jury.

7   In *United States v. Cerullo*, No. 05–cr–1190, 2007 WL 2683799, at *3 (S.D. Cal.

8   Sept. 7, 2007), the district court explained that where the grand jury repeatedly

9   asked how to distinguish a gift from earnings and the prosecutor repeatedly failed to

10  properly instruct them, the prosecutor committed error that prejudiced the defendant,

11  requiring dismissal of the indictment.  In *United States v. Peralta*, 763 F. Supp. 14,

12  19-21 (S.D.N.Y. 1991), the district court found that the prosecutor having

13  "misstated the applicable law," "compounded" by "inaccurate hearsay testimony,"

14  was error "which went both to the quality of the evidence before the grand jury and

15  to the requirements of the legal theory at the core of the government's case,"

16  justifying dismissal of the indictment.  In *United States v. D'Alessio*, 822 F. Supp.

17  1134, 1143-44 (D.N.J. 1993), the district court dismissed an indictment for mail

18  fraud where the application of a state ethics rule to the defendants was ambiguous,

19  and to redact references to the rule in the indictment would "alter the substance of

20  the charged offense."  In *United States v. Stevens*, 771 F. Supp. 2d 556, 558 (D. Md.

21  2011), the district court dismissed the indictment due to "grave doubts as to whether

22  the decision to indict was free from substantial influence of the improper advice of

23  counsel instruction" given by the prosecutor.

24      **B.     The Court Should Order Disclosure of Grand Jury Materials**

25              **Where There Is Evidence That the Grand Jury Was Misadvised**

26          In the event a court needs more information before ruling on dismissal of an

27  indictment, it may order disclosure of grand jury matters.  Pursuant to Federal Rule

28  of Criminal Procedure 6(e)(3)(E)(ii), a "court may authorize disclosure—at a time,

in a manner, and subject to any other conditions that it directs—of a grand jury matter … at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  The prosecutor's instructions to the grand jury "are matters occurring before the grand jury."  *Welch, supra*, 201 F.R.D. at 523.  Due to the secrecy of grand jury proceedings, a defendant seeking disclosure of grand jury instructions or related matters must show a "particularized need."  *Dennis v. United States*, 384 U.S. 855, 870-71 (1966).  "The standards the district court should follow when lifting the secrecy of grand jury proceedings are (1) that the desired material will avoid a possible injustice, (2) that the need for disclosure is greater than the need for continued secrecy, and, (3) that only the relevant parts of the transcripts should be disclosed."  *United States v. Plummer*, 941 F.2d 799, 806 (9th Cir. 1991).

Disclosure is appropriate where the Government, "on-the-record," has expressed an incorrect understanding of the law, which could have resulted in "possible misleading of the grand jury."  *United States v. Ho*, No. 08–00337, 2009 WL 2591345, at *4 (D. Haw. Aug.20, 2009) (district court granted defendant's request for in camera review of grand jury transcript where prosecutor misstated law at a hearing).  The indictment itself can also "suggest[ ] the government misunderstood the law."  *United States v. Bravo-Fernandez*, 239 F. Supp. 3d 411, 416 n. 8 (D.P.R. 2017), citing *United States v. FedEx Corp.*, No. C14–00380, 2016 U.S. Dist. LEXIS 6155, at *3 (N.D. Cal. Jan. 19, 2016) (finding that defendant showed particularized need for *in camera* review of grand jury instructions).  "[T]he district court has wide discretion to decide whether the need for secrecy predominates or the need for disclosure predominates."  *FDIC v. Ernst & Whinney*, 921 F.2d 83, 86 (6th Cir. 1990).

## III.   SIGNIFICANT CIRCUMSTANTIAL EVIDENCE SHOWS THAT THE GRAND JURY WAS MISADVISED ON THE LAW

The Government is attempting to criminalize email advertising by dressing

1   this case up with conspiracy and wire fraud allegations and insinuating that
2   "inactive," old, and abandoned IP addresses were somehow stolen.  But at its heart
3   this case is about commercial speech.  The Government's demonization of
4   unsolicited commercial emails makes it sound as though sending spam is per se
5   illegal.  But it's not.  The Act "does not ban spam outright, but rather provides a
6   code of conduct to regulate commercial e-mail messaging practices."  *Gordon v.*
7   *Virtumundo, Inc.*, 575 F.3d 1040, 1047-48 (9th Cir. 2009).  Nevertheless, the
8   Government has now on multiple occasions made clear that it considers unsolicited
9   commercial emailing itself to be illegal.  If the Government suggested to the grand
10  jury that Defendants could be criminally charged with conspiracy, wire fraud, and
11  CAN-SPAM violations on the basis that they participated in routine business
12  practices common to digital advertising, such as sending bulk unsolicited emails or
13  using various dbas and domain names, it is effectively flouting the Act in a way that
14  contravenes Congressional intent, making it too risky to engage in email advertising,
15  raising First Amendment concerns, and leading to the entirely reasonable conclusion
16  that the grand jury was misadvised on the law.

17      **A.    The Record Strongly Suggests That the Grand Jury Was**
18              **Misadvised**

19      On at least three occasions, the Government has made statements incorrectly
20  suggesting that it is criminal to send unsolicited commercial emails or to use dbas
21  and domain names in the course of digital advertising:

22      • **Paragraph 8 of the Indictment characterized the use of "different**
23        **names" as "concealment**."  The Indictment itself (¶8) alleges that "[i]t
24        was a further part of the scheme and artifice to defraud that the
25        defendants concealed their use of the IP addresses to send 'spam'

emails by using business names, post office boxes, and email addresses under different names."[5]

- **In filings, the Government clarified that the Indictment was referencing the use of various dbas and domain names.** The Government recently confirmed in response to Defendants' Motion for Bill of Particulars that the rather opaque reference to "different names" in the Indictment was a reference to Defendants' employer's use of various dbas, each with its own address, to register multiple domain names:

> During the course of the conspiracy, the defendants utilized hundreds of **DBAs**, post office boxes, and thousands of **domain names** to conceal their identity as the senders of spam. Each time a spamwatch organization or ISP would question or block delivery of their emails, the defendants would change the names of the **domain sending the emails**, IP addresses used, and create new DBAs and email address to control these new domain names.

Government's Response and Opposition to Defendants' Motion for Bill of Particulars, pp. 9:25-10:5 [Doc. No. 51] (emphasis added).

- **On the record, the Government has mischaracterized recipients of unsolicited commercial emails as "victims."** More recently, in support of its Motion for Protective Order, the Government argued that recipients of "spam" were "victims," analogizing the sending of "unsolicited, commercial email" to "a boiler-room scheme, where people were being called by phone and receiving phone calls that they did not want and potentially luring them into doing things they did not

---

[5] Although the Indictment alleges additional conduct as part of the "scheme and artifice to defraud" (¶¶5-7), it is not possible to determine whether the grand jury would have indicted had the Government not presented argument and evidence regarding the use of dbas and multiple domain names. Moreover, the additional conduct alleged raises issues regarding the meaning of what it means to be a "registrant" of IP addresses, which is the subject of Defendants' void for vagueness challenge in their concurrently filed motion to dismiss.

1
2
3
4
5

> want to do."  Declaration of Rim, ¶2, Exh. A [Transcript of Feb. 14,
> 2019 Motion Hearing], at pp. 15:13-16:15.  This statement in open
> court strongly suggests that the Government conveyed the same
> position—that recipients of unsolicited commercial emails are
> "victims"—to the grand jury.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

     As will be discussed below, the law is clear that it is both common and legal in the digital advertising world (1) to send unsolicited commercial emails, and (2) to use various dbas and domain names to send such emails.  Not only do these practices comply with the CAN-SPAM Act, criminalizing them would contravene the First Amendment.  There is a sufficient basis on the record to at least cast "grave doubt" regarding whether the grand jury's decision to indict was "free" from the "substantial influence" of the Government's misstatements of applicable law.  *See* Part II. *supra*, citing *Navarro, supra*, 608 F.3d at 539.[6]  There is no assurance that the grand jury would have indicted absent the Government's mischaracterization of commercial emailing and reliance on dbas and multiple domain names.  This should be enough to warrant dismissal of the Indictment.  But if the Court needs more information before rendering a decision, Defendants have shown the "particularized need" for disclosure of any grand jury instructions and Government argument and colloquy with the grand jury regarding spam and the use of dbas and multiple domain names.  *See* Part II., *supra*, citing *Plummer, supra*, 941 F.2d at 806.

21
22

    **B.**    **Commercial Emails and the Use of DBAs and Multiple Domain Names Do Not Violate the CAN-SPAM Act or California Law**

23
24

     Since the Government is not alleging that spam was sent to perpetrate fraud or another illegal objective, the question then becomes what is it about the spam that

25
26
27
28

---

[6] The Court can properly consider the Government's statements since it is "not limited to the face of the indictment in ruling on the motion to dismiss" and "[t]here is no prohibition against the consideration of extrinsic evidence for purposes of a Rule 12(b) motion to dismiss."  *United States v. Pickard*, 100 F. Supp. 3d 981, 990 (E.D. Cal. 2015).

the Government disapproves of?  The answer is found in Counts 2 through 5 of the Indictment charging wire fraud, where the Government alleges that as part of the "scheme and artifice to defraud" Defendants "concealed their use of the IP addresses to send 'spam' emails by using business names, post office boxes, and email addresses under different names."  Indictment ¶8.  This allegation infects the entire Indictment, since the object of the conspiracy alleged in Count 1 and of the CAN-SPAM Act violations alleged in Counts 6 through 10 was to send that same spam.  *See* Indictment ¶¶2.c. & 9.  In its Response and Opposition to Defendants' Motion for Bill of Particulars (Doc. No. 51, pp. 9:25-10:5), the Government, in effect, explained that this allegation concerned the use of dbas and multiple domain names "to conceal their identity as the senders of spam."  The Government's position regarding use of dbas and domain names must be evaluated by examining both the language of the CAN-SPAM Act and case law applying the Act and analogous California law.  Once that is done, it becomes apparent that the Government is advocating a position not only unsupported by the Act's text or case law, but that would transform the exercise of commercial speech into a crime.

By alleging that dbas and domain names were used to "conceal their identity as senders of spam," the Government is implicating the CAN-SPAM Act's prohibitions against concealing the identity of the initiator of email communications. The Act contains provisions regarding "header information," defined as "the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message."  15 U.S.C. § 7704(8).  The Act prohibits "materially falsif[ying] header information."  18 U.S.C. § 1037(a)(3).  "Materially" falsified header information is defined as "altered or concealed in a manner that would impair the ability of a recipient of the message, an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or

a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation." 18 U.S.C. § 1037(d)(2). Since under the Act, "initiate … means to originate or transmit … or to procure the origination or transmission of" an email advertisement, "more than one person may be considered to have initiated a message." 15 U.S.C. § 7702(9).

Based on the above statutory provisions, the validity of the Government's theory of liability largely depends on who is considered an "initiator" of email. Registration records for domain names, which are publically available, are supposed to accurately identify the person or entity who registered a particular domain name. If a dba can be an "initiator" of an email and can be identified by consulting domain registration records, then the ability of a recipient to identify the initiator is not impaired and header information is not materially falsified. But under the Government's theory, a dba can never be an initiator, and in this case, only the parent company—Defendants' employer whose subsidiary filed the dbas that registered domain names—can be an initiator. Because domain registration records would identify dbas, as opposed to Defendants' employer, using dbas to register domain names used to send emails would, in the Government's view, "impair" the ability of a recipient to identify the initiator and is therefore illegal. In essence, the Government would require email advertisers to use a parent corporate name when registering sending domains to avoid criminal liability.

The Government's theory is fundamentally flawed. There is nothing in the text of the CAN-SPAM Act or case law under it that prohibits a dba from being an initiator of email. The Act, by its terms does not require a corporate parent to register domain names, nor does it preclude a subsidiary from being the registrant through use of a dba. In fact, the Act expressly acknowledges that a corporate parent may operate through "separate lines of business or divisions" as an initiator of email. *See* 15 U.S.C. § 7702(16). Moreover, the use of dbas is a routine practice in business—the federal Small Business Administration actually recommends the

1   use of dbas as a way to "conduct business under a different identity from your own

2   personal name or your formal business entity name," as well as advising that "[y]our

3   domain name doesn't actually need to be the same as your legal business name,

4   trademark, or DBA."  *See* https://www.sba.gov/business-guide/launch-your-

5   business/choose-your-business-name.  Defendants' employer followed this accepted

6   corporate practice to, through publicly organized subsidiaries, legally register dbas

7   that in turn registered sending domain names that were traceable to the dbas through

8   public information.

9         Cases interpreting the CAN-SPAM Act confirm that it is not criminal to use

10   dbas and domain names that do not use the parent corporate name of the email

11   marketing company responsible for mailing.  In *Hoang v. Reunion.com, Inc.*, No. C-

12   08-3518 MMC, 2010 WL 1340535, at *6 (N.D. Cal. Mar. 31, 2010), the district

13   court compared the permissible use of email addresses (including domain names)

14   that provide "at most, 'incomplete' or 'less than comprehensive'" information about

15   the identity of the sender to "the common business practice of using a 'dba'"; in

16   contrast to emails "indicating the sender was an actual person known" to the

17   recipient when the sender was not.  In *Gordon v. Virtumundo, supra*, the Ninth

18   Circuit held "[t]here is of course nothing inherently deceptive in [defendant's] use of

19   fanciful domain names," absent "evidence" that the "practice is aimed at misleading

20   recipients as to the identity of the sender" (e.g., by having "misappropriated

21   identities" of individuals).  575 F.3d at 1064.  Even "'incomplete or less than

22   comprehensive information' regarding the sender" is not a violation.  *Id.*  In

23   *Facebook v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016), the Ninth

24   Circuit held that emails were not "misleading" just because the header did not

25   identify the company whose promotional campaign was being disseminated in the

26   emails at issue.  In *Silverstein v. Keynetics, Inc.*, 727 Fed. Appx. 244, 246 (9th Cir.

27   2018), the Ninth Circuit concluded that "the use of fictitious 'From' names does not

28   make an email header materially false or misleading within the meaning of the

1   CAN-SPAM Act where those names do not 'spoof' the identities of individuals

2   known to the recipient and are accompanied by accurate domain names and subject

3   lines that make it clear the e-mail is commercial in nature."  In *Omega World*

4   *Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 351, 357-58 (4th Cir. 2006), the

5   Fourth Circuit held that even inaccuracies in email header information "do not make

6   the headers 'materially false or materially misleading'" because the emails "were

7   chock full of methods to 'identify, locate, or respond to' the sender or to 'investigate

8   [an] alleged violation' of the CAN-SPAM Act."

9       California's analogous law, Business & Professions Code § 17952.5,

10  similarly does not prohibit the use of dbas or multiple domain names.  *See Kleffman*

11  *v. Vonage Holdings Corp.*, 49 Cal. 4th 334 (2010) (not unlawful to use multiple

12  domain names for purpose of bypassing spam filters); *Balsam v. Trancos, Inc*., 203

13  Cal. App. 4th 1083, 1096, 1097-98 (2012) (emails that do not identify or are not

14  traceable through publicly available sources to the advertiser or any real company

15  are "deceptive"—which is something different than using dbas); *Rosolowski v.*

16  *Guthy-Renker, LLC*, 230 Cal. App. 4th 1403 (2014) (not unlawful if sender is

17  identified in body of email, even if header does not identify "official name" of entity

18  sending email or does not entity traceable through public database such as

19  WHOIS).[7]

20      The leading criminal case under the CAN-SPAM Act, *United States v.*

21  *Kilbride*, 507 F. Supp. 2d 1051 (D. Ariz. 2007), *aff'd*, 584 F.3d 1240 (9th Cir.

22  2009), demonstrates how the Government is reaching to transform use of dbas and

23

24  ───────────────
    [7] California cases are relevant because Business & Professions Code § 17952.5 has
25  been construed to require "deceptive" conduct—the same standard required under
    the criminal provisions of the CAN-SPAM Act.  *See Zoobuh, Inc. v. Better*
26  *Broadcasting, LLC*, No. 2:11CV00516-DN, 2013 WL 2407669, at *5 (D. Utah May
    31, 2013) (comparing California law, which requires deception, and civil provisions
27  of CAN-SPAM Act); *United States v. Twombly*, 475 F. Supp. 2d 1019, 1025 (S.D.
    Cal. 2007) (stating that criminal provisions of CAN-SPAM Act require deception).

28

multiple domain names into a criminal scheme.  In *Kilbride*, the defendants, who ran an unsolicited pornographic email operation, were convicted of violating 18 U.S.C. § 1037(3) and (4).[8]  Testimony established that, in setting up their operation, defendants intended to "evade" the CAN-SPAM Act.  507 F. Supp. 2d at 1059.  Defendants engaged in technical machinations designed to disguise the U.S. origin of emails—using a network of computers outside the U.S. that they could access remotely, identifying in routing information a sending entity that they did not own or operate, and inserting "false return paths"—to ensure that recipients could not identify from header information who sent emails.  *Id.* at 1059, 1064-65.  Defendants used false information to register domains to ensure that emails could not be traced back to them through registrations.  The entity that registered domain names had no corporate affiliation with defendants and registrations contained the "fictitious," i.e., fabricated, name of a nonexistent individual and a "bogus phone number."  *Id.* at 1060, 1067-68.  Even *Kilbride* acknowledges that "mere registration and use of multiple domain names" is not unlawful—"there must be an element of fraud, a deliberate hiding of the identity of the person initiating the email."  *Id.* at 1067.  In *Kilbride* there was fraud because the defendants were emailing unsolicited pornography using means they **intended** would prevent recipients from tracing the emails back to them.

Here, in contrast to *Kilbride*, there is no allegation of fraud or deceit.  The Government does not allege that any of the techniques used in *Kilbride* to falsify header information were used or that false contact information was provided to domain registrars.  Rather, as clarified in its response to Defendants' motion for bill of particulars, the alleged concealment is that domain registrars had real contact information for the dbas that had registered the domain names instead of the direct

---

[8] Subsection (a)(4) of § 1037 prohibits "register[ing], using information that materially falsifies the identity of the actual registrant, for … two or more domain names …."

contact information of parent company for the dbas.  But so long as a domain registrar  contains the contact information for the dba that registered the domain name, email recipients would be able to stop or complain about unwanted emails, as required by CAN-SPAM.  The civil and criminal CAN-SPAM Act and California cases discussed above show that the use of fictitious business names is legal so long as information is not fabricated and is publicly available to permit identification of the sender or a person who can receive communications on behalf of the registrant.

As the above cases further reflect, even in civil cases, the courts have continually reined in the reach of the CAN-SPAM Act in particular, no doubt in recognition that the Act is vulnerable to abuse given its vagueness and breadth.  The Government's reliance on pejorative references to "spam" and legitimate practices involving the use of dbas and domain names to make its criminal case shows how far the Government is stretching the Act.

### C.      Unsolicited Commercial Email Practices Are Protected under the First Amendment

In addition to characterizing the use of domain names and dbas as criminal, the Government represented to the Court that "unsolicited commercial email" itself was a crime.  At the hearing on February 14, 2019, in seeking a protective order for forthcoming discovery, the Government argued that the recipients of "spam" were themselves "victims" of receiving "unsolicited, commercial email."  Declaration of Rim, ¶2, Exh. A [Transcript of Feb. 14, 2019 Motion Hearing], at pp. 15:13-16:15. The Government then compared unsolicited commercial emailing to "a boiler-room scheme, where people were being called by phone and receiving phone calls that they did not want and potentially luring them into doing things they did not want to do."  *Id*.  Tellingly, the Government's analogy did not differentiate between recipients of emails sent from allegedly misappropriated IP addresses or from legitimately purchased IPs.  Instead, the Government indicated to the Court that all recipients of unsolicited commercial emails were themselves victims of some crime.

To the extent that this was also represented to the grand jury, such interpretation of the law is not only unsupported by the CAN-SPAM Act, as described above, it is also a violation of the First Amendment.

Commercial speech—which includes email advertising—is entitled to First Amendment protection based on the following rationale:

> [T]he Supreme Court has recognized that the free flow of commercial information is "indispensable to the proper allocation of resources in a free enterprise system because it informs the numerous private decisions that drive the system." That flow not only serves the economic interest of the speaker but also assists consumers, furthering the societal interest in the fullest possible dissemination of legitimate information. Albeit advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all.

*Pan American v. Municipality of San Juan, Puerto Rico*, Civil No. 18-1017 (PAD), 2018 WL 6503215, at *8 (D.P.R. Dec. 10, 2018) (citations omitted). The Supreme Court has articulated a four-part test for assessing the constitutionality of a restriction on commercial speech:

> (1) if "the communication is neither misleading nor related to unlawful activity," then it merits First Amendment scrutiny as a threshold matter, in order for the restriction to withstand such scrutiny, (2) "[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech;" (3) "the restriction must directly advance the state interest involved;" and (4) it must not be "more extensive than is necessary to serve that interest."

*Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009) (quoting *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 564-66 (1980)). The Government has the burden of satisfying all of these factors. *Pan American, supra*, 2018 WL 6503215, at *9 (quoting *Ibanez v. Florida*, 512 U.S. 136, 143).

If the Government is attempting to use this case to criminalize the sending of unsolicited commercial emails, the Government cannot survive a First Amendment challenge. The Government does not allege anything unlawful about the contents of the commercial emails themselves. It does not allege that Defendants sent spam to perpetrate a fraud on unwary consumers or to foist illicit material, such as types of

1    pornography, on recipients.  Because the speech at issue—emails advertising

2    legitimate goods—is neither misleading nor related to unlawful activity, First

3    Amendment protection is warranted.

4         Even assuming that the Government has a "substantial interest" in restricting

5    commercial email, "the restriction must directly advance the state interest involved"

6    and it must not be "more extensive than is necessary to serve that interest."  *Metro*

7    *Lights, L.L.C., supra*, 551 F.3d at 903.  Regardless of the details alleged regarding

8    underlying conduct, if the Government obtained the Indictment by suggesting to the

9    grand jury that using dbas and domain names to send commercial emails is criminal,

10   then the restrictions on such business practices that the Government seeks to impose

11   through the Act, conspiracy, and wire fraud statutes is far more extensive than

12   necessary.  A chilling precedent would be set should the Government be permitted

13   to use this as a test case to broadly construe the CAN-SPAM Act in furtherance of

14   the criminalization of commercial email.  Why should email advertisers be singled

15   out and run the risk of criminal liability for exercising their First Amendment rights

16   and engaging in routine practices available to other types of businesses?  There is no

17   substantial state interest in criminalizing the use of multiple dbas and domain names

18   to send unsolicited commercial emails—Congress signaled as much when it passed

19   the CAN-SPAM Act and expressly declined to prohibit unsolicited commercial

20   emails in their entirety.

21        Moreover, the Government's interpretation of the law leaves no room for

22   digital advertising companies to use dbas and domain names for legitimate business

23   purposes—such as to defend against the aggressive criteria used by Spamhaus to

24   blacklist domains and IP addresses of commercial emailing companies, regardless of

25   whether those companies are compliant with United States CAN-SPAM regulations.

26   Spamhaus is a non-profit organization based in London and Geneva that has

27   undertaken a crusade against spam regardless of its source, destination, or

28

compliance with applicable law.[9]  It is recognized that even emails compliant with the Act are vulnerable to blacklisting.  *See* What CAN-SPAM Requires & How that Low Bar Harms U.S. Businesses, available at https://litmus.com/blog/how-to-fix-can-spam-so-it-doesnt-further-harm-u-s-business ("If a brand only clears the low bar set by CAN-SPAM, they are pretty much guaranteed to be blacklisted and blocked by inbox providers."). Because Spamhaus blacklists companies even if those companies are in compliance with United States CAN-SPAM regulations, it is possible, and likely probable, that companies would use various dbas and domain names to avoid getting unfairly blacklisted, not to deceive consumers, internet access services, and law enforcement—the constituents entitled to know the identity of initiators under the Act.  The Act does not include as a constituent a foreign organization such as Spamhaus, with an agenda contrary to United States law and a modus operandi of blacklisting individuals and entire companies associated with sending domains and IP addresses.  The use of dbas may affect Spamhaus' ability to track and unfairly blacklist perceived spammers, but it does not violate United States law.  First Amendment and other legal protections afforded to email advertisers in the United States should not be ignored simply because both Spamhaus, a foreign organization seeking to eradicate spam in the United States, and the Government are frustrated with perceived weaknesses in the Act.

/ / /

/ / /

/ / /

---

[9] Spamhaus has publicly expressed its view that the CAN-SPAM Act of 2003 does not go far enough to deter commercial emailing and is a "serious failure" and a "serious mistake."  *See* Spamhaus Position on CAN-SPAM Act of 2003, available at https://www.spamhaus.org/organization/statement/005/spamhaus-position-on-can-spam-act-of-2003.  Spamhaus uses a variety of methods, including algorithms and the subjective opinions of individuals working on its projects, to identify what it arbitrarily considers to be too much unsolicited email traffic sent from a domain or IP address.

1

**IV.    CONCLUSION**

2

      For all of the foregoing reasons, Defendants' motion should be granted.

3

4

      Respectfully submitted,

5

DATED:  March 15, 2019      Gary S. Lincenberg

6

Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,

7

Drooks, Lincenberg & Rhow, P.C.

8

9

By:      *s/ Naeun Rim*

10

Naeun Rim

11

Attorneys for Defendant Petr Pacas

12

13

DATED:  March 15, 2019      David W. Wiechert
Jessica C. Munk

14

William J. Migler
Law Office of David W. Wiechert

15

16

17

By:      *s/ David W. Wiechert*

18

David W. Wiechert
Attorneys for Defendant Jacob Bychak

19

20

DATED:  March 15, 2019      Randy K. Jones
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,

21

P.C.

22

23

By:      *s/ Randy K. Jones*

24

Randy K. Jones

25

Attorney for Defendant Mark Manoogian

26

27

28

1  DATED:  March 15, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Whitney Z. Bernstein
Thomas H. Bienert, Jr.
James Riddet
Bienert, Miller & Katzman, PLC


By:  _____*s/ Whitney Z. Bernstein*_____
          Whitney Z. Bernstein
Attorneys for Defendant Mohammed Abdul
Qayyum

1

## CERTIFICATE OF AUTHORIZATION
## TO SIGN ELECTRONIC SIGNATURE

2

3      Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative

4   Policies and Procedures of the United States District Court for the Southern District

5   of California, I certify that the content of this document is acceptable to counsel for

6   the Defendants and that I have obtained authorization from David W. Wiechert,

7   Randy K. Jones, and Whitney Z. Bernstein to affix their electronic signatures to this

8   document.

9

10                                 Respectfully submitted,

11   DATED:  March 15, 2019          Gary S. Lincenberg
                                     Naeun Rim
12                                   Bird, Marella, Boxer, Wolpert, Nessim,
                                     Drooks, Lincenberg & Rhow, P.C.
13

14

15                                 By:      *s/ Naeun Rim*
16                                          _____
                                                  Naeun Rim
17                                     Attorneys for Defendant Petr Pacas

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

Counsel for Defendants certify that the foregoing pleading has been

3

electronically served on the following parties by virtue of their registration with the

4

CM/ECF system:

5

Sabrina L. Feve

6

Assistant U.S. Attorney

7

sabrina.feve@usdoj.gov

8

9

Melanie K. Pierson

10

Assistance U.S. Attorney

11

melanie.pierson@usdoj.gov

12

13

Robert Ciaffa

14

Assistant U.S. Attorney

15

robert.ciaffa@usdoj.gov

16

17

18

Respectfully submitted,

19

DATED:  March 15, 2019

Gary S. Lincenberg
Naeun Rim

20

Bird, Marella, Boxer, Wolpert, Nessim,

21

Drooks, Lincenberg & Rhow, P.C.

22

23

24

By: _____*s/ Naeun Rim*_____

25

Naeun Rim
Attorneys for Defendant Petr Pacas

26

27

28