Gary S. Lincenberg - State Bar No. 123058
   glincenberg@birdmarella.com
Naeun Rim - State Bar No. 263558
   nrim@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Petr Pacas

*Additional counsel on next page*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:18-cr-04683-GPC |
|         Plaintiff, | **MOTION FOR INFORMANT DISCOVERY** |
|    vs. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' JOINT MOTION TO COMPEL DISCLOSURE OF DISCOVERY RELATING TO CONFIDENTIAL INFORMANT** |
| JACOB BYCHAK, MARK MANOOGIAN,  MOHAMMED ABDUL QAYYUM, AND PETR PACAS | |
|         Defendants. | |
| | Date:  April 19, 2019 |
| | Time: 1:00 p.m. |
| | Dept.: 2D |
| | Assigned to Hon. Gonzalo P. Curiel |

David W. Wiechert - State Bar No. 94607
    dwiechert@aol.com
Jessica C. Munk - State Bar No. 238832
    jessica@davidwiechertlaw.com
William J. Migler - State Bar No. 318518
    william@davidwiechertlaw.com
LAW OFFICE OF DAVID W. WIECHERT
27136 Paseo Espada, Suite B1123
San Juan Capistrano, California 92675
Telephone: (949) 361-2822

*Attorneys for Defendant Jacob Bychak*


Randy K. Jones - State Bar No. 141711
    rkjones@mintz.com
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
Telephone: (858) 314-1510

*Attorney for Defendant Mark Manoogian*


Whitney Z. Bernstein - State Bar No. 304917
    wbernstein@bmkattorneys.com
Thomas H. Bienert, Jr. - State Bar No. 135311
    tbienert@bmkattorneys.com
James Riddet - State Bar No.39826
    jriddet@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700

*Attorneys for Defendant Mohammed Abdul Qayyum*

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..................................................................... 5

II.     BACKGROUND ....................................................................... 7

     A.     The Government Alleges Defendants Defrauded Hostwinds, a Hosting Company, by Using Purportedly Forged Letters of Authorization ...................................................................... 7

     B.     The Government Has Relied on the CHS Since 2013 to Investigate This Case and Used that Information to Obtain Search Warrants ...................................................................... 9

     C.     The Case Against Defendants Is Highly Circumstantial ..................... 10

     D.     The Government Has Refused to Produce the Requested Discovery ................................................................................ 10

III.    THE LEGAL STANDARD REQUIRES THE GOVERNMENT TO PRODUCE THE REQUESTED DISCOVERY PURSUANT TO RULE 16, *BRADY* AND THEIR PROGENY ................................. 11

IV.    DISCOVERY RELATING TO THE CHS IS MATERIAL TO THE DEFENSE BECAUSE IT GOES TO THE CREDIBILITY OF KEY WITNESSES ........................................................................... 12

     A.     The Discovery Must Be Produced Because the CHS Communicated with Holden, the owner of Hostwinds ................... 12

     B.     The Discovery Must Be Produced Because the CHS Was Communicating with a Former Employee of Company A ................ 13

     C.     The Discovery Must Be Produced Because the Case Agent Relied on the CHS to Make Sworn Statements ............................. 14

     D.     The Informant Privilege Does Not Apply under *Roviaro* ................ 15

V.     THE GOVERNMENT MUST PRODUCE THE ITEMS OF DISCOVERY SPECIFIED IN THIS MOTION ................................. 17

     A.     The Identity and Contact Information of the CHS Must be Disclosed Immediately .................................................... 18

     B.     Evidence of any Benefits, Promises, or Compensation Provided to the CHS Must Be Produced .............................................. 18

     C.     All Communications with the CHS Recorded in any Form Must be Produced ............................................................... 19

     D.     All Materials Provided by the CHS to the FBI Must be Produced ....... 20

     E.     All Information Relating to the CHS's Criminal History Must be

Produced................................................................20

VI.   CONCLUSION ...............................................................21

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Benn v. Lambert*,
5
   283 F.3d 1040 (9th Cir. 2002) ............................................................................20

6

*Brady v. Maryland*,
7
   373 U.S. 83 (1963) ..................................................................................... 11, 12

8

*Giglio v. United States*,
   405 U.S. 150 (1972) ................................................................................... 11, 19

9

*LaMere v. Risley*,
10
   827 F.2d 622 (9th Cir. 1987) ...........................................................................18

11

*Roviaro v. United States*,
12
   353 U.S. 53 (1957) ...........................................................................................15

13

*Singh v. Prunty*,
14
   142 F.3d 1157 (9th Cir. 1998)..........................................................................20

15

*U.S. v. Jinian*,
16
   725 F.3d 954 (9th Cir. 2013) ...........................................................................10

17

*United States v. Bernal-Obeso*,
18
   989 F.3d 331 (9th Cir. 1993) ...........................................................................18

19

*United States v. Cutler*,
   806 F.2d 933 (9th Cir. 1986) ...........................................................................19

20

*United States v. Gonzalo Beltran*,
21
   915 F.2d 487 (9th Cir. 1990) ...........................................................................15

22

*United States v. Kojayan*,
23
   8 F.3d 1315 (9th Cir. 1993) .............................................................................19

24

*United States v. Montgomery*,
25
   998 F.2d 1468 (9th Cir. 1993)..........................................................................18

26

*United States v. Muniz-Jaquez*,
27
   718 F.3d 1180 (9th Cir. 2013)..........................................................................11

28

*United States v. Price*,
   566 F.3d 900 (9th Cir. 2009) ................................................................. 20

*United States v. Shaffer*,
   789 F.2d at 688 ....................................................................... 19, 20

**Statutes**

CAN-SPAM Act ...................................................................... 6, 7, 13, 16

**Other Authorities**

Federal Rules of Criminal Procedure Rule 16 ........................................ 11

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

As the Court is aware, this case spun off from a larger ongoing investigation into the commercial email practices of Company A, a large digital advertising company with offices in San Diego.  Company A was in the business of delivering bulk commercial emails on behalf of client companies to advertise their goods and services.  Many of Company A's clients are well-established companies, such as AT&T and Fidelity Life.  On October 31, 2018, the Government brought federal criminal charges in the instant case against four employees of Company A— Defendants Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum, and Petr Pacas (collectively "Defendants").  None of these Defendants are part of the control group of Company A. None have ever been in trouble with the law prior to this case.

The Indictment alleges that Defendants, acting on behalf of Company A, took actions to acquire IP addresses to send commercial emails.[1]  To deliver large amounts of emails, advertising companies must seek out a steady supply of Internet Protocol ("IP") addresses that are not blocked by spam filters.  This is because an email sent through an IP address that has been blocked by a spam filter will not reach the intended recipient.  The dispute in this case is whether Defendants, as employees of Company A, acquired certain IP netblocks[2] unlawfully, and whether Defendants along with Company A unlawfully sent bulk commercial emails facilitated in part by these netblocks.  The Government has alleged that Defendants "hijacked" certain abandoned IP netblocks by means of wire fraud (Counts 2 through 5), and that Defendants sent commercial emails from "hijacked" IP

---

[1]   Defendants are not accused of sending "spam" emails involving investment scams or pornography.  As argued in the concurrently-filed motion to dismiss based on misadvisement to the grand jury, on a broader level, the Government is also improperly alleging that unsolicited commercial emailing itself is criminal.

[2]   A "netblock" is a large group of IP addresses.

netblocks in violation of the CAN-SPAM Act (Counts 6-10).  The Government has also alleged that all Defendants were engaged in a conspiracy to commit these federal crimes (Count 1).  Defendants deny these allegations and intend to mount a vigorous defense.

According to the discovery, the genesis of the Government's investigation started with information provided by a confidential informant known to the FBI as Confidential Human Source S-0009118 ("CHS").  Defendants must have access to discovery relating to the CHS to adequately prepare for trial.  The requested informant discovery is necessary, relevant, and helpful to the defense for the following reasons:

First, during the time period alleged in the Indictment, the CHS was communicating with and receiving documents from Peter Holden, the owner of Hostwinds, which is the hosting company alleged to be the victim of the wire fraud counts.  Holden will likely testify that one or more Defendants deceived him into thinking that Company A owned the IP netblocks identified in the Indictment. It will be critical for Defendants to question the CHS on statements made by Holden, including any statements that may go to his motives or credibility.

Second, the CHS was also communicating with a former Company A employee who provided detailed information about Company A's operations.  The defense must be permitted to flesh out who this former employee is and what he told the CHS, especially in a case where the Government is alleging that there was a broader conspiracy between Company A and Defendants.  In particular, the defense must be able to explore a good faith defense, which will depend on what Defendants knew and what they and other employees at the Company were being told by management regarding the legality of certain actions.

Third, the FBI case agent relied heavily on the CHS's expertise and observations to investigate this case and to later provide justification for multiple search warrants.  The requested discovery is necessary for the defense to investigate

1  the credibility of the case agent, as well as the credibility of the CHS, and
2  potentially the validity of the warrants.

3      <u>Finally</u>, the informant privilege does not apply because there is no threat to
4  the safety of the informant or future investigations, and the materiality of the
5  requested discovery to preparing a defense substantially outweighs any minimal
6  interest the Government has in keeping the identity of the CHS confidential.

7      The Government has refused to produce the requested information on the
8  basis that it does not intend to call the CHS at trial.  But regardless of whether the
9  Government intends to affirmatively call the CHS, the evidence requested is
10  essential to the Defendants' ability to defend themselves because, among other
11  things, it will permit the defense to explore flaws in the Government's investigation
12  of this case, provide evidentiary support for pre-trial motions *in limine*, and enable
13  the impeachment of Government witnesses *other* than the CHS.  Defendants
14  respectfully request that the Court order the Government to produce this information
15  immediately so that Defendants may adequately prepare for trial.  At minimum,
16  Defendants ask that the Government submit the requested materials *in camera* so
17  that the Court can decide this motion.

## II.  BACKGROUND

### A.  The Government Alleges Defendants Defrauded Hostwinds, a Hosting Company, by Using Purportedly Forged Letters of Authorization

22      The Government has summarized its theory of the case in previous filings
23  before this Court.  (*See, e.g.*, Dkts. 47 and 51.)  In short, Defendants are accused of
24  having purchased abandoned IP netblocks, without the permission of the actual
25  owners of those netblocks, through a man named Daniel Dye, who has pled guilty to
26  a violation of the CAN-SPAM Act and is cooperating with the Government.  Once

an IP netblock is purchased, the IP address space must be "announced"[3] by a hosting company so that the IP address can be connected to the internet and used to transmit data. Hosting companies require the party requesting the announcement to provide a Letter of Authorization ("LOA")[4] that proves that the hosting company is authorized to announce the IP address. The Government's theory, apparently based on circumstantial evidence and statements from Dye, is that Defendants knew they were buying "hijacked," i.e. stolen IP netblocks from Dye. But the transactions with Dye are not where the Government alleges any fraud or misrepresentation occurred. Instead, the alleged misrepresentations at the heart of the Indictment center around purportedly forged LOAs that Defendants allegedly provided to hosting companies—specifically a hosting company called Hostwinds.

Counts 2 through 5 of the wire fraud counts allege that the following wire transfers were sent in furtherance of the scheme to defraud:

| Count | Date | From | To | Description |
|---|---|---|---|---|
| 2 | 11-11-13 | San Diego | Oklahoma | PayPal wire transfer of $600 for hosting of ECT netblock |
| 3 | 1-9-14 | San Diego | Oklahoma | PayPal wire transfer of $600 for hosting of Telalink netblock |
| 4 | 2-28-14 | San Diego | Oklahoma | PayPal wire transfer of $600 for hosting of MooreSolutions netblock |
| 5 | 3-10-14 | San Diego | Oklahoma | PayPal wire transfer of $600 for hosting of Telalink netblock |

(Dkt. 1 ("Indictment") at p.4.) The discovery indicates that each of the $600 PayPal wire transfers described above were sent to a hosting company in Oklahoma called

---

[3]   The "announcement" of an IP address alerts the internet to who is using the IP address space so that it may be assigned to an Autonomous System.

[4] LOAs are also sometimes called Letters of Agency.

1  Hostwinds, a company owned by Peter Holden.  Thus, Defendants are accused of

2  having defrauded Hostwinds by providing it with $600 and an allegedly forged LOA

3  to announce each IP netblock.

**B.     The Government Has Relied on the CHS Since 2013 to Investigate
This Case and Used that Information to Obtain Search Warrants**

6          According to the discovery, the CHS is an employee of Spamhaus, a foreign,

7  anti-spam organization described in an FBI 302 as an agency that "works with law

8  enforcement to identify and pursue spammers worldwide."  (ADCONION-DISC02-

9  REPORTS-001001.)[5]  In June of 2013, the CHS contacted the FBI and claimed that

10 he had received emails promoting television, internet, and dating websites that came

11 from Company A through hijacked IP addresses.  Over the course of the next few

12 months, the CHS emailed the FBI evidence to support his belief that Company A

13 was sending emails through hijacked IPs, including:

- A detailed report titled "Current [Company A] Direct Hijacks, July 13, 2013," which laid out a digital forensic analysis of several of the IP netblocks specified in the Indictment (ADCONION-DISC02-REPORTS-00984);

- One allegedly forged LOA addressed to Hostwinds that the CHS had in his possession in October of 2013 (ADCONION-DISC02-REPORTS-001000, 001002); and

- A spreadsheet of IP netblocks suspected to have been hijacked by Company A, along with associated domain names (ADCONION-DISC02-REPORTS-001005).

21          During an interview on June 2, 2014, the CHS revealed that he had obtained

22 LOAs directly from Peter Holden, the owner of the allegedly defrauded hosting

23 company.  (ADCONION-DISC02-REPORTS-01011.)  The CHS also provided

24 detailed information regarding which Company A employee was communicating

25 with Holden to announce the IP netblocks.

---

[5]   Defendants have provided citations to the bates numbers of the discovery for the Government's reference but have not attached these pages as exhibits to avoid publicly filing potentially sensitive information contained in the FBI 302s.

During that same June 2 interview and later on November 30, 2014 (ADCONION-DISC02-REPORTS-01018), the CHS provided the FBI with detailed information about Company A's history, internal operations, and the relationships between Defendants and other employees and executives at the Company.  The CHS indicated that he was receiving this information from a former employee of Company A.  (ADCONION-DISC02-REPORTS-01016.)

### C.    The Case Against Defendants Is Highly Circumstantial

Without witness testimony, the evidence against Defendants is highly circumstantial.  The bulk of the Government's case appears to be made up of emails where Defendants discuss the acquisition and announcement of IP netblocks purchased from Dye, and summary email reports indicating that commercial emails were sent from those netblocks.  These emails do not show that Defendants knew the IP netblocks were obtained without consent from the original owners.  Mr. Pacas does not even appear on any email communications relating to the acquisition of the IP netblocks identified in the Indictment.  This will make the testimony of people who interacted with the Defendants, including Holden and any former company employees, even more important to understanding the Defendants' states of mind.[6]

### D.    The Government Has Refused to Produce the Requested Discovery

On November 20, 2018, Defendant Qayyum filed a motion to compel discovery relating to confidential informants in this case, and other defendants similarly requested this discovery in joinders to the motion.  (Dkt. 36 at pp. 8-9; Dkt. 37; Dkt. 39-1 at p. 3.)  In response, the Government stated it would not provide informant discovery because the CHS was "not a percipient witness to the offenses,

---

[6]   Defendants have been charged with wire fraud, which is a specific intent crime. *See U.S. v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) ("The specific intent requirement is an aspect of the 'scheme to defraud' requirement; i.e., there is no fraudulent scheme without specific intent").

1   and is not contemplated as a witness in the government's case in chief." (Dkt. 47 at

2   pp. 13.) At the January 25, 2019, hearing, the Court granted Defendants' leave to

3   provided supplemental briefing on the need for disclosure of informant discovery.

4   **III.    THE LEGAL STANDARD REQUIRES THE GOVERNMENT TO**

5   **PRODUCE THE REQUESTED DISCOVERY PURSUANT TO RULE**

6   **16, *BRADY* AND THEIR PROGENY**

7          Rule 16(a) of the Federal Rules of Criminal Procedure requires the

8   Government to make available, upon a defendant's request, documents and other

9   materials "within the government's possession, custody, or control" that are either

10  "material to preparing the defense," or that the government intends to use in its case-

11  in-chief at trial. Fed. R. Crim. P. 16(a)(1)(E)(i).

12         To obtain discovery under Rule 16, all that is required is that the defendant

13  make a threshold showing of materiality. *Hernandez-Meza*, 720 F.3d at 768.

14  Materiality is a "low threshold" satisfied by a presentation of facts which tends to

15  show that the Government is in possession of information helpful to the defense.

16  *Id.*; *see also United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013)

17  ("Even inculpatory evidence may be relevant. A defendant who knows that the

18  government has evidence that renders his planned defense useless can alter his trial

19  strategy.")

20         The Government has a duty to disclose exculpatory and impeaching evidence.

21  *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150,

22  154 (1972); United States Attorneys' Manual ("USAM") § 9-5.001(B)

23  ("Government disclosure of material exculpatory and impeachment evidence is part

24  of the constitutional guarantee to a fair trial."). In *Brady*, the Supreme Court ruled

25  that evidence favorable to the accused must be turned over by the prosecutor, even if

26  it is not subject to discovery under Rule 16(a). *Brady v. Maryland*, 373 U.S. at 87.

27

28

## IV.  DISCOVERY RELATING TO THE CHS IS MATERIAL TO THE DEFENSE BECAUSE IT GOES TO THE CREDIBILITY OF KEY WITNESSES

The Government must produce the requested discovery under Rule 16 and *Brady* because it is both material to the preparation of the defense and is likely to lead to the discovery of exculpatory evidence.  It is clear from the discovery that the CHS was in contact with at least three potential witnesses whose credibility will be at issue during the trial: (1) Peter Holden, the owner of Hostwinds, (2) a former employee of Company A, and (3) the case agent.  Defendants must be permitted to interview the CHS regarding his interactions with these three potential witnesses to adequately prepare for trial.  Moreover, the Government cannot invoke the limited informant privilege in this case where there is no credible threat to the CHS's safety, and there is no indication that the CHS must remain anonymous to continue to be a source of information.

### A.  The Discovery Must Be Produced Because the CHS Communicated with Holden, the owner of Hostwinds

As part of its case-in-chief, the Government will have to show that Defendants deceived Holden, owner of the alleged victim Hostwinds, into believing that the LOAs they were providing were authentic.  Holden has told agents that a Defendant represented to him that Company A had purchased the companies listed as the author of the LOAs.  (ADCONION-DISC02-REPORTS-00039.)  Holden's credibility is a key issue because the line between whether he was a victim or a co-conspirator is a blurry one.  This is evident from the Government's decision to file criminal charges against Vincent Tarney, the owner of *another* hosting company who allegedly announced IP netblocks on behalf of Company A.  As the Government has indicated in prior filings, Mr. Tarney is accused of having announced IP netblocks on behalf of Company A despite knowing that the LOAs he was given may have been forged.  (*See, e.g.*, Dkt. 47 at p. 4.)  Rather than being

treated as a victim, he was charged as a co-conspirator in a separate case before this Court and has pled guilty to conspiring to violate the CAN-SPAM Act.  *See United State v. Tarney*, CR 18-3469 GPC.  Mr. Holden, on the other hand, has not been charged or arrested for his similar role in announcing the IP netblocks involved in this case.  To the contrary, he is being treated as the victim as to the wire fraud counts.  As is apparent from the case against Tarney, Holden's knowledge regarding the alleged falsity of the LOAs is the critical difference between whether the Government views him as a criminal or a victim.  Therefore, his credibility and motives are a critical area for the defense.

The CHS's knowledge is particularly important with respect to Holden because he received an allegedly forged LOA addressed to Hostwinds as early as October of 2013.  (ADCONION-DISC02-REPORTS-01000-01002.)  This is one month *before* the earliest wire fraud and CAN-SPAM counts charged in the Indictment.[7]  This suggests that the CHS was in communication with Holden during the time period that critical events alleged in the Indictment were taking place. Importantly, the CHS can shed light on what Holden knew about the likelihood that Company A was providing forged LOAs as of October of 2013, prior to the dates of any of the charged wire fraud transactions or CAN-SPAM emails.  The fact that Holden may have continued to announce IP netblocks for Company A *after* he provided a suspicious LOA to the CHS calls into question his credibility and motive for claiming that Defendants made misrepresentations to him.

**B.    The Discovery Must Be Produced Because the CHS Was Communicating with a Former Employee of Company A**

The CHS also received information, including emails, from a former employee of Company A.  The CHS describes this person as having "intimate

---

[7]   The dates in the wire fraud counts range from November 11, 2013, to March 10, 2014; and the dates in the CAN-SPAM counts range from November 3, 2013 to January 26, 2014.

1  knowledge of [Company A's] operations and of the hijacking of IPs."

2  (ADCONION-DISC02-REPORTS-01016.)  Through this source, the CHS provided

3  the FBI with detailed information about Company A's alleged IP "hijacking"

4  operation, including which of Company A's locations were in charge of the

5  "spamming," and which employees were responsible for overseeing those activities.

6  (ADCONION-DISC02-REPORTS-01017.)  The CHS also provided information

7  about the history of Company A's involvement in "spamming" and certain

8  acquisitions Company A made of other companies allegedly tied to "spamming."

9  (ADCONION-DISC02-REPORTS-01018.)

10       It is critical that Defendants be able to flesh out the information that the CHS

11  received from this former employee of Company A for a number of reasons.  At the

12  heart of this case is what Defendants knew and intended.  The Government's theory

13  is likely that Defendants' knowledge grew over time—that even if they did not

14  know that the first IP netblock Company A allegedly purchased from Dye was

15  "hijacked," they must have known by the second or the third or the fourth.  The

16  employee who was in communication with the CHS clearly has crucial information

17  regarding who at Company A knew what and when.  In addition to having relevant

18  information as to the knowledge of one or more Defendants, the employee may also

19  be able to provide details about what Company A's management represented to

20  Defendants about the legality of the acquisition and use of these IP netblocks.  Such

21  facts would go directly to the issue of whether Defendants were acting in good faith.

22  Without access to the CHS, Defendants' hands are shackled with respect to their

23  ability to determine the identity of this former employee.  It is therefore crucial that

24  the Government provide the requested informant discovery so that Defendants may

25  investigate the identity of this employee and adequately explore their defenses.

26  **C.     The Discovery Must Be Produced Because the Case Agent Relied**

27  **on the CHS to Make Sworn Statements**

28  The case agent for the Government relied on statements made by the CHS to

1  apply for at least two search warrants, including a warrant to search the email

2  account of Defendant Mark Manoogian.  Among other things, the agent relied on

3  information provided by the CHS regarding (1) Company A's alleged practice of

4  sending forged LOAs to "hijack" netblocks, (2) the spam filtering practices of major

5  webmail providers like Google, (3) the approximate market price of IP addresses,

6  and (4) the approximate value of the IP addresses supposedly "hijacked" by

7  Defendants.  (ADCONIAN-REPORTS-00108-00109.)  Defendants should be

8  permitted to investigate the statements the CHS made to the case agent, as well as

9  the credibility and reliability of the CHS himself, for possible impeachment material

10  as to the case agent and for potential attacks on the legality of the search warrants.

### D.    The Informant Privilege Does Not Apply under *Roviaro*

12        The Government has previously invoked the informant privilege to refuse to

13  provide the requested discovery.  But the limited informant privilege is overridden

14  in this case because the requested informant discovery is crucial to the preparation

15  of the Defendants' preparation for trial: "Where the disclosure of an informer's

16  identity, or of the contents of his communication, is relevant and helpful to the

17  defense of an accused, or is essential to a fair determination of a cause, the privilege

18  must give way." *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957).  The decision

19  to disclose the identity of an informant "calls for balancing the public interest in

20  protecting the flow of information against the individual's right to prepare his

21  defense." *Id*. at 62. To effectuate this balancing test, courts consider three factors:

22  1) the degree of the informant's involvement in the alleged activity; 2) the

23  relationship between the defense and the informant's likely testimony; and 3) the

24  governmental interests in nondisclosure.  *United States v. Gonzalo Beltran*, 915 F.2d

25  487, 488-89 (9th Cir. 1990).  On balance, these factors favor production of the

26  requested discovery.

27        With respect to the first factor, although the Government has characterized

28  the CHS as a "tipster with no involvement in the offense," (Dkt. 47 at pp. 14), the

1   discovery indicates that he had at least minor involvement.  He claims to have

2   received at least two emails from IP addresses "hijacked" by Company A's IP

3   addresses.  (ADCONION-DISC02-REPORTS-00980.)  Thus, the CHS claims to

4   have been a recipient of emails that were allegedly sent as part of Defendant's

5   broader conspiracy to violate the CAN-SPAM Act.  Moreover, the CHS was heavily

6   involved in the Government's investigation of Defendants and Company A.  As an

7   employee of a vigilante organization that has aligned itself with the Government on

8   investigations related to commercial email, the CHS has essentially acted as an

9   investigative agent for the FBI since 2013.  Among other things, the CHS gave

10  information to the FBI over the course of at least a year and a half, providing

11  multiple interviews in person and over the phone.  The CHS also analyzed numerous

12  IP addresses allegedly used by Company A, including those that are identified in the

13  Indictment, and generated reports for the FBI that included detailed digital forensic

14  analysis to explain why he believed these IP addresses were hijacked.  These facts

15  indicate he was far more than a "tipster" for the Government.

16          The second factor—the relationship between the defense and the informant's

17  likely testimony—weighs heavily in favor of Defendants.  The CHS may be a

18  crucial witness for the defense to impeach or otherwise shed light on the motives of

19  at least three potential government witnesses: Holden, the former Company A

20  employee, and the case agent.  As discussed above at length, the CHS was in direct

21  communication with these witnesses during the relevant time period.  Accordingly,

22  the CHS can provide valuable impeachment evidence with respect to those

23  witnesses.  Such evidence is critical in a case such as this, where the evidence

24  against Defendants is highly circumstantial.  There is no smoking gun document

25  establishing that Defendants knew any IP netblock was "hijacked."  Thus, the

26  Government's case will rise and fall on the credibility of witnesses who can testify

27  as to Defendants' knowledge and intent to defraud.  The CHS is the witness in the

28  best position to call the credibility of these witnesses into question.

1    Finally, the third factor—governmental interests in nondisclosure—also

2  strongly weighs in favor of Defendants.  The Government has no legitimate interest

3  in nondisclosure.  The Government cannot point to any threat to the CHS's safety—

4  Defendants have no prior criminal history, and there is no dangerous criminal

5  organization alleged to be lurking in the background.  As for the Government's

6  ability to use the CHS as a source in other cases, the Government has not articulated

7  any reason why the disclosure of the CHS's identity would interfere with their

8  ability to continue to rely on him as a source.  There is no indication that the CHS is

9  a wired informant being sent to secretly infiltrate spamming rings; there is no

10  indication that he is remaining anonymous to investigate on behalf of the

11  Government or to communicate with key suspects.  Because revelation of the CHS's

12  identity will neither endanger him nor jeopardize any ongoing investigations, the

13  Government cannot withhold this discovery on the basis of the informant privilege.

14  **V.    THE GOVERNMENT MUST PRODUCE THE ITEMS OF**

15  **DISCOVERY SPECIFIED IN THIS MOTION**

16    Defendants ask that the Court order the Government to immediately produce

17  all discovery relating to the CHS.  That discovery should include:

18    (1)    the CHS's identity and contact information;

19    (2)    copies of all documents, materials, or summaries relating to any

20           benefits, promises, or compensation the CHS has received to-date in

21           connection with his cooperation in this case;

22    (3)    copies of all communications between the Government (including both

23           law enforcement and prosecutors) and the CHS recorded in any form,

24           including written summaries, handwritten notes, emails, audio or video

25           recordings, and specifically including the emails sent to the FBI on July

26           15, 2013, July 31, 2013, October 17, 2013, and October 18, 2013;

27    (4)    copies of all documents, materials, memoranda, reports, or any other

28           items, whether tangible or intangible, provided to the Government

1         (including both law enforcement and prosecutors) by the CHS,

2         including the "numerous documents" provided and shown to the FBI

3         during its interview of the CHS on June 2, 2014;

4    (5)    information relating to the CHS's criminal history, including any arrest

5         reports, court records, or records of conviction; and

6    (6)    any and all other evidence material to the preparation of the defense or

7         otherwise exculpatory or impeaching of any Government witness.

8 Defendants address each of the aforementioned categories of discovery below.

### A.  The Identity and Contact Information of the CHS Must be Disclosed Immediately

The Government should be required to disclose the identity and contact information of the CHS immediately to allow the defense enough time to locate and interview him, particularly if he is in a foreign location.  Exculpatory and impeachment evidence material to guilt or innocence must be disclosed "in sufficient time to permit defendant to make effective use of that material." *LaMere v. Risley*, 827 F.2d 622, 625 (9th Cir. 1987); USAM § 9-5.001(D) (citations omitted).  In order to make effective use of the evidence, the Court should order the Government to disclose this information immediately.  Such disclosure will not endanger the CHS, and there is no justification for further delay of this critical evidence.

### B.  Evidence of any Benefits, Promises, or Compensation Provided to the CHS Must Be Produced

The Ninth Circuit has observed that confidential informants seeking benefits from the government face "temptations to produce as many accused as possible" and that "[t]he use of informants . . . is fraught with peril." *United States v. Montgomery*, 998 F.2d 1468, 1472 (9th Cir. 1993) (quoting *Velarde-Villareal v. United States*, 354 F.2d 9, 13 (9th Cir. 1965) and *United States v. Bernal-Obeso*, 989 F.3d 331, 333 (9th Cir. 1993)).  Benefits includes all monetary payments

1    received by the informant.  *See, e.g., United States v. Cutler*, 806 F.2d 933, 935 (9th

2    Cir. 1986); *United States v. Shaffer*, 789 F.2d at 688.  It also includes the details of

3    any cooperation agreement and information as to what the government did to satisfy

4    its obligations under any such agreement.  *See Giglio v. United States*, 405 U.S. 150,

5    154 (1971); *United States v. Kojayan*, 8 F.3d 1315, 1322 (9th Cir. 1993).  Disclosure

6    should include benefits which are going to be considered in the future as well as

7    ones which have been promised or already provided.

8           With respect to the disclosure of monetary benefits, the defense is entitled to a

9    specific breakdown of all dates on which the informant received money (whether in

10   cash or some other form), how much he received on each date, and why he received

11   the money.  This is to enable the defense to evaluate the timing of the payments in

12   relation to the instant case.  The defense should also be provided with information

13   about what, if anything, the informant was required to do in return for the payment.

14   Benefits received by an informant may also include other forms of consideration.

15   The defense should be informed of all other benefits, such as assistance in obtaining

16   residence or employment, and any other help which the government may have given

17   the informant.  The defense is entitled not only to information regarding these

18   benefits but documents that can be used to impeach or refresh the informant,

19   including signed informant agreements, checks, written contracts, and immigration

20   documents.

21          **C.     All Communications with the CHS Recorded in any Form Must be**

22                  **Produced**

23          The FBI 302s produced in this case indicate that the Government is

24   withholding certain communications from the CHS to the FBI.  Specifically, the

25   302s describe at least four emails from the CHS sent on July 15, 2013

26   (ADCONIAN-DISC02-REPORTS-00982), July 31, 2013 (ADCONIAN-DISC02-

27   REPORTS-00996), October 17, 2013 (ADCONIAN-DISC02-REPORTS-01000),

28   and October 18, 2013 (ADCONIAN-DISC02-REPORTS-01004).  While the

Government has produced copies of the attachments to those emails, it has not yet produced the emails themselves.[8]  The Government should be ordered to produce those emails and any other communications between the Government and the CHS recorded in any form.

### D.   All Materials Provided by the CHS to the FBI Must be Produced

The FBI 302s also indicate that on June 2, 2014, the CHS provided the FBI with "numerous documents including LOA's of hijacked netblocks, hijacked reports, profiles of individuals associated with spamming companies, various spreadsheets, and Powerpoint presentations" in electronic format.  (ADCONION-DISC02-REPORTS-01011.)  Defendants have been unable to find these materials in the discovery.  The Government should be ordered to produce the described documents as well as copies of any other documents or items provided by the CHS.

### E.   All Information Relating to the CHS's Criminal History Must be Produced

The informant's prior criminal record must be disclosed.  *See United States v. Price*, 566 F.3d 900, 911-12 (9th Cir. 2009); *Bernal-Obeso*, 989 F.2d at 333.  This should include information about criminal activity which has not been the subject of arrests, charges, or convictions, such as information about assets acquired through criminal activity.  *See United States v. Shaffer*, 789 F.2d 682, 688 (9th Cir. 1986).  If a witness has failed to report income received for his work as an informant or income from criminal activity on his tax returns, that information must be provided as well.  *See id*. Benefits of all types provided in connection with criminal cases must be disclosed.  *See Benn v. Lambert*, 283 F.3d 1040, 1057 (9th Cir. 2002) (release from jail without being charged, dismissal of charge, and delay in issuance of warrant); *Singh v. Prunty*, 142 F.3d 1157, 1162 (9th Cir. 1998) (dismissal of

---

[8]   To the extent that this discovery is buried within the terabytes of electronically stored information that the Government has produced on an ongoing basis, the Government should be required to identify its location.

charges, release on own recognizance, judge's statement considering cooperation at sentencing, and suspended and probationary sentences).

## VI.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this motion.

Respectfully submitted,

DATED:  March 15, 2019

Gary S. Lincenberg
Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By:     *s/ Naeun Rim*

Naeun Rim
Attorneys for Defendant Petr Pacas

DATED:  March 15, 2019

David W. Wiechert
Jessica C. Munk
William J. Migler
Law Office of David W. Wiechert

By:     *s/ David W. Wiechert*

David W. Wiechert
Attorneys for Defendant Jacob Bychak

1  DATED:  March 15, 2019          Randy K. Jones
                                   Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
2                                  P.C.

3

4                                  By:  _____
                                              s/ Randy K. Jones
5                                            Randy K. Jones
6                                  Attorney for Defendant Mark Manoogian

7
   DATED:  March 15, 2019          Whitney Z. Bernstein
8                                  Thomas H. Bienert, Jr.
                                   James Riddet
9                                  Bienert, Miller & Katzman, PLC

10

11

12                                 By:  _____
                                              s/ Whitney Z. Bernstein
13                                           Whitney Z. Bernstein
                                   Attorneys for Defendant Mohammed Abdul
14                                 Qayyum

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

# <u>CERTIFICATE OF AUTHORIZATION</u>
# <u>TO SIGN ELECTRONIC SIGNATURE</u>

3
4
5
6
7
8

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures of the United States District Court for the Southern District of California, I certify that the content of this document is acceptable to counsel for the Defendants and that I have obtained authorization from David W. Wiechert, Randy K. Jones, and Whitney Z. Bernstein to affix their electronic signatures to this document.

9
10

Respectfully submitted,

11
12
13

DATED:  March 15, 2019

Gary S. Lincenberg
Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

14
15
16

By:        *s/ Naeun Rim*
_____
Naeun Rim
Attorneys for Defendant Petr Pacas

17
18
19
20
21
22
23
24
25
26
27
28

## __CERTIFICATE OF SERVICE__

Counsel for Defendants certify that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

Sabrina L. Feve

Assistant U.S. Attorney

sabrina.feve@usdoj.gov


Melanie K. Pierson

Assistance U.S. Attorney

melanie.pierson@usdoj.gov


Robert Ciaffa

Assistant U.S. Attorney

robert.ciaffa@usdoj.gov

Respectfully submitted,

DATED:  March 15, 2019

Gary S. Lincenberg
Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:      *s/ Naeun Rim*
_____
Naeun Rim
Attorneys for Defendant Petr Pacas