# EXHIBIT RJN-A

# Congressional Record Daily Edition

Back to Document View Page (/congressional/result/congressional/pqpdocumentview?

accountid=139558&groupid=1084571)

## Title Info

**Title:**
CAN-SPAM ACT OF 2003

**Citation:**
149 Cong Rec S 13176

**Section:**
Senate

**Document Date:**
October 23, 2003

**Congress-Session:**
108- 1

**Reference Volume:**
**Vol.** 149 **No.** 150 **Pg.** S13176

**Permalink:**
https://congressional-proquest-
com.nyli.idm.oclc.org/congressional/docview/t17.d18.c4b763d80c000189?
accountid=139558 (https://congressional-proquest-
com.nyli.idm.oclc.org/congressional/docview/t17.d18.c4b763d80c000189?
accountid=139558)

## Full Text

Page 13176

On Wednesday, October 22, 2003, the Senate passed S. 877 (/profiles/gis/search/linking/linking?
doctype=Bill Tracking&subdoctype=null&pubdate=2003-04-
10&docid=billtracking/108_s_877&searchtype=doc&src=/app-gis/billtracking/108_s_877&exists=true),
as follows:

S. 877 (/profiles/gis/search/linking/linking?doctype=Bill Tracking&subdoctype=null&pubdate=2003-04-
10&docid=billtracking/108_s_877&searchtype=doc&src=/app-gis/billtracking/108_s_877&exists=true)
Be it enacted by the Senate and House of Representatives of the United States of America in Congress
assembled,

TITLE I-CONTROLLING THE ASSAULT OF NON-SOLICITED PORNOGRAPHY AND MARKETING ACT OF
2003
SEC. 101. SHORT TITLE.

This title may be cited as the "Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003", or the "CAN-SPAM Act of 2003".

SEC. 102. CONGRESSIONAL FINDINGS AND POLICY.

(a) Findings.-The Congress finds the following:

(1) Electronic mail has become an extremely important and popular means of communication, relied on by millions of Americans on a daily basis for personal and commercial purposes. Its low cost and global reach make it extremely convenient and efficient, and offer unique opportunities for the development and growth of frictionless commerce.

(2) The convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail. Unsolicited commercial electronic mail is currently estimated to account for over 45 percent of all electronic mail traffic, up from an estimated 7 percent in 2001, and the volume continues to rise. Most of these unsolicited commercial electronic mail messages are fraudulent or deceptive in one or more respects.

(3) The receipt of unsolicited commercial electronic mail may result in costs to recipients who cannot refuse to accept such mail and who incur costs for the storage of such mail, or for the time spent accessing, reviewing, and discarding such mail, or for both.

(4) The receipt of a large number of unsolicited messages also decreases the convenience of electronic mail and creates a risk

Page 13177

that wanted electronic mail messages, both commercial and noncommercial, will be lost, overlooked, or discarded amidst the larger volume of unwanted messages, thus reducing the reliability and usefulness of electronic mail to the recipient.

(5) Some unsolicited commercial electronic mail contains material that many recipients may consider vulgar or pornographic in nature.

(6) The growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions that carry and receive such mail, as there is a finite volume of mail that such providers, businesses, and institutions can handle without further investment in infrastructure.

(7) Many senders of unsolicited commercial electronic mail purposefully disguise the source of such mail.

(8) Many senders of unsolicited commercial electronic mail purposefully include misleading information in the message\'s subject lines in order to induce the recipients to view the messages.

(9) While some senders of unsolicited commercial electronic mail messages provide simple and reliable ways for recipients to reject (or "opt-out" of) receipt of unsolicited commercial electronic mail from such senders in the future, other senders provide no such "opt-out" mechanism, or refuse to honor the requests of recipients not to receive electronic mail from such senders in the future, or both.

(10) Many senders of bulk unsolicited commercial electronic mail use computer programs to gather large numbers of electronic mail addresses on an automated basis from Internet websites or online services where users must post their addresses in order to make full use of the website or service.

(11) Many States have enacted legislation intended to regulate or reduce unsolicited commercial electronic mail, but these statutes impose different standards and requirements. As a result, they do not appear to have been successful in addressing the problems associated with unsolicited commercial electronic mail, in part because, since an electronic mail address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply.

(12) The problems associated with the rapid growth and abuse of unsolicited commercial electronic mail cannot be solved by Federal legislation alone. The development and adoption of technological approaches and the pursuit of cooperative efforts with other countries will be necessary as well.

(b) Congressional Determination of Public Policy.-On the basis of the findings in subsection (a), the Congress determines that-

(1) there is a substantial government interest in regulation of unsolicited commercial electronic mail on a nationwide basis;

(2) senders of unsolicited commercial electronic mail should not mislead recipients as to the source or content of such mail; and

(3) recipients of unsolicited commercial electronic mail have a right to decline to receive additional unsolicited commercial electronic mail from the same source.

## SEC. 103. DEFINITIONS.

In this title:

(1) Affirmative consent.-The term "affirmative consent", when used with respect to a commercial electronic mail message, means that-

(A) the recipient expressly consented to receive the message, either in response to a clear and conspicuous request for such consent or at the recipient\'s own initiative; and

(B) if the message is from a party other than the party to which the recipient communicated such consent, the recipient was given clear and conspicuous notice at the time the consent was communicated that the recipient\'s electronic mail address could be transferred to such other party for the purpose of initiating commercial electronic mail messages.

(2) Commercial electronic mail message.-

(A) In general.-The term "commercial electronic mail message" means any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service (including content on an Internet website operated for a commercial purpose).

(B) Reference to company or website.-The inclusion of a reference to a commercial entity or a link to the website of a commercial entity in an electronic mail message does not, by itself, cause such message to be treated as a commercial electronic mail message for purposes of this title if the contents or circumstances of the message indicate a primary purpose other than commercial advertisement or promotion of a commercial product or service.

(3) Commission.-The term "Commission" means the Federal Trade Commission.

(4) Domain name.-The term "domain name" means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet.

(5) Electronic mail address.-The term "electronic mail address" means a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox (commonly referred to as the "local part") and a reference to an Internet domain (commonly referred to as the "domain part"), whether or not displayed, to which an electronic mail message can be sent or delivered.

(6) Electronic mail message.-The term "electronic mail message" means a message sent to a unique electronic mail address.

(7) FTC act.-The term "FTC Act" means the Federal Trade Commission Act (15 USCS § 41).

(8) Header information.-The term "header information" means the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message.

(9) Implied consent.-

(A) In general.-The term "implied consent", when used with respect to a commercial electronic mail message, means that-

(i) within the 3-year period ending upon receipt of such message, there has been a business transaction between the sender and the recipient (including a transaction involving the provision, free of charge, of information, goods, or services requested by the recipient); and

(ii) the recipient was, at the time of such transaction or thereafter in the first electronic mail message received from the sender after the effective date of this title, provided a clear and conspicuous notice of an opportunity not to receive unsolicited commercial electronic mail messages from the sender and has not exercised such opportunity.

(B) Mere visitation.-A visit by a recipient to a publicly available website shall not be treated as a transaction for purposes of subparagraph (A)(i) if the recipient did not knowingly submit the recipient\'s electronic mail address to the operator of the website.

(C) Separate lines of business or divisions.-If a sender operates through separate lines of business or divisions and holds itself out to the recipient, both at the time of the transaction described in subparagraph (A)(i) and at the time the notice under subparagraph (A)(ii) was provided to the recipient, as that particular line of business or division rather than as the entity of which such line of business or division is a part, then the line of business or the division shall be treated as the sender for purposes of this paragraph.

(10) Initiate.-The term "initiate", when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message. For purposes of this paragraph, more than 1 person may be considered to have initiated a message.

(11) Internet.-The term "Internet" has the meaning given that term in the Internet Tax Freedom Act (47 USCS § 151 nt).

(12) Internet access service.-The term "Internet access service" has the meaning given that term in section 231(e)(4) of the Communications Act of 1934 (47 USCS § 231).

(13) Procure.-The term "procure", when used with respect to the initiation of a commercial electronic mail message, means intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one\'s behalf, knowing, or consciously avoiding knowing, the extent to which that person intends to comply with the requirements of this title.

(14) Protected computer.-The term "protected computer" has the meaning given that term in 18 USCS § 1030.

(15) Recipient.-The term "recipient", when used with respect to a commercial electronic mail message, means an authorized user of the electronic mail address to which the message was sent or delivered. If a recipient of a commercial electronic mail message has 1 or more electronic mail addresses in addition to the address to which the message was sent or delivered, the recipient shall be treated as a separate recipient with respect to each such address. If an electronic mail address is reassigned to a new user, the new user shall not be treated as a recipient of any commercial electronic mail message sent or delivered to that address before it was reassigned.

(16) Routine conveyance.-The term "routine conveyance" means the transmission, routing, relaying, handling, or storing, through an automatic technical process, of an electronic mail message for which another person has identified the recipients or provided the recipient addresses.

(17) Sender.-The term "sender", when used with respect to a commercial electronic mail message, means a person who initiates such a message and whose product, service, or Internet web site is advertised or promoted by the message.

(18) Transactional or relationship message.-The term "transactional or relationship message" means an electronic mail message the primary purpose of which is-

(A) to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender;

(B) to provide warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient;

(C) to provide-

Page 13178

(i) notification concerning a change in the terms or features of;

(ii) notification of a change in the recipient\'s standing or status with respect to; or

(iii) at regular periodic intervals, account balance information or other type of account statement with respect to,

a subscription, membership, account, loan, or comparable ongoing commercial relationship involving the ongoing purchase or use by the recipient of products or services offered by the sender;

(D) to provide information directly related to an employment relationship or related benefit plan in which the recipient is currently involved, participating, or enrolled; or

(E) to deliver goods or services, including product updates or upgrades, that the recipient is entitled to receive under the terms of a transaction that the recipient has previously agreed to enter into with the sender.

(19) Unsolicited commercial electronic mail message.-The term "unsolicited commercial electronic mail message" means any commercial electronic mail message that-

(A) is not a transactional or relationship message; and

(B) is sent to a recipient without the recipient\'s prior affirmative or implied consent.

   SEC. 104. PROHIBITION AGAINST PREDATORY AND ABUSIVE COMMERCIAL E-MAIL.
(a) Offense.-

(1) In general.-Chapter 47 of title 18, United States Code, is amended by adding at the end the following new section:

"(a) In General.-Whoever, in or affecting interstate or foreign commerce, knowingly-

"(1) accesses a protected computer without authorization, and intentionally initiates the transmission of multiple commercial electronic mail messages from or through such computer,

"(2) uses a protected computer to relay or retransmit multiple commercial electronic mail messages, with the intent to deceive or mislead recipients, or any Internet access service, as to the origin of such messages,

"(3) falsifies header information in multiple commercial electronic mail messages and intentionally

initiates the transmission of such messages,

"(4) registers, using information that falsifies the identity of the actual registrant, for 5 or more electronic mail accounts or online user accounts or 2 or more domain names, and intentionally initiates the transmission of multiple commercial electronic mail messages from any combination of such accounts or domain names, or

"(5) falsely represents the right to use 5 or more Internet protocol addresses, and intentionally initiates the transmission of multiple commercial electronic mail messages from such addresses,

or conspires to do so, shall be punished as provided in subsection (b).

"(b) Penalties.-The punishment for an offense under subsection (a) is-

"(1) a fine under this title, imprisonment for not more than 5 years, or both, if-

"(A) the offense is committed in furtherance of any felony under the laws of the United States or of any State; or

"(B) the defendant has previously been convicted under this section or section 1030, or under the law of any State for conduct involving the transmission of multiple commercial electronic mail messages or unauthorized access to a computer system;

"(2) a fine under this title, imprisonment for not more than 3 years, or both, if-

"(A) the offense is an offense under subsection (a)(1);

"(B) the offense is an offense under subsection (a)(4) and involved 20 or more falsified electronic mail or online user account registrations, or 10 or more falsified domain name registrations;

"(C) the volume of electronic mail messages transmitted in furtherance of the offense exceeded 2,500 during any 24-hour period, 25,000 during any 30-day period, or 250,000 during any 1-year period;

"(D) the offense caused loss to 1 or more persons aggregating $5,000 or more in value during any 1-year period;

"(E) as a result of the offense any individual committing the offense obtained anything of value aggregating $5,000 or more during any 1-year period; or

"(F) the offense was undertaken by the defendant in concert with 3 or more other persons with respect to whom the defendant occupied a position of organizer or leader; and

"(3) a fine under this title or imprisonment for not more than 1 year, or both, in any other case.

"(c) Forfeiture.-

"(1) In general.-The court, in imposing sentence on a person who is convicted of an offense under this section, shall order that the defendant forfeit to the United States-

"(A) any property, real or personal, constituting or traceable to gross proceeds obtained from such offense; and

"(B) any equipment, software, or other technology used or intended to be used to commit or to facilitate the commission of such offense.

"(2) Procedures.-The procedures set forth in section 413 of the Controlled Substances Act (21 USCS § 853), other than subsection (d) of that section, and in Rule 32.2 of the Federal Rules of Criminal Procedure, shall apply to all stages of a criminal forfeiture proceeding under this section.

"(d) Definitions.-In this section:

"(1) Loss.-The term `loss\' has the meaning given that term in section 1030(e) of this title.

"(2) Multiple.-The term `multiple\' means more than 100 electronic mail messages during a 24-hour period, more than 1,000 electronic mail messages during a 30-day period, or more than 10,000 electronic mail messages during a 1-year period.

"(3) Other terms.-Any other term has the meaning given that term by section 3 of the CAN-SPAM Act of 2003.".

(2) Conforming amendment.-The chapter analysis for chapter 47 of title 18, United States Code, is amended by adding at the end the following:

"Sec.

"1037. Fraud and related activity in connection with electronic mail.".

(b) United States Sentencing Commission.-

(1) Directive.-Pursuant to its authority under 28 USCS § 994, and in accordance with this section, the United States Sentencing Commission shall review and, as appropriate, amend the sentencing guidelines and policy statements to provide appropriate penalties for violations of 18 USCS § 1037, as added by this section, and other offenses that may be facilitated by the sending of large quantities of unsolicited electronic mail.

(2) Requirements.-In carrying out this subsection, the Sentencing Commission shall consider providing sentencing enhancements for-

(A) those convicted under 18 USCS § 1037, who-

(i) obtained electronic mail addresses through improper means, including-

(I) harvesting electronic mail addresses of the users of a website, proprietary service, or other online public forum operated by another person, without the authorization of such person; and

(II) randomly generating electronic mail addresses by computer; or

(ii) knew that the commercial electronic mail messages involved in the offense contained or advertised an Internet domain for which the registrant of the domain had provided false registration information; and

(B) those convicted of other offenses, including offenses involving fraud, identity theft, obscenity, child pornography, and the sexual exploitation of children, if such offenses involved the sending of large quantities of unsolicited electronic mail.

(c) Sense of Congress.-It is the sense of Congress that-

(1) Spam has become the method of choice for those who distribute pornography, perpetrate fraudulent schemes, and introduce viruses, worms, and Trojan horses into personal and business computer systems; and

(2) the Department of Justice should use all existing law enforcement tools to investigate and prosecute those who send bulk commercial e-mail to facilitate the commission of Federal crimes, including the tools contained in chapters 18 USCS § 47 and 18 USCS § 63 (relating to fraud and false statements); chapter 71 of title 18, United States Code (relating to obscenity); chapter 110 of title 18, United States Code (relating to the sexual exploitation of children); and chapter 95 of title 18, United States Code (relating to racketeering), as appropriate.

SEC. 105. OTHER PROTECTIONS FOR USERS OF COMMERCIAL ELECTRONIC MAIL.
(a) Requirements for Transmission of Messages.-

(1) Prohibition of false or misleading transmission information.-It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message that contains, or is accompanied by, header information that is materially false or materially misleading. For purposes of this paragraph-

(A) header information that is technically accurate but includes an originating electronic mail address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading;

(B) a "from" line that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading; and

(C) if header information attached to a message fails to identify a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin, then such header information shall be considered materially misleading.

(2) Prohibition of deceptive subject headings.-It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message with a subject heading that such person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message.

(3) Inclusion of return address or comparable mechanism in commercial electronic mail.-

(A) In general.-It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message that does not contain a functioning return electronic mail address or

Page 13179

other Internet-based mechanism, clearly and conspicuously displayed, that-

(i) a recipient may use to submit, in a manner specified in the message, a reply electronic mail message or other form of Internet-based communication requesting not to receive future commercial electronic mail messages from that sender at the electronic mail address where the message was received; and

(ii) remains capable of receiving such messages or communications for no less than 30 days after the transmission of the original message.

(B) More detailed options possible.-The person initiating a commercial electronic mail message may comply with subparagraph (A)(i) by providing the recipient a list or menu from which the recipient may choose the specific types of commercial electronic mail messages the recipient wants to receive or does not want to receive from the sender, if the list or menu includes an option under which the recipient may choose not to receive any unsolicited commercial electronic mail messages from the sender.

(C) Temporary inability to receive messages or process requests.-A return electronic mail address or other mechanism does not fail to satisfy the requirements of subparagraph (A) if it is unexpectedly and temporarily unable to receive messages or process requests due to technical or capacity problems, if the technical or capacity problems were not reasonably foreseeable in light of the potential volume of response messages or requests, and if the problem with receiving messages or processing requests is corrected within a reasonable time period.

(D) Exception.-The requirements of this paragraph shall not apply to a message that is a transactional or relationship message.

(4) Prohibition of transmission of unsolicited commercial electronic mail after objection.-If a recipient makes a request using a mechanism provided pursuant to paragraph (3) not to receive some or any unsolicited commercial electronic mail messages from such sender, then it is unlawful-

(A) for the sender to initiate the transmission to the recipient, more than 10 business days after the receipt of such request, of an unsolicited commercial electronic mail message that falls within the scope of the request;

(B) for any person acting on behalf of the sender to initiate the transmission to the recipient, more than 10 business days after the receipt of such request, of an unsolicited commercial electronic mail message that such person knows or consciously avoids knowing falls within the scope of the request;

(C) for any person acting on behalf of the sender to assist in initiating the transmission to the recipient, through the provision or selection of addresses to which the message will be sent, of an unsolicited commercial electronic mail message that the person knows, or consciously avoids knowing, would violate subparagraph (A) or (B); or

(D) for the sender, or any other person who knows that the recipient has made such a request, to sell, lease, exchange, or otherwise transfer or release the electronic mail address of the recipient (including through any transaction or other transfer involving mailing lists bearing the electronic mail address of the recipient) for any purpose other than compliance with this title or other provision of law.

(5) Inclusion of identifier, opt-out, and physical address in unsolicited commercial electronic mail.-It is unlawful for any person to initiate the transmission of any unsolicited commercial electronic mail message to a protected computer unless the message provides-

(A) clear and conspicuous identification that the message is an advertisement or solicitation;

(B) clear and conspicuous notice of the opportunity under paragraph (3) to decline to receive further unsolicited commercial electronic mail messages from the sender; and

(C) a valid physical postal address of the sender.

(6) Materiality defined.-For purposes of paragraph (1), an inaccuracy or omission in header information is material if it would materially impede the ability of a party seeking to allege a violation of this title to locate the person who initiated the message or to investigate the alleged violation.

(b) Aggravated Violations Relating to Unsolicited Commercial Electronic Mail.-

(1) Address harvesting and dictionary attacks.-

(A) In general.-It is unlawful for any person to initiate the transmission, to a protected computer, of an unsolicited commercial electronic mail message that is unlawful under subsection (a), or to assist in the origination of such message through the provision or selection of addresses to which the message will be transmitted, if such person knows, should have known, or consciously avoids knowing that-

(i) the electronic mail address of the recipient was obtained using an automated means from an Internet website or proprietary online service operated by another person, and such website or online service included, at the time the address was obtained, a notice stating that the operator of such website or online service will not give, sell, or otherwise transfer addresses maintained by such website or online service to any other party for the purposes of initiating, or enabling others to initiate, unsolicited electronic mail messages; or

(ii) the electronic mail address of the recipient was obtained using an automated means that generates possible electronic mail addresses by combining names, letters, or numbers into numerous permutations.

(B) Disclaimer.-Nothing in this paragraph creates an ownership or proprietary interest in such electronic mail addresses.

(2) Automated creation of multiple electronic mail accounts.-It is unlawful for any person to use scripts or other automated means to register for multiple electronic mail accounts or online user accounts from which to transmit to a protected computer, or enable another person to transmit to a protected computer, an unsolicited commercial electronic mail message that is unlawful under subsection (a).

(3) Relay or retransmission through unauthorized access.-It is unlawful for any person knowingly to relay or retransmit an unsolicited commercial electronic mail message that is unlawful under subsection (a) from a protected computer or computer network that such person has accessed without authorization.

(c) Compliance Procedures.-An action for violation of paragraph (2), (3), (4), or (5) of subsection (a) may not proceed if the person against whom the action is brought demonstrates that -

(1) the person has established and implemented, with due care, reasonable practices and procedures to effectively prevent violations of such paragraph; and

(2) the violation occurred despite good faith efforts to maintain compliance with such practices and procedures.

(d) Supplementary Rulemaking Authority.-The Commission may by rule-

(1) modify the 10-business-day period under subsection (a)(4)(A) or subsection (a)(4)(B), or both, if the Commission determines that a different period would be more reasonable after taking into account-

(A) the purposes of subsection (a);

(B) the interests of recipients of commercial electronic mail; and

(C) the burdens imposed on senders of lawful commercial electronic mail; and

(2) specify additional activities or practices to which subsection (b) applies if the Commission determines that those activities or practices are contributing substantially to the proliferation of commercial electronic mail messages that are unlawful under subsection (a).

(e) Requirement To Place Warning Labels on Commercial Electronic Mail Containing Sexually Oriented Material.-

(1) In general.-No person may initiate in or affecting interstate commerce the transmission, to a protected computer, of any unsolicited commercial electronic mail message that includes sexually oriented material and-

(A) fail to include in subject heading for the electronic mail message the marks or notices prescribed by the Commission under this subsection; or

(B) fail to provide that the matter in the message that is initially viewable to the recipient, when the message is opened by any recipient and absent any further actions by the recipient, includes only-

(i) to the extent required or authorized pursuant to paragraph (2), any such marks or notices;

(ii) the information required to be included in the message pursuant to subsection (a)(5); and

(iii) instructions on how to access, or a mechanism to access, the sexually oriented material.

(2) Prescription of marks and notices.-Not later than 120 days after the date of the enactment of this title, the Commission in consultation with the Attorney General shall prescribe clearly identifiable marks or notices to be included in or associated with unsolicited commercial electronic mail that contains sexually oriented material, in order to inform the recipient of that fact and to facilitate filtering of such electronic mail. The Commission shall publish in the Federal Register and provide notice to the public of the marks or notices prescribed under this paragraph.

(3) Definition.-In this subsection, the term "sexually oriented material" means any material that depicts sexually explicit conduct (as that term is defined in 18 USCS § 2256), unless the depiction constitutes a small and insignificant part of the whole, the remainder of which is not primarily devoted to sexual matters.

(4) Penalty.-A violation of paragraph (1) is punishable as if it were a violation of 18 USCS § 1037.

SEC. 106. BUSINESSES KNOWINGLY PROMOTED BY ELECTRONIC MAIL WITH FALSE OR MISLEADING TRANSMISSION INFORMATION.

(a) In General.-It is unlawful for a person to promote, or allow the promotion of, that person\'s trade or business, or goods, products, property, or services sold, offered for sale, leased or offered for lease, or otherwise made available through that trade or business, in a commercial electronic mail message the transmission of which is in violation of section 105(a)(1) if that person-

(1) knows, or should have known in ordinary course of that person\'s trade or business, that the goods, products, property, or services sold, offered for sale, leased or offered for lease, or otherwise made available through that trade or business were being promoted in such a message;

Page 13180

(2) received or expected to receive an economic benefit from such promotion; and

(3) took no reasonable action-

(A) to prevent the transmission; or

(B) to detect the transmission and report it to the Commission.

(b) Limited Enforcement Against Third Parties.-

(1) In general.-Except as provided in paragraph (2), a person (hereinafter referred to as the "third party") that provides goods, products, property, or services to another person that violates subsection (a) shall not be held liable for such violation.

(2) Exception.-Liability for a violation of subsection (a) shall be imputed to a third party that provides goods, products, property, or services to another person that violates subsection (a) if that third party-

(A) owns, or has a greater than 50 percent ownership or economic interest in, the trade or business of the person that violated subsection (a); or

(B)(i) has actual knowledge that goods, products, property, or services are promoted in a commercial electronic mail message the transmission of which is in violation of section 105(a)(1); and

(ii) receives, or expects to receive, an economic benefit from such promotion.

(c) Exclusive Enforcement by FTC.-Subsections (e) and (f) of section 107 do not apply to violations of this section.

SEC. 107. ENFORCEMENT BY FEDERAL TRADE COMMISSION.

(a) Violation Is Unfair or Deceptive Act or Practice.-Except as provided in subsection (b), this title shall be enforced by the Commission as if the violation of this title were an unfair or deceptive act or practice proscribed under section 18(a)(1)(B) of the Federal Trade Commission Act (15 USCS § 57a(a)(1)(B)).

(b) Enforcement by Certain Other Agencies.-Compliance with this title shall be enforced-

(1) under section 8 of the Federal Deposit Insurance Act (12 USCS § 1818), in the case of-

(A) national banks, and Federal branches and Federal agencies of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers), by the Office of the Comptroller of the Currency;

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, organizations operating under section 25 or 25A of the Federal Reserve Act (12 USCS § 601 and 12 USCS § 611), and bank holding companies and their nonbank subsidiaries or affiliates (except brokers, dealers, persons providing insurance, investment companies, and investment advisers), by the Board;

(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System) insured State branches of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers), by the Board of Directors of the Federal Deposit Insurance Corporation; and

(D) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, and any subsidiaries of such savings associations (except brokers, dealers, persons providing insurance, investment companies, and investment advisers), by the Director of the Office of Thrift Supervision;

(2) under the Federal Credit Union Act (12 USCS § 1751) by the Board of the National Credit Union Administration with respect to any Federally insured credit union, and any subsidiaries of such a credit union;

(3) under the Securities Exchange Act of 1934 (15 USCS § 78a) by the Securities and Exchange Commission with respect to any broker or dealer;

(4) under the Investment Company Act of 1940 (15 USCS § 80a-1) by the Securities and Exchange Commission with respect to investment companies;

(5) under the Investment Advisers Act of 1940 (15 USCS § 80b-1) by the Securities and Exchange Commission with respect to investment advisers registered under that Act;

(6) under State insurance law in the case of any person engaged in providing insurance, by the applicable State insurance authority of the State in which the person is domiciled, subject to section 104 of the Gramm-Bliley-Leach Act (15 USCS § 6701);

(7) under part A of subtitle VII of title 49, United States Code, by the Secretary of Transportation with respect to any air carrier or foreign air carrier subject to that part;

(8) under the Packers and Stockyards Act, 1921 (7 USCS § 181) (except as provided in section 406 of that Act (7 USCS § 226, 7 USCS § 227)), by the Secretary of Agriculture with respect to any activities subject to that Act;

(9) under the Farm Credit Act of 1971 (12 USCS § 2001) by the Farm Credit Administration with respect to any Federal land bank, Federal land bank association, Federal intermediate credit bank, or production credit association; and

(10) under the Communications Act of 1934 (47 USCS § 151) by the Federal Communications Commission with respect to any person subject to the provisions of that Act.

(c) Exercise of Certain Powers.-For the purpose of the exercise by any agency referred to in subsection (b) of its powers under any Act referred to in that subsection, a violation of this title is deemed to be a violation of a Federal Trade Commission trade regulation rule. In addition to its powers under any provision of law specifically referred to in subsection (b), each of the agencies referred to in that subsection may exercise, for the purpose of enforcing compliance with any requirement imposed under this title, any other authority conferred on it by law.

(d) Actions by the Commission.-The Commission shall prevent any person from violating this title in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 USCS § 41) were incorporated into and made a part of this title. Any entity that violates any provision of that subtitle is subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act in the same manner, by the same means, and with the same jurisdiction, power, and duties as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated into and made a part of that subtitle.

(e) Enforcement by States.-

(1) Civil action.-In any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person engaging in a practice that violates section 105 of this title, the State, as parens patriae, may bring a civil action on behalf of the residents of the State in a district court of the United States of appropriate jurisdiction-

(A) to enjoin further violation of section 105 of this title by the defendant; or

(B) to obtain damages on behalf of residents of the State, in an amount equal to the greater of-

(i) the actual monetary loss suffered by such residents; or

(ii) the amount determined under paragraph (2).

(2) Statutory damages.-

(A) In general.-For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message received by or addressed to such residents treated as a separate violation) by-

(i) up to $100, in the case of a violation of section 105(a)(1); or

(ii) $25, in the case of any other violation of section 105.

(B) Limitation.-For any violation of section 105 (other than section 105(a)(1)), the amount determined under subparagraph (A) may not exceed $1,000,000.

(C) Aggravated damages.-The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if-

(i) the court determines that the defendant committed the violation willfully and knowingly; or

(ii) the defendant\'s unlawful activity included one or more of the aggravating violations set forth in section 105(b).

(3) Attorney fees.-In the case of any successful action under paragraph (1), the State shall be awarded the costs of the action and reasonable attorney fees as determined by the court.

(4) Rights of federal regulators.-The State shall serve prior written notice of any action under paragraph (1) upon the Federal Trade Commission or the appropriate Federal regulator determined under subsection (b) and provide the Commission or appropriate Federal regulator with a copy of its complaint, except in any case in which such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Federal Trade Commission or appropriate Federal regulator shall have the right-

(A) to intervene in the action;

(B) upon so intervening, to be heard on all matters arising therein;

(C) to remove the action to the appropriate United States district court; and

(D) to file petitions for appeal.

(5) Construction.-For purposes of bringing any civil action under paragraph (1), nothing in this title shall be construed to prevent an attorney general of a State from exercising the powers conferred on the attorney general by the laws of that State to-

(A) conduct investigations;

(B) administer oaths or affirmations; or

(C) compel the attendance of witnesses or the production of documentary and other evidence.

(6) Venue; service of process.-

(A) Venue.-Any action brought under paragraph (1) may be brought in the district court of the United States that meets applicable requirements relating to venue under 28 USCS § 1391.

(B) Service of process.-In an action brought under paragraph (1), process may be served in any district in which the defendant-

(i) is an inhabitant; or

(ii) maintains a physical place of business.

(7) Limitation on state action while federal action is pending.-If the Commission or other appropriate Federal agency under subsection (b) has instituted a civil action or an administrative action for violation of this

Page 13181

title, no State attorney general may bring an action under this subsection during the pendency of that action against any defendant named in the complaint of the Commission or the other agency for any violation of this title alleged in the complaint.

(f) Action by Provider of Internet Access Service.-

(1) Action authorized.-A provider of Internet access service adversely affected by a violation of section 105 may bring a civil action in any district court of the United States with jurisdiction over the defendant-

(A) enjoin further violation by the defendant; or

(B) recover damages in an amount equal to the greater of-

(i) actual monetary loss incurred by the provider of Internet access service as a result of such violation; or

(ii) the amount determined under paragraph (2).

(2) Statutory damages.-

(A) In general.-For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message that is transmitted or attempted to be transmitted over the facilities of the provider of Internet access service, or that is transmitted or attempted to be transmitted to an electronic mail address obtained from the provider of Internet access service in violation of section 105(b)(1)(A)(i), treated as a separate violation) by-

(i) up to $100, in the case of a violation of section 105(a)(1); or

(ii) $25, in the case of any other violation of section 105.

(B) Limitation.-For any violation of section 105 (other than section 105(a)(1)), the amount determined under subparagraph (A) may not exceed $1,000,000.

(C) Aggravated damages.-The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if-

(i) the court determines that the defendant committed the violation willfully and knowingly; or

(ii) the defendant\'s unlawful activity included one or more of the aggravated violations set forth in section 105(b).

(3) Attorney fees.-In any action brought pursuant to paragraph (1), the court may, in its discretion, require an undertaking for the payment of the costs of such action, and assess reasonable costs, including reasonable attorneys\' fees, against any party.

## SEC. 108. EFFECT ON OTHER LAWS.

(a) Federal Law.-

(1) Nothing in this title shall be construed to impair the enforcement of section 223 or 231 of the Communications Act of 1934 (47 USCS § 223 or 47 USCS § 231, respectively), chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, United States Code, or any other Federal criminal statute.

(2) Nothing in this title shall be construed to affect in any way the Commission\'s authority to bring enforcement actions under FTC Act for materially false or deceptive representations or unfair practices in commercial electronic mail messages.

(b) State Law.-

(1) In general.-This title supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.

(2) State law not specific to electronic mail.-This title shall not be construed to preempt the applicability of State laws that are not specific to electronic mail, including State trespass, contract, or tort law, and other State laws to the extent that those laws relate to acts of fraud or computer crime.

(c) No Effect on Policies of Providers of Internet Access Service.-Nothing in this title shall be construed to have any effect on the lawfulness or unlawfulness, under any other provision of law, of the adoption, implementation, or enforcement by a provider of Internet access service of a policy of declining to transmit, route, relay, handle, or store certain types of electronic mail messages.

## SEC. 109. DO-NOT-E-MAIL REGISTRY.

(a) In General.-Not later than 6 months after the date of enactment of this title, the Commission shall transmit to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Energy and Commerce a report that-

(1) sets forth a plan and timetable for establishing a nationwide marketing Do-Not-E-mail registry;

(2) includes an explanation of any practical, technical, security, privacy, enforceability, or other concerns that the Commission has regarding such a registry; and

(3) includes an explanation of how the registry would be applied with respect to children with e-mail accounts.

(b) Authorization To Implement.-The Commission may establish and implement the plan, but not earlier than 9 months after the date of enactment of this title.

SEC. 110. STUDY OF EFFECTS OF UNSOLICITED COMMERCIAL ELECTRONIC MAIL.

(a) In General.-Not later than 24 months after the date of the enactment of this title, the Commission, in consultation with the Department of Justice and other appropriate agencies, shall submit a report to the Congress that provides a detailed analysis of the effectiveness and enforcement of the provisions of this title and the need (if any) for the Congress to modify such provisions.

(b) Required Analysis.-The Commission shall include in the report required by subsection (a)-

(1) an analysis of the extent to which technological and marketplace developments, including changes in the nature of the devices through which consumers access their electronic mail messages, may affect the practicality and effectiveness of the provisions of this title;

(2) analysis and recommendations concerning how to address unsolicited commercial electronic mail that originates in or is transmitted through or to facilities or computers in other nations, including initiatives or policy positions that the Federal government could pursue through international negotiations, fora, organizations, or institutions; and

(3) analysis and recommendations concerning options for protecting consumers, including children, from the receipt and viewing of unsolicited commercial electronic mail that is obscene or pornographic.

SEC. 111. IMPROVING ENFORCEMENT BY PROVIDING REWARDS FOR INFORMATION ABOUT VIOLATIONS; LABELING.

(a) In General.-The Commission shall transmit to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Energy and Commerce-

(1) a report, within 9 months after the date of enactment of this title, that sets forth a system for rewarding those who supply information about violations of this title, including-

(A) procedures for the Commission to grant a reward of not less than 20 percent of the total civil penalty collected for a violation of this title to the first person that-

(i) identifies the person in violation of this title; and

(ii) supplies information that leads to the successful collection of a civil penalty by the Commission; and

(B) procedures to minimize the burden of submitting a complaint to the Commission concerning violations of this title, including procedures to allow the electronic submission of complaints to the Commission; and

(2) a report, within 18 months after the date of enactment of this title, that sets forth a plan for requiring unsolicited commercial electronic mail to be identifiable from its subject line, by means of compliance with Internet Engineering Task Force Standards, the use of the characters "ADV" in the subject line, or other comparable identifier, or an explanation of any concerns the Commission has that cause the Commission to recommend against the plan.

(b) Implementation of Reward System.-The Commission may establish and implement the plan under subsection (a)(1), but not earlier than 12 months after the date of enactment of this title.

SEC. 112. SEPARABILITY.

If any provision of this title or the application thereof to any person or circumstance is held invalid, the remainder of this title and the application of such provision to other persons or circumstances shall not be affected.

SEC. 113. EFFECTIVE DATE.

The provisions of this title other than section 109, shall take effect 120 days after the date of the enactment of this title.

TITLE II-REALTIME WRITERS ACT
SEC. 201. SHORT TITLE.

This title may be cited as the "Training for Realtime Writers Act of 2003".

SEC. 202. FINDINGS.

Congress makes the following findings:

(1) As directed by Congress in section 723 of the Communications Act of 1934 (47 USCS § 613), as added by section 305 of the Telecommunications Act of 1996 (P.L. 104-104; 110 Stat. 126), the Federal Communications Commission adopted rules requiring closed captioning of most television programming, which gradually require new video programming to be fully captioned beginning in 2006.

(2) More than 28,000,000 Americans, or 8 percent of the population, are considered deaf or hard of hearing, and many require captioning services to participate in mainstream activities.

(3) More than 24,000 children are born in the United States each year with some form of hearing loss.

(4) According to the Department of Health and Human Services and a study done by the National Council on Aging-

(A) 25 percent of Americans over 65 years old are hearing impaired;

(B) 33 percent of Americans over 70 years old are hearing impaired; and

(C) 41 percent of Americans over 75 years old are hearing impaired.

(5) The National Council on Aging study also found that depression in older adults may be directly related to hearing loss and disconnection with the spoken word.

(6) Empirical research demonstrates that captions improve the performance of individuals learning to read English and, according to numerous Federal agency statistics, could benefit-

(A) 3,700,000 remedial readers;

(B) 12,000,000 young children learning to read;

Page 13182

(C) 27,000,000 illiterate adults; and

(D) 30,000,000 people for whom English is a second language.

(7) Over the past 5 years, student enrollment in programs that train court reporters to become realtime writers has decreased significantly, causing such programs to close on many campuses.

SEC. 203. AUTHORIZATION OF GRANT PROGRAM TO PROMOTE TRAINING AND JOB PLACEMENT OF REALTIME WRITERS.

(a) In General.-The National Telecommunications and Information Administration shall make competitive grants to eligible entities under subsection (b) to promote training and placement of individuals, including individuals who have completed a court reporting training program, as realtime writers in order to meet the requirements for closed captioning of video programming set forth in section 723 of the Communications Act of 1934 (47 USCS § 613) and the rules prescribed thereunder.

(b) Eligible Entities.-For purposes of this title, an eligible entity is a court reporting program that-

(1) can document and demonstrate to the Secretary of Commerce that it meets minimum standards of educational and financial accountability, with a curriculum capable of training realtime writers qualified to provide captioning services;

(2) is accredited by an accrediting agency recognized by the Department of Education; and

(3) is participating in student aid programs under title IV of the Higher Education Act of 1965.

(c) Priority in Grants.-In determining whether to make grants under this section, the Secretary of Commerce shall give a priority to eligible entities that, as determined by the Secretary of Commerce-

(1) possess the most substantial capability to increase their capacity to train realtime writers;

(2) demonstrate the most promising collaboration with local educational institutions, businesses, labor organizations, or other community groups having the potential to train or provide job placement assistance to realtime writers; or

(3) propose the most promising and innovative approaches for initiating or expanding training and job placement assistance efforts with respect to realtime writers.

(d) Duration of Grant.-A grant under this section shall be for a period of two years.

(e) Maximum Amount of Grant.-The amount of a grant provided under subsection (a) to an entity eligible may not exceed $1,500,000 for the two-year period of the grant under subsection (d).

## SEC. 204. APPLICATION.

(a) In General.-To receive a grant under section 203, an eligible entity shall submit an application to the National Telecommunications and Information Administration at such time and in such manner as the Administration may require. The application shall contain the information set forth under subsection (b).

(b) Information.-Information in the application of an eligible entity under subsection (a) for a grant under section 203 shall include the following:

(1) A description of the training and assistance to be funded using the grant amount, including how such training and assistance will increase the number of realtime writers.

(2) A description of performance measures to be utilized to evaluate the progress of individuals receiving such training and assistance in matters relating to enrollment, completion of training, and job placement and retention.

(3) A description of the manner in which the eligible entity will ensure that recipients of scholarships, if any, funded by the grant will be employed and retained as realtime writers.

(4) A description of the manner in which the eligible entity intends to continue providing the training and assistance to be funded by the grant after the end of the grant period, including any partnerships or arrangements established for that purpose.

(5) A description of how the eligible entity will work with local workforce investment boards to ensure that training and assistance to be funded with the grant will further local workforce goals, including the creation of educational opportunities for individuals who are from economically disadvantaged backgrounds or are displaced workers.

(6) Additional information, if any, of the eligibility of the eligible entity for priority in the making of grants under section 203(c).

(7) Such other information as the Administration may require.

## SEC. 205. USE OF FUNDS.

(a) In General.-An eligible entity receiving a grant under section 203 shall use the grant amount for purposes relating to the recruitment, training and assistance, and job placement of individuals, including individuals who have completed a court reporting training program, as realtime writers, including-

(1) recruitment;

(2) subject to subsection (b), the provision of scholarships;

(3) distance learning;

(4) development of curriculum to more effectively train realtime writing skills, and education in the knowledge necessary for the delivery of high-quality closed captioning services;

(5) assistance in job placement for upcoming and recent graduates with all types of captioning employers;

(6) encouragement of individuals with disabilities to pursue a career in realtime writing; and

(7) the employment and payment of personnel for such purposes.

(b) Scholarships.-

(1) Amount.-The amount of a scholarship under subsection (a)(2) shall be based on the amount of need of the recipient of the scholarship for financial assistance, as determined in accordance with part F of title IV of the Higher Education Act of 1965 (20 USCS § 1087kk).

(2) Agreement.-Each recipient of a scholarship under subsection (a)(2) shall enter into an agreement with the National Telecommunications and Information Administration to provide realtime writing services for a period of time (as determined by the Administration) that is appropriate (as so determined) for the amount of the scholarship received.

(3) Coursework and employment.-The Administration shall establish requirements for coursework and employment for recipients of scholarships under subsection (a)(2), including requirements for repayment of scholarship amounts in the event of failure to meet such requirements for coursework and employment. Requirements for repayment of scholarship amounts shall take into account the effect of economic conditions on the capacity of scholarship recipients to find work as realtime writers.

(c) Administrative Costs.-The recipient of a grant under section 203 may not use more than 5 percent of the grant amount to pay administrative costs associated with activities funded by the grant.

(d) Supplement Not Supplant.-Grants amounts under this title shall supplement and not supplant other Federal or non-Federal funds of the grant recipient for purposes of promoting the training and placement of individuals as realtime writers

SEC. 206. REPORTS.
(a) Annual Reports.-Each eligible entity receiving a grant under section 203 shall submit to the National Telecommunications and Information Administration, at the end of each year of the grant period, a report on the activities of such entity with respect to the use of grant amounts during such year.

(b) Report Information.-

(1) In general.-Each report of an entity for a year under subsection (a) shall include a description of the use of grant amounts by the entity during such year, including an assessment by the entity of the effectiveness of activities carried out using such funds in increasing the number of realtime writers. The assessment shall utilize the performance measures submitted by the entity in the application for the grant under section 204(b).

(2) Final report.-The final report of an entity on a grant under subsection (a) shall include a description of the best practices identified by the entity as a result of the grant for increasing the number of individuals who are trained, employed, and retained in employment as realtime writers.

SEC. 207. AUTHORIZATION OF APPROPRIATIONS.
There is authorized to be appropriated to carry out this title, amounts as follows:

(1) $20,000,000 for each of fiscal years 2004, 2005, and 2006.

(2) Such sums as may be necessary for fiscal year 2007.

## Copyright

ProQuest Copyright © 2003 All Rights Reserved.