UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 18-CR-4683-GPC |
|---|---|
| Plaintiff, | Hon. Gonzalo P. Curiel |
| v. | **DECLARATION OF MARC A. LINDSEY** |
| JACOB BYCHAK, MARK MANOOGIAN, MOHAMMED ABDUL QAYYUM, and PETR PACAS, | |
| Defendants. | |

**DECLARATION OF MARC A. LINDSEY**

1. My name is Marc A. Lindsey, I am over the age of 21 years and I have personal knowledge of the matters set forth herein, or have familiarized myself with the following matters from the Declaration of John Curran ("Curran's Declaration") in support of the Government's Response in Opposition to Defendants' Motion to Dismiss Counts 6-10 and Count 1 ("Government's Opposition").

2. I am president of Avenue4 LLC ("Avenue4"). I co-founded Avenue4 in 2014, and have served as its president from Avenue4's founding. Avenue4 is an IPv4 market advisor. Prior to founding Avenue4, I led the IPv4 practice at Levine, Blaszak, Block & Boothby, LLP ("LB3"). The IPv4 practice at LB3 began in 2008. LB3 is a technology law firm located in Washington, D.C. In my role at Avenue4 and LB3, I have advised numerous holders of legacy IPv4 address space (as defined in Paragraph 9 below) in connection with managing their registration records with ARIN, and participating in the IPv4 market. My clients have included both legacy address holders (including entities with legacy /8 blocks, which are the largest allocated blocks, consisting of 16,777,216 numbers) and non-legacy address holders.

3. Curran's Declaration emphasizes the importance of accurate Internet Protocol number resource registries, but it does not address several key factors regarding the limits and inaccuracies of the publicly available database listing the previously assigned or allocated Internet Protocol ("IP") numbers resource (the Whois database) maintained by the American Registry for Internet Numbers ("ARIN"), and the nature of the rights held by legacy address holders that have elected to not enter into a legacy registration services agreement ("LRSA") or regular registration service agreement ("RSA") with ARIN. These factors reveal that legacy address holders are not part of the Regional Internet Registry ("RIR") system and inaccuracies and outdated legacy address holder listing information in ARIN's Whois database are not uncommon—which means the Whois database is not dispositive with respect to identifying who owns, controls or has the right to use legacy address space.

4. At the core of the Defendants' Motion To Dismiss and the Government's Opposition is the question of whether legacy address holders (entities given IP address space prior to ARIN's existence) are "registrants" under the CAN-SPAM Act where the legacy holder has taken no affirmative action or election to register with ARIN merely because ARIN retained the legacy address information in the number allocation and assignment listing database ARIN received from InterNIC, its predecessor, when ARIN was formed in 1997 to allocate IP number from the remaining IP number free pool.

**Legacy Address Space Allocations and Historic Record Keeping**

5. Prior to 1993 after the ARPANET (the U.S. Defense Department's Advanced Research Projects Agency Network) and NSFNET (the National Science Foundation's education and research network) were interconnected, the responsibility for assigning unique IP addresses and then keeping track of them for the interconnected network assignments fell to Jon Postel, at first informally and then formally as Director of the Internet Assigned Numbers Authority ("IANA") operated by SRI International under a contract with the National Science Foundation.

6. In 1993, as the Internet continued to grow, the National Science Foundation initiated a competitive process to identify a contractor to take over the database, directory and listing services (i.e., maintaining the lists of prior IP numbers allocations and assignments, and domain

name registrations) and technical coordination functions necessary to administer and manage the Internet's growth.  The InterNIC contract was awarded to Network Solutions, Inc. and AT&T Corp.  IP number and domain name assignments, allocations and record keeping then fell to Network Solutions, Inc.

7. To obtain address space from IANA or InterNIC, the requesting organization needed only to issue a written request using a short form text template identifying the organization.  If the request was approved, these early recipients received a notice identifying the address space.  The notice did not include, incorporate or reference any registration agreement, membership contract or other form of contract terms and conditions.   These early recipients of IP address space were encouraged to follow then-current industry best practices and community standards for network operators on the internet, but there were no binding contractual registration agreements between allocating / assigning organization(s) and the early address recipients at the time their legacy address space was given to them.  [See, e.g., Milton Mueller, *et al.*, *Dimensioning the Elephant: An Empirical Analyses of the IPv4 Number Market*, at 2 (2012), available at https://www.internetgovernance.org/wp-content/uploads/IPv4marketTPRC20122.pdf (last visited August 19, 2019); and Benjamin Shantz, *Determining Ownership and Control of IPv4 Addresses*, Washington University Law Journal (2017), Vol. 94, Issue 3, 742–744 (2017)].

8. The legacy address allocation and assignment directory listings were maintained by IANA and InterNIC, respectively, for the benefit of the community to (i) help ensure that no single address was allocated to, or used by, more than one network, and (ii) provide a publicly available listing of contact information of the Internet's network operators.  The publicly available directories that started with IANA, was handed to InterNIC, and then taken over by the RIRs is what the Internet community now refers to as the Whois database for IP numbers.

9. As the internet continued to grow rapidly in the 1990s, various Internet governance stakeholders successfully advocated to geographically distribute the allocation/assignment and management of IP address space into Regional Internet Registries (RIRs).  Over time, the central IP number allocation and assignment functions performed initially by IANA, then by InterNIC, were distributed to the RIRs in phases.  [See *The Internet Registry System*, https://www.ripe.net/participate/internet-governance/internet-technical-community/the-rir-system (last visited August 15, 2019)].  As each RIR assumed responsibilities for IP address allocations and assignments, the portions of the database listings of IP address allocations and assignments made prior to the founding of the each RIR (which is considered "legacy address space") relevant to its region were handed to them by IANA and/or InterNIC with the understanding that, as the new stewards of IP address management, the RIRs would continue to maintain the listings of the legacy address space allocations and assignments.  [See Milton Mueller, *Scarcity in IP addresses: IPv4 Address Transfer Markets and the Regional Internet Address Registries* (2008) (available at https://www.internetgovernance.org/wp-content/uploads/IPAddress_TransferMarkets.pdf) (last visited August 19, 2019) ("Scarcity in IP addresses") at 4-6].

10. Currently, there are five RIRs: (i) AFRINIC (established in 2005 to serve countries on the African continent); (ii) APNIC (founded in 1993 to cover Asia Pacific and Oceania countries); (iii) ARIN (established in 1997 to take over from InterNIC in the United States, Canada, the Caribbean, and certain other outlying countries in the North Atlantic Ocean); (iv) RIPE NCC (opened in 1992 with Europe, the Middle East and parts of Central Asia as its service region); and (v) LACNIC (created in 2001 to cover Latin American and certain Caribbean countries).

**Inaccuracies in ARIN's WHOIS Database Listing Means it is not Definitive in all Cases**

11. Routing of IP addresses is performed by Internet Service Providers ("ISPs"). ISPs manage their routing tables by applying their specific filters and policies in conformance with accepted internet protocols. Many (most but not all) then publish information about their routes and routing policies in the global internet routing registry ("IRR"). [See generally https://www.ripe.net/manage-ips-and-asns/db/support/managing-route-objects-in-the-irr]. The IRR helps ISPs configure their routers to ensure their traffic is transited on other networks, block traffic that should not be transmitted, and troubleshoot when traffic is not reaching its intended destination. [See http://www.irr.net/docs/overview.html]. ARIN's Whois database is not used for these purposes, and the IRR is not linked to the ARIN Whois database. [See https://www.arin.net/resources/manage/irr/].

12. A unique listing in the ARIN Whois database is not necessary for an organization to have effective control over IP addresses that are routed over the internet. Because these inaccuracies are common and do not directly impact routability of IP addresses, the ARIN Whois database is not dispositive with respect to who currently holds rights to route or otherwise use any particular IP block. [But see Curran's Declaration,¶ 8 asserting that ARIN's Whois database is authoritative].

13. Accuracy of the Whois database is an important ARIN policy objective, and widely accepted in the internet community as beneficial for proper functioning of the internet. [Curran's Declaration, ¶ ¶ 9-10]. Nevertheless, discrepancies between the entity listed in the Whois database and the entity using or controlling the IP address space is common. There are numerous occurrences within the ARIN Whois database of instances where the name of the original legacy address holders remain listed but that entity no longer has effective control over the legacy address space, either because it has been acquired, changed its name, or, in some cases, no longer exists as a legal entity.

14. As part of its process of taking in legacy address holders under LRSAs, ARIN validates the entity's current status and its rightful claim of control of the relevant legacy space. [See *Legacy Resource Holders,* https://www.arin.net/resources/guide/legacy/ (last visited August 18, 2019)]. There is no comparable validation process for legacy address space listings in cases where the listed recipient or its successor does not submit itself for LRSA pre-vetting unless the legacy holder seeks ARIN's approval to transfer the legacy space to a third party. [See ARIN's Number Resource Policy Manual ("NRPM") Sections 8.2, 8.3, 8.4 and 8.5].

15. ARIN also relies on address holders to update ARIN with any changes to their listing information. This reliance is backed by a contractual obligation from ARIN registrants pursuant to Section 3(b) of the Current LRSA / RSA attached as Exhibit 1. However, this self-reporting approach is not effective with respect to legacy address holders that remain outside ARIN's contract and policy enforcement framework.

**Legacy Address Holders are Outside the RIR Registry System**

16. Relying on references to a complex set of delegations, assumptions of responsibilities, and technical protocol and policy recommendations [see, e.g., Curran's Declaration, ¶ ¶ 4, 5, 8, 11, and 13], ARIN advocates for a framework that allows it to impose its current registry policies on legacy holders (and their legacy address space) who have not entered into registration agreements with ARIN. [See Curran's Declaration, ¶ 11 stating that "ARIN's policies apply to all

3

number resources enumerated in the registry regardless of whether or not they are subject to a formal agreement."]

17. Based on my experience, ARIN's position runs contrary to normal contract law in the United States, and conflicts with the intentions and understandings of most legacy address holders. It is even contrary to the understanding of the General Counsel of the National Science Foundation ("NSF"), which had stewardship authority over IP address space for the U.S. Government prior to the establishment of Regional Internet Registry system. In a letter dated August 30, 2012 to a legacy address holder clarifying the address holders rights and interests in its number block, Lawrence Rudolf, NSF General Counsel stated that "NSF does not believe that ARIN, or for that matter any other organization, could retroactively affect property and rights distributed to you (or any other recipient) . . . ." [https://via.hypothes.is/https://www.internetgovernance.org/wp-content/uploads/NSF_GC_Letter_RE_ARIN.pdf at 2 (last visited August 19, 2019)].

18. Unless and until a legacy address holder enters into an LRSA or RSA with ARIN or another RIR, legacy address space and legacy address holders are, as succinctly stated by RIPE NCC (another RIR), "outside the current hierarchical Internet registry system." [See *Legacy Internet Resources* (2011), https://www.ripe.net/manage-ips-and-asns/legacy-resources (last visited August 19, 2019)].

19. In an effort to bring legacy address holders into the hierarchical internet registry system, ARIN launched its legacy address registration services agreement program in late 2007 (the "LRSA Program"). The purpose of the LRSA Program was to incent legacy address holders to enter into LRSAs in order to bind them and their address space contractually to ARIN and its registry policies. A copy of the current LRSA (which is now merged into a single template with ARIN's regular registration services agreement) is attached hereto as Exhibit 1 (the "Current RSA/LRSA").

20. ARIN has successfully caused many legacy address holders to enter into the LRSA and subject their address space to ARIN's registry policies and control. [Curran's Declaration, ¶ 12]. However, not all legacy holders have done so. Many legacy address holders undergo a process of determining whether the burdens of bringing their legacy address space into the formal ARIN registry system are outweighed by the benefits.

21. Legacy address holders who have not voluntarily entered into an LRSA or RSA with ARIN continue to use and route their legacy numbers over the public internet largely undisturbed and without controversy. ARIN itself recognizes that entry into an LRSA or RSA is not required for legacy holders to retain their rights to address space previously given to them. [See *Legacy Resource Services: Services Available to Legacy Resource Holders,* https://www.arin.net/resources/guide/legacy/services/ (last visited on August 19, 2019) ("ARIN Legacy Resource Services") (listing how ARIN maintains records of legacy address holders that have not entered into RSAs or LRSAs)].

22. ARIN acknowledges that it retains the obligation to list organizations that have been allocated or assigned address space in ARIN's Whois database. [See ARIN Legacy Resource Services and Curran's Declaration, ¶ 4 (stating "ARIN provides registry services for all Internet number blocks within the ARIN service region, including registry services for those allocations and assignments made prior to ARIN's formation in 1997."] But the nature of what legacy address holders receive from ARIN and the rights they have to interact with ARIN's registry are significantly constrained where the legacy address holder has not registered with ARIN by entering into a registration services agreement. Key examples of these constraints include the following:

4

  a. ARIN will not update its Whois database to reflect transfers of control of legacy addresses (including when a legacy address holder, and all of its assets, have been lawfully acquired by, or merged into, another organization). [See NRPM Section 8.2, 8.3 and 8.5, and Curran's Declaration, ¶ 11].

  b. ARIN will not issue Resource Public Key Infrastructure ("RPKI") certificates to any legacy address holder that is not a party to a registration services agreement. RPKI is an important cryptograph means for an organization with allocated or assigned address space to certify that the IP routes that announce the organization's IP addresses are valid. [See *What is RPKI*? (2019), available at https://www.ripe.net/manage-ips-and-asns/resource-management/certification/what-is-rpki (last visited on August 15, 2019)].

  c. Only legacy address holders that have entered into RSAs with ARIN qualify for ARIN membership, which includes important voting rights in the governance of ARIN.

23. Upon execution of the Current RSA/LRSA attached as Exhibit 1, ARIN "grants to Holder the following specified rights: (1) The *exclusive right to be the registrant* of the Included Number Resources within the ARIN database; (2) The right to use the Included Number Resources within the ARIN database; and (3) The right to transfer the registration of the Included Number Resources pursuant to the Policies." [Section 2(b) of the Current RSA/LRSA attached as Exhibit 1].

24. By entering into a RSA or LRSA, a legacy address holder, among other things, affirmatively and contractually agrees to: (i) conform to ARIN's terms, conditions, and the NRPM) [See Section 1(c) of the Current RSA/LRSA attached as Exhibit 1], (ii) waive any property rights it may have in its address space [See Section 7 of the Current RSA/LRSA attached as Exhibit 1], (iii) follow ARIN's policies to obtain ARIN's consent prior to transferring control of its IP numbers (rather than the commercial terms of the arrangement between the source and recipient) [NRPM Sections 8.2, 8.3, 8.4 and 8.5], and (iv) grant ARIN the right to revoke the address space under certain circumstances. [See Section 13 of the Current RSA/LRSA attached as Exhibit 1].

25. Based on my experience, the reasons why certain legacy address holders have decided to not enter into LRSAs with ARIN after evaluating the tradeoff between remaining outside the RIR system or accepting ARIN's LRSA terms and conditions are varied. Some prefer to retain the pre-ARIN rights they believe they have in their address space – free of any enforceable contractual commitment to comply with ARIN's policies. Others seek to avoid paying registration fees to ARIN since no registration fees can be charged for legacy address space unattached to LRSAs. Because "ARIN does not negotiate individual changes in the RSA or LRSA," [*Registration Services Agreement (RSA) FAQ,* available at https://www.arin.net/about/corporate/agreements/rsa_faq/ (last visited August 15, 2019)], organizations accustomed to fairly balancing commercial risks and responsibilities for their members and shareholders in negotiated agreements are advised by their legal counsel to not sign ARIN's template agreement. Remaining outside the formal RIR registration system is, therefore, not a nefarious or unusual occurrence. Even though ARIN denies certain important registration services to legacy address holders that remain outside the registration system, many reasonably believe it is in their best interest to do so.

26. Based on my experience advising legacy IP address space holders, organizations who lawfully acquired rights in legacy IP numbers from the original recipients often choose to delay or avoid entirely updating the ARIN database to reflect the conveyance or other change in control because updating the ARIN Whois database to reflect an organizational change in control

5

significantly alters the holder's rights and formalizes its contractual commitments to submit to ARIN's policies and control. This is, from ARIN's perspective, undesirable, but common in the ordinary exercise of legacy address holders' rights—particularly in cases where a controlling organization acquired the address space through a merger or acquisition, or where the listed legacy address holder has leased (either short-term or long term) address space to a third party.

**Legacy Addresses Holders Not Party to LRSAs Lack Registrant Status with ARIN**

27. Legacy address holders that have not entered into any RSA or LRSA with ARIN: (i) remain outside the RIR system, (ii) are not members of ARIN like all other regular address holders and legacy holders that have signed an LRSA, (iii) are denied important rights to update their ARIN Whois database records to reflect changes in control or use rights, (iv) have not taken any affirmative action to register their address space with ARIN, and (v) have not been granted by ARIN an exclusive right to an accurate entry in any ARIN database. And in some cases, the entity listed in the ARIN Whois database no longer exists, or no longer has effective control over the legacy IP address space to which it is associated.

28. It is, therefore, reasonable to conclude that an entity listed as an early recipient of legacy address space in ARIN's Whois database should not qualify as a registrant merely because its name appears in the ARIN's Whois database unless and until (i) the entity has assented to be registered with ARIN by entering into an LRSA or RSA, and (ii) the accuracy of the listing has been validated.

I declare under penalty of perjury, that the foregoing is true and correct, and that this declaration was executed on the 20th day of August 2019 in Washington, DC.

By: _____

Marc A. Lindsey
President, Avenue4 LLC
2001 L Street, NW
Suite 900
Washington, DC 20036

**EXHIBIT 1**

(American Registry for Internet Numbers, LTD. Registration Services Agreement, RSA Version 12.0 / LRSA version 4.0 (August 2016))

**AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD.
REGISTRATION SERVICES AGREEMENT**

This REGISTRATION SERVICES AGREEMENT ("Agreement") is made by and between the AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD. ("ARIN"), a Virginia nonprofit corporation, and

_____, ("Holder").

1. INTRODUCTION

   (a)  ARIN is a Regional Internet Registry serving the United States, Canada, and specific designated islands in the Caribbean Sea and North Atlantic Ocean. ARIN is responsible for the registration, administration, and stewardship of Internet number resources in these geographic areas.

   (b)  For purposes of this Agreement (i) the term "Included Number Resources" means the Internet number resources, which include without limitation registration rights for Internet Protocol ("IP") address space and Autonomous System Numbers ("ASN's"), issued or to be issued to Holder by ARIN, and any other number resources issued to Holder or its predecessor in interest prior to ARIN's inception on December 22, 1997 ("Legacy Number Resources") and specifically identified by Holder as subject to this Agreement; and, (ii) the term "Services" means the services that ARIN provides pursuant to this Agreement with respect to the Included Number Resources to Holder, including, without limitation, the inclusion of the registry entries for IP address space and/or ASN's, reverse name service on network blocks, Resource Public Key Infrastructure ("RPKI"), maintenance of resource records, and administration of IP address space; and (iii) any reference to "number resources" shall mean both IP address space and ASN's.

   (c)  In addition to the Agreement, the Services are subject to the terms and conditions of ARIN's Number Resource Policy Manual (as amended, supplemented, or otherwise modified as provided under Section 5), and other policies, guidelines and procedures adopted by ARIN (collectively, the "Policies") and published on ARIN's Website located at http://www.arin.net (the "Website"). This Agreement and the Policies are referred to collectively as the "Service Terms." In the event of any inconsistency between the Policies and this Agreement, the terms of this Agreement will prevail but solely to the extent of the inconsistency. This Agreement supersedes any prior or contemporaneous agreement between Holder and ARIN for Included Number Resources.

   d) Because of the necessary role that ARIN performs for the Internet community, ARIN reserves the right, in its sole and absolute discretion, to amend, supplement, restate or otherwise modify any or all Policies at any time and from time to time, including the right to implement new Policies and/or make some or all Policies obsolete. ARIN will provide notice (pursuant to Section 14(i)) of Policy changes to Holder. ARIN will also publish Policy changes on its Website. Policy changes are effective immediately and binding on Holder upon the earlier of ARIN's notice to Holder or publication on ARIN's Website, at which time the Policy changes shall constitute a part of the Policies. Holder's continued access to or use of any Services after such notice or publication constitutes Holder's acceptance of such Policy changes.

   (e) ARIN may only modify the terms of this Agreement under the following circumstances:

   (1)     The Board finds an immediate and compelling need to amend the Agreement due to a definable, discrete, identifiable change in relevant statute or caselaw; or

   (2)     Upon recommendation of the Board and ratification by Member vote.

Upon ARIN changing the terms of this Agreement, ARIN will provide notice of change in writing delivered by any of the following methods: (i) hand delivery, (ii) certified U.S. or registered international mail, return receipt requested, postage prepaid, (iii) reputable overnight courier. The effective date of such a change shall be no earlier than 90 days from the notice. ARIN will also publish the revised terms of the Agreement on its Website. Holder's continued access to or use of any Services after such notice or publication constitutes Holder's acceptance of the revised terms.

2. CONDITIONS OF SERVICE

(a)  Compliance. In receiving or using any of the Services, Holder must comply with the Service Terms.

(b) Provision of Services and Rights. Subject to Holder's on-going compliance with its obligations under the Service Terms, including, without limitation, the payment of the fees (as set forth in Section 4), ARIN shall (i) provide the Services to Holder in accordance with the Service Terms and (ii) grant to Holder the following specified rights:

(1)  The exclusive right to be the registrant of the Included Number Resources within the ARIN database;
(2)  The right to use the Included Number Resources within the ARIN database; and
(3)  The right to transfer the registration of the Included Number Resources pursuant to the Policies.

Holder acknowledges that other registrants with ARIN have rights that intersect or otherwise impact Holder's rights and/or use of the Included Number Resources, including, but not limited to, other registrants benefiting from visibility into the public portions of registrations of the Included Number Resources as further described in the Policies.

(c)    Information and Cooperation. Holder has completed an application provided by ARIN for one or more Services (the "Application"). Holder must (i) promptly notify ARIN if any information provided in the Application changes during the term of this Agreement, and (ii) make reasonable efforts to promptly, accurately, and completely provide any information or cooperation required pursuant to the Service Terms or in response to any inquiry or request made to Holder by ARIN during the term of this Agreement. In addition, Holder shall promptly provide ARIN with complete and accurate information, and cooperation as required by any Service Terms or that ARIN requests in connection with ARIN's provision of any of the Services to Holder. If Holder does not provide ARIN with such information or cooperation that ARIN requests, ARI N may take such failure into account in evaluating Holder's subsequent requests for transfer, allocation or assignment of additional number resources, or requests for changes to any Services.

(d)  Prohibited Conduct By Holder. In using any of the Services, Holder shall not: (i) disrupt or interfere with the security or use of any of the Services; (ii) violate any applicable laws, statutes, rules, or regulations; or (iii) assist any third party in engaging in any activity prohibited by any Service Terms.

(e)  Cooperation With Government Authority. ARIN shall have the right, without liability or notice to Holder, to cooperate and comply with all applicable laws, statutes, rules, or regulations and all government or judicial inquiries or orders ("Orders") with respect to Holder's use of any Service. ARIN shall have the right, without liability or notice to Holder, to follow any Order concerning any number resources or Holder's use of any Service, including an Order to stop any Service or to terminate this Agreement. ARIN shall, when legally permitted and to the extent allowed by an Order, notify Holder within a reasonable amount of time after receipt of an Order.

(f)   Content Control. Holder acknowledges that ARIN does not have the ability to control or influence content accessible through or facilitated by those who receive number resources, directly or indirectly, from ARIN.

3. USE OF THE ARIN DATABASE

(a)  Authorization. The Administrative Point of Contact ("POC") will be an employee designated by Holder who will be the principal point of contact between Holder and ARIN with respect to the Included

Number Resources in the ARIN registry database, and have the sole right to designate other qualifying POCs of Holder with authority to modify the Included Number Resources in the ARIN registry database ("Authority"). The Administrative POC will also facilitate Holder's compliance with the terms and conditions of this Section 3. Upon ARIN's request, Holder will promptly provide ARIN with accurate documentation and information regarding the identity of the Administrative POC and any other POCs with the authority to act on behalf of Holder. Holder must notify ARIN promptly if: (i) the relationship between a POC and Holder is terminated; (ii) a POC's Authority is to be revoked; (iii) Holder has any reason to believe that a POC has granted or will grant a third party unauthorized access to the ARIN registry database or any portion thereof; or (iv) if Holder wants to designate a different Administrative POC. Notices to ARIN under this Section 3(a) must be given by email to hostmaster@arin.net or submitted through an authorized account via ARIN Online and will be effective when acknowledged as received by ARIN.

(b) Responsibility for Directory Services Data. Holder is responsible for the timely and accurate maintenance of directory services data (Whois) with respect to the Included Number Resources, as well as data concerning any organization to which Holder further sub-delegates the Included Number Resources.

(c) Holder Liability for Acts and Omissions. Holder is solely and exclusively responsible for all acts and omissions of its POCs and/or others acting by or on behalf of Holder, whether or not authorized in law or in fact. Holder is solely and exclusively responsible for the security of its access to and use of Included Number Resources in the ARIN registry database and for any loss or damage that Holder suffers based on its access or use of the ARIN registry database.

4. FEES AND PAYMENTS

(a) Fee Schedule. As a condition precedent to ARIN's duty to provide any Services, Holder shall pay ARIN for providing the Services in accordance with ARIN's Fee Schedule for Included Number Resources, which is available on the Website. ARIN will have the right to change the Fee Schedule applicable to one or more Services, which change will be posted on the Website, provided that ARIN must set its fees in an open and transparent manner through the ARIN community consultation process. Any change to the Fee Schedule shall be effective upon publication on the Website and shall not be applied retroactively. Legacy maintenance fees cannot exceed the fees charged to comparable non-legacy holders for registration services as set forth in ARIN's Fee Schedule for comparable number resources.

(b) Initial Fees in Advance of Service. Prior to ARIN providing Holder with Services, Holder shall pay ARIN any applicable "initial fees" as set forth in the Fee Schedule, as well as any presently outstanding fees due to ARIN.

(c) Fee Notices and Outcomes. Holder will be notified in writing by an invoice from ARIN to pay its fees. Such invoice will be sent at least 30 days before payment is due. If Holder does not pay the fees due to ARIN under this Agreement when due, ARIN shall provide a second written notice to the Holder that will constitute the notice of delinquency (the "Delinquency Notice"). If Holder fails to make payment in response to the Delinquency Notice within thirty (30) days after the date of such Delinquency Notice, ARIN shall provide Holder with a final delinquency notice and make reasonable efforts to reach Holder telephonically (the "Final Delinquency Notice"). If, for any reason, Holder has not made such payment within thirty (30) days after ARIN provides the Final Delinquency Notice, ARIN has the right to: (i) stop providing Services, and/or (ii) if any invoice remains unpaid six (6) months after payment was due, terminate this Agreement and revoke the Included Number Resources. If the Services are stopped, Holder may have the Services restored if it brings its account current before revocation. To the extent the Included Number Resources have been revoked but not reissued by ARIN, Holder may seek to have such Included Number Resources restored if it contacts ARIN, brings its account current, pays an additional fee that ARIN may prescribe on its Fee Schedule, and signs the then-current Registration Services Agreement.

(d) No Refunds. All fees paid by Holder to ARIN are deemed fully earned upon receipt and are nonrefundable.

9

5.  CURRENT AND FUTURE POLICIES

Pursuant to ARIN's Policy Development Process ("PDP"), ARIN maintains the Policies and may at any time in its sole and absolute discretion amend the Policies, implement new policies (which once amended or implemented, becomes part of the Policies), or revoke existing Policies. Such amendments or new Policies shall be binding upon Holder immediately upon publication on ARIN's Website. Holder acknowledges and agrees to be bound by and comply with the Policies (as amended from time to time), except to the extent the Policies conflict with the terms of this Agreement.

6.  REVIEW OF HOLDER'S NUMBER RESOURCES

Whenever a transfer or additional IP address space is requested by Holder, ARIN may review Holder's utilization of previously allocated or assigned number resources and other Services received from A RIN to determine if Holder is complying with the Service Terms. Except as set forth in this Agreement, (i) ARIN will take no action to reduce the Services currently provided for Included Number Resources due to lack of utilization by the Holder, and (ii) ARIN has no right to revoke any Included Number Resources under this Agreement due to lack of utilization by Holder. However, ARIN may refuse to permit transfers or additional allocations of number resources to Holder if Holder's Included Number Resources are not utilized in accordance with Policy.

7.  NO PROPERTY RIGHTS

Holder acknowledges and agrees that: (a) the Included Number Resources are not property (real, personal, or intellectual) of Holder; (b) Holder does not and will not have or acquire any property rights in or to Included Number Resources by virtue of this Agreement; (c) Holder will not attempt, directly or indirectly, to obtain or assert any patent, trademark, service mark or copyright in any number resources in the United States or any other country; and (d) Holder will transfer or receive Included Number Resources in accordance with the Policies.

8.  IMPACT OF VOLUNTARY RETURN OF NUMBER RESOURCES

Holder may voluntarily return to ARIN any portion of the Included Number Resources. If Holder returns any portion of the Included Number Resources, it may be eligible for certain benefits, including partial or permanent reduction in ARIN fees, as ARIN may from time to time prescribe.

9.  REPRESENTATIONS AND WARRANTIES

Each party represents and warrants to the other party that: (a) it has the full power and authority to enter into and perform its obligations under this Agreement; (b) the assent to and performance by it of its obligations under this Agreement do not breach or conflict with any other agreement or arrangement by which it is bound; (c) it will comply with this Agreement, the Policies and all applicable laws, regulations or rules, and (d) this Agreement constitutes a legal, valid, binding, and an executory obligation of the parties executing or assenting to this Agreement, enforceable in accordance with its terms and conditions.

10. BANKRUPTCY

   (a)  If Holder: (i) files any petition under any chapter of the Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") or other insolvency or bankruptcy law; or (ii) has a petition filed against it under any insolvency or bankruptcy law; or (iii) makes a general assignment for the benefit of creditors, has a receiver appointed for it, or a trustee takes possession of all or substantially all of Holder's assets; or (iv) dissolves, liquidates or ceases its normal business, or indicates its intent to dissolve, liquidate, or cease its normal business operations (each of the foregoing, a "Bankruptcy Event"), Holder will promptly provide written notice thereof to ARIN. Upon such notice, or if ARIN otherwise learns of the occurrence of a Bankruptcy Event, ARIN may take such appropriate or lawful action, including, but not limited to, intervening in such Bankruptcy Event, to preserve its rights under this Agreement, including, but not limited to, ARIN's rights under Section 7. Holder agrees to consent to ARIN intervening in any such Bankruptcy Event and taking such other appropriate or lawful actions as ARIN determines, in its sole and absolute discretion, so that ARIN can protect its rights under this Agreement, including, but not limited to, Section 7.

   (b)  Holder acknowledges and agrees that this Agreement is executory.

(c)  Holder further hereby acknowledges and agrees that none of the number resources, none of the Services, or nothing else provided by or on behalf of AR IN in connection therewith is or will be the property (real, personal, or intellectual) of Holder's bankruptcy estate within the meaning of Section 541 of the Bankruptcy Code.

(d)  Upon the occurrence of a Bankruptcy Event, such Bankruptcy Event or any other event of default or breach under this Agreement shall constitute "cause" pursuant to Section 362(d) of the Bankruptcy Code for granting ARIN relief from the automatic stay or any other applicable injunction to exercise ARIN's rights and remedies under this Agreement, and Holder shall, and hereby does, consent to such relief.

11. INDEMNIFICATION

(a)  Holder shall indemnify, defend, and hold harmless ARIN, each of their respective predecessors, successors and assigns, each of their respective employees, representatives, agents, attorneys, advisors, trustees, directors, officers, managers, and members (collectively, the "Indemnified Parties") from any and all claims, demands, disputes, actions, suits, proceedings, judgments, damages, injuries, losses, expenses, costs and fees (including costs and fees associated with attorneys, accountants, investigators and experts), interests, fines and penalties of whatever nature, character or description, whether known or unknown, anticipated or unanticipated, fixed or contingent, now existing or which may hereafter accrue (collectively, "Claims") brought or asserted by a third party against any of the Indemnified Parties alleging facts or circumstances that, directly or indirectly, relate to or arise from or in connection with: (1) any authorized or unauthorized access to or use of any Service or any Included Number Resources by Holder or any of Holder's parent, subsidiaries or other affiliates, or any of their respective predecessors, successors or assigns, or any of their respective directors, officers, managers, shareholders, members, partners, employees, representatives, agents, advisors, or other persons acting by, through, under or in concert with any of them (each, a "Holder Party" and collectively the "Holder Parties"); (2) any authorized or unauthorized access to or use of any Service or any Included Number Resources by any person who acquired authorized or unauthorized access to or use of any Service or any Included Number Resources by or through a Holder Party; and/or (3) any breach of any Service Terms by Holder or any other Holder Party.

(b)  Holder shall keep ARIN informed of and consult with ARIN in connection with the progress of any such Claim. Holder shall not settle, compromise, or in any other manner dis pose of any Claim without the prior written consent of ARIN. Holder shall not engage in any action or omit to take any action in connection with any Claim that would likely result in harm or have an adverse consequence to ARIN, any of ARIN's rights pursuant to any Service Terms, or any Included Number Resources or other number resources. ARIN shall have the right to participate in the settlement, compromise and/or disposition of any Claim. Holder may retain counsel to defend against any Claims provided Holder may retain such counsel only upon prior written approval by ARIN, such approval not to be unreasonably withheld. If, in ARIN's reasonable judgment, (i) a potential or actual conflict exists or arises between the interest of ARIN and Holder in any such Claim or (ii) Holder fails to diligently and fully perform its obligations under this Section 11, ARIN shall have the right to (i) retain its own counsel, whose reasonable fees and costs will be paid by Holder, to defend the Indemnified Parties and (ii) control the disposition of any Claim at Holder's sole cost and expense.

(c)  Holder shall provide written notice to ARIN promptly of the assertion against Holder or any other person of any Claim or the commencement of any Claim, whether or not an Indemnified Party is named or identified in the Claim, alleging facts or circumstances that, in any way, whether directly or indirectly, relate to, arise from, or may be connected with any Service Terms.

12. DISCLAIMERS, EXCLUSIONS, AND LIMITATIONS

(a) DISCLAIMER OF WARRANTIES. HOLDER ACKNOWLEDGES AND AGREES THAT THE SERVICES, INCLUDING, WITHOUT LIMITATION, THE INCLUDED NUMBER RESOURCES AND THE REGISTRATION THEREOF, ARE PROVIDED ON AN "AS-IS" BASIS WITH ALL RISKS AND FAULTS ASSOCIATED THEREWITH. EXCEPT AS PROVIDED IN SECTION 9 (REPRESENTATIONS AND WARRANTIES) ABOVE, ARIN MAKES NO

REPRESENTATION, WARRANTY OR COVENANT OF ANY KIND WITH RESPECT TO ANY SERVICES OR ANY INCLUDED NUMBER RESOURCES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY IMPL IED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTION OF REQUIREMENTS, NON-INFRINGEMENT, OR ANY WARRANTY ARISING OUT OF A COURSE OF PERFORMANCE, DEALING, TRADE OR USAGE. AND ANY AND ALL SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS ARE HEREBY DISCLAIMED BY ARIN AND WAIVED BY HOLDER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ARIN DOES NOT REPRESENT, WARRANT OR COVENANT THAT ANY SERVICE OR INCLUDED NUMBER RESOURCE, OR ANY ACCESS OR USE THEREOF: (i) WILL BE UNINTERRUPTED, (ii) WILL BE FREE OF DEFECTS, INACCURACIES, OR ERRORS, (iii) WILL MEET HOLDER'S REQUIREMENTS, OR (iv) WILL OPERATE IN THE CONFIGURATION OR WITH OTHER HARDWARE OR SOFTWARE THAT HOLDER USES.

(b) EXCLUSION OF LIABILITIES AND DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY, NEITHER PARTY WILL BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY, INCLUDING, WITHOUT LIMITATION, ANY CLIENTS OR CUSTOMERS OF HOLDER, FOR ANY LIABILITIES AT LAW OR IN EQUITY OR FOR ANY DAMAGES, INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE, EXEMPLARY, OR SPECIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LIABILITIES OR DAMAGES RELATING TO LOST PROFITS, OR LOSS OF GOODWILL) ARISING OUT OF, RELATING TO, OR CONNECTED WITH ANY SERVICES, ANY INCLUDED NUMBER RESOURCES, OR OTHERWISE IN CONNECTION THEREWITH, WHETHER BASED ON CONTRACT, TORT OR ANY CAUSE OF ACTION, EVEN IF THE OTHER PARTY IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(c) LIMITATION OF LIABILITY. IN NO EVENT, WHETHER BASED ON CONTRACT, TORT, STATUTE, OR ANY CAUSE OF ACTION, WILL A PARTY'S LIABILITY TO THE OTHER PARTY OR ANY THIRD PARTY, INCLUDING, WITHOUT LIMITATION, ANY CLIENTS OR CUSTOMERS OF HOLDER, EXCEED IN THE AGGREGATE THE GREATER OF (i) THE AMOUNT PAID BY HOLDER TO ARIN FOR THE SERVICES DURING THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE EVENT THAT GIVES RISE TO SUCH LIABILITY OR (ii) ONE HUNDRED U.S. DOLLARS (US$100.00).

13. TERM AND TERMINATION

(a) Term. Unless earlier terminated in accordance with the termination provisions of this Agreement, the term of this Agreement shall commence on the date Holder first receives any Service and shall continue for one (1) year thereafter. This Agreement shall renew automatically unless earlier terminated in accordance with the termination provisions of this Agreement.

(b) Suspension of Services or Termination of Agreement for Cause by ARIN. ARIN shall have the right to suspend Services without notice to Holder if Holder breaches any of Sections 2(c), 2(d), 4 or 7. In addition, ARIN may immediately suspend Services upon written notice to Holder pursuant to Section 2(e) or if Holder breaches Section 2(d) or Section 11. Upon ARIN's written notice to Holder, ARIN shall have the right to immediately terminate this Agreement for cause for: (i) Holder's failure to pay fees pursuant to Section 4; (ii) Holder's material breach of Section 2(c), Section 2(d) or Section 7; or (iii) pursuant to Section 2(e). If Holder breaches any other provision of this Agreement and such breach remains uncured by Holder (as determined by ARIN in its reasonable determination) for sixty (60) days after the date of ARIN's written notice of the breach, ARIN shall have the right to terminate this Agreement for cause. Holder may utilize Section 14(k) to dispute any ARIN termination or suspension of Services.

ARIN shall provide notice of termination of this Agreement in writing to Holder, delivered by any of the following methods: (i) hand delivery, (ii) certified U.S. or registered international mail, return receipt requested, postage prepaid, or (iii) reputable overnight courier.

(c) Termination for Cause by Holder. Holder may terminate this Agreement for cause, by giving written notice thereof to ARIN, if: (i) ARIN materially breaches this Agreement and such material breach remains uncured for sixty (60) days after ARIN's receipt of written notice of the breach from Holder; (ii) ARIN refuses to provide the Services with respect to Holder's Included Number Resources, except where ARIN has stopped the Services or terminates this Agreement as permitted herein; (iii) ARIN

enforces any Policy against Holder which has been applied in violation of this Agreement and does not remedy any material adverse effect caused by such action within sixty (60) days' after written notice thereof; or (iv) ARIN assesses a Maintenance Fee in violation of Section 4(a) and does not cure such violation within sixty (60) days' after written notice thereof. If ARIN formally disputes Holder's right to terminate this Agreement, ARIN shall respond in writing to Holder and may deny its actions are a breach or alternatively indicate its corrective action. Any failure of ARIN to respond to Holder in writing shall constitute a denial of the breach and create a dispute between the parties which will be resolved pursuant to Section 14(k). If the Holder still seeks to terminate this Agreement for cause after receiving a response from ARIN, it must bring action pursuant to Section 14(k), and obtain a judgment by the Arbitrator chosen for this purpose that such cause to terminate exists. If such a cause for termination is found by the Arbitrator against ARIN, this Agreement will be terminated, ARIN will be under no obligation to provide any of the Services under this Agreement. Upon termination, Included Number Resources that were Legacy Number Resources immediately prior to being brought under this Agreement shall resume their status as Legacy Number Resources, and all other Included Number Resources shall be returned to ARIN.

(d)  Voluntary Termination by Holder with Return of Included Number Resources to ARIN. Holder shall have the right to terminate this Agreement at any time if it returns to ARIN, without limitation, all rights to Included Number Resources. If Holder wishes to terminate this Agreement in accordance with this Section 13(d), the Holder must submit written notice to ARIN of its intent to return, in total, all Included Number Resources, and ARIN will accept the return of the Included Number Resources thirty (30) days after such notice being provided.

(e) Effect of Termination. Except as described in Section 13(c) and 14(k), if this Agreement is terminated, then (i) ARIN will immediately revoke the Included Number Resources and otherwise cease providing the Services and will have no liability for doing so, and (ii) Holder remains liable for all fees payable to ARIN for Services rendered up to and including the date of termination.

(f)  Survival. The defined terms and the following sections of this Agreement, as well as any other provision which by its nature survives termination, will survive termination of this Agreement and remain in effect: 2(e), 2(f), 4(d), 7, 10, 11, 12, 13(e), 13(f) and 14.

14. GENERAL PROVISIONS

(a) Assignment.

(i)  Holder may not assign or transfer, whether voluntarily or by operation of law, this Agreement or any of its rights or obligations under it, without ARIN's prior written permission, which may not be unreasonably withheld if such assignment and/or transfer is consistent with ARIN's Transfer Policies as included in the Policies. The event of any transaction (whether a merger, acquisition, or sale) in which Holder's controlling managerial and/or voting interest changes during the term of this Agreement shall be considered an assignment. Any attempt by Holder to assign or transfer this Agreement or any rights or obligations under it, other than as provided in this Section 14(a)(i), will be of no force or effect.
(ii)  ARIN shall have the right to freely assign this Agreement upon written notice to Holder if ARIN is changing its corporate organization to permit a successor organization to provide the Services contemplated by this Agreement.

(b) Relationship of Parties. The relationship between the parties is and will be that of independent contractors. No joint venture, partnership, employment, agency, or similar arrangement is created between the parties. Neither party has the right or power to act for or on behalf of the other or to bind the other in any respect other than as expressly provided for in this Agreement.

(c) Entire Agreement. This Agreement and the Policies (which are hereby incorporated by reference to the extent they do not conflict with this Agreement) constitute the entire understanding between the parties and replaces and supersedes any and all prior and contemporaneous agreements and understandings, whether oral or written, express or implied, between the parties with respect to the

Included Number Resources or any Services which are the subject matter of this Agreement. All other agreements between Holder and ARIN for number resources other than the Included Number Resources or any Services associated with such number resources, if any, remain unchanged by this Agreement.

(d) Waiver. No waiver of any provision or consent to any action under this Agreement will constitute a waiver of any other provisions or consent to any other action, nor will such waiver or consent constitute a continuing waiver or consent or commit any party to provide past or future a waiver or consent.

(e) Severability. If any provision of this Agreement is determined to be illegal, invalid, or otherwise unenforceable by a court or tribunal of competent jurisdiction, then to the extent necessary to make such provision and/or this Agreement legal, valid, or otherwise enforceable, such provision will be limited, construed, or severed and deleted from this Agreement, and the remaining portion of such provision and the remaining other provisions hereof will survive, remain in full force and effect, and continue to be binding, and will be interpreted to give effect to the intention of the parties insofar as possible.

(f) Successors and Assigns. This Agreement will be binding upon and inure to the benefit of the parties and with respect to ARIN, its successors and permitted assigns, and with respect to Holder, its permitted successors and permitted assigns.

(g) No Third-Party Rights. This Agreement is made solely for the benefit of the parties and does not, and will not, be construed to grant any rights or remedies to any other person or entity other than as expressly provided for in this Agreement.

(h) Construction. This Agreement will be construed as if it was jointly drafted by both parties and may not be construed against either one. The word "including" means "including, without limitation." The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section or other subdivision. Unless the context of this Agreement otherwise requires, words using singular or plural number also include the plural or singular number, respectively. The headings contained in this Agreement are for the purposes of convenience only and are not intended to define or limit the contents of the provisions contained therein.

(i) Written Notice. All "written notice" or notice required or permitted to be given in writing under this Agreement will be delivered to the other party by any of the following methods: (i) hand delivery, (ii) certified U.S. or registered international mail, return receipt requested, postage prepaid, (iii) reputable overnight courier, (iv) electronic mail, (v) electronic messaging via ARIN Online, or (vi) facsimile. If Holder gives notice to ARIN, it must use ARIN's current address, which is currently: ARIN, Attention: Financial and Legal Services Department, PO Box 232290, Centreville, VA 20120, or the following email address: compliance@arin.net. ARIN shall update Holder with any changes to this address by written notice pursuant to this Section. If ARIN provides notice to Holder, ARIN must use the contact information provided by Holder to ARIN during the application process or other contact information provided by Holder in accordance with the terms of this Section. All notices will be deemed received and effective as follows: (i) if by hand-delivery, on the date of delivery, (ii) if by delivery via U.S. or registered international mail, on the date of receipt appearing on a return receipt card, (iii) if by overnight courier, on the date receipt is confirmed by such courier service, (iv) if by electronic mail, 24 hours after the message was sent, if no "system error" or other notice of non-delivery is generated, or (v) if by electronic messaging, at the next successful login to ARIN Online by the notified contact.

(j) Force Majeure. Neither party shall be deemed in default hereunder, nor shall either party be responsible for any cessation, interruption, or delay in the performance of its obligations under this Agreement where such failure of performance is the result of any force majeure event, including, but not limited to, earthquake, flood, fire, storm, natural disaster, act of God, civil disturbances, war, terrorism, armed conflict, riots, failure of contractors or subcontractors to perform, labor strike, lockout, boycott, or acts of governmental authorities or any event similar to the foregoing (each a "Force Majeure Event"). In the event a Force Majeure Event extends for a period in excess of thirty (30) days in the aggregate and prevents a party from performing its obligations under this Agreement, the other party

may, in its discretion, terminate this Agreement immediately upon written notice to the party affected by the force majeure event. If, pursuant to this force majeure provision, a party terminates this Agreement, ARIN will cease to provide Services under this Agreement and the Included Number Resources will resume the status they had prior to this Agreement.

(k) Governing Law, Jurisdiction, Venue and Dispute Resolution.

(i) This Agreement and the parties' performance under it shall be governed in all respects by, and construed in accordance with, the laws of the Commonwealth of Virginia and, as applicable, the United States of America.

(ii) In the event of any dispute(s) regarding any term or condition or provision or performance or conduct arising out of or relating to this Agreement, the parties each agree to first seek resolution through cooperative settlement negotiations involving themselves or their representatives as they each deem appropriate; and, second, in the event cooperative settlement negotiations are not successful, or do not occur, within thirty (30) days after a party initiates such negotiations, the parties agree that upon the request of either party any unresolved dispute(s) shall be submitted to binding and final arbitration for resolution. If Holder's principal place of business is in the United States, such arbitration shall be held in Washington, D.C., or by agreement of both parties at any other location, in accordance with the rules of the American Arbitration Association ("AAA") then in effect. If the Holder's principal place of business is in Canada, such arbitration shall be held in Ottawa, Canada, or by agreement of both parties at any other location, in accordance with the rules of the locally prevalent equivalent of AAA arbitration rules then in effect. If Holder's principal place of business is in any country other than the United States or Canada but otherwise within ARIN's service region, such arbitration shall be held in Miami, Florida, or by agreement of both parties at any other location, in accordance with the rules of the AAA then in effect. A single arbitrator shall be selected by the parties by striking in turn from a list of arbitrators supplied by the AAA or, as applicable, the locally prevalent equivalent of AAA. Each party shall bear their own attorneys' fees, and the initiating party shall initially bear the costs of the arbitration's expenses. Any judgment upon the award rendered pursuant to the arbitration proceeding may be entered in any court having competent jurisdiction. Notwithstanding the foregoing in this Paragraph, either party may bring an action before the United States District Court for the Eastern District of Virginia or the Circuit Court for Fairfax County, Virginia for a temporary restraining order, preliminary injunction and/or other injunctive relief to seek to maintain the status quo between the parties pending resolution of the dispute(s) in accordance with the terms of this Paragraph; provided that, for a Canadian domiciled entity, such action may also be brought in the above listed US courts, the Ontario Superior Court of Justice for those domiciled in Ontario, or the equivalent court in the Canadian province where the entity is headquartered.

(iii) If Holder is part of a national, state, or local government authority whose laws or regulations strictly require that the laws of that particular jurisdiction or domicile must apply to this Agreement and ARIN is provided with written substantiation of such requirement reasonably acceptable to ARIN, this Agreement shall also be governed pursuant to such laws. If there is a dispute regarding applicability of such laws to this Agreement, it shall be resolved in accordance with Section 14(k)(ii).

(l) Subsequent Version(s). If any subsequent version(s) of the Registration Services Agreement is authorized by ARIN, the parties may choose to substitute a signed copy of the then- existing subsequent version, with all its terms, instead of this Agreement, and the Included Number Resources and other Services will then be governed by the subsequent version. The consideration for such change is the original agreement and the agreement to abide by the revised terms. There is no requirement for a Holder who has signed this Agreement to engage in any subsequent version.

(m) Expenses. Except as specifically set forth in this Agreement, the parties agree to pay their own expenses related to this Agreement.

(n) Amendment. Except as set forth in Section 1(d), no amendment of any provision of this Agreement shall be valid unless in writing and signed or authorized in writing by ARIN, which writing specifically references such as an amendment to this Agreement.

(o)  Execution. This Agreement may be executed by a party's signature and copies of this Agreement so executed and delivered shall have the same force and effect as an original. This Agreement may be executed in two (2) or more counterpart signature pages, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-17-

**Each party hereby accepts, without modification, all of the terms and conditions
of this Registration Services Agreement.**

| **Agreed: (This section to be completed by Holder)** | **Authorized Officer** |
|---|---|
| Legal Name of Company (Holder): | Name (Print): |
| D/B/A (if any): | Title (Print): |
| ORG ID: | Signature: |
| Ticket Number: | Date: |
| **Billing Contact Information if different from authorized officer** | **Contact Information of Authorized Officer** |
| Name (Print): | Phone: |
| Title (Print): | EMail: |
| Phone: | Street Address: |
| EMail: | City and State: |
| Street Address | Postal Code: |
| City and State | Country: |
| Postal Code: | |
| Country: | |

**American Registry for Internet Numbers, LTD. By: (This section to be completed by ARIN)**

| **Billing Contact Information if different from authorized officer** | **Contact Information of Authorized Officer** |
|---|---|
| Name (Print): | Signature: |
| | Date: |

[Source: https://www.arin.net/about/corporate/agreements/rsa.pdf]