Gary S. Lincenberg - SBN 123058
  glincenberg@birdmarella.com
Naeun Rim - SBN 263558
  nrim@birdmarella.com
BIRD, MARELLA, BOXER,
WOLPERT, NESSIM, DROOKS,
LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

*Attorneys for Petr Pacas*

David W. Wiechert - SBN 94607
  dwiechert@aol.com
Jessica C. Munk - SBN 238832
  jessica@wmgattorneys.com
William J. Migler - SBN 318518
  william@wmgattorneys.com
WIECHERT, MUNK & GOLDSTEIN, PC
27136 Paseo Espada, Suite B1123
San Juan Capistrano, California 92675
Telephone: (949) 361-2822

*Attorneys for Jacob Bychak*

Randy K. Jones - SBN 141711
  rkjones@mintz.com
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
Telephone: (858) 314-1510

*Attorney for Mark Manoogian*

Whitney Z. Bernstein - SBN 304917
  wbernstein@bmkattorneys.com
Thomas H. Bienert, Jr. - SBN 135311
  tbienert@bmkattorneys.com
James Riddet - SBN 39826
  jriddet@bmkattorneys.com
BIENERT | KATZMAN PC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700

*Attorneys for Mohammed Abdul Qayyum*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JACOB BYCHAK, MARK MANOOGIAN, MOHAMMED ABDUL QAYYUM, AND PETR PACAS<br><br>Defendants. | CASE NO. 3:18-cr-04683-GPC<br><br>**DEFENDANTS' JOINT MOTION TO DISMISS WIRE FRAUD COUNTS 2-5 AND TO STRIKE WIRE FRAUD ALLEGATIONS IN COUNT 1 FOR FAILURE TO STATE AN OFFENSE**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: February 20, 2020<br>Time: 1:00 PM<br>Dept.: 2D<br><br>Assigned to Hon. Gonzalo P. Curiel |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ................................................................................................ 5

II.  BACKGROUND ............................................................................................... 6

    A.  The Wire Fraud Counts in the Indictment Accuse Defendants of Scheming to Acquire Inactive IP Addresses .................................................... 6

    B.  ARIN and the Federal Government Have Publicly Asserted for Years, Including in This Case, that IP Addresses Are Not Property ........................ 8

III.  LEGAL STANDARD ...................................................................................... 11

IV.  ARGUMENT ................................................................................................... 12

    A.  The Government Has Failed to Plead Wire Fraud As A Matter of Law Because IP Addresses Are Not "Property" For Purposes of the Wire Fraud Statute .................................................................................................. 12

    B.  Even if the IP Netblocks Are "Property," the Indictment Does Not Allege that Defendants Obtained the IP Netblocks By Means of Material Misrepresentations. ........................................................................ 17

V.  CONCLUSION ................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carpenter v. United States*,
484 U.S. 19 (1987) ...................................................................................... 5, 12

*Cleveland v. United States*,
531 U.S. 12 (2000) ................................................................................. 13, 16, 17

*Dowling v. United States*,
473 U.S. 207 (1985) ............................................................................... 14, 15, 16

*Glob. NAPS, Inc. v. Verizon New England, Inc.*,
No. CV 02-12489-RWZ, 2015 WL 12781223 (D. Mass. Mar. 10, 2015) ................. 16

*Glob. NAPS, Inc. v. Verizon New England, Inc.*,
No. CV 02-12489-RWZ (D. Mass. 2015) ................................................ 10

*Kremen v. Cohen*,
No. C 98-20718 (N.D. Cal. 2006) ............................................... 10

*McNally v. United. States*,
483 U.S. 350 (1987) ........................................................ 5, 12, 16, 17, 18, 21

*Neder v. United States*,
527 U.S. 1 (1999) ............................................................................ 19

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ............................................................... 14

*In re Nortel Networks Corp.*,
Case No. 09-10138 (Bankr. D. Del. 2010) .............................................. 10, 11

*Pasquantino v. United States*,
544 U.S. 349 (2005) ................................................................... 13

*Skilling v. United States*,
561 U.S. 358 (2010) ............................................................. 12, 16, 17

*United States v. Berry*,
638 F.Supp.2d 1163 (N.D. Cal. 2009) ........................................ 11

*United States v. Bruchhausen,*
    977 F.2d 464 (9th Cir. 1992) ............................................................... 19, 20

*United States v. Cecil,*
    608 F.2d 1294 (9th Cir. 1979) ................................................................... 18

*United States v. Dadanian,*
    856 F.2d 1391 (9th Cir. 1988) ..................................................................... 5

*United States v. Henry,*
    29 F.3d 112 (3d Cir.1994) .......................................................................... 14

*United States v. Jinian,*
    725 F.3d 954 (9th Cir. 2013) ........................................................................ 5

*United States v. Lew,*
    875 F.2d 219 (9th Cir. 1989) ................................................ 12, 17, 18, 19

*United States v. Riggs,*
    739 F. Supp. 414 (N.D. Ill. 1990) ........................................................ 15, 16

*United States v. Shortt Accountancy Corp.,*
    785 F.2d 1448 (9th Cir. 1986) ..................................................................... 11

*Universal Health Servs., Inc. v. United States,*
    136 S. Ct. 1989 (2016) ................................................................................ 19

**Statutes**

18 U.S.C. § 1343 ................................................................................................ 12

18 U.S.C. § 1346 ............................................................................................ 5, 12

18 U.S.C. § 1956(c)(7)(A) ................................................................................. 17

18 U.S.C. § 2314 ............................................................................................... 15

**Other Authorities**

Fed. R. Crim. P. 12 ...................................................................................... 11, 18

Fed. Rule of Evid. 201………………………………………………………… 8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

*Internet Protocol ("IP") addresses are not property.*  That is what the Government's expert John Curran, the Chief Executive Officer of the American Registry for Internet Numbers, Ltd. ("ARIN"), swore to this Court.  In his declaration in support of the Government's Response in Opposition to the Defendants' Motion to Dismiss the Indictment as Void for Vagueness ("Curran Declaration"), Curran quoted a U.S. Federal Communications Commission ("FCC") publication as stating, "When a registry allocates a[n IP] number to an entity, it is giving that entity the ability to use that number; *no property right is conferred to the recipient*."  (Dkt. 107-1 ¶ 14.)  The emphasis in the quote was added by Curran.

The Government's concession that IP addresses are not property requires this Court to dismiss all wire fraud counts and strike all wire-fraud-related allegations from the Indictment.  It is well-established that the wire fraud statute is "limited in scope to the protection of **property rights**."  *McNally v. United. States,* 483 U.S. 350, 360 (1987) (emphasis added), *superseded by statute on other grounds*, 18 U.S.C. § 1346; *see also United States v. Dadanian*, 856 F.2d 1391, 1392 (9th Cir. 1988).[1]  The only items that Defendants Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum, and Petr Pacas are accused of having "acquired" in the Indictment are IP addresses.  Because IP addresses are the only alleged object of Defendants' alleged wire fraud scheme, if IP addresses are not property as the Government itself maintains, the Government has failed to state a wire fraud offense.

Alternatively, even if IP addresses *are* property, the wire fraud counts must be

---

[1]   *McNally* was a case about the mail fraud statute, but the analysis for mail fraud and wire fraud are the same.  *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) ("the wire fraud statute is read in light of the case law on mail fraud"), *quoting United States v. Manarite*, 44 F.3d 1407, 1411 n. 5 (9th Cir. 1995); *see also Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987).

1  dismissed because the Indictment fails to allege that Defendants obtained the IP addresses
2  *by means of a material misrepresentation*.  Although the Indictment describes an alleged
3  misrepresentation—namely a letter of agency ("LOA") stating that the original IP address
4  holder authorized the Defendants to use the IP addresses—it does not allege that the
5  misrepresentation was *the means by which Defendants acquired the IP addresses*. This
6  distinction is critical.  Similarly, the Indictment does not allege that the misrepresentation
7  was material.  To the contrary, in statements to the Court, the Government described the
8  *lack* of materiality when it stated that the recipient of the LOA "did not believe it was his
9  job to verify whether or not the LOAs were, in fact, true."  (Hr'g Tr. 21:1-2 (Apr. 30,
10 2019).)

11      Because these defects in the Indictment are fatal to the wire fraud counts, the Court
12 must dismiss Counts 2-5 and strike all language relating to wire fraud in Count 1.

## II.   BACKGROUND

### A.   The Wire Fraud Counts in the Indictment Accuse Defendants of Scheming to Acquire Inactive IP Addresses

16      On October 31, 2018, the Government brought felony criminal wire fraud and CAN-
17 SPAM Act charges against four employees of a large digital advertising company
18 ("Company A").  The premise of the Indictment is that Defendant employees, who were
19 responsible for leasing or purchasing IP addresses on behalf of Company A, allegedly
20 "acquired" IP addresses for Company A that were in actuality registered to other
21 companies.  (Indictment ¶ 2.)  The dispute at trial will revolve around whether Defendants
22 were duped into believing they were legitimately purchasing IP addresses from the
23 Government's cooperating witness Daniel Dye, or whether, as the Government alleges,
24 Defendants decided to jeopardize their jobs and reputations (and in the case of
25 Mr. Qayyum and Mr. Pacas, their immigration status) by purchasing IP addresses they
26 knew to be stolen, even though doing so afforded them no personal benefit or economic
27 gain.  Defendants deny the Government's characterization of the events as stated in the
28 Indictment, various motion papers, and in oral arguments made to the Court.  For the

purposes of this motion, however, the Court may assume that the Government's version of the facts are true.

Defendants are charged in Count 1 with conspiracy to commit wire fraud and electronic mail fraud and in Counts 2-5 with substantive wire fraud counts. The substance of the wire fraud allegations in the Indictment are as follows:

- Defendants "would identify or pay to identify blocks of Internet Protocol (IP) addresses called 'netblocks' that were registered to others and appeared to be inactive." (Indictment ¶ 2a; *see also* ¶ 5.)

- Defendants would then "create and send letters to Internet hosting companies fraudulently stating the letter bearer had been authorized by the registrants of the inactive IP addresses to use the IP addresses." (Indictment ¶ 2b; *see also* ¶ 6)

- Defendants allegedly "concealed their use of the IP addresses to send 'spam' emails by using business names, post office boxes, and email addresses under different names." (Indictment ¶ 8.)

- In furtherance of the above, Defendants wired $600 to a hosting company in Oklahoma through PayPal. (*Id.*)

To connect the IP netblocks referenced in the wire fraud counts to the internet, Defendants are alleged to have paid a hosting company ("Company H") $600 to "announce" each of the IP netblocks. Put simply, "announcement" is the process of notifying internet service providers that the holder of an IP netblock is connecting those IP addresses to the internet. As part of the process of "announcement," certain Defendants are alleged to have provided the owner of Company H with a fraudulent letter of agency ("LOA") that was allegedly forged to look like it had been written and signed by a representative of the actual holder of the IP netblock.

The LOA is the central misrepresentation alleged as part of the wire fraud scheme. The Government does not contend, however, that Company H believed the LOA was authentic or that Company H was necessarily deceived. To the contrary, in the course of opposing Defendants' motion to compel discovery regarding a confidential informant who had communications with the owner of Company H ("Mr. H") about LOAs, the Government stated to the Court:

> [T]he government's case does not rest, as the defense appears to believe, on [Mr. H] testifying that he did not know [the LOAs] were forged.  My expectation is that [Mr. H] is going to testify that he did not believe it was his job to verify whether or not the LOAs were, in fact, true; that his job was to collect an LOA and to provide it to an entity known as an upstream provider.  And that's because [Mr H] did not have the power or authority to transfer IP blocks between registrants.

(Declaration of Naeun Rim ("Rim Decl.") ¶ 10, Exh. I, Hr'g Tr. 20-21 (Apr. 30, 2019).)

## B. ARIN and the Federal Government Have Publicly Asserted for Years, Including in This Case, that IP Addresses Are Not Property[2]

As the Court is aware, ARIN is a non-profit corporation that serves as one of the world's five Regional Internet Registries and has been responsible for the allocation of IP addresses in the North America region since 1997.  (Dkt. 107-1 ("Curran Decl.") ¶ 4.) While ARIN's predecessors had also allocated IP netblocks to entities, it was in a very informal manner.  ARIN, in the other hand, began requiring entities to sign a contract with ARIN known as a Registration Service Agreement ("RSA") before allocating to them a new IP netblock.  (Dkt. 116-1 ("Lindsey Decl.") ¶ 7). By signing the RSA, entities contractually agree to comply with ARIN's policies and receive the "exclusive right to be the registrant" of the allocated IP netblock.[3] (Lindsey Decl. ¶ 23 (quoting ARIN's 2016 RSA Template).) Registrants who are not in compliance with these and other policies are subject to having their IP addresses revoked and reclaimed by ARIN.[4]

Similar to the way a home address allows people to locate a home, an IP address is

---

[2]   The facts in this subsection are undisputed or are taken from Government filings or from materials published by ARIN and government agencies.  Defendants ask that the Court take judicial notice of these facts pursuant to Federal Rule of Evidence 201(b)(2).

[3]   Among other policy requirements, IP registrants must pay ARIN's annual fees, must utilize a minimum percentage of IP addresses within their allocated netblocks, and cannot transfer their right to use the IP addresses to a third party without ARIN's approval. *See ARIN's Number Resource Policy Manual Version 2019.2* ("ARIN Policies"), available at https://www.arin.net/participate/policy/nrpm/.

[4]   *Id*. ("Section 12. Resource Review").

1   what allows devices on the internet to be located and found by other devices on the

2   internet.  The demand for IP addresses is high because every device connected to the

3   internet must be assigned a unique IP address to ensure that data is sent to the intended

4   recipient.  (Curran Decl. ¶ 10.)  Given the limited number of IPv4 addresses, any IPv4

5   address that goes unused is considered to be a waste of a finite resource.  ARIN has taken

6   the position that its policies are designed to prevent this waste and conserve IP space by

7   giving ARIN the ability to allocate IP addresses on a needs-based basis, to take back IP

8   addresses from registrants who fail to demonstrate continued need and utilization, and to

9   place restrictions on registrants' ability to transfer IP addresses to organizations without

10  ARIN's approval and a newly executed RSA.[5]

11        While it is clear that ARIN's policies apply to those who signed written RSAs, it is

12  not clear whether entities who were allocated IP addresses *before* ARIN's creation, known

13  as "legacy" addresses, are subject to these policies.  Legacy IP address holders ("legacy

14  holders") received IP addresses from ARIN's predecessors *without* having to sign a written

15  agreement.  (Rim Decl. ¶ 6, Exh. E at 2 ("ARIN Article in Business Law Today").)  ARIN

16  chose to transfer the information it had about the legacy address allocations into its WhoIs

17  database, but there is no law requiring legacy holders to pay ARIN's fees or comply with

18  its policies.  Some legacy holders have voluntarily signed a Legacy Registration Service

19  Agreement ("LRSA") with ARIN that subjects them to similar conditions as an RSA.  The

20  principle benefit of doing so is to be able to keep their WhoIs information up-to-date—

21  without an LRSA, a legacy holder cannot make changes or corrections to the WhoIs

22  database.  (*Id*. at 5.)  There is no legal requirement to sign an LRSA, however, and many

23  legacy holders have chosen not to do so, opting instead to leave their WhoIs information

24  outdated either because they no longer intend to use the IP addresses or because they

25  simply do not want to be restricted by ARIN's policies.  (*Id*.)  **It is undisputed in this case**

26  **that all of the IP netblocks referenced in the Indictment were legacy netblocks that were**

27  ───────────────

28  [5]   *Id*. ("Section 8. Transfers").

1  ***not subject to an LRSA during the timeframe alleged.***

2        There has been significant debate within the internet community as to whether ARIN

3  has any control over legacy holders who choose not to sign an LRSA. (*Id*. at 3.)  Some

4  have taken the position that legacy holders effectively "own" their legacy addresses and

5  can do whatever they want with them—they can choose to leave them abandoned and

6  unused or to sell them to third parties without involving ARIN or complying with ARIN's

7  transfer policies.  (*Id*. at 2.)  ARIN has taken the position that all legacy addresses are

8  subject to its policies, with or without a contract, and can be revoked by ARIN if out of

9  compliance.  Importantly, ARIN itself has argued that legacy addresses can only be

10 transferred to a third party that has ARIN's approval and has agreed to sign an RSA.  (*Id*.

11 at 3.)

12       To bolster its position, ARIN has repeatedly stated over the years that IP addresses

13 are not property:

14  •    Since at least June of 2004, ARIN's RSA has contained a provision with the
         heading "NO PROPERTY RIGHTS" and has expressly required the registrant
15       to agree that IP addresses are "not property (real, personal or intellectual)" and
         that the registrant does "not acquire any property rights" by virtue of being
16       allocated the IP address.  (Rim Decl. ¶ 3, Exh. B at 3.)

17  •    ARIN's LRSA has contained near identical language stating IP addresses are
         not property since at least October of 2007.  (Rim Decl. ¶ 4, Exh. C (ARIN's
18       2007 LRSA Template.)

19  •    Lawyers for ARIN have published multiple articles in publications such as the
         American Bar Association's *Business Law Today* and *Bloomberg BNA*
20       arguing that IP addresses are not property rights and including legal
         justification for that position. (Rim Decl. ¶¶ 6-7, Exhs. E and F.)
21
    •    ARIN has intervened in several court cases over the years arguing that IP
22       addresses are not property and that legacy holders cannot transfer their IP
         addresses to any third party without ARIN's approval.  *See, e.g.*, *Glob. NAPS,*
23       *Inc. v. Verizon New England, Inc.*, No. CV 02-12489-RWZ (D. Mass. 2015);
         *In re Nortel Networks Corp.*, Case No. 09-10138 (Bankr. D. Del. 2010);
24       *Kremen v. Cohen*, No. C 98-20718 (N.D. Cal. 2006).

25       Government agencies have also consistently and publicly supported ARIN's

26 position:

27  •    As Curran informed the Court, the FCC stated in a 2010 publication made
         available on its website, "When a registry allocates a number to an entity, it is
28       giving that entity the ability to use that number; ***no property right is conferred***

*to the recipient.*" (Rim Decl. ¶ 5, Exh. D at 5 (emphasis added).)[6]

- In an official statement on December 3, 2012, the National Telecommunications and Information Administration embraced ARIN's policies, stating that the United States Government "participates in the development of and is supportive of the policies, processes, and procedures agreed upon by the Internet technical community through ARIN." (Rim Decl. ¶ 8, Exh. G at 2.)

- Canada's Department of Industry submitted a letter to a bankruptcy court in support of ARIN's motion to intervene in the *Nortel* case, *supra*, in which it stated, "It is our view that Internet Numbers never became the property of the persons who were authorised to use them, nor were they ever free of the conditions governing their use. . . While rights to use Internet Numbers are legal and enforceable, they do not constitute property." (Rim Decl. ¶ 9, Exh. H at 1-2.)

## III.   LEGAL STANDARD

A defendant may move to dismiss charges in an indictment for failure to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(iii). "A pretrial motion is generally 'capable of determination' before trial if it involves questions of law rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). "A district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Id.* In particular, where a fact is undisputed, courts may rely on that fact in ruling on a pretrial motion to dismiss "without fear of invading the province of the jury." *United States v. Berry*, 638 F.Supp.2d 1163, 1165 (N.D. Cal. 2009), *citing United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005) ("dismissing an indictment based on the resolution of a legal question in the presence of undisputed facts is authorized by the Federal Rules of Criminal Procedure").

---

[6]   Cannon, Robert, *Potential Impacts on Communications from IPv4 Exhaustion & IPv6 Transition*, FCC Staff Working Paper 3, (Dec. 2010), available at https://apps.fcc.gov/edocs_public/attachmatch/DOC-303870A1.pdf.

## IV.    ARGUMENT

### A.    The Government Has Failed to Plead Wire Fraud As A Matter of Law Because IP Addresses Are Not "Property" For Purposes of the Wire Fraud Statute

The wire fraud statute prohibits the use of interstate wires to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  Courts have interpreted this language to mean that the intent to obtain ***money or property*** from the victim is a required element of a mail or wire fraud offense.  *See, e.g., McNally*, 483 U.S. at 360 (reversing mail fraud conviction where jury was not required to find that the victim was defrauded of money or property); *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) ("the intent of the scheme must be to obtain money or property.")  It is not sufficient for the defendant merely to deceive someone if the object of the deceit was not to obtain property.  *See id*.

While the word "property" is not defined in the wire fraud statute, the Supreme Court has issued several decisions that offer limited guidance.  In *McNally* itself, the Court held that the term "property" did not include the intangible right to honest services from the government.  483 U.S. at 356.[7]  In that same term, the Court clarified in *Carpenter* that "property" was not limited to tangible property and could include intangible property rights—such as a publication's right to confidential business information—that "have long been recognized as property."  *Carpenter v. United States*, 484 U.S. 19, 26 (1987) (citing a string of Supreme Court cases recognizing confidential business information as property).

---

[7]    In response to *McNally*, Congress passed the honest services fraud statute, which expressly states that the phrase "scheme or artifice to defraud" includes a scheme to deprive another of the intangible right to honest services. *See* 18 U.S.C. § 1346.  The new statute did not disturb the central holding of *McNally*, however, which was that mail fraud required a showing of intent to obtain property.  Defendants are not charged with honest services fraud, nor do the allegations against them meet those elements. *See Skilling v. United States*, 561 U.S. 358, 409 (2010) (honest services fraud limited to schemes involving kickbacks or bribes, neither of which are alleged against Defendants here).

1    In *Cleveland*, the Court considered the mail fraud convictions of defendants who were

2    alleged to have defrauded the State of Louisiana by applying for licenses to operate a video

3    poker business under their children's names while concealing from the State the true

4    ownership of the business.  *Cleveland v. United States*, 531 U.S. 12, 16-17 (2000).  The

5    Court reversed the convictions, holding that a business license was not "property" for the

6    purposes of the mail fraud statute, at least in the hands of the State.  *Id*. at 26-27.  Five

7    years later, in *Pasquantino*, the Court affirmed the wire fraud convictions of defendants

8    accused of defrauding Canada of tax revenue by smuggling liquor into the country without

9    paying the liquor tax.  *Pasquantino v. United States*, 544 U.S. 349, 354-55 (2005).  In

10   contrast to the business license at issue in *Cleveland*, the Court held that Canada's

11   entitlement to tax revenue did constitute "property."  *Id*. at 355-56.

12          In this case, Defendants are not alleged to have used confidential business

13   information without their employers' permission, nor are they alleged to have sought to

14   avoid paying a tax—the object of their alleged fraud was to acquire IP addresses.

15   (Indictment ¶¶ 2 and 5.)  But like other federal agencies before it, the Government in this

16   case has adopted ARIN's position that ***IP addresses are not property***.  In the Defendants'

17   motion to dismiss the CAN-SPAM counts as void for vagueness, Defendants argued that it

18   was reasonable for a person to believe that a legacy IP address with no LRSA on file had

19   been "abandoned" and was therefore effectively "unregistered."  (Dkt. 69-1, Mot. at 8.)

20   More than two and a half months after the close of briefing on the motion, and without

21   seeking leave of Court, the Government then filed the Declaration of John Curran to rebut

22   Defendants' argument.  Specifically, Curran stated that because IP addresses were not

23   "property," legacy IP addresses could not be considered "abandoned" or "unregistered"

24   simply because there was no LRSA.[8]  (Curran Decl. ¶¶ 19-23.)  Having taken the position

25   _____

26   [8]   Curran incorrectly stated that Defendants were arguing they had "lawfully obtained
     'unregistered IP addresses' because they were 'abandoned." (Curran Decl. ¶ 23.)  To the

27   contrary, Defendants were arguing that, because many legacy holders who no longer
     intended to use their IP addresses did not sign LRSAs, thereby effectively abandoning the

28   IP addresses, it was reasonable to construe the term "registrant" in the CAN-SPAM statute

that IP addresses are not property to support their argument that the term "registrant" in the CAN-SPAM Act is not void for vagueness, the Government cannot now take the opposite position.  *See New Hampshire v. Maine*, 532 U.S. 742, 755 (2001) (party judicially estopped from arguing one interpretation in same case where it previously argued a different interpretation to gain an advantage at a different stage of the proceeding).  The Government is bound by the position that IP addresses are not property, and have accordingly failed to state a wire fraud offense.

The Government's position that IP addresses are not property is consistent with other cases that have analyzed the issue.  "[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right."  *United States v. Henry*, 29 F.3d 112, 115 (3d Cir.1994).  There are ***no cases*** that have held that an IP address constitutes "property" under the wire fraud statute.  There are courts, however, that have considered whether a copyright, an intangible interest that is comparable in many respects to an IP address, constitutes "property" for the purposes of criminal statutes and have concluded that it does not.  In *United States v. LaMacchia*, for example, a district court dismissed a criminal wire fraud action brought against a defendant accused of having made copyrighted software applications available to others on the internet, thereby depriving copyright holders of licensing fees and royalties.  871 F. Supp. 535, 537 (D. Mass. 1994).  The court concluded that, although a copyright conferred a limited property interest to the copyright holder, a copyright was not "property" for the purposes of the wire fraud statute.  *Id*. at 543 ("[T]he 'bundle of rights' conferred by copyright is unique and distinguishable from the indisputably broad range of property interests protected by the mail and wire fraud statutes").  In reaching this conclusion, the court relied on *Dowling v. United States*, 473 U.S. 207, 228-29 (1985), a case in which the Supreme Court held that the unauthorized sale of copyrighted works did not constitute interstate transportation of stolen property in

---

as being limited to only those who had affirmatively signed an RSA or LRSA with ARIN.

1   violation of 18 U.S.C. § 2314.

2          Importantly, in *Dowling*, the Supreme Court concluded that a copyright was not

3   "property" for the purpose of the stolen goods statute even as it recognized that the

4   Copyright Act *did* confer a limited set of property rights to the copyright holder.  *See id.* at

5   216-17.  The Court reasoned that while the copyright holder was entitled to a "bundle of

6   exclusive rights" to "publish, copy, and distribute" the author's work, the "copyright owner

7   . . . holds no ordinary chattel" because the copyright protection "has never accorded the

8   copyright owner complete control over all possible uses of his work." *Id*.  Acknowledging

9   the distinctive nature of copyrights, the Court concluded, "It follows that interference with

10  copyright does not easily equate with theft, conversion, or ***fraud***." *Id*. at 217 (emphasis

11  added).  *See also United States v. Riggs*, 739 F. Supp. 414, 422-23 (N.D. Ill. 1990) ("the

12  copyright holder owns only a bundle of intangible rights which can be infringed, but not

13  stolen or converted").

14         If copyrights are not "property" for the purposes of criminal wire fraud, neither are

15  IP addresses.  Like a copyright holder, the Government and ARIN have taken the position

16  that the holder of an IP address has the "exclusive right" to authorize the use of that IP

17  address and to be listed as the registrant on the WhoIs database.  (Curran Decl. ¶ 19.)

18  These can be characterized as a "bundle of exclusive rights" similar to a copyright, as

19  characterized by the Supreme Court in *Dowling*.  *See* 473 U.S. at 216-17.  ARIN and other

20  government agencies have also taken the position that there are strict limits to an IP

21  address holder's right to transfer or sell an IP address—that all transfers must be done

22  pursuant to ARIN's policies, and no transfer can occur without ARIN's approval.[9]  Thus,

23  as with copyrights, "the [IP address] holder's dominion is subjected to precisely defined

24  limits." *Id*. at 217.  Because IP addresses are intangible, it is "less clear . . . the taking that

25  occurs when an infringer arrogates the use of another's [IP address]." *Id*. at 217 (regarding

26

27  [9]   *ARIN's Number Resource Policy Manual Version 2019.2*, available at

28  https://www.arin.net/participate/policy/nrpm/.

copyrights).  "The infringer invades a statutorily defined province guaranteed to the [IP address] holder alone. But he does not assume physical control over the [IP address]; nor does he wholly deprive its owner of its use."  *Id.* (regarding copyrights).

Moreover, an IP address, particularly a legacy IP address, has even less property-like characteristics than a copyright.[10]  A copyright holder must at minimum apply for a legally recognizable copyright to receive the limited bundle of rights described in *Dowling*. Legacy IP holders, on the other hand, were simply allocated IP netblocks without even having to sign a written agreement.  While a copyright requires the creation of content, at bottom, an IP address is just an intangible series of numbers.  Unlike a domain name (such as "www.google.com") or a trademark (such as Mattel™), an IP address does not have inherent value in it of itself.  People do not rely on IP addresses to find websites, and IP addresses are not recognizable or associated with a specific entity, the goodwill of a business, a brand, or a service.  Coupled with the limited right of IP address holders to transfer IP addresses without ARIN's approval, these additional characteristics of IP addresses take them even further away from the traditional meaning of "property."

In any case, at minimum, the question of whether IP addresses are property is ambiguous.  Under such circumstances, when construing federal criminal fraud statutes, the Supreme Court has not hesitated to rely on the rule of lenity.  *See Cleveland*, 531 U.S. at 25 ("to the extent that the word 'property' is ambiguous as placed in § 1341, we have instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity'"); *see also Skilling*, 561 U.S. at 410; *McNally*, 483 U.S. at 360.  This is especially the case for mail and wire fraud because these crimes are also predicate offenses

---

[10]   That is not to say that IP address holders have *no* property interest in their IP addresses. In the context of bankruptcy proceedings, courts have even held "that holders of legacy IP addresses have at least some property interests in their addresses and that those interests are transferable." *Glob. NAPS, Inc. v. Verizon New England, Inc.*, No. CV 02-12489-RWZ, 2015 WL 12781223, at *3 (D. Mass. Mar. 10, 2015).  But *Dowling*, *LaMcchia,* and *Riggs* make clear that a limited interest does not alone make an intangible item "property" within the meaning of *criminal* property statutes.

1    under RICO, 18 U.S.C. § 1961, and the money laundering statute, 18 U.S.C. §

2    1956(c)(7)(A). *Cleveland*, 531 U.S. at 25.

3        The rule of lenity requires this Court to reject the "harsher alternative reading" of a

4    statute and construe it in favor of the defendant. *Id.* This is because "reading the statute to

5    proscribe a wider range of offensive conduct" could "raise the due process concerns

6    underlying the vagueness doctrine." *Skilling*, 561 U.S. at 408-09. The due process

7    concern is even more heightened here, where ARIN and several government agencies have

8    stated for years the IP addresses are not property. It would be a gross violation of due

9    process for federal agencies to take the position for years that IP addresses are not property

10   and to publicly endorse ARIN's position on this point, even in bankruptcy proceedings

11   where freedom is not at issue, only to turn around and ask the Court to find that IP

12   addresses are property in the context of a *criminal* prosecution. The doctrine of lenity is

13   based on the premise that "the citizen is entitled to fair notice of what sort of conduct may

14   give rise to punishment." *McNally*, 483 U.S. at 375. How can the ordinary person be said

15   to have had "fair notice" that IP addresses were property when government agencies have

16   been saying otherwise for decades? "Rather than construe the statute in a manner that

17   leaves its outer boundaries ambiguous" and leave it open to vagueness challenges, the

18   Court must conclude, as the Government itself has stated, that IP addresses are not

19   property within the meaning of the criminal wire fraud statute.

20      **B.**     **Even if the IP Netblocks Are "Property," the Indictment Does Not Allege**

21             **that Defendants Obtained the IP Netblocks By Means of Material**

22             **Misrepresentations.**

23        For a wire fraud offense, it is not enough to allege that a defendant intended to

24   obtain money or property—he must have intended "to obtain money or property *from the*

25   *victim of the deceit*." *See Lew*, 875 F.2d at 221 (emphasis added). In *Lew*, a jury convicted

26   an immigration attorney of mail fraud for submitting false immigration applications on

27   behalf of his clients to the United States government. The Ninth Circuit overturned the

28   mail fraud convictions on the basis that although Lew was found to have made false

1  statements, those statements had been made to the *government*, from whom he was not

2  alleged to have obtained any money or property.  Likewise, although Lew had obtained

3  money from his clients in the form of attorney's fees, he was not alleged to have done so

4  by *deceiving* them.  *Lew*, 875 F.2d at 221.  Relying on *McNally*, the Ninth Circuit held that

5  a defendant can only commit mail fraud if he intended to obtain money or property *from*

6  *the one who is deceived*.  *Id*.

7         It is not clear from the Indictment who is alleged to be the victim of the supposed

8  wire fraud.  In statements to the Court, the Government has stated that it perceives the

9  victims of the wire fraud to be "the individuals who were the registrants of these IP

10  netblocks who had their property used without their consent."  (Rim Decl. ¶ 10, Exh. I,

11  Hr'g Tr. 29 (Apr. 30, 2019).)  The Government has also suggested during oral argument

12  that "webmail providers," such as Gmail, are also potential victims because they had to

13  "incur the cost of filtering the spam" and were deceived by the "IP block."  (*Id*.)  The

14  Indictment does not specify what these supposed costs are or how webmail providers were

15  deceived by the "IP block."[11]  But whether the alleged "victims" are the legacy holders or

16  internet services providers, the wire fraud counts fail under *Lew*.

17         Defendants are accused of having taken the legacy holders' IP addresses, but *they*

18  *are not alleged to have deceived them*—the Indictment does not allege that Defendants had

19  any interaction with them at all or even knew if the companies still existed.  As for who

20  *was* allegedly deceived, Defendants are accused of (1) having provided false LOAs to

21  Company H, who, as the Government has said, had no interested in verifying an LOA's

22

---

23  [11]   That Defendants are unable to discern from the Indictment the identity of the alleged

24  victim is in itself improper.  At minimum, an indictment must set forth "a sufficient
   description of the charges against [a defendant] to enable him to prepare his defense, to

25  ensure that the defendant is prosecuted on the basis of facts presented to the grand jury, to
   enable him to plead jeopardy against a later prosecution, and to inform the court of the

26  facts alleged so that it can determine the sufficiency of the charge." *United States v. Cecil*,

27  608 F.2d 1294, 1296 (9th Cir. 1979).  An indictment that does not meet these requirements

28  must be dismissed for lack of specificity.  *See Id*.; Fed. R. Cr. P. 12(b)(3)(B)(iii).

authenticity (*Id*. at 20-21); and (2) having registered for domain names and DBAs to "conceal" their use of the IP addresses, which the Government has suggested in Court may have deceived internet service providers ("ISPs"). (*Id.* at 29.) But Defendants are not alleged to have *obtained any money or property* from either Company H or internet service providers. In fact, the Indictment alleges that Defendants *paid* Company H $600 to announce the IP netblocks. Thus, as was the case in *Lew*, Defendants are alleged to have made misrepresentations to one party (Company H or ISPs) and to have obtained the alleged property—here, IP addresses—from another (legacy holders). Such facts are not sufficient to constitute wire fraud, which requires the *property* to have been obtained *from the deceived party*. *See Lew*, 875 F.2d at 221. Otherwise, the taking of the property is not *by means of* deceit. *See id.*

In wire fraud, misrepresentations must also be material. *Neder v. United States*, 527 U.S. 1, 25 (1999). ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.") A misrepresentation is "material" if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016). Here, none of the misrepresentations alleged could be construed as "material." The Indictment does not explain how the allegedly forged LOAs or misleading DBAs and domain names influenced anyone to part with money or property or how they influenced anyone to act differently at all. In fact, the Government indicated in Court that Mr. H *did not care whether the LOAs were forged* and even suggested that the Defendants chose to use Company H precisely because Mr. H was indifferent to the LOAs' authenticity. (Rim Decl. ¶ 10, Exh. I, Hr'g Tr. 20-21 (Apr. 30, 2019).) None of these alleged facts support the claim that the LOA was material such that it "influenced" or was "capable of influencing" someone to part with money or property.

To the extent that the Government intends to argue that internet service providers would not have agreed to route the IP netblocks had they known any LOAs were allegedly forged, the Ninth Circuit has already rejected that argument. *See United States v.*

1  *Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992).  In *Bruchhausen*, the defendant was

2  convicted of wire fraud for purchasing equipment from manufacturers under the false

3  premise that they would be used in the United States when he was in fact exporting them to

4  Soviet Bloc countries.  On appeal, the Court reversed his convictions, holding that the fact

5  that the manufacturers would not have sold the equipment to the defendant had they known

6  the truth was not sufficient to support a wire fraud conviction.  *Id.* at 466-67.  Similarly, in

7  this case, even if the ISPs were to claim that they would not have routed the IP addresses

8  had they known the LOAs were in fact forged as alleged, that is not enough to state an

9  offense for wire fraud.  *See id.*

10       A central flaw in the Government's wire fraud theory is that neither an LOA nor a

11  misleading domain or DBA name can be a means by which one *acquires* an IP address.[12]

12  It is unclear when one can be said to have "acquired" an IP address from another, but if one

13  were to identify a point of IP acquisition, it would most logically be the point at which

14  Defendants allegedly purchased the IP netblocks from cooperating witness Daniel Dye.  It

15  would not be at the point of netblock "announcement" by Company H, during which an

16  LOA would come into play.  Announcement connects IP addresses to the internet—it does

17  not transfer IP addresses from one party to another.  The Government confirmed as much

18  to the Court when it stated that Mr. H did not believe he had to check the authenticity of an

19  LOA to announce a netblock because "***he did not have the power or authority to transfer***

20  ***IP blocks between registrants***."  (Rim Decl. ¶ 10, Exh. I, Hr'g Tr. 21 (Apr. 30, 2019)

21  (emphasis added).)  Nor is the use of certain domain names or DBAs a step in the process

22  of IP acquisition.  Thus, at worst, Defendants can be alleged to have made

23  misrepresentations so that they could *use* IP netblocks—but the alleged facts, even

24  assuming they are true, do not show that they (1) obtained the IP netblocks (b) by means of

25  material misrepresentations (3) made to victims.  Even if the Court discounts the

26

27  _____

   [12]  Because an IP address is not property, it is not clear that one can "acquire" an IP

28  address at all.

Government's own position that the IP netblocks are not property, the Indictment's

allegations are insufficient as a matter of law to support the offense of wire fraud.

## V.     CONCLUSION

"There are no constructive offenses; and before one can be punished, it must be

shown that his case is plainly within the statute." *McNally*, 483 U.S. at 360.  Defendants

are accused of having fraudulently acquired IP addresses, something that ARIN has

described for years as being ***not property.***  Given the Government's position that IP

addresses are not property, the wire fraud counts cannot be said to be plainly within the

statute.  Neither do the remaining allegations meet any of the other elements of wire fraud.

The Court must dismiss the wire fraud counts from the Indictment.

Respectfully submitted,

DATED:  January 23, 2020              Gary S. Lincenberg
                                     Naeun Rim
                                     Bird, Marella, Boxer, Wolpert, Nessim,
                                     Drooks, Lincenberg & Rhow, P.C.

                              By:    _____*s/ Naeun Rim*_____
                                           Gary S. Lincenberg
                                     Attorneys for Petr Pacas

DATED:  January 23, 2020              David W. Wiechert
                                     Jessica C. Munk
                                     William J. Migler
                                     Wiechert, Munk & Goldstein, PC

                              By:    _____*s/ Jessica C. Munk*_____
                                           Jessica C. Munk
                                     Attorneys for Jacob Bychak

DATED:  January 23, 2020              Randy K. Jones
                                     Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
                                     P.C.

                              By:    _____*s/ Randy K. Jones*_____
                                           Randy K. Jones
                                     Attorney for Mark Manoogian

DATED:  January 23, 2020

Whitney Z. Bernstein
Thomas H. Bienert, Jr.
James Riddet
BIENERT | KATZMAN PC

By:  _____*s/ Whitney Z. Bernstein*_____
Whitney Z. Bernstein
Attorneys for Mohammed Abdul Qayyum

## CERTIFICATE OF AUTHORIZATION
## TO SIGN ELECTRONIC SIGNATURE

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures of the United States District Court for the Southern District of California, I certify that the content of this document is acceptable to counsel for the Defendants and that I have obtained authorization to affix their electronic signatures to this document.

Respectfully submitted,

DATED:  January 23, 2020

Gary S. Lincenberg
Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By:  _____*s/ Naeun Rim*_____
Naeun Rim
Attorneys for Petr Pacas

1

## CERTIFICATE OF SERVICE

2     Counsel for Defendant certifies that the foregoing pleading has been electronically

3  served on the following parties by virtue of their registration with the CM/ECF system:

4                                Sabrina L. Feve

5                             Assistant U.S. Attorney

6                            sabrina.feve@usdoj.gov

7

8                             Melanie K. Pierson

9                            Assistance U.S. Attorney

10                          melanie.pierson@usdoj.gov

11

12                                Robert Ciaffa

13                            Assistant U.S. Attorney

14                          robert.ciaffa@usdoj.gov

15                           Respectfully submitted,

16

17  DATED:  January 23, 2020          Gary S. Lincenberg
                                      Naeun Rim
18                                    Bird, Marella, Boxer, Wolpert, Nessim,
19                                    Drooks, Lincenberg & Rhow, P.C.

20

21                                By:        _/s/ Naeun Rim_
22                                               Naeun Rim
23                                       Attorneys for Petr Pacas

24

25

26

27

28