1   Gary S. Lincenberg - SBN 123058
        glincenberg@birdmarella.com
2   Naeun Rim - SBN 263558
        nrim@birdmarella.com
3   BIRD, MARELLA, BOXER,
    WOLPERT, NESSIM, DROOKS,
4   LINCENBERG & RHOW, P.C.
    1875 Century Park East, 23rd Floor
5   Los Angeles, California 90067-2561
    Telephone: (310) 201-2100
6   Facsimile: (310) 201-2110

7   *Attorneys for Petr Pacas*

8   David W. Wiechert - SBN 94607
        dwiechert@aol.com
9   Jessica C. Munk - SBN 238832
        jessica@wmgattorneys.com
10  William J. Migler - SBN 318518
        william@wmgattorneys.com
11  WIECHERT, MUNK & GOLDSTEIN, PC
    27136 Paseo Espada, Suite B1123
12  San Juan Capistrano, California 92675
    Telephone: (949) 361-2822

13
    *Attorneys for Jacob Bychak*
14

Randy K. Jones - SBN 141711
    rkjones@mintz.com
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
Telephone: (858) 314-1510

*Attorney for Mark Manoogian*


Whitney Z. Bernstein - SBN 304917
    wbernstein@bmkattorneys.com
Thomas H. Bienert, Jr. - SBN 135311
    tbienert@bmkattorneys.com
James Riddet - SBN 39826
    jriddet@bmkattorneys.com
BIENERT | KATZMAN PC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700

*Attorneys for Mohammed Abdul Qayyum*

15
## UNITED STATES DISTRICT COURT
16
## SOUTHERN DISTRICT OF CALIFORNIA
17

18  UNITED STATES OF AMERICA,

19              Plaintiff,

20          vs.

21  JACOB BYCHAK, MARK
    MANOOGIAN,  MOHAMMED
22  ABDUL QAYYUM, AND PETR
    PACAS
23              Defendants.

24

25

26

27

28

CASE NO. 3:18-cr-04683-GPC

**DECLARATION OF NAEUN RIM
IN SUPPORT OF DEFENDANTS'
JOINT MOTION TO DISMISS
WIRE FRAUD COUNTS 2-5 AND
TO STRIKE WIRE FRAUD
ALLEGATIONS IN COUNT 1 FOR
FAILURE TO STATE AN
OFFENSE**

Date: February 20, 2020
Time: 1:00 PM
Dept.: 2D

Assigned to Hon. Gonzalo P. Curiel

# DECLARATION OF NAEUN RIM

I, Naeun Rim, declare as follows:

1.      I am an active member of the Bar of the State of California and a Principal with Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, A Professional Corporation, attorneys of record for Defendant Petr Pacas in this action.  I make this declaration in support of Defendant Petr Pacas' Motion to Dismiss Wire Fraud Counts 2 to 5 and to Strike Wire Fraud Allegations in Count 1 for Failure to State and Offense Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2.      Attached as **Exhibit A** is a true and correct copy of a Registry Service Agreement ("RSA") template dated March 10, 2011, by American Registry for Internet Numbers, Ltd ("ARIN"), produced to Defendants by ARIN as Bates numbers ARIN-BYCHAK 0093-101.

3.      Attached as **Exhibit B** is a true and correct copy of an RSA template dated June 18, 2004, produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0051-58.

4.      Attached as **Exhibit C** is a true and correct copy of an RSA template dated October 31, 2007, by ARIN and produced to Pacas as Bates numbers ARIN_BYCHAK_0123-127.

5.      Attached as **Exhibit D** is a true and correct copy of a Federal Communications Commission ("FCC") Staff Working Paper by Robert Cannon and produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0272-302.

6.      Attached as **Exhibit E** is a true and correct copy of an article entitled "Guidance from ARIN on Legal Aspects of the Transfer of Internet Protocol Numbers" published in *Business Law Today* and produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0188-192.

7.      Attached as **Exhibit F** is a true and correct copy of an article entitled "Internet Protocol Numbers and the American Registry for Internet Numbers…"

published in *Bloomberg BNA* and produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0193-197.

8.    Attached as **Exhibit G** is a true and correct copy of a letter from the National Telecommunications and Information Administration and produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0001-02.

9.    Attached as **Exhibit H** is a true and correct copy of a letter from Canada's Department of Industry regarding Case No. 09-10138 (KG) and produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0269-271.

10.    Attached as **Exhibit I** is a true and correct copy of the transcript for the April 30, 2019, hearing in this matter.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this declaration on January 23, 2020, at Los Angeles, California.


_____*s/ Naeun Rim*_____
Naeun Rim

1

## <u>CERTIFICATE OF SERVICE</u>

2      Counsel for Defendant certifies that the foregoing pleading has been electronically

3   served on the following parties by virtue of their registration with the CM/ECF system:

4                                   Sabrina L. Feve

5                                Assistant U.S. Attorney

6                               sabrina.feve@usdoj.gov

7

8                                 Melanie K. Pierson

9                                Assistance U.S. Attorney

10                             melanie.pierson@usdoj.gov

11

12                                   Robert Ciaffa

13                               Assistant U.S. Attorney

14                              robert.ciaffa@usdoj.gov

15                               Respectfully submitted,

16

17  DATED:  January 23, 2020         Gary S. Lincenberg
                                     Naeun Rim
18                                   Bird, Marella, Boxer, Wolpert, Nessim,
19                                   Drooks, Lincenberg & Rhow, P.C.

20

21                               By:    _/s/ Naeun Rim_____

22                                          Naeun Rim
23                                   Attorneys for Petr Pacas

24

25

26

27

28

DECLARATION OF NAEUN RIM IN SUPPORT OF MOTION TO DISMISS WIRE FRAUD COUNTS

# EXHIBIT A

RSA: Version 10.2 (10 March 2011)

**AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD.**
**SERVICE AGREEMENT**

This SERVICE AGREEMENT ("Agreement") is made by and between the AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD. ("ARIN"), a Virginia nonprofit corporation, and _____, ("Applicant").
ARIN will not accept any alterations to this Agreement.  Applicant must return the entire Agreement, including a completed signature page, to ARIN to indicate its acceptance, without modification, of all the terms and conditions of the Agreement.  Applicant may return the signed Agreement in PDF form.

1.  INTRODUCTION

    ARIN is a Regional Internet Registry serving Canada, the United States, and specific designated islands in the Caribbean Sea and North Atlantic Ocean, and is responsible for the registration, administration, and stewardship of Internet number resources in these geographic areas. Applicant must submit this Agreement and any requested accompanying information to ARIN to apply to receive and use certain services ("Services") from ARIN, which may include, without limitation, an allocation/assignment of IP address space, assignment of Autonomous System numbers ("ASNs"), inverse addressing on network blocks, maintenance of resource records, and administration of IP address space. Allocation/assignment of IP address space and assignment of ASNs shall hereinafter be defined as "number resources."

2.  AUTHORITY TO MODIFY AGREEMENT

    BECAUSE OF THE NECESSARY ROLE THAT ARIN PERFORMS FOR THE INTERNET COMMUNITY, ARIN RESERVES THE RIGHT TO MODIFY THIS AGREEMENT AT ANY TIME. ARIN WILL PROVIDE NOTIFICATION OF ANY MODIFICATION(S) VIA ELECTRONIC MAIL TO THE CURRENTLY REGISTERED ADMINISTRATIVE POINT OF CONTACT.  FOLLOWING THIS ELECTRONIC NOTIFICATION, ARIN WILL POST THE MODIFICATION(S) ON ITS WEBSITE.  CHANGES WILL BE EFFECTIVE AFTER BEING POSTED ON ARIN'S WEBSITE FOR 30 DAYS AND WILL BE APPLIED TO ALL APPLICANTS OR PERSONS RECEIVING SERVICES.  CONTINUED RECEIPT OR USE OF THE SERVICES CONSTITUTES APPLICANT'S ACCEPTANCE OF THE CHANGES.

3.  EVALUATION AND ACCEPTANCE

    Following Applicant's submission of a completed application, ARIN will evaluate Applicant's request for Services.  Evaluation may require additional documentation to support the application such as, but not limited to, business plans, management documentation, state registration, Dun & Bradstreet and/or taxpayer information, and/or registration under the province or country in which the entity is registered for verification purposes.  If ARIN, in its sole, exclusive, and reasonable discretion, applying ARIN's Number Resource Policy Manual,  Guidelines, and Procedures (collectively, the "Policies"), as published on ARIN's website, located at "*http://www.arin.net*" (the "Website"), and internal verification process, determines that it will provide the Services to Applicant, ARIN shall provide written notice to Applicant of its willingness to do so, and ARIN will promptly commence providing the Services to Applicant in accordance with the terms and conditions of this Agreement.  If ARIN, in its sole, exclusive, and reasonable discretion, applying its published Policies and internal verification process, determines that it will not provide the Services, it will provide written notice to Applicant of its decision.  If, at any point, including during the application process and/or the pendency of this Agreement, Applicant actively misrepresents, falsifies, or otherwise fraudulently provides information, ARIN may immediately terminate this Agreement.

4.  CONDITIONS OF SERVICE

ARIN_BYCHAK_0093

RSA: Version 10.2 (10 March 2011)

(a) Provision. Subject to ARIN's agreement to provide the Services and Applicant's ongoing compliance with its obligations under this Agreement, including, without limitation, the timely payment of the Fees (as defined below), ARIN shall provide the Services to Applicant in accordance with this Agreement and the Policies.

(b) Change Request. To change the Services that it receives from ARIN, Applicant must provide ARIN with written notice (entitled a "Change Request"). If ARIN, in its sole, exclusive, and reasonable discretion, determines that it will provide the Services to Applicant as set forth in the Change Request, ARIN will commence providing the Services as modified to Applicant in accordance with the terms and conditions of this Agreement. If ARIN, in its sole, exclusive, and reasonable discretion, determines that it will not provide the Services as requested by Applicant to be modified, it will provide written notice to Applicant that it will not provide Services in accordance with the Change Request.

(c) Cooperation. During the term of this Agreement, Applicant shall provide ARIN complete, up-to-date, and accurate information, assistance, and cooperation that ARIN reasonably requests in ARIN's provision of the Services to Applicant, including, without limitation, during ARIN's review of Applicant's utilization of number resources. Applicant shall promptly notify ARIN if any of its information changes during the Agreement. If Applicant does not provide ARIN with all information, assistance, and cooperation that ARIN reasonably requests, ARIN may: (i) take such failure into account in refusing Applicant's future allocation/assignment of number resources; and/or (ii) terminate this Agreement and revoke and reclaim Applicant's number resources.

(d) Prohibited Conduct. In using the Services, Applicant shall not: (i) disrupt or interfere with the security or use of the Services; (ii) violate any applicable laws, statutes or regulations; or (iii) assist any third party in engaging in any activity prohibited by this Agreement. If a definitive finding of a violation of law or regulation is established by a decision of a national, state, or other government authority regarding any of (i) through (iii), ARIN will follow such decisions and will cooperate with all government inquiries that utilize legally appropriate methods to obtain information from ARIN.

(e) Content Control. Applicant acknowledges that ARIN does not have the ability to control or influence content accessible through or facilitated by those who receive number resources, directly or indirectly, from ARIN.

5.  USE OF THE ARIN DATABASE

(a) Authorization. The Administrative Point of Contact ("POC") will be the principal point of contact between Applicant and the ARIN database, and have the sole right to designate other qualifying POCs of Applicant with authority to modify the ARIN database ("Authority"). The Administrative POC will also facilitate Applicant's compliance with the terms and conditions of this Section 5. Applicant will provide ARIN with any and all documentation and information regarding the Administrative POC that ARIN reasonably requests. Applicant must notify ARIN in writing immediately if: (i) the relationship an employee with Authority has with Applicant is or will be terminated; (ii) an employee with Authority will have that Authority revoked; (iii) Applicant has reason to believe that an employee with Authority has granted or will grant a third party unauthorized access to the ARIN database; (iv) Applicant has any reason to believe that an employee with Authority should not be trusted; or (v) Applicant wants to designate another Administrative POC. Notices to ARIN under this Section must be given by e-mail to hostmaster@arin.net or submitted through an authorized account via ARIN Online and will be effective when acknowledged as received by ARIN.

(b) Responsibility for Directory Services Data. Applicant is responsible for the timely and accurate maintenance of directory services data (WHOIS), as well as data concerning any organization to which it further sub-delegates number resources.

ARIN_BYCHAK_0094

RSA: Version 10.2 (10 March 2011)

(c) Applicant Liability for Unauthorized Acts or Omissions.  Applicant is solely and exclusively responsible for all acts and omissions undertaken by any of its POCs and/or employees with Authority, whether or not authorized in law or in fact.  Applicant is solely and exclusively responsible for the security of its access to and use of number resources in the ARIN database and any loss or damage that Applicant suffers based on any unauthorized access thereto.

6.  FEES AND PAYMENTS

(a) Fee Schedule. As a condition precedent to ARIN's duty to provide the Services, Applicant shall pay ARIN for providing the Services in accordance with ARIN's Fee Schedule, which is available on the Website.  From time to time, during the term of this Agreement and as it may renew, ARIN will have the right to change the amount of the fees or institute new fees relating to the Services.

(b) No Refunds. All fees paid by Applicant to ARIN are deemed fully earned upon receipt and are nonrefundable.

(c)  Registration Fees. Prior to ARIN providing Applicant with its requested allocation/assignment of number resources, Applicant shall pay ARIN the applicable "registration fee," as set forth in the Fee Schedule, as well as any outstanding fees for other resources received from ARIN. Applicant shall also pay ARIN the applicable "annual renewal fee," if any, as set forth in the Fee Schedule, at least five (5) days prior to the end of the anniversary month of ARIN's first issuance of the Services to Applicant (*e.g.*, ARIN's initial allocation/assignment of number resources to Applicant) occurs.  If, for any reason, the Applicant has not made prompt payment, and/or ARIN is unable to contact the Applicant, ARIN has the right to take the following actions if the invoice is overdue: (i) stop providing Services; or (ii) terminate this Agreement and revoke the number resources previously allocated or assigned.  Any Applicant whose Services were stopped pursuant to 6(c)(i) may have the Services restored if it brings its account current before revocation.  Any number resources revoked pursuant to 6(c)(ii) shall be held by ARIN for a minimum 6-month period from the date of revocation before they are reissued.  Any Applicant whose number resources have not been reissued by ARIN may restore the Services related to these number resources and have the revocation nullified if it contacts ARIN, brings its account current, signs a revised Agreement, and begins prepayment for all future Services.

7.  POLICIES

Pursuant to ARIN's Policy Development Process, ARIN maintains the Policies and may, at any time in its sole and absolute discretion, amend the Policies, implement new policies (which, once implemented, will be considered Policies), or make certain Policies obsolete.  Such amendments or new Policies shall be binding upon Applicant immediately after they are posted on the Website.  Applicant acknowledges and agrees it has read, understands, and agrees to be bound by and comply with the Policies, as amended.

8.  REVIEW OF APPLICANT'S NUMBER RESOURCES

ARIN may review, at any time, Applicant's use of previously allocated or assigned number resources or Services received from ARIN to determine if Applicant is complying with this Agreement and the Policies and is using the Services for their intended purposes.  Without limiting the foregoing, if Applicant is a holder of a direct allocation or assignment from ARIN, Applicant agrees that it will use the number resources solely for uses consistent with its application and this Agreement, including, for example, its internal infrastructure or to provide Internet access to its customer base. If ARIN determines that the number resources or any other Services are not being used in compliance with this Agreement, the Policies, or the purposes for which they are intended, ARIN may: (i) revoke the number resources; (ii) cease providing the Services to Applicant; and/or (iii) terminate this Agreement.

ARIN_BYCHAK_0095

RSA: Version 10.2 (10 March 2011)

(c) Applicant Liability for Unauthorized Acts or Omissions.  Applicant is solely and exclusively responsible for all acts and omissions undertaken by any of its POCs and/or employees with Authority, whether or not authorized in law or in fact.  Applicant is solely and exclusively responsible for the security of its access to and use of number resources in the ARIN database and any loss or damage that Applicant suffers based on any unauthorized access thereto.

## 6.   FEES AND PAYMENTS

(a) Fee Schedule. As a condition precedent to ARIN's duty to provide the Services, Applicant shall pay ARIN for providing the Services in accordance with ARIN's Fee Schedule, which is available on the Website.  From time to time, during the term of this Agreement and as it may renew, ARIN will have the right to change the amount of the fees or institute new fees relating to the Services.

(b) No Refunds. All fees paid by Applicant to ARIN are deemed fully earned upon receipt and are nonrefundable.

(c)  Registration Fees. Prior to ARIN providing Applicant with its requested allocation/assignment of number resources, Applicant shall pay ARIN the applicable "registration fee," as set forth in the Fee Schedule, as well as any outstanding fees for other resources received from ARIN. Applicant shall also pay ARIN the applicable "annual renewal fee," if any, as set forth in the Fee Schedule, at least five (5) days prior to the end of the anniversary month of ARIN's first issuance of the Services to Applicant (*e.g.*, ARIN's initial allocation/assignment of number resources to Applicant) occurs.  If, for any reason, the Applicant has not made prompt payment, and/or ARIN is unable to contact the Applicant, ARIN has the right to take the following actions if the invoice is overdue: (i) stop providing Services; or (ii) terminate this Agreement and revoke the number resources previously allocated or assigned.  Any Applicant whose Services were stopped pursuant to 6(c)(i) may have the Services restored if it brings its account current before revocation.  Any number resources revoked pursuant to 6(c)(ii) shall be held by ARIN for a minimum 6-month period from the date of revocation before they are reissued.  Any Applicant whose number resources have not been reissued by ARIN may restore the Services related to these number resources and have the revocation nullified if it contacts ARIN, brings its account current, signs a revised Agreement, and begins prepayment for all future Services.

## 7.   POLICIES

Pursuant to ARIN's Policy Development Process, ARIN maintains the Policies and may, at any time in its sole and absolute discretion, amend the Policies, implement new policies (which, once implemented, will be considered Policies), or make certain Policies obsolete.  Such amendments or new Policies shall be binding upon Applicant immediately after they are posted on the Website.  Applicant acknowledges and agrees it has read, understands, and agrees to be bound by and comply with the Policies, as amended.

## 8.   REVIEW OF APPLICANT'S NUMBER RESOURCES

ARIN may review, at any time, Applicant's use of previously allocated or assigned number resources or Services received from ARIN to determine if Applicant is complying with this Agreement and the Policies and is using the Services for their intended purposes.  Without limiting the foregoing, if Applicant is a holder of a direct allocation or assignment from ARIN, Applicant agrees that it will use the number resources solely for uses consistent with its application and this Agreement, including, for example, its internal infrastructure or to provide Internet access to its customer base. If ARIN determines that the number resources or any other Services are not being used in compliance with this Agreement, the Policies, or the purposes for which they are intended, ARIN may: (i) revoke the number resources; (ii) cease providing the Services to Applicant; and/or (iii) terminate this Agreement.

ARIN_BYCHAK_0095

RSA: Version 10.2 (10 March 2011)

9.  NO PROPERTY RIGHTS

Applicant acknowledges and agrees that the number resources are not property (real, personal, or intellectual) and that Applicant does not acquire any property rights in or to any number resources by virtue of this Agreement or otherwise.  Applicant further agrees that it will not attempt, directly or indirectly, to obtain or assert any trademark, service mark, copyright, or any other form of property rights in any number resources in the United States or any other country.

10.  REPRESENTATIONS AND WARRANTIES

(a)  By Each Party.  Each party represents and warrants to the other party that: (i) it has the full power and authority to enter into and perform its obligations under this Agreement; (ii) the assent to and performance by it of its obligations under this Agreement do not constitute a breach of or conflict with any other agreement or arrangement by which it is bound, or any applicable laws, regulations, or rules; and (iii) this Agreement constitutes a legal, valid, binding, and an executory obligation of the parties executing or assenting to this Agreement, enforceable in accordance with its terms and conditions.

(b)  By Applicant. Applicant hereby represents and warrants to ARIN that during the term of this Agreement: (i) it will not infringe the patent, copyright, trademark, trade secret, right of publicity, or other right of any third party in its use of the Services; and (ii) Applicant will comply with this Agreement, the Policies, and all applicable laws, rules, and regulations in its use of the Services.

11.  BANKRUPTCY

If Applicant: (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) files any petition under any chapter of the Bankruptcy Code or other insolvency or bankruptcy law; (iv) has a petition filed against it under any insolvency or bankruptcy law; (v) makes a general assignment for the benefit of creditors, has a receiver appointed for it, or a trustee takes possession of all or substantially all of Applicant's assets; or (vi) ceases or affirmatively indicates its intent to cease its normal business operations (each of the foregoing, a "Bankruptcy Event"), Applicant will notify ARIN immediately. Upon such notice, or if ARIN otherwise learns of the occurrence of any of the foregoing events, ARIN may intervene in any such bankruptcy or insolvency proceeding or take other appropriate, lawful action to preserve its rights under this Agreement and the Policies, and its ability to provide the Services to its other users, including, without limitation: (i) revoking the number resources assigned to Applicant; and/or (ii) terminating this Agreement. Applicant agrees to consent to ARIN's intervening in any such bankruptcy court proceeding so that ARIN can protect its rights under this Agreement with respect to the Policies, number resources, and any other rights ARIN has under this Agreement. Applicant acknowledges and agrees that this Agreement is executory. Applicant acknowledges and agrees that it holds no title or property interest in the number resources and such number resources do not, and shall not, constitute property of the Applicant's bankruptcy estate within the meaning of Section 541 of Title 11 of the United States Code (the "Bankruptcy Code").   Applicant hereby acknowledges and agrees that, upon the occurrence of a Bankruptcy Event, such Bankruptcy Event or any other event of default under this Agreement shall constitute "cause" pursuant to Bankruptcy Code Section 362(d) for granting ARIN relief from the automatic stay or any other applicable injunction to exercise its rights and remedies under this Agreement, and Applicant shall, and hereby does, consent to such relief.

12.  INDEMNIFICATION

ARIN_BYCHAK_0096

RSA: Version 10.2 (10 March 2011)

Applicant shall indemnify, defend, and hold ARIN and its employees, representatives, agents, attorneys, affiliates, trustees, directors, officers, and managers, and members (the "Indemnified Parties") harmless from any damage, loss, cost, or expense (including without limitation, attorneys' fees and costs) incurred by an Indemnified Party  or in connection with any  claim, demand, or action ("Claim") brought or asserted against any of the Indemnified Parties alleging facts or circumstances that would constitute a breach of any provision of this Agreement by Applicant, or its employees or contractors, or arising from, relating to, or connected with: (i) unauthorized access to or use of the ARIN database by Applicant or any of its current or former employees, representatives, agents, attorneys, affiliates, directors, officers, POCs, or managers; (ii) unauthorized access to or use of Applicant's information or number resources in the ARIN database; or (iii) Applicant's use of the Services. If Applicant is obligated to provide indemnification pursuant to this provision, ARIN may, in its sole and absolute discretion, control the disposition of any Claim at Applicant's sole cost and expense.  If ARIN permits Applicant to control the disposition of any Claim, Applicant shall not settle, compromise, or in any other manner dispose of any Claim without the prior written consent of ARIN. Applicant agrees to notify ARIN promptly of the assertion against it or any other person of any claim or the commencement of any action or proceeding relating to any transaction contemplated by this Agreement, whether or not an Indemnified Party is named in the claim or action.

13. DISCLAIMERS, EXCLUSIONS, AND LIMITATIONS

(a)  DISCLAIMER OF WARRANTIES. ARIN PROVIDES THE SERVICES ON AN "AS-IS" BASIS. ARIN DOES NOT REPRESENT OR WARRANT THAT THE SERVICES OR THEIR USE: (i) WILL BE UNINTERRUPTED, (ii) WILL BE FREE OF DEFECTS, INACCURACIES, OR ERRORS, (iii) WILL MEET APPLICANT'S REQUIREMENTS, OR (iv) WILL OPERATE IN THE CONFIGURATION OR WITH OTHER HARDWARE OR SOFTWARE APPLICANT USES. ARIN MAKES NO WARRANTIES OTHER THAN THOSE MADE EXPRESSLY IN THIS AGREEMENT, AND HEREBY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, AND/OR NON-INFRINGEMENT.

(b)  EXCLUSION OF DAMAGES. ARIN WILL NOT BE LIABLE TO APPLICANT OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE, EXEMPLARY, OR SPECIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO LOST PROFITS, LOST DATA, OR LOSS OF GOODWILL) ARISING OUT OF, RELATING TO, OR CONNECTED WITH THE SERVICES, BASED ON ANY CAUSE OF ACTION, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(c)  LIMITATION OF LIABILITY. EXCEPT IN THE EVENT OF A MATERIAL BREACH OF ARIN'S REPRESENTATIONS AND WARRANTIES UNDER THIS AGREEMENT, IN NO EVENT WILL ARIN'S LIABILITY TO APPLICANT OR ANY THIRD PARTY EXCEED THE GREATER OF (i) THE AMOUNT PAID BY APPLICANT TO ARIN DURING THE SIX MONTHS IMMEDIATELY PRECEDING THE EVENT THAT GIVES RISE TO SUCH LIABILITY OR (ii) $100.

14. TERM AND TERMINATION.

(a)  Term. The term of this Agreement shall commence on the date Applicant first receives the Services (the "Effective Date") and shall continue for one year thereafter. This Agreement shall renew automatically on the anniversary date of the Effective Date for unlimited one-year terms, unless earlier terminated in accordance with the termination provisions of this Agreement or if Applicant gives written notice to ARIN of its desire not to renew this Agreement at least thirty (30) days prior to the expiration of the then-current term.

(b)  Termination for Cause by ARIN. ARIN shall have the right to terminate this Agreement for cause by providing written notice to Applicant in accordance with Section 15(j): (i) for the reasons as set forth in Sections 3, 4(c), 4(d), 6(c), 8, 11, or  if Applicant breaches any provision of Section

ARIN_BYCHAK_0097

RSA: Version 10.2 (10 March 2011)

5; or (ii) if Applicant breaches any other provision of this Agreement and such breach remains uncured in ARIN's reasonable determination for thirty (30) days following Applicant's receipt of written notice of the breach from ARIN.

(c) Termination for Cause by Applicant. Applicant shall have the right to terminate this Agreement for cause upon written notice if ARIN materially breaches this Agreement and such breach remains uncured for thirty (30) days after ARIN's receipt of written notice of the breach from Applicant.

(d) Termination by Applicant with Return of Number Resources. Applicant shall have the right to terminate this Agreement if it returns, without limitation, all number resources assigned and/or allocated to it by ARIN.  If Applicant wishes to terminate this Agreement in accordance with this Section 14(d), Applicant must submit thirty (30) days' prior written notice to ARIN of its intent to return, in total, its ARIN assigned or allocated number resources, and must return the resources within thirty (30) days of ARIN's receipt of written notice of the Applicant's intent. This Agreement remains in effect until the Applicant has returned all number resources to ARIN.

(e) Effect of Termination. If this Agreement expires or is terminated: (i) ARIN will immediately revoke the number resources and otherwise cease providing the Services and will have no liability for doing so; (ii) Applicant must immediately pay ARIN all fees that Applicant owes for Services rendered up to and including the date of expiration or termination; and (iii) Applicant will lose all membership rights and benefits in ARIN, if any.

(f) Survival. The following sections will survive termination or expiration of this Agreement: 4(e), 5(b), 5(c), 6(a), 6(b), 9 through 13, 14(e), and 15.

15. GENERAL PROVISIONS.

(a) Assignment or Transfer.

(i) Except as provided in 15(a)(ii), Applicant may not assign or delegate this Agreement or any of its rights or obligations under it, including without limitation the exclusive right to use the number resources allocated or assigned to it, without ARIN's express written permission, which may not be unreasonably withheld if such assignment and/or transfer is consistent with ARIN's then current Transfer Policies, as included in the Policies.

(ii) The event of any transaction (whether a merger, acquisition, or sale) in which Applicant's controlling managerial and/or voting interest changes during the term of this Agreement shall be considered an assignment, so long as the Applicant provides ARIN with written notification within thirty (30) days of such assignment.

(iii) Any attempt by Applicant to assign this Agreement or any rights or obligations under it, other than as provided in this Section 15(a), will be of no force or effect.

(iv) ARIN shall have the right to freely assign this Agreement or any of its rights or obligations under it upon written notice to Applicant if ARIN is changing its corporate organization to permit a successor organization to provide the Services contemplated by this Agreement.

(b) Information.  Pursuant to the Policies, Applicant consents to assume responsibility for ensuring information involving assignments and allocations from within its allocated or assigned number resources received from ARIN is correct and provided to ARIN in a timely manner.

(c) Relationship of Parties. The relationship between the parties is and will be that of independent contractors. No joint venture, partnership, employment, agency, or similar

ARIN_BYCHAK_0098

RSA: Version 10.2 (10 March 2011)

arrangement is created between the parties. Neither party has the right or power to act for or on behalf of the other or to bind the other in any respect other than as expressly provided for in this Agreement.

(d)  Entire Agreement. This Agreement (and the Policies and the Fee Schedule, which are hereby incorporated by reference) constitutes the entire understanding between the parties and replaces and supersedes any and all prior and contemporaneous agreements and understandings, whether oral or written, express or implied, between the parties with respect to the subject matter of this Agreement.

(e)  Waiver. No waiver of any provision or consent to any action under this Agreement will constitute a waiver of any other provisions or consent to any other action, nor will such waiver or consent constitute a continuing waiver or consent or commit any party to provide a past or future waiver or consent.

(f)  Severability. If any provision of this Agreement is determined to be illegal, invalid, or otherwise unenforceable by a court or tribunal of competent jurisdiction, then to the extent necessary to make such provision and/or this Agreement legal, valid, or otherwise enforceable, such provision will be limited, construed, or severed and deleted from this Agreement, and the remaining portion of such provision and the remaining other provisions hereof will survive, remain in full force and effect, and continue to be binding, and will be interpreted to give effect to the intention of the parties insofar as possible.

(g)  Successors and Assigns. This Agreement will be binding upon and inure to the benefit of the parties and with respect to ARIN, its successors and assigns, and with respect to Applicant, its permitted successors and permitted assigns.

(h)  No Third-Party Rights. This Agreement is made solely for the benefit of the parties and does not, and will not, be construed to grant any rights or remedies to any other person or entity other than as expressly provided for in this Agreement.

(i)  Construction. This Agreement will be construed as if it was jointly drafted by both parties and may not be construed against either one.

(j)  Written Notice. All "written notice" required or permitted to be given under this Agreement will be delivered to the other party by any of the following methods: (i) hand delivery; (ii) certified U.S. or international mail, return receipt requested, postage prepaid; (iii)  reputable overnight courier; (iv) electronic mail; or (v) electronic messaging via ARIN Online. If Applicant gives notice to ARIN, it must use the following address: ARIN, Attention: Financial Services Department, 3635 Concorde Parkway, Suite 200, Chantilly, VA 20151, or the following e-mail address: billing@arin.net. If ARIN provides notice to Applicant, ARIN must use the contact information provided by Applicant to ARIN during the application process or other contact information provided by Applicant in accordance with the terms of this Section. All notices will be deemed received and effective as follows: (i) if by hand-delivery, on the date of delivery; (ii) if by delivery via U.S. mail, on the date of receipt appearing on a return receipt card; (iii) if by overnight courier, on the date receipt is confirmed by such courier service; (iv) if by electronic mail, 24 hours after the message was sent, if no "system error" or other notice of non-delivery is generated; or (v) if by electronic messaging, at the next successful login to ARIN Online by the notified contact.

(k)  Force Majeure. Neither party shall be deemed in default hereunder, nor shall either party be responsible for any cessation, interruption, or delay in the performance of its obligations under this Agreement where such failure of performance is the result of any force majeure event, including, but not limited to, earthquake, flood, fire, storm, natural disaster, act of God, civil disturbances, war, terrorism, armed conflict, riots, failure of contractors or subcontractors to perform, labor strike, lockout, boycott, or acts of governmental authorities. In the event a force majeure event extends for a period in excess of thirty (30) days in the aggregate and prevents a

ARIN_BYCHAK_0099

RSA: Version 10.2 (10 March 2011)

party from performing its obligations under this Agreement, that party may, in its discretion, terminate this Agreement immediately upon written notice to the other party.

(l)   Governing Law, Jurisdiction, and Venue. This Agreement and the parties' performance under it shall be governed in all respects by, and construed in accordance with, the laws of the Commonwealth of Virginia and the United States of America.   In the event of any dispute(s) regarding any term or condition or provision or performance or conduct arising out of or relating to this Agreement, the parties each agree to first seek resolution through cooperative settlement negotiations involving themselves or their representatives as they each deem appropriate; and, second, in the event cooperative settlement negotiations are not successful after thirty (30) days, the parties agree to submit any unresolved dispute(s) to binding and final arbitration for resolution. Such arbitration shall be held in Fairfax County, Virginia, in accordance with the rules of the American Arbitration Association ("AAA") then in effect.   A single arbiter shall be selected by the parties by striking in turn from a list of arbiters supplied by the AAA.   Each party shall bear their own attorneys' fees, and the initiating party shall initially bear the costs of the arbitration's expenses.   Virginia law shall be controlling.   Any judgment upon the award rendered pursuant to the arbitration proceeding may be entered in any court having competent jurisdiction.    This arbitration provision will apply unless the Applicant is part of a national, state, or local government authority whose laws or regulations require that their law and jurisdiction must apply to such an agreement. In such an instance, upon written demonstration of such national, state, or local law or regulation, arbitration shall be conducted in the city or county in which Applicant's principal place of business is domiciled, in accordance with the provisions set forth above, except that Applicant's law shall be controlling.   The Arbitrator may reallocate the costs of the arbitration's expense between the parties, but may not reallocate legal fees incurred by the parties.   The Arbitrator is permitted to assess all arbitration costs, including any legal fees incurred by the parties, against any party that has acted in bad faith during the proceeding.

ARIN_BYCHAK_0100

RSA: Version 10.2 (10 March 2011)

Applicant acknowledges its acceptance, without modification, of all the terms and conditions of the Agreement.

| **Agreed: (This section to be completed by Applicant)** | **Authorized Officer** |
|---|---|
| Legal Name of Company (Applicant): | Name (Print): |
| D/B/A (if any): | Title (Print): |
| ORG ID: | Signature: |
| Ticket Number: | Date: |
| **Billing Contact Information if different from authorized officer** | **Contact Information of Authorized Officer** |
| Name (Print): | Phone: |
| Title (Print): | E-Mail: |
| Phone: | Street Address: |
| E-Mail: | City and State: |
| Street Address | Postal Code: |
| City and State | Country: |
| Postal Code: | |
| Country: | |

**American Registry for Internet Numbers, LTD. By:**
**(This section to be completed by ARIN)**

| **ARIN's Authorized Contracting Agent** | |
|---|---|
| Name (Print): | Signature: |
| | Date: |

ARIN_BYCHAK_0101

# EXHIBIT B

RSA: Version 8 (06/18/2004)

**AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD.**
**SERVICE AGREEMENT**

This SERVICE AGREEMENT (this "Agreement") is made by and between the AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD. ("ARIN"), a Virginia non-profit organization, and ("Applicant").

AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD. ("ARIN") will not accept any alterations to this Service Agreement. Applicants choosing to send only the signature page of this document to ARIN are indicating their acceptance of all the terms and conditions of the agreement, without modification.

BECAUSE OF THE NECESSARY ROLE THAT ARIN PERFORMS FOR THE INTERNET COMMUNITY, ARIN MUST RESERVE AND HEREBY DOES RESERVE THE RIGHT TO MAKE CHANGES TO THIS AGREEMENT AT ANY TIME, WITH OR WITHOUT SPECIFIC NOTICE TO APPLICANT. THESE CHANGES, IF ANY, WILL BE EFFECTIVE ONLY WHEN POSTED ON ARIN'S WEB SITE FOR 30 DAYS, AND WILL BE APPLIED TO ALL PERSONS RECEIVING SERVICES. CONTINUED RECEIPT OR USE OF THE SERVICES CONSTITUTES APPLICANT'S ACCEPTANCE OF SUCH CHANGES. ACCORDINGLY, APPLICANT SHOULD REVIEW ARIN'S WEB SITE TO REVIEW ANY CHANGES MADE TO THIS AGREEMENT.

   1.   INTRODUCTION. ARIN is a regional Internet Registry serving North America, the Caribbean, and sub-Saharan Africa and is responsible for the registration, administration, and conservation of Internet Protocol ("IP") address space in these geographic areas. Applicant has submitted this Agreement and the accompanying information to ARIN to apply to receive and use certain services (the "Services") from ARIN, which may include, without limitation, an allocation/assignment of IP address space, assignment of autonomous system numbers ("ASNs"), inverse addressing on network blocks, maintenance of network records and administration of IP address space (allocation/assignment of IP address space and assignment of ASNs shall hereinafter be defined as "numbering resources").

   2.   APPLICATION. To apply to receive or use any of the Services, Applicant must complete the online application process on ARIN's web site, located at "*arin.net*" (the "Web Site"). In so doing, Applicant must: (i) provide ARIN with accurate and complete application information, including, without limitation, the Services that it wishes to receive, (ii) promptly notify ARIN if any of this information changes during the term of this Agreement, and (iii) promptly, accurately, and completely respond to any inquiry made to Applicant by ARIN during the term of this Agreement. Applicant agrees that in applying to receive or use the Services and in using the Services, it must comply with ARIN's then-current Policies and Guidelines, as published on the Web Site (the "Policies"). If Applicant fails to do any of the foregoing during the term of this Agreement, ARIN may terminate this Agreement and refuse to provide the Services to Applicant.

   3.   EVALUATION AND ACCEPTANCE. Following Applicant's completion of the online application process, ARIN will evaluate Applicant's request for the Services. If ARIN, in its sole and exclusive discretion applying its published policies, determines that it can provide the Services to Applicant, ARIN shall provide written notice to Applicant of its willingness to do so, and ARIN will promptly commence providing the Services to Applicant in accordance with the terms and conditions of this Agreement. If ARIN, in its sole and exclusive discretion applying its published policies, determines that it cannot, it will provide written notice to Applicant that it will not provide the Services to Applicant and this Agreement will terminate immediately upon such written notice.

   4.   CONDITIONS OF SERVICE.

       (a)  Provision. Subject to ARIN's agreement to provide the Services in accordance with Section 3 and Applicant's ongoing compliance with its obligations under this Agreement, including, without limitation, the payment of the "Fees" (as defined below), ARIN shall provide the Services to Applicant in accordance with the Policies.

1

ARIN_BYCHAK_0051

RSA: Version 8 (06/18/2004)

        (b)   Change Request.   If Applicant desires to change the Services that it receives from ARIN, it must provide ARIN with written notice (a "Change Request").   ARIN will evaluate Applicant's Change Request.   If ARIN, in its sole and exclusive discretion, determines that it can provide the Services to Applicant as set forth in the Change Request, ARIN will promptly commence providing such Services to Applicant in accordance with the terms and conditions of this Agreement.   If ARIN, in its sole and exclusive discretion, determines that it cannot, it will provide written notice to Applicant that it cannot provide Services in accordance with the Change Request.

        (c)   Cooperation.   During the term of this Agreement, Applicant shall provide ARIN with all information, assistance and cooperation that ARIN requests in ARIN's provision of the Services to Applicant and ARIN's other users, including, without limitation, in its review of Applicant's utilization of allocated numbering resources.   If Applicant does not provide ARIN with any information, assistance or cooperation that ARIN requests, ARIN may: (i) revoke and reclaim Applicant's numbering resources, (ii) take such failure into account in determining Applicant's future allocation/assignment of numbering resources, or (iii) terminate this Agreement.

        (d)   Changes to Services.   Applicant acknowledges and agrees that ARIN fulfills a critical role in the continued evolution of the Internet and, accordingly, ARIN may, in its sole and absolute discretion, change, modify, suspend, or make improvements to any aspect of the Services, temporarily or permanently, at any time without specific notice to Applicant, and ARIN will not be liable for doing so.   ARIN will have the right from time to time to change the amount of the fees or institute new fees relating to the Services, as set forth in Section 6, but such changes to fees will only take effect upon the renewal of the Services.

        (e)   Prohibited Conduct.   Through its use of the Services, Applicant shall not: (i) disrupt or interfere with the security or use of the Services; (ii) violate any applicable laws or government regulations; or (iii) assist any third party in engaging in any activity prohibited by this Agreement.   A private party or governmental authority that obtains a judgment from an appropriate judicial tribunal should send a copy of this judgment to ARIN's General Counsel at the address provided in Section 15(i).   A definitive finding of a violation of law or regulation when established by a decision of a national, state or other government authority regarding (i) through (iii) should similarly be sent to ARIN's General Counsel for ARIN's review and action.   ARIN will cooperate with all government inquiries utilizing legally appropriate methods for obtaining information from ARIN regarding allegations of prohibited conduct.

        (f)   Content Control.   Applicant acknowledges that content transmitted over the Internet occurs in real-time.   Accordingly, ARIN does not have the ability to control content accessible through or facilitated by those who receive numbering resources, directly or indirectly, from ARIN.

5.   USE OF THE ARIN DATABASE.

        (a)   Authorization.   To obtain a digital certificate, Applicant must designate one or more employees to serve as an Administrative Point-of-Contact ("POC").   The Administrative POC will be the principal point of contact between Applicant and the ARIN database, and have the sole right to provide other POCs at Applicant with authority to modify the ARIN database ("Authority").   The Administrative POC will also facilitate Applicant's compliance with the terms and conditions of Section 5 of this Agreement.   Applicant will appoint an Administrative POC promptly following ARIN's acceptance of this Agreement.   Applicant will provide ARIN with the documentation and information regarding the Administrative POC that ARIN requests.   Applicant must notify ARIN immediately if: (i) an employee with Authority has or will terminate its relationship with Applicant; (ii) an employee with Authority will have their Authority revoked; (iii) Applicant has reason to believe that an employee with Authority has granted or will grant a third party unauthorized access to the ARIN database; (iv) Applicant has any reason to believe that an employee with Authority should not be trusted; or (v) if Applicant wants to modify its Administrative POC.   Notices to ARIN under this Section must be given by email to noc@arin.net, and will be effective when acknowledged as received by ARIN.

        (b)   Liability for Unauthorized Access.   Applicant is solely and exclusively responsible for all acts and omissions undertaken by any of its POCs, whether or not authorized in fact.   Applicant is solely and exclusively responsible for the security of its access to and use of numbering resources in the ARIN database, and any loss or damage that Applicant suffers based on any unauthorized access thereto.

2

ARIN_BYCHAK_0052

RSA:  Version 8 (06/18/2004)

6.    FEES AND PAYMENTS.

(a)  Fee Schedule.  As a condition precedent to ARIN's duty to provide the Services, Applicant shall pay ARIN for providing the Services in accordance with ARIN's then-current fee schedule (the "Fee Schedule").

(b)  No Refunds.  All fees paid by Applicant to ARIN are non-refundable.

(c)  Registration Fees.  Applicant shall pay ARIN the applicable "registration fee," as set forth in the Fee Schedule [hyperlink], prior to ARIN providing Applicant with its requested allocation/assignment of numbering resources.  Applicant shall also pay ARIN the applicable "renewal registration fee," if any, as set forth in the Fee Schedule, at least five (5) days prior to each one-year anniversary of ARIN's first issuance of the Services to Applicant (e.g., ARIN's initial allocation/assignment of numbering resources to Applicant).  If, for any reason, Applicant does not pay any applicable renewal registration fee, ARIN shall have the right to: (i) revoke the numbering resources previously allocated and/or previously assigned or (ii) terminate this Agreement.

7.    POLICIES.  Because of the nature of ARIN's role in the operation and development of the Internet, ARIN maintains the Policies and may need to amend its existing Policies, implement new Policies, or make certain Policies obsolete.  Applicant acknowledges and agrees it has read, understands and agrees to be bound by the Policies.  Applicant shall fully comply with the Policies, including, without limitation, the IP Address Space Allocation and Assignment Policy, the IP Address Space Numbering Resources, Certificate Practice Statement, ASN Transfer Policies and Guidelines, and the IP Address Reassignment Policy.  ARIN may, at any time in its sole and absolute discretion, amend the Policies or create new Policies and such amendments or new policies shall be binding upon Applicant thirty days after they are posted on ARIN's web site.

8.    REVIEW OF APPLICANT'S NUMBERING RESOURCES.  ARIN may review, at any time, Applicant's use of the previously allocated numbering resources or other Services to determine if Applicant is complying with this Agreement, the Policies, and using the Services for their intended purposes.  Without limiting the foregoing, if Applicant is an Internet Service Provider, Applicant agrees that it will use the numbering resources solely for uses consistent with its application, including, for example, its internal infrastructure or to provide Internet access to its customer base.  If ARIN determines that the numbering resources or any other Services are not being used in compliance with this Agreement, the Policies, or for purposes for which they are intended, ARIN may: (i) revoke the numbering resources, (ii) cease providing the Services to Applicant, or (iii) terminate this Agreement.

9.    NO PROPERTY RIGHTS.  Applicant acknowledges and agrees that the numbering resources are not property (real, personal or intellectual) and that Applicant shall not acquire any property rights in or to any numbering resources by virtue of this Agreement or otherwise.  Applicant further agrees that it will not attempt, directly or indirectly, to obtain or assert any trademark, service mark, copyright or any other form of property rights in any numbering resources in the United States or any other country.

10.  REPRESENTATIONS AND WARRANTIES.

(a)  By Each Party.  Each party represents and warrants to the other party that: (i) it has the full power and authority to enter into and perform its obligations under this Agreement, (ii) the assent to and performance by it of its obligations under this Agreement do not constitute a breach of or conflict with any other agreement or arrangement by which it is bound, or any applicable laws, regulations or rules, and (iii) this Agreement constitutes a legal, valid, binding and an executory obligation of the parties executing or assenting to this Agreement, enforceable in accordance with its terms and conditions.

(b)  By Applicant.  Applicant hereby represents and warrants to ARIN that during the term of this Agreement that:  (i) it will not infringe the patent, copyright, trademark, trade secret, right of publicity or other right of any third party in its use of the Services, and (ii) Applicant will comply with all applicable laws, rules and regulations in its use of the Services, including this Agreement and the Policies.

3

ARIN_BYCHAK_0053

RSA:  Version 8 (06/18/2004)

11. BANKRUPTCY.  If Applicant:  (i) files any petition under any chapter of the Bankruptcy Code, or other insolvency or bankruptcy law; or (ii) has a petition filed against it under any insolvency or bankruptcy law; or (iii) makes a general assignment for the benefit of creditors, has a receiver appointed for it, or a trustee takes possession of all or substantially all of Applicant's assets; or (iv) ceases or intends to cease its normal business operations, Applicant will notify ARIN immediately.  Upon such notice, or if ARIN otherwise learns of the occurrence of any of the foregoing events, ARIN may intervene in any such bankruptcy or insolvency proceeding or take other appropriate, lawful action to preserve its rights under this Agreement and the Policies, and its ability to provide the Services to other of its users, including, without limitation, by: (i) revoking the numbering resources assigned to Applicant, or (ii) terminating this Agreement.  Applicant agrees to consent to ARIN's intervening in any such bankruptcy court proceeding so that ARIN can protect its rights under this Agreement with respect to the Policies and Guidelines for Transferring Internet Protocol (IP) Space & ASNs and any other rights ARIN has under this Agreement.  Applicant acknowledges and agrees that this Agreement is executory.

12. INDEMNIFICATION.  Applicant shall indemnify, defend and hold ARIN and its employees, representatives, agents, attorneys, affiliates, directors, officers, managers and shareholders (the "Indemnified Parties") harmless from any damage, loss, cost or expense (including without limitation, attorneys' fees and costs) incurred by it or in connection with any third-party claim, demand or action ("Claim") brought or asserted against any of the Indemnified Parties alleging facts or circumstances that would constitute a breach of any provision of this Agreement by Applicant, or arising from, relating to, or connected with:  (i) unauthorized access to or use of the ARIN database by Applicant or any of its current or former employees, representatives, agents, attorneys, affiliates, directors, officers, POCs, or managers; (ii) unauthorized access to or use of Applicant's information or numbering resources in the ARIN database; or (iii) Applicant's use of the Services.  If Applicant is obligated to provide indemnification pursuant to this provision, ARIN may, in its sole and absolute discretion, control the disposition of any Claim at Applicant's sole cost and expense.  Without limiting the foregoing, Applicant may not settle, compromise or in any other manner dispose of any Claim without the consent of ARIN.

13. DISCLAIMERS, EXCLUSIONS AND LIMITATIONS.

(a)  DISCLAIMER OF WARRANTIES.  ARIN PROVIDES THE SERVICES ON AN "AS IS" BASIS.  ARIN DOES NOT REPRESENT OR WARRANT THAT THE SERVICES OR THEIR USE: (i) WILL BE UNINTERRUPTED, (ii) WILL BE FREE OF DEFECTS, INACCURACIES OR ERRORS, (iii) WILL MEET APPLICANT'S REQUIREMENTS, OR (iv) WILL OPERATE IN THE CONFIGURATION OR WITH OTHER HARDWARE OR SOFTWARE APPLICANT USES.  ARIN MAKES NO WARRANTIES OTHER THAN THOSE MADE EXPRESSLY IN THIS AGREEMENT, AND HEREBY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND NON-INFRINGEMENT.

(b)  EXCLUSION OF DAMAGES.  ARIN WILL NOT BE LIABLE TO APPLICANT OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR SPECIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO LOST PROFITS, LOST DATA OR LOSS OF GOODWILL) ARISING OUT OF, RELATING TO OR CONNECTED WITH THE SERVICES, BASED ON ANY CAUSE OF ACTION, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(c)  LIMITATION OF LIABILITY.   EXCEPT FOR A BREACH OF A PARTY'S REPRESENTATIONS AND WARRANTIES UNDER THIS AGREEMENT OR IN CONNECTION WITH APPLICANT'S INDEMNITY OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT WILL THE LIABILITY OF EITHER PARTY IN CONNECTION WITH THIS AGREEMENT EXCEED THE GREATER OF (i) THE AMOUNT PAID BY APPLICANT TO ARIN DURING THE SIX MONTHS IMMEDIATELY PRECEDING THE EVENT THAT GIVES RISE TO SUCH LIABILITY OR (ii) $100.

14. TERM AND TERMINATION.

(a)  Term.  The term of this Agreement shall commence on the date on which Applicant first receives the Services (the "Effective Date") and shall continue for one year thereafter.  This Agreement shall renew automatically on the annual anniversary date of the Effective Date for unlimited, one year terms, unless earlier terminated in accordance with the termination provisions of this Agreement or if either party gives written notice to the other party of its desire not to renew this Agreement at least thirty (30) days prior to the expiration of the then-current term.

4

ARIN_BYCHAK_0054

RSA: Version 8 (06/18/2004)

     (b) Termination for Cause by ARIN. ARIN shall have the right to terminate this Agreement for cause: (i) immediately upon written notice in accordance with Sections 2, 3, 4(c), 4(e), 6(c), 8, 11, 15(a), or 15(j); (ii) immediately upon written notice if Applicant breaches any provision of Section 5; or (iii) immediately upon written notice if Applicant breaches any other provision of this Agreement and such breach remains uncured for ten (10) days following ARIN's written notice to Applicant of it.

     (c) Termination for Cause by Applicant. Applicant shall have the right to terminate this Agreement for cause immediately upon written notice if ARIN materially breaches this Agreement and such breach remains uncured for thirty (30) days after ARIN's receipt of written notice of the breach from Applicant.

     (d) Effect of Termination. If this Agreement expires or is terminated: (i) ARIN will immediately revoke the numbering resources and otherwise cease providing the Services and will have no liability for doing so, (ii) Applicant must immediately pay ARIN any outstanding fees that Applicant owes, but Applicant will not incur any additional fees, and (iii) Applicant will lose all membership rights and benefits in ARIN, if any.

     (e) Survival. The following Sections will survive termination or expiration of this Agreement: 4(f), 5(b), 6(a), 6(b), 9 through 13, 14(d), 14(e), and 15.

    15. GENERAL PROVISIONS.

     (a) Assignment and Transfer. Applicant is not permitted to assign this Agreement or any of its rights or obligations under it, including, without limitation, the right to use the numbering resources allocated to it, without ARIN's written permission. If Applicant attempts to assign this Agreement or any rights or obligations under it, including, without limitation, by involuntary assignment to Applicant's creditors, such assignment will be of no force or effect and ARIN shall have the right to immediately: (i) revoke any of the numbering resources allocated or assigned to Applicant, or (ii) terminate this Agreement. ARIN shall have the right to freely assign this Agreement upon written notice to Applicant.

     (b) Relationship of Parties. The relationship between the parties will be that of independent contractors. No joint venture, partnership, employment, agency or similar arrangement is created between the parties. Neither party has the right or power to act for or on behalf of the other or to bind the other in any respect other than as expressly provided for in this Agreement.

     (c) Entire Agreement. This Agreement (and the Policies and the Fee Schedule, which are hereby incorporated by reference) constitutes the entire understanding between the parties and replaces and supersedes any and all prior and contemporaneous agreements and understandings, whether oral or written, express or implied, between the parties with respect to the subject matter of this Agreement.

     (d) Waiver. No waiver of any provision or consent to any action under this Agreement will constitute a waiver of any of the other provisions or consent to any other action, nor will such waiver or consent constitute a continuing waiver or consent or commit any party to provide past or future a waiver or consent.

     (e) Severability. If any provision of this Agreement is determined to be illegal, invalid or otherwise unenforceable by a court or tribunal of competent jurisdiction, then to the extent necessary to make such provision and/or this Agreement legal, valid or otherwise enforceable, such provision will be limited, construed or severed and deleted from this Agreement, and the remaining portion of such provision and the remaining other provisions hereof will survive, remain in full force and effect and continue to be binding, and will be interpreted to give effect to the intention of the parties insofar as possible.

     (f) Successors and Assigns. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

     (g) No Third-Party Rights. This Agreement is made solely for the benefit of the parties and does not, and will not, be construed to grant any rights or remedies to any other person or entity other than as expressly provided for in this Agreement.

5

ARIN_BYCHAK_0055

RSA:  Version 8 (06/18/2004)

       (h)  Construction. This Agreement will be construed as if it was jointly drafted by both parties and may not be construed against either one.

       (i)  Written Notice.  All "written notice" required or permitted to be given under this Agreement will be delivered to the other party by any of the following methods:  (i) hand delivery, (ii) certified U.S. mail, return receipt requested, postage prepaid, (iii) overnight courier, or (iv) electronic mail.  If Applicant gives notice to ARIN, it must use the following address: ARIN, Attention: Accounting Department, 3635 Concorde Parkway, Suite 200, Chantilly, VA  20151 or the following email address: billing@ARIN.net. If ARIN provides notice to Applicant, ARIN must use the contact information provided by Applicant to ARIN during the application process or other contact information provided by Applicant in accordance with the terms of this Section.  All notices will be deemed received and effective as follows: (i) if by hand-delivery, on the date of delivery, (ii) if by delivery by U.S. mail, on the date of receipt appearing on a return receipt card, (iii) if by overnight courier, on the date receipt is confirmed by such courier service, or (iv) if by electronic mail, 24 hours after the message was sent, if no "system error" or other notice of non-delivery is generated.

       (j)  Force Majeure.  ARIN shall not be deemed in default hereunder, nor shall ARIN be responsible for, any cessation, interruption or delay in the performance of its obligations under this Agreement where such failure of performance is the result of any force majeure event, including, but not limited to, earthquake, flood, fire, storm, natural disaster, act of God, civil disturbances, war, terrorism, armed conflict, riots, failure of contractors or subcontractors to perform, labor strike, lockout, boycott, or acts of governmental authorities. In the event a force majeure event extends for a period in excess of thirty (30) days in the aggregate and prevents ARIN from performing its obligations under this Agreement, ARIN may, in its discretion, terminate this Agreement immediately upon written notice to Applicant.

6

ARIN_BYCHAK_0056

RSA:  Version 8 (06/18/2004)

        (k)  Governing  Law,  Jurisdiction,  and  Venue.    This  Agreement  and  the  parties' performance under it shall be governed in all respects by, and construed in accordance with, the laws of the Commonwealth of Virginia and the United States of America.  Applicant consents to the exclusive use of, and venue in, the federal and state courts located in Fairfax County, Virginia unless the applicant is part of a national, state, or local  government authority whose laws or regulations require that their jurisdiction and venue must also apply to such an agreement.  In such an instance, upon written demonstration of such national, state or local law or regulation, ARIN will agree to permit jurisdiction and venue in both federal and state courts in Fairfax County, Virginia, as well as the courts of the national, state or local government.

American Registry For Internet Numbers, LTD.

By:

_____

ARIN Authorized Contracting Agent :

_____

Print Name:

_____

Date:

**Agreed:**

_____

Name of Company: (Applicant)

_____

Signature of Signing Official:

_____

Name of Signing Official and Title:

_____

Date:

_____

ORG ID:

_____

Ticket Number:

_____

Email and Phone Number of Signing Official :

**Mailing Address of Signing Official:**

_____

Street and Suite:

_____

City and State:

Zip Code: _____   Country: _____

7

ARIN_BYCHAK_0057

RSA:  Version 8 (06/18/2004)

8

ARIN_BYCHAK_0058

# EXHIBIT C

Legacy LSA Version 1.1 (10/31/07)

**AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD.**
**LEGACY SERVICE AGREEMENT**

This LEGACY SERVICE AGREEMENT ("Legacy Agreement") is made by and between the AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD. ("ARIN"), a Virginia nonprofit corporation, and _____, ("Legacy Applicant"), which holds the following specifically enumerated number resources: _____, _____, _____("Included Number Resources"). This Legacy Agreement only covers the Included Number Resources; any other number resources held by the Legacy Applicant pursuant to an existing RSA or not described here are not covered by the terms of this Legacy Agreement.

1. INTRODUCTION

ARIN is a Regional Internet Registry serving Canada, many Caribbean and North Atlantic islands, and the United States, since 1997, is responsible for the registration, administration, and stewardship of Internet number resources in these geographic areas. To complete the process for the regularization of the Included Number Resources and the provision of certain Services (as defined herein below), Legacy Applicant must comply with the provisions of this Agreement by submitting an application, an executed Legacy Agreement and provide any requested accompanying information to ARIN. For purposes of this Legacy Agreement, the term "Services" may include, without limitation, the inclusion of the legacy IP address space, and/or Autonomous System numbers ("ASNs") previously issued to Legacy Applicant in the ARIN "WHOIS" database, inverse addressing on network blocks, maintenance of network records, and administration of IP address space related to number resources issued prior to ARIN's inception on December 22, 1997 in its service area. IP address space and ASNs shall be defined as "number resources.")

2. APPLICATION

Legacy Applicant must complete a legacy application found on ARIN's website, located at "http://www.arin.net" (the "Website"). Legacy Applicant must: (a) provide ARIN with accurate, up-to-date and complete application information, (b) promptly notify ARIN if any of its information changes during the term of this Legacy Agreement, and (c) promptly, accurately, and completely respond to any inquiry made to Legacy Applicant by ARIN or its designee during the term of this Legacy Agreement. Legacy Applicant agrees that in applying to receive or use the Services and in using the Services, it must comply with ARIN's Number Resource Policy Manual, Certificate Practice Statement, Guidelines, and Procedures ("Policies"), as published on the Website, as long as the terms of the Policies are not inconsistent with this Legacy Agreement. In the event of any inconsistency between the Policies and this Legacy Agreement, the terms of this Legacy Agreement will prevail, including but not limited to those Policies adopted after this Legacy Agreement is executed. If Legacy Applicant fails to comply with the terms of this Legacy Agreement, ARIN may terminate this Legacy Agreement and refuse to provide the Services to Legacy Applicant.

3. EVALUATION AND ACCEPTANCE

Following Legacy Applicant's completion of the online application process, ARIN will promptly evaluate Legacy Applicant's request for the Services. Evaluation may require Legacy Applicant's submission of additional documentation to support its application such as, but not limited to, state registration, Dun & Bradstreet and/or taxpayer information, and/or registration under the province or country in which the entity is registered for verification purposes. If ARIN, in its sole and exclusive discretion, applying its published Policies and internal verification process, determines that it can provide the Services to Legacy Applicant, ARIN shall provide written notice to Legacy Applicant of its willingness to do so, and ARIN will promptly commence providing the Services to Legacy Applicant in accordance with the terms and conditions of this Legacy Agreement. If ARIN, in its sole and exclusive discretion, applying

ARIN_BYCHAK_0120

its published Policies and internal verification process, determines that it cannot provide the Services, it will provide written notice to Legacy Applicant of its decision.

4. CONDITIONS OF SERVICE

(a) Provision. Subject to ARIN's agreement to provide the Services in accordance with Section 3 and Legacy Applicant's ongoing compliance with its obligations under this Legacy Agreement, including, without limitation, the payment of the Fees (as defined below), ARIN shall provide the Services to Legacy Applicant in accordance with this Legacy Agreement and the Policies.

(b) Change Request. If subsequent to signing this Legacy Agreement Legacy Applicant desires to change the Services that it receives from ARIN, it must provide ARIN with written notice (a "Change Request"). ARIN will evaluate Legacy Applicant's Change Request. If ARIN, in its sole and exclusive discretion, determines that it can provide the Services to Legacy Applicant as set forth in the Change Request, ARIN will commence providing the Services as modified to Legacy Applicant in accordance with the terms and conditions of this Legacy Agreement. If ARIN, in its sole and exclusive discretion, determines that it cannot provide the Services as requested by Legacy Applicant to be modified, it will provide written notice to Legacy Applicant that it cannot provide Services in accordance with the Change Request, and describe the reasons therefore.  ARIN's inability to provide the Services in accordance with the Change Request may be subject to the provisions of Section 15(l) of this Agreement regarding Dispute Resolution.

(c) Cooperation. During the term of this Legacy Agreement, Legacy Applicant shall provide ARIN complete, up-to-date and accurate information, assistance, and cooperation that ARIN requests in ARIN's provision of the Services to Legacy Applicant, including, without limitation, during any review of Legacy Applicant's utilization of allocated number resources. If Legacy Applicant does not provide ARIN with required information, assistance, or cooperation that ARIN requests, ARIN may: (i) take such failure into account in determining Legacy Applicant's future allocation/assignment of additional number resources, and/or (ii) terminate this Legacy Agreement.

(d) Prohibited Conduct. In using the Services, Legacy Applicant shall not: (i) disrupt or interfere with the security or use of the Services; (ii) be found to have violated any applicable laws, statutes or regulations by a ruling of a court or government regulatory agency; or (iii) assist any third party in engaging in any activity prohibited by this Legacy Agreement. In the event a private party or governmental authority obtains a judgment from an appropriate judicial tribunal against Legacy Applicant, such other person shall send a copy of this judgment to ARIN's General Counsel at the address provided in Section 15(i). A definitive finding of a violation of law or regulation when established by a decision of a national, state, or other government authority regarding (i) through (iii) herein should similarly be sent to ARIN's General Counsel for ARIN's review and action. ARIN will cooperate with all government or judicial inquiries utilizing legally appropriate methods for obtaining information from ARIN regarding allegations of prohibited conduct.

(e) Content Control. Legacy Applicant acknowledges that content transmitted over the Internet occurs in real time. Accordingly, ARIN does not have the ability to control content accessible through or facilitated by those who receive number resources, directly or indirectly, from ARIN.

5. USE OF THE ARIN DATABASE

(a) Authorization. To obtain a digital certificate, Legacy Applicant must meet the requirements and follow the procedures as outlined in ARIN's Certificate Practice Statement ("CPS"), which is available at http://www.arin.net/CA/. The Administrative Point of Contact ("POC") will be the principal point of contact between Legacy Applicant and the ARIN database, and have the sole right to designate other qualifying POCs of Legacy Applicant with authority to modify the ARIN database ("Authority"). The Administrative POC will also facilitate Legacy Applicant's compliance with the terms and conditions of this Section 5. Legacy Applicant will provide ARIN with any documentation and information regarding the Administrative POC that ARIN requests. Legacy Applicant must notify ARIN immediately if: (i) an

ARIN_BYCHAK_0121

employee with Authority has or will terminate its relationship with Legacy Applicant; (ii) an employee with Authority will have that Authority revoked; (iii) Legacy Applicant has reason to believe that an employee with Authority has granted or will grant a third party unauthorized access to the ARIN database; (iv) Legacy Applicant has any reason to believe that an employee with Authority should not be trusted; or (v) if Legacy Applicant wants to designate another Administrative POC. Notices to ARIN under this Section must be given by e-mail to hostmaster@arin.net, and will be effective when acknowledged as received by ARIN.

(b) Legacy Applicant is responsible for the timely and accurate maintenance of directory services data (WHOIS) as well as any organization to which it further sub-delegates number resources.

(c) Liability for Unauthorized Access. Legacy Applicant is solely and exclusively responsible for all acts and omissions undertaken by any of its POCs, whether or not authorized in law or in fact. Legacy Applicant is solely and exclusively responsible for the security of its access to and use of number resources in the ARIN database, and any loss or damage that Legacy Applicant suffers based on any unauthorized access thereto.

## 6. FEES; PAYMENTS

(a) ARIN's Standard Posted Fee Schedule Does Not Apply to the Legacy Resources Covered by This Agreement. ARIN hereby agrees that the fees it usually charges for Services will not apply to Legacy Applicants.  ARIN's Fee Schedule, which is available at http://www.arin.net/billing/fee_schedule.html, does not apply to this Legacy Agreement, and a Legacy Fee Schedule will apply.  For example, Legacy Applicants do not have to pay ARIN any "registration fee," typically set forth in the Fee Schedule.

(b) Annual Maintenance Fees Paid By Legacy Applicants For Resources Covered By This Agreement. Legacy Applicant shall only be required to pay ARIN the currently applicable "Annual Legacy Maintenance Fee" as set forth in the ARIN Legacy Fee Schedule. This fee shall be $100 per year until the year 2013.  ARIN will send an invoice to prompt such payment before the due date.  This fee will be waived through 2013 if the Legacy Applicant returns one-fourth or more of the Included Number Resources.  ARIN will accept the return of any IPv4 address block with a prefix size of a /24 or shorter. After 2013, ARIN, by vote of ARIN's Board, may annually increase the Legacy Fee  by no more than (1) the amount charged non-Legacy holders for this maintenance service; and (2) no increase per year greater than $25.   If Legacy Applicant does not pay the Annual Legacy Maintenance Fee or other fees that may be owed ARIN hereunder, ARIN shall provide written notification to the Applicant approximately thirty (30) days following the date on which the payment is not made.  If Legacy Applicant fails to make payment in response to the notice of delinquency, ARIN shall provide Legacy Applicant with an additional written notice, by certified or registered mail, return receipt requested, (as appropriate in each country), and, when possible, by e-mail and telephone.  ARIN has the right to: (i) revoke the included number resources if unpaid after 12 months of the due date, and/or ARIN is unable to contact the Applicant after 12 months, or (ii) terminate this Legacy Agreement and stop providing the services.  Any resources revoked pursuant to (i) shall be held by ARIN for a further period of 12 months by ARIN before they are reissued.  Any Legacy Applicant whose resources are held by ARIN during this 12 month period may  restore the services related to these resources and have the revocation nullified if it contacts ARIN and brings its account current during the foregoing 12 month period.

(c) No Refunds. All fees paid by Legacy Applicant to ARIN are nonrefundable.

## 7. CURRENT AND FUTURE POLICIES

As set forth in Section 2, to the extent of any conflict between the provisions of this Legacy Agreement and the Policies, the terms of this Legacy Agreement shall prevail. Notwithstanding the foregoing, pursuant to ARIN's Internet Resource Policy Evaluation Process ("IRPEP"), ARIN maintains the Policies and may at any time in its sole and absolute discretion amend the Policies, implement new

ARIN_BYCHAK_0122

policies (which once implemented, will be considered Policies), or make certain Policies obsolete. Such amendments or new Policies shall be binding upon Legacy Applicant immediately after they are posted on the Website. Legacy Applicant acknowledges and agrees it has read, understands, and agrees to be bound by and comply with the Policies, as amended, except to the extent those Policies may conflict with the rights and duties provided Legacy Applicant in this Legacy Agreement.

## 8. REVIEW OF LEGACY APPLICANT'S NUMBER RESOURCES

ARIN may, no more other than annually, or whenever a transfer or additional IP address space is requested, review Legacy Applicant's utilization of previously allocated or assigned number resources and/or other Services received from ARIN to determine if Legacy Applicant is complying with this Legacy Agreement and the Policies.

## 9. NO PROPERTY RIGHTS

Legacy Applicant acknowledges and agrees that the number resources are not property (real, personal, or intellectual) and that Legacy Applicant does not have any property rights in or to the Included Number Resources, including but not limited by this Legacy Agreement or the prior issuance of these resources to it. Legacy Applicant further agrees that it will not attempt, directly or indirectly, to obtain or assert any trademark, service mark, copyright, or any other form of property rights in any included number resources in the United States or any other country.

## 10. VOLUNTARY RETURN OF INCLUDED NUMBER RESOURCES

(a) ARIN requests that Legacy Applicant conform to RFC 2050 and RFC 2008 and voluntarily return to ARIN the portion of all Included Number Resources that it is unlikely to need over the next 10 years.  A Legacy Applicant that returns no less than 25% of the Included Number Resources will be eligible for a series of benefits, including partial or permanent reduction in ARIN fees, membership and meeting costs as the Board of Trustees may from time-to-time prescribe.  These benefits will increase as the percentage of Included Number Resources returned increases to 50% and again at 75%.  ARIN will accept the return of any IPv4 address block with a prefix size of a /24 or shorter.

(b) ARIN will take no action to reduce the services provided for Included Number Resources that are not currently being utilized by the Legacy Applicant.

## 11. REPRESENTATIONS AND WARRANTIES

(a) By Each Party. Each party represents and warrants to the other party that: (i) it has the full power and authority to enter into and perform its obligations under this Legacy Agreement, (ii) the assent to and performance by it of its obligations under this Legacy Agreement do not constitute a breach of or conflict with any other agreement or arrangement by which it is bound, or any applicable laws, regulations, or rules, and (iii) this Legacy Agreement constitutes a legal, valid, binding, and an executory obligation of the parties executing or assenting to this Legacy Agreement, enforceable in accordance with its terms and conditions.

(b) By Legacy Applicant. Legacy Applicant hereby represents and warrants to ARIN that during the term of this Legacy Agreement:  that Legacy Applicant will comply with all applicable laws, rules, and regulations in its use of the Services, including this Legacy Agreement and the Policies.

## 12. BANKRUPTCY

If Legacy Applicant: (a) files any petition under any chapter of the Bankruptcy Code or other insolvency or bankruptcy law; or (b) has a petition filed against it under any insolvency or bankruptcy law; or (c) makes a general assignment for the benefit of creditors, has a receiver appointed for it, or a trustee takes possession of all or substantially all of Legacy Applicant's assets; or (d) ceases or

ARIN_BYCHAK_0123

intends to cease its normal business operations, Legacy Applicant will notify ARIN immediately. ARIN may intervene in any such bankruptcy or insolvency proceeding or take other appropriate, lawful action to preserve its rights under this Legacy Agreement. including terminating this Agreement. Legacy Applicant agrees to consent to ARIN's intervening in any such bankruptcy court proceeding so that ARIN can protect its rights under this Legacy Agreement with respect to the rights ARIN has under this Legacy Agreement. Legacy Applicant acknowledges and agrees that this Legacy Agreement is executory.

13. DISCLAIMERS, EXCLUSIONS, AND LIMITATIONS

(a) DISCLAIMER OF WARRANTIES. ARIN PROVIDES THE SERVICES ON AN "AS-IS" BASIS. ARIN DOES NOT REPRESENT OR WARRANT THAT THE SERVICES OR THEIR USE: (i) WILL BE UNINTERRUPTED, (ii) WILL BE FREE OF DEFECTS, INACCURACIES, OR ERRORS, (iii) WILL MEET LEGACY APPLICANT'S REQUIREMENTS, OR (iv) WILL OPERATE IN THE CONFIGURATION OR WITH OTHER HARDWARE OR SOFTWARE LEGACY APPLICANT USES. ARIN MAKES NO WARRANTIES OTHER THAN THOSE MADE EXPRESSLY IN THIS LEGACY AGREEMENT, AND HEREBY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, AND/OR NON-INFRINGEMENT.

(b) EXCLUSION OF DAMAGES. ARIN WILL NOT BE LIABLE TO LEGACY APPLICANT OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE, OR SPECIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO LOST PROFITS, LOST DATA, OR LOSS OF GOODWILL) ARISING OUT OF, RELATING TO, OR CONNECTED WITH THE SERVICES, BASED ON ANY CAUSE OF ACTION, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(c) LIMITATION OF LIABILITY. EXCEPT IN THE EVENT OF A MATERIAL BREACH OF ARIN'S REPRESENTATIONS AND WARRANTIES UNDER THIS LEGACY AGREEMENT, IN NO EVENT WILL ARIN'S LIABILITY TO LEGACY APPLICANT OR ANY THIRD PARTY EXCEED THE GREATER OF (i) THE AMOUNT PAID BY LEGACY APPLICANT TO ARIN DURING THE SIX MONTHS IMMEDIATELY PRECEDING THE EVENT THAT GIVES RISE TO SUCH LIABILITY OR (ii) $100.

14. TERM AND TERMINATION.

(a) Term. The term of this Legacy Agreement shall commence on the date Legacy Applicant first receives the Services (the "Effective Date") and shall continue for one year thereafter. This Legacy Agreement shall renew automatically on the anniversary date of the Effective Date for unlimited one-year terms, unless earlier terminated in accordance with the termination provisions of this Legacy Agreement or if either party gives written notice to the other party of its desire not to renew this Legacy Agreement at least thirty (30) days prior to the expiration of the then-current term.

(b) Termination for Cause by ARIN. ARIN shall have the right to terminate this Legacy Agreement for cause in accordance with Section 15(j) : (i) immediately upon written notice for the reasons as set forth in Sections 2, 4(c), 4(d), 6(b),  11, or if Legacy Applicant breaches any provision of Section 5; or (ii) upon written notice if Legacy Applicant breaches any other provision of this Legacy Agreement and such breach remains uncured in ARIN's reasonable determination for thirty  (30) days following ARIN's written notice to Legacy Applicant.

(c) Termination for Cause by Legacy Applicant. Legacy Applicant shall have the right to seek to terminate this Legacy Agreement for cause upon written notice if ARIN materially breaches this Legacy Agreement and such breach remains uncured for thirty (30) days after ARIN's receipt of written notice of the breach from Legacy Applicant.  If ARIN believes any claim of breach is not correct or has been cured, it shall respond in writing.  If the Legacy Applicant still seeks to terminate for cause, it must bring action pursuant to paragraph 15(l), and obtain a judgment by the Arbitrator

ARIN_BYCHAK_0124

chosen for this purpose that such cause to terminate exists. If such a cause for termination is found by the Arbitrator against ARIN, the Legacy Agreement will be terminated and the Included Number Resources will resume the status they had prior to the Legacy Agreement.

(d) Termination by Legacy Applicant Through Return of Number Resources. Legacy Applicant shall have the right to terminate this Legacy Agreement at any time if it returns, without limitation, all Included Number Resources. If Legacy Applicant wishes to terminate this Legacy Agreement in accordance with this Section 14(d), the Legacy Applicant must submit thirty (30) days prior written notice to ARIN of its intent to return, in total, the Included Number Resources, and must return the resources within thirty (30) days of ARIN's receipt of written notice of the Legacy Applicant's intent. This Legacy Agreement remains binding until the Legacy Applicant has returned all Legacy number resources described in this Agreement to ARIN.

(e) Effect of Termination. If this Legacy Agreement expires or is terminated except as described in paragraph 14(c): (i) ARIN will immediately revoke the number resources and otherwise cease providing the Services and will have no liability for doing so, and (ii) Legacy Applicant must immediately pay ARIN any outstanding fees that Legacy Applicant owes.

(f) Survival. The following Sections will survive termination or expiration of this Legacy Agreement: 4(e), 5(b), 5(c), 6(b), 9, 12, 13, 14(d), 14(e), and 15.

15. GENERAL PROVISIONS.

(a) Assignment or Transfer. Legacy Applicant is permitted to assign this Legacy Agreement or any of its rights or obligations under it, with ARIN's written permission, which may not be unreasonably withheld if such assignment and/or transfer is consistent with ARIN's Transfer Policies. If Legacy Applicant attempts to assign this Legacy Agreement or any rights or obligations under it, including, without limitation, by involuntary assignment to Legacy Applicant's creditors, such assignment will be of no force or effect. The event of any transaction (whether a merger, acquisition or sale) in which Legacy Applicant's controlling managerial and/or voting interest changes during the term of this Legacy Agreement shall be considered an assignment requiring ARIN's written consent to continued use of the number resources. ARIN shall have the right to freely assign this Legacy Agreement upon written notice to Legacy Applicant if ARIN is changing its corporate organization to permit a successor organization to provide the Services contemplated by this Legacy Agreement.

(b) Pursuant to Policies, Legacy Applicant consents to assume responsibility for ensuring information involving assignments and allocations from within its allocated or assigned number resources in this Agreement is correct and provided to ARIN in a timely manner.

(c) Relationship of Parties. The relationship between the parties is and will be that of independent contractors. No joint venture, partnership, employment, agency, or similar arrangement is created between the parties. Neither party has the right or power to act for or on behalf of the other or to bind the other in any respect other than as expressly provided for in this Legacy Agreement.

(d) Entire Legacy Agreement. This Legacy Agreement (and the Policies which are hereby incorporated by reference to the extent they do not conflict with this Legacy Agreement) constitutes the entire understanding between the parties and replaces and supersedes any and all prior and contemporaneous agreements and understandings, whether oral or written, express or implied, between the parties with respect to the included Number Resources which are the subject matter of this Legacy Agreement. All other RSAs for number resources from ARIN, if any, remain unchanged by this Legacy RSA.

(e) Waiver. No waiver of any provision or consent to any action under this Legacy Agreement will constitute a waiver of any other provisions or consent to any other action, nor will such waiver or

ARIN_BYCHAK_0125

consent constitute a continuing waiver or consent or commit any party to provide past or future a waiver or consent.

(f) Severability. If any provision of this Legacy Agreement is determined to be illegal, invalid, or otherwise unenforceable by a court or tribunal of competent jurisdiction, then to the extent necessary to make such provision and/or this Legacy Agreement legal, valid, or otherwise enforceable, such provision will be limited, construed, or severed and deleted from this Legacy Agreement, and the remaining portion of such provision and the remaining other provisions hereof will survive, remain in full force and effect, and continue to be binding, and will be interpreted to give effect to the intention of the parties insofar as possible.

(g) Successors and Assigns. This Legacy Agreement will be binding upon and inure to the benefit of the parties and with respect to ARIN, its successors and permitted assigns, and with respect to Legacy Applicant, its permitted successors and assigns.

(h) No Third-Party Rights. This Legacy Agreement is made solely for the benefit of the parties and does not, and will not, be construed to grant any rights or remedies to any other person or entity other than as expressly provided for in this Legacy Agreement.

(i) Construction. This Legacy Agreement will be construed as if it was jointly drafted by both parties and may not be construed against either one.

(j) Written Notice. All "written notice" required or permitted to be given under this Legacy Agreement will be delivered to the other party by any of the following methods: (i) hand delivery, (ii) certified U.S. mail, return receipt requested, postage prepaid, (iii) overnight courier, or (iv) electronic mail. If Legacy Applicant gives notice to ARIN, it must use ARIN's current address, which is currently: ARIN, Attention: Financial and Legal Services Department, 3635 Concorde Parkway, Suite 200, Chantilly, VA 20151, or the following e-mail address: billing@arin.net. If ARIN provides notice to Legacy Applicant, ARIN must use the contact information provided by Legacy Applicant to ARIN during the application process or other contact information provided by Legacy Applicant in accordance with the terms of this Section. All notices will be deemed received and effective as follows: (i) if by hand-delivery, on the date of delivery, (ii) if by delivery via U.S. mail, on the date of receipt appearing on a return receipt card, (iii) if by overnight courier, on the date receipt is confirmed by such courier service, or (iv) if by electronic mail, 24 hours after the message was sent, if no "system error" or other notice of non-delivery is generated.

(k) *Force Majeure.* ARIN shall not be deemed in default hereunder, nor shall ARIN be responsible for any cessation, interruption, or delay in the performance of its obligations under this Legacy Agreement where such failure of performance is the result of any *force majeure* event, including, but not limited to, earthquake, flood, fire, storm, natural disaster, act of God, civil disturbances, war, terrorism, armed conflict, riots, failure of contractors or subcontractors to perform, labor strike, lockout, boycott, or acts of governmental authorities. In the event a *force majeure* event extends for a period in excess of thirty (30) days in the aggregate and prevents ARIN from performing its obligations under this Legacy Agreement, ARIN may, in its discretion, terminate this Legacy Agreement immediately upon written notice to Legacy Applicant.

(l) Governing Law, Jurisdiction, Venue and Dispute Resolution. (i) This Legacy Agreement and the parties' performance under it shall be governed in all respects by, and construed in accordance with, the laws of the Commonwealth of Virginia and the United States of America. In the event of any dispute(s) regarding any term or condition or provision or performance or conduct arising out of or relating to this Legacy Agreement, the parties each agree to first seek resolution through cooperative settlement negotiations involving themselves or their representatives as they each deem appropriate; and, second, in the event cooperative settlement negotiations are not successful, or do not occur, the parties agree to submit any unresolved dispute(s) to binding and final arbitration for resolution. Such arbitration shall be held in Washington, D.C., or by agreement of both parties at any other location, in accordance with the rules of the American Arbitration Association ("AAA") then in effect.

ARIN_BYCHAK_0126

If the Legacy Applicant's principal place of business is in any country other than the United States but within ARIN's service region, ARIN agrees to hold such arbitration pursuant to the locally prevalent equivalent of AAA arbitration rules in the capital of such country upon written request of the Legacy Applicant, provided the Applicant requests this, or if ARIN begins the proceeding if a request to transfer is received no less than 30 days after such a dispute begins.   A single arbiter shall be selected by the parties by striking in turn from a list of arbiters supplied by the AAA. Each party shall bear their own attorneys' fees, and the initiating party shall initially bear the costs of the arbitration's expenses.   United States and Virginia law shall be controlling. Any judgment upon the award rendered pursuant to the arbitration proceeding may be entered in any court having competent jurisdiction.

(ii) If the Legacy Applicant is part of a national, state, or local government authority whose laws or regulations require that their law, jurisdiction or domicile must apply to such an agreement, when ARIN is provided a written demonstration of such national, state, or local law or regulation, the arbitration shall be conducted pursuant to the Legacy Applicant's laws.   If there is a dispute regarding applicability of such law jurisdiction or domicile, it shall be decided by the arbitral tribunal if it cannot be resolved by agreement of the parties.

(m) If any subsequent version(s) of the Legacy Service Agreement is authorized by ARIN, any prior signatory of any version of the Legacy Service Agreement may choose to substitute a signed copy of the then-extant subsequent version, with all its terms, instead of the Legacy Agreement they previously signed, and the Included Number Resources will then be governed by the subsequent version.  The consideration for such change is the original agreement and the agreement to abide by the revised terms.   There is no requirement for an Applicant who has signed this Agreement to engage in any subsequent version.

ARIN_BYCHAK_0127

| Agreed: (This section to be completed by Legacy Applicant) | Authorized Officer |
|---|---|
| Legal Name of Company (Legacy Applicant): | Name (Print): |
| D/B/A (if any): | Title (Print): |
| ORG ID: | Signature: |
| Ticket Number: | Date: |
| **Billing Contact Information if different from authorized officer** | **Contact Information of Authorized Officer** |
| Name (Print): | Phone: |
| Title (Print): | E-Mail: |
| Phone: | Street Address: |
| E-Mail: | City and State: |
| Street Address | Postal Code: |
| City and State | Country: |
| Postal Code: | |
| Country: | |

**American Registry for Internet Numbers, LTD. By: (This section to be completed by ARIN)**

| ARIN's Authorized Contracting Agent | |
|---|---|
| Name (Print): | Signature: |
| | Date: |

9

34

ARIN_BYCHAK_0128

# EXHIBIT D



# Potential Impacts on Communications From IPv4 Exhaustion & IPv6 Transition

**Robert Cannon**

**Federal Communications Commission**
**FCC Staff Working Paper 3**
**December 2010**

ARIN_BYCHAK_0272

# Potential Impacts on Communications from IPv4 Exhaustion & IPv6 Transition

**Robert Cannon**

## FCC Staff Working Paper 3

Federal Communications Commission
Washington, DC 20554
December 2010

FCC Staff Working Papers are intended to stimulate discussion and critical comment within the FCC, as well as outside the agency, on issues that may affect communications policy. The analyses and conclusions set forth are those of the authors and do not necessarily reflect the view of the FCC, other Commission staff members, or any Commissioner. Given the preliminary character of some titles, it is advisable to check with the authors before quoting or referencing these working papers in other publications. Recent titles are listed at the end of this paper and all titles are available on the FCC website at http://www.fcc.gov/papers/.

ARIN_BYCHAK_0273

# Abstract

The Internet is in transition.  The original address space, IPv4, is nearly exhausted; the Internet is in the progress of migrating to the new IPv6 address space.

The Internet Protocol version 4 (IPv4) developed in the late 1970s has the capacity for about 4 billion unique addresses.  It would have been hard to imagine in the 1970s that 4 billion addresses were not going to be enough.  But by the early 1990s, Internet engineers recognized that the supply of addresses was relatively limited compared to likely demand, and they set to work designing a successor to IPv4.  They developed a new Internet Protocol, IPv6, with a vastly increased address space: 340 trillion trillion trillion addresses.

Broadband Internet access has become essential to the United States and the rest of the world. The exhaustion of IPv4 addresses and the transition to IPv6 could result in significant, but not insurmountable, problems for broadband Internet services.  In the short term, to permit the network to continue to grow, engineers have developed a series of kludges. These kludges include more efficient use of the IPv4 address resource, conservation, and the sharing of IPv4 addresses through the use of Network Address Translation (NAT).  While these provide partial mitigation for IPv4 exhaustion, they are not a long-term solution, increase network costs, and merely postpone some of the consequences of address exhaustion without solving the underlying problem.  Some of these fixes break end-to-end connectivity, impairing innovation and hampering applications, degrading network performance, and resulting in an inferior version of the Internet.  These kludges require capital investment and ongoing operational costs by network service providers, diverting investment from other business objectives. Network operators will be confronted with increased costs to offer potentially inferior service.

The short term solutions are necessary because there is not enough time to completely migrate the entire public Internet to "native IPv6" where end users can communicate entirely via IPv6.  Network protocol transitions require significant work and investment, and with the exhaustion of IPv4 addresses looming, there is insufficient time to complete the full IPv6 transition.

But the short-term solutions are problematic. The "solution to the solution" is to complete the transition to a native IPv6 network.  A native IPv6 network will restore end-to-end connectivity with a vastly expanded address space, will improve network performance, and should decrease costs.  Completing the transition of the public Internet to IPv6 will take time.

ARIN_BYCHAK_0274

# Table of Contents

INTRODUCTION ........................................................................................................... 1

IPV4 ADDRESSES ...................................................................................................... 3

    IP NUMBER ALLOCATION ......................................................................................... 4
    IPV4 EXHAUSTION .................................................................................................. 7

THE IPV6 SOLUTION ................................................................................................ 9

    SUPPORT FOR THE IPV6 SOLUTION ......................................................................... 10
    US GOVERNMENT .................................................................................................. 11

HISTORY:  THE NCP-TO-TCP TRANSITION ..................................................... 15

POTENTIAL ISSUES ................................................................................................ 16

    PACE OF ADOPTION ............................................................................................... 16
    CONSUMER DEMAND ............................................................................................. 17
    NO FLAG DATE ...................................................................................................... 17
    IPV6 TRANSITION METHODS .................................................................................. 17
    PREPARATIONS FOR TRANSITION ........................................................................... 19
    IPV4 ALLOCATIONS AND TRANSFERS ..................................................................... 19
    COST OF TRANSITION ............................................................................................ 21
    NAT BOXES ........................................................................................................... 22
    SECURITY .............................................................................................................. 25
    LAW ENFORCEMENT .............................................................................................. 25

WHERE TO GO FOR MORE INFORMATION ..................................................... 26

ARIN_BYCHAK_0275

# Potential Impacts on Communications from IPv4 Exhaustion & IPv6 Transition

## Robert Cannon[1]

### Introduction

The Internet is in transition. The original address space, IPv4, is nearly exhausted; the Internet is in the progress of migrating to the new IPv6 address space.

The Internet Protocol version 4 (IPv4) developed in the late 1970s has the capacity for about 4 billion unique addresses. It would have been hard to imagine in the 1970s that 4 billion addresses were not going to be enough. But by the early 1990s, Internet engineers recognized that the supply of addresses was relatively limited compared to likely demand, and they set to work designing a successor to IPv4. They developed a new Internet Protocol, IPv6, with a vastly increased address space: 340 trillion trillion trillion addresses.[2]

Broadband Internet access has become essential to the United States and the rest of the world.[3] The exhaustion of IPv4 addresses and the transition to IPv6 could result in significant, but not insurmountable, problems for broadband Internet services. As stated by the IEEE-USA:

> Running out of addresses does not mean the IPv4-based Internet will suddenly stop working. However, it does mean it will be difficult, if not impossible, to distribute new IP addresses to new or expanding enterprises. Such a limitation will have clear impacts on commerce and innovation.[4]

*If* the network were to run out of addresses, no additional computers, subscribers or services could be added to the network. In the short term, to permit the network to continue to grow, engineers have developed a series of kludges.[5] These kludges include more efficient use of the IPv4 address resource, conservation, and the sharing of IPv4 addresses through the use of Network Address Translation (NAT). While these provide partial mitigation for IPv4 exhaustion, they are not a long-term solution, increase network costs, and merely postpone some of the consequences of address exhaustion without solving the underlying problem. Some of

---

[1] Senior Counsel for Internet Law, Office of Strategic Planning and Policy Analysis, FCC. The author would like to thank Susan Crawford, John Curran, Bobby Flaim, Henning Schulzrinne, Doug Sicker, Tom Wheeler, Bill Woodcock, Paul de Sa, Sherille Ismail, Walter Johnston, Chuck Needy, and Irene Wu for their comments, input and review of the paper. Special thanks go to Richard Hovey who has provided counsel to the FCC on IPv6 for many years.

[2] IPv4 Depletion and IPv6 Deployment, RIPE NCC FAQs (last visited Dec. 7, 2010) ("The Internet Engineering Task Force (IETF) developed the new protocol, IPv6, which allows for $2^{128}$, or roughly 340 trillion, trillion, trillion unique IP addresses.").

[3] *See* National Broadband Plan: Connecting America, FCC (2010).

[4] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 8 (2009).

[5] A *kludge* is defined as "a software or hardware configuration that, while inelegant, inefficient, clumsy, or patched together, succeeds in solving a specific problem or performing a particular task." Kludge | Dictionary.com (accessed Nov. 30, 2010).

ARIN_BYCHAK_0276

these fixes break end-to-end connectivity, impairing innovation and hampering applications, degrading network performance, and resulting in an inferior version of the Internet.[6]   These kludges require capital investment and ongoing operational costs by network service providers, diverting investment from other business objectives.[7]  Network operators will be confronted with increased costs to offer potentially inferior service.[8]

The short term solutions are necessary because there is not enough time to completely migrate the entire public Internet to "native IPv6" where end users can communicate entirely via IPv6.[9]  Network protocol transitions require significant work and investment, and with the exhaustion of IPv4 addresses looming, there is insufficient time to complete the full IPv6 transition.

But the short-term solutions are problematic. The "solution to the solution" is to complete the transition to a native IPv6 network.  A native IPv6 network will restore end-to-end connectivity with a vastly expanded address space, will improve network performance, and should decrease costs. Completing the transition of the public Internet to IPv6 will take time.[10]

This paper will explore the IPv6 transition and its implications for communications policy.  As with other transitions, early preparation greatly facilitates transition – and like previous transitions, some companies are well on their way with transition plans, while others may not be as advanced.  This paper also seeks to identify potential issues that could cause bumps along the way.  These are issues that stakeholders need to be aware of to facilitate a smooth and effective transition.

Assistant Secretary of Commerce for Communications and Information, Lawrence Strickling, recently stated, "*action is needed*."

> [W]e want to impress upon everyone that this is an urgent issue, but one that can be successfully handled with good planning. And we want to encourage companies to share

---

[6] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 14 (2009) ("It is one thing to offer a lesser class of service to those who do not value a full Internet experience. However, it is another to lockout a class of people by not fully explaining the importance of the full Internet experience. That is, if one subscribes to an Internet access service with a crippled NAT, and with a constantly changing IP address, one will not be able to enjoy current and future applications that rely on the end-to-end Internet model.").

[7] Lorenzo Colitti, IPv6 at Google NANOG, Slide 5 (Jun. 2010) ("network complexity creations operation / support costs").

[8] *See* Geoff Huston, Is the Transition to IPv6 a "Market Failure," CircleID (Sept. 28, 2009); Why we choose 6RD for our ADSL Access Network, Softbank, NANOG50 (Oct. 2010) ("Nobody wants to pay for IPv6 transition").

[9] Ron Broersma, Dual-Stacked Enterprise Network DREN and SPAWAR, Google IPv6 Implementors Conference Slide 3 (Jun. 10, 2010) ("If you haven't started yet, you're already behind"); Geoff Huston, Is the Transition to IPv6 a "Market Failure," The ISP Column (Sept. 2009) (The Transition Process: "The general tenor of industry comment on this transition timetable is that while it may have been feasible to complete this transition prior to IPv4 address exhaustion if the industry had commenced with this effort in the late 90's, this is no longer a feasible objective given our current situation. We are now incapable of orchestrating a comprehensive transition to IPv6 within the time available as determined by the anticipated time remaining for the unallocated pool of IPv4 addresses.").

[10] *See* OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 40 (May 2008) ("The three options available to networks that are growing after the depletion of previously unallocated IPv4 address space are *i)* denser deployment of NAT, *ii)* obtaining and deploying additional IPv4 infrastructure if actors gain access to previously allocated addresses, and: *iii)* IPv6 deployment").

2
FCC Staff Working Paper

ARIN_BYCHAK_0277

best practices on IPv6 uptake for all businesses to benefit, particularly for small- and medium-sized enterprises.[11]

Industry, governments, and consumers must prepare for the IPv6 transition, working together to minimize disruption and costs, and to maintain Internet services that have become integral and vital to our country and the world.[12]

## IPv4 Addresses

The foundation of the Internet is the Internet Protocol. The Internet Protocol is a relatively simple protocol designed to interconnect networks, transmitting data back and forth. It is a general purpose protocol that facilitates networking over various physical telecommunications infrastructures (e.g., cable, DSL, fiber, wireless) and supports various applications (e.g., World Wide Web, email, video, file transfer, VoIP).

### Figure 1: Internet Hourglass[13]



The Internet Protocol does not interact with or process the data that is transmitted; that is the responsibility of higher layer functionality of applications and services. The Internet Protocol does not provide lower layer infrastructure telecommunications. The responsibility of the Internet Protocol is to route packets from end-to-end across disparate networks.[14] Packets

---

[11] NTIA Press Release, NTIA Convenes Stakeholders to Discuss IPv6 Deployment (Sept. 28, 2010).

[12] Organizations Urged to Stop Delaying IPv6 Deployment to Safeguard Future Growth of the Internet, Numbering Resource Organization (Sept. 15, 2010) ("The biggest threat facing the Internet today is that less than 6% of the current form of IP addresses, IPv4, remains and the pool is likely to be completely depleted next year.").

[13] This is a simplified version of the Internet Hourglass. See J. Rosenberg, UDP and TCP as the New Waist of the Internet Hourglass, IETF Draft (Aug. 14, 2008).

[14] See, e.g., Rick Whitt, MCI, A Horizontal Leap Forward: Formulating a New Communications Policy Framework Based on the Network Layers Model, 56 Fed. Comm. L.J. 587 (2004); Sicker & Mindel, "Refinements of a Layered

ARIN_BYCHAK_0278

transmitted through the Internet have a header which includes the source and destination IP addresses; routing is based on the destination IP address.

Released in 1978, Internet Protocol version 4 (IPv4) was the first stable version of the Internet Protocol (previous versions were developmental). In 1980, The Department of Defense announced that the ARPANet would migrate to IPv4 on January 1, 1983.[15]  In 1985, when the National Science Foundation initiated the NSFNET, NSF staff concluded that the use of the Internet Protocol was essential to the success of the NSFNet. In the early 1990s, NSF decided both to allow public traffic on the NSFNet and to privatize the network, establishing the foundation of the current public Internet.[16]

IPv4 has an address space containing over 4 billion unique IP addresses.[17]  In the 1970s, when the ARPANet was a private network utilized by researchers and government agencies, it was thought that this would be sufficient.[18]

### IP Number Allocation

The Internet Corporation for Assigned Names and Numbers (ICANN) currently manages the IP numbering resource through the Internet Assigned Number Authority (IANA) function.[19]  IANA distributes large address blocks to the five Regional Internet Registries (RIRs):

- African Network Information Centre (AfriNIC),
- American Registry of Internet Numbers (ARIN),
- Asia Pacific Network Information Center (APNIC),
- Latin American and Caribbean IP Address Regional Registry (LACNIC),[20] and
- Réseaux IP Européens Network Coordination Centre (RIPE NCC).

---

Model For Telecommunications Policy," The Journal on Telecommunications and High Technology Law, Volume I, 2002; *A Layered Model for Internet Policy*, 1 J. TELECOMM. & HIGH TECH. L. 37 (2002).

[15] RFC 760, DOD Standard: Internet Protocol (Jan. 1980); RFC 791, Internet Protocol: DARPA Internet Program Protocol Specification, (Sept. 1981); J. Postel, RFC 801, NCP/TCP Transition Plan (Nov. 1981). ARPANet had been using the Network Control Protocol. See NCP – Network Control Protocol, Living Internet.

[16] *See* NSFNET: A Partnership for High-Speed Networking, Final Report 1987-1995, Merit Networks.

[17] Geoff Huston, IPv4 Address Report ("The IPv4 address space is a 32 bit field. There are 4,294,967,296 unique values, considered in this context as a sequence of 256 "/8s", where each "/8" corresponds to 16,777,216 unique address values."). See also Lljitsch van Beinjnum, Everything You Need to Know About IPv6, Ars Technica (Mar. 7, 2007) ("With 32 bits, it's possible to express 4,294,967,296 different values. Over half a billion of those are unusable as addresses for various reasons, giving us a total of 3.7 billion possible addresses for hosts on the Internet.").

[18] See Bradner, S., A. Mankin, The Recommendation for the IP Next Generation Protocol, RFC 1752, Sec. 2 (Jan. 1995) ("Even the most farseeing of the developers of TCP/IP in the early 1980s did not imagine the dilemma of scale that the Internet faces today. 1987 estimates projected a need to address as many as 100,000 networks at some vague point in the future. We will reach that mark by 1996. There are many realistic projections of many millions of interconnected networks in the not too distant future.").

[19] IANA – About the Internet Assigned Numbers Authority (last visited Nov. 17, 2010). *See* Management of Internet Names and Numbers, Statement of Policy, US Department of Commerce, National Telecommunications and Information Administration (1998) (White Paper) (setting forth Internet governance principles of stability, competition, private, bottom-up coordination, representation).

[20] See IPv4 Allocations/Assignments, available space and forecasting, LACNIC (last visited Dec. 4, 2010).

ARIN_BYCHAK_0279

The RIRs assign address blocks to Local Internet Registries (LIRs) or networks within their territories pursuant to each RIRs' own policies.[21] Those networks, in turn, can assign blocks of addresses to smaller networks, or individual numbers to individual subscribers.

**Figure 2: IP Address Allocation**



RIRs manage IP numbers as a public resource. When a registry allocates a number to an entity, it is giving that entity the ability to use that number; no property right is conferred to the recipient. IP numbers are allocated on a needs-basis pursuant to RIR policies; recipients pay fees which support the operation of the registries.[22]

The IANA allocates IPv4 addresses to RIRs in large blocks of 16,777,216 addresses each (referred to as "/8" address blocks). Within the total IPv4 address space, there are 256 /8 address blocks. Approximately thirty-six of these address blocks are held in reserve (these addresses are used for multicasting and various other dedicated applications). Of the 220 blocks available to the IANA for distribution and allocation, 213 had been allocated as of December 2010 to the

---

[21] Geoff Huston, IPv4 Address Report. RIR policies are created through bottom-up policy making processes in each RIR community.

[22] *See* ARIN: Fee Schedule. See Dan Campbell, Comments on an IP Address Trading Market, CIRCLEID (Feb. 15, 2008) (discussing how IP addresses are allocated by RIRs).

ARIN_BYCHAK_0280

RIRs, leaving 7 blocks still available in the IANA pool.[23] When the next two blocks are allocated and only 5 blocks remain at IANA, these blocks will be distributed one each to the five RIRs.[24]

**Figure 3: IPv4 Address Space Utilization**[25]



[23] See IANA IPv4 Address Space Registry, IANA; Four /8 Blocks Allocated to the RIRs – 2.73% Remains at IANA, ARIN (Nov. 30, 2010); Goeff Huston, IPv4 Address Report (accessed Oct. 5, 2010).
[24] Global Policy for the Allocation of the Remaining IPv4 Address Space, ICANN (Mar. 6, 2009).
[25] Slide from the ARIN IPv4 Depletion: IPv6 Adoption (Nov. 11, 2010) slide deck; slides used by permission.

### IPv4 Exhaustion

With the success of the Internet has come great demand for Internet addresses, exhausting the supply of available IPv4 addresses. Experts predict that IANA's supply of IPv4 addresses will likely be exhausted by February, 2011.[26] As of November 2010, 2.73% of the total IPv4 address blocks remained available for allocation by IANA to the RIRS.[27]

**Figure 4: Available IPv4 Space in /8s[28]**



<hr/>

[26] Geoff Huston, IPv4 Address Report (last accessed Dec. 2, 2010); Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper (2009); Tony Hain, "A Pragmatic Report on IPv4 Address Space Consumption," The Internet Protocol Journal, Volume 8, Number 3. At the point where IANA's inventory of IPv4 address blocks is depleted, depletion will trickle through the system. The RIRs will still have some address blocks in inventory; projections are that their inventories will be exhausted by the Fall of 2011. Some large end users are already reporting difficulty acquiring requested IP address resources. *See* William Jackson, CIO Council Shepherds Agencies Through IPv6 Transitions, GCN (Nov. 12, 2010) (stating "shortages already are appearing. A Labor Department employee said that the department requested from Verizon, its Network vendor, three Class C IPv4 address blocks containing a little more than 500,000 addresses each, but was able to get only one block. ").

[27] Four /8 Blocks Allocated to the RIRs – 2.73% Remains at IANA, ARIN (Nov. 30, 2010); Unallocated IPv4 Internet Addresses Soon to Be Consumed, ICANN Press Release (Jan. 19, 2010). *See also* Internet Addressing – Measuring Deployment of IPv6, Working Party on Communication Infrastructures and Services Policy, Directorate for Science and Technology, OECD, p. 3 (Feb. 4, 2010).

[28] Slide from the ARIN IPv4 Depletion: IPv6 Adoption (Nov. 11, 2010) slide deck; slides used by permission.

ARIN_BYCHAK_0282

Several factors have increased demand for IPv4 addresses. These include increased Internet deployment, and new and more advanced devices on the network.[29] As the supply of IPv4 addresses dwindles, there is concern that some networks may engage in hoarding.[30]

---

### Relationship of IP Address to Domain Names

Most people think of domain names as "Internet addresses." Ask for someone's email address, and they will give you something with a domain name: "robert.cannon@fcc.gov". However, there is no host on the Internet with the address "fcc.gov." Instead, domain names are used as a mnemonic device to obtain IP addresses.

When a human attempts an interaction on the Internet using a domain name, a query is sent to a domain name server. That server will answer the domain name query with an IP number. For example, the domain name "fcc.gov" might resolve to "192.104.54.5." Having acquired the IP address, the human's computer now knows the address of the destination computer and will initiate interaction.

Domain names have several features. They can be easily remembered by humans. Domain names can be easily updated with a different IP address, permitting the owner of the domain name to use or move to a different host on a different service with a different IP address, even though everyone continues to communicate with the site using the same domain name. For example, when the White House was the subject of a DOS attack that focused on the IP address of one of the White House servers, the White House changed servers and changed IP addresses in the domain name record of whitehouse.gov, without changing the domain name with which people were reaching the White House.* The domain name system acts as an address book for easy look-up of IP number addresses.

* Keith A. Rhodes, Code Red, Code Red II, and SirCam Attacks Highlight Need for Proactive Measures, Testimony Before the Subcommittee on Government Efficiency, Financial Management, and Intergovernmental Relations, Committee on Government Reform, House of Representatives, GAO-01-1073T (Aug. 29, 2001).

---

[29] See Alain Durand, IPv6 @ Comcast: Managing 100+ Million IP Addresses, Presented at RIPE 54, Slide 6 (May 2007) (Comcast Triple Play results in the need for 8 to 9 IP addresses per subscriber); GAO, Internet Protocol version 6, Federal Agencies Need to Plan for Transition and Manage Security Risks, p. 8 (May 2005); Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 8 (2009); Factsheet: IPv6 – the Internet's Vital Expansion, ICANN (Oct. 2007); Doug Montgomery, IPv6: Hope, Hype and (Red) Herrings, NIST (2006) (presentation on the promise and misunderstandings surrounding IPv6).

[30] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 9 (2009).

ARIN_BYCHAK_0283

## The IPv6 Solution

In response to IPv4 address exhaustion, the Internet Engineering Task Force (IETF) created IPv6, a new version of the Internet Protocol with a vastly expanded address space.[31] The new version also included many desired features such as enhanced security.[32] As work progressed, many IPv6 improvements have been incorporated into IPv4 networks, leaving a vastly increased address space as the one clear feature of IPv6.[33]

### Figure 5: About IPv4 and IPv6[34]

| IP version | IPv4 | IPv6 |
|---|---|---|
| Deployed | 1981 | 1999 |
| Address Size | 32-bit number | 128-bit number |
| Address Format | Dotted Decimal Notation: 192.0.2.76 | Hexadecimal Notation: 2001:0DB8:0234:AB00: 0123:4567:8901:ABCD |
| Number of Addresses | $2^{32}$ = 4,294,967,296 | $2^{128}$ = 340,282,366,920,938,463, 463,374,607,431,768,211,456 |
| Examples of Prefix Notation | 192.0.2.0/24<br>10/8<br><br>(a "/8" block = 1/256th of total IPv4 address space = $2^{24}$ = 16,777,216 addresses) | 2001:0DB8:0234::/48<br>2600:0000::/12 |



---

[31] *See* Proceedings of the 18th IETF, p. 53 (August 1990) (Minutes of August 2nd Meeting, presentation by Frank Solensky on the rate of utilization of the IP space); Bradner, S. and A. Mankin, The Recommendation for the IP Next Generation Protocol, RFC 1752 (Jan. 1995).

[32] *See* Planning Guide/Roadmap Toward IPv6 Adoption within the US Government, The Federal CIO Council Architecture and Infrastructure Committee Technology Infrastructure Subcommittee Federal IPv6 Working Group, p. vii & 4 (May 2009) (discussing benefits of IPv6).

[33] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 16 (2009) ("There are a host of other features, but in the ten years since the IETF published the IPv6 specification,22 most have been back-ported to IPv4. "); OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 17 (May 2008) ("Some experts attribute additional benefits to IPv6, although many have been ported to IPv4 or are contingent on the removal of NATs, which are deeply embedded into the existing infrastructure.").

[34] Slide from the ARIN IPv4 Depletion: IPv6 Adoption (Nov. 11, 2010) slide deck; slides used by permission.

ARIN_BYCHAK_0284

## Support for the IPv6 Solution

The IPv6 solution is supported by all Internet addressing authorities: ICANN (IANA),[35] ARIN,[36] RIPE NCC,[37] APNIC,[38] LACNIC,[39] AFRINIC,[40] and Numbering Resource Organization.[41] IPv6 has also been supported by the co-designer of the original Internet Protocol Vint Cerf.[42] It is supported by the US Department of Defense, the Office of Management and Budget, and the Federal CIO Council.[43] Other supporters of IPv6 include the Internet Society,[44] the European Commission,[45] the OECD,[46] the ITU,[47] and the ICT Standards Advisory Council of Canada.[48]

---

[35] On the Deployment of IPv6, ICANN Resolution (June 2007) ("the future growth of the Internet therefore increasingly depends on the availability and timely deployment of IPv6"). See also Unallocated IPv4 Internet Addresses Soon to Be Consumed, ICANN Press Release (Jan. 19, 2010) ("For the global Internet to grow and prosper without limitation, we need to encourage the rapid widespread adoption of the IPv6 protocol." Rod Beckstrom, ICANN's President and Chief Executive Officer.).

[36] IPv6 Board Resolution, ARIN (May 7, 2007) ("Be It Resolved, that this Board of Trustees hereby advises the Internet community that migration to IPv6 numbering resources is necessary for any applications which require ongoing availability from ARIN of contiguous IP numbering resources").

[37] RIPE Position Paper, IPv6 Act Now, RIPE NCC (Oct. 2007) ("Growth and innovation on the Internet depends on the continued availability of IP address space. The remaining pool of unallocated IPv4 address space is likely to be fully allocated within two to four years. IPv6 provides the necessary address space for future growth. We therefore need to facilitate the wider deployment of IPv6 addresses. While the existing IPv4 Internet will continue to function as it currently does, the deployment of IPv6 is necessary for the development of future IP networks.").

[38] APNIC – Ipv6 Program (last visited Jan. 22, 2010) ("IPv6 deployment is a very important issue in our community. It is a priority for APNIC to dedicate significant resources to help facilitate IPv6 deployment in the Asia Pacific region and provide stakeholders with the necessary information to make this important decision for their organizations.")

[39] LACNIC Portal IPv6. Why Is It Important to Implement IPv6, Portal IPv6, LACNIC (accessed January 21, 2010) ("The deployment of IPv6 is essential to avoid reaching this situation, and it is the only solution to IPv4 exhaustion that we can qualify as practically permanent.").

[40] AFRINIC – Ipv6 Resource Center (accessed January 22, 2010) ("IPv6 is the culmination of over a decade's worth of work, mainly inspired by this address exhaustion and is designed to enable the global expansion of the Internet.").

[41] Numbering Resource Organization – IPv6 ("The NRO, on behalf of the five Regional Internet Registries (RIRs), is calling on all stakeholders to make the deployment of IPv6 a priority").

[42] See, e.g., Paul Krill, Internet Pioneer Cerf Urges IPv6 Migration, InfoWorld (Sept. 17, 2009). Vint Cerf is currently "Chief Internet Evangelist" at Google. Cerf's Up at Google, Google Press Center (Sept. 8, 2005).

[43] Planning Guide/Roadmap Toward IPv6 Adoption within the US Government, The Federal CIO Council Architecture and Infrastructure Committee Technology Infrastructure Subcommittee Federal IPv6 Working Group, p. viii (May 2009) ("The transition of the Internet to IPv6 is generally seen as the only practical and readily available long-term solution to IPv4 address exhaustion for devices connected to the public internet.").

[44] ISOC Highlights Importance of Greater IPv6 Deployment, ISOC Press Release (Nov. 12, 2007).

[45] Communication From the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, Advancing the Internet: Action Plan for the Deployment of Internet Protocol version 6 (IPv6) in Europe p. 8 (May 27, 2008) ("Europe should set itself the objective to widely implement IPv6 by 2010. Concretely speaking at least 25% of users should be able to connect to the IPv6 Internet and to access their most important content and service providers without noticing a major difference compared to IPv4.").

[46] Unallocated IPv4 Internet Addresses Soon to Be Consumed, ICANN Press Release (Jan. 19, 2010). See also Internet Addressing – Measuring Deployment of IPv6, Working Party on Communication Infrastructures and Services Policy, Directorate for Science and Technology, OECD, p. 3 (Feb. 4, 2010) ("Encouraging this deployment is an explicit goal of the OECD").

[47] ITU WTSA Resolution 64. See also ITU IPv6 Study Group. ITU is requesting to be an IPv6 registry.

[48] IPv6 in Canada: Final Report and Recommendations of the ISACC IPv6 Task Group (IITG), IITG Final Report to ISACC, ISACC-10-42200 (Mar. 16, 2010). Major network equipment vendors also support IPv6. See, e.g., CISCO

ARIN_BYCHAK_0285

According to RIPE NCC,

> [U]niversal broadband will put heavy strain on the infrastructure of the Internet, as all computers connected to the global network need an IP address. To safeguard the future growth of the digital economy, a timely adoption of IPv6 is essential.[49]

The Federal Government CIO Council stated

> The emergence of IPv6, providing the world with an exponentially larger number of available IP addresses, is essential to the continued growth of the Internet and development of new applications leveraging mobile Internet connectivity. Although the information technology (IT) community has come up with workarounds for this shortage in the IPv4 environment, IPv6 is the true long-term solution to this problem.[50]

### US Government

US Government activity regarding IPv6 can be divided into three areas:

- US Military Networks (Department of Defense);
- US Government non-military networks (Office of Management and Budget); and
- Private networks (Department of Commerce).

*US military networks.* The Department of Defense (DOD), with its network-centric operations, has high network address demands and therefore places a priority on the expanded address space. In 2003, it was the first government branch to announce an IPv6 transition policy,[51] declaring that:

> The achievement of net-centric operations and warfare, envisioned as the Global Information Grid (GIG) of inter-networked sensors, platforms and other Information Technology/National Security System (IT/NSS) capabilities (ref a), depends on effective implementation of IPv6 in concert with other aspects of the GIG architecture.[52]

> The DOD set 2008 as the deadline by which it should complete its IPv6 transition. DOD's transition to IPv6 has been described as "aggressive" and DOD has operational plans that would require a high demand on a network address space. DOD is reported to have received a substantial IPv6 address allocation.[53]

---

IPv6 Solutions (Last Updated Dec. 2009); Juniper IPv6 Solutions (May 1, 2002); Migrating Routed Networks and Services to IPv6 - Alcatel-Lucent.

[49] Government | IPv6 Act Now, RIPE NCC (accessed January 25, 2010).

[50] IPv6 Transition Guidance, Federal CIO Council Architecture and Infrastructure Committee, CIO Council, p. 3 (Feb. 2006).

[51] The DOD oversaw the network protocol transition from NCP-to-IPv4.

[52] DOD Memo for Secretaries of the Military Departments, From Dept of Defense Chief Information Officer, Subj: Internet Protocol version 6 (IPv6) (June 9, 2003).

[53] The US Department of Defense has 42 Million Billion Billion Billion IPv6 Addresses, Royal Pingdom (Mar. 26th, 2009) (DOD "has a /13 IPv6 block (the smaller the number, the larger the block). No one else in the world is even close to that. The next-largest block after that is a /19 block (which is already huge). In other words the DoD owns a block 64 times larger than anyone else's."); Captain RV Ros Dixon, IPv6 in the Department of Defense, Defense Information Systems Agency.

ARIN_BYCHAK_0286

***US government non-military networks.*** In 2005, the Office of Management and Budget mandated that federal agencies initiate the transition to IPv6.[54] According to the CIO Council:

[T]he Office of Management Budget issued Memorandum M-05-22, "Transition Planning for Internet Protocol Version 6 (IPv6)", establishing the goal of enabling all Federal government agency network backbones to support the next generation of the Internet Protocol Version 6 (IPv6) by June 30, 2008. The memorandum require[d] the agency's network backbone to be ready to transmit both IPv4 and IPv6 traffic, and support IPv4 and IPv6 addresses, by June 30, 2008. . . . The requirements for June 30, 2008 [were] for the network backbone (core) only. IPv6 [did] not actually have to be operationally enabled (i.e. turned on) by June 30, 2008. However, network backbones must [have been] ready to pass IPv6 traffic and support IPv6 addresses. Applications, peripherals, and other IT assets which are not leveraged in the execution of the functions mentioned above are not required for the June 30, 2008 deadline.[55]

Moving the government's information technology from "ready" to "operational" will require additional work. On September 28, 2010, at a Department of Commerce IPv6 Workshop, OMB released a further memo *Transition to IPv6* setting forth additional deadlines for the federal IPv6 transition:

In order to facilitate timely and effective IPv6 adoption, agencies shall:

• Upgrade public/external facing servers and services (e.g. web, email, DNS, ISP services, etc) to operationally use native IPv6 by the end of FY 2012;

• Upgrade internal client applications that communicate with public Internet servers and supporting enterprise networks to operationally use native IPv6 by the end of FY 2014. [56]

In 2005, OMB created an IPv6 Advisory Group[57] and tasked the CIO Council[58] with publishing transition planning guidance.[59] The CIO Council established an Interagency IPv6 Working Group, headed by Peter Tseronis, Senior Advisor, US Department of Energy.[60]

---

[54] Karen S. Evans, Administrator, Office of E-Government and Information Technology, Transition Planning for Internet Protocol Version 6 (IPv6), M-05-22 (August 2, 2005).

[55] IPv6 Transition Guidance, Federal CIO Council Architecture and Infrastructure Committee, CIO Council, p. 1 & 3 (Feb. 2006) ("As of July 2008, all major agencies met the June 30, 2008 deadline for successfully demonstrating their adoption of IPv6 technology."). *See also* Carolyn Duffy Marsan, Feds: We are ready for IPv6 D-Day, Network World (Jun. 26, 2008).

[56] Vivek Kundra, Transition to IPv6, Memorandum for Chief Information Officers and Executive Departments and Agencies, Executive Office of the President, Office of Management and Budget (Sept. 28, 2010).

[57] IPv6 Transition Guidance, Federal CIO Council Architecture and Infrastructure Committee, CIO Council, p. 25 (Feb. 2006).

[58] "The Chief Information Officers (CIO) Council was established by Executive Order 13011, Federal Information Technology, on July 16, 1996, now revoked. The CIO Council's existence was codified into law by Congress in the E-Government Act of 2002. The CIO Council serves as the principal interagency forum for improving practices in the design, modernization, use, sharing, and performance of Federal Government agency information resources. The Council's role includes developing recommendations for information technology management policies, procedures, and standards; identifying opportunities to share information resources; and assessing and addressing the needs of the Federal Government's IT workforce. The Chair of the CIO Council is the Deputy Director for Management for

ARIN_BYCHAK_0287

OMB also directed the National Institute of Standards and Technology (NIST) to develop standards and testing necessary to support adoption of IPv6 by US Government agencies. The NIST project is known as USGv6.[61] NIST has developed a technical standards profile for US Government acquisition of IPv6 hosts and routers, and a specification for network protection devices. [62] NIST is also actively establishing a testing program in order to test the compliance of products and vendors with the profile.[63] The Government Services Administration updated the Federal Acquisition Regulation (FAR) to reflect the IPv6 specifications,[64] and is assisting agencies with IPv6 procurement needs.[65]

*Private networks.* In 2004, the Department of Commerce (the National Telecommunications and Information Administration (NTIA) and the National Institute of Standards and Technology (NIST)) initiated an investigation into the US Government's policy response to IPv6. This culminated with the release of the 2006 Report *Technical and Economic Assessment of Internet Protocol, Version 6 (IPv6)*. In the Report, the Department of Commerce stated:

Industry stakeholders and Internet experts generally agree that IPv6-based networks would be technically superior to the common installed base of IPv4-based networks. The vastly increased IP address space available under IPv6 could potentially stimulate a plethora of new innovative communications services. Deployment of IPv6 would, at a minimum, "future proof" the Internet against potential address shortages resulting from the emergence of new services or applications that require large quantities of globally routable Internet addresses.

Current market trends suggest that demand for unique IP addresses could expand considerably in future years. The growing use of the Internet will likely increase pressures on existing IPv4 address resources, as more and more people around the globe seek IP addresses to enjoy the benefits of Internet access. In addition, the potential development of new classes of networked applications (e.g., widely available networked computing in the home, the office, and industrial devices for monitoring, control, and repair) could result in rapid increases in demand for global IP addresses.

---

the Office of Management and Budget (OMB) and the Vice Chair is elected by the CIO Council from its membership." Federal Chief Information Officers Council, About Us (visited Jan. 25, 2010).
[59] IPv6 Transition Guidance, Federal CIO Council Architecture and Infrastructure Committee, CIO Council, p. 3 (Feb. 2006).
[60] IPv6 Transition Guidance, Federal CIO Council Architecture and Infrastructure Committee, CIO Council, p. 23 (Feb. 2006).
[61] USGv6 Technical Infrastructure, Advanced Networks Division, NIST.
[62] A Profile for IPv6 in the US Government – Version 1.0, Recommendations of NIST, NIST SP500-267 (July 2008).
[63] USGv6 Testing Program, Advanced Network Technologies Division, NIST. NIST's USGv6 documentation is a good resource for other networks embarked on the IPv6 transition.
[64] Federal Acquisition Regulation; FAR Case 2005-041, Internet Protocol Version 6 (IPv6), Final Rule, 74 Fed. Reg. 65605 (Dec. 10, 2009) ("The Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) are issuing a final rule amending the Federal Acquisition Regulation (FAR) to require Internet Protocol Version 6 (IPv6) compliant products be included in all new information technology (IT) acquisitions using Internet Protocol (IP)".).
[65] GSA – IPv6.

ARIN_BYCHAK_0288

Over time, IPv6 could become (as compared to IPv4) a more useful, more flexible mechanism for providing user communications on an end-to-end basis. The redesigned header structure in IPv6 and the enhanced capabilities of the new protocol could also simplify the configuration, and operation of certain networks and services. These enhancements could produce operations and management cost savings for network administrators. In addition, auto-configuration and other features of IPv6 could make it easier to connect computers to the Internet and simplify network access for mobile Internet users.[66]

Addressing the appropriate role for the government in promoting the transition, the Department of Commerce at that time concluded,

The Task Force finds that no substantial market barriers appear to exist that would prevent industry from investing in IPv6 products and services as its needs require or as consumers demand. The Task Force, therefore, believes that aggressive government action to accelerate deployment of IPv6 by the private sector is not warranted at this time. The Task Force believes that, in the near term, private sector organizations should undertake a careful analysis of their business cases for IPv6 adoption and plan for the inevitable emergence of IPv6 traffic on both internal and external networks.[67]

In 2010, the Department of Commerce announced that grantees for the Comprehensive Community Infrastructure Awards, which are part of the NTIA Broadband Technology Opportunity Program (BTOP) stimulus grants, must report on "Internet protocol address utilization and IPv6 implementation." Recipients are required to file quarterly reports until the end of their funding.[68]

On September 28, 2010, NTIA convened an IPv6 Workshop, during which Assistant Secretary of Commerce for Communications and Information Lawrence Strickling stated,

[F]or industry in particular – smart-phone and router manufactures, transport providers, Internet service providers, and chief information and technology officers throughout the industry – action is needed. Today we want to impress upon everyone that this is an urgent issue, but one that can be successfully handled with good planning. And we want to encourage companies to share best practices on IPv6 uptake for all businesses to benefit, particularly for small- and medium-sized enterprises.[69]

The NTIA event, which was moderated by US CTO Aneesh Chopra and US CIO Vivek Kundra, highlighted the importance of industry and government working together, sharing information

---

[66] Technical and Economic Assessment of Internet Protocol, Version 6 (IPv6), IPv6 Task Force, Department of Commerce, Executive Summary (Jan. 2006).

[67] Technical and Economic Assessment of Internet Protocol, Version 6 (IPv6), IPv6 Task Force, Department of Commerce, Executive Summary (Jan. 2006).

[68] Notice of Funds Availability (NOFA) and Solicitation of Applications, Broadband Technology Opportunities Program, National Telecommunications and Information Administration, US Department of Commerce, 75 Fed. Reg. 3792 (Jan. 22, 2010). See comments of kc claffy, National Broadband Plan Proceeding, Docket 09-51 (filed Jan. 27, 2010) (commenting on the need for good data to research networks).

[69] NTIA Press Release, NTIA Convenes Stakeholders to Discuss IPv6 Deployment, Sept. 28, 2010.

ARIN_BYCHAK_0289

and best practices that could facilitate the transition.[70]   At the event, the CIO Council released its new memo with the new deadlines for the federal IPv6 transition.[71]

## History:  The NCP-to-TCP Transition

The Internet has seen network protocol transitions before.  The precursor to the Internet was the ARPANet, initiated in 1969 as an experimental research packet-switched network by the Advanced Research Project Agency (ARPA) of DOD.  ARPANet's network protocol was the Network Control Protocol (NCP).[72]  By 1980, ARPANet had moved from an experiment to an operational network and was being integrated into the Defense Data Network.  For this to be successful, and for the network to become a "network of networks," the network had to migrate to the new Internet Protocol (IPv4) developed by Bob Kahn and Vint Cerf.

At the time, the Defense Communications Agency (DCA) was responsible for operational management of the ARPANet. In 1980, DCA announced that ARPANet would transition to IPv4 on January 1, 1983.  In hindsight, with the success of the Internet, this appears to have been an obviously good decision.  But that was not evident at the time.  NCP was working fine for many network operators who had little need or incentive to migrate to the new protocol.[73]  To facilitate the transition and encourage the NCP-recalcitrants, ARPANet leadership engaged in awareness raising and educational campaigns, including newsletters, discussion groups, and at times more drastic measures.  Twice during 1982, Jon Postel and Vint Cerf turned off NCP on the ARPANet; any non-IPv4 hosts were left offline.  This subtly demonstrated to the ARPANet community the need to prepare for the transition.

In 1981, Jon Postel released the NCP/TCP (IPv4) Transition Plan.[74]  The ARPANet would go through a one year transition during 1982, where Hosts would support both NCP and IPv4 (i.e., operate in dual stack mode).  Postel's plan was a phased transition calling for different applications to migrate over to TCP at different times.

The NCP-to-IPv4 transition had two characteristics that distinguish it from the current transition: a flag-day transition date and a clear directive from an authority that could back it up. On January 1, 1983, NCP would be turned off.  Those networks who had failed to prepare – and

---

[70] Agenda, Internet Protocol Version 6 (IPv6) Workshop: The Impact of the Adoption and Deployment of IPv6 Addresses for Industry, the US Government, and the Internet Economy, US Department of Commerce, National Telecommunications and Information Administration, September 28, 2010.

[71] Vivek Kundra, Transition to IPv6, Memorandum for Chief Information Officers and Executive Departments and Agencies, Executive Office of the President, Office of Management and Budget (Sept. 28, 2010).

[72] ARPNet migrated from its original *Host-to-Host* protocol to the newer *Network Control Protocol* in 1970. See, e.g., Peter Salas, *Casting the Net: From ARPANet to Internet and Beyond*, p. 188 (Addison-Wesley Professional 1995).

[73] Janet Abbate, Inventing the Internet, p. 141 (MIT Press 2000) ("Most host system managers had no compelling interest in converting to the Internet protocols, and the transition required a number of steps that would cost the host sites time and money"); Thomas Parke Hughes, Agatha C. Hughes, Michael Thad Allen, Gabrielle Hecht, Technologies of Power; The Hidden Lives of Standards, p. 127 (MIT Press 2001).

[74] J. Postel, RFC 801, NCP/TCP Transition Plan (Nov. 1981).

15
FCC Staff Working Paper

ARIN_BYCHAK_0290

there were a significant number of them – fell offline, and proceeded to spend several panicked months attempting to upgrade their computers and regain connectivity.[75]

The transition was described as "traumatic" and "disruptive." It was met with resistance and recalcitrance. Even with the superiority of IPv4 over NCP, in the end a number of those involved remarked that the transition may not have succeeded or occurred at all without the directive from the DCA and the hard deadline.[76]

## Potential Issues

The IPv4-to-IPv6 transition is encountering multiple challenges.    These challenges impact public policy considerations in different ways. This section surveys potential issues that would be prudent to monitor and could influence the course of the transition.

### Pace of Adoption

IPv6 migration started slowly; little content was available, connectivity was limited, backbone services were not always abundant, IPv4 devices are embedded, and there was a lack of IPv6 exchange points.[77]  In 2010, the OECD released a report comprehensively reviewing the state of IPv6 adoption, concluding,

> By early 2010, IPv6 was still a small proportion of the Internet. However, IPv6 use was growing faster than continued IPv4 use, albeit from a low base. And several large-scale deployments are taking place or are planned. Overall, the Internet is still in the early stages of a transition whereby end hosts, networks, services, and middleware are shifting from IPv4-only to support both IPv4 and IPv6.[78]

---

[75] See TCP/IP Internet Protocol, Living Internet; Ronda Hauben, From the ARPANET to the Internet: A Study of the ARPANET TCP/IP Digest and of the Role of Online Communication in the Transition from the ARPANET to the Internet (recounting resistance to the transition).

[76] See, e.g., Janet Abbate, Inventing the Internet, p. 141 (MIT Press 2000) ("Clearly the transition to the Internet protocols would not have occurred so quickly – perhaps not at all at many sites – without considerable pressure from the military managers."); Email from Jack Haverty to IH mailing list, NCP to TCP/IP Transition (April 27, 2009) (recounting transition). In her book, Inventing the Internet, Jane Abbate states that on the date of the cut-over to IPv4, "only about half the sites had actually implemented a working version of TCP/IP." Janet Abbate, Inventing the Internet, p. 141 (MIT Press 2000).

[77] Factsheet: IPv6 – the Internet's Vital Expansion, ICANN (Oct. 2007) (adoption of IPv6 "has been slow"); Internet Addressing – Measuring Deployment of IPv6, Working Party on Communication Infrastructures and Services Policy, Directorate for Science and Technology, OECD, p. 4 (Feb. 4, 2010) ("By the measurements explored in this report, adequate adoption of IPv6 cannot yet be demonstrated. In particular, IPv6 is not being deployed sufficiently rapidly at present to intercept the estimated IPv4 exhaustion date. Surveys show that lack of vendor support remains a barrier to IPv6 deployment, as does the lack of business models."); OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 18 (May 2008); Comcast IPv6 Monitor (showing percent of top websites that are reachable via IPv6); Geoff Huston, Is the Transition to IPv6 a "Market Failure," The ISP Column (Sept. 2009) ("The Transition Process"); Packet Clearing House Report on Distribution of IPv6-Endabled IXPs (accessed Nov. 29, 2010).

[78] Karine Perset, Internet Addressing: Measuring Deployment of IPv6, OECD (Apr. 2010).

ARIN_BYCHAK_0291

A significant barrier to IPv6 adoption has been a negative network effect: without much on IPv6 networks, there has been little incentive to join IPv6 networks.[79]  There was no one there with which to interact.  With few end users joining IPv6 networks, there was little incentive to create IPv6 resources or content.[80]  However, with the migration of US Government networks and other major networks and services to IPv6, network effect has been shifting, creating an incentive to join.[81]

### Consumer Demand

There has not been consumer demand for IPv6.  There is consumer demand for Internet access (regardless of whether IPv4 or IPv6) and for new features.  Public Internet services are generally reachable today via IPv4, so there is no perceived need by consumers to run IPv6.  Consumers have customer premises equipment such as cameras, TVs or game consoles that may only be IPv4 enabled.  If the Internet service provider migrates to IPv6, the service provider risks upsetting consumers whose equipment may no longer work properly.

### No Flag Date

Unlike the previous transition from NCP to IPv4, there is no hard date by which the transition must be achieved.  There is no hard and fast deadline creating urgency, which has been key to other successful transitions.[82]  Some experts predict that the transition will be protracted, potentially taking decades.  However others project that there will be a network effect whereby, when sufficient amounts of online assets have migrated to IPv6, networks will tip to IPv6 and IPv4 will fade.  At this point the transition could accelerate.

### IPv6 Transition Methods

IPv6 is not backwards compatible.[83]  IPv6 networks cannot directly interconnect with IPv4 networks.  As both networks will co-exist for some time, [84] this creates an issue for how devices on IPv4 and IPv6 networks are able to interact with each other.  Network engineers have

---

[79] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 9 (2009); OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 37 (May 2008) ("From an end user's perspective, the key issue with transitioning to IPv6 is likely to be content rather than cost. There is currently little Internet content available via IPv6…").

[80] Briefing Paper: IPv6 Deployment: State of Play and the Way Forward, Internet Society (June 18, 2009) (describing this as the chicken or the egg problem); Harold Feld, RIPE Makes Me Vaguely Uneasy By Creating Legal Market for IP Addresses, Tales from the Sausage Factory (Jan. 7, 2009) ("Why would I spend money to build an IPv6 network when everyone else I want to talk to is on the IPv4 network? The failure of IPv6 migration to date pretty much answers that question: "no reason, so I won't do it."").

[81] See Carolyn Duffy Marsan, YouTube Turns On IPv6 Support, Net Traffic Spikes, PC World (Feb. 1, 2010); Carolyn Duffy Marsan, Comcast, Netflix Report Rise in IPv6 Activity, Network World (Mar. 24, 2010).

[82] See Planning Guide/Roadmap Toward IPv6 Adoption within the US Government, ver. 1.0, CIO Council, p. 5 (May 2009) ("Although there is an increasing sense of urgency in Federal Government to start moving toward IPv6, it is not the same situation as Y2K, which had a clear date by which transition was vital. ").  As noted above, the US Government has set specific deadlines for transitioning the US Government to IPv6.

[83] IPv6 Depletion: IPv6 Adoption, ARIN, Slide 8 (Sept. 30, 2009).

[84] Internet Addressing – Measuring Deployment of IPv6, Working Party on Communication Infrastructures and Services Policy, Directorate for Science and Technology, OECD, p. 4 (Feb. 4, 2010) ("An IPv6-only network is the end-point of a potentially long transition phase where both IPv4 and IPv6 will co-exist in a "dual-stack" mode of operation on most of the Internet"); Hillary A. Elmore, L. Jean Camp, Brandon P. Stephens, *Diffusion and Adoption of IPv6 in the United States* (Mar 2008) (estimating that the transition could take between 6 and 70 years); Doug Montgomery, IPv6: Hope, Hype and (Red) Herrings, NIST (2006) (describing transition as a "marathon").

17

ARIN_BYCHAK_0292

been investing significant energy in developing and deploying viable and effective transition solutions.[85]  But the variety of different transition solutions also raises the concern of how well different solutions will work with each other, whether there will be conflicts, and what might get broken in the process.

Generally, the methods of solving this problem are known as Dual Stack and Tunneling.[86]  With the Dual Stack solution, a host runs both an IPv4 and an IPv6 stack side by side.  Traffic which reaches the host using either network protocol can interact with the host.  In the GAO diagram below, the routers are dual stack and handle traffic from either IPv4 or IPv6 clients on their respective networks.

<div align="center">

**Figure 6:  Example of a Dual Stack Network**[87]

</div>



[85] *See, e.g.*, North American Network Operators Group (NANOG) 50 Meeting Agenda, Oct. 3 – 6, 2010, Atlanta, GA (several panels discussing IPv6 transition).
[86] *See* IPv6 Transition Guidance, Federal CIO Council Architecture and Infrastructure Committee, CIO Council, p. 8, Sec. 2.2.1 (Feb. 2006); IPv6 Deployment Strategies, CISCO (Dec. 23, 2002); John Curran, An Internet Transition Plan version 3, IETF Informational  (May 2008). During the NCP to IPv4 transition, hosts were able to operate both NCP and IPv4 and some hosts acted as translators.  See J. Postel, *NCP/TCP Transition Plan*, RFC 801 (Nov. 1981); Janet Abbate, Inventing the Internet, p. 141 (MIT Press 2000); Email from Jack Haverty to IH mailing list, NCP to TCP/IP Transition (April 27, 2009) (recounting transition).
[87] GAO, Internet Protocol version 6, Federal Agencies Need to Plan for Transition and Manage Security Risks, p. 21 (May 2005).

ARIN_BYCHAK_0293

Tunneling is a solution utilized when there is no native IPv6 connectivity between different points on the network. IPv6 packets are encapsulated within IPv4 packets, carried across an IPv4 network to the other side where the IPv4 packet is removed and the IPv6 packets continue on their way. [88] Conversely, IPv4 packets can also be tunneled across IPv6 networks.

**Figure 7: Example of Tunneling IPv6 Traffic Inside an IPv4-Only Internet**[89]



Source: GAO.

### Preparations for Transition

Established networks that are strongly engaged in IETF, ICANN, and RIR processes appear to be taking appropriate measures in anticipation of the IPv6 transition. However, lessons from past transitions indicate that there may be some businesses that are not as aware or prepared.[90] Unprepared businesses could begin to experience connectivity and service issues, and difficulty acquiring additional IPv4 addresses.[91] A business that delays transition could find it costly to achieved on a compressed schedule.[92]

### IPv4 Allocations and Transfers

IP address blocks have historically been allocated based on need.[93] The costs involved in receiving an allocation are nominal and are not generally a factor in considering whether to apply for an allocation.[94] The principle requirement has been the ability to demonstrate need for the IP addresses, pursuant to community developed RIR address policy. If an address block was not needed, it would (in theory) be returned; it could not be traded.

IPv4 conservation has dampened the pace of IPv4 exhaustion. In the early days of the Internet when the US dominated Internet use, some US firms received large IPv4 block

[88] Lljitsch van Beinjnum, Everything You Need to Know About IPv6, Ars Technica (Mar. 7, 2007); B. Carpenter, K. Moore, IETF RFC 3056, Connection of IPv6 Domains via IPv4 Clouds (Feb. 2001).

[89] GAO, Internet Protocol version 6, Federal Agencies Need to Plan for Transition and Manage Security Risks p. 22 (May 2005).

[90] During the NCP-to-IPv4 transition, even with a dictate from DCA to make ready for the transition, many entities put off preparations, creating "a mad rush at the end of 1982" to prepare for the switch over to TCP/IP. Janet Abbate, Inventing the Internet, p. 141 (MIT Press 2000).

[91] Lee Wei Lian, IP Scarcity Could Hit Unwary Businesses, Says Internet Body, The Malaysian Insider (Mar. 16, 2010).

[92] See Iljitsch van Beijnum, There is no Plan B: why the IPv4-to-IPv6 transition will be ugly, ars technical (Sept. 29, 2010).

[93] Geoff Huston, IPv4 Address Report.

[94] See ARIN Number Resource Policy Manual, Sec. 4.2 Allocation to ISPs (Jan. 13, 2010).

19

ARIN_BYCHAK_0294

allocations; some of these entities have returned unused IPv4 address resources to Internet number registries.[95] While these conservation efforts have helped, they have merely delayed IPv4 exhaustion without solving the long-term problem.[96]

One proposal has been to allow transfers and trade of IP blocks (instead of returning unused resources to the RIRs).[97] This could create an incentive for holders of underutilized IP address blocks to sell them to parties that would put them to more productive use.[98] Transferring IPv4 number allocations would enable new entrants to acquire assignments of IP number resources that are not subordinate to a legacy stakeholder.[99] It would also take pressure off during the transition period, permitting networks to continue to expand, and allowing those engaged in the transition additional time to resolve any transition issues encountered.[100] Two RIRs have policies that permit transfers of IP address block assignments under certain conditions.[101]

The addresses transferred are just numbers. For them to be valuable, they must be routable. The routability of the numbers could be unstable if an RIR does not authenticate the transfer, if conflicting claims to the numbers arise, or if there is any other corruption in the integrity of a unique number assignment to network.[102] Unauthorized transfers could create an issue of the RIR not having a direct relationship with, and knowledge of, the transferee, and thus be unable to maintain accurate address assignment records along with associated contact

---

[95] Lljitsch van Beinjnum, Everything You Need to Know About IPv6, Ars Technica (Mar. 7, 2007) ("For instance, IBM, Xerox, HP, DEC, Apple and MIT all received "class A" address blocks of nearly 17 million addresses. (So HP, which acquired DEC, has more than 33 million addresses.)"); Geoff Huston, IPv4 Address Report ("Unneeded addresses are to be passed back to the registry. "); Recovering IPv4 Address Space, ICANN Blog (Feb. 6, 2008) ("With help from the Regional Internet Registries, three /8s were returned in 2007 and last month we recovered one more.")

[96] Lljitsch van Beinjnum, Everything You Need to Know About IPv6, Ars Technica (Mar. 7, 2007) (such efforts only buys us a few more years).

[97] See Milton Mueller, Scarcity in IPv4 Addresses: IPv4 Address Transfer Markets and the Regional Internet Address Registries, IGP (July 20, 2008); OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 26 (May 2008); Huston, G., IPv4 address transfers, proposed to APNIC on 26 July 2007; Titley, N. and van Mook, R., Enabling methods for reallocation of IPv4 resources, (Oct. 23, 2007); Dan Campbell, Comments on an IP Address Trading Market, CIRCLEID (Feb. 15, 2008).

[98] See Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 11 (2009); Communication From the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, Advancing the Internet: Action Plan for the Deployment of Internet Protocol version 6 (IPv6) in Europe, p. 4 (May 27, 2008). See RIPE NCC IPv4 Address Allocation and Assignment Policies for the RIPE NCC Service Region, Sec. 5.5 Feb. 2010.

[99] OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 27 (May 2008).

[100] Milton Mueller, Scarcity in IPv4 Addresses: IPv4 Address Transfer Markets and the Regional Internet Address Registries, IGP p. 17 (July 20, 2008) ("The transition could turn out to be more complicated, costly and difficult than anticipated, and we don't know how long it will last. If we try to use an address shortage to force ISPs into making the transition before they are ready, we could develop damaging gaps in connectivity due to shortages of address resources and compatibility problems.").

[101] See ARIN Number Resource Policy Manual, Sec. 4.2.3 Reassigning Address Space to Customers (Sept. 2010); IPv4 Address Allocation and Assignment Policies for RIPE NCC Service Region, Sec. 5.5 Transfers of Allocations (Oct. 2010).

[102] See OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 27 (May 2008); Ray Plzak, IP Address Hijacking: An ARIN Perspective (Nov. 2003) (PDF).

ARIN_BYCHAK_0295

information.[103] There is concern that the scarcity of IPv4 numbers will result in IPv4 number hijacking where addresses are utilized by someone other than the assignee of record.[104] The resulting lack of accurate address information also has significant implications for law enforcement and global anti-cybercrime efforts. Finally, there is also concern about the impact of address transfers on the routing table and fragmentation.

### Cost of Transition

The cost of transitioning to IPv6 could be problematic. Costs involved in the IPv6 transition include renumbering networks, running two separate networks (IPv4 and IPv6) simultaneously, upgrading relevant software and hardware, training staff, and testing implementations.[105] The cost of IPv6 will involve capital investment and ongoing operational costs that will have to be diverted from other business goals and which can be difficult to bear in today's economic climate.[106] Some networks may be averse to expending financial resources to make the transition until absolutely required.[107] According to an IEEE White Paper,

> A report generated for the National Institute of Standards and Technology (NIST) in 2005 stated that it would take 25 years to have a total transition to IPv6 at a cost of $25B, in 2003 dollars. However, a scholarly report on the adoption of IPv6 indicates that we will run out of IPv4 addresses well before the 25 years is up. Note that the same NIST report indicates the $25B would be less than 1% on network infrastructure spending, and they estimate the benefits of migrating to IPv6 are $10B *per year*.

> Also take into consideration that 25 years is still relatively fast for technology adoption. The introduction of digital switching to analog switching took more than 35 years. Moreover, there are still analog switches used in the public switched network. Likewise, we are twelve years into a 25-year migration from switched voice and video services to predominantly IP-based, end-to-end, voice and video services. What is different is the old technologies coexisted fairly well with the new technology, and it was hard for the average user to notice they were communicating with older technology (except for some features or quality).

---

[103] See Dan Campbell, Comments on an IP Address Trading Market, CIRCLEID (Feb. 15, 2008); IPv6 in Canada: Final Report and Recommendations of the ISACC IPv6 Task Group (IITG), IITG Final Report to ISACC, ISACC-10-42200, p. 16 (Mar. 16, 2010) ("Unclear ownership of some IPv4 addresses plus a lack of tools to block wrong addresses could lead to instability of the routing system ").

[104] Ray Plzak, IP Address Hijacking: An ARIN Perspective (Nov. 2003).

[105] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 17 (2009); Factsheet: IPv6 – The Internet's Vital Expansion, ICANN (Oct. 2007); Briefing Paper: IPv6 Deployment: State of Play and the Way Forward, Internet Society (June 18, 2009); IPv6 Economic Impact Assessment, RTI International for NIST (Oct. 2005) ; OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 36 (May 2008) ("The cost of IPv6 deployment cannot be evaluated generically, as such costs vary on a case-by-case basis according to network needs and business"); Marco Hogewoning, IPv6 at XS4ALL RIPE 59 Lisboa (Slides).

[106] Briefing Paper: IPv6 Deployment: State of Play and the Way Forward, Internet Society (June 18, 2009).

[107] The financial cost of the transition was likewise an issue during the NCP-to-IPv4 transition. See Janet Abbate, Inventing the Internet, p. 141 (MIT Press 2000) ("Most host system managers had no compelling interest in converting to the Internet protocols, and the transition required a number of steps that would cost the host sites time and money").

ARIN_BYCHAK_0296

The NIST report also mentioned the cost to ISP's for migrating to IPv6 would be $136M (2003 dollars). Again, this cost is a fraction of annual ISP network equipment spending, and thus should not be a major impediment. However, without a clear return-on-investment to the ISP, other than being able to offer IPv6 connectivity, it is hard to get them to make the investment.[108]

Geoff Huston notes that ISPs will bear an additional cost as the result of the transition without an improvement of service to customers. Indeed, Huston notes, since many of the transition methods deteriorate end-to-end connectivity and quality-of-service, ISPs who deploy transition solutions will incur increased costs while offering inferior service – and thus will be at a potential competitive disadvantage.[109]

Conversely, officials from the Defense Research and Engineering Network (DREN) have been sharing information from their IPv6 transition experience. DREN was an early IPv6 mover and was able to incorporate IPv6 into the regular lifecycle of their networks. As a result, they indicate that they were able to migrate their networks to IPv6 with little additional money set aside for the IPv6 transition.[110] The DREN experience suggests that, with planning, anticipated expenses could be mitigated.

### NAT Boxes

One of the more passionate points of discussion surrounding IPv6 involves Network Address Translation (NAT) boxes.[111] A NAT box is a host on the Internet with an IP address that has behind it a network of privately addressed computers. A specific block of addresses has been set aside for private use and is not advertised by networks to the public Internet.[112] Since these addresses only work internally and cannot be used to communicate on the public internet, they can be reused over and over again behind NATs.

An example of a NAT might be an off-the-shelf Wi-Fi access point that a residential user might use for home Internet access. The ISP assigns to that subscriber an IP address which is assigned to whatever computer the subscriber attaches at the end of the network. The subscriber attaches the Wi-Fi router. Behind the Wi-Fi router could be all of the computers in the house; the router assigns them IP addresses from the private IP address space. In this way, a subscriber

---

[108] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 19-20 (2009).

[109] Geoff Huston, Is the Transition to IPv6 a "Market Failure," The ISP Column (Sept. 2009) (The Transition Process). See also J. Curran, RFC 1669, Market Viability as a IPng Criteria, IETF (Aug. 1994) ("No internetworking vendor (whether host, router, or service vendor) can afford to deploy and support products and services which are not desired in the marketplace.").

[110] DREN Helps Make the Transition to Internet Protocol 6 (IPv6), Department of Defense DREN (accessed Dec. 4, 2010); John M. Baird, Defense Research and Engineering Network (DREN) IPv6 Deployment Joint Engineering Team (Sept. 21, 2010).

[111] See, e.g., IPv6 Forum, NATS: Just Say No, CIRCLEID (Oct. 24, 2003); Martin Geddes, Why NAT Isn't As Bad As You Thought, CIRCLEID (Jan. 15, 2004); Dan Campbell, As IPv6 deploys, Will We Look Back on NAT as the Ugly Step Sister or Unsung Hero, CIRCLEID (Feb. 4, 2008).

[112] Y. Rekhter, B. Moskowitz, D. Karrenberg, G. J. De Groot, E. Lear, Address Allocation for Private Internets, IETF RFC 1918 (Feb. 1996).

ARIN_BYCHAK_0297

with one public IP number can have multiple computers attached to the Internet.[113]   Commercial ISPs may utilize private IP numbers for their subscribers, and corporate LANs (such as the FCC internal network) may also utilize private IP addresses.[114]

### Figure 8:  An Example of a Network Address Translation[115]



Network operators utilize NATs for various objectives.  First, NATs are used to conserve the scarce numbering resource; one public address maps to multiple private addresses.  Second, NATs are also used for network management and security, creating single points of entry into networks.

After the transition to IPv6, with the dramatically increased address space, NATs would no longer be necessary in order to deal with the scarce numbering resource.  It is expected that with IPv6 the use of NATs will likely decrease although it may not disappear.[116]

---

[113] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 10 (2009).

[114] Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 10 (2009).

[115] Source: GAO, Internet Protocol version 6, Federal Agencies Need to Plan for Transition and Manage Security Risks, p. 7 (May 2005).

[116] Some argue that the use of NATs obviates the need for the IPv6 transition. Even if core networks migrate to IPv6, the argument goes, enterprise networks have no incentive to incur the burden and cost, and have sufficient addressing resource available through the use of NAT. See Johna Till Johnson, Is It Truly Necessary to Upgrade to IPv6, Network World (Oct. 3, 2007).

ARIN_BYCHAK_0298

NAT boxes have drawbacks.[117] As stated by the CIO Council, "[w]hile NAT has to some extent delayed the exhaustion on IPv4 address space for the short term, it complicates general application bi-directional communication."[118] NAT boxes break the end-to-end nature of Internet communications, and thus interfere with some Internet applications and services, and create an impediment to innovation.[119]

NAT boxes may work well when traffic originates from within the private network and the NAT box can track which host to return traffic to (someone on the network requests a webpage, and the NAT box knows who to return the webpage to). NAT boxes do not work so well when the traffic originates outside the network trying to reach someone inside the network (for example, someone trying to set up a VoIP call with someone inside the network.[120] Since the request from the VoIP outsider came to the NAT box IP address, the NAT box has no idea which computer inside the network the outsider is actually trying to reach).[121] NAT boxes present barriers to applications which seek to take advantage of IP address transparency. They inject non-standardized intelligence into the network, requiring application developers to conform to each non-standardized implementation.[122] They require a conversion from the public address space to private address spaces, which degrade the performance of some applications.[123] NATs also result in less accurate geolocation, make identification and blocking of abuse more difficult, and frustrate IP-based authentication.[124]

---

[117] *See, e.g.*, Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 12 (2009) (providing an extensive discussion of the limitation of NATs).

[118] IPv6 Transition Guidance, Federal CIO Council Architecture and Infrastructure Committee, CIO Council, p. 6 (Feb. 2006).

[119] OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6 (May 2008) (Problems often associated with NATs include increasing the complexity of networks, creating asymmetry between clients and servers, complicating the provision of public services within a local network and interfering with peer-to-peer applications.); Tom Vest, Migration or Stagflation? IPv6, Protocol Number Resource Management, and the Future of the Internet Sept 2008. See also Alain Durand, IPv6 @ Comcast: Managing 100+ Million IP Addresses, Presented at RIPE 54, Slide 4 (May 2007) (stating "In the control plane, all devices need to be remotely managed, so NAT isn't going to help us, nor is federated Net 10 islands…IPv6 is the clear solution for us.").

[120] Lljitsch van Beijnum, NAT – in Depth, Ipv6.com (2008) ("NAT breaks protocols that require incoming connections and protocols that carry IP addresses in them.").

[121] Lljitsch van Beinjnum, Everything You Need to Know About IPv6, Ars Technica (Mar. 7, 2007) ("NAT also breaks protocols that embed IP addresses. For instance, with VoIP, the client computer says to the server, "Please send incoming calls to this address." Obviously this doesn't work if the address in question is a private address."); Next Generation Internet: IPv4 Address Exhaustion, Mitigation Strategies and Implications for the US, IEEE-USA White Paper, p. 12 (2009); Factsheet: IPv6 – the Internet's Vital Expansion, ICANN (Oct. 2007).

[122] OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 14 (May 2008) ("Some have pointed out a primary reason NATs introduce complexity is the lack of standards to specify their —behaviour in different scenarios. For example, standards to specify how NATs deal with peer-to-peer applications such as voice-over-IP, have not been devised. As a result, NAT implementations vary widely. Unable to predict how specific NATs will react, application designers have had to devise complex —work-arounds.")

[123] Communication From the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions, Advancing the Internet: Action Plan for the Deployment of Internet Protocol version 6 (IPv6) in Europe, p. 4 (May 27, 2008) ("It adds a layer of complexity in that there are effectively two distinct classes of computers: those with a public address and those with a private address. This often increases costs for the design and maintenance of networks as well as for the development of applications.")

[124] Lorenzo Colitti, IPv6 at Google NANOG, Slide 6 (June 2010).

### Security

IPv6 is a new network protocol which will require new training, experience, and implementations. During the transition, new vulnerabilities could be introduced, and IPv4 security devices and software may be of limited use.[125] As network operators have done when introducing anything new into networks, operators will have to work with and test IPv6 implementations in order to ensure security.[126]

### Law Enforcement

The transition to IPv6 creates concerns for law enforcement. During the transition, kludges will be employed by networks in order to conserve addresses and allow networks to keep expanding. These solutions, however, break end-to-end connectively and make it difficult to map specific IP numbers to individual end users. IP numbers may map to carrier grade NAT boxes which may have behind them many households, neighborhoods, or even towns, making it difficult to know to whom an IP address belongs.[127] Law enforcement has also expressed concern that WHOIS[128] for IPv6 contain accurate and useful information. ISPs may incur additional administrative burdens of having to retain records of the dynamic mapping between addresses.[129] There may also be issues with CALEA compliance. The ARIN Government Working Group has been working on these issues.[130]

---

[125] Michael Warfield, Internet Security Systems, Security Implications of IPv6 (2003) ("IPv6 is not a panacea for security, though, because few security problems derive solely from the IP layer in the network model. For example, IPv6 does not protect against misconfigured servers, poorly designed applications, or poorly protected sites. In addition, IPv6 and IPv6 transitional mechanisms introduce new, not widely understood, tools and techniques that intruders can use to secure unauthorized activity from detection. These IPv6-derived efforts are often successful even against existing IPv4 networks.").

[126] See *Planning Guide/Roadmap Toward IPv6 Adoption within the US Government,* The Federal CIO Council Architecture and Infrastructure Committee Technology Infrastructure Subcommittee Federal IPv6 Working Group, p. 34 (May 2009); OECD Study: Economic considerations in the management of IPv4 and in the deployment of IPv6, p. 42 (May 2008).

[127] *See* M. Ford, M. Boucadair, A. Durand, P. Levis, P. Roberts, Issues with IP Address Sharing, IETF Informational Draft (Mar. 8, 2010).

[128] *See, e.g.,* Internet Management: Prevalence of False Contact Information for Registered Domain Names , GAO-06-165 (Nov. 2005); Lennard G. Krugar, Internet Domain Names: Background and Policy Issues, Congressional Research Service (Oct. 28, 2009)

[129] *See* Jason Weil, COX, Service Provider NAT44 Overview, NANOG50, slide 5 (October 2010).

[130] *See* ARIN XXV Public Policy Meeting Day 1 Notes – 19 April 2010; ARIN XXIII Public Policy Meeting Day 2 Notes – 28 April 2009 (noting work of ARIN Government Working Group, mentioning Bobby Flaim, FBI, and Marc Moreau, Royal Canadian Mounted Police); ARIN Government Working Group (AGWG) (Apr. 2009); Supervisory Special Agent Robert Flaim, Law Enforcement and Internet Governance: "An Ounce of Prevention is Worth a Pound of Cure," AfriNIC Government Working Group Meeting Nov. 26, 2010.

ARIN_BYCHAK_0300

## Where to Go for More Information

A wealth of information is available concerning the IPv6 transition. To learn more, review the information at the following sources:

- Numbering Authorities
    - o American Registry for Internet Numbers (ARIN): IPv4/IPv6: The Bottom Line
        - ARIN IPv6 Wiki
        - ARIN attends many technology conferences where it provides IPv6 information
    - o Number Resource Organization: are::you:IPv6:ready?
    - o IPv6 Act Now (RIPE NCC)
- United States Government
    - o IPv6 Transition Guidance (CIO Council)
    - o Technical Infrastructure for USGv6 Adoption (NIST)
        - USGv6 Profile
        - USGv6 Testing Program (NIST)
    - o DOD Joint Interoperability Test Command IPv6
        - Defense Research and Engineering Network (DREN)
- North American Network Operators' Group (NANOG) IPv6 Tutorials
    - o NANOG holds regular meetings which include IPv6 technical information; these meetings can be viewed online and are archived.
- IPv6 Forum
- Organization for Economic Cooperation and Development Resources on Internet Addressing: IPv4 and IPv6

ARIN_BYCHAK_0301

## Other Recent Staff Papers

Titles Can Be Downloaded at
http://www.fcc.gov/papers/

"Maximum Impact for Minimum Subsidy:  Reverse Auctions for Universal Access in Chile and India," Irene S. Wu, FCC Staff Working Paper 2, October 2010.

"Transformative Choices:  A Review of 70 Years of FCC Decisions," Sherille Ismail, FCC Staff Working Paper 1, October 2010.

"A Market-Based Approach to Establishing Licensing Rules: Licensed versus Unlicensed Use of Spectrum," Mark Bykowsky, Mark Olson, and William Sharkey, OSP Working Paper 43, February 2008.

"Modeling the Efficiency of Spectrum Designated to License Use and Unlicensed Operations," Mark Bykowsky, Mark Olson, and William Sharkey, OSP Working Paper 42, February 2008.

"Enhancing Spectrum's Value via Market-Informed Congestion Etiquettes," Mark Bykowsky, Kenneth Carter, Mark Olson, and William Sharkey, OSP Working Paper 41, February 2008.

"Competition Between Cable Television and Direct Broadcast Satellite - It's More Complicated Than You Think," Andrew S. Wise and Kiran Duwadi, Media and International Bureaus, January 2005.

"The Scarcity Rationale for Regulating Traditional Broadcasting: An Idea Whose Time Has Passed," John W. Berresford, Media Bureau, March 2005.

"A Survival Analysis of Cable Networks," Keith S. Brown, Media Bureau, December 2004.

"Traits of an Independent Communications Regulator: a Search for Indicators," by Irene Wu, International Bureau, June 2004.

"The Limits of Economic Regulation: The U.S. Experience," Peyton L. Wynns, International Bureau, June 2004.

ARIN_BYCHAK_0302



ARIN_BYCHAK_0303

# EXHIBIT E

*Click to view the latest*
**Business Law TODAY**

MAY 2013

American Bar Association · Section of Business Law: Practical Resources for the Business Lawyer

# BUSINESS LAW TODAY

# Guidance from ARIN on Legal Aspects of the Transfer of Internet Protocol Numbers

## By Ben Edelman and Stephen M. Ryan

Every device connected to the global Internet needs a numeric identifier, an "Internet Protocol" address, or simply "IP address." The Internet's continued growth presents a challenge: most IP addresses have already been assigned to networks and organizations, leaving few left for newcomers and growth. In this context, some networks seek to sell the addresses they previously received – sales which can usefully transfer resources to the networks that most need them, but with certain risks that must be handled with appropriate care. As advisors and counsel to the American Registry for Internet Numbers (ARIN), which assigns and manages these numbers in most of North America, we seek to clarify the circumstances in which such transfers are permitted and to set out the legal, contractual, and policy basis for applicable restrictions.

### ARIN's Role and Responsibility for IP Numbers

ARIN is the non-profit corporation that oversees the allocation of Internet Protocol numbers and performs other services related to the operation of the Internet in the North American service region, including the United States, Canada, and certain Caribbean islands. ARIN has served in this capacity since 1998, and in many aspects is similar to, but different from, the Internet Corporation for Assigned Names and Numbers (ICANN), which provides overall global coordination for the domain names and numbers used in the Internet.

ARIN carries out duties assigned to it and handed off to it by the U.S. government – duties that had previously been performed by the government. In particular, effective December 1, 1997, the National Science Foundation (NSF) approved the "transfer [of] responsibility for the IP Number assignment . . . to ARIN." NSF recognized that the formation of ARIN, as an industry self-governance body, was necessary to "give the users of IP numbers (mostly Internet service providers, corporations and other large institutions) a voice in the policies by which they are managed and allocated within the North American region." (*See* NSF Press Release, June 24, 1997.)

ARIN's authority is also recognized through ICANN's contracts with the U.S. government and in turn through ARIN's agreements with ICANN. ICANN's relationship with the U.S. government is presented in part in ICANN's Memorandum of Understanding with the Department of Commerce, November 25, 1998, and various amendments thereto. ARIN's contract with ICANN is embodied in ARIN's assent to the Memorandum of Understanding between ICANN and the Address Supporting Organization (October 29, 2004).

To carry out its obligation of coordinating IP number resource policy in its service region, ARIN follows a rigorous, open policy process. Interested ARIN members and the public, including government agencies, can submit policies for consideration by the ARIN community. Policies are dis-

cussed both online and via periodic in-person meetings, and policies are only enacted when they enjoy a consensus among ARIN members. This is exactly the type of multistakeholder industry self-coordination which U.S. government policy has sought for Internet resources.

### The Importance of IP Address Uniqueness

The Internet Protocol standard requires that each device connected to a network have a unique IP addresses not used by any other device on the network. Organizations may configure their equipment with any IP addresses they wish, just as they may label folders in their file cabinet with any names they choose, and as long as uniqueness is maintained, the system works. But *global* uniqueness is required when communicating with the Internet at large, as most networks seek to do. Specifically, if a network attempted to connect to the Internet using IP addresses already in use by another network, both networks would find their communications unreliable.

The U.S. government established the Internet Registry System to issue unique IP addresses for Internet research, for facilitating Internet connectivity, and for private use. The Internet Assigned Numbers Authority (IANA) assigns large address blocks to the five Regional Internet Registries (RIR), of which ARIN is one. To assure that each address is assigned only once, IANA carefully assures that each RIR re-

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

1

ARIN_BYCHAK_0188

Case 3:18-cr-04683-GPC   Document 149-2   Filed 01/23/20   PageID.1233   Page 70 of 145

ceives distinct address blocks. In turn, each RIR also carefully manages its assigned IP address blocks in its portion of the registry, making individual entries assigning ranges of IP addresses to particular networks as requested. Specifically, when the RIR issues an IP address blocks to a network, the RIR labels the entry in the RIR's registry to indicate the organization's name and related contact information. In short, an "IP address block," as the term is commonly used with respect to globally unique Internet addresses, is defined by and inseparable from its uniqueness in the Internet Registry System.

Uniqueness, as assured by the Internet Registry System, is the crux of the value and importance of IP addressing. From one perspective, IP addresses are just numbers; anyone can pick a number, and configure it into their computer to use it. Completely private networks can and do make use of any IP addresses that they wish. But when it comes to communications with the global Internet, the Internet Registry System provides the required coordination – encapsulating and assuring the right of each participating network to uniquely use assigned IP address blocks free from conflict with others participating in the Internet Registry System.

**ARIN's IP Address Transfer Policy**

As the four billion Internet Protocol Version 4 Numbers (IPv4) began to run low, ARIN members discussed mechanisms to permit voluntary reallocation of IPv4 addresses to networks that most need them. The ARIN policy process culminated in a consensus on a flexible market-based transfer policy that allows a network to receive the definitive right to IP numbers in the registry, subject to a handful of lightweight restrictions: Under current ARIN policy, the recipient must sign a registration services agreement (RSA) for the addresses it receives, and the recipient must demonstrate "need" for those addresses, consistent with the same standards applied to all other ARIN address allocations. ARIN does not require disclosure of the compensation paid between the parties nor does ARIN share in the compensation.

These reasonable restrictions are appropriate to formalize parties' relationships and to maintain longstanding policy principles. An RSA contract is a basic formalization of rights and responsibilities. ARIN has always required RSAs in its transactions with networks, both to protect ARIN's interests and to clarify networks' rights vis-à-vis ARIN. This process is well-established: more than 3,500 ISPs and network operators have signed more than 11,000 RSAs to date.

Meanwhile, the ARIN community has concluded that demonstrating need is appropriate to assure that networks obtain only the addresses they genuinely require. With IPv4 numbers running low, it would be shortsighted for a network to be permitted to obtain more than it needs – and the networks in the ARIN region therefore have created policies that currently do not allow organizations to take more than they genuinely need. Some networks might wish to obtain a long-term or even indefinite supply of IP numbers, but current community policies intentionally disfavor such tactics: the ARIN community consensus is that networks should be moving to IPv6, the next generation Internet numbering system. Indeed, decades of policies from ARIN and predecessors have limited networks to the addresses they demonstrably need, whether during issuance or when being transferred from one network to another. This requirement should surprise no one.

**Services for Networks that Flout ARIN Community Policies**

From time to time, critics of current IP resource allocation policies encourage ISPs and network operators to ignore ARIN policy, asserting they have an unfettered right to "sell" addresses in any way they see fit. For example, in a November 2012 article in *Business Law Today*, one commentator suggested that IP address holders can "freely alienate their number assets" – selling to anyone they like. We emphatically disagree.

We first note the policy consequences of allowing addresses to be transferred without restriction. For example, limitless

rights to "sell" such numbers would permit them to be "sold" to spammers – who constantly need new addresses as their existing IP address blocks develop bad reputations and become blocked by network operators. Limitless sales would also help those who "phish" and engage in identity theft, activities that similarly damage address reputation. Moreover, limitless sales would permit speculators, who don't use the numbers, to buy up numbers and create artificial scarcity. Putting aside the selfishness of such an approach and the real harm it presents to the Internet, it risks forfeiting the valuable benefits that ARIN provides.

Networks' requests of ARIN also provide ample basis for ARIN's restrictions on transfers. Whether requesting new assignments or transferring addresses from another party, a legitimate network is likely to want multiple services from ARIN: WHOIS to list that network as the authorized and exclusive user of the specified numbers in the Internet Registry System; DNS reverse lookup to confirm the domain names associated with various numbers; and, in the future, perhaps resource certification to cryptographically affirm the network's association with those numbers. To date, ARIN has provided these services to all networks in its service region – networks that signed RSAs as they obtained addresses directly from ARIN, early recipients that signed legacy RSAs (LRSAs) to formalize their relationship with ARIN, and also early recipients of IP numbers who that have not signed LRSAs. ARIN intends to voluntarily continue to provide these services to recipients that comply with ARIN policy. But if a network deliberately flouts ARIN policy, it cannot in the next breath demand that ARIN provide it with services, presumably for free. There is no legal or equitable obligation for ARIN to provide services to those who deliberately choose not to follow ARIN policies. To the contrary, ARIN members expect ARIN to withhold services from networks that intentionally and flagrantly violate ARIN policy; that would be a valid exercise of the ARIN policy process, and it should come as no great surprise to networks that ignore

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.  2

ARIN_BYCHAK_0189

the requirements established by the ARIN community through its open policy process.

For addresses associated with RSA or LRSA contract between ARIN and the address holder, the applicability of ARIN's policies is particularly clear-cut: the contract requires such compliance. Separately, critics occasionally raise questions about addresses allocated by ARIN's government predecessors, without the formality of the RSA contracts. Specifically, some have suggested that those early address allocations yield special rights that include the right to transfer addresses without restriction. Here too, we disagree. The following sections present authority for the applicability of restrictions, duly established by ARIN's community and public processes, to early addresses allocations.

### Rights and Obligations of Early IP Number Recipients

Early IP number recipients always understood, or should have understood, that their participation in an interconnected network would necessarily entail compliance with reasonable network policies set by the group, including policies yet to be devised. These requirements have flowed through nearly two decades of subsequent U.S. government policy. For example, when the National Science Foundation (NSF) in 1993 passed responsibility for IP addresses management to contractor Network Solutions (NSI), the NSF's Statement of Work required compliance with certain technical specifications called RFCs that are periodically issued by the Internet Engineering Task Force (IETF). Specifically, the Statement of Work required compliance with RFC 1174 which called for following both existing practice in management of IP addresses as well as "documentation to be issued as RFCs" – indicating that new rules and requirements in the management of IP addresses would arise from time to time. (The Statement of Work instructed: "Awardee shall provide registration services in accordance with the provisions of RFC 1174.") RFC 1174 in turn required the IANA and the Internet regional registries to meet and produce documentation of the

operational procedures and requirements to be used in operation of the registry system ("documentation *to be issued* as RFCs," emphasis added).

Just as RFC 1174 contemplated, subsequent IETF documents further formalized the obligations of recipients of IP numbers. For example, RFC 2050 (which was issued in November 1996 before ARIN's formation) in Section 3.1 specifically notes the prospect of reclaiming addresses if the recipient's need no longer exists. Then Section 4.7 adds that transfers of existing assignments from one party to another may occur only with registry permission, and further provides that "the party trying to obtain the IP address must meet the same criteria as if they were requesting an IP address from the Internet Registry." These rules were prepared exactly as anticipated by the use of the future tense in RFC 1174 ("documentation *to be issued*," emphasis added), as combined output of the regional registries and the IANA.

In short, recipients of address space under the NSF cooperative agreement were definitely subject to policies developed by the Internet technical community, including policies established after addresses had been allocated.

As the successor in management of the IP addresses in the region, ARIN inherited responsibility for coordinating and implementing these policies. It would have been easy at the handoff for NSF to restrict ARIN's duties with respect to the management of previously-issued number resources. But the contemporaneous documents reveal no reference to such a limitation, and in fact active statements to the contrary.

Importantly, the creation of ARIN included explicit affirmation of the scope of ARIN's authority as to early IP numbers. For example, the NSF's June 24, 1997, press release celebrates the fact that "creation of ARIN will give the users of IP numbers . . . a voice in the policies by which they *are managed* and allocated within the North American region" (emphasis added). The antecedent for "they" is "IP numbers," and notice the lack of restriction or qualifier on that term; the sentence offers no suggestion

that only a subset of North American IP numbers (such as numbers to be issued in the future) are subject to management by IP number users via the ARIN process. Thus, the only reasonable interpretation of this contemporaneous NSF statement is that ARIN has authority to set policy for the IP numbers previously issued by the U.S. government or contractors acting for the U.S. government. Furthermore, verb tense confirms the scope of ARIN's responsibility: As of the time of the press release, no IP numbers had yet been allocated by ARIN, but the press release nonetheless instructs that the ARIN process will set the policies by which IP numbers in the region "*are* managed" (emphasis added) – meaning the policies will apply to the numbers already allocated by ARIN's predecessors in the region. Any contrary interpretation would undermine the NSF's stated intent to enable self-governance of IP addresses by the users in the region.

### U.S. Government Policy for Early IP Numbers

Some critics seek support in a recent private letter sent by Mr. Larry Rudolph, the general counsel of the NSF, regarding his views as to the supposed rights of early recipients of IP numbers. But Rudolph's letter was written more than 14 years after the end of NSF's role in policy oversight of IP numbers. Rather, since 1999, the White House Office of Science and Technology Policy (OSTP) and the Department of Commerce's (DOC) National Telecommunications and Information Administration (NTIA), have overseen the U.S. government's interests in Internet infrastructure. If an advisory opinion were needed to clarify the U.S. government's view of rights in early IP numbers, one would expect that opinion to come from OSTP, DOC, or the Office of Legal Policy at the Department of Justice – but not from NSF. Indeed, in a follow-up letter, Mr. Rudolph himself acknowledged that his prior "observations" were not a "legal or policy position on behalf of the U.S. Government."

Rudolf's letter was almost immediately repudiated by the subsequent statement of

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.   **3**

   **ARIN_BYCHAK_0190**

USG IP address policy by the NTIA. Shortly after Rudolph's letter began to publicly circulate, NTIA Administrator Lawrence Strickling posted NTIA's reaffirmation of ARIN's role and responsibility in managing the IP address registry in accordance with the policies developed by community in the region. Specifically, the NTIA statement explained: "The American Registry for Internet Numbers (ARIN) is the RIR for Canada, many Caribbean and North Atlantic islands, and the United States. The USG participates in the development of and is supportive of the policies, processes, and procedures agreed upon by the Internet technical community through ARIN." In our view, NTIA's statement is more persuasive, both through its substance (including its explicit reliance on a decade of U.S. government policy) and its source (the agency with current responsibility for these matters).

**Protections for Early Address Recipients**
Since ARIN processes may permissibly alter policy as to IP numbers issued before ARIN's creation, one might reasonably ask what protects early IP number recipients against arbitrary or otherwise improper action by ARIN. The answers are several. For one, ARIN must operate in accordance with its articles of incorporation and bylaws which – duly established during ARIN's formation and reviewed by the U.S. government at that time – require reasonable, non-discriminatory treatment grounded in proper technical justification. Furthermore, ARIN must act in accordance with its own procedures, including changes to policy based on community consensus as grounded in the history and tradition of the Internet technical standards process. These protections amply protect early IP number recipients.

ARIN's good faith stewardship of its responsibilities is demonstrated by its generous treatment of pre-ARIN IP number recipients. For the past 15 years, ARIN has provided no-charge WHOIS, reverse DNS, and other services to early IP number recipients. ARIN has offered (but never required) that early IP number recipients sign

a Legacy Registry Services Agreement that formalizes the parties' relationship. Current ARIN policies allow early IP number recipients to sell their exclusive right to use IP numbers to others, realizing significant financial gain (potentially a windfall in some cases, since those recipients did not pay the U.S. government for rights to those resources and the effort necessary to free up underutilized IP addresses could be quite modest.) ARIN imposes minimal restrictions on such transfers. In short, early IP number recipients have every reason to be thankful for the services and policies ARIN has put in place.

**U.S. and Canadian Bankruptcy Courts' View of ARIN's Authority**
A growing number of IP transfers have occurred to date, including some publicized transactions from bankrupt estates. To ARIN's knowledge, in each and every instance sellers have agreed to follow ARIN policy and have in fact followed ARIN policy.

Despite bankruptcy proceedings recognizing ARIN's role, some critics argue that ARIN policies rules do not bind sellers of IP numbers issued before ARIN began operation. Some even argue that a transfer from Nortel's bankrupt estate to Microsoft supports this view, but that case actually stands for exactly the opposite proposition. In bankruptcy proceedings, the U.S. Nortel estate no longer needed IP numbers it had received years earlier, so it sought to sell those numbers to Microsoft. As initially proposed, the sale sought recognition of the IP addresses as property and did not recognize ARIN's inherent role with respect to IP address management. ARIN intervened in the bankruptcy sale. ARIN had the clear support of the Canadian government and other third parties. See Industry Canada's April 13, 2011, filing in the Nortel Networks bankruptcy *(In re Nortel Networks Inc. et al.,* D. Del. Case No. 09-10138 (KG), docket #5253):

This submission is in support of ARIN's interventions related to the legal underpinnings of the current governance structure

of Internet numbers . . . and to bring to your attention substantive governmental and policy concerns that arise from the sale of Internet numbers in the manner and on the terms suggested in the Debtor's Motion. . . Their use in accordance with the policies adopted by ICANN, ARIN and the regional registries provides essential assurances respecting the ultimate identity and accountability of Internet users.

Microsoft and the Nortel estate ultimately agreed to modify the transaction consistent with ARIN's right to review and approve the transaction following ARIN's established policy. Specifically, in *Nortel* docket #5315, the parties modified the transfer agreement as a transfer of rights and interests in the address blocks, and called for a RSA contract between ARIN and Microsoft. After ARIN's investigation confirmed Microsoft's need for the numbers and found that the transfer complied with established policy, ARIN assented and permitted the transfer to proceed. The bankruptcy trustee and bankruptcy judge assented to this arrangement, and Microsoft – a sophisticated multinational corporation – saw that complying with ARIN's policies added value to its intended transaction. In short, *Nortel* offers only a precedent for following ARIN's policies, not ignoring them.

In myriad transactions after Nortel-Microsoft, bankruptcy courts systematically recognized ARIN's role as the registry in the region and required sellers to comply with ARIN policy. For example, the court in *In re Borders Group, Inc.*, 11-10614 (Bankr. S.D.N.Y.) stated:

Notwithstanding anything herein to the contrary, . . . (i) the [Internet Address] Sale, . . . is conditioned upon ARIN's consent including any terms and/or conditions established by ARIN's transfer policies or any other policies, guidelines, or regulations developed by ARIN and published on its website, as may be amended and supplemented from time to time (collectively, "ARIN's Policies"), (ii) the transfer of the Debtors' interests in the Internet Addresses

Published in *Business Law Today,* May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.                     4

to the Purchaser is subject to ARIN's Policies, (iii) the Debtors and the Purchaser are required to comply with ARIN's Policies before any transfer of the Debtors' rights in the Internet Addresses may be effectuated; [. . . ]

Indeed, the court specifically indicated that ARIN need not change its policies in any way:

(iv) ARIN is not required to take any action in violation of ARIN's Policies in connection with or as a consequence of this Order, the [Internet Address] Sale, or the Agreements, nor shall ARIN be required to apply a different standard to the transfer of the Internet Addresses than it does to the transfer of non-legacy Internet Protocol numbers. Nothing in this Order is intended, nor shall be construed, as exempting the Debtors and Purchaser from complying with the ARIN Policies.

Orders in similar cases are in accord. See e.g. *In re Teknowledge Corporation*; 10-60457 (Bankr. N.D. Cal.) and *Global NAPS, Inc. v. Verizon New England, Inc.*; 02-12489, 05-10079 (D. Mass.), both permitting sales of IP numbers in bankruptcy proceedings only to the extent compliant with ARIN policy.

### Validity of ARIN RSA and LRSA Contracts
ARIN has long formalized its rights and obligations to networks via standard Registration Service Agreements (RSA) contracts laying out rights in IP Numbers. These documents are easily available for public review.

One ARIN critic argues that RSAs are "nothing more than illusory contracts" because, he says, "ARIN, as apparent promisor, makes no binding commitment at all and . . . retain[s] an unlimited right to determine the nature or extent of its performance." The plain language of the RSAs says otherwise. For example, RSA Section 2 grants a network the exclusive right to be the registrant of a given set of numbers, to use those numbers in the registry,

and to transfer those numbers. Certainly these rights are encumbered by community policy, but this is to be expected because developing and managing IP address policy is a fundamental principle of ARIN's very existence as part of the global Internet Registry system. A network signing an RSA receives valuable rights, including a commitment from ARIN to associate the number resources with that organization alone, and subject only to the exceptions provided in the RSA – ample consideration to support a valid and enforceable contract.

### Looking Forward
IPv4 numbers are indeed in short supply. The question at hand is what to do about it. Some of ARIN's critics envision a future where the networks that received addresses early can sell them to the highest bidder, whether a legitimate network, a spammer, a person engaging in online fraud, or someone stockpiling addresses for future sale. Such a theory recognizes no societal needs or Internet community constraints whatever. In contrast, ARIN's current policies allow transfers with only limited restrictions to prevent the worst abuses and provide additional value to the resources. Some early networks probably will sell their rights to underutilized addresses, even reaping windfall profits, and ARIN policies allow them to do so consistent with the community's rules. But networks' right to make these transfers is nonetheless constrained, including by the agreements networks have accepted in receiving these and other addresses, as well as by applicable law and by longstanding U.S. government policy. That is as it should be.

During this transition to the more capacious numbering system of IPv6, the top priority is, and should be, keeping the Internet running smoothly – assuring that the remaining IPv4 addresses are available to those who need them, and managing all number resources in the registry in accordance with the policies established by the technical community via open multistakeholder discussion. ARIN's policies and procedures reveal its commitment to that task.

*Ben Edelman, PhD. and Esq., is a Harvard Business School professor and an advisor to ARIN. Stephen Ryan is counsel to the American Registry for Internet Numbers and a partner in the international law firm, McDermott Will & Emery. The authors thank Matthew Martel of McDermott for guidance on questions pertaining to bankruptcy.*

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

ARIN_BYCHAK_0192

# EXHIBIT F

# Bloomberg BNA

**BNA's**
# Bankruptcy Law Reporter™

Reproduced with permission from BNA's Bankruptcy Law Reporter, 24 BBLR 32, 01/05/2012. Copyright © 2012 by The Bureau of National Affairs, Inc. (800-372-1033) http://www.bna.com

# Internet Protocol Numbers and the American Registry for Internet Numbers: Suggested Guidance for Bankruptcy Trustees, Debtors-in-Possession, and Receivers

  

BY STEPHEN M. RYAN, MATTHEW MARTEL, AND BEN EDELMAN[*]

**B**ankruptcy trustees, debtors-in-possession, and receivers are seeing an increase in efforts to sell Internet Protocol (IP) addresses, also referred to "IP Numbers." IP Numbers are the unique numeric identifiers associated with computers connected to the Internet. While sales of IP Numbers can deliver value to the estate, IP Numbers are unusual in that their value, use and transfer are enhanced by applicable contract and policy. Ignoring the contracts and policies can delay the sale process and reduce or negate the value of IP Numbers. This article seeks to provide an overview of issues associated with IP Number sales, as well as suggesting an approach for permissible and straightforward sales to obtain the highest value.

A bit of background is helpful. The American Registry of Internet Numbers (ARIN), a Virginia domiciled U.S. non-profit, issues IP numbers. More information about ARIN is included subsequently.

* Thanks to ARIN CEO-President John Curran for his input and advice.

*Stephen Ryan and Matt Martel are partners in the international law firm, McDermott Will & Emery, which represents ARIN. Mr. Ryan is counsel to the American Registry for Internet Numbers. Ben Edelman, PhD. and Esq., is a Harvard University Business School professor.*

## Summary of Issue and Proposed Resolution

There are several guidelines trustees, debtors-in-possession, and receivers should follow to reduce uncertainty in the sale process, avoid delay, and maximize the benefits to the estate when seeking to sell IP Numbers:

- ARIN should receive notice of the contemplated sale. ARIN can assist sellers in many ways, including by verifying whether the IP Numbers the seller desires to transfer match the numbers appearing in ARIN's registration records.

- The sale motion and related sale documents should avoid statements regarding debtor's "ownership" of the IP Numbers. IP Numbers are not traditional property rights. What is being transferred can most accurately be described as the "debtor's interest in the registration right to IP Numbers" and the IP Numbers.

- The sale motion and related sale documents should expressly state "the Seller has the exclusive right to use the IP Numbers subject to ARIN's policies and the Seller has the right to transfer its exclusive right to use the IP Numbers to the Purchaser only pursuant to the terms and conditions set forth in ARIN's transfer policies (the "Transfer Policies")."

- If there is a recital that no consents are needed to effectuate the transfer, a carve out for ARIN's approval should be present. For example, "Other than pursuant to any terms and/or conditions established by the Transfer Policies or any other policies, guidelines, or regulations developed by ARIN and published on its website, as may be amended and supplemented from time to time (collectively, "ARIN's Policies"), no consents or approvals are required for the Seller to transfer the Seller's rights in the IP Numbers." Alter-

ARIN_BYCHAK_0193

2

natively, ARIN's approval may be sought in advance to allow a statement that no further consents are needed to effectuate the transfer.

- In bankruptcy cases, if a sale free and clear is contemplated, there should also be a recital that IP Numbers cannot be transferred free and clear of ARIN's Policies pursuant to Section 363 of the Bankruptcy Code. For example, "ARIN's Policies do not constitute interests the Seller may sell free and clear of pursuant to Section 363(f) of the Bankruptcy Code and, as such, the transfer of the IP Numbers authorized pursuant to this Order shall not be free and clear of ARIN's Policies."

- The sale documents should state that no transfer will occur until the purchaser complies with ARIN's policies. For example, the sale order should state "The Seller and Purchaser are required to comply with ARIN's policies before any transfer of the Seller's rights may be effectuated, and nothing in this Order is intended, nor shall be construed, as exempting the Seller and Purchaser from complying with those policies."

- Prior to consummation of the sale, ARIN can assist the seller and purchaser in determining whether the purchaser can qualify for a transfer of the rights to use the IP Numbers.

## The Purpose and Function of IP Numbers

IP Numbers are critical to the reliable operation of the Internet: Every device connected to the Internet needs a unique IP Number in order to send and receive information to/from others. The use of the same unique IP Number by two or more purported registrants would cause unreliable Internet service or no Internet service at all. Proper stewardship of IP Numbers is necessary to assure that IP Numbers are assigned uniquely.

At present, the vast majority of the Internet uses the Internet Protocol version 4 (IPv4) numbering system, which has a limited capacity of approximately 4.2 billion unique numbers which was established in the earliest days of the Internet. A new standard, Internet Protocol version 6 (IPv6), promises increased capacity, but is not yet widely in use.

Due to the remarkable success of the Internet, the IPv4 numbers have been nearly fully allocated and as a result, unused IPv4 numbers are becoming scarce. It is therefore increasingly important that available IPv4 numbers are used prudently and efficiently for the public good, and this demand to put underutilized IP numbers into productive use can be beneficial in monetizing these IP Numbers.

## The Role of ARIN in Allocating IP Numbers

The American Registry for Internet Numbers is the non-profit corporation that oversees the allocation of Internet Protocol numbers and performs other services related to the operation and advancement of the Internet in the North American service region, including the U.S., Canada and certain Caribbean islands. ARIN is one of five Regional Internet Registries (RIRs); other RIRs perform similar services in other regions.

ARIN carries out duties originally assigned to it by the U.S. Government that had been performed by the government. In particular, effective December 1, 1997, the National Science Foundation (NSF) approved the "transfer [of] responsibility for the IP Number assignment . . . to ARIN." (See NSF Amendment No. 07 to Cooperative Agreement No. NCR-9218742.) Attachment A

chronicles the delegation of authority from the U.S. government to ARIN in greater detail. NSF recognized that the formation of an ARIN, as an industry self-governance body, was necessary in order to "*give the users of IP numbers (mostly Internet service providers, corporations and other large institutions) a voice in the policies by which they are managed and allocated within the North American region*" (See NSF Press Release: http://www.nsf.gov/news/news_summ.jsp?cntn_id=102819).

ARIN provides a variety of functions to coordinate the proper functioning of IP Numbers. For example, ARIN assures that each IP Number is assigned for use by at most one network. ARIN provides appropriate public records including a "WHOIS" public listing of the authorized user of each IP Number; accurate and up-to-date records are crucial so that any entity (be it an ordinary consumer, a network engineer, or law enforcement officer) can determine who is responsible for a given IP Number.

Consistent with its commitment to its members and to the U.S. government, ARIN is obliged to manage IP Number registrations in a responsible and impartial manner in accordance with the policies democratically developed by the Internet community. In furtherance of this mission, ARIN members and interested parties in the community establish consensus policies that apply to the allocation and management of IP Numbers. These policies have significant implications for successful operation of the Internet, since IP Numbers are used to connect customers to the Internet, and with the interconnection of each IP Number to the Internet there are technical repercussions for all Internet service providers globally. The ARIN policies reflect the multiple interests that exist in the management of the IP numbers, including the registrant, the network operator community, and governmental interests in areas such as law enforcement and cybersecurity.

## ARIN's Policies on the Transfer of IP Numbers

Among these policies are ARIN's policies on the transfer of registration rights in IP Numbers, the Transfer Policies. The Transfer Policies allow those holding registration rights in IP Numbers to transfer interests in such IP Numbers to a new party under certain circumstances.

The Transfer Policies establish two methods by which registration rights in IP Numbers may be transferred. First, transfers may occur upon a merger or acquisition. That policy may apply if a buyer acquires network hardware, customer lists, or other assets from the estate. However, that policy does not apply to sale of IP Numbers separate from an estate's other resources. Second, ARIN allows a transfer to a specific recipient (specified transfer), chosen by the then-current registrant of the IP Numbers, typically upon payment of a fee from the recipient to the registrant. ARIN policy provides that specified transfers are subject to requirements: (a) the recipient demonstrates a justified need for the IP Numbers; (b) the recipient demonstrates that it will actually use the IP numbers rather than hold the IP numbers for use at a later point in time; (c) the recipient is based in ARIN's service area[2]; and (d) the recipient signs an appropriate contract, an ARIN "Regis-

---

[2] A current policy proposal that is likely to be adopted may permit an inter-region transfer.

ARIN_BYCHAK_0194

tration Services Agreement" (RSA), affirming compliance with applicable policies. (There are over 11,000 such agreements entered into by more than 3,500 entities, including agencies of the U.S. Government.)

ARIN's transfer requirements apply to sellers in bankruptcy and receivership. IP Numbers are not the "property" of the entity that has the right to use the IP Numbers. Rather, upon assignment of IP Numbers, an entity receives the right to use those IP Numbers to the exclusion of all other parties, as well as the right to the various benefits that ARIN provides, such as the maintenance of the WHOIS database. ARIN Policies are part of the bundle of rights and services associated with an entity's interest in IP Numbers.

More than 3,500 networks or "end user" corporations have affirmatively agreed that IP Numbers are not "property." In particular, the current ARIN RSA contract specifically provides: "Applicant acknowledges and agrees that the number resources are not property (real, personal, or intellectual) and that Applicant does not acquire any property rights in or to any number resources by virtue of this Agreement or otherwise."[3]

See also Attachment B, which presents relevant authority as to ARIN's role in setting rules for the allocation and management of IP addresses, including judicial findings as well as statements of policy of the U.S. and Canadian governments.

Some IP Numbers were issued before ARIN's formation (legacy numbers) and before the standardization of RSA contracts clarifying networks' rights and responsibilities. Nonetheless, as detailed above and in Attachment B, ARIN believes transfers of legacy numbers remain subject to key ARIN policies while acknowledging that there is no written contract between ARIN and the legacy holder. In particular, the management of existing number resources according to community-developed policies is necessary for fulfillment of the self-governance goals for which ARIN was established.

### Compliance with ARIN Policies Is Consistent With Achieving the Highest Value for the Estate

A trustee, debtor-in-possession, or receiver selling its rights to IP Numbers is likely to maximize its recovery by complying with applicable ARIN policies. An organization buying rights to IP Numbers will build its business on those resources—making implementation decisions that, in most instances, can be changed only with considerable effort and delay. Disputed or unreliable IP Numbers are therefore unappealing to sophisticated buyers who operate lawfully, and accounting for the interests of such buyers is crucial to obtaining full value for the estate. Full compliance with ARIN policies can help attract large buyers and obtain the greatest value for the IP Numbers.

The ARIN community includes numerous organizations with substantial need for IP Numbers. A seller offering addresses consistent with ARIN policy will typically enjoy interest from these buyers, and their interest will tend to bid up prices to a higher level than a seller operating independent of ARIN. ARIN also operates a "listing service" whereby buyers and sellers can find each other. These considerations further demonstrate the importance of compliance with ARIN policies in order for sellers to obtain the greatest value for their IP Numbers.

### ARIN's Request to Trustees, Debtors-in-Possession, and Receivers

ARIN is aware that debtors are increasingly seeking to sell their interests in IP Numbers. ARIN believes that many trustees, debtors-in-possession, and trustees may be unfamiliar with the nature and function of IP Numbers and with ARIN and applicable ARIN policies. ARIN welcomes the opportunity to assist sellers and potential buyers in these regards.

As a threshold matter, ARIN believes it must receive notice of bankruptcy and receivership proceedings wherein a debtor seeks to transfer its IP Numbers. Such transfers can occur only in compliance with ARIN policies, and resources may be unusable if the proper transfer process is not followed. Notice to ARIN is necessary so that ARIN can advise parties of applicable requirements.

Second, the sale motion and other sale documentation should avoid references to the estate's "ownership" of the IP Numbers as such references tend to mislead potential buyers as to the nature of what they are acquiring in the sale process.

Third, the sale documentation should state clearly that the seller's rights to the IP Numbers can be sold only in accordance with ARIN's Transfer Policies.

Fourth, the sale documents should avoid blanket statements that no third party consents are necessary to effectuate a transfer or, alternatively, should expressly carve out ARIN's Transfer Policies in the third party consent provisions of such sale documents.

Fifth, if a sale free and clear of the interests of others is contemplated pursuant to Section 363(f) of the Bankruptcy Code, ARIN's Transfer Policies must be carved out of such provisions.

Finally, putting potential purchasers in touch with ARIN prior to consummation of the sale can assist all parties in determining whether the purchasers qualify for a transfer under ARIN Policies, thereby reducing uncertainty to sellers and purchasers.

Recent proceedings further reveal valuable benefits that result from ARIN's participation throughout the process: helping the estate obtain the greatest possible value, clarifying parties' rights and obligations, reducing litigation complexity, and advancing judicial economy. ARIN believes these benefits accrue most readily if ARIN becomes involved as close as possible to the commencement of each sale of IP Numbers. In contrast, when ARIN learns of a sale only at or near the close of the transaction, ARIN has found that additional motion practice and delay are nearly inevitable, resulting in increased costs to the estate as well as additional burden on the court.

ARIN appreciates the interest and support of trustees, debtors-in-possession, and receivers in selling rights to IP Numbers to the buyers who value them most. ARIN looks forward to assisting in achieving that important objective.

---

[3] RSA version 10.2, March 10, 2011. https://www.arin.net/resources/agreements/rsa.pdf.

ARIN_BYCHAK_0195

4

## Attachment A

### Additional Information Regarding the Delegation of Authority From the U.S. Government to ARIN

The Internet is an outgrowth of the U.S. government's financial investment in communications networks carried out under agreements with the Defense Advanced Research Projects Agency and the National Science Foundation (NSF).

To maintain globally unique IP Numbers and conserve the finite number of them, the United States government established a system for allocating and managing IP Numbers. From 1987 to 1991, the U.S. government delegated the authority to register IP Numbers to IANA. In 1992, the NSF, pursuant to its authority over the Internet under 42 U.S.C. §§ 1862(a)(4)[4] and (g),[5] solicited and received bids for private companies to perform various functions for the Internet community, including registration services.

At the outset, NSF awarded the contract to perform various Internet functions, including certain aspects of the registration of IP Numbers, to Network Solutions, Inc. (NSI) pursuant to a five-year cooperative agreement (the Cooperative Agreement) under the Federal Grants and Cooperative Act, 31 U.S.C. § 6301 et seq. As a result, NSI took over the function of registering IP Numbers from IANA on January 1, 1993.

The explosion in the use of the Internet, probably not foreseen by NSF or most others, caused an unacceptable financial and administrative burden on NSF. NSI developed a plan for NSF to transfer the IP Number registration function to a nonprofit organization, and NSF agreed to this plan.

Effective December 1, 1997, NSF approved the "transfer [of] responsibility for the IP Number assignment . . . to ARIN." NSF Amendment No. 07 to Cooperative Agreement No. NCR-9218742. ARIN's mission is to be responsible for the management of IP Numbers for all the geographic regions NSI administered under its Cooperative Agreement, as amended, with the NSF.

On June 24, 1998 the NSF issued a press release announcing the formation of ARIN, entitled "Internet Moves toward Privatization, IP Numbers Handled by Non-Profit." The press release stated, in pertinent part:

> The NSF has approved a plan from Network Solutions, Inc. (NSI) which establishes the American Registry for Internet Numbers (ARIN). Under the plan, ARIN **would assume full responsibility for Internet Protocol (IP) number assignments and related administrative tasks** previously handled by NSI. . . . The creation of ARIN is

consistent with the recommendations received from the Internet community at workshops over the past eighteen months, and with concurrence from a federal interagency working group. (emphasis added)

Thus, the creation of ARIN was initiated and supervised by both the NTIA and NSF pursuant to NSF's supervisory responsibility under the Cooperative Agreement.

In addition, the United States Department of Commerce (DOC) granted the Internet Corporation for Assigned Names and Numbers (ICANN) responsibility for establishing, in conjunction with Internet users, policies for Internet Protocol Address Space, pursuant to a Memorandum of Understanding between the DOC and ICANN dated November 28, 1998, as amended May 25, 2001. In 1999, ICANN also assumed responsibility for the technical management functions previously performed by the U.S. government under contract with IANA, which has been renewed to the present day. The ICANN Memorandum of Understanding states (in part) that ICANN shall:

> Allocate Internet Numbering Resources—This function involves overall responsibility for allocated and unallocated IPv4 and IPv6 address space and Autonomous System Number space. It includes the responsibility for delegation of IP address blocks to regional registries for routine allocation, typically through downstream providers, to Internet end-users within the regions served by those registries.

ARIN is one of the regional registries contemplated by the DOC's contract with ICANN. As such, ARIN further derives its powers to oversee and allocate IP Numbers from ICANN's agreement with the DOC.

These actions of the United States government demonstrate an unbroken chain from the government to ARIN with respect to the management, allocation, and policies relating to IP Numbers.

## Attachment B

### ARIN's Role in Setting Policy, as Affirmed by Courts and Regulators

In a report issued in December 2010, the U.S. Federal Communications Commission stated its position that IP Numbers are not property. See FCC Staff Working Paper No. 3 at 5, December, 2010:

> RIRs [like ARIN] manage IP numbers as a public resource. When a registry allocates a number to an entity, it is giving that entity the ability to use that number; no property right is conferred to the recipient. IP numbers are allocated on a needs-basis pursuant to RIR policies; recipients pay fees which support the operation of the registries.

Industry Canada is in accord. See Industry Canada's April 13, 2011 filing in the Nortel Networks bankruptcy (*In re Nortel Networks Inc. et al.*, D. Del. Case No. 09-10138 (KG), docket #5253):

> This submission is in support of ARIN's interventions related to the legal underpinnings of the current governance structure of Internet numbers . . . and to bring your attention substantive governmental and policy concerns that arise from the sale of Internet numbers in the manner and on the terms suggested in the Debtor's Motion. . . . Their use in accordance with the policies adopted by ICANN, ARIN and the regional registries

---

[4] 42 U.S.C. § 1861 *et seq.* is the National Science Foundation Act. Section 1862(a)(4) provides that "[t]he [NSF] is authorized and directed—to foster and support the development and use of computer and other scientific and engineering methods and technologies, primarily for research and education in the sciences and engineering." 11 U.S.C. § 1861(a)(4).

[5] Section 1862(g) provides that "[i]n carrying out subsection (a)(4) of this section, the [NSF] is authorized to foster and support access by the research and education communities to computer networks which may be used substantially for purposes in addition to research and education in the sciences and engineering, if the additional uses will tend to increase the overall capabilities of the networks to support such research and education activities." 11 U.S.C. § 1862(g).

COPYRIGHT © 2012 BY THE BUREAU OF NATIONAL AFFAIRS, INC.    BBLR    ISSN 1044-7474
ARIN_BYCHAK_0196

provides essential assurances respecting the ultimate identity and accountability of Internet users.

In the Nortel bankruptcy matter, an appropriate voluntary resolution that satisfied all parties was reached.

In a seminal case that has addressed the issue of whether IP Numbers are property, *Kremen v. ARIN*, No. 5:06-cv-02554-JW (N.D. Cal. April 12, 2006), the District Court rejected plaintiff's request of a finding that IP Numbers were property. The Kremen court further af-firmed that IP Numbers are not property: ''IP resources may only be transferred from one entity to another pursuant to the terms of ARIN's Guidelines for Transferring Internet Protocol (IP) Space . . . and subject to ARIN's Transfer Policy . . . Among other things, the Guidelines provide that IP resources are non-transferrable, may not be sold or assigned and may only be transferred upon ARIN's approval of a formal transfer request.'' (Id. at 3)

ARIN_BYCHAK_0197

# EXHIBIT G



Published on *National Telecommunications and Information Administration*
(https://www.ntia.doc.gov)

Home > United States Government's Internet Protocol Numbering Principles

# United States Government's Internet Protocol Numbering Principles

December 03, 2012 by Assistant Secretary for Communications and Information and NTIA Administrator Lawrence E. Strickling

Internet Protocol (IP) numbers underpin and connect broadband and IP-based network infrastructures. Without IP numbers, we could not attach computers and smartphones to the Internet, and we could not route traffic to and from those devices. Without an adequate supply of these numbers, we could not design cloud computing networks or the smart grid. As we move to a world of innovation where virtually everything can be networked to everything else, we need to ensure a sufficient supply of IP numbers.

When the Internet Protocol was first developed in the early 1970's, few of the scientists and technologists involved could have predicted what IP would mean for network development and the incredible innovation it would spur. Version 4, or IPv4, was developed in the early '80s by the technical wizards of the Internet Engineering Task Force (IETF). Who would have expected that the 4.3 billion IPv4 numbers would not be enough for future networks? Who could have forecast the explosive growth of the Internet and the need for billions of devices to be attached to these networks? Thankfully, many of those same technical experts – being rather clever people - have been worrying about the size of the IPv4 number pool for quite a while. They began to work on the "next generation" protocol known as IPv6. And it's good they did because we are running out of IPv4 numbers. As opposed to IPv4, IPv6 supports 340 trillion trillion trillion possible numbers – and it represents a new generation of technology for network growth and development and innovation.

As we continue to transition to this next-generation Internet routing system, it is important to clarify the United States Government's (USG) position on the development of Internet technical standards and policies:

- We continue to believe that the proper model for the development of Internet technical standards and policies, including those related to IP numbers, is the multistakeholder model.

ARIN_BYCHAK_0001

- The five Regional Internet Registries (RIRs), via their multistakeholder processes, are responsible for developing policies for the use of IP numbers within their respective specific geographic regions.

- The American Registry for Internet Numbers (ARIN) is the RIR for Canada, many Caribbean and North Atlantic islands, and the United States. The USG participates in the development of and is supportive of the policies, processes, and procedures agreed upon by the Internet technical community through ARIN.

- The USG supports and encourages the uptake and adoption of IPv6 throughout the IP value chain, and strives to be an early adopter as evident in Office of Management and Budget (OMB) Directives for U.S. federal agency IPv6 implementation.

- Consistent with the policies developed through the current multistakeholder model, the USG believes that all IP numbers are allocated for use on a needs basis and should be returned to the numbering pool when no longer needed.

 SHARE

National Telecommunications and Information Administration
1401 Constitution Ave., NW Washington, DC 20230

commerce.gov | Privacy Policy | Web Policies | Information Quality | FOIA | Accessibility | usa.gov

**Source URL:** https://www.ntia.doc.gov/blog/2012/united-states-government-s-internet-protocol-numbering-principles

ARIN_BYCHAK_0002

# EXHIBIT H

 Industry Canada   Industrie Canada



**APR 1 3 2011**

The Honourable Kevin Gross
United States Bankruptcy Judge
United States Bankruptcy Court for the District of Delaware
824 North Market Street
6th Floor
Wilmington, DE 19801

> *In re* **Nortel Networks Inc., et al: Motion to approve sale of Internet Numbers**
> **Case No. 09-10138 (KG)**

I am writing in my capacity as Assistant Deputy Minister, Strategic Policy Sector of the Department of Industry, a department of the Government of Canada. My duties encompass responsibility for telecommunications policy, including Internet and Domain Name System policy. Within the scope of these duties, my sector serves as the Government of Canada liaison with the Internet Corporation for Assigned Names and Numbers (ICANN), American Registry for Internet Numbers (ARIN), the Canadian Internet Registration Authority (CIRA), and other international counterparts.

This submission is in support of ARIN's interventions related to the legal underpinnings of the current governance structure of Internet numbers, whether legacy numbers or otherwise, and to bring to your attention substantive governmental and policy concerns that arise from the sale of Internet numbers in the manner and on the terms suggested in the Debtor's Motion, the Proposed Order annexed to the Motion, as well as the Asset Sale Agreement. Internet Numbers are among the fundamental building blocks of the Internet. Their use in accordance with the policies adopted by ICANN, ARIN and the regional registries provides essential assurances respecting the ultimate identity and accountability of Internet users.

The Government of Canada recognizes the importance of a timely resolution of these matters before the insolvency court, but has serious reservations concerning several provisions of the sale of Internet Numbers as currently proposed.

First, we note that in footnote 6 on page 5 of the Motion, there is a reference to "Legacy Numbers" and an assertion that such numbers were "assigned" to NNI. It is the position of the Government of Canada that the use of "assign" is colloquial in the factual context and is misleading in law. It is our view that Internet Numbers never became the property of the persons who were authorised to use them, nor were they ever free of the conditions governing their use.

...2

 Canada

ARIN_BYCHAK_0269

- 2 -

We take particular exception to the assertions in paragraph L of the Proposed Order.  While rights to use Internet Numbers are legal and enforceable, they do not constitute property.   For property rights to apply, it would have been necessary for NNI or its predecessors to have acquired the numbers in a transaction that transferred title in a manner recognized by law.  We are aware of no such circumstances, and do not believe that legacy numbers in Canada are property of the person authorised to use them.

As we understand the Proposed Order, the essential value of the Internet Numbers being "sold" is their status as "legacy numbers," as there seems to be an underlying assumption that such numbers are not subject to the governance structures that have been put in place in the years subsequent to the allocation of those numbers to Bell Northern Research (BNR) – the predecessor of NNI.  In essence, much of the value that is placed on the legacy numbers derives not from their ability to connect users to the Internet, but from the underlying theory that they are unencumbered and unrestrained by the current Internet governance structures created subsequent to their initial allocation to BNR.  Under this theory, such numbers would be, in effect, "black numbers."  We are, as a government, deeply concerned with any such result.

The governing principle of the use of Internet numbering is that numbers that are not used are to be made available to other users.  The recognition of a property right in Internet Numbers would imperil the cooperative basis for Internet use, and potentially lead to hoarding and speculation in Internet Numbers and the creation of artificial scarcity to drive up the monetized value of those numbers.  As noted in the Debtor's Motion (see paras. 7 – 8), numbers will become increasingly scarce prior to the widespread adoption of Ipv6 numbers over time.

The existence of black numbers would also pose a threat to public order and national security.  The present requirements on Internet use and registration permit law enforcement and national security authorities to identify the actual users of Internet Numbers, which permits the detection and suppression of crime, such as child pornography and electronic fraud, and threats to national security, including espionage and terrorism.  Black numbers could permit end users to escape identification and so hinder the investigation of crime and security threats.

Major and costly efforts are being made in all developed countries to suppress spam, misleading or fraudulent claims made over the Internet, identity theft and the theft of personal and business information.  Black numbers would mask the activities and identities of the perpetrators of such activities.  This is of great concern to this country, which has recently adopted anti-spam legislation that is designed to suppress such activity.

...3

ARIN_BYCHAK_0270

- 3 -

Canada has a history of support for the development of the Internet as a means of communications that facilitates family and personal relationships, business transactions, consumer and business information, and government information and transactional services. We are very concerned that, if the Proposed Order is issued in its current form, the repercussions could negatively impact the fundamental principles upon which the Internet has been built and potentially put at risk the social, economic and governmental benefits that have been the hallmark of its development to date.

We thank the Court for considering this submission.

Marta Morgan

Assistant Deputy Minister

Strategic Policy Sector

86

ARIN_BYCHAK_0271

# EXHIBIT I

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  UNITED STATES OF AMERICA,      .
                                   .
 5              Plaintiff,         . No. 18-cr-4683-GPC
                                   .
 6              v.                 . April 30, 2019
                                   . 1:00 p.m.
 7  JACOB BYCHAK,                  .
    MARK MANOOGIAN,                .
 8  MOHAMMED ABDUL QAYYUM,         .
    PETR PACAS,                    .
 9                                 .
              Defendants.          . San Diego, California
10  . . . . . . . . . . . . . . . .

11                  TRANSCRIPT OF MOTION HEARING
12            BEFORE THE HONORABLE GONZALO P. CURIEL
                    UNITED STATES DISTRICT JUDGE
13

14

15  APPEARANCES:

16  For the Plaintiff:      United States Attorney's Office
                            By: MELANIE K. PIERSON, ESQ.
17                               SABRINA FEVE, ESQ.
                            880 Front Street, Room 6293
18                          San Diego, California 92101

19  For the Defendant       Law Office of David W. Wiechert
    JACOB BYCHAK:           By: JESSICA C. MUNK, ESQ.
20                               DAVID W. WIECHERT, ESQ.
                            115 Avenida Miramar
21                          San Clemente, California 92672

22  For the Defendant       Mintz Levin
    MARK MANOOGIAN:         By:  RANDY K. JONES, ESQ.
23                          3580 Carmel Mountain Road, Suite 300
                            San Diego, California 92130

24

25  ///
```

```
 1   APPEARANCES (CONTINUED):

 2

 3   For the Defendant        Bienert, Miller & Katzman, P.L.C.
     MOHAMMED ABDUL           By:  WHITNEY Z. BERNSTEIN, ESQ.
 4   QAYYUM:                       JAMES RIDDET, ESQ.
                                   THOMAS BIENERT, ESQ.
 5                            903 Calle Amanecer, Suite 350
                              San Clemente, California 92673
 6

 7   For the Defendant        Bird Marella Boxer Wolpert
     PETR PACAS:                Nessim Drooks & Lincenberg
 8                            By:  NAEUN RIM, ESQ.
                              1875 Century Park East
 9                            Suite 2300
                              Los Angeles, California 90067
10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:          Chari L. Bowery, RPR, CRR
                              USDC Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California 92101
24                            chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1              SAN DIEGO, CALIFORNIA; APRIL 30, 2019; 1:00 P.M.

 2                                -o0o-

 3              THE CLERK:  Calling Item Number 1 on the calendar,

 4    Case Number 18-cr-4683, U.S.A. v. Defendant Number 1, Jacob

 5    Bychak, if I could please have the appearance of the attorney.

 6              MS. MUNK:  Good afternoon, Your Honor.  Jessica Munk

 7    and Dave Wiechert on behalf of Jacob Bychak, who is present in

 8    court.

 9              THE COURT:  Good afternoon.

10              THE CLERK:  Defendant Number 2, Mark Manoogian.

11              MR. JONES:  Good afternoon, Your Honor.  Randy Jones

12    on behalf of my client, Mark Manoogian, who is present in

13    court.

14              THE COURT:  Mr. Jones, good afternoon.

15              THE CLERK:  Defendant Number 3, Mohammed Abdul

16    Qayyum.

17              MS. BERNSTEIN:  Good afternoon, Your Honor.  Whitney

18    Bernstein, with Jim Riddet and Tom Bienert, present on behalf

19    of Mr. Qayyum, who is also present before the Court.

20              THE COURT:  Good afternoon.

21              THE CLERK:  And Defendant Number 4, Petr Pacas.

22              MS. RIM:  Good afternoon, Your Honor.  Naeun Rim on

23    behalf of Petr Pacas, who is present in court.

24              THE COURT:  Good afternoon.

25              MS. FEVE:  Good afternoon, Your Honor.  Sabrina Feve
```

1    and Melanie Pierson for the United States.

2           THE COURT:  Good afternoon to you all.

3       We are here on motions that have been filed over the

4    course of the last couple of months, and I have been reviewing

5    moving papers, supporting papers, cases cited, and at this

6    point, here is what I am prepared to do.

7       With respect to the motion to dismiss indictment on the

8    basis that the charges are void for vagueness and the motion to

9    dismiss indictment for misadvising the grand jury of law, I am

10   prepared to continue that on the Court's own motion to May 30

11   at 1:00 p.m., and at that time, the Court will have sufficient

12   time to review not only the papers but all the cases that are

13   cited.

14      I appreciate that this challenge of this subsection is a

15   question of first impression.  There is no case law on it.  I

16   do anticipate preparing a written order in order to properly

17   address the arguments that have been raised by the parties.

18          And do you have something that you would like to say about

19   that, or you are not available on the 30th?

20          MS. MUNK:  Yes, Your Honor.  I am not available on

21   the 30th.  I am handling this motion for the defense team.  I

22   will be out of the country on vacation.  If we can do that

23   sometime in early June.

24          THE COURT:  I have a number of trials that look like

25   they are going to be going forward in June.  The first date I

5

```
 1  can give you in June would be June 20th.
 2           MS. FEVE:  Your Honor, I am out of the district on
 3  June 20.  I am sorry.
 4           THE COURT:  That's what happens when you have seven,
 5  eight attorneys.
 6      What about May 23?
 7           MS. MUNK:  Your Honor, unfortunately, I am out on a
 8  vacation from the 21st to the 31st.  And the week before that,
 9  Mr. Wiechert and myself are going to be in trial up in L.A.
10           THE COURT:  So, when are you going to be back,
11  Ms. Feve?
12           MS. FEVE:  Your Honor, I am only gone the 19th to the
13  21st.
14           THE COURT:  What about the 27th of June?
15           MS. RIM:  Your Honor, I am going to be in trial that
16  week, but I am happy to -- I mean, we can --
17      (Counsel confer.)
18           THE COURT:  Let's see.  Do I understand that --
19           MR. BIENERT:  Your Honor, Thomas Bienert.  I am out
20  of town around that time, and I was doing the dismissal motion.
21      May I just suggest, whenever it is convenient with you
22  today, if, rather than doing this with you, if we all caucus
23  with your clerk, we might be able to come up with -- assuming
24  she knows your windows, I am trying to figure out how we can do
25  that without each of us interrupting when you come up with a
```

1   new date.

2          THE COURT:  We can do that.  And, yes, Kimmi has full

3   knowledge of when I have trials and everything else.  So I will

4   ask you to work that out with her.

5       And the take-away essentially being that there's enough

6   substance here that the Court wants to make sure it gets it

7   right, and so I will need additional time for that.

8          So what I am prepared to address today are

9   discovery-related motions.  We have a motion for discovery that

10  was filed back in November, and then that was supplemented by a

11  motion for informant discovery.  We have a motion for a bill of

12  particulars, which in some ways is also discovery-related.  And

13  then we have the motion for modification of protective order,

14  which certainly is discovery-related.

15      From what I can tell in my review of all the pleadings, it

16  doesn't look like there are any discovery disputes beyond the

17  request for confidential human source identification

18  information and the request regarding protective order in terms

19  of who to make or allow access to the discovery that is the

20  subject of the motion to modify.

21      But correct me if I'm wrong; are there any other areas of

22  discovery that the Court needs to address at this moment?

23          MS. BERNSTEIN:  Your Honor, I believe one other area

24  of outstanding discovery was relating to the criminal history

25  of the government witnesses and cooperators.  We had requested

1    this on June 25th, both in a meet-and-confer with the

2    government --

3            THE COURT:  June 25?

4            MS. BERNSTEIN:  I am sorry.  January 25th.

5        -- both in a meet-and-confer in the hallway with the

6    government and also in the discovery motion that was filed,

7    which is Document 36.  This is specifically requested, I

8    believe, in Section O, Subsection 6, as well as Section O,

9    Subsection 8, as well as Subsection Q.

10       So we are still requesting and awaiting the criminal

11   history of the cooperating witnesses.

12           THE COURT:  So, when you say "cooperating witnesses,"

13   these are witnesses that the government intends to call at

14   trial, or just any witness who has provided cooperation?

15           MS. BERNSTEIN:  We would like it for any witness that

16   is going to provide cooperation; however, we do know that there

17   are two specific cooperating witnesses.  They have both, I

18   believe, entered guilty pleas as well, pursuant to cooperation

19   addendums, and we believe that criminal history exists for at

20   least one of them if not both of them, and we request that of

21   the government.

22           THE COURT:  So, let me inquire, with respect to those

23   criminal history reports for those two cooperators, has that

24   been provided or is that going to be provided?

25           MS. PIERSON:  Ms. Feve is looking through our index

1    of discovery because it was our understanding that those had

2    been provided for those two a long time ago.  But we will

3    double-check because if they haven't, of course, we intend to

4    provide them.

5            THE COURT:  Right.  Yes.  That would surprise me.  I

6    would expect that that would have been turned over.

7            MS. BERNSTEIN:  Certainly, I apologize if we have

8    missed that.  There's voluminous discovery here.  But if we

9    have missed it, I would just appreciate being redirected to

10   where that is.

11           THE COURT:  Okay.  So it doesn't sound like there's

12   an issue to address; but, to the extent the government has not

13   turned it over, I expect the government will turn over the

14   criminal history reports for these two cooperating individuals.

15   I knowed Dye is one of them.

16       And then, anything else other than what I am getting ready

17   to address?

18           MS. BERNSTEIN:  One other category, Your Honor, would

19   be that we have requested -- and maybe this ties into the

20   motion to amend the protective order, but we requested in a

21   March 25th email to the government that the government produce

22   the requests that the government made to Earth Class Mail, as

23   well as Yahoo, that generated the responses in Production

24   Number 5, which is the production that's at issue with the

25   protective order.

1        THE COURT:  And I think that is further fleshed out

2   in the motion for a modified protective order.  I did see that

3   request contained in that pleading.  So we can take that up in

4   the context of the motion for modified protective order.

5        MS. BERNSTEIN:  Thank you.

6        THE COURT:  Anything else?  All right.

7      So, then, with respect to the identification of --

8        MS. PIERSON:  Could I just --

9        THE COURT:  Yes.

10       MS. PIERSON:  With the matter of discovery, I would

11  move the Court right now, orally, to have a limited unsealing

12  order.  There is a 2703(d) order that the government used to

13  obtain the records from Yahoo.  It is under seal.  We would

14  like the Court to unseal it for the limited purposes of us

15  giving it to the defense in this case.  And that would provide

16  them, then, with the Court's order for the Yahoo information

17  that is at issue with the protective order.  So I just ask that

18  you allow it unsealed for that purpose.

19       THE COURT:  Yes.  I will grant that oral motion.

20      And so, then, does that partially respond, then, to the

21  request that was made moments ago?

22       MS. PIERSON:  It should.

23       THE COURT:  And, I guess, half of it, right?  Because

24  some of the materials were received from Yahoo and some other

25  materials were received --

```
 1              MS. PIERSON:  Some were obtained from Earth Class
 2    Mail via grand jury subpoena.
 3              THE COURT:  Is there any objection to providing that?
 4              MS. PIERSON:  I have never in my entire career
 5    provided a grand jury subpoena to anyone in any criminal case.
 6    It would surprise me.  Typically, they are entitled to the
 7    records and the custodian of records --
 8              THE COURT:  Yeah, and I thought the request was
 9    directed more at any communications that may have been
10    forwarded to the requested party.
11         Is that right, Ms. Bernstein, versus a grand jury
12    subpoena?
13              MS. BERNSTEIN:  Yes, Your Honor.  I think we were
14    specifically requesting the subpoena and the email requests.  I
15    think we want the ability to review the subpoena that was sent
16    and what was responsive to the subpoena as well as any
17    non-subpoena email request that had been sent to Earth Class
18    Mail, if Yahoo is covered by Ms. Pierson's previous
19    representation.
20              THE COURT:  What is the authority for your request?
21              MS. BERNSTEIN:  May I have a moment?
22              THE COURT:  Yes.
23         (Counsel confer.)
24              MS. RIM:  Your Honor, the purpose of the request --
25    sorry; I am the one who wrote the motion, so I am going to
```

1    address the issue.

2         The purpose of the request -- and we have actually

3    typically seen subpoenas produced along with the responsive

4    documents that help us identify what was requested and what the

5    documents are, so that's all we are asking for.  This is the

6    first time we have learned that this was responsive to a grand

7    jury subpoena.  We would be satisfied if the government could

8    just characterize what it requested from the third party so

9    that we know what we are looking at and what parameters they

10   asked for.

11        THE COURT:  Any objection?

12        MS. PIERSON:  Without looking at the subpoena and

13   researching it, I am not sure that I would have any.  It

14   doesn't seem that I would.  But I need to look at the subpoena

15   to properly answer that question.

16        THE COURT:  Why don't you do that.  I will direct the

17   parties to meet and confer, and if there's no problems or

18   issues, then the government can provide this, and if there are

19   any issues, then I will direct the parties to further address

20   this.

21        With respect to the discovery regarding the CHS, as I

22   understand it, the parties agree that the multi-factor test the

23   Court is to apply is, one, to determine the degree of the

24   informant's involvement in the criminal activity; two, identify

25   the relationship between the defendants' asserted defense and

1    the likely testimony of the informant; and three, the

2    government's interest in nondisclosure.

3        With respect to the first, it does not appear that there

4    is any information or suggestion that the CHS, who alerted the

5    government to certain issues that ultimately culminated in

6    these charges -- there is no suggestion that he was actually

7    involved in the criminal activity.

8        With respect to the relationship between an asserted

9    defense and likely testimony, the only asserted defense that I

10   have seen is one with respect to exploring a good-faith defense

11   which depends upon what the defendants knew.  With respect to

12   that, it is not clear how this CHS would help move this

13   good-faith defense forward.  And so, at this point, I don't

14   find that that factor weighs in favor of disclosure.

15       And as to the government's interest in nondisclosure,

16   while the Court does recognize that it doesn't appear that this

17   individual is someone whose life would be at risk if his

18   identity was made known, certainly individuals such as the CHS,

19   who assist the government, end up on the wrong side of these

20   issues as far as certain people are concerned.

21       So, to the extent that the government wishes to keep this

22   individual's identity confidential, and to the extent that this

23   individual wishes to keep his identity unknown, it seems to the

24   Court that that is a legitimate consideration.  But, most

25   notably, it doesn't appear that there's any real information

 1    that the informant was involved in criminal activity or

 2    otherwise moves the ball forward as to an asserted defense.

 3        So I would be prepared to deny the request for information

 4    relating to the CHS, except I am considering having the

 5    government disclose whether or not the CHS has a criminal

 6    record or was provided compensation, consideration, prior to

 7    obtaining the search warrants in this investigation so as to

 8    then provide the basis for an assertion that the government did

 9    not truthfully reveal relevant information regarding possible

10    motivation for the CHS when they relied somewhat on the CHS's

11    information.  Although, I have reviewed the affidavits, and

12    there's not great weight placed on the CHS with respect to the

13    information that's provided.  It appears that information was

14    provided, and it was followed up by the FBI in a number of

15    ways.

16        So, ultimately, that would be my tentative with respect to

17    CHS information.

18            MS. FEVE:  Your Honor, with regard to your two

19    questions, I can represent -- I will check that it is not in

20    the discovery, but I can represent to the Court that he was

21    not -- the source did not receive compensation and that we are

22    unaware of any criminal history for the CHS.

23            THE COURT:  All right.  So that would be my tentative

24    with respect to disclosure or identification of the

25    confidential human source.

1    Do the defendants wish to be heard?

2         MS. RIM:  Yes, Your Honor, briefly.  Thank you.

3    Your Honor, just to lend some context to the case and the

4    defense, it is not only a good-faith defense that the defense

5    intends to raise.  Obviously, the central defense here is

6    whether a misrepresentation was made -- or one of the central

7    defenses -- to a gentleman named Peter Holden, who was the

8    owner of Hostwinds, the hosting company that received the

9    600-dollar payment identified in the wire fraud Counts 2

10   through 5.

11        And we think that's pretty critical here because a similar

12   person, Mr. Tarney, was actually indicted as a co-conspirator

13   and has pled guilty, presumably on the basis that he was aware

14   that the LOAs that he received were allegedly forged.

15        So there is a critical question.  If Mr. Holden is going

16   to be a central witness in the government's case and the

17   government is going to rely on his testimony that he received

18   some type of misrepresentation from one or more defendants, his

19   credibility will be very central.

20        The CHS had communications with Mr. Holden, not just about

21   this incident, but if you look at the timeline, the CHS first

22   contacts the FBI.  And as a reminder, the CHS is a member of

23   Spamhaus.

24        MS. FEVE:  Just make sure, if it's under seal, you

25   didn't disclose what is under seal.

101

```
 1           MR. WIECHERT:  I am not sure --

 2           MS. FEVE:  Your Honor, my concern is, and I raised it

 3    with the defense, that we submitted a series of documents to

 4    the Court under seal.  My understanding is the defense is going

 5    to produce a redacted version of their reply brief because they

 6    realized they inadvertently disclosed information that was

 7    contained in the sealed documents.  And because I don't know

 8    what the defense is going to argue, I just want to remind the

 9    defense that to the extent their timeline is going to refer to

10    the government's sealed submissions -- if it's just to the

11    discovery and they want to make that clear, that's fine.

12        It is just that one of the challenges here is because we

13    anticipate a redacted brief, I want to make it as clear as we

14    can what briefing the Court is relying on.

15           MS. RIM:  Your Honor, first of all, I just want to

16    clarify.  We did not say -- well, it sort of doesn't matter.  I

17    don't want to get the Court involved in the weeds of this.

18           THE COURT:  More than I already am?

19           MS. RIM:  Yes.

20        We relied on discovery that was produced not pursuant to

21    any protective order.  I believe some excerpts of that was

22    filed under seal with the Court, but my understanding is it is

23    not sealed in the sense that it's not been provided to the

24    defense under any protective order.

25        The thing that we are redacting is, at the request of the
```

16

 1   prosecution, we agreed to redact the names of some of the

 2   witnesses, whom we identified purely to be able to clarify who

 3   we are talking about, not to embarrass anybody.  So we are

 4   happy to redact those names and just provide the initials.

 5       I would like to, in my argument, describe the arguments

 6   and the time frames that I referenced in the motion.  It is not

 7   going to be redacted because there is no basis for redaction

 8   for discovery that is not produced under a protective order.

 9       To the extent that the prosecution wants to seal this

10   proceeding, I have no -- I don't know what the basis would be

11   for that, but I don't think there is anyone in here who's not a

12   party or counsel.

13           THE COURT:  Well, let me just go back to something

14   you said a moment ago with respect to, I think, the second

15   prong of this multi-factor test, the relationship between the

16   defendant's asserted defense and the likely testimony of the

17   informant.

18       You were referencing a defense which will focus on the

19   credibility of Holden, who is someone who will testify about

20   certain alleged misrepresentations.  And so, to the extent that

21   I were to accept that that represents a defense, then the next

22   part, that second prong, relates to the likely testimony of the

23   informant.

24       At this point, what I hear is, to put it politely,

25   speculative and conjecture as far as what this individual would

103

1    have to say about Mr. Holden.

2        Do you have something that lets me know, if this CHS

3    testified, that his likely testimony would advance your attack

4    of Holden?

5            MS. RIM:  Yes, Your Honor.  There are two things.

6    One is the timeline I was just about to explain.  The CHS, who

7    is a member of Spamhaus -- so it's an organization that has an

8    anti-spam agenda, whether it's legal or illegal -- contacts the

9    FBI in June of 2013 and says, "I think there's a company that's

10   hijacking some netblocks."

11       A couple of months later, in October of 2013, he provides

12   to the FBI two LOAs that he says he got from Hostwinds, which

13   is the company Mr. Holden owns, and he says, "These are

14   forged."

15       So he had a communication with Mr. Holden about

16   potentially forged LOAs in October of 2013.  That is one month

17   before the first wire fraud, the date of the first wire fraud

18   count in the indictment.  The date of the first wire fraud

19   count is November 11, 2013.  And then the next -- between

20   November and March of 2014 is when the alleged counts of wire

21   fraud occur.  So those are the dates in which the government is

22   alleging that the defendants somehow deceived Mr. Holden,

23   provided him with LOAs that were allegedly forged and that he

24   received money in order to host them and announce them.

25           Just to clarify, what that means is before any of those

transactions, there was a conversation between the informant
and Mr. Holden about LOAs that the informant identified to the
FBI as forged.

After the last alleged wire fraud count, the informant
produces to the FBI, in June of 2014, the four LOAs that are
the subject of the four counts of indictment of wire fraud, and
then he says, "I got these from Pete Holden, and I believe they
are forged."

So the question is if he had conversations with Mr. Holden
before the first transaction and after the last transaction
about these letters that may have been forged, then what did
Mr. Holden know?  Was there actually misrepresentation?  And
who can testify about that to impeach his testimony about it
apart from the CHS?  This is the only witness we know of who
was in communication with Mr. Holden at the time that these
events were going on.  And we believe that we at least have the
obligation, in the course of providing effective assistance, to
at least interview the informant and to ask questions that
perhaps the government may not have asked during its interviews
with him.

So that's a central part of the argument.  There's some
other parts of the argument.  He was also in contact with a
former employee of a related company.  And he himself, in
interviews -- "he" being the informant -- indicates that this
individual has an extreme bias and is very angry at Company A

1   as well as all of Company A's employees.  We need to know why

2   he thinks that.  What statements were made by this former

3   employee to make him think that?  If that former employee is

4   going to testify -- and based on whom the government is

5   representing that person to be, we believe he is going to

6   testify -- evidence that that employee is biased is going to be

7   critical for our defense.

8       So it is all related to our request under Rule 16,

9   *Brady* -- is it *Giglio* or "Jiglio"?  I can never decide.  But

10  that's with respect to the second prong.

11      I want to note with respect to the first prong, about the

12  informant's involvement, Your Honor is right; we are not

13  alleging that the informant was involved in a crime.  But I do

14  want to point out that this is not a drug transaction, it is

15  not a crime that happens on -- you know, in a matter of a few

16  minutes.  These are allegations that spanned conversations and

17  involved misrepresentations that happened over a period of

18  time.  And to some degree, if the informant is talking to the

19  person who's alleged to have been deceived while those

20  transactions are going on, he may not be involved, but he is

21  certainly percipient to relevant information surrounding the

22  incident.

23      As to the third prong, regarding the government's interest

24  in nondisclosure, I believe I said this in the brief, so Your

25  Honor has probably already considered it; but we are certainly

 1    willing to agree to a protective order, which we would honor

 2    and not disclose any information publicly.  And we think that

 3    would take care of any interest in nondisclosure.

 4              THE COURT:  All right.  Let me hear from the

 5    government with respect to this description of the CHS, where

 6    he would be able to assist the defense as to Holden.

 7    Evidently, there are these bookend conversations that the CHS

 8    has with Holden with respect to these LOAs.

 9         And what is your position as to whether or not it's

10    relevant what Mr. Holden knew, come June of 2014, when he

11    arrived with these four -- when the CHS arrives with these

12    additional four LOAs?

13              MS. FEVE:  Your Honor, I believe our position is that

14    it is not relevant or material, and I will explain why.

15         The first reason is because there's actually -- I don't

16    believe there is any evidence.  The Court has the same 302 that

17    the defense has that summarizes what we know about the CHS,

18    about the CHS's interaction with Holden.  So the defense is --

19    we have pointed them to that 302, and they are not pointing to

20    anything in that 302 to show that the CHS in fact told Holden,

21    "These LOAs were forged."

22         But I think the more significant aspect is that the

23    government's case does not rest, as the defense appears to

24    believe, on Holden testifying that he did not know they were

25    forged.  My expectation is that Holden is going to testify that

```
 1    he did not believe it was his job to verify whether or not the
 2    LOAs were, in fact, true; that his job was to collect an LOA
 3    and to provide it to an entity known as an upstream provider.
 4    And that's because Holden did not have the power or authority
 5    to transfer IP blocks between registrants.  He was part of a
 6    process, and that is why they used him.
 7        But Holden's testimony, I believe, will be that he could
 8    not himself control whether or not the netblock became
 9    functional for the defendants; that his job was to collect the
10    information and pass it on to an upstream provider, who I
11    believe in this case was Cogent.
12        And I believe those materials are with the defense.
13             THE COURT:  And did I see something where a
14    different -- I am not sure what you call it -- not a
15    clearinghouse, but a service provider, had told Company A or
16    the defendants that it was not prepared to, I guess, provide
17    these netblocks or to --
18             MS. FEVE:  Yes.
19             THE COURT:  -- absent further verification?  And then
20    at that point, then, one of the co-defendants said, "You know
21    what?  Let's just go basically to Holden because" --
22             MS. FEVE:  He won't ask any questions.
23             THE COURT:  -- "he won't ask any questions"?
24             MS. FEVE:  Yes.
25             THE COURT:  I guess that was Holden's MO.
```

1    Meanwhile, other companies had a different view if they

2 thought that something was wrong with the authentication or

3 verifications?

4         MS. FEVE:   Other companies interpreted their

5 gatekeeping function differently.

6    But I think that the defense argument for this -- the CHS

7 to have helpful and relevant information, first of all, it has

8 to not be cumulative.  And since there's already evidence that

9 Holden was getting notification from upstream providers who

10 might have pushed back, that there's an argument it's

11 cumulative, that it was not only the CHS -- excuse me -- who

12 was telling Holden, as the defense speculates, that there's a

13 problem with the LOAs; that we also know from the discovery

14 that upstream providers were at times pushing back on the

15 materials provided by Holden to the upstream provider that he

16 got from the conspirators.

17    So, first, I believe there's evidence showing that it is

18 cumulative.  But also, for it to be relevant as far as

19 impeaching Holden, that argument presupposes that Holden is

20 going to take the stand and testify that the misrepresentations

21 to him were material, and that's what we are suggesting, is we

22 don't anticipate that to be his testimony.

23    Furthermore, even if it was, it is still unclear how the

24 CHS -- we would have to call the CHS to potentially impeach

25 him, but that would require Holden to lie on cross-exam, if

 1    asked, "Were you ever told by Spamhaus that these LOAs were

 2    forged?"

 3         If he says, "Yes, they told me," there's no reason to call

 4    the CHS because there's no impeachment.

 5         Again, whether or not it's admissible, whether or not it

 6    would be called, whether or not it's premature, those are

 7    relevant issues; but I think the central issue as far as

 8    whether or not this particular piece of information is going to

 9    give the defense access to information they believe is material

10    or central to their defense is that it has to be material to

11    Peter Holden.  He has to get up on the stand and say, "But for

12    believing every word of this LOA, I would have never done

13    something," and since we don't anticipate him testifying to

14    that, I don't see how the CHS would be relevant.

15              THE COURT:  Let me ask this.  With respect to the

16    likely testimony of the CHS, is there any reason to believe

17    that his testimony would likely be impeaching?

18              MS. FEVE:  No, Your Honor.  That's why we are

19    pointing to the 302s that the defense have to show that

20    there's -- I don't believe there is anything in those 302s, and

21    it is part of why we also submitted it to the Court, so you

22    would have the benefit of access to the same 302, to see -- we

23    don't believe those 302s show there's going to be any useful

24    point of impeachment, but because it was with the defense,

25    before the Court, and we have directed them specifically to

1  that document, it is the opportunity to point to it and help us

2  understand their theory so if we understand their theory, we

3  don't have to contest the issue if it's, in fact, persuasive.

4          THE COURT:  What about this former employee who had

5  this animus towards Company A and its employees?  I think there

6  was some suggestion that perhaps this individual would be

7  called by the government in its case.  Is that true?

8          MS. FEVE:  He potentially would be called for some

9  404(b) evidence, but that would all depend on pretrial motions

10 regarding 404(b) for uncharged netblocks.

11      And something to draw the Court's attention to is that

12 when the Court paraphrased the defense argument before issuing

13 its tentative, you relied on their opening brief, which is what

14 the government had an opportunity to respond to in its

15 response.  And their opening brief said that this employee was

16 incredibly important for their defense because he was going to

17 help exonerate the defendants because he was going to provide

18 information showing that they had a good-faith defense.

19      There's been a 180-degree about-face in their reply brief,

20 where they are now saying the person who was going to exonerate

21 them by testifying to their good-faith defense -- they are now

22 saying, "Oh, no.  We must incriminate him because he is

23 unreliable and untrustworthy, and we should be given an

24 opportunity to challenge his credibility."

25      So, the discrepancy between their opening argument and the

 1    argument they put forth in their reply brief I submit to the

 2    Court is evidence that it is speculative and more of a fishing

 3    expedition than of a concrete example to the Court of why that

 4    particular individual is essential to their ability to prepare

 5    their defense.

 6          But taking a step back, as far as this individual, the

 7    defendants know who this individual is.  Mr. Pacas worked with

 8    him.  So, to the extent that they are saying that only the CHS

 9    is aware that there was some bad blood between that individual

10    and any of the former employers of the defendants, I submit

11    that that evidence from the CHS would both be hearsay but also

12    cumulative; whereas, the defendants know from the discovery but

13    also from their own clients that defendants are well aware that

14    there was plenty of bad blood between that particular

15    individual and his former employer.  And the discovery has

16    plenty of documents.

17          In addition, we are -- we have just gotten unsealed, in

18    separate litigation, documents obtained from a consultant

19    retained by their employer.

20               THE COURT:  By "their employer," by Company A?

21               MS. FEVE:  Company A.  And we will prepare those

22    documents for discovery.

23          Those documents will also show to the Court that Company A

24    and Company B were well aware of this individual and that their

25    relationship was negative, to say the least.

26

1        But it is just to say, again, they do not need the CHS to

2   testify to the fact there was bad blood because, A, it would

3   not be admissible from him because he would only have hearsay;

4   but, B, they already have it, and it's cumulative, both from

5   what their clients know -- again, directing Ms. Rim to the

6   discovery involving her own client and his interactions with

7   the individual who they now say they would need to impeach but

8   who initially they believed would exonerate them.

9        Does that address the Court's questions?

10            THE COURT:  Yes.

11            MS. FEVE:  Thank you.

12            THE COURT:  Any reply?

13            MS. RIM:  Yes, Your Honor.  I am a little bit puzzled

14   by some of the statements.

15        If Mr. Holden gets up on the witness stand and says, "I

16   was lied to by the defendants; I thought these LOAs were

17   totally authentic," who are we going to call to say, "But you

18   said otherwise to the CHS"?

19        The CHS -- you gave him two LOAs that the CHS now says was

20   forged before the transactions at issue, and then you gave him

21   four LOAs that the government alleges were forged after.  And

22   the CHS is in contact with the FBI during this time.  Who is

23   going to testify about that apart from the CHS?  We can't call

24   the FBI agent to say what the CHS told him.  We can't call the

25   government, the prosecution, to testify as to what was just

1    represented.  The informant is the only person who can be that

2    witness.

3        This is not a fishing expedition.  The government

4    is confusing the questions that we disclosed to the Court we

5    may ask the CHS, once we have an opportunity to question him,

6    with the actual hard facts here, which is that they have an

7    informant who had extensive communications with two very

8    central witnesses to their case; the person who was allegedly,

9    either, apparently not deceived or deceived -- either way, the

10   subject for the wire fraud transactions -- and an employee who

11   is going to testify about the relationships between the

12   defendants and the company and who was doing what, which we did

13   brief in our motion.

14           THE COURT:  So let me ask you, with respect to who

15   was deceived, does that relate to just wire fraud, or does that

16   relate to these SPAM Act causes of action or counts as well?

17           MS. RIM:  To some degree, it relates to the CAN-SPAM

18   counts as well, because there's an element of a false

19   representation regarding registration.  Yes.

20           THE COURT:  Representation.

21       So, I know, in your papers, you have characterized the

22   victim as being Mr. Holden; meanwhile, in other documents I

23   have seen, the -- I guess the original owners of these -- if

24   not websites, these -- what would you call it?

25           MS. RIM:  IP netblocks.

```
 1              THE COURT:  Netblocks.  That those were the victims.
 2         To show that there was a false representation wouldn't
 3    require for Mr. Holden to recount that he was a victim,
 4    correct?
 5              MS. RIM:  Your Honor, I think that's a question that
 6    has to be answered.  I don't think I can answer that question.
 7    It is the government's theory in their case.  I am not sure.
 8              THE COURT:  Let me ask, do you believe that you are
 9    required in your case in chief to demonstrate Mr. Holden was a
10    victim?
11              MS. FEVE:  No, Your Honor.
12              THE COURT:  I wouldn't see that that would be a
13    requirement at this point.
14              MS. FEVE:  And this is for the wire fraud or for the
15    CAN-SPAM charge, Your Honor?
16              THE COURT:  Well, certainly for the SPAM, and I am
17    not sure about the wire fraud.  I haven't looked at that very
18    closely.
19         But I kept encountering this language about Mr. Holden as
20    a victim, and it seems like the statute is not directed at
21    Mr. Holden as much as it is to individuals who would end up
22    being the recipients of these emails.  And then if anyone is a
23    victim, it would be the IP person -- the entity that has had
24    their profit accessed through false verifications, so that they
25    would be the victims, but it wouldn't be Holden.
```

```
 1              MS. FEVE:  No, Your Honor.  Our theory is not that
 2   Mr. Holden is the victim here.  I think the most obvious
 3   victims are the individuals who were the registrants of these
 4   IP netblocks who had their property used without their consent.
 5   It is -- with regard to the CAN-SPAM Act, there's an argument
 6   that the webmail providers are also potential victims.
 7              THE COURT:  The webmail provider, would that be --
 8              MS. FEVE:  The argument would be that Gmail, because
 9   it had to incur the cost of filtering the spam and was deceived
10   by one of -- in this case, the IP block.  Now, again, that is
11   to say Gmail is a potential victim if you look at the statute.
12   But the victims that we have been focusing on in this case --
13   and that's clear from the discovery -- have been individuals
14   whose identities and property were used without permission.
15              THE COURT:  So I guess I went on -- if not a detour,
16   I am asking these questions because what I am hearing is
17   there's an assertion that Mr. Holden presents himself as a
18   victim because he was fooled on the front end, in 2013, and
19   then later on, in 2014; when, really, was he fooled in 2014,
20   given that he might have been told by the CHS in 2013 that
21   these were false?
22         And then, my question is does that really matter in terms
23   of proving these charges, that in 2014 he did or didn't know?
24              MS. FEVE:  I would refer back to the elements here,
25   and I don't believe that there's an element for either --
```

```
 1              THE COURT:  I don't believe there is either.
 2        And so, to the extent that it is not an element, then that
 3   proposition that you are offering, that the CHS would be able
 4   to show that there was no reliance or that there was no
 5   deception in 2014, it is a nonissue.
 6              MS. RIM:  Your Honor, a misrepresentation is an
 7   element.
 8              THE COURT:  Certainly.
 9              MS. RIM:  I don't know who the misrepresentation
10   would be made to apart from Mr. Holden.  But even if he is
11   going to testify that he knew these LOAs were forged, we do not
12   have a 302 to that effect.  We don't have a statement from him
13   confirming that he is going to testify to that.  I am not
14   questioning the government's representation, but the government
15   doesn't know what Mr. Holden is going to say.
16        We shouldn't have to prove what Mr. Holden is going to say
17   to be able to interview a witness who had extensive
18   communications with what is undoubtedly a central witness in
19   the government's case and who talked to him potentially about
20   the authenticity of these letters as part of our investigation.
21        I don't know what he is going to say today, but by the
22   time he gets on the stand and says something, it is going to be
23   too late for me to say, "Hold on.  Now we know we need this
24   informant's testimony."  We should be able to investigate this
25   now.
```

```
 1                THE COURT:  All right.

 2                MS. FEVE:  Your Honor, I would just note two points

 3     about defense counsel's argument.  The first is she keeps --

 4     she started saying he had extensive communications.  I do not

 5     believe any of the 302s support that representation.

 6          And the second one is she actually said that he

 7     potentially talked to Holden.  Again, if we refer back to the

 8     case law, "potentially talked" is not the threshold.  The

 9     threshold is that they bear the burden.  If they meet that

10     burden, we then have an in camera hearing.  After we have the

11     in camera hearing, the Court can then decide.  I think that's

12     the proper procedure to fall back on.

13          Even talking about them getting access to his identity

14     jumps ahead one step, which is that first they have to meet the

15     threshold and only then can we do an in camera hearing so the

16     Court can vet the source.

17                THE COURT:  All right.  The Court is prepared to

18     confirm its tentative and deny the request at this time for

19     identifying information regarding the CHS.  The Court finds

20     that there is no indication the CHS was involved in the

21     criminal activity; that the relationship between an asserted

22     defense and the likely testimony is tenuous at best; and the

23     government does have an interest in not disclosing this

24     individual who continues to be relied upon, it appears, by the

25     government in receiving notice of other individuals involved in
```

1   this type of illegal spam activity.

2       Next we will take up the motion to modify the protective

3   order, and that's a motion to modify the protective order

4   issued on March 6.  And the request is to have the subject

5   discovery provided to Company A and accessible to their law

6   firm, Sheppard Mullin, and outside counsel for Company A.

7       The first question that the Court will take up is

8   procedural, whether or not this is a motion for

9   reconsideration.  The Court doesn't view this as a motion for

10  reconsideration, but the Court invited this motion at the

11  hearing in February.  At that time, the Court was concerned

12  about the release of emails and certain communications to the

13  extent that it contained PII.  At the same time, the Court was

14  of the view that once defense counsel reviewed that

15  information, they would be in a better position to determine

16  whether or not there was, in fact, personal identifying

17  information.

18      Defense counsel has reviewed these materials and asserts

19  that the discovery material consists of copies of letters sent

20  to Company A's compliance department as produced by Earth Class

21  Mail, a digital mailbox service used by Company A that received

22  mail on the company's behalf and sent copies of the mail to

23  them electronically, and, second of all, emails produced by

24  Yahoo marked as spam that appeared to have been received from

25  IP addresses alleged to be associated with Company A.

33

```
 1          So the defendants assert that this material has already
 2    been received, is in the possession of Company A, and, as such,
 3    there's no point, there's no good cause, in continuing the
 4    protective order that the Court has put in place.
 5          And in their reply to the government's response, the
 6    defendants assert that even the government concedes that the
 7    discovery materials are in Company A's possession and were
 8    received by individuals other than the defendants.
 9          I don't see that to be the case in the government's
10    response, that they concede that the discovery materials are in
11    Company A's possession.  Instead, what I saw in the
12    government's response is that, before the Court relies on
13    defendants' representation that there can be no violation of
14    these third-party privacy interests because Company A already
15    knows their addresses and personal information, the government
16    requests an opportunity to vet this information directly with
17    Company A's outside counsel.
18          Similarly, with regard to the email addresses obtained
19    from Yahoo, defendants can discuss with Company A how it
20    distributed email and the defense can ask Company A to collect
21    and discuss a particular date, time, ad campaign, netblock mail
22    platform, that will direct Company A to the relevant record.
23          So I don't see that the government is conceding.
24          Is that accurate, Ms. Feve, that you are not conceding
25    that this information is already in the possession of
```

1   Company A?

2          MS. FEVE:  That is correct, Your Honor.  There are

3   one -- there's a handful of documents that are in Company A's

4   possession.

5          THE COURT:  How do you know that?

6          MS. FEVE:  How do I know that?

7      Because the government's discovery to the defendants has

8   Bates stamp numbers at the bottom.  And if the defense looks at

9   the examples you have seen, what you will typically see is the

10  Bates stamp will start with -- and I won't say it out loud, but

11  it's Company A -- and then there will be a dash with what

12  discovery production it is, and then there will be a dash after

13  that, and numbers.

14         THE COURT:  So there's Bates stamps that were applied

15  by Company A?

16         MS. FEVE:  No, Your Honor.

17      To facilitate the defendants' review of the documents,

18  when we Bates stamped the documents, we tried to use the Bates

19  stamp as a pointer to where we collected that information from.

20         THE COURT:  So some of the information that you

21  obtained, you did receive it from Company A?

22         MS. FEVE:  Yes.  Absolutely, Your Honor.  Actually,

23  the vast bulk of what we received is from Company A.

24         THE COURT:  But the subject materials that are at

25  issue in this motion are ones outside of that?

```
 1              MS. FEVE:  So, Your Honor, we took what we got from
 2    Earth Class Mail and we did a -- we did not do an exhaustive
 3    survey.  I can't tell you I looked for every single document
 4    from Earth Class Mail, because there are thousands of documents
 5    from Earth Class Mail.  But what we saw was that there was a
 6    mismatch between what we got from Company A and what we got
 7    from Earth Class Mail.  Both sets of documents that we
 8    collected were provided to the defense, and they should be able
 9    to tell the difference based on the Bates stamp.
10         So when they see certain things that say Company A's
11    parent company -- because they will often sometimes actually
12    see two Bates stamp numbers on there.  There will be the one
13    that we got when we got the original documents from Company A,
14    and then there's the ones that we put on top of it, to make it
15    clear what we were calling it with regard to this case.
16         Does that make sense?
17              THE COURT:  I think so.
18              MS. FEVE:  But, going back to the Court's question,
19    we have the discovery that we got in response to a grand jury
20    subpoena to Company A.  We have the materials we received from
21    Earth Class Mail --
22              THE COURT:  I am sorry.  So the grand jury materials
23    were requested of Company A?
24              MS. FEVE:  Yes.
25              THE COURT:  And then we have the Earth Class Mail --
```

36

1          MS. FEVE:  Then we have materials from Earth Class

2    Mail.

3          When we compare them, they are not coextensive.

4          That is the reason, while I appreciate the defendants are

5    saying they are, our evidence is they are not.

6          To the extent that we are -- we have made a mistake

7    because of how voluminous the Company A materials are, we are

8    happy to go back to Sheppard Mullin and talk to them because

9    they also have indexes of what they supplied.

10          But at this time, our good-faith belief for the Court is

11    they are not the same, so that is why we got the protective

12    order.

13          THE COURT:  So let me ask defense counsel on that

14    point, why do you believe that everything that has been

15    provided now is in fact in the possession of Company A, given

16    that reported mismatch?

17          MS. RIM:  Your Honor, first, that is partly why we

18    asked for the request that the government made to these

19    companies because we assumed that in the subpoena it would say,

20    "We want the accounts belonging to X, X, X," and those would

21    clarify whether the government was seeking specifically

22    material related to Company A; or, "We want emails from these

23    IPs," which may or may not be associated with Company A.

24          So the other point is that the government acknowledges

25    that this is voluminous material.  We can't sit down and do a

1   matchy-match between what Company A produced and what these

2   third-party companies produced.  It would just take an

3   unreasonable amount of time.  It would be very burdensome.

4        If the government requested material that is obviously

5   already in the possession of Company A because they are

6   requesting materials relating to those accounts, it should

7   be -- it's safe to assume that Company A already has that PII.

8        But even if some of the material is not in Company A's

9   possession, the defense has to confer with Company A to

10   determine whether that is the case.  For example, with the

11   Yahoo emails, these are emails that it looks to me -- I am not

12   sure, but it appears that they are emails that were allegedly

13   sent by Company A.  I believe the government is going to take

14   the position that these were the numerous, numerous emails that

15   were sent by Company A to Yahoo subscribers and Verizon.net

16   subscribers.

17        How can our clients know which of those emails were sent

18   by Company A or not without conferring with Company A?

19        And if the company didn't send these emails, that is going

20   to be very relevant to the defense, which is that these emails

21   were not sent by this company.

22        But the email addresses and the IP addresses from where

23   the emails belong to don't belong to Mr. Pacas; I don't believe

24   they belong to any other defendant.  So there's no way for the

25   defendants to assist counsel in determining where these emails

1    came from, and certainly not all of them, unless we speak to

2    Company A.

3        It is the same with the Earth Class Mail documents, Your

4    Honor.  Mr. Pacas was not in the compliance department.  I

5    believe the government has represented that one defendant was.

6    I don't know.  But I don't have access to that defendant.  And

7    there are more than one account within the compliance

8    department.  We should be able to go to Company A and show them

9    these documents and say, "What are these, and who sent them,

10   and what does that mean?  Are these compliant with the

11   company's policies?"  Et cetera.

12       So even if there is not a complete overlap, it doesn't

13   change the fact that Company A is material to our investigation

14   of the defense.  And we are not seeking to have the protective

15   order totally eradicated here.  We are just asking the Court to

16   allow us to share it with the central witness in our case for

17   the purposes of investigation for these documents.

18           THE COURT:  So, as I understand it, there's a very

19   limited universe of documents that the government intends to

20   offer at trial.  I don't know if it's 800 or 8,000 or

21   something.

22           MS. PIERSON:  Way less than that.

23           THE COURT:  So these materials, do these fall inside

24   or outside?

25           MS. PIERSON:  Outside.  Outside.

1          And I think that this might help clarify for the Court.

2          The Yahoo materials are, like, 845,000 pages, but they are

3     not emails, per se.  There is no content to the email.  There

4     is no date to the email.  There is no subject line to the

5     email.  All it is is a listing of email addresses that received

6     emails.  There is the recipients' email addresses.  It

7     identifies the IP address that was used to send it.  It

8     identifies the name of the sender and the contact email

9     address; in other words, if you were going to unsubscribe from

10    whatever, it's like "admin@domainname.com."  That's all that

11    there is.  There is no content.  There is no date.

12         There would be -- this was material given to the

13    government by Yahoo saying, "We think that these represent

14    possible spam."

15         I can see virtually no way for either side to admit this

16    at trial; however, what I could see was the potential for

17    disaster if we had a Yahoo witness on the stand who says,

18    "Well, we gave the government 845,000 pages of emails back in

19    2013," and then the defense says, "Oh, my God.  We have not

20    seen them."  So we gave them this.

21         And we brought copies of them.  That is why we asked to

22    have the Elmo to be shown.  So if you want to see what these

23    documents look like, it is a string of, you know,

24    JaneDoe@Yahoo.com, IP address, contact@domainname.com; and

25    then the next name, JohnDoe@Yahoo.com, IP address, domain.com.

40

 1     That's all it is.

 2            THE COURT:  Are you saying that ultimately you don't

 3     believe this is *Brady*, it is not *Giglio*, it is not Rule 16 in

 4     the sense that you intend to offer it in your case in chief or

 5     that it's material to any defense that has been identified; but

 6     that out of an abundance of caution you have turned it over

 7     because you obtained it during the course of the investigation

 8     and you wanted to avoid a situation where someone from Yahoo

 9     was on the witness stand and there was testimony about what

10     they provided, and then the defense ends up screaming, "This is

11     awful" because you received information that was not provided

12     to them?

13            MS. PIERSON:  Exactly.  That's the exact -- why we

14     turned this over.  And we will give them the 2703(d) order so

15     they can see exactly what we asked for there.

16        But I can't see how any of this, given the incomplete

17     nature of the information provided, could be admitted by either

18     party.

19            THE COURT:  So why does this matter?

20            MS. RIM:  Your Honor, it is hard for us to know

21     because we can't investigate it without knowing what these

22     emails are.  It's helpful now that the government has provided

23     some of this information, but it matters because our clients

24     are charged with violating five counts of the CAN-SPAM Act,

25     which, one of the elements is that numerous emails were sent.

```
 1              THE COURT:  And this material has nothing to do with
 2      any of these counts?
 3              MS. RIM:  Well, the materials apparently show emails
 4      that were sent from IP addresses, and that's an element of
 5      those CAN-SPAM Act counts, that numerous, voluminous emails
 6      were sent from hijacked IPs.
 7          So we don't know if they are going to be admitted in the
 8      case in chief as an exhibit, but we --
 9              THE COURT:  I think we do know.  The government just
10      said they have no intention to offer this.
11          Is that right, Ms. Pierson?
12              MS. PIERSON:  Yes.  That is correct.
13          Would you like me to put one of those up so everybody can
14      know what we are talking about here?
15              THE COURT:  Yes.
16          (Brief discussion off the record.)
17              MS. PIERSON:  Now you can see what the documents look
18      like.
19              THE COURT:  So, I am curious.  How would this in any
20      fashion be intertwined or relate to a defense of this case?
21              MS. RIM:  Well, Your Honor, I think we need to be
22      able to talk to Company A to ask them what this information is.
23              THE COURT:  But, evidently, you have information just
24      like it -- is that correct -- that was obtained from Company A?
25      Or no?
```

```
 1            MS. PIERSON:  No.  No.  This is -- this is what we
 2    got from Yahoo.
 3            THE COURT:  I thought the theory that I heard earlier
 4    from Ms. Feve is there was a mismatch.
 5            MS. PIERSON:  That was Earth Class Mail.  This is
 6    Yahoo.  There's two categories of records.
 7            MS. RIM:  And please correct me if I'm wrong.  My
 8    understanding is that the government is alleging these are
 9    emails sent by Company A to Yahoo users?
10            MS. PIERSON:  This is what Yahoo told us about the
11    documents.  We have not investigated these documents.  We have
12    provided them to you in an abundance of caution in that you
13    might feel that it had some relevance to this case and we did
14    not want to be in a position of having a Yahoo person
15    testify they had given us this information when we didn't give
16    it to you.
17            THE COURT:  So, as far as what is contained on this
18    document, are you certain or reasonably certain that it even
19    relates to the defendants in this case?
20            MS. PIERSON:  We were told by Yahoo that it did.
21        But what we have are hundreds of thousands of personal
22    email addresses -- so-and-so@Yahoo.com, so-and-so@Yahoo.com --
23    which are all real email addresses, which is personal
24    identifying information, which we are seeking to protect with
25    the protective order.  That's what it is about.
```

1          MS. RIM:  But the allegation is that these emails

2   were sent by Company A to these email addresses.  So it's

3   personal identifying information, but it is apparently personal

4   identifying information that Company A already had, and that's

5   why the government requested this information.  And there's no

6   way for us to really understand this without talking to

7   Company A.

8          THE COURT:  So, is that correct, that this

9   information would have been obtained from Company A?

10         MS. PIERSON:  No.  It was obtained from Yahoo.

11         THE COURT:  But the report is that Yahoo received it

12  from Company A?

13         MS. RIM:  Yes.

14         MS. PIERSON:  Yahoo said that they believed the

15  ultimate sender was Company A.

16      What is on here are -- the critical part is the IP

17  address.  And they can go through and look at the IP addresses

18  just like we can and decide whether or not it was an IP address

19  that was ever used by Company A or not, and that can be

20  disclosed all day long.

21      The only thing we don't want disclosed is what comes

22  before the "@Yahoo.com."  But because there are so many of

23  them, we didn't want to take the time to redact it before we

24  provided it to the defendants.  We wanted to simply provide

25  them with the discovery so they could look at it rather than

1    going through and redacting each of those.

2          THE COURT:  So Yahoo believed this came from

3    Company A?

4          MS. PIERSON:  Right.

5          THE COURT:  Do you believe it came from Company A?

6          MS. PIERSON:  We have not investigated that to know

7    the truth or falsity of that.

8          THE COURT:  So, but, at this point, all we have is,

9    then, Yahoo providing this in response to your request for

10   materials that were received from Company A?

11         MS. PIERSON:  For materials that -- that came from

12   certain IP addresses.

13         MS. FEVE:  Your Honor, what the defendants will see

14   when they get the (d) order is that, for a certain date range,

15   we asked for header information pertaining to a list of IP

16   addresses.  We never identified Company A.  What we did is we

17   provided Yahoo with a list of IP addresses.

18      So Yahoo says, "Those IP addresses, for that date range,

19   here is what we have."

20         THE COURT:  So, then, the follow-up is, as far as

21   these IP addresses, does the defense assert these IP addresses,

22   in fact, are ones that belong to or were tied to Company A?

23         MS. RIM:  I believe the government is alleging that,

24   and we need to be able to confirm that by showing the materials

25   to Company A, asking them whether these emails came from which

1    IP addresses and which of those IP addresses belong to

2    Company A.

3        Our clients are not privy to all of the IP addresses the

4    company owned.  There's millions and millions of them.  And the

5    government has already characterized this as being close to a

6    million pages of documents.

7        So we need to, in order to be able to investigate the

8    relevance of this -- and it is not -- Your Honor, I just want

9    to remind everybody that the government has the burden of

10   showing the good cause here, and the central reason why there

11   is no good cause is that these are emails -- the government

12   requested emails from Yahoo that they believe were sent by

13   Company A using IP addresses that the government alleges were

14   controlled by Company A.

15       So I am just not seeing what the basis for excluding

16   Company A is from this discovery when the defense has a clear

17   need to confer with Company A about the relevance of these

18   materials, even if the government is not going to introduce

19   them.  Maybe we want to introduce them.  We don't know yet.

20           THE COURT:  So, here is the salient point in all

21   this, is whether or not it's true that all of this either began

22   or originated with or concluded that it is Company A that is

23   the recipient and, to that extent, then, was or has been in

24   possession of these documents.  If the answer is yes, they were

25   in possession of the documents or have possession, then it is a

1    nonissue.  So I agree with you.  But the million-dollar

2    question is is that true?  And certainly, the government

3    doesn't admit that or acknowledge that.

4         At the same time, especially with respect to these

5    documents from Yahoo, it appears that the government made a

6    request for certain IP addresses that they believe were

7    associated with Company A.

8         Is that correct, Ms. Pierson or Ms. Feve?

9              MS. FEVE:  Your Honor, it was pursuant to our

10   investigation into Company A that we asked for these IP

11   addresses.  But part of what we were doing was vetting

12   information about whether or not there was evidence those IP

13   addresses were controlled by Company A.  Part of doing the

14   investigation was not to incriminate them but to determine what

15   the evidence showed.

16        They are going to get the (d) order, Your Honor, and they

17   are going to see what we asked for.  And, again, they can ask

18   Company A about these IP addresses, which are going to be more

19   relevant than the two lists because they have many, many mail

20   distribution lists; but also, arguably the most helpful field

21   in this discovery is the -- where you see "sender."

22        You are going to see "game department," and then you are

23   going to see almost a parens, where it's going to have

24   "admin@amazingagainst.com."  The domain in that email address,

25   "amazingagainst.com," is going to either be a domain that

47

```
 1    Company A controlled or didn't.  They are going to know that,
 2    and there is no restriction on the defendants' ability to share
 3    all of those domain names, as well as all of what we call a
 4    "friendly from," which is where you see "game department" in
 5    quotes.
 6              THE COURT:  No restriction for them to share with --
 7              MS. FEVE:  To disclose to Company A, "Did you control
 8    amazingagainst.com?  Did you use this IP address?  Did you use
 9    the friendly from 'game department'?  Did you have emails
10    called admin@amazingagainst.com?"
11        The only field in this discovery that the government is
12    seeking to protect is the third-party recipient, and the
13    third-party recipient is going to be on many different
14    distribution lists that different people have.  But we, again,
15    do not know at this time what Company A does and doesn't have.
16        We are happy to discuss with them, "Did you believe that
17    you provided us with all of your distribution lists?"  We have
18    not seen it in discovery, and so we have, again, a good-faith
19    belief that at this time we have not seen any evidence that
20    they have these third-party private email addresses.
21        But, again, with regard to the defense's concern that they
22    can't explore their defense, they can explore the domain.  They
23    can explore the friendly from, and they can explore the IP with
24    no restriction on their ability to discuss it.
25              MS. RIM:  Your Honor, the obligation should be on the
```

1    government to redact each and every recipient's email address

2    from these close to a million pages of discovery if that is

3    what the government's position is going to be.

4        Our position remains that these email addresses apparently

5    were already in the possession of Company A.  That's why they

6    are part of this production.

7        It is critical for us -- I think the government has

8    demonstrated why we have to go to Company A with this to not

9    only determine whether these emails were sent from these IP

10   addresses but to determine whether these domain names did

11   belong to Company A.

12       Even if some of them weren't in the possession of

13   Company A, that is even more relevant because then nobody

14   related to this case is responsible for those emails.

15       The sending of the emails are part of the CAN-SPAM counts,

16   and Ms. Munk just pointed out that even the IP address that's

17   displayed on the screen is the subject of Count 7, which is a

18   CAN-SPAM Act count.

19       So there is no good cause here --

20           THE COURT:  I'm sorry.  What part of this is related

21   to Count 7?

22           MS. MUNK:  Your Honor, what is shown on the Elmo

23   here --

24           MS. PIERSON:  And Your Honor, I marked it as

25   Government's Exhibit 1, so we can talk about it as Government's

1   Exhibit 1.

2          MS. MUNK:  Government's Exhibit 1, the netblock is

3   167.87, and then there's additional numbers.  That is Count 7

4   of the indictment.  So this is absolutely pertinent to our

5   defense here, and this goes to the central issue of the case.

6          Just to add to what co-counsel said, Your Honor, it is

7   unreasonable for us, as a defense, to have to go through

8   845,000 pages, presumably, I guess, on the phone with

9   Company A, to go through each domain name, whether or not they

10  had it.

11         If the government wants to redact the email addresses,

12  then they should redact the email addresses.  But, essentially,

13  we want to be able to give these documents to the company for

14  them to let us know what exactly is going on here, and we don't

15  know.  Our clients did not send emails, so we have to go to

16  Company A.

17         THE COURT:  The Court's view is that, to the extent

18  that this is already in the possession of Company A, then

19  there's no good cause; that these materials are materials that

20  the defense has good reason to want to review and consider

21  their impact on their defense; that, because they are so

22  voluminous, I am not going to require the defense to point out

23  what of all of this they do or do not have.  I am going to

24  place that burden squarely on the government.  It is their

25  burden to show good cause for a protective order.  At this

1    point, I am not prepared to find that there is good cause

2    relating to these materials given the explanation, given the

3    description, given how these materials were obtained, and

4    ultimately, they are just too voluminous for this Court to go

5    through them all.

6         And at this point, I am prepared to expand the individuals

7    or parties that can review these.  As far as that is concerned,

8    I am prepared to limit that.

9         And so, at this point, I will turn to the government to

10   request, who are you requesting that these materials be limited

11   to?  I know at this point there's a request for Sheppard

12   Mullin, I think for outside counsel, for any number of

13   individuals with Company A.  In your view, what would be the

14   appropriate pool of those that would have access?

15             MS. PIERSON:  I guess, in our view, if we are talking

16   about who would we give access to, I think the appropriate

17   people would be IT personnel at Company A because they are the

18   ones who would be able to identify the various IP addresses

19   that were used, the various domain names; the people engaged in

20   that, as opposed to upper management and Sheppard Mullin, who

21   are engaged in the ongoing investigation that was the subject

22   of the declaration filed under seal.

23             THE COURT:  So, let me ask, why would upper

24   management need to review these materials?

25             MS. RIM:  Your Honor, the defense would be satisfied

1    if the protective order was limited to the compliance

2    department of Company A as well as Sheppard Mullin, not to

3    ignore your question.

4             MS. PIERSON:  We do have an issue with the compliance

5    department because -- and, again, it was discussed with the

6    Court in the filing under seal -- because there are people in

7    the compliance department who are -- that we discussed in that

8    particular declaration.

9        But if I could just step back for a moment, because the

10   Court suggested there was evidence that Company A was in

11   possession of this stuff, and I think that that's really not

12   necessarily the case.  Because the way Company A did its

13   mailings was they sent -- some of the mailings were sent from

14   their internal email teams, but many other mailings were sent

15   by what they call affiliates.  And affiliates are someone where

16   you go and you farm it out.  And you send them an email

17   campaign, and then they send it out to the email addresses that

18   they have.

19       So Company A -- sorry -- sends the email campaign that

20   they have to the affiliates, and then the affiliates send it

21   out to so-and-so@Yahoo.com.  And it is the affiliates who have

22   these email addresses and lists.

23       And in that way, Company A can increase a hundred-fold its

24   footprint because they can send hundreds or thousands of

25   affiliates out, sending these emails, as opposed to just being

1    sent by their own internal email group.

2         So, you know, the idea that all of these were in the

3    possession or are in the possession of Company A, to the extent

4    that the Court had that impression, is possibly erroneous

5    because of their extensive use of affiliate marketers and

6    affiliate marketers especially to send to sort of the lower

7    tier clients, if you will.

8         They had -- the company has higher tier clients that are

9    large, national firms whose names you would recognize, and

10   those were carried more by the internal emails.  But then the

11   lower tier clients, who might be "tirecoupons.com" or

12   "Asiansingles" or something like that, would be farmed out to

13   the affiliates, and the affiliates then would send it out to

14   JaneDoe@Yahoo.com.  So the "Jane Doe" address might belong to

15   the affiliate.

16              THE COURT:  All right.  I have a commitment that I

17   have to make, but here is what I am going to do.

18        I am going to let the government know that the Court views

19   the government as holding the burden in establishing good

20   cause.  In their response, at page 6, line 11, the government

21   asserts that if the defendants are correct that Company A

22   should already have the mailing address, email addresses, and

23   any other PII contained in the discovery materials, then

24   there's no prejudice.

25        My view of that sentence is that if the defendants are

53

 1   correct, that Company A already has the mailing addresses, and

 2   email addresses and other PII, then that's for the government

 3   to show to the satisfaction of the Court that that is the case.

 4        And, I guess, let me turn it around; that it is the

 5   government's burden to show that these addresses are not in the

 6   possession of Company A.  Given what has been requested, given

 7   how it's been requested, given the position of the defense, I

 8   want further clarification and further information that leads

 9   the Court to conclude that Company A does not already have the

10   mailing address, email addresses, and other PII.

11        So I am going to place the onus on you.  I will direct the

12   government to file something by next Wednesday.  And then I

13   will allow the defense to file a response by the following

14   Wednesday.  And then I will take the matter under submission,

15   and I will issue an order.

16        And then, with respect to who this information would be

17   accessible to, to the extent that you wish to address that

18   further, I will permit that as well.  But at this point, as a

19   threshold matter, I want to be pointed to the proof, the

20   reasons, why the Court should conclude that this information is

21   not already in possession of Company A.

22             MS. FEVE:  Your Honor, one reason why we asked is

23   because the defendants are -- one of the arguments they make in

24   their brief is that the government made a willful

25   misrepresentation to the Court.

```
1              THE COURT:  I don't believe that you made that.

2              MS. FEVE:  And so we are asking just for

3    clarification, because obviously, if so, we have a reporting

4    obligation.

5              THE COURT:  No, no, I don't.  I did see that in the

6    moving papers, and I saw that addressed in the response.  I

7    don't believe that the government ended up misrepresenting

8    anything.

9         I believe the points and authorities asserts, at page 2,

10   the Court issued the protective order based on the government's

11   representation that the discovery material contained personal

12   identifying information that was not already known to

13   Company A.

14        And the government's response was it had obtained records

15   from third parties that included PII for third-party witnesses

16   whom the government alleges received, and in some cases

17   complained about, email spam.

18        So I am not prepared to find that the government made any

19   misrepresentations; but, at the same time, the Court does find

20   that the government has the burden to establish good cause and

21   that, at this point, I am not satisfied that that showing has

22   been made, but I will give the government this further

23   opportunity.  All right.

24             MS. RIM:  Your Honor, just one brief request.  Could

25   we at least include Sheppard Mullin in the protective order,
```

55

```
 1    and we can accept Your Honor's request for further briefing
 2    with regard to Company A, but at least outside counsel of
 3    Sheppard Mullin?
 4              THE COURT:  You mean ultimately?  Because at this
 5    point, I am going to stay or I am not going to direct the
 6    government to produce these materials today.  I am going to
 7    wait for the government to provide this additional briefing,
 8    and then afterwards, I will issue an order one way or another.
 9    And to the extent that I issue an order modifying, I will
10    identify who is entitled to review, access this information.
11    All right?
12              MS. RIM:  Thank you.
13              MS. FEVE:  Thank you, Your Honor.
14              THE COURT:  Thank you.
15              MS. PIERSON:  There was one motion that the Court
16    didn't address at all, which was the government's motion for
17    reciprocal discovery.
18              THE COURT:  I expect at this time the defense is
19    going to assert that they are not sure that all the
20    government's discovery obligations have been addressed or met;
21    but, Ms. Bernstein?
22              MS. BERNSTEIN:  Your Honor, it sounds like even the
23    government noticed today that they intend to continue producing
24    discovery.  They also have represented that they intend to
25    continue to produce discovery that they intend to request
```

1    protective orders for, so it certainly doesn't sound like their

2    discovery is complete.

3          We are aware of our obligations and we will, of course,

4    meet those.

5              THE COURT:  At this point, I will refrain from making

6    any reciprocal discovery order until we conclude these issues.

7    All right.  That will be all.

8              MR. RIDDET:  Your Honor, we haven't set a date to

9    come back.

10             THE COURT:  I think you said you were going to set a

11   date with my clerk.

12             MS. PIERSON:  Can we have one more, because we filed

13   a joint motion relative to --

14             THE COURT:  Speedy trial?

15             MS. PIERSON:  -- to exclude time, yes.

16         And the way that read was that we were excluding time from

17   today's date to the date set today for trial.  Rather than

18   excluding from the last hearing to this hearing, what we

19   intended to do was exclude from this hearing to the date of

20   trial.

21             MR. RIDDET:  We would agree that the time can go from

22   the next motion date until the trial date.

23             THE COURT:  Well, at this point, I will find

24   excludable time from today to the next hearing date, given the

25   pending motions, motions to dismiss.  And then, at that time,

```
 1    we will determine whether or not we need to continue for some

 2    other reason.

 3         But the Court continues to find that this case is complex,

 4    and that's an additional basis to find excludable time.

 5         Does that address your concern?

 6              MS. PIERSON:  I guess so, yeah.

 7              THE COURT:  Go ahead.  Ms. Pierson, did you want to

 8    say something?

 9              MS. PIERSON:  We just want to be sure that the

10    defense is also okay with the Court's ruling here on excludable

11    time, that they all are in --

12              MR. WIECHERT:  There are motions pending.

13              THE COURT:  Right.  Even if they weren't okay --

14              MR. RIDDET:  Well, we are.

15              THE COURT:  -- you would have a hard time showing the

16    Ninth Circuit that I erred in finding excludable time.

17         The motion to dismiss was just -- the reply was filed

18    within a couple of weeks ago and so this was the first hearing

19    that we had on that.  And to the extent that it is a matter of

20    first impression, certainly there's justification to kick it to

21    the next hearing date.  And after that, it may be that I take

22    it under submission to write up the order, so that would also

23    be justified.

24         But at this point, I think we have the record covered.

25              ALL:  Thank you, Your Honor.
```

58

```
 1        (End of proceedings at 2:30 p.m.)

 2                          -oOo-

 3              C-E-R-T-I-F-I-C-A-T-I-O-N

 4

 5           I hereby certify that I am a duly appointed,

 6   qualified and acting official Court Reporter for the United

 7   States District Court; that the foregoing is a true and correct

 8   transcript of the proceedings had in the aforementioned cause;

 9   that said transcript is a true and correct transcription of my

10   stenographic notes; and that the format used herein complies

11   with rules and requirements of the United States Judicial

12   Conference.

13              DATED:  May 3, 2019, at San Diego, California.

14

15                      /s/  Chari L. Bowery
                        _____
16                      Chari L. Bowery
                        CSR No. 9944, RPR, CRR
17

18

19

20

21

22

23

24

25
```