Gary S. Lincenberg - SBN 123058
    glincenberg@birdmarella.com
Naeun Rim - SBN 263558
    nrim@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

*Attorneys for Petr Pacas*

David W. Wiechert - SBN 94607
    dwiechert@aol.com
Jessica C. Munk - SBN 238832
    jessica@wmgattorneys.com
William J. Migler - SBN 318518
    william@wmgattorneys.com
WIECHERT, MUNK & GOLDSTEIN,
PC
27136 Paseo Espada, Suite B1123
San Juan Capistrano, California 92675
Telephone: (949) 361-2822

*Attorneys for Jacob Bychak*

Randy K. Jones - SBN 141711
    rkjones@mintz.com
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
Telephone: (858) 314-1510

*Attorney for Mark Manoogian*

Whitney Z. Bernstein - SBN 304917
    wbernstein@bmkattorneys.com
Thomas H. Bienert, Jr. - SBN 135311
    tbienert@bmkattorneys.com
James Riddet – SBN 39826
    jriddet@bmkattorneys.com
BIENERT | KATZMAN PC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700

*Attorneys for Mohammed Abdul Qayyum*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>JACOB BYCHAK, MARK MANOOGIAN,  MOHAMMED ABDUL QAYYUM, AND PETR PACAS,<br><br>　　　　　Defendants. | CASE NO. 3:18-cr-04683-GPC<br><br>**MEMORANDUM OF POINTS AND AUTHORITES IN SUPPORT OF MOTION TO DISMISS WIRE FRAUD COUNTS FOR VIOLATING THE FIFTH AMENDMENT DUE PROCESS AND SIXTH AMENDMENT FAIR NOTICE PROTECTIONS**<br><br>Assigned to Hon. Gonzalo P. Curiel<br>Courtroom 2D<br><br>Hrg Date: June 26, 2020<br>Hrg. Time: 2:30 p.m. |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................6

II.   PROCEDURAL HISTORY ...................................................................................9

    A.    The Government Relies on Documents from ARIN in Opposition to
Defendants' CAN-SPAM Motion..................................................................9

    B.    Defendants Rely on Documents from ARIN and Statements From the
Government's Expert in Their Motion to Dismiss the Wire Fraud Counts ..........10

    C.    The Parties Meet and Confer on Undisputed Preliminary Facts Regarding
IP Addresses ..............................................................................................11

III.  ARGUMENT........................................................................................................12

    A.    Whether IP Addresses Are "Property" Is Subject to the Constitutional
Requirement of Fair Notice That Is Unquestionably a Legal Issue for the
Court ..........................................................................................................12

    B.    Based on the Undisputed and Indisputable Facts, the Federal Fraud Statutes
Do Not Give Fair Notice That IP Addresses Constitute Property ........................14

        1.    Congress Has Expressly Declined to Exercise Authority Over IP
Addresses and Long Ago Relinquished That Role to ARIN .......................15

        2.    IP Addresses Have "Long Been Recognized" As *Not Property* By
ARIN, the Organization That Administers Polices Pertaining to IP
Addresses ..............................................................................................18

    C.    Applying *Kremen* Would Violate the Prohibition Against Novel Construction
and Deviate from the Ninth Circuit's Treatment of "Property" In the
Context of Federal Fraud Statutes ..................................................................21

    D.    The Court May Consider Extrinsic Preliminary Facts to Decide Questions
of Law........................................................................................................24

    E.    If the Court Does Not Wish to Consider Extrinsic Preliminary Facts, the
Indictment Must Be Dismissed for Lack of Fair Notice....................................27

IV.   CONCLUSION.....................................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000) ...................................................................................................12

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris,*
    729 F.3d 937 (9th Cir. 2013) ............................................................................... 8, 13

*Borre v. United States,*
    940 F.2d 215 (7th Cir. 1991) ...................................................................................22

*Carpenter v. United States,*
    484 U.S. (1987) ............................................................................................... 14, 22

*Cleveland v. United States,*
    531 U.S. 12 (2000) ............................................................................13, 14, 15, 22

*Dowling v. United States,*
    473 U.S. 207 (1985) ...................................................................................... 14, 17

*Farrell v. Burke,*
    449 F.3d 470 (2d Cir. 2006) ...................................................................................12

*Gautt v. Lewis,*
    489 F.3d 993 (9th Cir. 2007) .................................................................12, 13, 27, 28

*Kelly v. United States,*
    590 U.S. __, 2020 WL 2200833 (2020) ............................................................ 6, 7, 14

*Kremen v. Cohen,*
    337 F.3d 1024 (9th Cir. 2003) ...........................................................................*passim*

*Liparota v. United States,*
    471 U.S. 419 (1985) ...................................................................................................14

*McNally v. United States,*
    483 U.S. 350 (1987) ..................................................................................... 13, 14, 22

*In re Nortel Networks Inc.,*
    Case No. 09-10138-CCS (Bankr. D. Del.) ...............................................................23

*Rotstein v. Cable & Wireless, Inc.,*
    No. G027549, 2002 WL 691458 (Cal. Ct. App. Apr. 24, 2002)................................23

Case No. 3:18-cr-04683-GPC

MEMORANDUM OF POINTS AND AUTHORITIES

*Russell v. United States*,
    369 U.S. 749 (1962) ........................................................................................................28

*Sprint Corp. v. F.C.C.*,
    331 F.3d 952 (D.C. Cir. 2003) ......................................................................................15

*Stirone v. United States*,
    361 U.S. 212 (1960) ........................................................................................................12

*United States v. Aguilar*,
    756 F.2d 1418 (9th Cir.1985).........................................................................................12

*United States v. Bruchhausen*,
    977 F.2d 464 (9th Cir. 1992) .........................................................................................22

*United States v. Cecil*,
    608 F.3d 1294 (9th Cir. 1979) .......................................................................................28

*United States v. Chamberlain*,
    No. 14-CR-00316-VC-1, 2015 WL 10096591 (N.D. Cal. Aug. 27, 2015) ...............12

*United States v. Du Bo*,
    186 F.3d 1177 (9th Cir. 1999) .........................................................................................8

*United States v. Franklin*,
    No. 1:15-cr-00242-BLW, 2016 WL 4033105 (D. Idaho, July 27, 2016) ...........25, 26

*United States v. Gaudin*,
    515 U.S. 506 (1995) ........................................................................................................13

*United States v. Kail*,
    No. 18-cr-00172-BLF-1, 2018 WL 6511154 (N.D. Cal. Dec. 11, 2018)............25, 16

*United States v. Kato*,
    878 F.2d 267 (9th Cir. 1989) .........................................................................................22

*United States v. Lanier*,
    520 U.S. 259 (1997) .................................................................................................14, 21

*United States v. Omer*,
    395 F.3d 1087 (9th Cir. 2005) .................................................................................8, 28

*United States v. Reyes*,
    No. CR-06-00556-CRB, 2007 WL 831808 (N.D. Cal. Mar. 16, 2007) ........................7

*United States v. Saathoff*,
  708 F. Supp. 2d 1020 (S.D. Cal. 2010) ...................................................................7, 13, 21, 27

*United States v. Shortt Accountancy Corp.*,
  785 F.2d 1448 (9th Cir.1986) ...................................................................................................25

*United States v. Shotts*,
  145 F.3d 1289 (11th Cir. 1998) ...............................................................................................22

*United States v. Tsinhnahijinnie*,
  112 F.3d 988 (9th Cir. 1997) ...................................................................................................27

*United States v. Vasquez-Ramos*,
  531 F.3d 987 (9th Cir. 2008) ............................................................................................. 8, 13

*United States v. Williams*,
  553 U.S. 285, 170 L.Ed.2d 650 (2008) ...................................................................................12

*United States v. Yang*,
  No. 16-CR-00334-LHK-1, 2019 WL 5684527 (N.D. Cal. Nov. 1, 2019) ......................... 25, 26

**Statutes**

18 U.S.C. § 1037(a)(5) ...................................................................................................... 9, 17, 18

18 U.S.C. § 1343 ...................................................................................................................... 7, 21

47 U.S.C. § 251(e)(1) ....................................................................................................................16

MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

This motion arises out of constitutional defects from the Indictment's failure to allege a fraud involving "property;" this Court's request that Defendants Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum, and Petr Pacas provide a procedural vehicle for deciding this issue; and a recent Supreme Court decision which bolster's the defense position. Defendants filed a motion to dismiss the wire fraud allegations on the basis that IP addresses are not "property" within the meaning of the wire fraud statute.  The Court held that it was unable to decide the question, stating that "it lacks the factual record necessary to determine whether IP addresses assigned prior to creation of the American Registry of Internet Numbers (ARIN) on December 22, 1997 are 'property' for the purposes of the wire fraud statute." (Dkt. 160 at 2.)  The Court concluded both (1) that the facts alleged in the Indictment were insufficient to enable the Court to decide whether IP addresses were property, and (2) that it could not consider facts outside of the Indictment to decide the question.  (*Id.* at 6-7.)  This left Defendants in a legal quandary of not knowing whether the wire fraud counts state a criminal offense.  Recognizing this, during a telephonic hearing on April 8, 2020, the Court granted Defendants' request to brief the question of how the Court should proceed on deciding whether an IP address is property.  The Court also ordered the parties to meet and confer on what facts in the record regarding IP addresses were undisputed.  The Government confirmed during the meet and confer process that nearly all of the facts set forth by John Curran and Marc Lindsey were undisputed.[1]

Meanwhile, on May 7, 2020, the Supreme Court unanimously overturned the wire fraud convictions of several public officials because a state agency's "intangible rights of allocation, exclusion, and control" traffic lanes does "not create a property interest." *Kelly v. United States*, 590 U.S. __, 2020 WL 2200833 (2020) at *5, citing *Cleveland v. United States*, 531 U.S. 12, 26

---

[1]    The parties' correspondence is attached to the Declaration of Naeun Rim (Rim Decl.) as Exh. A to paragraph 2.  Defendants have concurrently filed a Notice of Statement of Undisputed Facts.

(2000).  Once again, the Court counseled the importance of employing "a limiting construction" to avoid vagueness problems with federal fraud statutes.  *Id.* at *4.  The unanimous reversal by the Supreme Court in *Kelly* warns of the enormous toll on the parties and the judicial system when lower courts give the benefit of the doubt to the government as to whether or not "property" has been charged.

In light of (1) the Supreme Court's decision in *Kelly* reaffirming the obligation of the lower courts to avoid novel constructions of "property" under the federal fraud statutes, and (2) confirmation by the Government during the meet-and-confer process that key facts are undisputed, the case is ripe for this Court to decide whether IP addresses are property.  Indeed, the Fifth and Sixth Amendments, as well as the interests of judicial economy, require it. Defendants suggest the Court progress through the issues as follows:

<u>First</u>, the Court should address the Constitutional challenge.  Where an indictment alleges as a property interest something which is not recognized as a property interest, Defendants are not provided fair notice that their alleged conduct constituted a wire fraud.  As such, the indictment is void for vagueness as applied to IP addresses.  Whether a statute is vague as applied to the allegations on the face of an indictment is a matter of law that can and must be decided pretrial.  *See United States v. Saathoff*, 708 F. Supp. 2d 1020, 1033-34 (S.D. Cal. 2010) (dismissing indictment pretrial because honest services statute was unconstitutionally vague as applied to the conduct alleged in the indictment, and "defendants would be denied their Fifth and Sixth Amendment rights to fair notice should a trial be permitted").[2]  The question of vagueness comes down to one of fair notice and statutory construction—would an average person of ordinary intelligence know that IP addresses are property under 18 U.S.C. § 1343?  *Id.* at 1034.  Matters of fair notice and statutory construction are questions of law that

---

[2]   Vagueness-as-applied to the face of an indictment (which can be determined pretrial) is distinguishable from vagueness-as-applied to a defendant's *actual conduct*, which some courts have held must be decided by the court after trial.  *See, e.g.*, *United States v. Reyes*, No. CR-06-00556-CRB, 2007 WL 831808, at *7 (N.D. Cal. Mar. 16, 2007) (finding pre-trial as-applied vagueness challenge premature because defendants sough the court to consider facts that "were unsupported by the indictment, which alleges otherwise").

must be decided by the Court, not a jury.  *See, e.g., Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 946 (9th Cir. 2013) (whether a statute gives fair notice is a question of law); *United States v. Vasquez-Ramos*, 531 F.3d 987, 990 (9th Cir. 2008) (statutory construction is question for the court, "not a question of fact").  The preliminary facts necessary to decide this issue of fair notice are limited—put simply (1) Congress long ago relinquished to ARIN the authority to manage and allocate IP addresses, (2) ARIN's consistent stance over the years has been and continues to be that IP addresses, whether legacy or not, are not property, and (3) no court has clearly held that IP addresses are "property" under any definition.  These facts are undisputed or indisputable.  Based on these facts, it is clear that a person of ordinary intelligence would not have had fair notice that IP addresses were "property"—and waiting until the end of trial to make that determination when the pertinent facts are already known to the Court would be a colossal waste of the jury's time and substantially prejudice Defendants.

<u>Second</u>, if the Court rejects Defendants' constitutional challenge, the Court should consider extrinsic, preliminary facts to address the statutory construction problem.  The Court's denial of the earlier motion to dismiss suggested a novel application of the three-factor test in *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003).  To the extent that the Court believes it must complete that *Kremen* analysis here, and needs a more detailed factual predicate to do so, the Court should consider whatever extrinsic preliminary facts it believes is necessary to decide whether IP addresses are "property."  The Court may conduct an evidentiary hearing as to preliminary facts pursuant to *Kremen* or Federal Rule of Evidence 104(a).  *Kremen* itself held that (1) whether something was "a species of property to which conversion applies is a *question of law rather than of adjudicative fact*," and (2) in considering that question, the court could *consider facts outside of the record* to make that determination.  *Id.* at 1034, n.10 (emphasis added).

<u>Finally</u>, if the Court refuses to consider any extrinsic, preliminary facts, the Court must dismiss the Indictment for failing to include enough facts to enable the Court to decide whether the Indictment has sufficiently alleged property, an essential element of wire fraud.  *See United States v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005) ("the indictment's failure to recite an essential element of the charged offense" is a "fatal flaw requiring dismissal"); *United States v.*

*Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (indictments must include all "implied, necessary elements, not present in the statutory language").

## II.   PROCEDURAL HISTORY

A summary of the proceedings thus far will help illustrate why the matter is ripe for decision.

### A.   The Government Relies on Documents from ARIN in Opposition to Defendants' CAN-SPAM Motion

On March 15, 2019, Defendants filed a motion to dismiss the CAN-SPAM counts as being void for vagueness, arguing that the word "registrant" in 18 U.S.C. § 1037(a)(5) was vague.  (Dkt. 69-1.)  In its opposition, the Government cited to materials outside of the Indictment to set forth preliminary facts about IP address allocation and registration,[3] including items published on ARIN's website regarding Registration Services Agreements ("RSAs") and articles published by ARIN on third party websites.[4]  (Dkt. 75 at 9-10.)  Nearly two and a half months after briefing on the motion was over, the Government went further and filed an expert declaration from John Curran, the CEO of ARIN, in support of its opposition without seeking leave of Court.  (Dkt. 107-1.)  It was in that declaration that Mr. Curran, the Government's witness, stated under oath, "*no property right is conferred to recipient*" when an IP number is allocated.  (*Id.* at ¶ 14 (bold italics in original).)  The Court granted Defendants' request to file a counter-declaration from an expert, and Defendants filed a declaration from Marc Lindsey, an IPv4 market advisor.  (Dkt. 116.)  The Government did not seek to cross examine Mr. Lindsey or identify any facts in his declaration that were in dispute.

On February 28, 2020, in its order denying Defendants' motion to dismiss the CAN-

---

[3]   The Government stated, "A brief summary of the history of IP address allocation and registration is helpful to appreciate the fallacy of defendants' argument."  (Dkt. 75 at 9.)

[4] See, e.g., *Guidance from ARIN on Legal Aspects of the Transfer of Internet Protocol Numbers,* available at https://www.americanbar.org/groups/business_law/publications/blt/2013/05/03_edelman/ (published May 31, 2013), cited in Dkt. 154 at 2.

1  SPAM counts, the Court took into account preliminary facts regarding IP addresses and

2  allocation, relying on the ARIN article the Government had cited from the American Bar

3  Association and also information from ARIN's website.  The Court concluded, "A 'registrant'

4  of an IP address is the person or entity who has been assigned the IP address by ARIN or its

5  predecessors, and whose information is stored and listed in ARIN's WhoIs database."  (Dkt.

6  154 at 18.)

7        **B.**      **Defendants Rely on Documents from ARIN and Statements From the**

8             **Government's Expert in Their Motion to Dismiss the Wire Fraud Counts**

9        After the Government offered a declaration in which the ARIN CEO swore that IP

10  addresses were not property, the Court granted the Defendants' under seal application to

11  subpoena documents from ARIN relating to that statement.  Because the documents were

12  relevant to the question of whether IP addresses were property, an essential element of wire

13  fraud, the Court allowed Defendants to wait for the subpoena response before filing the

14  motion to dismiss the wire fraud counts.  (Dkt. 141, 10/24/19 Trans. 66:22-67:22.)

15        As was the case with the word "registrant" at issue in the CAN-SPAM motion, the

16  Indictment refers to IP addresses and netblocks without including specific details about how IP

17  addresses function.  Thus, when Defendants submitted the motion to dismiss the wire fraud

18  counts, Defendants had to rely on evidence outside of the Indictment regarding the

19  characteristics of IP addresses in order to adequately brief the question of whether IP addresses

20  were property.  Defendants assumed they would be permitted to introduce preliminary facts

21  and evidence about the characteristics of IP addresses similar to that which had been submitted

22  and considered in the CAN-SPAM motion.  Accordingly, Defendants relied entirely on (1) the

23  documents from ARIN that had been produced in response to the Court-approved subpoena

24  (Dkt. 149-2), (2) materials from ARIN's website, (3) statements from the declarations of John

25  Curran and Marc Lindsey that were filed with the CAN-SPAM motions (Dkt. 149-1 at 6-11),

26  and (4) statements the Government had made in Court transcripts and filings.

27        The Government did an about-face and claimed it disputed the statement of its own

28  expert that IP addresses were not property.  Having relied on similar evidence to oppose the

CAN-SPAM motion, the Government suddenly argued that the Court could not consider these preliminary facts or any outside evidence when considering a pretrial motion to dismiss. The Court agreed with the Government on that point but, like Defendants, found that the Indictment did not sufficiently describe IP addresses to enable the Court to evaluate whether they were property. The Court denied Defendants' motion but granted Defendants leave to file this brief regarding how the Court should now proceed as to the wire fraud counts.

## C. The Parties Meet and Confer on Undisputed Preliminary Facts Regarding IP Addresses

On order of the Court, the Government met and conferred with Defendants about the preliminary facts regarding IP addresses. The Government identified only a few paragraphs in Mr. Curran and Mr. Lindsey's declaration as being disputed.[5] (Decl. Rim ¶ 2, Exh. A at 1.) Defendants have filed a Notice of Statement of Undisputed Facts ("SUF") concurrently with this motion consolidating in a chart the statements in both experts' declarations to which the Government did not object. With respect to the documents Defendants had submitted as part of the wire fraud motion, the Government did not take a position. Thus, Defendants have concurrently filed a Request for Judicial Notice ("RJN") with respect to those documents, along with an additional Exhibit I.[6]

---

[5]   Specifically, the Government disputed paragraphs 3, 5, 6, 8, 11-14, 18, 22, 25, and 26 of Mr. Linsey's declaration, and paragraphs 14,15,19, and 21 of its witness' declaration. The Government did not provide a basis for the disputes. These paragraphs are omitted from the SUF and are not necessary for the Court's determination of the issues.

[6]   For the Court's convenience, Defendants have included only the pages on which Defendants rely in the exhibits to the RJN. To the extent the Court wishes to consider the whole document, the exhibits are attached in their entirety to the Declaration of Naeun Rim that was filed in support of the prior motion to dismiss the wire fraud counts. (Dkt. 149-2.)

III.   **ARGUMENT**

A.     **Whether IP Addresses Are "Property" Is Subject to the Constitutional Requirement of Fair Notice That Is Unquestionably a Legal Issue for the Court**

The heart of this dispute revolves around the constitutional requirement of fair notice in a criminal case.  The Indictment charges Defendants with committing wire fraud for allegedly obtaining "inactive" IP netblocks and using them without the authorization of the entities to whom they were originally assigned.  For these wire fraud counts to survive as alleged, both the wire fraud statute and the allegations in the Indictment have to pass constitutional muster. With respect to the wire fraud statute, the due process clause of the Fifth Amendment requires statutes to provide "a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 170 L.Ed.2d 650 (2008).  This is an objective standard, not a subjective one—whether a person was on *actual notice* that his conduct was proscribed is not relevant.  *Farrell v. Burke*, 449 F.3d 470, 483 (2d Cir. 2006) (vagueness-as-applies is "objective, not subjective," and "actual notice should not be given decisive weight in answering them"); *United States v. Chamberlain*, No. 14-CR-00316-VC-1, 2015 WL 10096591, at *1 (N.D. Cal. Aug. 27, 2015) (vague-as-applied analysis not a question of "whether the defendant himself had actual notice of the illegality of his conduct").  With respect to the Indictment, the Sixth Amendment guarantees a defendant the fundamental right to be informed of the nature and criminal charges against him.  U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation"); *Gautt v. Lewis*, 489 F.3d 993, 1002-03 (9th Cir. 2007).  The Fifth Amendment also requires that defendants be made only to stand trial for charges that were returned by a grand jury in its indictment.  U.S. Const. amend. V; *Apprendi v. New Jersey,* 530 U.S. 466, 499-500 (2000); *Stirone v. United States,* 361 U.S. 212, 215–18, (1960); *United States v. Aguilar,* 756 F.2d 1418, 1423 (9th Cir.1985).

An indictment serves as the means by which a defendant is given notice of both the crime with which he has been charged and the specific conduct that is alleged to constitute that

1  crime.  *Gautt*, 489 F.3d at 1004.  Thus, it is not enough that the charged statute give sufficient

2  notice of what is prohibited—the indictment too must be sufficiently clear to inform a

3  defendant that the conduct he is accused of constitutes a crime.  *See id.*; *Saathoff*, 708 F. Supp.

4  2d at 1042 (dismissing indictment charging honest services fraud prior to trial as being vague-

5  as-applied where conduct described in indictment was not clearly a violation of the honest

6  services fraud statute).  Together, these constitutional principles prohibit the scenario

7  Defendants face here: not knowing whether what they are charged with in the wire fraud

8  counts sufficiently states the offense of wire fraud.  *See id.*

9        The trouble with the sufficiency of the wire fraud counts in this case starts with the

10  vagueness of the federal fraud statutes—namely words like "property" or "goods," which have

11  long been recognized by the Supreme Court as having a tendency to be ambiguous, particularly

12  as it pertains to intangible objects. *See, e.g., Cleveland v. United States*, 531 U.S. 12, 25 (2000);

13  Dowling (re copyrights).  Rather than striking down the federal fraud statutes as being void for

14  this ambiguity, the Supreme Court has directed courts to *construe the statute in accordance with fair*

15  *notice principles* to determine what does and does not qualify as property.  *Id.*  Thus, if a question

16  arises as to whether an alleged object is "property," it is an issue of statutory construction—a

17  question of law which must be decided by a judge, not a jury.  *Ass'n des Eleveurs de Canards et*

18  *d'Oies du Quebec v. Harris*, 729 F.3d 937, 946 (9th Cir. 2013) (whether a statute gives fair notice is

19  a question of law); *United States v. Vasquez-Ramos*, 531 F.3d 987, 990 (9th Cir. 2008) (statutory

20  construction is question for the court, "not a question of fact").  Accordingly, the seminal cases

21  on this issue often involve appellate courts reviewing errors made by lower courts at the

22  motion to dismiss or jury instruction stage.  *See, e.g., Cleveland*, 531 U.S. at 17 (error on review

23  was district court's denial of "mo[tion] to dismiss the mail fraud counts on the ground that the

24  alleged fraud did not deprive the State of 'property' under § 1341"); *McNally v. United States*, 483

25  U.S. 350, 361 (1987) (error on review was jury instruction on substantive mail fraud that failed

26  to require a finding of property).[7]  For this reason, the Court cannot defer this issue for trial

27

28  ———————————————
[7]   The way the Supreme Court has treated "property" stands in stark contrast to its treatment
of "materiality."  In *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995), the Supreme Court

because it is the Court, not the jury, that must decide whether an IP address is property.  If it finds that IP addresses are not property, the wire fraud counts must be dismissed; and if it finds that they are property, the Court must so instruct the jury.

**B.** **Based on the Undisputed and Indisputable Facts, the Federal Fraud Statutes Do Not Give Fair Notice That IP Addresses Constitute Property**

Because federal crimes are "solely creatures of statute," the Court has directed courts to apply the canons of statutory construction when "assessing the reach" of that statute. *Dowling v. United States*, 473 U.S. 207, 213 (1985); *Liparota v. United States,* 471 U.S. 419, 424 (1985), citing *United States v. Hudson,* 7 Cranch 32 (1812).  In doing so, courts are to consider "language, legislative history, and purpose in order strictly to determine the scope of the conduct the enactment forbids."  *Dowling* , 473 U.S. at 213.

As it pertains to the fair notice requirement, the Court has described "three related manifestations:" (1) the vagueness doctrine, (2) the rule of lenity, and (3) the prohibition on novel construction.  *United States v. Lanier*, 520 U.S. 259, 266 (1997). "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear *at the relevant time* that the defendant's conduct was criminal." *Id.* (emphasis added).  The question in construing the federal fraud statutes has never been whether an alleged item *could now* be considered "property."  To the contrary, in reference to federal fraud statutes, the Supreme Court has reiterated time and time again, "There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *McNally v. United States*, 483 U.S. 350, 360 (1987)  Thus, although the Supreme Court has considered the "property" element of the federal criminal fraud statutes as it applies to intangible objects on more than one occasion (*see Kelly*, *Cleveland*, *Carpenter*, *McNally*, *Dowling*), it

---

overturned a jury conviction for false statement on the basis that it was error for the lower court to decide materiality as a matter of law without submitting the question to the jury.  In contrast, the Court has never held that the question of "property" should have been submitted to a jury—rather, the Court has consistently decided whether the lower court's interpretation of what constituted "property" was correct or not.  This contrast confirms that whether an IP address is "property" is purely a question of law for the Court.

1   has never articulated a multi-factor test for lower courts to apply to decide *substantively* whether

2   something is property.  Rather, due to vagueness concerns inherent in the concept of

3   "property," the Court has only construed intangible rights as property if they have "*long been*

4   *recognized as property.*" *See Cleveland*, 531 U.S. at 13 (2000) (emphasis added), *quoting Carpenter v.*

5   *United States,* 484 U.S. at 26 (1987) (construing confidential business information as property

6   because it "has long been recognized as property").

7         The plain language of the wire fraud statute makes no reference to IP addresses.  Nor is

8   it clear from the word "property" whether that encompasses IP addresses.  Thus, the inquiry

9   turns to (1) how the legislature has treated IP addresses, (2) whether IP addresses have "long

10  been recognized as property" by the pertinent authority, and (3) how courts were treating the

11  issue during the relevant time period.  All of these considerations require the Court to find that

12  an ordinary person would not have been on notice during the time period alleged in the

13  indictment (December 2010 to September 2014) that IP addresses were "property" under the

14  wire fraud statute.

### 1.   Congress Has Expressly Declined to Exercise Authority Over IP Addresses and Long Ago Relinquished That Role to ARIN

17        The Court is familiar with some of this history.  Prior to 1997, various government

18  institutions, including the Defense Advanced Research Projects Agency ("DARPA") and the

19  National Science Foundation ("NSF"), through contract Network Solutions, Inc. ("NSI"), was

20  in charge of the allocation and assignment of IP addresses.  (Dkt. 154 at 4 (CAN-SPAM

21  Order).)  "In 1997, these institutions transferred their duties and responsibilities concerning IP

22  address management and assignment to the newly-founded American Registry of Internet

23  Numbers." (*Id.* at 5.)  ARIN is not a government agency but is a private, non-profit

24  organization that continues to be responsible for managing the allocation and assignment of IP

25  addresses in the United States and the North American Region.  (SUF 4-6.)  Significantly, the

26  transfer of NSF's management over IP addresses to ARIN was considered "another step by

27  the federal government in the continuing *privatization* and commercialization of the Internet"—

28  the goal was to move IP management *away* from government regulation and further towards

becoming a "self-regulating entity."[8] (SUF 4 (emphasis added).) This was in stark contrast to Congress's treatment of telephone numbers. Through the Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (1996), amended the Communications Act, 47 U.S.C. §§ 151 et seq., Congress vested exclusive authority over "all aspects of numbering administration" for telephone numbers in the United States in the Federal Communications Commission ("FCC"), a federal agency. *Sprint Corp. v. F.C.C.*, 331 F.3d 952, 954 (D.C. Cir. 2003); 47 U.S.C. § 251(e)(1). While Congress could have exerted similar authority over IP addresses, it chose not to do so.

Over the years, the internet moved more and more towards privatization, with ARIN continuing to act as the authoritative body when it came to policies pertaining to the assignment of IP addresses. (SUF 10.) Indeed, according to Mr. Curran, federal government agencies follow ARIN's policies, not the other way around. (*Id.*) In 2012, Congress spoke even more clearly. In response to a proposal by the United Nations and other international bodies to increase government control over the Internet, the House of Representatives passed a resolution (with the Senate concurring) (hereafter "Concurrent Resolution") stating, "[I]t is the sense of Congress that the Assistant Secretary of Commerce for Communications and Information . . . should continue working to implement the position of the United States on Internet governance that *clearly articulates the consistent and unequivocal policy of the United States to promote a global Internet free from government control and preserve and advance the successful multi-stakeholder model* that governs the Internet today." H. CON. RES. 127 (emphasis added).[9] The "multi-stakeholder model" refers to the process by which ARIN develops IP resource policy in the North American region in conjunction with ARIN members, the public, and the government.

---

[8]   "Internet Moves Toward Privatization," National Science Foundation News Release 97-046, https://www.nsf.gov/news/news_summ.jsp?cntn_id=102819 (June 24, 1997) (emphasis added) (cited by John Curran in SUF 4).

[9]   House Concurrent Resolution 127/Senate Concurrent Resolution 50, available at https://www.govinfo.gov/content/pkg/BILLS-112hconres127ih/pdf/BILLS-112hconres127ih.pdf, p 3.

1   (RJN Exh. E at 1.)[10] ARIN follows a rigorous open policy process, whereby all of these

2   "stakeholders" in the internet can "submit policies for consideration by the ARIN

3   community"—but it is ultimately ARIN that approves the policies for IP numbers.  Thus, in

4   endorsing the multi-stakeholder model through the Concurrent Resolution and emphasizing

5   that the Internet should be "free from government control," Congress expressly endorsed

6   ARIN as the authority on IP address policy.  Accordingly, in a 2013 article published in the

7   American Bar Association's *Business Law Today*, counsel for ARIN took the position the

8   "*ARIN has the authority to set policy for the IP numbers previously issued* by the U.S. government or

9   contractors acting for the U.S. government." (*Id.* (emphasis added).)

10         As Defendants argued in the original motion to dismiss the wire fraud counts, the

11   Supreme Court case that is most on point is *Dowling*, where the Court considered whether the

12   federal fraud/theft statutes extended to copyrights which, as with IP addresses, have been

13   characterized as "a bundle of exclusive rights to the owner of the copyright" conferred by the

14   Copyright Act. *See* 473 U.S. at 216-17. As part of the Court's analysis of whether a copyright

15   was a property right in the context of the travel fraud statute, the Court considered carefully

16   the history of copyright laws and the great hesitation Congress showed before making

17   copyright infringement a felony.  *Dowling*, 473 U.S. at 225.  That reluctance prompted the

18   Supreme Court to conclude that Congress had intended federal criminal enforcement of

19   copyright laws to be conducted solely through the copyright statutes—it did not intend to

20   bring copyright generally under the broad umbrella of federal fraud.

21         Like in *Dowling*, here, the legislative history shows that Congress has also shown great

22   reluctance with IP addresses—it has hesitated to insert the federal government into the

23   policing or managing of IP addresses at all.  Moreover, Congress also separately passed a

24   criminal statute that expressly invoked IP addresses, 18 U.S.C. § 1037(a)(5), but the purpose

25

26   _____

[10]   Available online at *Guidance from ARIN on Legal Aspects of the Transfer of Internet Protocol*
27   *Numbers,*
     https://www.americanbar.org/groups/business_law/publications/blt/2013/05/03_edelman/
28   (published May 31, 2013) (cited on by the Court in Dkt. 154 at 2).

1   was not to vindicate anyone's "property interest" in the IP address—rather, consistent with

2   Congress's continued deference to ARIN, the conduct that the statute criminalized with

3   respect to IP addresses was *falsely representing oneself to be the registrant or the legitimate successor in*

4   *interest to ARIN*.  *See also Effectiveness and Enforcement of the CAN-SPAM Act: A Report to Congress*,

5   Federal Trade Commission Guide/Report, 2005 WL 3956860, at *24 (describing section

6   1037(a)(5) as criminalizing the act of "contacting the relevant IP registration authority [ARIN]

7   to trick the registration authority into reassigning the address to the spammer").  Thus, far

8   from evincing an intent to bring IP addresses within the ambit of the federal wire fraud

9   statutes, Congress has consistently publicized its position that the authority when it comes to

10  IP addresses rises and falls with ARIN.  Having so imbued ARIN with that authority,

11  Congress's position regarding the nature of the rights that are assigned to an IP addresses

12  holder cannot be separated from ARIN's position—Congress has consistently expressed

13  deference and support for ARIN and its policies, and their stated positions on the matter are

14  therefore one and the same.

15          **2.**     **IP Addresses Have "Long Been Recognized" As *Not Property* By**

16                 **ARIN, the Organization That Administers Polices Pertaining to IP**

17                 **Addresses**

18          As the Court is well aware, ARIN has consistently maintained that IP addresses are not

19  property and emphasized the importance of treating them as a public resource—including

20  during the entire time period at issue in this case between December 2010 to September 2014.

21  (SUF 1.)  ARIN's position in this regard is the same across the board for all IP addresses: to

22  ARIN, no IP address is property, regardless of whether the IP address is subject to a

23  Registration Services Agreement ("RSA"), a Legacy Registration Services Agreement

24  ("LRSA"), or is a legacy IP address with neither an RSA nor an LRSA.  (RJN Exh. E at 3).

25  ARIN's stance is that its current IP address policies state clearly that IP addresses are not

26  property, and that these policies were inherited by legacy holders, even without an executed

27  LRSA.  (*Id.*)

28          The discussion about whether IP addresses are "property" is not simply one of

semantics.  The debate arose in large part due to the uncertainty surrounding the nature of the rights of those who hold legacy IP addresses.  Prior to ARIN's creation, IP address assignment was the wild west—IP addresses were allocated, and rules and rights were neither discussed nor defined:

> To obtain address space from IANA or InterNIC, the requesting organization needed only to issue a written request using a short form text template identifying the organization. If the request was approved, these early recipients received a notice identifying the address space. The notice did not include, incorporate or reference any registration agreement, membership contract or other form of contract terms and conditions.

(SUF 16.)

> Put another way, according to IANA,

> There were no rules prior to ARIN's formation. You first emailed or called Jon Postel and got an assignment emailed back or told to you over the phone. Then with SRI and DOD and NetSol you filled out a simple form, emailed or faxed or mailed it in, and got an assignment back via the same method. None of the assignment paperwork had any rules, and no rules were published at the time.

(Decl. Rim. ¶ 3, Exh. A.)

For those who have an LRSA or RSA with ARIN, the rights are clearer.  As a matter of contract, the IP address holder agrees that the IP address is not property.  According to the RSA and LRSA templates produced by ARIN:

- Since at least June of 2004, ARIN's RSA has contained a provision with the heading "NO PROPERTY RIGHTS" and has expressly required the registrant to agree that IP addresses are "not property (real, personal or intellectual)" and that one does "not acquire any property rights" by virtue of being allocated the IP address. (RJN Exh. B at 3.)

- In October of 2007, ARIN created an LRSA template that contained nearly identical language stating IP addresses are not property.  (RJN Exh. C at 4.)

The dispute thus emerged within the internet community around whether legacy IP addresses were bound by ARIN's policies, including the position that IP addresses are not property.  The critical issue was whether those who had legacy IP addresses could sell them to third parties without ARIN's knowledge or consent, and without requiring the buyer to comply with ARIN's policies.  (RJN Exh. E at 2.)  ARIN's position was that legacy holders could not do so without ARIN's authority and argued that treating IP addresses as a property right could be disastrous for the internet, including by leading to hoarding—the creation of artificial

scarcity—of IP addresses. (*Id.*) In a 2010 publication made available on its website, the FCC echoed ARIN's stance: "When a registry allocates a number to an entity, it is giving that entity the ability to use that number; *no property right is conferred to the recipient*." (RJN Exh. D at 5 (emphasis added).)[11]   Likewise, the government wrote a letter supporting ARIN's position in a bankruptcy action and warned that "the recognition of a property right in Internet Numbers would imperil the cooperative basis for Internet use, and potentially lead to hoarding and speculation in Internet Numbers."  (RJN Exh. H at 3.) Some, like the then General Counsel of NSF Larry Rudolph (in his private capacity), took the position that ARIN had no oversight over legacy IP addresses unless there was a valid LRSA.  (RJN Exh. E at 3.)  In response to Mr. Rudolph's position, the National Telecommunications and Information Administration ("NTIA"), an agency within the Department of Commerce that took over NSF's role as the federal agency liaison to ARIN, issued an official statement on December 3, 2012, in which it stated, "The [United States Government] participates in the development of and is supportive of the policies, processes, and procedures agreed upon by the Internet technical community through ARIN."[12]  In 2013, ARIN published articles in third party publications such as American Bar Association's *Business Law Today* and *Bloomberg BNA* explaining that IP addresses are not property rights, regardless of whether there was an LRSA or RSA, and including legal justification for that position.  (RJN, Exhs. E and F.)

What's critical for the purposes of a fair notice analysis is that regardless of whether an IP address is active or inactive, whether the IP address holder has a contract with ARIN or not, none have "long been recognized as property. " Yet that is required for an intangible object to be consider "property" for the purposes of criminal wire fraud.  At best, the legacy IP address holders were afforded a set of rights that were never clear.  Those who signed the RSAs and

---

[11]  Cannon, Robert, *Potential Impacts on Communications from IPv4 Exhaustion & IPv6 Transition*, FCC Staff Working Paper 3, (Dec. 2010), available at
https://apps.fcc.gov/edocs_public/attachmatch/DOC-303870A1.pdf.

[12]  Available at https://www.ntia.doc.gov/blog/2012/united-states-government-s-internet-protocol-numbering-principles

LRSAs were under clear contractual provisions stating under no uncertain terms that they were receiving no property right in an allocated IP addresses.  When the authoritative voice on IP address policy aggressively and publicly takes the position that IP addresses are not and have never been property, and when federal agencies and even foreign governments voice their support for that stance, a person of ordinary intelligence would not be a on notice that IP addresses could constitute "property" under a criminal statute.  More importantly, a court should be hesitant to be the first to determine definitively that IP addresses are a "property" right at the urging of prosecutors looking to catch a few convictions with little regard for the legitimate policy interests that inform ARIN's position that IP addresses are not property.

**C.   Applying *Kremen* Would Violate the Prohibition Against Novel Construction and Deviate from the Ninth Circuit's Treatment of "Property" In the Context of Federal Fraud Statutes**

The Court suggests in its order denying wire fraud motions that it believes it is appropriate to apply the three-part test the Ninth Circuit relied on in *Kremen*, a civil tort case in which the question was whether domain names were considered "property" for the tort of conversion under California law. ( Order at 8.)  But no court has applied the *Kremen* factors to determine whether an IP address is property under the criminal wire fraud statute.  If the Court were to apply the *Kremen* test, it would be doing so as a matter of first impression.  This is expressly prohibited by fair notice principles.  "Due process does not permit a defendant to be tried under a novel construction of a criminal statute in a case where 'neither the statute nor any prior judicial decision has fairly disclosed' the charged conduct to be within its scope." *Saathoff*, 708 F. Supp. 2d at 1036 (citing *Lanier*, 520 U.S. at 266, 117 S.Ct. 1219).  Novel constructions not only violate the fair notice doctrine, they also violate the *ex post* facto clause, which "bars legislatures from making substantive criminal offense retroactive." *Lanier*, 520 U.S. 259, 266-67.

The question before the Court is one of statutory construction.  It is not whether IP addresses can be construed to be property under a novel legal theory.  It is whether 18 U.S.C. § 1343 puts the ordinary person of average intelligence on notice as to what is prohibited.

1    Within that framework, the question is whether IP addresses have "*long been recognized as*
2    *property*," not whether they *could* be construed to meet that definition under California law. *See*
3    *Cleveland*, 531 U.S. at 13 (emphasis added), *quoting Carpenter v. United States,* 484 U.S. at 26 (1987)
4    (construing confidential business information as property because it "has long been recognized
5    as property").

6         Some circuits have held that courts are to look to state law when considering whether
7    something is "property" under the mail fraud statute.  *See, e.g., United States v. Shotts*, 145 F.3d
8    1289, 1294 (11th Cir. 1998); *Borre v. United States*, 940 F.2d 215, 220 (7th Cir. 1991).  But in
9    neither of these cases (which were decided prior to *Cleveland*) did the courts conduct a first-run
10   analysis of whether the intangible item in question was property under state law principles.
11   Rather, they were both able to find clear, established answers.  In *Shotts*, the Court found that a
12   business license was not "property" under Alabama law; in *Borre*, the Court found that a
13   television franchise was "property" under Illinois law.  *Id.* As the Court noted in *Shotts*, the odd
14   result of looking to state law to determine the definition of property is that "what constitutes
15   mail fraud apparently is susceptible to fifty different interpretations." *Id.*  at 1294.  Perhaps for
16   that reason, the Ninth Circuit has not adopted this approach and has limited itself to *federal case*
17   *law* when conducting this analysis.  *Id.* at 1295, n.7 (unlike the Eleventh and Seventh Circuits,
18   the Ninth Circuit has "looked to federal law for that answer").  *See also e.g., United States v.*
19   *Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992) (relying on *Cleveland, Carpenter* and *McNally* to
20   conclude that a manufacturer's interest in the destination of its products had not "long been
21   recognized as property"); *United States v. Kato*, 878 F.2d 267, 269 (9th Cir. 1989) (relying on
22   *McNally, Carpenter*, and other Ninth Circuit cases to determine that a pilot's license is not
23   property).  Thus, regardless of what the law is in other circuits, the Ninth Circuit has never
24   indicated that it is appropriate to apply state law.

25         In any case, if the Court has reached the question of whether IP addresses meet the
26   *Kremen* factors, the inquiry is already over: the Court has only reached that question because
27   there is no indication that IP addresses have "long been recognized as property" by any statute,
28   authority, or case, as required by *Cleveland*.  Indeed, the defense is aware of no case under

1   California law that has held that IP addresses are property.  On California case held that

2   telephone numbers were not property for the purpose of conversion.  *See Rotstein v. Cable &*

3   *Wireless, Inc.,* No. G027549, 2002 WL 691458, at *6 (Cal. Ct. App. Apr. 24, 2002).  But none

4   expressly addressed IP addresses in the context of California property law.  The only case that

5   may have considered a related issue within the alleged time frame is a Delaware bankruptcy

6   case, *In re Nortel Networks Inc.*, Case No. 09-10138-CCS (Bankr. D. Del.).  In *Nortel*, a

7   bankruptcy court approved the debtor's motion to sell Nortel's "rights *in*" approximately

8   666,624 legacy IPv4 numbers to Microsoft, including Nortel's "exclusive right to *use*" the

9   numbers.  (*See id.* Docket No. 5315 (Sale Order) ¶¶  G, P (emphasis added).  Notably, *Nortel*

10  did not hold that IP addresses were property.  To the contrary, after ARIN intervened, the

11  parties entered into an amended purchase agreement that expressly clarified that what was

12  being transferred was *not* an "ownership interest" in IP addresses, but rather the right to use IP

13  addresses:

14

15      SECTION 2.1      ~~Section 2.1.~~Purchase and Sale.

16          2.1.1    Legacy Number Blocks.  Subject to the terms and conditions of this Agreement, at
        the Closing (with regard to the Initial Legacy Numbers) and the Subsequent Transfer Dates (with
17      regard to the Subsequent Legacy Numbers), the Purchaser shall purchase from the Seller, and the
        Seller shall sell, transfer and assign to the Purchaser, on an "as is" and "where is" basis and to the
18      fullest extent permitted under Section 363(f) of the Bankruptcy Code, ~~all of the~~ Seller's ~~right, title~~
        ~~and interest~~Rights in and to the Legacy Number Blocks free and clear of all Liens and Claims
19      (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the
        Purchaser or any of its Affiliates).  Upon such sale, transfer and assignment, the Legacy Number
20      Blocks shall be subject to terms of the LRSA.

21
            "Seller's Rights" means Seller's exclusive right to use the Legacy Numbers Blocks,
22      Seller's exclusive right to transfer the Legacy Number Blocks, and any other legal and equitable
        rights that Seller may have in and to, the Legacy Number Blocks.
23

24

25  (*See id.* Dkt. 5252-4 at 8 (Redline of Sale Agreement)) (RJN Exh. I.)  As is evident, the phrase

26  "all of the Seller's right, title and interest" was crossed out and replaced with the word

27  "Rights."  A definition of the "Sellers Rights" was added to reflect the language of ARIN

28  LRSA agreements—that what was conferred on the Buyer was an "exclusive right to use" IP

1  addresses, but *not a property right*.  (*Id.*)

2      Thus, to the extent that state law is relevant to the question of fair notice at all, at best, it

3  can only inform one as to whether an IP address had "long been recognized" as a property

4  right under tort law.  But it is not appropriate to consider the issue as a matter of first

5  impression.  Thus, the *Kremen* factors are irrelevant, and the Court need not consider them.

6      If the Court believes it must apply the *Kremen* factors, the factual record is still sufficient

7  for the Court to conclude that IP addresses are not property.  Under *Kremen*, "First, there must

8  be an interest capable of precise definition; second, it must be capable of exclusive possession

9  or control; and third, the putative owner must have established a legitimate claim to

10  exclusivity." 337 F.3d at 1030.[13]  Already on the first prong, with respect to legacy IP addresses,

11  there is no interest "capable of precise definition." It remains unclear today what the rights of

12  legacy holders are.  ARIN has stated that it has the power to "reclaim[] addresses if the

13  recipient's need no longer exists," and legacy holders cannot transfer IP addresses without

14  ARIN's approval.  (RJN Exh. E at 3.)  These statements also call into question whether the IP

15  address is ever "capable of exclusive possession or control." *Kremen*, 337 F.3d at 1030.  If

16  ARIN can revoke the IP address any time, that suggests that legacy holders do not have

17  exclusive possession or control consistent with a property right.  And if a legacy holder has

18  chosen not to sign an LRSA that states it is the exclusive registrant with the right to use the IP

19  address, the legacy holder cannot say that it has "established a legitimate claim to exclusivity"

20  under the *Kremen* test.

21      **D.    The Court May Consider Extrinsic Preliminary Facts to Decide Questions**

22           **of Law**

23      When considering the above matters, the Court has clear authority under Federal Rule

24  of Evidence 104(a) to consider extrinsic preliminary facts.  *San Diego Gas & Elec. Co.*, No.

---

26  [13]  The wording of the test itself proves Defendants' point that it evades the fair notice
27  question: if one is looking at whether something is *capable* of precise definition or of exclusive
    possession, then one is recognizing that no such definition or exclusive possession right has yet
28  been provided for under law.

1    06CR0065 DMS, 2009 WL 4824489, at *4 (S.D. Cal. Aug. 31, 2009).  In making "preliminary

2    fact" determinations, "the court is not bound by the rules of evidence except those with

3    respect to privileges." *Id.*  It is common for courts to make findings of fact, even when

4    disputed, if doing so is necessary to decide a question of law, "as long as the court's findings on

5    the motion do not invade the province of the ultimate finder of fact." *United States v. Shortt*

6    *Accountancy Corp.,* 785 F.2d 1448, 1452 (9th Cir.1986).  Indeed, in *Kremen*, the Ninth Circuit took

7    judicial notice of facts extrinsic to the record—namely how the Domain Name System "DNS"

8    functioned—to decide the whether domain names were property.  337 F.3d at 1032-33.  The

9    court rejected the argument of one of the defendants who complained that the court could not

10   consider facts regarding the characteristics of DNS because they were outside of the record:

> Network Solutions complains about the absence of specific record evidence regarding the DNS. ***But whether domain names are a species of property to which conversion applies is a question of law rather than of adjudicative fact; we may consider record evidence but need not so restrict ourselves.*** See Fed.R.Evid. 201(a) advisory committee notes. Network Solutions has had ample opportunity to contest the nature of the DNS in both its answering brief on appeal and its response to amici. It has raised no material point of dispute.

*Id.* at 1033, n.10 (emphasis added).

        The Court's analysis of the IP addresses here will be similar to the *Kremen* court's analysis

in that the Court need only consider the legislative history and general mechanics of IP

addresses and IP address registration, facts which are largely undisputed between the parties

and recounted in the concurrently filed SUF. Most importantly, these facts are limited and

distinct from those that the jury would consider at trial.  The Court can *assume all facts in the*

*Indictment are true*, and need only consider preliminary facts regarding how IP addresses function

and are allocated, complex technical topics outside the jury's purview.  At trial, Defendants

would challenge the truth of the allegations in the Indictment regarding Defendants' conduct

connected with the obtaining and use of IP addresses.

        The question of law the Court is being asked to answer here is not akin to the factual

questions it issue in the *Yang, Kail,* and *Franklin* decisions, authorities the Court cited in its

Order in declining to consider extrinsic evidence. (Dkt. 160 at 6.) In *Yang*, defendants were

charged with filing fraudulent immigration forms and identity theft. *United States v. Yang*, No. 16-CR-00334-LHK-1, 2019 WL 5684527, at *1-2 (N.D. Cal. Nov. 1, 2019). Yang's motions to dismiss asked the court to take judicial notice of a small portion of the allegedly fraudulent forms and supporting documents and determine that said forms were not signed under penalty of perjury. *Id.* at *4. This was clearly evidence that contradicted the charges in the indictment.

In *Kail*, the defendant was charged with mail, wire, and honest services fraud, in connection with taking kickbacks as a Netflix procurement officer.  Kail argued in a motion to dismiss that the indictment did not allege economic harm to Netflix, an element that defendant contended was required, and requested the court to take judicial notice of several search warrant affidavits and civil interrogatories and responses which, purportedly, showed the indictment's failure to state an offense. *United States v. Kail*, No. 18-cr-00172-BLF-1, 2018 WL 6511154, at *1-2 (N.D. Cal. Dec. 11, 2018). Much like in *Yang*, the defendant was asking the court in a pretrial motion to make factual findings that were not related to a matter of law, and just as in *Yang*, the *Kail* court declined to do so. *Id.* at *2.

Lastly, the defendants in *Franklin* were charged with identity theft via the use of counterfeit credit and debit cards and IDs. *United States v. Franklin*, No. 1:15-cr-00242-BLW, 2016 WL 4033105, at *1 (D. Idaho, July 27, 2016). Defendant Franklin moved to dismiss the indictment arguing that the grand jury was not presented sufficient evidence on the factual issue of whether he had the mens rea necessary for the offence. He asked the court to review the grand jury transcript, which he contended used only the word "they" to describe the acts of both he and his coconspirator, thus making it ambiguous if Franklin actually knowingly possessed the offending cards and fake IDs. *Id.* at *2.  The court denied the motion finding that the indictment put defendant on notice that he allegedly possessed the requisite knowledge, an issue that was ultimately a matter for the jury to decide at trial.

There are stark differences between these three cases and the instant one.  The defendants in *Yang*, *Kail*, and *Franklin* asked their respective courts to resolve central factual allegations in their respective cases that were jury questions.  Defendants here are not asking the Court to make factual determinations of whether their conduct was part of a scheme to

defraud, whether their conduct caused economic harm, or whether they had the necessary *mens rea* for the fraud offense; Defendants are not asking this Court to determine any issue that will be put to the jury.  Rather, Defendants are asking the court to decide whether the alleged scheme in their indictment as a matter of law was directed at obtaining "property" as that term is used in the wire fraud statute.  The problem Defendants are raising is "not that the government failed to prove an element of the crime, but that it failed to comply with the requirements of the Constitution."  *United States v. Tsinhnahijinnie*, 112 F.3d 988, 992 (9th Cir. 1997).

### E.   If the Court Does Not Wish to Consider Extrinsic Preliminary Facts, the Indictment Must Be Dismissed for Lack of Fair Notice

In the order denying Defendants' wire fraud motion, the Court held, "Here, the Indictment does not provide facts necessary to adequately assess how IP addresses assigned prior to the creation of ARIN function with reference to traditional principles of property law." (Dkt. 160 at 7.)  To the extent the Court continues to take the position that it cannot consider preliminary facts, if the Indictment does not contain enough facts for the Court to be able to determine whether or not an IP address is property, *then the Indictment does not give Defendants sufficient notice of whether they have been charged with a crime.*

When determining whether defendants have received fair notice of the charges against them, courts must begin by analyzing the content of the charging document. *Gautt*, 489 F.3d at 1003.  While it is generally sufficient for an indictment to track the words of the statute charged, where an element of a statute has a "vagueness problem," as is the case with "property," then "a valid indictment must add more specific allegations to give defendants fair warning of the crimes with which they are charged." *Saathoff*, 708 F. Supp. at 1020 (applying the same as to honest services fraud), *citing United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir.1999) (necessary elements not present in the statutory language must be included in an indictment).  "It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it

1   must state the species,—it must descend to particulars." *Russell v. United States*, 369 U.S. 749,

2   764–66, (1962). Put another way, in the case of wire fraud, it is not enough for an indictment

3   to allege the generic term "property"—it must specify what that property is, and the minimum

4   facts to enable the Court to determine whether the item alleged is in fact property.

5       Here, the generic term in the wire fraud statute is "property," and the only particulars

6   the Indictment provides is its reference to IP netblocks, or as the Court has now inferred, the

7   right to use them. The Indictment does not explain in detail the characteristics of IP netblocks,

8   how they are assigned, how they are transferred, or how they are used. It describes the IP

9   netblocks as "inactive" but does not explain what that means. On its face, the Indictment does

10  not set forth facts necessary to determine the nature of rights assigned the entities alleged to be

11  the holders of the IP addresses. Indeed, the Court stated just that: "Limiting itself to the four

12  corners of the Indictment, the Court is unable to determine whether the IP netblocks at issue

13  in the Indictment constitute 'property' for the purposes of the wire fraud statute at this time."

14  (Dkt. 160 at 9.) This deficiency is fatal to the Indictment, which at minimum must "furnish the

15  defendant with a sufficient description of the charges against him to enable him . . . *to inform the*

16  *court of the facts alleged so that it can determine the sufficiency of the charge*." *United States v. Cecil*, 608 F.3d

17  1294, 1297 (9th Cir. 1979) (emphasis added). Thus, if the Court has concluded that is bound by

18  the four corners of the Indictment, the absence of these facts requires dismissal of the wire

19  fraud counts for inadequate notice and failure to allege the necessary element of property. An

20  "indictment's failure to recite an essential element of the charged offense" is a "fatal flaw

21  requiring dismissal." *United States v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005). In a criminal

22  case, when notice is deficient at the outset, subsequent clarifications through the

23  "triumvirate—the evidence, the jury instructions, and the closing argument"—cannot cure the

24  constitutional defect. *Gautt*, 489 F.3d at 1005.

25      Finally, the Indictment is vague as to whether it is alleging the property to be  IP

26  addresses or  the right to use IP addresses. While the Court seems to have inferred that the

27  alleged property must be the "right to use" the IP addresses in order to connect the alleged

28

MEMORANDUM OF POINTS AND AUTHORITIES

property to the alleged deceit (the Letter of Agency),[14] the Indictment does not  specify which of the two is the "property" that Defendants allegedly sought to obtain.  This is critical because there is no way to know whether the Grand Jury indicted on the theory that Defendants obtained property (1) when they allegedly purchased the IP addresses from Daniel Dye or (2) when they allegedly used the LOAs to announce them.  The "right to use" something does not comport with a common understanding of what falls under "property."

The concept is even more confusing where the IP netblocks are alleged to have been "inactive"—which presumably means they were not being used by the alleged IP address holder.[15]  If the property right is the *right to use* the IP address instead of the IP address itself, and IP addresses in question were allegedly *not in use* by the legacy holder, that raises the separate question of whether an unused right-to-use can be considered a property right at all. In this and many other ways, the sparse details in the Indictment as to IP addresses leave the Court and Defendants uncertain as to the nature of the property right alleged.  The Indictment fails to state enough facts to enable the Court to determine whether IP addresses or the right to use them are "property."  If the Court cannot consider extrinsic facts to evaluate the issue, the wire fraud counts must be dismissed for lack of sufficiency.

## IV.    CONCLUSION

The Court is aware of overwhelming, undisputed, and indisputable evidence that ARIN, the authority over IP addresses, has taken the position that IP addresses are not property.  In the interest of judicial economy and conservation of jury time, the Court should consider this evidence and decide prior to trial that, in the absence of a property right in IP addresses that

---

[14]  "A fair reading of the Indictment conveys that the Defendants are charged with depriving the legacy IP registrants of their right to use the subject IP netblocks by deceptive means, including letters sent to hosting companies and subsequent efforts to conceal the scheme, and with the object of using the IP netblocks to send spam." (Dkt. 160 at 15.)

[15]  Again, Defendants are forced to infer this because, as the Court noted, the Indictment is not clear on its face as to "what it means for an IP address to be active or inactive." (Dkt. 160 at 6.)

1   has "long been recognized," the Court must dismiss the  wire fraud counts as a matter of law.

2                                    Respectfully submitted,

3   DATED:  May 18, 2020              Gary S. Lincenberg
                                      Naeun Rim
4                                     Bird, Marella, Boxer, Wolpert, Nessim,
5                                     Drooks, Lincenberg & Rhow, P.C.

6

7                                By:  _____
                                          *s/ Naeun Rim*
8                                         Naeun Rim
                                     Attorneys for Petr Pacas
9

10  DATED:  May 18, 2020              David W. Wiechert
                                      Jessica C. Munk
11                                    William J. Migler
                                      Law Office of David W. Wiechert
12

13                               By:  _____
                                          *s/ David W. Wiechert*
14                                        David W. Wiechert
15                                   Attorneys for Jacob Bychak

16  DATED:  May 18, 2020              Randy K. Jones
                                      Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
17

18                               By:  _____
                                          *s/ Randy K. Jones*
19                                        Randy K. Jones
20                                   Attorney for Mark Manoogian

21  DATED:  May 18, 2020              Whitney Z. Bernstein
                                      Thomas H. Bienert, Jr.
22                                    James Riddet
                                      Bienert, Miller & Katzman, PLC
23

24                               By:  _____
                                          *s/ Whitney Z. Bernstein*
25                                        Whitney Z. Bernstein
26                                   Attorneys for Mohammed Abdul Qayyum

27

28

Case No. 3:18-cr-04683-GPC
MEMORANDUM OF POINTS AND AUTHORITIES

## <u>CERTIFICATE OF AUTHORIZATION</u>
## <u>TO SIGN ELECTRONIC SIGNATURE</u>

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures of the United States District Court for the Southern District of California, I certify that the content of this document is acceptable to counsel for the Defendants and that I have obtained authorization from Randy K. Jones, David W. Wiechert, and Whitney Z. Bernstein to affix their electronic signatures to this document.

Respectfully submitted,

DATED:  May 18, 2020

Gary S. Lincenberg
Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:  _____*s/ Naeun Rim*_____
Naeun Rim
Attorneys for Petr Pacas

**<u>CERTIFICATE OF SERVICE</u>**

Counsel for Defendants certify that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

Sabrina L. Feve

Assistant U.S. Attorney

sabrina.feve@usdoj.gov


Melanie K. Pierson

Assistance U.S. Attorney

melanie.pierson@usdoj.gov


Respectfully submitted,

DATED: May 18, 2020

Gary S. Lincenberg
Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By: _____*s/ Naeun Rim*_____
Naeun Rim
Attorneys for Petr Pacas