Gary S. Lincenberg - SBN 123058
  glincenberg@birdmarella.com
Naeun Rim - SBN 263558
  nrim@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

*Attorneys for Petr Pacas*

David W. Wiechert - SBN 94607
  dwiechert@aol.com
Jessica C. Munk - SBN 238832
  jessica@wmgattorneys.com
William J. Migler - SBN 318518
  william@wmgattorneys.com
WIECHERT, MUNK & GOLDSTEIN,
PC
27136 Paseo Espada, Suite B1123
San Juan Capistrano, California 92675
Telephone: (949) 361-2822

*Attorneys for Jacob Bychak*

Randy K. Jones - SBN 141711
  rkjones@mintz.com
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
Telephone: (858) 314-1510

*Attorney for Mark Manoogian*

Whitney Z. Bernstein - SBN 304917
  wbernstein@bmkattorneys.com
Thomas H. Bienert, Jr. - SBN 135311
  tbienert@bmkattorneys.com
James Riddet – SBN 39826
  jriddet@bmkattorneys.com
BIENERT | KATZMAN PC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700

*Attorneys for Mohammed Abdul Qayyum*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 3:18-cr-04683-GPC |
|---|---|
| Plaintiff, | **DEFENDANTS' JOINT REQUEST FOR JUDICIAL NOTICE** |
| vs. | Date: June 26, 2020 |
| JACOB BYCHAK, MARK MANOOGIAN, MOHAMMED ABDUL QAYYUM, AND PETR PACAS, | Time: 2:30 p.m. Crtrm.: 2D |
| Defendants. | Assigned to Hon. Gonzalo P. Curiel |

Defendants Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum, and Petr Pacas, ("Defendants") respectfully request that the Court take judicial notice, pursuant to Federal Rules of Evidence ("Rule") 201(b), of the following documents attached as exhibits A through I.

1.      Attached as **Exhibit A** is a true and correct copy of an excerpt of a Registry Service Agreement ("RSA") template dated March 10, 2011, by American Registry for Internet Numbers, Ltd ("ARIN"), produced to Defendants by ARIN as Bates numbers ARIN-BYCHAK 0096, with emphasis added in yellow.

2.      Attached as **Exhibit B** is a true and correct copy of an excerpt of an RSA template dated June 18, 2004, produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0053, with emphasis added in yellow.

3.      Attached as **Exhibit C** is a true and correct copy of an excerpt of an RSA template dated October 31, 2007, by ARIN and produced to Pacas as Bates numbers ARIN_BYCHAK_0120-123, with emphasis added in yellow.

4.      Attached as **Exhibit D** is a true and correct copy of an excerpt of a Federal Communications Commission ("FCC") Staff Working Paper by Robert Cannon and produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0280, with emphasis added in yellow.

5.      Attached as **Exhibit E** is a true and correct copy of an excerpt of an article entitled "Guidance from ARIN on Legal Aspects of the Transfer of Internet Protocol Numbers" published in *Business Law Today* and produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0188-192, with emphasis added in yellow.

6.      Attached as **Exhibit F** is a true and correct copy of an excerpt of an article entitled "Internet Protocol Numbers and the American Registry for Internet Numbers..." published in *Bloomberg BNA* and produced to Defendants by ARIN as Bates numbers ARIN_BYCHAK_0193-197, with emphasis added in yellow.

7.      Attached as **Exhibit G** is a true and correct copy of an excerpt of a letter from the National Telecommunications and Information Administration and produced to

1  Defendants by ARIN as Bates numbers ARIN_BYCHAK_0001-02, with emphasis

2  added in yellow.

3  8.      Attached as **Exhibit H** is a true and correct copy of an excerpt of a letter from

4  Canada's Department of Industry regarding Case No. 09-10138 (KG) and produced to

5  Defendants by ARIN as Bates numbers ARIN_BYCHAK_0269-271, with emphasis

6  added in yellow.

7  9.      Attached as **Exhibit I** is a true and correct copy of an excerpt from a Blackline

8  Amended Purchase Agreement filed by the parties in *In re Nortel Networks Inc.*, Case No.

9  09-10138-CCS (Bankr. D. Del.) as Dkt. 5254-4.

10              <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

11          Pursuant to Federal Rule of Evidence 201(b), a court may notice an adjudicative

12  fact if it is "not subject to reasonable dispute."  A fact is "not subject to reasonable

13  dispute" if it is "generally known," or "can be accurately and readily determined from

14  sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)-(2).

15  See *Stiefel v. Bechtel Corp.,* 497 F. Supp. 2d 1138, 1144 (S.D. Cal. 2007) (Facts are not

16  "subject to reasonable dispute" when "they are generally known in the

17  community….").  A court shall take judicial notice of a judicially noticeable fact "if

18  requested by a party and supplied with the necessary information."  Fed. R. Evid.

19  201(d).  "A party is entitled upon timely request to an opportunity to be heard as to the

20  propriety of taking judicial notice and the tenor of the matter noticed."  Fed. R. Evid.

21  201(e).

22          A Court may take judicial notice of items like public notices, decisions,

23  government documents, and other materials of administrative agencies, including

24  documents available from reliable sources on the internet.  See *Papai v. Harbor Tug &*

25  *Barge Co.*, 67 F.3d 203, 207 n.5 (9th Cir.1995) ("Judicial notice is properly taken of

26  orders and decisions made by other courts and administrative agencies."), *rev'd on other*

27  *grounds*, 520 U.S. 548 (1997); *Barrera v. Comcast Holdings Corp.*, No. 14-cv-00343-THE,

28  2014 WL 1942829, n.1 (N.D. Cal. May 12, 2014) (granting request for judicial notice of

FCC docket materials indicating FCC sought public comment on petition); *Robinson v. Mortgage Elec. Registration Sys.*, No. CV 19-2185 PSG (ASx), 2019 WL 2491550, at *7 (C.D. Cal. June 14, 2019) (Court "can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet.'").

In addition, Courts routinely take judicial notice on press release documents and published articles provided that the authenticity of the documents is not in dispute.  *See, e.g.*, *Patel v. Parnes*, 253 F.R.D. 531, 547 (C.D. Cal. 2008); *In re American Funds Securities Litigation*, 556 F. Supp. 2d 1100, 1107 (C.D. Cal. 2008); *Lane v. Page*, 649 F. Supp. 2d 1256, 1300 (D.N.M. 2009).

Here, meeting the test enunciated in Rule 201, each of the facts for which the Defendants request the Court take judicial notice are either generally known to the community or may be accurately and readily determined by sources whose accuracy cannot reasonably be questioned.  For example, in regards to **Exhibits A-C**, Registry Service Agreements produced by ARIN, it is generally known, especially in the internet marketing community, that ARIN is the controlling authority when it comes to the administration of Internet Protocol addresses.  Likewise, **Exhibit E**, an article entitled "Guidance from ARIN on Legal Aspects of the Transfer of Internet Protocol Numbers" published in *Business Law Today*, and **Exhibit F**, an article entitled "Internet Protocol Numbers and the American Registry for Internet Numbers..." published in *Bloomberg BNA,* are also articles written by ARIN in third-party publications regarding IP addresses.  Indeed, courts have taken judicial notice of ARIN's policies and statements regarding IP addresses before, including this Court.  *See United States v. Bychak*, 18-CR-4683 GPC (Dkt. 154 at 3-4) (relying on an online version Exhibit E and excerpts from ARIN's website); *Global Naps, Inc. v. Verizon New Eng., Inc.*, No. 02-12489-RWZ, 2015 WL 12781223 at 16 n.1 (D. Mass. Mar. 10, 2015) (taking judicial notice of ARIN's policy that "if a company goes out of business, regardless of the reason, the point of contact (POC) listed for the number resource does not have the authority to sell, transfer, assign, or give the number resource to any other person or

1    organization.").

2        In addition, **Exhibit D**, an FCC Staff Working Paper, and **Exhibit G,** a letter

3    from the National Telecommunications and Information Administration, are

4    publications from federal agencies. **Exhibit H** is a letter from Canada's Department of

5    Industry regarding Canada's position on whether IP addresses are property.  These

6    exhibits are subject to judicial notice because they contain facts that are accurately and

7    readily determined from sources whose accuracy cannot reasonably be questioned.  *See*

8    *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (Public records and

9    government documents are generally considered "not to be subject to reasonable

10   dispute."); *Moore v. Verizon Commc'n Inc.*, No. C 09-1823 SBA, 2010 WL 361987 (N.D.

11   Cal. Sept. 10, 2010) (taking judicial notice of decisions and policy statements of the

12   Federal Communications Commission.); *see also Pension Benefit Guar. Corp. v. White*

13   *Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993) (Courts have defined a public

14   record to include letter decisions of government agencies, and published reports of

15   administrative bodies).

16       Finally, **Exhibit I** is an excerpt from a Blackline Amended Purchase Agreement

17   filed by the parties in *In re Nortel Networks Inc.*, Case No. 09-10138-CCS (Bankr. D.

18   Del.) as Dkt. 5254-4.  This exhibit is subject to judicial notice because it is a matter of

19   public record that was filed on PACER. *United States v. Raygoza-Garcia*, 902 F.3d 994,

20   1001 (9th Cir. 2018) ("A court may take judicial notice of undisputed matters of public

21   record, which may include court records available through PACER").

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1    For the foregoing reasons, Defendants Jacob Bychak, Mark Manoogian,

2  Mohammed Abdul Qayyum, and Petr Pacas hereby requests that the Court take judicial

3  notice of Exhibits A through I.

4

5  DATED:  May 18, 2020                Gary S. Lincenberg
                                       Naeun Rim
6                                      Bird, Marella, Boxer, Wolpert, Nessim,
                                       Drooks, Lincenberg & Rhow, P.C.
7

8                                      By:      _s/ Naeun Rim_____
                                                    Naeun Rim
9                                           Attorneys for Petr Pacas

10

11  DATED:  May 18, 2020               David W. Wiechert
                                       Jessica C. Munk
12                                     William J. Migler
                                       Wiechert, Munk & Goldstein, PC
13

14                                     By:      _s/ David W. Wiechert_____
                                                    David W. Wiechert
15                                          Attorneys for Jacob Bychak

16  DATED:  May 18, 2020               Whitney Z. Bernstein
                                       Thomas H. Bienert, Jr.
17                                     James Riddet
                                       BIENERT | KATZMAN PC
18

19                                     By:      _s/ Whitney Z. Bernstein_____
                                                    Whitney Z. Bernstein
20                                          Attorneys for Mohammed Abdul Qayyum

21

22  DATED:  May 18, 2020               Randy K. Jones
                                       Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,
23                                     P.C.

24                                     By:      _s/ Randy K. Jones_____
                                                    Randy K. Jones
25                                          Attorney for Mark Manoogian

26

27

28

## <u>CERTIFICATE OF AUTHORIZATION</u>
## <u>TO SIGN ELECTRONIC SIGNATURE</u>

Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative Policies and Procedures of the United States District Court for the Southern District of California, I certify that the content of this document is acceptable to counsel for the Defendants and that I have obtained authorization from Randy K. Jones, David W. Wiechert, and Whitney Z. Bernstein to affix their electronic signatures to this document.

Respectfully submitted,

DATED:  May 18, 2020

Gary S. Lincenberg
Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:    *s/ Naeun Rim*
_____
Naeun Rim
Attorneys for Petr Pacas

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Defendants certify that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

Sabrina L. Feve

Assistant U.S. Attorney

sabrina.feve@usdoj.gov

Melanie K. Pierson

Assistance U.S. Attorney

melanie.pierson@usdoj.gov

Respectfully submitted,

DATED:  May 18, 2020

Gary S. Lincenberg
Naeun Rim
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By:  _____*s/ Naeun Rim*_____
Naeun Rim
Attorneys for Petr Pacas

8

DEFENDANTS' JOINT REQUEST FOR JUDICIAL NOTICE

# EXHIBIT A

RSA: Version 10.2 (10 March 2011)

## 9.  NO PROPERTY RIGHTS

Applicant acknowledges and agrees that the number resources are not property (real, personal, or intellectual) and that Applicant does not acquire any property rights in or to any number resources by virtue of this Agreement or otherwise.   Applicant further agrees that it will not attempt, directly or indirectly, to obtain or assert any trademark, service mark, copyright, or any other form of property rights in any number resources in the United States or any other country.

## 10. REPRESENTATIONS AND WARRANTIES

(a)  By Each Party.  Each party represents and warrants to the other party that: (i) it has the full power and authority to enter into and perform its obligations under this Agreement; (ii) the assent to and performance by it of its obligations under this Agreement do not constitute a breach of or conflict with any other agreement or arrangement by which it is bound, or any applicable laws, regulations, or rules; and (iii) this Agreement constitutes a legal, valid, binding, and an executory obligation of the parties executing or assenting to this Agreement, enforceable in accordance with its terms and conditions.

(b)  By Applicant. Applicant hereby represents and warrants to ARIN that during the term of this Agreement: (i) it will not infringe the patent, copyright, trademark, trade secret, right of publicity, or other right of any third party in its use of the Services; and (ii) Applicant will comply with this Agreement, the Policies, and all applicable laws, rules, and regulations in its use of the Services.

## 11. BANKRUPTCY

If Applicant: (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) files any petition under any chapter of the Bankruptcy Code or other insolvency or bankruptcy law; (iv) has a petition filed against it under any insolvency or bankruptcy law; (v) makes a general assignment for the benefit of creditors, has a receiver appointed for it, or a trustee takes possession of all or substantially all of Applicant's assets; or (vi) ceases or affirmatively indicates its intent to cease its normal business operations (each of the foregoing, a "Bankruptcy Event"), Applicant will notify ARIN immediately. Upon such notice, or if ARIN otherwise learns of the occurrence of any of the foregoing events, ARIN may intervene in any such bankruptcy or insolvency proceeding or take other appropriate, lawful action to preserve its rights under this Agreement and the Policies, and its ability to provide the Services to its other users, including, without limitation: (i) revoking the number resources assigned to Applicant; and/or (ii) terminating this Agreement. Applicant agrees to consent to ARIN's intervening in any such bankruptcy court proceeding so that ARIN can protect its rights under this Agreement with respect to the Policies, number resources, and any other rights ARIN has under this Agreement. Applicant acknowledges and agrees that this Agreement is executory. Applicant acknowledges and agrees that it holds no title or property interest in the number resources and such number resources do not, and shall not, constitute property of the Applicant's bankruptcy estate within the meaning of Section 541 of Title 11 of the United States Code (the "Bankruptcy Code").   Applicant hereby acknowledges and agrees that, upon the occurrence of a Bankruptcy Event, such Bankruptcy Event or any other event of default under this Agreement shall constitute "cause" pursuant to Bankruptcy Code Section 362(d) for granting ARIN relief from the automatic stay or any other applicable injunction to exercise its rights and remedies under this Agreement, and Applicant shall, and hereby does, consent to such relief.

## 12. INDEMNIFICATION

ARIN_BYCHAK_0096

# EXHIBIT B

6.    FEES AND PAYMENTS.

(a)  Fee Schedule.  As a condition precedent to ARIN's duty to provide the Services, Applicant shall pay ARIN for providing the Services in accordance with ARIN's then-current fee schedule (the "Fee Schedule").

(b)  No Refunds.  All fees paid by Applicant to ARIN are non-refundable.

(c)  Registration Fees.  Applicant shall pay ARIN the applicable "registration fee," as set forth in the Fee Schedule **[hyperlink]**, prior to ARIN providing Applicant with its requested allocation/assignment of numbering resources.  Applicant shall also pay ARIN the applicable "renewal registration fee," if any, as set forth in the Fee Schedule, at least five (5) days prior to each one-year anniversary of ARIN's first issuance of the Services to Applicant (e.g., ARIN's initial allocation/assignment of numbering resources to Applicant).  If, for any reason, Applicant does not pay any applicable renewal registration fee, ARIN shall have the right to: (i) revoke the numbering resources previously allocated and/or previously assigned or (ii) terminate this Agreement.

7.    POLICIES.  Because of the nature of ARIN's role in the operation and development of the Internet, ARIN maintains the Policies and may need to amend its existing Policies, implement new Policies, or make certain Policies obsolete.  Applicant acknowledges and agrees it has read, understands and agrees to be bound by the Policies.  Applicant shall fully comply with the Policies, including, without limitation, the IP Address Space Allocation and Assignment Policy, the IP Address Space Numbering Resources, Certificate Practice Statement, ASN Transfer Policies and Guidelines, and the IP Address Reassignment Policy.  ARIN may, at any time in its sole and absolute discretion, amend the Policies or create new Policies and such amendments or new policies shall be binding upon Applicant thirty days after they are posted on ARIN's web site.

8.    REVIEW OF APPLICANT'S NUMBERING RESOURCES.  ARIN may review, at any time, Applicant's use of the previously allocated numbering resources or other Services to determine if Applicant is complying with this Agreement, the Policies, and using the Services for their intended purposes.  Without limiting the foregoing, if Applicant is an Internet Service Provider, Applicant agrees that it will use the numbering resources solely for uses consistent with its application, including, for example, its internal infrastructure or to provide Internet access to its customer base.  If ARIN determines that the numbering resources or any other Services are not being used in compliance with this Agreement, the Policies, or for purposes for which they are intended, ARIN may: (i) revoke the numbering resources, (ii) cease providing the Services to Applicant, or (iii) terminate this Agreement.

9.    NO PROPERTY RIGHTS.  Applicant acknowledges and agrees that the numbering resources are not property (real, personal or intellectual) and that Applicant shall not acquire any property rights in or to any numbering resources by virtue of this Agreement or otherwise.  Applicant further agrees that it will not attempt, directly or indirectly, to obtain or assert any trademark, service mark, copyright or any other form of property rights in any numbering resources in the United States or any other country.

10.    REPRESENTATIONS AND WARRANTIES.

(a)  By Each Party.  Each party represents and warrants to the other party that: (i) it has the full power and authority to enter into and perform its obligations under this Agreement, (ii) the assent to and performance by it of its obligations under this Agreement do not constitute a breach of or conflict with any other agreement or arrangement by which it is bound, or any applicable laws, regulations or rules, and (iii) this Agreement constitutes a legal, valid, binding and an executory obligation of the parties executing or assenting to this Agreement, enforceable in accordance with its terms and conditions.

(b)  By Applicant.  Applicant hereby represents and warrants to ARIN that during the term of this Agreement that: (i) it will not infringe the patent, copyright, trademark, trade secret, right of publicity or other right of any third party in its use of the Services, and (ii) Applicant will comply with all applicable laws, rules and regulations in its use of the Services, including this Agreement and the Policies.

3

ARIN_BYCHAK_0053

# EXHIBIT C

Legacy LSA Version 1.1 (10/31/07)

**AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD.**
**LEGACY SERVICE AGREEMENT**

This LEGACY SERVICE AGREEMENT ("Legacy Agreement") is made by and between the AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD. ("ARIN"), a Virginia nonprofit corporation, and _____, ("Legacy Applicant"), which holds the following specifically enumerated number resources: _____, _____, _____("Included Number Resources"). This Legacy Agreement only covers the Included Number Resources; any other number resources held by the Legacy Applicant pursuant to an existing RSA or not described here are not covered by the terms of this Legacy Agreement.

1. INTRODUCTION

ARIN is a Regional Internet Registry serving Canada, many Caribbean and North Atlantic islands, and the United States, since 1997, is responsible for the registration, administration, and stewardship of Internet number resources in these geographic areas.  To complete the process for the regularization of the Included Number Resources and the provision of certain Services (as defined herein below), Legacy Applicant must comply with the provisions of this Agreement by submitting an application, an executed Legacy Agreement and provide any requested accompanying information to ARIN.  For purposes of this Legacy Agreement, the term "Services" may include, without limitation, the inclusion of the legacy IP address space, and/or Autonomous System numbers ("ASNs") previously issued to Legacy Applicant in the ARIN "WHOIS" database, inverse addressing on network blocks, maintenance of network records, and administration of IP address space related to number resources issued prior to ARIN's inception on December 22, 1997 in its service area.  IP address space and ASNs shall be defined as "number resources.")

2. APPLICATION

Legacy Applicant must complete a legacy application found on ARIN's website, located at "http://www.arin.net" (the "Website"). Legacy Applicant must: (a) provide ARIN with accurate, up-to-date and complete application information, (b) promptly notify ARIN if any of its information changes during the term of this Legacy Agreement, and (c) promptly, accurately, and completely respond to any inquiry made to Legacy Applicant by ARIN or its designee during the term of this Legacy Agreement. Legacy Applicant agrees that in applying to receive or use the Services and in using the Services, it must comply with ARIN's Number Resource Policy Manual, Certificate Practice Statement, Guidelines, and Procedures ("Policies"), as published on the Website, as long as the terms of the Policies are not inconsistent with this Legacy Agreement. In the event of any inconsistency between the Policies and this Legacy Agreement, the terms of this Legacy Agreement will prevail, including but not limited to those Policies adopted after this Legacy Agreement is executed.   If Legacy Applicant fails to comply with the terms of this Legacy Agreement, ARIN may terminate this Legacy Agreement and refuse to provide the Services to Legacy Applicant.

3. EVALUATION AND ACCEPTANCE

Following Legacy Applicant's completion of the online application process, ARIN will promptly evaluate Legacy Applicant's request for the Services.  Evaluation may require Legacy Applicant's submission of additional documentation to support its application such as, but not limited to, state registration, Dun & Bradstreet and/or taxpayer information, and/or registration under the province or country in which the entity is registered for verification purposes. If ARIN, in its sole and exclusive discretion, applying its published Policies and internal verification process, determines that it can provide the Services to Legacy Applicant, ARIN shall provide written notice to Legacy Applicant of its willingness to do so, and ARIN will promptly commence providing the Services to Legacy Applicant in accordance with the terms and conditions of this Legacy Agreement. If ARIN, in its sole and exclusive discretion, applying

ARIN_BYCHAK_0120

policies (which once implemented, will be considered Policies), or make certain Policies obsolete. Such amendments or new Policies shall be binding upon Legacy Applicant immediately after they are posted on the Website. Legacy Applicant acknowledges and agrees it has read, understands, and agrees to be bound by and comply with the Policies, as amended, except to the extent those Policies may conflict with the rights and duties provided Legacy Applicant in this Legacy Agreement.

8. REVIEW OF LEGACY APPLICANT'S NUMBER RESOURCES

ARIN may, no more other than annually, or whenever a transfer or additional IP address space is requested, review Legacy Applicant's utilization of previously allocated or assigned number resources and/or other Services received from ARIN to determine if Legacy Applicant is complying with this Legacy Agreement and the Policies.

9. NO PROPERTY RIGHTS

Legacy Applicant acknowledges and agrees that the number resources are not property (real, personal, or intellectual) and that Legacy Applicant does not have any property rights in or to the Included Number Resources, including but not limited by this Legacy Agreement or the prior issuance of these resources to it. Legacy Applicant further agrees that it will not attempt, directly or indirectly, to obtain or assert any trademark, service mark, copyright, or any other form of property rights in any included number resources in the United States or any other country.

10. VOLUNTARY RETURN OF INCLUDED NUMBER RESOURCES

(a) ARIN requests that Legacy Applicant conform to RFC 2050 and RFC 2008 and voluntarily return to ARIN the portion of all Included Number Resources that it is unlikely to need over the next 10 years. A Legacy Applicant that returns no less than 25% of the Included Number Resources will be eligible for a series of benefits, including partial or permanent reduction in ARIN fees, membership and meeting costs as the Board of Trustees may from time-to-time prescribe. These benefits will increase as the percentage of Included Number Resources returned increases to 50% and again at 75%. ARIN will accept the return of any IPv4 address block with a prefix size of a /24 or shorter.

(b) ARIN will take no action to reduce the services provided for Included Number Resources that are not currently being utilized by the Legacy Applicant.

11. REPRESENTATIONS AND WARRANTIES

(a) By Each Party. Each party represents and warrants to the other party that: (i) it has the full power and authority to enter into and perform its obligations under this Legacy Agreement, (ii) the assent to and performance by it of its obligations under this Legacy Agreement do not constitute a breach of or conflict with any other agreement or arrangement by which it is bound, or any applicable laws, regulations, or rules, and (iii) this Legacy Agreement constitutes a legal, valid, binding, and an executory obligation of the parties executing or assenting to this Legacy Agreement, enforceable in accordance with its terms and conditions.

(b) By Legacy Applicant. Legacy Applicant hereby represents and warrants to ARIN that during the term of this Legacy Agreement: that Legacy Applicant will comply with all applicable laws, rules, and regulations in its use of the Services, including this Legacy Agreement and the Policies.

12. BANKRUPTCY

If Legacy Applicant: (a) files any petition under any chapter of the Bankruptcy Code or other insolvency or bankruptcy law; or (b) has a petition filed against it under any insolvency or bankruptcy law; or (c) makes a general assignment for the benefit of creditors, has a receiver appointed for it, or a trustee takes possession of all or substantially all of Legacy Applicant's assets; or (d) ceases or

ARIN_BYCHAK_0123

# EXHIBIT D

The RIRs assign address blocks to Local Internet Registries (LIRs) or networks within their territories pursuant to each RIRs' own policies.[21] Those networks, in turn, can assign blocks of addresses to smaller networks, or individual numbers to individual subscribers.

**Figure 2:  IP Address Allocation**



RIRs manage IP numbers as a public resource.  When a registry allocates a number to an entity, it is giving that entity the ability to use that number; no property right is conferred to the recipient.  IP numbers are allocated on a needs-basis pursuant to RIR policies; recipients pay fees which support the operation of the registries.[22]

The IANA allocates IPv4 addresses to RIRs in large blocks of 16,777,216 addresses each (referred to as "/8" address blocks).  Within the total IPv4 address space, there are 256 /8 address blocks.  Approximately thirty-six of these address blocks are held in reserve (these addresses are used for multicasting and various other dedicated applications).  Of the 220 blocks available to the IANA for distribution and allocation, 213 had been allocated as of December 2010 to the

---

[21] Geoff Huston, IPv4 Address Report.  RIR policies are created through bottom-up policy making processes in each RIR community.

[22] *See* ARIN: Fee Schedule. See Dan Campbell, Comments on an IP Address Trading Market, CIRCLEID (Feb. 15, 2008) (discussing how IP addresses are allocated by RIRs).

ARIN_BYCHAK_0280

# EXHIBIT E

*Click to view the latest*
Business Law **TODAY**

MAY 2013

American Bar Association · Section of Business Law: Practical Resources for the Business Lawyer

# BUSINESS LAW TODAY

# Guidance from ARIN on Legal Aspects of the Transfer of Internet Protocol Numbers

### By Ben Edelman and Stephen M. Ryan

Every device connected to the global Internet needs a numeric identifier, an "Internet Protocol" address, or simply "IP address." The Internet's continued growth presents a challenge: most IP addresses have already been assigned to networks and organizations, leaving few left for newcomers and growth. In this context, some networks seek to sell the addresses they previously received – sales which can usefully transfer resources to the networks that most need them, but with certain risks that must be handled with appropriate care. As advisors and counsel to the American Registry for Internet Numbers (ARIN), which assigns and manages these numbers in most of North America, we seek to clarify the circumstances in which such transfers are permitted and to set out the legal, contractual, and policy basis for applicable restrictions.

### ARIN's Role and Responsibility for IP Numbers

ARIN is the non-profit corporation that oversees the allocation of Internet Protocol numbers and performs other services related to the operation of the Internet in the North American service region, including the United States, Canada, and certain Caribbean islands. ARIN has served in this capacity since 1998, and in many aspects is similar to, but different from, the Internet Corporation for Assigned Names and Numbers (ICANN), which provides overall global coordination for the domain names and numbers used in the Internet.

ARIN carries out duties assigned to it and handed off to it by the U.S. government – duties that had previously been performed by the government. In particular, effective December 1, 1997, the National Science Foundation (NSF) approved the "transfer [of] responsibility for the IP Number assignment . . . to ARIN." NSF recognized that the formation of ARIN, as an industry self-governance body, was necessary to "give the users of IP numbers (mostly Internet service providers, corporations and other large institutions) a voice in the policies by which they are managed and allocated within the North American region." (*See* NSF Press Release, June 24, 1997.)

ARIN's authority is also recognized through ICANN's contracts with the U.S. government and in turn through ARIN's agreements with ICANN. ICANN's relationship with the U.S. government is presented in part in ICANN's Memorandum of Understanding with the Department of Commerce, November 25, 1998, and various amendments thereto. ARIN's contract with ICANN is embodied in ARIN's assent to the Memorandum of Understanding between ICANN and the Address Supporting Organization (October 29, 2004).

To carry out its obligation of coordinating IP number resource policy in its service region, ARIN follows a rigorous, open policy process. Interested ARIN members and the public, including government agencies, can submit policies for consideration by the ARIN community. Policies are discussed both online and via periodic in-person meetings, and policies are only enacted when they enjoy a consensus among ARIN members. This is exactly the type of multi-stakeholder industry self-coordination which U.S. government policy has sought for Internet resources.

### The Importance of IP Address Uniqueness

The Internet Protocol standard requires that each device connected to a network have a unique IP addresses not used by any other device on the network. Organizations may configure their equipment with any IP addresses they wish, just as they may label folders in their file cabinet with any names they choose, and as long as uniqueness is maintained, the system works. But *global* uniqueness is required when communicating with the Internet at large, as most networks seek to do. Specifically, if a network attempted to connect to the Internet using IP addresses already in use by another network, both networks would find their communications unreliable.

The U.S. government established the Internet Registry System to issue unique IP addresses for Internet research, for facilitating Internet connectivity, and for private use. The Internet Assigned Numbers Authority (IANA) assigns large address blocks to the five Regional Internet Registries (RIR), of which ARIN is one. To assure that each address is assigned only once, IANA carefully assures that each RIR re-

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

1

ARIN_BYCHAK_0188

ceives distinct address blocks. In turn, each RIR also carefully manages its assigned IP address blocks in its portion of the registry, making individual entries assigning ranges of IP addresses to particular networks as requested. Specifically, when the RIR issues an IP address blocks to a network, the RIR labels the entry in the RIR's registry to indicate the organization's name and related contact information. In short, an "IP address block," as the term is commonly used with respect to globally unique Internet addresses, is defined by and inseparable from its uniqueness in the Internet Registry System.

Uniqueness, as assured by the Internet Registry System, is the crux of the value and importance of IP addressing. From one perspective, IP addresses are just numbers; anyone can pick a number, and configure it into their computer to use it. Completely private networks can and do make use of any IP addresses that they wish. But when it comes to communications with the global Internet, the Internet Registry System provides the required coordination – encapsulating and assuring the right of each participating network to uniquely use assigned IP address blocks free from conflict with others participating in the Internet Registry System.

### ARIN's IP Address Transfer Policy

As the four billion Internet Protocol Version 4 Numbers (IPv4) began to run low, ARIN members discussed mechanisms to permit voluntary reallocation of IPv4 addresses to networks that most need them. The ARIN policy process culminated in a consensus on a flexible market-based transfer policy that allows a network to receive the definitive right to IP numbers in the registry, subject to a handful of lightweight restrictions: Under current ARIN policy, the recipient must sign a registration services agreement (RSA) for the addresses it receives, and the recipient must demonstrate "need" for those addresses, consistent with the same standards applied to all other ARIN address allocations. ARIN does not require disclosure of the compensation paid between the parties nor does ARIN share in the compensation.

These reasonable restrictions are appropriate to formalize parties' relationships and to maintain longstanding policy principles. An RSA contract is a basic formalization of rights and responsibilities. ARIN has always required RSAs in its transactions with networks, both to protect ARIN's interests and to clarify networks' rights vis-à-vis ARIN. This process is well-established: more than 3,500 ISPs and network operators have signed more than 11,000 RSAs to date.

Meanwhile, the ARIN community has concluded that demonstrating need is appropriate to assure that networks obtain only the addresses they genuinely require. With IPv4 numbers running low, it would be shortsighted for a network to be permitted to obtain more than it needs – and the networks in the ARIN region therefore have created policies that currently do not allow organizations to take more than they genuinely need. Some networks might wish to obtain a long-term or even indefinite supply of IP numbers, but current community policies intentionally disfavor such tactics: the ARIN community consensus is that networks should be moving to IPv6, the next generation Internet numbering system. Indeed, decades of policies from ARIN and predecessors have limited networks to the addresses they demonstrably need, whether during issuance or when being transferred from one network to another. This requirement should surprise no one.

### Services for Networks that Flout ARIN Community Policies

From time to time, critics of current IP resource allocation policies encourage ISPs and network operators to ignore ARIN policy, asserting they have an unfettered right to "sell" addresses in any way they see fit. For example, in a November 2012 article in *Business Law Today*, one commentator suggested that IP address holders can "freely alienate their number assets" – selling to anyone they like. We emphatically disagree.

We first note the policy consequences of allowing addresses to be transferred without restriction. For example, limitless

rights to "sell" such numbers would permit them to be "sold" to spammers – who constantly need new addresses as their existing IP address blocks develop bad reputations and become blocked by network operators. Limitless sales would also help those who "phish" and engage in identity theft, activities that similarly damage address reputation. Moreover, limitless sales would permit speculators, who don't use the numbers, to buy up numbers and create artificial scarcity. Putting aside the selfishness of such an approach and the real harm it presents to the Internet, it risks forfeiting the valuable benefits that ARIN provides.

Networks' requests of ARIN also provide ample basis for ARIN's restrictions on transfers. Whether requesting new assignments or transferring addresses from another party, a legitimate network is likely to want multiple services from ARIN: WHOIS to list that network as the authorized and exclusive user of the specified numbers in the Internet Registry System; DNS reverse lookup to confirm the domain names associated with various numbers; and, in the future, perhaps resource certification to cryptographically affirm the network's association with those numbers. To date, ARIN has provided these services to all networks in its service region – networks that signed RSAs as they obtained addresses directly from ARIN, early recipients that signed legacy RSAs (LRSAs) to formalize their relationship with ARIN, and also early recipients of IP numbers who that have not signed LRSAs. ARIN intends to voluntarily continue to provide these services to recipients that comply with ARIN policy. But if a network deliberately flouts ARIN policy, it cannot in the next breath demand that ARIN provide it with services, presumably for free. There is no legal or equitable obligation for ARIN to provide services to those who deliberately choose not to follow ARIN policies. To the contrary, ARIN members expect ARIN to withhold services from networks that intentionally and flagrantly violate ARIN policy; that would be a valid exercise of the ARIN policy process, and it should come as no great surprise to networks that ignore

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

**2**

**ARIN_BYCHAK_0189**

the requirements established by the ARIN community through its open policy process.

For addresses associated with RSA or LRSA contract between ARIN and the address holder, the applicability of ARIN's policies is particularly clear-cut: the contract requires such compliance. Separately, critics occasionally raise questions about addresses allocated by ARIN's government predecessors, without the formality of the RSA contracts. Specifically, some have suggested that those early address allocations yield special rights that include the right to transfer addresses without restriction. Here too, I disagree. The following sections present authority for the applicability of restrictions, duly established by ARIN's community and public processes, to early addresses allocations.

### Rights and Obligations of Early IP Number Recipients

Early IP number recipients always understood, or should have understood, that their participation in an interconnected network would necessarily entail compliance with reasonable network policies set by the group, including policies yet to be devised. These requirements have flowed through nearly two decades of subsequent U.S. government policy. For example, when the National Science Foundation (NSF) in 1993 passed responsibility for IP addresses management to contractor Network Solutions (NSI), the NSF's Statement of Work required compliance with certain technical specifications called RFCs that are periodically issued by the Internet Engineering Task Force (IETF). Specifically, the Statement of Work required compliance with RFC 1174 which called for following both existing practice in management of IP addresses as well as "documentation to be issued as RFCs" – indicating that new rules and requirements in the management of IP addresses would arise from time to time. (The Statement of Work instructed: "Awardee shall provide registration services in accordance with the provisions of RFC 1174.") RFC 1174 in turn required the IANA and the Internet regional registries to meet and produce documentation of the

operational procedures and requirements to be used in operation of the registry system ("documentation *to be issued* as RFCs," emphasis added).

Just as RFC 1174 contemplated, subsequent IETF documents further formalized the obligations of recipients of IP numbers. For example, RFC 2050 (which was issued in November 1996 before ARIN's formation) in Section 3.1 specifically notes the prospect of reclaiming addresses if the recipient's need no longer exists. Then Section 4.7 adds that transfers of existing assignments from one party to another may occur only with registry permission, and further provides that "the party trying to obtain the IP address must meet the same criteria as if they were requesting an IP address from the Internet Registry." These rules were prepared exactly as anticipated by the use of the future tense in RFC 1174 ("documentation *to be issued*," emphasis added), as combined output of the regional registries and the IANA.

In short, recipients of address space under the NSF cooperative agreement were definitely subject to policies developed by the Internet technical community, including policies established after addresses had been allocated.

As the successor in management of the IP addresses in the region, ARIN inherited responsibility for coordinating and implementing these policies. It would have been easy at the handoff for NSF to restrict ARIN's duties with respect to the management of previously-issued number resources. But the contemporaneous documents reveal no reference to such a limitation, and in fact active statements to the contrary.

Importantly, the creation of ARIN included explicit affirmation of the scope of ARIN's authority as to early IP numbers. For example, the NSF's June 24, 1997, press release celebrates the fact that "creation of ARIN will give the users of IP numbers . . . a voice in the policies by which they *are managed* and allocated within the North American region" (emphasis added). The antecedent for "they" is "IP numbers," and notice the lack of restriction or qualifier on that term; the sentence offers no suggestion

that only a subset of North American IP numbers (such as numbers to be issued in the future) are subject to management by IP number users via the ARIN process. Thus, the only reasonable interpretation of this contemporaneous NSF statement is that ARIN has authority to set policy for the IP numbers previously issued by the U.S. government or contractors acting for the U.S. government. Furthermore, verb tense confirms the scope of ARIN's responsibility: As of the time of the press release, no IP numbers had yet been allocated by ARIN, but the press release nonetheless instructs that the ARIN process will set the policies by which IP numbers in the region "*are* managed" (emphasis added) – meaning the policies will apply to the numbers already allocated by ARIN's predecessors in the region. Any contrary interpretation would undermine the NSF's stated intent to enable self-governance of IP addresses by the users in the region.

### U.S. Government Policy for Early IP Numbers

Some critics seek support in a recent private letter sent by Mr. Larry Rudolph, the general counsel of the NSF, regarding his views as to the supposed rights of early recipients of IP numbers. But Rudolph's letter was written more than some 14 years after the end of NSF's role in policy oversight of IP numbers. Rather, since 1999, the White House Office of Science and Technology Policy (OSTP) and the Department of Commerce's (DOC) National Telecommunications and Information Administration (NTIA), have overseen the U.S. government's interests in Internet infrastructure. If an advisory opinion were needed to clarify the U.S. government's view of rights in early IP numbers, one would expect that opinion to come from OSTP, DOC, or the Office of Legal Policy at the Department of Justice – but not from NSF. Indeed, in a follow-up letter, Mr. Rudolph himself acknowledged that his prior "observations" were not a "legal or policy position on behalf of the U.S. Government."

Rudolf's letter was almost immediately repudiated by the subsequent statement of

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

**ARIN_BYCHAK_0190**

USG IP address policy by the NTIA. Shortly after Rudolph's letter began to publicly circulate, NTIA Administrator Lawrence Strickling posted NTIA's reaffirmation of ARIN's role and responsibility in managing the IP address registry in accordance with the policies developed by community in the region. Specifically, the NTIA statement explained: "The American Registry for Internet Numbers (ARIN) is the RIR for Canada, many Caribbean and North Atlantic islands, and the United States. The USG participates in the development of and is supportive of the policies, processes, and procedures agreed upon by the Internet technical community through ARIN." In our view, NTIA's statement is more persuasive, both through its substance (including its explicit reliance on a decade of U.S. government policy) and its source (the agency with current responsibility for these matters).

**Protections for Early Address Recipients**
Since ARIN processes may permissibly alter policy as to IP numbers issued before ARIN's creation, one might reasonably ask what protects early IP number recipients against arbitrary or otherwise-improper action by ARIN. The answers are several. For one, ARIN must operate in accordance with its articles of incorporation and bylaws which – duly established during ARIN's formation and reviewed by the U.S. government at that time – require reasonable, non-discriminatory treatment grounded in proper technical justification. Furthermore, ARIN must act in accordance with its own procedures, including changes to policy based on community consensus as grounded in the history and tradition of the Internet technical standards process. These protections amply protect early IP number recipients.

ARIN's good faith stewardship of its responsibilities is demonstrated by its generous treatment of pre-ARIN IP number recipients. For the past 15 years, ARIN has provided no-charge WHOIS, reverse DNS, and other services to early IP number recipients. ARIN has offered (but never required) that early IP number recipients sign

a Legacy Registry Services Agreement that formalizes the parties' relationship. Current ARIN policies allow early IP number recipients to sell their exclusive right to use IP numbers to others, realizing significant financial gain (potentially a windfall in some cases, since those recipients did not pay the U.S. government for rights to those resources and the effort necessary to free up underutilized IP addresses could be quite modest.) ARIN imposes minimal restrictions on such transfers. In short, early IP number recipients have every reason to be thankful for the services and policies ARIN has put in place.

**U.S. and Canadian Bankruptcy Courts' View of ARIN's Authority**
A growing number of IP transfers have occurred to date, including some publicized transactions from bankrupt estates. To ARIN's knowledge, in each and every instance sellers have agreed to follow ARIN policy and have in fact followed ARIN policy.

Despite bankruptcy proceedings recognizing ARIN's role, some critics argue that ARIN policies rules do not bind sellers of IP numbers issued before ARIN began operation. Some even argue that a transfer from Nortel's bankrupt estate to Microsoft supports this view, but that case actually stands for exactly the opposite proposition. In bankruptcy proceedings, the U.S. Nortel estate no longer needed IP numbers it had received years earlier, so it sought to sell those numbers to Microsoft. As initially proposed, the sale sought recognition of the IP addresses as property and did not recognize ARIN's inherent role with respect to IP address management. ARIN intervened in the bankruptcy sale. ARIN had the clear support of the Canadian government and other third parties. See Industry Canada's April 13, 2011, filing in the Nortel Networks bankruptcy *(In re Nortel Networks Inc. et al.,* D. Del. Case No. 09-10138 (KG), docket #5253):

This submission is in support of ARIN's interventions related to the legal underpinnings of the current governance structure

of Internet numbers . . . and to bring to your attention substantive governmental and policy concerns that arise from the sale of Internet numbers in the manner and on the terms suggested in the Debtor's Motion. . . Their use in accordance with the policies adopted by ICANN, ARIN and the regional registries provides essential assurances respecting the ultimate identity and accountability of Internet users.

Microsoft and the Nortel estate ultimately agreed to modify the transaction consistent with ARIN's right to review and approve the transaction following ARIN's established policy. Specifically, in *Nortel* docket #5315, the parties modified the transfer agreement as a transfer of rights and interests in the address blocks, and called for a RSA contract between ARIN and Microsoft. After ARIN's investigation confirmed Microsoft's need for the numbers and found that the transfer complied with established policy, ARIN assented and permitted the transfer to proceed. The bankruptcy trustee and bankruptcy judge assented to this arrangement, and Microsoft – a sophisticated multinational corporation – saw that complying with ARIN's policies added value to its intended transaction. In short, *Nortel* offers only a precedent for following ARIN's policies, not ignoring them.

In myriad transactions after Nortel-Microsoft, bankruptcy courts systematically recognized ARIN's role as the registry in the region and required sellers to comply with ARIN policy. For example, the court in *In re Borders Group, Inc.*, 11-10614 (Bankr. S.D.N.Y.) stated:

Notwithstanding anything herein to the contrary, . . . (i) the [Internet Address] Sale, . . . is conditioned upon ARIN's consent including any terms and/or conditions established by ARIN's transfer policies or any other policies, guidelines, or regulations developed by ARIN and published on its website, as may be amended and supplemented from time to time (collectively, "ARIN's Policies"), (ii) the transfer of the Debtors' interests in the Internet Addresses

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

ARIN_BYCHAK_0191

to the Purchaser is subject to ARIN's Policies, (iii) the Debtors and the Purchaser are required to comply with ARIN's Policies before any transfer of the Debtors' rights in the Internet Addresses may be effectuated; [. . . ]

Indeed, the court specifically indicated that ARIN need not change its policies in any way:

(iv) ARIN is not required to take any action in violation of ARIN's Policies in connection with or as a consequence of this Order, the [Internet Address] Sale, or the Agreements, nor shall ARIN be required to apply a different standard to the transfer of the Internet Addresses than it does to the transfer of non-legacy Internet Protocol numbers. Nothing in this Order is intended, nor shall be construed, as exempting the Debtors and Purchaser from complying with the ARIN Policies.

Orders in similar cases are in accord. See e.g. *In re Teknowledge Corporation*; 10-60457 (Bankr. N.D. Cal.) and *Global NAPS, Inc. v. Verizon New England, Inc.*; 02-12489, 05-10079 (D. Mass.), both permitting sales of IP numbers in bankruptcy proceedings only to the extent compliant with ARIN policy.

### Validity of ARIN RSA and LRSA Contracts

ARIN has long formalized its rights and obligations to networks via standard Registration Service Agreements (RSA) contracts laying out rights in IP Numbers. These documents are easily available for public review.

One ARIN critic argues that RSAs are "nothing more than illusory contracts" because, he says, "ARIN, as apparent promisor, makes no binding commitment at all and . . . retain[s] an unlimited right to determine the nature or extent of its performance." The plain language of the RSAs says otherwise. For example, RSA Section 2 grants a network the exclusive right to be the registrant of a given set of numbers, to use those numbers in the registry,

and to transfer those numbers. Certainly these rights are encumbered by community policy, but this is to be expected because developing and managing IP address policy is a fundamental principle of ARIN's very existence as part of the global Internet Registry system. A network signing an RSA receives valuable rights, including a commitment from ARIN to associate the number resources with that organization alone, and subject only to the exceptions provided in the RSA – ample consideration to support a valid and enforceable contract.

### Looking Forward

IPv4 numbers are indeed in short supply. The question at hand is what to do about it. Some of ARIN's critics envision a future where the networks that received addresses early can sell them to the highest bidder, whether a legitimate network, a spammer, a person engaging in online fraud, or someone stockpiling addresses for future sale. Such a theory recognizes no societal needs or Internet community constraints whatever. In contrast, ARIN's current policies allow transfers with only limited restrictions to prevent the worst abuses and provide additional value to the resources. Some early networks probably will sell their rights to underutilized addresses, even reaping windfall profits, and ARIN policies allow them to do so consistent with the community's rules. But networks' right to make these transfers is nonetheless constrained, including by the agreements networks have accepted in receiving these and other addresses, as well as by applicable law and by longstanding U.S. government policy. That is as it should be.

During this transition to the more capacious numbering system of IPv6, the top priority is, and should be, keeping the Internet running smoothly – assuring that the remaining IPv4 addresses are available to those who need them, and managing all number resources in the registry in accordance with the policies established by the technical community via open multistakeholder discussion. ARIN's policies and procedures reveal its commitment to that task.

*Ben Edelman, PhD. and Esq., is a Harvard Business School professor and an advisor to ARIN. Stephen Ryan is counsel to the American Registry for Internet Numbers and a partner in the international law firm, McDermott Will & Emery. The authors thank Matthew Martel of McDermott for guidance on questions pertaining to bankruptcy.*

Published in *Business Law Today*, May 2013. © 2013 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

**ARIN_BYCHAK_0192**

# EXHIBIT F

# Bloomberg BNA

### BNA's
## Bankruptcy Law Reporter™

Reproduced with permission from BNA's Bankruptcy Law Reporter, 24 BBLR 32, 01/05/2012. Copyright © 2012 by The Bureau of National Affairs, Inc. (800-372-1033) http://www.bna.com

# Internet Protocol Numbers and the American Registry for Internet Numbers: Suggested Guidance for Bankruptcy Trustees, Debtors-in-Possession, and Receivers

  

By STEPHEN M. RYAN, MATTHEW MARTEL, AND BEN EDELMAN[*]

**B**ankruptcy trustees, debtors-in-possession, and receivers are seeing an increase in efforts to sell Internet Protocol (IP) addresses, also referred to "IP Numbers." IP Numbers are the unique numeric identifiers associated with computers connected to the Internet. While sales of IP Numbers can deliver value to the estate, IP Numbers are unusual in that their value, use and transfer are enhanced by applicable contract and policy. Ignoring the contracts and policies can delay the sale process and reduce or negate the value of IP Numbers. This article seeks to provide an overview of issues associated with IP Number sales, as well as suggesting an approach for permissible and straightforward sales to obtain the highest value.

A bit of background is helpful. The American Registry of Internet Numbers (ARIN), a Virginia domiciled U.S. non-profit, issues IP numbers. More information about ARIN is included subsequently.

* Thanks to ARIN CEO-President John Curran for his input and advice.

*Stephen Ryan and Matt Martel are partners in the international law firm, McDermott Will & Emery, which represents ARIN. Mr. Ryan is counsel to the American Registry for Internet Numbers. Ben Edelman, PhD. and Esq., is a Harvard University Business School professor.*

## Summary of Issue and Proposed Resolution

There are several guidelines trustees, debtors-in-possession, and receivers should follow to reduce uncertainty in the sale process, avoid delay, and maximize the benefits to the estate when seeking to sell IP Numbers:

- ARIN should receive notice of the contemplated sale. ARIN can assist sellers in many ways, including by verifying whether the IP Numbers the seller desires to transfer match the numbers appearing in ARIN's registration records.

- The sale motion and related sale documents should avoid statements regarding debtor's "ownership" of the IP Numbers. IP Numbers are not traditional property rights. What is being transferred can most accurately be described as the "debtor's interest in the registration right to IP Numbers" and the IP Numbers.

- The sale motion and related sale documents should expressly state "the Seller has the exclusive right to use the IP Numbers subject to ARIN's policies and the Seller has the right to transfer its exclusive right to use the IP Numbers to the Purchaser only pursuant to the terms and conditions set forth in ARIN's transfer policies (the "Transfer Policies")."

- If there is a recital that no consents are needed to effectuate the transfer, a carve out for ARIN's approval should be present. For example, "Other than pursuant to any terms and/or conditions established by the Transfer Policies or any other policies, guidelines, or regulations developed by ARIN and published on its website, as may be amended and supplemented from time to time (collectively, "ARIN's Policies"), no consents or approvals are required for the Seller to transfer the Seller's rights in the IP Numbers." Alter-

ARIN_BYCHAK_0193

2

natively, ARIN's approval may be sought in advance to allow a statement that no further consents are needed to effectuate the transfer.

- In bankruptcy cases, if a sale free and clear is contemplated, there should also be a recital that IP Numbers cannot be transferred free and clear of ARIN's Policies pursuant to Section 363 of the Bankruptcy Code. For example, "ARIN's Policies do not constitute interests the Seller may sell free and clear of pursuant to Section 363(f) of the Bankruptcy Code and, as such, the transfer of the IP Numbers authorized pursuant to this Order shall not be free and clear of ARIN's Policies."

- The sale documents should state that no transfer will occur until the purchaser complies with ARIN's policies. For example, the sale order should state "The Seller and Purchaser are required to comply with ARIN's policies before any transfer of the Seller's rights may be effectuated, and nothing in this Order is intended, nor shall be construed, as exempting the Seller and Purchaser from complying with those policies."

- Prior to consummation of the sale, ARIN can assist the seller and purchaser in determining whether the purchaser can qualify for a transfer of the rights to use the IP Numbers.

## The Purpose and Function of IP Numbers

IP Numbers are critical to the reliable operation of the Internet: Every device connected to the Internet needs a unique IP Number in order to send and receive information to/from others. The use of the same unique IP Number by two or more purported registrants would cause unreliable Internet service or no Internet service at all. Proper stewardship of IP Numbers is necessary to assure that IP Numbers are assigned uniquely.

At present, the vast majority of the Internet uses the Internet Protocol version 4 (IPv4) numbering system, which has a limited capacity of approximately 4.2 billion unique numbers which was established in the earliest days of the Internet. A new standard, Internet Protocol version 6 (IPv6), promises increased capacity, but is not yet widely in use.

Due to the remarkable success of the Internet, the IPv4 numbers have been nearly fully allocated and as a result, unused IPv4 numbers are becoming scarce. It is therefore increasingly important that available IPv4 numbers are used prudently and efficiently for the public good, and this demand to put underutilized IP numbers into productive use can be beneficial in monetizing these IP Numbers.

## The Role of ARIN in Allocating IP Numbers

The American Registry for Internet Numbers is the non-profit corporation that oversees the allocation of Internet Protocol numbers and performs other services related to the operation and advancement of the Internet in the North American service region, including the U.S., Canada and certain Caribbean islands. ARIN is one of five Regional Internet Registries (RIRs); other RIRs perform similar services in other regions.

ARIN carries out duties originally assigned to it by the U.S. Government that had been performed by the government. In particular, effective December 1, 1997, the National Science Foundation (NSF) approved the "transfer [of] responsibility for the IP Number assignment . . . to ARIN." (See NSF Amendment No. 07 to Cooperative Agreement No. NCR-9218742.) Attachment A chronicles the delegation of authority from the U.S. government to ARIN in greater detail. NSF recognized that the formation of an ARIN, as an industry self-governance body, was necessary in order to *"give the users of IP numbers (mostly Internet service providers, corporations and other large institutions) a voice in the policies by which they are managed and allocated within the North American region"* (See NSF Press Release: http://www.nsf.gov/news/news_summ.jsp?cntn_id=102819).

ARIN provides a variety of functions to coordinate the proper functioning of IP Numbers. For example, ARIN assures that each IP Number is assigned for use by at most one network. ARIN provides appropriate public records including a "WHOIS" public listing of the authorized user of each IP Number; accurate and up-to-date records are crucial so that any entity (be it an ordinary consumer, a network engineer, or law enforcement officer) can determine who is responsible for a given IP Number.

Consistent with its commitment to its members and to the U.S. government, ARIN is obliged to manage IP Number registrations in a responsible and impartial manner in accordance with the policies democratically developed by the Internet community. In furtherance of this mission, ARIN members and interested parties in the community establish consensus policies that apply to the allocation and management of IP Numbers. These policies have significant implications for successful operation of the Internet, since IP Numbers are used to connect customers to the Internet, and with the interconnection of each IP Number to the Internet there are technical repercussions for all Internet service providers globally. The ARIN policies reflect the multiple interests that exist in the management of the IP numbers, including the registrant, the network operator community, and governmental interests in areas such as law enforcement and cybersecurity.

## ARIN's Policies on the Transfer of IP Numbers

Among these policies are ARIN's policies on the transfer of registration rights in IP Numbers, the Transfer Policies. The Transfer Policies allow those holding registration rights in IP Numbers to transfer interests in such IP Numbers to a new party under certain circumstances.

The Transfer Policies establish two methods by which registration rights in IP Numbers may be transferred. First, transfers may occur upon a merger or acquisition. That policy may apply if a buyer acquires network hardware, customer lists, or other assets from the estate. However, that policy does not apply to sale of IP Numbers separate from an estate's other resources. Second, ARIN allows a transfer to a specific recipient (specified transfer), chosen by the then-current registrant of the IP Numbers, typically upon payment of a fee from the recipient to the registrant. ARIN policy provides that specified transfers are subject to requirements: (a) the recipient demonstrates a justified need for the IP Numbers; (b) the recipient demonstrates that it will actually use the IP numbers rather than hold the IP numbers for use at a later point in time; (c) the recipient is based in ARIN's service area[2]; and (d) the recipient signs an appropriate contract, an ARIN "Regis-

---

[2] A current policy proposal that is likely to be adopted may permit an inter-region transfer.

ARIN_BYCHAK_0194

tration Services Agreement" (RSA), affirming compliance with applicable policies. (There are over 11,000 such agreements entered into by more than 3,500 entities, including agencies of the U.S. Government.)

ARIN's transfer requirements apply to sellers in bankruptcy and receivership. IP Numbers are not the "property" of the entity that has the right to use the IP Numbers. Rather, upon assignment of IP Numbers, an entity receives the right to use those IP Numbers to the exclusion of all other parties, as well as the right to the various benefits that ARIN provides, such as the maintenance of the WHOIS database. ARIN Policies are part of the bundle of rights and services associated with an entity's interest in IP Numbers.

More than 3,500 networks or "end user" corporations have affirmatively agreed that IP Numbers are not "property." In particular, the current ARIN RSA contract specifically provides: "Applicant acknowledges and agrees that the number resources are not property (real, personal, or intellectual) and that Applicant does not acquire any property rights in or to any number resources by virtue of this Agreement or otherwise."[3]

See also Attachment B, which presents relevant authority as to ARIN's role in setting rules for the allocation and management of IP addresses, including judicial findings as well as statements of policy of the U.S. and Canadian governments.

Some IP Numbers were issued before ARIN's formation (legacy numbers) and before the standardization of RSA contracts clarifying networks' rights and responsibilities. Nonetheless, as detailed above and in Attachment B, ARIN believes transfers of legacy numbers remain subject to key ARIN policies while acknowledging that there is no written contract between ARIN and the legacy holder. In particular, the management of existing number resources according to community-developed policies is necessary for fulfillment of the self-governance goals for which ARIN was established.

## Compliance with ARIN Policies Is Consistent With Achieving the Highest Value for the Estate

A trustee, debtor-in-possession, or receiver selling its rights to IP Numbers is likely to maximize its recovery by complying with applicable ARIN policies. An organization buying rights to IP Numbers will build its business on those resources—making implementation decisions that, in most instances, can be changed only with considerable effort and delay. Disputed or unreliable IP Numbers are therefore unappealing to sophisticated buyers who operate lawfully, and accounting for the interests of such buyers is crucial to obtaining full value for the estate. Full compliance with ARIN policies can help attract large buyers and obtain the greatest value for the IP Numbers.

The ARIN community includes numerous organizations with substantial need for IP Numbers. A seller offering addresses consistent with ARIN policy will typically enjoy interest from these buyers, and their interest will tend to bid up prices to a higher level than a seller operating independent of ARIN. ARIN also operates a "listing service" whereby buyers and sellers can find each other. These considerations further demonstrate the importance of compliance with ARIN policies in order for sellers to obtain the greatest value for their IP Numbers.

## ARIN's Request to Trustees, Debtors-in-Possession, and Receivers

ARIN is aware that debtors are increasingly seeking to sell their interests in IP Numbers. ARIN believes that many trustees, debtors-in-possession, and trustees may be unfamiliar with the nature and function of IP Numbers and with ARIN and applicable ARIN policies. ARIN welcomes the opportunity to assist sellers and potential buyers in these regards.

As a threshold matter, ARIN believes it must receive notice of bankruptcy and receivership proceedings wherein a debtor seeks to transfer its IP Numbers. Such transfers can occur only in compliance with ARIN policies, and resources may be unusable if the proper transfer process is not followed. Notice to ARIN is necessary so that ARIN can advise parties of applicable requirements.

Second, the sale motion and other sale documentation should avoid references to the estate's "ownership" of the IP Numbers as such references tend to mislead potential buyers as to the nature of what they are acquiring in the sale process.

Third, the sale documentation should state clearly that the seller's rights to the IP Numbers can be sold only in accordance with ARIN's Transfer Policies.

Fourth, the sale documents should avoid blanket statements that no third party consents are necessary to effectuate a transfer or, alternatively, should expressly carve out ARIN's Transfer Policies in the third party consent provisions of such sale documents.

Fifth, if a sale free and clear of the interests of others is contemplated pursuant to Section 363(f) of the Bankruptcy Code, ARIN's Transfer Policies must be carved out of such provisions.

Finally, putting potential purchasers in touch with ARIN prior to consummation of the sale can assist all parties in determining whether the purchasers qualify for a transfer under ARIN Policies, thereby reducing uncertainty to sellers and purchasers.

Recent proceedings further reveal valuable benefits that result from ARIN's participation throughout the process: helping the estate obtain the greatest possible value, clarifying parties' rights and obligations, reducing litigation complexity, and advancing judicial economy. ARIN believes these benefits accrue most readily if ARIN becomes involved as close as possible to the commencement of each sale of IP Numbers. In contrast, when ARIN learns of a sale only at or near the close of the transaction, ARIN has found that additional motion practice and delay are nearly inevitable, resulting in increased costs to the estate as well as additional burden on the court.

ARIN appreciates the interest and support of trustees, debtors-in-possession, and receivers in selling rights to IP Numbers to the buyers who value them most. ARIN looks forward to assisting in achieving that important objective.

---

[3] RSA version 10.2, March 10, 2011. https://www.arin.net/resources/agreements/rsa.pdf.

ARIN_BYCHAK_0195

4

## Attachment A

## Additional Information Regarding the Delegation of Authority From the U.S. Government to ARIN

The Internet is an outgrowth of the U.S. government's financial investment in communications networks carried out under agreements with the Defense Advanced Research Projects Agency and the National Science Foundation (NSF).

To maintain globally unique IP Numbers and conserve the finite number of them, the United States government established a system for allocating and managing IP Numbers. From 1987 to 1991, the U.S. government delegated the authority to register IP Numbers to IANA. In 1992, the NSF, pursuant to its authority over the Internet under 42 U.S.C. §§ 1862(a)(4)[4] and (g),[5] solicited and received bids for private companies to perform various functions for the Internet community, including registration services.

At the outset, NSF awarded the contract to perform various Internet functions, including certain aspects of the registration of IP Numbers, to Network Solutions, Inc. (NSI) pursuant to a five-year cooperative agreement (the Cooperative Agreement) under the Federal Grants and Cooperative Act, 31 U.S.C. § 6301 et seq. As a result, NSI took over the function of registering IP Numbers from IANA on January 1, 1993.

The explosion in the use of the Internet, probably not foreseen by NSF or most others, caused an unacceptable financial and administrative burden on NSF. NSI developed a plan for NSF to transfer the IP Number registration function to a nonprofit organization, and NSF agreed to this plan.

Effective December 1, 1997, NSF approved the "transfer [of] responsibility for the IP Number assignment . . . to ARIN." NSF Amendment No. 07 to Cooperative Agreement No. NCR-9218742. ARIN's mission is to be responsible for the management of IP Numbers for all the geographic regions NSI administered under its Cooperative Agreement, as amended, with the NSF.

On June 24, 1998 the NSF issued a press release announcing the formation of ARIN, entitled "Internet Moves toward Privatization, IP Numbers Handled by Non-Profit." The press release stated, in pertinent part:

> The NSF has approved a plan from Network Solutions, Inc. (NSI) which establishes the American Registry for Internet Numbers (ARIN). Under the plan, ARIN **would assume full responsibility for Internet Protocol (IP) number assignments and related administrative tasks** previously handled by NSI. . . . The creation of ARIN is

consistent with the recommendations received from the Internet community at workshops over the past eighteen months, and with concurrence from a federal interagency working group. (emphasis added)

Thus, the creation of ARIN was initiated and supervised by both the NTIA and NSF pursuant to NSF's supervisory responsibility under the Cooperative Agreement.

In addition, the United States Department of Commerce (DOC) granted the Internet Corporation for Assigned Names and Numbers (ICANN) responsibility for establishing, in conjunction with Internet users, policies for Internet Protocol Address Space, pursuant to a Memorandum of Understanding between the DOC and ICANN dated November 28, 1998, as amended May 25, 2001. In 1999, ICANN also assumed responsibility for the technical management functions previously performed by the U.S. government under contract with IANA, which has been renewed to the present day. The ICANN Memorandum of Understanding states (in part) that ICANN shall:

> Allocate Internet Numbering Resources—This function involves overall responsibility for allocated and unallocated IPv4 and IPv6 address space and Autonomous System Number space. It includes the responsibility for delegation of IP address blocks to regional registries for routine allocation, typically through downstream providers, to Internet end-users within the regions served by those registries.

ARIN is one of the regional registries contemplated by the DOC's contract with ICANN. As such, ARIN further derives its powers to oversee and allocate IP Numbers from ICANN's agreement with the DOC.

These actions of the United States government demonstrate an unbroken chain from the government to ARIN with respect to the management, allocation, and policies relating to IP Numbers.

## Attachment B

## ARIN's Role in Setting Policy, as Affirmed by Courts and Regulators

In a report issued in December 2010, the U.S. Federal Communications Commission stated its position that IP Numbers are not property. See FCC Staff Working Paper No. 3 at 5, December, 2010:

> RIRs [like ARIN] manage IP numbers as a public resource. When a registry allocates a number to an entity, it is giving that entity the ability to use that number; no property right is conferred to the recipient. IP numbers are allocated on a needs-basis pursuant to RIR policies; recipients pay fees which support the operation of the registries.

Industry Canada is in accord. See Industry Canada's April 13, 2011 filing in the Nortel Networks bankruptcy (*In re Nortel Networks Inc. et al.*, D. Del. Case No. 09-10138 (KG), docket #5253):

> This submission is in support of ARIN's interventions related to the legal underpinnings of the current governance structure of Internet numbers . . . and to bring your attention substantive governmental and policy concerns that arise from the sale of Internet numbers in the manner and on the terms suggested in the Debtor's Motion. . . . Their use in accordance with the policies adopted by ICANN, ARIN and the regional registries

---

[4] 42 U.S.C. § 1861 *et seq.* is the National Science Foundation Act. Section 1862(a)(4) provides that "[t]he [NSF] is authorized and directed—to foster and support the development and use of computer and other scientific and engineering methods and technologies, primarily for research and education in the sciences and engineering." 11 U.S.C. § 1861(a)(4).

[5] Section 1862(g) provides that "[i]n carrying out subsection (a)(4) of this section, the [NSF] is authorized to foster and support access by the research and education communities to computer networks which may be used substantially for purposes in addition to research and education in the sciences and engineering, if the additional uses will tend to increase the overall capabilities of the networks to support such research and education activities." 11 U.S.C. § 1862(g).

    COPYRIGHT © 2012 BY THE BUREAU OF NATIONAL AFFAIRS, INC.   BBLR   ISSN 1044-7474

ARIN_BYCHAK_0196

provides essential assurances respecting the ultimate identity and accountability of Internet users.

In the Nortel bankruptcy matter, an appropriate voluntary resolution that satisfied all parties was reached. In a seminal case that has addressed the issue of whether IP Numbers are property, *Kremen v. ARIN*, No. 5:06-cv-02554-JW (N.D. Cal. April 12, 2006), the District Court rejected plaintiff's request of a finding that IP Numbers were property. The Kremen court further affirmed that IP Numbers are not property: "IP resources may only be transferred from one entity to another pursuant to the terms of ARIN's Guidelines for Transferring Internet Protocol (IP) Space . . . and subject to ARIN's Transfer Policy . . . Among other things, the Guidelines provide that IP resources are nontransferrable, may not be sold or assigned and may only be transferred upon ARIN's approval of a formal transfer request." (Id. at 3)

ARIN_BYCHAK_0197

# EXHIBIT G



Published on *National Telecommunications and Information Administration*
(https://www.ntia.doc.gov)

Home > United States Government's Internet Protocol Numbering Principles

# United States Government's Internet Protocol Numbering Principles

December 03, 2012 by Assistant Secretary for Communications and Information and NTIA
Administrator Lawrence E. Strickling

Internet Protocol (IP) numbers underpin and connect broadband and IP-based network infrastructures.
Without IP numbers, we could not attach computers and smartphones to the Internet, and we could
not route traffic to and from those devices. Without an adequate supply of these numbers, we could
not design cloud computing networks or the smart grid. As we move to a world of innovation where
virtually everything can be networked to everything else, we need to ensure a sufficient supply of IP
numbers.

When the Internet Protocol was first developed in the early 1970's, few of the scientists and
technologists involved could have predicted what IP would mean for network development and the
incredible innovation it would spur.  Version 4, or IPv4, was developed in the early '80s by the
technical wizards of the Internet Engineering Task Force (IETF).   Who would have expected that the
4.3 billion IPv4 numbers would not be enough for future networks?  Who could have forecast the
explosive growth of the Internet and the need for billions of devices to be attached to these networks?
Thankfully, many of those same technical experts – being rather clever people - have been worrying
about the size of the IPv4 number pool for quite a while. They began to work on the "next generation"
protocol known as IPv6. And it's good they did because we are running out of IPv4 numbers.  As
opposed to IPv4, IPv6 supports 340 trillion trillion trillion possible numbers – and it represents a new
generation of technology for network growth and development and innovation.

As we continue to transition to this next-generation Internet routing system, it is important to clarify
the United States Government's (USG) position on the development of Internet technical standards
and policies:

- We continue to believe that the proper model for the development of Internet technical
  standards and policies, including those related to IP numbers, is the multistakeholder model.

ARIN_BYCHAK_0001

- The five Regional Internet Registries (RIRs), via their multistakeholder processes, are responsible for developing policies for the use of IP numbers within their respective specific geographic regions.

- The American Registry for Internet Numbers (ARIN) is the RIR for Canada, many Caribbean and North Atlantic islands, and the United States. The USG participates in the development of and is supportive of the policies, processes, and procedures agreed upon by the Internet technical community through ARIN.

- The USG supports and encourages the uptake and adoption of IPv6 throughout the IP value chain, and strives to be an early adopter as evident in Office of Management and Budget (OMB) Directives for U.S. federal agency IPv6 implementation.

- Consistent with the policies developed through the current multistakeholder model, the USG believes that all IP numbers are allocated for use on a needs basis and should be returned to the numbering pool when no longer needed.

 SHARE

National Telecommunications and Information Administration
1401 Constitution Ave., NW Washington, DC 20230

commerce.gov | Privacy Policy | Web Policies | Information Quality | FOIA | Accessibility | usa.gov

**Source URL:** https://www.ntia.doc.gov/blog/2012/united-states-government-s-internet-protocol-numbering-principles

ARIN_BYCHAK_0002

# EXHIBIT H


Industry Canada   Industrie Canada

**APR 1 3 2011**



The Honourable Kevin Gross
United States Bankruptcy Judge
United States Bankruptcy Court for the District of Delaware
824 North Market Street
6th Floor
Wilmington, DE 19801

> *In re* **Nortel Networks Inc., et al: Motion to approve sale of Internet
> Numbers**
> **Case No. 09-10138 (KG)**

I am writing in my capacity as Assistant Deputy Minister, Strategic Policy
Sector of the Department of Industry, a department of the Government of Canada.
My duties encompass responsibility for telecommunications policy, including
Internet and Domain Name System policy. Within the scope of these duties, my
sector serves as the Government of Canada liaison with the Internet Corporation
for Assigned Names and Numbers (ICANN), American Registry for Internet
Numbers (ARIN), the Canadian Internet Registration Authority (CIRA), and other
international counterparts.

This submission is in support of ARIN's interventions related to the legal
underpinnings of the current governance structure of Internet numbers, whether
legacy numbers or otherwise, and to bring to your attention substantive
governmental and policy concerns that arise from the sale of Internet numbers in
the manner and on the terms suggested in the Debtor's Motion, the Proposed
Order annexed to the Motion, as well as the Asset Sale Agreement. Internet
Numbers are among the fundamental building blocks of the Internet. Their use in
accordance with the policies adopted by ICANN, ARIN and the regional registries
provides essential assurances respecting the ultimate identity and accountability
of Internet users.

The Government of Canada recognizes the importance of a timely
resolution of these matters before the insolvency court, but has serious
reservations concerning several provisions of the sale of Internet Numbers as
currently proposed.

First, we note that in footnote 6 on page 5 of the Motion, there is a
reference to "Legacy Numbers" and an assertion that such numbers were
"assigned" to NNI. It is the position of the Government of Canada that the use of
"assign" is colloquial in the factual context and is misleading in law. It is our
view that Internet Numbers never became the property of the persons who were
authorised to use them, nor were they ever free of the conditions governing their
use.

...2



ARIN_BYCHAK_0269

- 2 -

We take particular exception to the assertions in paragraph L of the Proposed Order. While rights to use Internet Numbers are legal and enforceable, they do not constitute property. For property rights to apply, it would have been necessary for NNI or its predecessors to have acquired the numbers in a transaction that transferred title in a manner recognized by law. We are aware of no such circumstances, and do not believe that legacy numbers in Canada are property of the person authorised to use them.

As we understand the Proposed Order, the essential value of the Internet Numbers being "sold" is their status as "legacy numbers," as there seems to be an underlying assumption that such numbers are not subject to the governance structures that have been put in place in the years subsequent to the allocation of those numbers to Bell Northern Research (BNR) – the predecessor of NNI. In essence, much of the value that is placed on the legacy numbers derives not from their ability to connect users to the Internet, but from the underlying theory that they are unencumbered and unrestrained by the current Internet governance structures created subsequent to their initial allocation to BNR. Under this theory, such numbers would be, in effect, "black numbers." We are, as a government, deeply concerned with any such result.

The governing principle of the use of Internet numbering is that numbers that are not used are to be made available to other users. The recognition of a property right in Internet Numbers would imperil the cooperative basis for Internet use, and potentially lead to hoarding and speculation in Internet Numbers and the creation of artificial scarcity to drive up the monetized value of those numbers. As noted in the Debtor's Motion (see paras. 7 – 8), numbers will become increasingly scarce prior to the widespread adoption of Ipv6 numbers over time.

The existence of black numbers would also pose a threat to public order and national security. The present requirements on Internet use and registration permit law enforcement and national security authorities to identify the actual users of Internet Numbers, which permits the detection and suppression of crime, such as child pornography and electronic fraud, and threats to national security, including espionage and terrorism. Black numbers could permit end users to escape identification and so hinder the investigation of crime and security threats.

Major and costly efforts are being made in all developed countries to suppress spam, misleading or fraudulent claims made over the Internet, identity theft and the theft of personal and business information. Black numbers would mask the activities and identities of the perpetrators of such activities. This is of great concern to this country, which has recently adopted anti-spam legislation that is designed to suppress such activity.

...3

ARIN_BYCHAK_0270

- 3 -

Canada has a history of support for the development of the Internet as a means of communications that facilitates family and personal relationships, business transactions, consumer and business information, and government information and transactional services. We are very concerned that, if the Proposed Order is issued in its current form, the repercussions could negatively impact the fundamental principles upon which the Internet has been built and potentially put at risk the social, economic and governmental benefits that have been the hallmark of its development to date.

We thank the Court for considering this submission.

Marta Morgan
Assistant Deputy Minister
Strategic Policy Sector

36

ARIN_BYCHAK_0271

# EXHIBIT I

"**SEC**" means the Securities and Exchange Commission.

"**Securities Disclosure Documents**" has the meaning set forth in the first sentence of Article IV.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Seller's Rights**" means Seller's exclusive right to use the Legacy Numbers Blocks, Seller's exclusive right to transfer the Legacy Number Blocks, and any other legal and equitable rights that Seller may have in and to, the Legacy Number Blocks.

"**Seller Disclosure Schedule**" means the disclosure schedule delivered by the Seller to Purchaser on the date hereof.

"**Software**" means any computer programs, applications and interfaces, whether in source code or object code, and all related documentation, user and operational guides and/or manuals.

"**Straddle Period**" has the meaning set forth in Section 6.4(b).

"**Subsequent Legacy Numbers**" means that subset of the Legacy Number Blocks listed on Exhibit C hereto.

"**Subsequent Purchase Price**" has the meaning set forth in Section 2.2.3(a).

"**Subsequent Transfer**" has the meaning set forth in Section 2.3.3(a).

"**Subsequent Transfer Date**" has the meaning set forth in Section 2.3.3(a).

"**Subsidiary**" of any Person means any Person Controlled by such first Person.

"**Tax**" means (a) any domestic or foreign federal, state, local, provincial, territorial or municipal taxes or other impositions by or on behalf of any Government Entity, including the following taxes and impositions: net income, gross income, individual income, capital, value added, goods and services, harmonized sales, gross receipts, sales, use, ad valorem, business rates, transfer, franchise, profits, business, environmental, real property, personal property, service, service use, withholding, payroll, employment, unemployment, severance, occupation, social security, excise, stamp, stamp duty reserve, customs, and all other taxes, fees, duties, assessments, deductions, withholdings or charges of the same or of a similar nature, however denominated, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto whether or not disputed, and (b) any obligation to pay any amounts set forth in clause (a) with respect to another Person, whether by contract, by reason of law, as a result of transferee or successor liability, as a result of being or ceasing to be a member of an affiliated, consolidated, combined or unitary group or otherwise for any period.

"**Tax Authority**" means any local, municipal, governmental, state, provincial, territorial, federal, including any U.S. or other fiscal, customs or excise authority, body or officials (or any entity or individual acting on behalf of such authority, body or officials) anywhere in the world with responsibility for, and competent to impose, collect or administer, any form of Tax.

-6-

6

basis of the exchange rate published in the Wall Street Journal, Eastern Edition for the day in question.

1.2.5   Statutory References.  Unless otherwise specifically indicated, any reference to a statute in this Agreement refers to that statute and to the regulations made under that statute as in force from time to time.

### ARTICLE II~~Article II~~
PURCHASE AND SALE OF LEGACY NUMBER BLOCKS

### SECTION 2.1     ~~Section 2.1.~~ Purchase and Sale.

2.1.1   Legacy Number Blocks.  Subject to the terms and conditions of this Agreement, at the Closing (with regard to the Initial Legacy Numbers) and the Subsequent Transfer Dates (with regard to the Subsequent Legacy Numbers), the Purchaser shall purchase from the Seller, and the Seller shall sell, transfer and assign to the Purchaser, on an "as is" and "where is" basis and to the fullest extent permitted under Section 363(f) of the Bankruptcy Code, ~~all of the~~ Seller's ~~right, title and interest~~Rights in and to the Legacy Number Blocks free and clear of all Liens and Claims (other than Permitted Encumbrances, Assumed Liabilities and Liens created by or through the Purchaser or any of its Affiliates). Upon such sale, transfer and assignment, the Legacy Number Blocks shall be subject to terms of the LRSA.

2.1.2   Excluded Assets.  Notwithstanding anything in this Section 2.1 or elsewhere in this Agreement to the contrary, the Seller shall retain its right, title and interest in and to, and the Purchaser shall have no rights with respect to the right, title and interest of the Seller in and to, any assets of the Seller other than the Legacy Number Blocks (collectively, the "Excluded Assets").

2.1.3   Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing (with respect to the Initial Legacy Numbers) or the applicable Subsequent Transfer Date (with respect to the Subsequent Legacy Numbers), the Purchaser shall assume and become responsible for, and perform, discharge and pay when due, the following Liabilities of the Seller (the "Assumed Liabilities"):

(a)   all Liabilities with respect to the ~~ownership~~use or exploitation of the Legacy Number Blocks, or any other legal and equitable rights in or to, or any Interests in, the Legacy Number Blocks, arising and relating to periods after the Closing Date (with respect to the Initial Legacy Numbers) or the applicable Subsequent Transfer Date (with respect to the Subsequent Legacy Numbers), including all such Liabilities related to Actions or claims brought against or in relation to the Legacy Number Blocks, and all maintenance fees, service charges and registration costs, as applicable, related to the Legacy Number Blocks; and

(b)   all Liabilities for, or related to any obligation for, any Tax that the Purchaser bears under Article VI (including, for the avoidance of doubt, Transfer Taxes imposed in connection with this Agreement and the transactions contemplated hereunder or in connection with the execution of any other Transaction Document).

2.1.4   Excluded Liabilities.  Except as provided in Section 2.1.3 and Article VI, the Purchaser shall not assume at the Closing or any Subsequent Transfer Date, as applicable, any of

-8-
~~8~~