ROBERT S. BREWER, JR.
United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
RANDY S. GROSSMAN
Assistant United States Attorney
California Bar Nos. 112520/226590/177890
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: (619) 546-6786
Sabrina.Feve@usdoj.gov
Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>JACOB BYCHAK (1),<br>MARK MANOOGIAN (2),<br>MOHAMMED ABDUL QAYYUM (3),<br>PETR PACAS (4),<br><br>                    Defendants. | Case No. 18cr04683-GPC<br><br>**GOVERNMENT RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE WIRE FRAUD COUNTS FOR FIFTH AMENDMENT DUE PROCESS & SIXTH AMENDMENT NOTICE VIOLATIONS**<br><br>**Honorable Gonzalo P. Curiel**<br><br>Date:    June 26, 2020<br>Time:    2:30 p.m. |

## I.    INTRODUCTION

The Supreme Court has ruled that "property," for purposes of the wire and mail fraud statutes, is "something of value" or a "valuable entitlement." *Pasquantino v. United States*, 544 U.S. 349, 355, 357 (2005). The government therefore bears the burden of proving at trial that, under the wire fraud statute's first essential element, Defendants' scheme to obtain property by means of false or fraudulent representations involved obtaining something of value or a valuable entitlement. Ninth Cir. Model Jury

Instr. § 8.124. To decide whether the government has met this burden via a motion to dismiss would impermissibly invade the province of the jury. Rather, the proper challenge to the sufficiency of the government's evidence is via a Rule 29 motion.

Defendants, however, argue that the Court can either hold a hearing on whether IP addresses are property for purposes of the wire fraud statute via Rule 104 of the Rules of Evidence ("Rule 104"), or decide the issue as a question of law before trial under the doctrines of void-for-vagueness and fair notice. Rule 104, however, only permits the Court to hold hearings on "preliminary questions" about the admissibility of evidence. It does not permit the Court to determine an ultimate issue, like whether IP addresses are something of value and therefore property under 18 U.S.C. § 1343.

Defendants' void-for-vagueness and fair notice argument is similarly unsupported. When, as here, Defendants are not raising a First Amendment challenge and the statute in question does not incorporate by reference any other law or constitutional provision, the void-for-vagueness and fair notice challenges are one and the same. *United States v. Lanier*, 520 U.S. 259, 267 (1997). The Supreme Court and Ninth Circuit have recognized only two ways to argue void-for-vagueness: as a facial or as an as-applied challenge. *United States v. Williams*, 553 U.S. 285, 304 (2008); *United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001). Defendants do not raise a facial attack, perhaps because the Supreme Court has repeatedly held that property, for purposes of the mail and wire fraud statutes, is given its "ordinary or natural meaning" and includes "every species of valuable right and interest." *Pasquantino*, 544 U.S. at 255-56 (citations omitted). Nor do they raise an as-applied challenge, as they recognize it would be premature. ECF No. 169-1 at 7. Defendants opt instead for a third type of challenge, citing "vagueness as-applied to the face of the indictment" to argue the indictment must allege not only the elements of the charge, but also evidence of why IP addresses are property. The Court, however, has already rejected this argument, finding that "the Government need not allege in the indictment its case theory or the evidence

underlying the charges" to satisfy "the 'fair notice' requirement." ECF No. 160 at 15 (quoting *United States v. Holmes*, 2020 WL 666563, at *6 (N.D. Cal. Feb. 11, 2020)).

Defendants' motion proffers a series of factual assertions that they claim are undisputed and indisputable. As will be discussed below, the government disagrees with most of the material statements that Defendants rely on, particularly their contention that ARIN does not recognize the possessory interests of IP address registrants. The larger problem with Defendants' factual assertions, however, is that they do not resolve the question of whether IP addresses are a "valuable entitlement" for purposes of wire fraud and omit or ignore relevant facts. At trial, the government will introduce evidence showing that Defendants repeatedly stated they "own[ed]" the blocks of IP addresses at issue in this case. The evidence will also show that Defendants paid hundreds of thousands of dollars to obtain these IP addresses, used the IP addresses to make millions of dollars sending commercial email, and kept using the IP addresses even after they were publicly flagged as "hijacked" because of how valuable they were.

A hearing on these facts in advance of trial would usurp the jury's fact-finding role. It would also be a waste of resources. To provide context for both the CAN-SPAM and wire fraud counts, the government will have to educate the jury about IP addresses, including by showing how IP addresses work, how IP addresses are distributed, and how ARIN records and publishes information for IP address registrants. Any pretrial hearing or evidentiary ruling on Defendants' motion would therefore be both redundant and unwarranted. To avoid a hearing, Defendants ask the Court to take judicial notice of portions of documents that echo their position that IP addresses cannot be property. Their excerpts are impermissibly offered for the truth of the matter asserted, however, and not properly before the Court. For these reasons and those described in more detail below, Defendants' motion to dismiss the wire fraud counts, their request for an evidentiary hearing, and their requests for judicial notice should be denied.

## II.  RELEVANT PROCEDURAL BACKGROUND[1]

On October 31, 2018, a federal grand jury in the Southern District of California returned a ten-count indictment charging defendants Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum, and Petr Pacas (collectively, "Defendants") with Conspiracy, in violation of Title 18, United States Code, Section 371; four counts of Wire Fraud, in violation of Title 18, United States Code, Section 1343; five counts of Electronic Mail Fraud, in violation of Title 18, United States Code, Section 1037(a)(5) (the "CAN-SPAM" counts), and Criminal Forfeiture.

The indictment's ten charges all relate to Defendants' hijacking of legacy Internet Protocol (IP) addresses and the use of the purloined IP addresses to send spam. Defendants have filed numerous pretrial motions in this case. Two prior motions provide context for the motion now before the Court: the motion to dismiss the CAN-SPAM counts and the motion to dismiss the wire fraud counts for failure to state a claim.

### A.  Defendants' Motion to Dismiss the CAN-SPAM Counts

In March 2019, Defendants filed a motion to dismiss the CAN-SPAM counts (Counts 6-10) as void for vagueness both facially and as-applied and for failing to state a claim, which the United States opposed. ECF Nos. 69, 154. Several months later, the parties filed competing expert declarations, with the United States submitting the declaration of John Curran, the CEO of ARIN, and Defendants submitting the declaration of Marc Lindsey, an IPv4 market advisor and attorney. ECF Nos. 107-1, 116. Prior to the hearing on their motion, Defendants indicated that they were not requesting an evidentiary hearing. In response, on August 27, 2019, the United States submitted briefing advising the Court that it agreed not to request a hearing based upon a discrete set of undisputed "relevant and material facts." ECF No. 122 at 2. In

---

[1] The Court is familiar with, and the United States adopts by reference, the Statement of Facts submitted in support of its opposition to Defendant's Rule 12 Motion to Dismiss Wire Fraud Counts. ECF No. 150 at 3-4.

particular, the United States listed the following material facts that both Curran and Lindsey agreed upon: (1) ARIN's predecessors were responsible for assigning IP addresses and keeping track of them; (2) these prior authorities maintained a listing of IP address allocation to "ensure that no single address was allocated, or used by, more than one network" and to provide public listing of the registrants' contact information; (3) ARIN currently maintains this listing, or registry, and the registry includes information for legacy (i.e. pre-ARIN) IP address holders; and 4) the registry is publicly available. *Id.* at 2-3. After identifying the undisputed facts its opposition relied on, the United States noted a disagreement between Curran and Lindsey regarding "property rights in [pre-ARIN] IP addresses under contract law" and advised the Court and Defendants that this disagreement was "immaterial to the Court's determination of whether the term 'registrant' is unconstitutionally vague. This Court need not embroil itself in determining property rights in IP addresses under contract law." *Id.* at 3-4.

The Court heard argument on the CAN-SPAM motion on October 24, 2019. ECF No. 135. On February 28, 2020, the Court denied Defendants' facial void-for-vagueness challenge and Rule 12 motion to the CAN-SPAM counts, finding that the "words used in the statute are given their ordinary meaning" and "the language of [1037](b)(5) is not ambiguous." ECF No. 154 at 18. The Court denied without prejudice Defendants' as-applied challenge, finding it "premature" because, at the "pre-trial phase," the "Court lacks the factual predicate necessary," such as "factual issues including how pre-1997 addresses function . . . and the terms of ARIN's service agreements, that may bear upon the Court's decision." *Id.* at 15.

The Court's Order did not refer to either the Curran or the Lindsey declarations. At a February 2020 hearing on Defendants' motion to dismiss the wire fraud counts, government counsel asked, "if the court is actually making factual findings, if it's referring to the declaration of John Curran which is outside the scope of the indictment," to which the Court replied, "I'm not." Ex. A, Feb. 20, 2020 Hrg. Tr., at 7. During an

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

April 8, 2020 telephone conference, the Court again confirmed that it had not relied upon either declaration: "[T]he Court saw that what we had was this dispute between the experts as to what was and what wasn't. And, at the end of the day, I relied essentially on dictionary definitions, which are wholly appropriate where there's a void-for-vagueness argument." Ex. B, Apr. 8, 2020 Hrg. Tr., at 14-15.

### B.   Defendants' Motion to Dismiss the Wire Fraud Counts

On January 23, 2020, Defendants filed a motion to dismiss the wire fraud charges (Counts 2-5) for failure to state an offense based on their argument that IP addresses are not property for purposes of the wire fraud statute. ECF Nos. 149, 160. The Court denied the motion in a written opinion issued on April 8, 2020, finding the government had adequately alleged § 1343's statutory element that defendants sought to obtain money or property and noting that it lacked a factual record to determine whether IP addresses "are 'property' for purposes of the wire fraud statute." ECF No. 160 at 2.

At a telephonic status hearing on April 8, 2020, after learning that the Court had denied the motion to dismiss the wire fraud counts, Defendants asked again to have the wire fraud charges dismissed. In particular, they requested the Court rule, as a matter of law, that IP addresses were not property within the meaning of the wire fraud statute based on undisputed facts. The Court noted that considering evidence outside the indictment for a facial void-for-vagueness challenge to the CAN-SPAM Act counts was very different from considering the extrinsic facts urged by the defense in their motion to dismiss the wire fraud counts. The Court also observed that, "I allowed any number of things to be filed—and keeping in mind that I didn't rely upon 98 percent of them—to me, doesn't change the conclusion." Ex. B at 15.

At the April 8, 2020 status hearing, the Court requested briefing from the parties regarding its legal authority to consider facts outside the record on a motion to dismiss the wire fraud counts. *Id.* at 6-7, 11-13. In particular, the Court asked, "how will we confront this question" of whether "IP blocks are or are not property," and would

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

-6-

determination of this question "invade[] the province of the jury." *Id.* at 6, 9. The Court set a date for a hearing on these issues for June 26, 2020. Defendants, seeking a hearing under Rule 104 and setting forth their argument that the wire fraud counts should be dismissed for void-for-vagueness, filed their brief on May 18, 2020. ECF No. 169. This brief addresses the Court's questions and Defendants' arguments.

## III.   LEGAL BACKGROUND: THE SUPREME COURT'S DEFINTION OF "PROPERTY" IN THE MAIL AND WIRE FRAUD STATUTES

At the February 20, 2020 hearing on Defendants' motion to dismiss the wire fraud counts, the Court pointedly noted that "everyone was focused on the substance of" what an "IP address" was. Ex. A at 19. The Court, however, repeatedly observed that the relevant question was whether IP addresses "qualify or constitute property for purposes of" the mail and wire fraud statutes. *Id.* at 11; ECF No. 160 at 1, 2, 16. The Court's emphasis on this point signaled that, in arguing over whether IP addresses were more like the copyrights in *Dowling v. United States*, 473 U.S. 207 (1985), or the domain names in *Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003), the parties had failed to identify the threshold legal issue: what is "property" for purposes of §§ 1343 and 1341.[2] The government apologizes for this oversight; this section seeks to rectify its earlier failure to identify and address this threshold issue.

As the Court appears to have anticipated, the Supreme Court has squarely addressed and answered this question. Property for purposes of the wire and mail fraud statutes is "something of value" or a "valuable entitlement." *Pasquantino*, 544 U.S. at 355, 357. At issue in *Pasquantino* was whether Canada's right to uncollected excise taxes on liquor constituted property under § 1343. *Id.* at 355. *Pasquantino* held that this right was "an entitlement" to collect money, which was "something of value" and

---

[2] Because the "mail and wire fraud statutes share the same language in relevant part," the Supreme Court "applies the same analysis to both sets of offenses." *Carpenter v. United States*, 484 U.S. 19, 25 (1987).

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

therefore property. *Id.* The Supreme Court based this finding, in part, on *McNally v. United States*, 483 U.S. 350, 358 (1987), which had previously held that "property rights" are "something of value." *Id.* It also relied on *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004), for the proposition that "[v]aluable entitlements like these are 'property' as that term ordinarily is employed." *Pasquantino*, 544 U.S. at 356.

In reaching this decision, the Supreme Court distinguished *Pasquantino*'s facts from those in *Cleveland v. United States,* 531 U.S. 12 (2000), based on its determination that the government interest in *Cleveland* was "purely regulatory," whereas Canada's interest in uncollected tax revenue was an "economic" interest. 544 U.S. at 356-57. *Cleveland*, however, still recognized that property for purposes of the mail fraud statute was an "entitlement" and reached its ruling, in part, by finding that the government's interest in a pre-license processing fee, unlike a post-license revenue stream, was not "an entitlement . . . sufficient to establish a state property right." 531 U.S. at 22.

Leaving no doubt that *Pasquantino*'s definition of "property" remains controlling precedent for wire fraud cases, the Supreme Court recently reaffirmed the definition in *Kelly v. United States*, 140 S. Ct. 1565 (2020). *Kelly* involved wire fraud charges against public officials who sought to manipulate public resources, namely access to the George Washington Bridge, for political purposes. Justice Kagan, writing for the majority, characterized this scheme as one to alter a regulatory choice and distinguished it from the "property fraud" schemes whose object involves a "valuable entitlement." *Id.* at 1573-74 (quoting *Pasquantino v. United States*, 544 U.S. 347, 357 (2005)). Concluding that the defendants' realignment of the Bridge's access lanes affected a *Cleveland*-like regulatory interest, and that the employee time and labor necessary to effectuate the lane realignment, while unquestionably a valuable entitlement constituting "property," was "incidental" to the fraudulent scheme and not its object, the Supreme Court reversed the defendants' fraud convictions. *Id.*

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

-8-

The Supreme Court, in repeatedly interpreting property as a "valuable entitlement" or "something of value," has rejected efforts to restrict "property" for purposes of wire and mail fraud to ownership or other narrow possessory interests. In *Carpenter v. United States*, 484 U.S. 19, 26 (1987), the Supreme Court rebuffed the argument that property must be owned to satisfy the wire fraud statute. "[N]ews matter, however little susceptible of ownership or dominion in the absolute sense . . . [can] be distributed and sold to those who will pay money for it, as for any other merchandise." *Id.* (quoting *International News Service v. Associated Press*, 248 U.S. 215, 236 (1918)). Emphasizing the broad nature of property rights under § 1343, *Pasquantino* cited Black's Law Dictionary for the position that "property" includes "every species of valuable right and interest." 544 U.S. at 356 (internal citations omitted).

Consistent with this binding precedent, the Courts of Appeal, reviewing convictions for mail and wire fraud, have found a range of valuable rights and interests to be property under these two statutes, including: the right to full payment, mining claims, civil causes of action, software source code, jobs, and employment contracts. *See United States v. Ali*, 620 F.3d 1062, 1067-68 (9th Cir. 2010) (right to full payment); *Nygard v. Dickinson*, 97 F.2d 53, 56 (9th Cir. 1938) (mining claims); *United States v. Neff*, 787 F. App'x 81, 91 (3d Cir. 2019) (civil causes of action); *United States v. Seidlitz*, 589 F.2d 152, 160 (4th Cir. 1978) (software source code); *Sorich v. United States*, 709 F.3d 670, 675 (7th Cir. 2013) (jobs); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (employment contracts).

Similarly, the Courts of Appeal have rejected arguments seeking to narrow the definition of property to something less than a "valuable entitlement" or "something of value." *See, e.g.*, *Ali*, 620 F.3d at 1068 (rejecting argument that "only 'traditionally recognized forms of property' constitute property under the [mail and wire fraud] statutes."); *United States v. Blaszczak*, 947 F.3d 19, 32 (2d Cir. 2019) ("While *Cleveland* remains good law, courts have consistently rejected attempts –

similar to those advanced by Defendants here – to apply its holding expansively . . . . [and find it] establish[ed] rigid criteria for defining property.") (internal citations omitted). The Supreme Court's definition of property as "something of value" or a "valuable entitlement" therefore applies directly to the issue now before the Court.[3]

## IV.     WHETHER IP ADDRESSES ARE "PROPERTY" FOR PURPOSES OF § 1343 MUST BE DECIDED AFTER TRIAL

At the April 8, 2020 status conference, the Court directed the parties to address two questions: (1) "how will we confront this question" of whether "IP blocks are or are not property;" and (2) would determination of this question "invade[] the province of the jury." Ex. B at 6, 9. The answers to these two questions are: (1) via a post-trial motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"); and (2) yes.

The Court, in considering Defendants' separate Rule 12(b) motions to dismiss the CAN-SPAM and wire fraud counts, repeatedly ruled that it cannot look to extrinsic facts. "In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment," and it "must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." ECF No. 154 at 16 (quoting *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002)); ECF No. 160 at 4-5. Motions to dismiss for failure to state an offense should not "assess the veracity of [an indictment's] claims or test the evidence . . . ." ECF No. 160 at 6 (quoting *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996)). Rather, the procedural tool for challenging the veracity of an indictment's claims and testing the evidence's legal sufficiency is a post-trial Rule 29 motion.

---

[3] The Court may have anticipated this definition when it noted at the hearing on Defendants' previous motion to dismiss the wire fraud counts that "I don't think anyone disputes that IP address, that netblocks confer some entitlement . . . ." Ex. A at 9.

Defendants, having failed to obtain dismissal of the wire fraud counts for failing to state an offense and seeking to forestall a trial, argue there is a third way: Rule 104. ECF No. 169-1 at 8. In the alternative, they propose that the Court could consider and rule on "undisputed or indisputable facts." *Id*. Finally, noting the Court's willingness to allow the parties to submit extrinsic evidence for purposes of the previous void-for-vagueness challenge, Defendants now argue that the wire fraud counts should be dismissed under void-for-vagueness as a matter of law based on their unilateral proffer of extrinsic evidence.

This section addresses the two questions the Court directed the parties to brief, including why Rule 104 would not permit the Court to invade the province of the jury and determine whether IP addresses are property for purposes of wire fraud. It also, for the sake of the record, addresses why Defendants' "undisputed or undisputable facts" are both disputed and disputable, and why their requests for judicial notice and judicial estoppel should be denied. A separate section addresses Defendants' void-for-vagueness and fair notice challenges.

## A.    Rule 29 Is the Appropriate Tool for Considering Whether IP Addresses Are "Property" for Purposes of Wire Fraud

The correct way to challenge the government's ability to satisfy an essential or jurisdictional element of an offense is not via a motion to dismiss, but via Rule 29. *United States v. Nukida*, 8 F.3d 665, 672-73 (9th Cir. 1993). Rule 29(a) permits a defendant, after the government closes its evidence or after the close of all the evidence and before the matter is submitted to the jury, to seek acquittal by challenging the sufficiency of the evidence to sustain a conviction. Fed. R. Crim. P. 29(a). Rule 29(c) permits a defendant to make the same challenge after a jury returns a verdict. Fed. R. Crim. P. 29(c).

A Rule 29 motion is the proper procedural tool for challenging the adequacy of the government's evidence. For example, in *United States v. Miller*, 953 F.3d 1095,

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

-11-

1108 (9th Cir. 2020), the Ninth Circuit stated that, under Rule 29(c), the courts consider whether there is sufficient evidence of a charge's "essential elements," including, in that case, whether the government had introduced sufficient evidence of an "interstate wire communication" needed to sustain wire fraud charges. Multiple other decisions have similarly found that evidentiary challenges to wire fraud's essential elements are brought via Rule 29. *See, e.g., United States v. French*, 748 F.3d 922, 935 (9th Cir. 2014) (defendant may challenge the sufficiency of the evidence that she acted with the requisite intent to defraud under §§ 1341 and 1343 via Rule 29(c)); *United States v. Jinian*, 725 F.3d 954, 959-62 (9th Cir. 2013) (Rule 29(a) motion allows a defendant to challenge the sufficiency of the evidence of an interstate wire and thereby seek acquittal of a wire fraud charge); *Blaszczak*, 947 F.3d at 30-31 (overruling government objection that defendants' failure to object to the wire fraud jury instruction that she must have "deprive[d] [the victim] of 'something of value'" failed to preserve the issue because defendant brought a Rule 29(a) challenge to whether the wire fraud scheme involved "property").

Tellingly, the *Kelly* decision that Defendants rely on arose from a Rule 29 motion, not from a motion to dismiss or a Rule 104 hearing. In *United States v. Baroni*, 909 F.3d 550, 561 (3d Cir. 2018), the Third Circuit considered the *Kelly* defendants "challenge [to] the sufficiency of the evidence underlying their wire fraud convictions." *Cert. granted sub nom. Kelly v. United States*, 139 S. Ct. 2777 (2019), and *rev'd and remanded sub nom. Kelly v. United States*, 140 S. Ct. 1565 (2020). In particular, both the Third Circuit and, later, the Supreme Court reviewed the defendants' argument, brought via Rule 29, that the evidence was insufficient to show that the alleged victim was "deprived of any property right." *Baroni*, 909 F.3d at 562.[4]

---

[4] In fact, the district court in *Kelly* rejected defendants' attempt to litigate their as-applied vagueness challenge via a motion to dismiss, finding it "inappropriate for a

Similarly, *McNally*, *Carpenter*, *Cleveland*, and *Pasquantino* all came before the Supreme Court post-trial. In *McNally*, the Supreme Court's review of the post-trial record focused on the trial court's instruction to the jury that it could find the defendants had impermissibly obtained money or property by one of two theories and found that both theories of property impermissibly included a right to honest and impartial government services. 483 U.S. at 354-55. In *Carpenter*, the Supreme Court took specific note of findings the district court made "on the basis of testimony presented at trial." 484 U.S. at 22. *Cleveland* relied on trial evidence showing that the government's interest in a pre-license processing fee, unlike a post-license revenue stream, was not "an entitlement . . . sufficient to establish a state property right." 531 U.S. at 22. Finally, in *Pasquantino*, the Supreme Court referred "to the evidence presented at trial" in determining that Canada's "valuable entitlement" to collect tax revenue was "something of value" and therefore property for purposes of the wire fraud statute. 544 U.S. at 353-54. The Supreme Court's reliance on substantive trial records in each of these canonical wire fraud cases illustrates why any pretrial attack on the sufficiency of the government's evidence pertaining to the wire fraud "property" element is inherently premature and should only be brought via Rule 29.

## B.    Rule 104 Is Not an Appropriate Basis for Defendants' Challenge

Defendants cite Rule 104(a) as the sole procedural tool for hearing evidence extrinsic to the four corners of the indictment. ECF No. 169-1 at 24-25. Rule 104 does not, however, allow for a hearing on anything other than "preliminary questions" about the admissibility of evidence. Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists or evidence is admissible." Rule 104 provides the court with the gatekeeping authority to decide preliminary questions that make evidence inadmissible under some other rule of

---

pretrial motion." *See* Br. for Pet., *United States v. Kelly*, 2019 WL 4568203, at \*12 (Sept. 17, 2019).

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

evidence, but it does not itself provide a substantive basis for excluding evidence. *United States v. Evans*, 728 F.3d 953, 960-61 (9th Cir. 2013).

In determining whether a party has introduced sufficient evidence to meet its burden under Rule 104, the "trial court neither weighs credibility nor makes a finding that the party has proved the conditional fact by a preponderance of the evidence." *Huddleston v. United States,* 485 U.S. 681, 690 (1988). The court must simply examine the evidence and decide whether the jury *could* find that conditional fact by a preponderance of the evidence (if so, the evidence goes to the jury). In *Evans*, the Ninth Circuit found that the district court had exceeded its authority under Rule 104 and invaded the province of the jury when it excluded an Oregon birth certificate offered as evidence by a defendant charged with an immigration offense based on the court's belief that the birth certificate was fraudulent. 128 F.3d at 961-62.

Rule 104 hearings, by the statute's plain language, relate to the admissibility of specific types of evidence *at trial*. For example, Rule 104 hearings have examined the existence of a medical condition to determine whether the statement in question was made for purposes of medical diagnosis and thus fell within an exception to the hearsay rule. *United States v. Lukashov*, 694 F. 3d 1107 (9th Cir. 2012). Other Rule 104 hearings have explored the existence of a conspiracy to determine the admissibility of potential co-conspirator statements; the existence of an agency relationship to determine whether the statements are admissible against the principal; and the unavailability of a witness to determine whether former testimony is admissible. *See Bourjaily v. United States*, 483 U.S. 171 (1987) (coconspirator statements); *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) (agency relationship); *United States v. Brewer*, 947 F. 2d 404 (9th Cir.1991) (witness unavailability). The defense cites no case, nor are counsel for the government aware of any, where the court considered a motion to dismiss an indictment under Rule 104.

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

The only case that the government has found to address this issue contradicts Defendants' argument. In in civil case, where summary judgment is permitted, the district court denied a Rule 104 motion asking it to determine disputed trial facts. In *Patriarch, Inc. v. Dynomite Distribution*, No. 06cv4960-CAS, 2007 WL 4800400 (C.D. Cal. Feb. 14, 2007), the court was asked to construe the alleged oral contract between the parties. The plaintiff asked the court to find, as a matter of law, that the oral agreement was a license of intellectual property rights, rather than a sale of such rights, arguing such conclusion was the only tenable one given the evidence. *Id.* at *1. In denying the motion for a Rule 104 hearing, the Court noted that while, in a civil case, the Court may construe contract terms as a matter of law, the undisputed language of the agreement between the parties was not before the Court. *Id.* Rather, the parties disputed the language of the agreement, making the issue one for the jury to decide. *Id.*

In the instant case, the defense has not identified any grounds for a hearing under Rule 104. The defense has not cited any portion of the Federal Rules of Evidence under which it seeks a ruling on the admissibility of evidence, the existence of a privilege, or the qualifications of a witness to testify (the grounds for a hearing pursuant to Rule 104). The defense motion has placed nothing before the Court to decide under Rule 104. Instead, the defense asks the Court to go beyond the bounds of Rule 104 and the four corners of the indictment and rule, as a matter of law, that an IP address is not property for purposes of the wire fraud statute. Neither legal precedent nor the language of the rule itself supports this request.

**C.    Granting Defendants' Request for a Hearing Would Invade the Province of the Jury**

In response to the Court asking the parties if determination of whether "IP blocks are or are not property" would "invade the province of the jury," Ex. B at 6, 9, the government respectfully submits that such a hearing would represent such an impermissible invasion.

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

-15-

"[A] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996). "A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence . . . . The Court should not consider evidence not appearing on the face of the indictment." *Id.* (internal citations omitted). In *Jensen*, the court dismissed the indictment for lack of venue, based on a marine accident report, a marine casualty report, and two affidavits of a marine investigator submitted by the defense, which suggested that the vessel in question was on the high seas rather than the District of Washington at the time of the offense. *Id.* The Ninth Circuit held that the district court erred in considering the documentation submitted by the defense: "By basing its decision on evidence that should only have been presented at trial, the court in effect granted summary judgment for the defendants. This it may not do." *Id.*

Similarly, in *Nukida*, the Ninth Circuit overruled a district judge's dismissal of counts charging the defendant with tampering with consumer products affecting interstate commerce because the district court impermissibly relied on its own determination of whether the government could prove the tampered products affected interstate commerce. 8 F.3d at 667-68. Finding that the products' interstate nexus was "one of the material elements of the offense," the Ninth Circuit ruled that the defendant's motion to dismiss based on the argument that her actions did not affect interstate commerce "amounted to a premature challenge to the sufficiency of the government's evidence tending to prove a material element of the offense." *Id.* at 669-70. Significantly, for purposes of evaluating Defendants' arguments, *Nukida* rebuked the trial court for looking to the statute's legislative history and ruling on defendant's motion to dismiss "as a matter of statutory interpretation" regarding whether the charged conduct involved "an economic impact on interstate commerce." *Id.* at 671. "The district court erred in relying on legislative history to cloud the meaning of this

otherwise clear language." *Id*. The determination of whether the defendant's "actions resulted in sufficient effects on interstate commerce is essentially factual, and therefore inappropriate for resolution on a pretrial motion to dismiss . . . ." *Id.* at 672.

In *United States v. Shortt Accountacy,* 785 F.2d 1448, 1452 (9th Cir. 1986), which Defendants relied on, the Ninth Circuit stated that the district court may "decide the issue raised in the pretrial motion before trial if it is 'entirely segregable' from the evidence to be presented at trial. If the pretrial claim is 'substantially founded upon and intertwined with' evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." (internal citations omitted). As the ultimate finder of fact is concerned with the general issue of guilt, a motion requiring factual determinations may be decided before trial only when "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington,* 395 U.S. 57, 60 (1969); *see United States v. Lunstedt,* 997 F.2d 665, 667 (9th Cir.1993) ("a district court can only grant [a motion to dismiss] if it is 'entirely segregable' from the evidence to be presented at trial."). Examples of such segregable issues include double jeopardy, former convictions, former acquittals, statute of limitations, and immunity. *United States v. Sharma*, No. 17cr0055-TLN, 2019 WL 2285393, at *2 (E.D. Cal. May 29, 2019).

Defendants' motion, however, does not address a segregable legal defense that can be raised prior to trial, like double jeopardy or the statute of limitations. Instead, Defendants challenge the government's ability to prove that IP netblocks are a "valuable entitlement" or "something of value" as required by the wire fraud statute. If, as here, the evidence before the Court relates to one of "the essential elements" of the charge, it is "the jury's exclusive function to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Bernhardt*, 840 F.2d 1441, 1448 (9th Cir. 1988). The Court "may not usurp the role

-17-

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

Under the Ninth Circuit's Model Criminal Jury Instructions, the first essential element of wire fraud requires evidence that Defendants participated in a scheme or plan for obtaining property by means of false or fraudulent pretenses, representations, or promises. Ninth Cir. Model Jury Instr. § 8.124.[5] The government, like the prosecutors in *Pasquantino* and *Carpenter*, will therefore need to present evidence showing why the IP netblocks hijacked by Defendants represented a "valuable entitlement" or "something of value." To this end, the government will likely introduce the following non-exhaustive list of evidence at trial: (i) testimony and evidence regarding what an IP address is, how it works, how it is allocated, where it is registered, and whether more than one entity can use an IP address at the same time; (ii) testimony and evidence regarding the average cost of leasing and buying IP addresses over the course of the conspiracy, including whether costs were higher for those seeking IP addresses to send

---

[5] Model Jury Instruction 8.124 sets forth following elements for wire fraud:

> First, the defendant knowingly [participated in] [devised] [intended to devise] a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[, or omitted facts.] [Deceitful statements of half-truths may constitute false or fraudulent representations];
>
> Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;
>
> Third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and
>
> Fourth, the defendant used, or caused to be used, an interstate [or foreign] wire communication to carry out or attempt to carry out an essential part of the scheme.

commercial email, and, if so, why; (iii) testimony and evidence regarding how users "announced" IP addresses and assigned them to particular servers, what a "LOA" is, how it works, and who relied on them; (iv) testimony and evidence regarding Defendants' need for IP addresses, the hundreds of thousands of dollars they spent to acquire IP addresses, and the millions of commercial emails they sent from the hijacked IP addresses; and (v) testimony and evidence regarding the millions of dollars that Defendants' employer made by sending commercial email from the hijacked IP addresses.

This list of examples pertains only to the first element of the wire fraud charge and does not presume to address the charge's remaining three elements or the CAN-SPAM counts. It bears noting, however, that much of the evidence listed above would also be relevant to the CAN-SPAM counts and would be introduced at trial in relation to those charges. The detail, breadth, and overlap of the evidence at issue for determining whether IP addresses are "something of value" or a "valuable entitlement" show why ruling on this issue prior to trial would not only impermissibly deprive the government of the opportunity to put on its own evidence and improperly usurp the jury's role, but be inefficient as well.

**D. Defendants' Evidentiary Submissions Are Legally and Factually Infirm**

Tacitly recognizing that it is the jury's exclusive right to resolve factual disputes, Defendants argue that there are only three "preliminary facts necessary to decide" its motion to dismiss and that these facts are "undisputed or indisputable." ECF No. 169-1 at 8. There are three critical flaws with this argument. First, the government retains the right to choose and put on its own case. "[T]he prosecutor is entitled to prove its case by evidence of its own choice . . . [and] a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997); *see also United States v. Rojas-Pedroza*, 716 F.3d 1253, 1271 (9th Cir. 2013).

1    *Old Chief* found that the limited exception to "the accepted rule that the

2    prosecution is entitled to prove its case by evidence of its own choice," *id.* at 169, was

3    when a defendant agreed to stipulate to the government having proven an essential

4    element involving "felony-convict status." *Id.* at 189. Here, Defendants have not offered

5    to stipulate to the government having met its evidentiary burden and instead challenge

6    the government's ability to satisfy an essential element. Their motion and the documents

7    they ask the Court to rule on confound the "accepted rule" that the government gets to

8    choose its own evidence and should be denied on that basis alone.

9         There are, however, two additional flaws in Defendants' argument that the Court

10   should rule on their "three preliminary facts." One issue is that the legal theories

11   whereby Defendants seek to put their choice of evidence before the Court without even

12   holding a hearing, i.e. judicial notice and judicial estoppel, are infirm and should be

13   rejected. The other problem is that the facts Defendants seek to put before the Court are

14   in both in dispute and incomplete. The following two subsections address these two

15   problems with Defendants' proffered evidence.

16        1.    Defendants' Proffered Evidence Lacks a Legal Foundation

17        Defendants ask the Court to admit and accept as true a series of attachments

18   submitted under one of two theories: judicial notice or judicial estoppel. For the

19   following reasons, Defendants' requests should be denied.[6]

20

21   ─────────────

     [6] Defendants also chose to submit the parties' email correspondence as an exhibit. *See*

22   ECF No. 169-4. Filing these emails without prior leave of the Court violated the Local

23   Rules. Civil Rule 83.9, which applies to criminal proceedings under Criminal Rule

     1.1(e)(27), states that "Except as authorized by the judge, attorneys must not send copies

24   to the judge of letters sent to others." The emails are therefore not properly before the

     Court. If the Court nonetheless elects to read them, they show that, while agreeing that

25   certain statements in the Curran and Lindsey declarations appear true in isolation, the

26   government noted the statements' broad representations did not account for nuances

     and interpretation, making them an unreliable basis for a ruling by the court. Defendants

27   did not provide a final version of their SUF to the government for concurrence and

28

a. *Judicial Notice*

Defendants, seeking to avoid a hearing, propose that the Court simply take judicial notice of their evidence under Rule 201. ECF 169-3. Their request should be denied because it impermissibly seeks to admit the documents for the truth of the matter asserted therein and because the assertions within the documents are reasonably in dispute and require additional evidence to decide the issue at hand.

Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is: (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id*. In cautioning against judicial notice, Rule 201's advisory committee notes emphasize that "taking evidence, subject to cross-examination and rebuttal, is the best way to resolve controversies involving disputes of adjudicative facts, that is, facts pertaining to the parties." *Id*., Adv. Comm. Notes. Dispensing with these traditional methods should only be done when there is "[a] high degree of indisputability." *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1151 (9th Cir. 2005) (citing Fed. R. Evid. 201, Adv. Comm. Notes.). "[T]he kind of things about which courts ordinarily take judicial notice are (1) scientific facts: for instance, when does the sun rise or set; (2) matters of geography: for instance, what are the boundaries of a state; or (3) matters of political history: for instance, who was president in 1958." *Mat Van, Inc. v. Sheldon good & Co. Auctions, LLC*, No. 07-CV-912-IEG-BLM, 2008 WL 346421, at *22-23 (S.D. Cal. Feb. 6, 2008) (quoting *Sahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997)). The discrete and precise facts that are properly subject to judicial notice in no way resemble the legal conclusions and policy discussions for which Defendants seek judicial notice.

---

omitted from their email exhibit the attachment the government compiled in an effort to clarify which facts were at issue.

Defendants' request for judicial notice suffers both in form and substance. When evaluating judicial notice, courts must carefully distinguish between permissible requests for judicial notice of a document's existence and impermissible requests to take judicial notice of the facts contained therein. For example, a "court may take judicial notice of matters of public record." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). However, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* Likewise, a court may take judicial notice of publications to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art of Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *see also Miller v. Sawant*, 2020 WL 1987073 n.2 (9th Cir. 2020) (taking judicial notice of an article's date for the limited purpose of identifying when a victim's name became public). In unrelated cases, the facts within court filings are similarly subject to dispute and thus not suited for judicial notice. *United States v. Raygoza-Garcia*, 902 F.3d 994, 1001-02 (9th Cir. 2018); *United States v. Cerda-Ramirez*, 730 F. App'x 449, 452 (9th Cir. 2018).

Defendants misunderstand and thus overestimate the scope of Rule 201 by asking the Court to take judicial notice of disputed facts contained within their nine exhibits. Defendants request judicial notice of four categories of documents, none of which fall within Rule 201. First, as to Defense Exhibits A-C, Defendants request judicial notice of three Registry Service Agreement ("RSA") templates from ARIN. The Court cannot judicially notice the RSA templates because the truth of their contents, particularly as it relates to property rights, is disputable. *King v. Kramer*, 763 F.3d 635, 648-50 (7th Cir. 2014) (affirming denial of judicial notice to a contract in which the meaning was disputed); *see Cirulli v. Astorino*, No. 14-CV-5459 NSR, 2015 WL 4635707, at 4 n.5 (S.D.N.Y. Aug. 3, 2015) (declining judicial notice of a non-disparagement agreement). The Court also cannot take judicial notice simply because ARIN drafted the templates,

nor did the Court do so in its prior order (ECF No. 154 at 3-4), as Defendants suggest. ARIN did not and cannot define "property" for purposes of § 1343. Only the courts and Congress can do that. The accuracy of a private entity describing what falls into the legal definition of property for purposes of wire fraud is therefore generally questionable and specifically disputed by the United States, as described below.

Second, the mere fact that government agencies were involved in drafting Defense Exhibits D and G does not make their facts indisputable. Judicial notice of public records may be proper for proof of their existence, but not for the truth of disputed contents. *See Khoja*, 899 F.3d at 1000-02 (finding it appropriate to take judicial notice of the date of a public filing, but holding it was abuse of discretion to take judicial notice of the facts contained within it); *see also United States v. Ritchie*, 342 F.3d 903, 907-09 (9th Cir. 2018). Significantly, Defendants disregard the actual text of Defense Exhibit D, a Staff Working Paper from the Federal Communications Commission (FCC), which expressly warns on its very first page that its contents are only "preliminary materials circulated to stimulate discussion and critical comment" and "do not necessarily reflect the view of the FCC." ECF No. 149-2 at 37 (providing full copy of Defendant's excerpted exhibit and available at https://www.fcc.gov/reports-research/working-papers). Likewise, Defense Exhibit G is a blog posted on the National Telecommunications and Information Administration ("NTIA") website from the NTIA Administrator describing the government's position on the development of internet technical standards and policies. The validity of its contents is disputable, and it does not constitute an admission of government record.

Third, the contents of Defense Exhibits E and F—two news articles—are neither generally known nor from sources whose accuracy cannot be questioned. As with public records, judicial notice of private-party publications can establish, when appropriate, what was in the public realm at the time but not the truthfulness of its facts. *See Von Saher*, 592 F.3d at 960 (9th Cir. 2010). The truthfulness of the content, which describes

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

-23-

ARIN and government policies, is improper for judicial notice because a private entity is not a source whose accuracy cannot reasonably be questioned in providing not just descriptive information, but also analysis. For example, Exhibit E presents a private party's view on the "legal aspects" of IP numbers, references documents not before the court, and provides legal analysis of relevant case law. There is similarly no reason why this Court should take judicial notice of Exhibit F's interpretation of case law when the Court can conduct its own analysis on that point. The articles' interpretation of fact and law is disputable and not subject to judicial notice.

Fourth, Defense Exhibit H, a letter from a Canadian Department of Industry Official discussing Canada's position on Internet Numbers, and Defense Exhibit I, a PACER downloaded excerpt of an agreement, are improper for judicial notice. Neither Exhibit H nor I deals with the immediate parties in this case. Once again, Defendants cannot conflate the Court's ability to take judicial notice of the fact that such documents were publicly filed with the ability to take judicial notice of the facts contained therein. *Khoja*, 899 F.3d at 1000-2 (finding judicial notice of facts contained within European Medical Agency report was an abuse of discretion, but separately allowing judicial notice of the date on which a foreign application was filed, but not the facts contained therein); *Color Switch LLC v. Fortafy Games DMCC*, 377 F. Supp. 3d 1075, 1090 (E.D. Cal. 2019) (taking judicial notice of foreign document's existence, but not the facts therein). The case Defendants cite proves as much. *See Raygoza-Garcia*, 902 F.3d at 1001-02 (denying judicial notice because defendant sought judicial notice not just of the public filings' events, but the facts therein). The mere fact of the public filing of these documents does not change that their contents are not generally known or from a source that cannot reasonable be questioned. For the foregoing reasons and, because the facts are reasonably in dispute as described below, this Court should deny Defendants' request for judicial notice of Defense Exhibits A-I.

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

-24-

b. *Judicial Estoppel*

Defendants unsuccessfully argued in their prior motion to dismiss the wire fraud charges that judicial estoppel prevents the United States from contesting the assertion that IP addresses are not property. ECF No. 149-1 at 13-14 ("Having taken the position that IP addresses are not property to support their argument that the term 'registrant' in the CAN-SPAM Act is not void for vagueness, the Government cannot now take the opposite position."). While their current brief does not expressly refer to this legal argument, several pointed statements in their briefing misrepresent the record in a manner that suggests they are nonetheless raising an estoppel argument. ECF No. 169-1 at 9-11. For example, they state that the government's opposition to the CAN-SPAM motion to dismiss "relie[d]" on Curran's statement that ARIN does not confer property rights to recipients of IP address allocations. *Id*. at 9. They also claim that, after Defendants sought dismissal of the wire fraud charges, the "Government did an about-face and claimed it disputed the statement of its own expert that IP addresses were not property." *Id*. at 10. The record, however, shows that months before the hearing on the CAN-SPAM motion the United States submitted briefing in which it noted the disagreement between Curran and Lindsey regarding "property rights in [pre-ARIN] IP addresses under contract law" and specifically advised the Court that this disagreement was "immaterial to the Court's determination of whether the term 'registrant' is unconstitutionally vague. This Court need not embroil itself in determining property rights in IP addresses under contract law." ECF No. 122 at 3-4.

The record shows that the United States never "relied" on Curran's statement regarding property rights, let alone exhibited the hypocrisy implied by Defendants. Framed another way, if the United States had struck from Curran's declaration the statement upon which Defendants rely so heavily, Defendants, in the event they later learned of it, would have likely accused the government of violating its discovery obligations and improperly seeking to conceal information. There can be no reasonable

1   dispute that, once Curran drafted a declaration describing this position, the prudent

2   choice for any prosecution team was to disclose it. To this end, the government

3   submitted a declaration containing the disputed statement and specifically requested

4   that the Court not consider the statements from either Curran or Lindsey discussing

5   ARIN's position on IP ownership. These actions in no way estopped the government

6   from arguing that IP addresses are property for purposes of the wire fraud statute. *See*

7   *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Defendants' insinuation that the

8   government has a legal or ethical obligation to agree with their position that IP addresses

9   are not property is therefore baseless.

10                  2.    Material Facts Are in Dispute

11          Defendants' argument that the government cannot reasonably dispute any of their

12   factual assertions are also baseless. Defendants propose three "preliminary facts

13   necessary to decide" its motion to dismiss: (1) that Congress "relinquished to ARIN the

14   authority to manage and allocate IP addresses;" (2) ARIN's constant position has been

15   and remains that "IP addresses, whether legacy or not, are not property;" and (3) no

16   court has specifically ruled that IP addresses "are 'property' under any definition." ECF

17   No. 169-1 at 8. They also submitted documents attached to a Declaration from Counsel,

18   as well as a "Statement of Undisputed Facts ("SUF").[7] ECF No. 169-2, 3, and 4.

19          The government disagrees with the fundamental premise of Defendants'

20   argument that these three factual allegations are the proper basis for deciding whether

21   IP addresses are property for purposes of wire fraud. The test of whether IP addresses

22

23   _____

    [7] The government does not agree or disagree to the admissibility, authentication, or

24   relevance of any of the facts contained in Defendants' attachments because those

25   objections are beyond the scope of this argument. The government will only address
    disputed facts that are material insofar as Defendants have specifically relied on them

26   in this brief. In particular, for the reasons discussed below, the government disputes
    Defendants' characterizations of, and inferences from, SUF Nos. 1 and 10.

27

28   Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud          -26-
     Counts under Void-for-Vagueness & Fair Notice

are property is whether they represent a "valuable entitlement" or "something of value" and these three factual allegations do not address, let alone answer, that question. For the purposes of maintaining a clear record, however, the government offers the following explanation for why these three factual assertions are disputed and disputable.

### a. *ARIN Is Independent of the U.S. Government*

The parties agree that ARIN is a non-profit non-governmental organization that manages the allocation and assignment of IP addresses for the region containing Canada, the United States, and the Caribbean countries. ECF No. 169-1 at 15. The parties also agree that the United States has sought to avoid politicizing the Internet by limiting regulatory control over it, unlike with domestic telephony. *Id.* at 16 (quoting Congressional Resolution supporting promotion of "a global Internet free from government control…").

The government nonetheless disputes Defendants' inference from Congress's support for ARIN being both apolitical and independent that ARIN is in a position to bind or speak for the United States. To hold otherwise would undermine the goal of establishing ARIN as an independent non-governmental entity. ARIN's putative ability to bind the United States would also impermissibly intrude upon the United States' rights as a sovereign nation and the Senate's ratification powers. *Cf. Medellin v. Texas*, 552 U.S. 491, 510-11 (2008) (ruling that the International Court of Justice cannot bind the United States).

Defendants' argument that Congress "relinquished" control over the Internet and IP allocation to ARIN also overlooks other crucial stakeholders. The Congressional Resolution quoted by Defendants expressed support for the "multi-stakeholder model that governs the Internet…." ECF 169-1 at 16. While ARIN is part of this model, so are ICANN and the other Regional Registries. As Defendants note, ARIN also develops policies for its region "in conjunction" with its own community stakeholders. ECF 169-1 at 16-17. The record proffered by Defendants therefore rebuts their argument that only

ARIN decides "policies for IP numbers." *Id*. Policies over Internet governance emanate from a collaborative multi-stakeholder model and the structure of this governance model continues to evolve. *See, e.g.*, ICANN, https://www.icann.org/stewardship-accountability (last accessed June 1, 2020). While ARIN is a powerful and important voice in guiding these policies, it is far from the only one. *Id*. To the extent that the government's relationship to ARIN is therefore even relevant to defining "property" for the wire fraud statute, the government disagrees with Defendants' assertion that ARIN can legislate for Congress or otherwise dictate federal law.

b. *ARIN Recognizes Legacy Registrants' Property Interests*

Defendants do not accurately characterize ARIN's position regarding registrants' possessory interests in their allocated IP addresses. Defendants state that, "ARIN's consistent stance over the years had been and continues to be that IP addresses, whether legacy or not, are not property," ECF No. 169-1 at 8, and argue that this stance should determine whether IP addresses are "property" for purposes of the wire fraud statute. This argument ignores both the Supreme Court case law that has already defined "property" under §1343 as "something of value" or a "valuable entitlement," *see supra* Section III, and ARIN's statements recognizing that IP address allocation confers a valuable entitlement on its registrants.

To begin with, in the declaration at the center of Defendants' argument, Curran recognized that IP addresses confer a valuable entitlement on registrants when he stated that, "Interfering with the organizations that have the exclusive right to use the [legacy IP] addresses without the knowledge and permission of the holder is theft." ECF No. 107-1, ¶ 21. Other examples of ARIN recognizing IP address registrants' valuable entitlements include Curran, acting in his capacity as CEO of ARIN in 2011, publicly writing the following in response to Nortel's decision to sell its legacy IP addresses to Microsoft for $7.5 million:

> ARIN has never asserted that registrants have no rights with respect [to] address blocks registered to them; that would actually run contrary to one of the key goals of the registry itself…. As part of the registry services offered by ARIN, address block holders have various rights []such as the right to be the exclusive registrant, to update their registration information, and even the right to transfer their address blocks to another party…

*See* Ex. C, Mueller, Internet Governance, *ARIN Stumbles into the Nortel-Microsoft IP Address Deal*, https://www.internetgovernance.org/2011/04/15/arin-stumbles-into-the-nortel-microsoft-ip-address-deal/ (last accessed June 6, 2020).[8]

In a separate 2011 interview, Curran said that ARIN supported sales of legacy IP netblock to help "get underutilized IPv4 address blocks into use." *See* Ex. D, Marsan, Network World, *Does ARIN have the Right to Approve all IPv4 Address Sales?*, https://www.networkworld.com/article/2203104/does-arin-have-the-right-to-approve-all-ipv4-address-sales-.html (last accessed June 6, 2020).

In 2017, Curran, again speaking on behalf of ARIN, addressed the decision of the Massachusetts Institute of Technology to sell some of its legacy IP addresses for millions of dollars, rather than returning them to ARIN:

---

[8] The article to which Curran's statement was responding was published by Georgia Tech's Internet Governance Project and began by noting,

> "Something extraordinary happened today in the Internet economy. It is now official: legacy IPv4 address holders – that is, organizations and companies who received their IP addresses before ARIN existed and are not under one of its Registration Services Agreement contracts – have property rights in their v4 address blocks. They can sell them to whoever they like. And the institution that insists that no such property rights can ever exist – the American Registry for Internet Numbers (ARIN) has been incorporated into an agreement that legally ratifies this."

The government provides this article not for the truth of its contents, but as an illustration of why the selected clips submitted by Defendants fail to accurately represent the public debate over a position they claim is undisputed and indisputable.

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

1
2
3
4
5
6

> When someone is assigned an IP address block from the Internet number registry, they get some rights; for example, the right to be the only party associated with the IP address block, the right to update their entry in the registry with newer contact info, etc., and the ability to transfer those rights to another party in accordance with registry policy. You can have rights to something without owning the underlying property – so just as one can have, for example, oil rights to a piece of land without owning the land (and often can sell those rights to a third party), IP address holders have rights to an entry in registry and can sell those rights to others.

7
8
9
10

*See* Ex. E, Curran, Quora, *How can MIT sell their IPv4 Address Space for Millions of Dollars when they Theoretically don't "own" the Addresses?*, https://www.quora.com/How-can-MIT-sell-their-IPv4-address-space-for-millions-of-dollars-when-they-theoretically-dont-own-the-addresses (last accessed June 6, 2020).

11
12
13
14
15
16

The articles in which Curran made his statements illustrate why Defendants incorrectly characterize ARIN's position as undisputed and indisputable. Most importantly, however, the direct quotations from Curran speaking on behalf of ARIN, which span the scope of the illegal activity alleged in the indictment, show that there is a factual dispute over whether ARIN recognizes that legacy IP addresses like those at issue in the indictment confer a valuable entitlement on their rightful registrants.[9]

17
18

   c. *Courts Have Recognized that IP Addresses Are a "Valuable Entitlement" That Confer "Something of Value"*

19
20
21
22
23

The third factual assertion Defendants argue the Court should rely on is that no court has specifically ruled that IP addresses "are 'property' under any definition." ECF No. 167-4 at 8. This assertion mistakenly assumes that prior judicial opinions can or should substitute for the jury's determination of whether there is evidence that IP

24
25
26
27

---

[9] Defendants, in fact, previously acknowledged that ARIN's position is more nuanced than their motion suggests. At the hearing on their motion to dismiss the CAN-SPAM counts, defense counsel told the Court, "ARIN doesn't have any right to control or do anything about this early Legacy space where one hasn't entered a contract. They want to, but they do not. And there could be all these transfers that have occurred that, maybe, four corporations down now use this IP space." ECF No. 141 at 38.

28

1    addresses are "something of value" or a "valuable entitlement." They should not. It also

2    ignores the fact that this lack of precedent is not dispositive and that courts have

3    repeatedly recognized newer technologies as property under § 1343. *See infra* § V.D.1.

4    To the extent that there is some reassurance in knowing that prior cases *have* recognized

5    that IP addresses confer a "valuable entitlement" on their registrants, the government

6    notes that the following three cases dispute Defendants' implicit position that no court

7    has recognized IP netblock registrants' entitlement to something of value.

8        In *Global NAPS, Inc. v. Verizon New England, Inc.*, 2015 WL 12781223, at *3

9    (D. Mass. Mar. 10, 2015), the district court granted a motion to compel the transfer of

10   assets. The assets in question were two legacy IP netblocks. *Id.* As a preliminary matter,

11   the court could not compel the transfer without first confirming the receiver had "the

12   right to possess the claimed receivership property." *Id.* at *2. To resolve this threshold

13   issue, the district court engaged in a lengthy analysis of "whether the organization that

14   is assigned an IP address holds a property interest in it" and found that "the courts and

15   agencies that have considered the issue appear to be unanimous that holders of legacy

16   IP addresses have at least some property interests in their addresses . . . ." *Id.* at *2-3.

17   Based on these findings, the district court ordered the transfer of assets. *Id.*

18       The prior decisions referred to in *Global NAPS* included the bankruptcy

19   proceeding *In re Nortel Networks, Inc.*, 2011 WL 1100983, Docket # 5315 (Bankr. D.

20   Del. Mar. 22, 2011). In *Nortel*, the bankruptcy judge approved the sale of legacy IP

21   addresses after confirming that the debtor "ha[d] the exclusive right to use the Internet

22   Numbers and the exclusive right to transfer its exclusive right to use the Internet

23   Numbers." *Id.* at *4. In reaching its conclusion, the bankruptcy judge (and, later, the

24   district judge in *Global Naps*), noted that the general counsel of the National Science

25   Foundation, which assigned IP addresses before ARIN, expressed the view that IP

26   addresses given out prior to ARIN's formation constituted "a thing of value." *Global*

27   *NAPS*, 2015 WL 12781223, at *3 (internal citations omitted).

28

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud                    -31-
Counts under Void-for-Vagueness & Fair Notice

1    The other case cited in *Global NAPS* was *Kremen v. Cohen*, No. C 98-20718,

2    Docket #1250 (N.D. Cal. Dec. 20, 2006). In this case (which arose after the Ninth

3    Circuit's decision in *Kremen*, 337 F.3d 1024, and involved the plaintiff's ensuing efforts

4    to obtain legacy netblocks assigned to the entities that had fraudulently obtained his

5    domain name), the district court concluded that ARIN could not be compelled to revoke

6    a block of IP addresses issued prior to its formation because those netblocks were not

7    in ARIN's control. *See Global NAPS*, 2015 WL 12781223, at *3.

8    The cases and evidence cited above illustrate that there are facts and precedent

9    showing that legacy IP addresses represent something of value or a valuable

10    entitlement.[10] This evidence, no matter how staunchly Defendants contest it, shows why

11    granting Defendants' motion to dismiss or holding an evidentiary hearing on this issue

12    would invade the province of the jury.

13    **V.    SECTION 1343 AND THE INDICTMENT ARE NOT VAGUE**

14    Defendants' argument that the term "property" is vague is both premature and

15    fails on the law and the facts. The Supreme Court has observed that the "[v]agueness

16    doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of

17    the Fifth Amendment." *Williams*, 553 U.S. at 304. "Vague statutes are invalidated for

18    three reasons: (1) to avoid punishing people for behavior that they could not have known

19    was illegal; (2) to avoid subjective enforcement of laws based on 'arbitrary and

20    discriminatory enforcement' by government officers; and (3) to avoid any chilling

21    effect on the exercise of First Amendment freedoms." *Humanitarian Law Project v.*

22    *Mukasey*, 552 F.3d 916, 928 (9th Cir. 2009), *aff'd and rev'd in part sub nom on other*

23    *grounds Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (quoting *Foti v. City*

---

24    [10] The government does not put these cases and disputed evidence before the Court to

25    suggest that the Court should (or rightly could) determine ARIN's possessory interests

26    in legacy IP blocks. The extent of ARIN's interest in legacy or non-legacy IP blocks

27    has no bearing on whether a jury could find that legacy IP addresses can confer

something of value or a valuable entitlement to an IP addresses' registrant.

28

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud          -32-
Counts under Void-for-Vagueness & Fair Notice

*of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998)) (internal quotation marks omitted). Defendants argue that the wire fraud charges would punish them for the first reason, i.e. behavior they could not have known was illegal, because "the federal fraud statutes do not give fair notice that IP addresses constitute property." ECF No. 169-1 at 14.

The Supreme Court recognizes two ways in which Defendants can raise this argument regarding vagueness and fair notice: (1) a facial challenge to the statutory text itself, and (2) an as-applied challenges to the statute's application to Defendants' conduct. For the first challenge, a statute is unconstitutionally vague on its face if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304 (citations omitted). For the second, a statute is unconstitutionally vague as applied if it fails to place a defendant on notice that his conduct is criminal. *Purdy*, 264 F.3d at 811. In this case, both challenges would fail.

### A.   Defendants Do Not Allege a Facial Challenge

Defendants do not bring a facial challenge to Section 1343's use of "property," nor could they. Courts "should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). When a criminal statute does not define a specific term, the courts "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Russello v. United States*, 464 U.S. 16, 21 (1983) (citations omitted). Applying these rules, the Supreme Court has given "property" its "ordinary or natural meaning." *Pasquantino*, 544 U.S. at 356; *see supra* Section III. Rather than dispute this canon and try to argue that Section 1343's use of "property" is facially vague, Defendants instead argue the "indictment is void for vagueness as applied" because IP addresses should not fall within the definition of "property." ECF No. 169-1 at 7, 12, 13.

**B.     Defendants' As-Applied Challenge to the Facts Is Premature**

This Court already held, and Defendants recognize, that an as-applied vagueness challenge is premature. ECF No. 169-1 at 7 n.2; ECF No. 154 at 14-15. "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013) (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)); *see also United States v. Rodriguez*, 360 F.3d 949, 953 (9th Cir. 2004) ("Where, as here, a statute is challenged as unconstitutionally vague in a cause of action not involving the First Amendment, we do not consider whether the statute is unconstitutional on its face. Rather, we must determine 'whether the statute is impermissibly vague in the circumstances of this case.'") (citation omitted). The government presents its evidence at trial. Any pretrial adjudication of an as-applied challenge is therefore premature.

**C.     Defendant's "As-Applied-to-the-Indictment" Challenge Is Legally and Factually Unsupported**

Recognizing both that the Supreme Court has defined "property" for purposes of the mail and wire fraud statutes and a facial challenge would thus fail, and that an as-applied challenge to the facts is premature, Defendants propose a third way for the Court to grant their motion: a "vagueness as-applied to the face of the indictment" challenge. ECF No. 169-1 at 7 n.2. This argument is unsupported by the law and the facts.

1.     The Law Does Not Recognize This Third Type of Challenge

None of the hundreds of Supreme Court and Circuit Court cases that have considered the Due Process clause's void-for-vagueness doctrine have ever recognized this third and distinct challenge. Defendants rely instead on a single case in support of their theory: *United States v. Saathoff*, 708 F. Supp. 2d 1020 (S.D. Cal. 2010). ECF No. 169-1 at 7 n.2, 27. Judge Benitez's decision in *Saathoff* fails to support Defendants' argument for three reasons. First, Judge Benitez did not presume to set forth a new type of vagueness challenge in *Saathoff*. Given the depth and detail of the decision, Judge

Benitez would have expressly stated and explained why he was recognizing a novel due process challenge if that was, in fact, what he intended. Instead, *Saathoff* addressed a standard as-applied challenge that resolved whether the honest services fraud statute was "vague as applied to these defendants." 708 F. Supp. 2d at 1035. Second, the record in *Saathoff* was unique because of parallel litigation that had already provided relevant factual records in California Supreme Court and Ninth Circuit opinions. *See id*. at 1026-28, 1033. Significantly, *Saathoff* did not contemplate the submission of pretrial evidence—much less an evidentiary hearing—that Defendants seek here. Third, Judge Benitez openly struggled with the concern that the honest services statute itself, 18 U.S.C. § 1346, unlike the wire fraud statute, was "a model of vagueness," "relatively unknown," and "not commonly charged." *Id*. at 1023, 1025. His reservations foreshadowed *Skilling v. United States*, 561 U.S. 358, 409 (2010), which limited Section 1346's statutory reach just months after the decision in *Saathoff*. No similar set of parallel civil proceedings or statutory infirmity applies in this case.

## 2.   The Indictment Properly Pleads Wire Fraud

The Court has denied and should continue to deny Defendants' attack on the legal sufficiency of the indictment. "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). "The test for sufficiency of the indictment is 'not whether it could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'" *United States v. Awad*, 551 F.3d 930, 935 (9th Cir.2009) (citations omitted); *see also United States v. Inryco, Inc.*, 642 F.2d 290, 294 (9th Cir.1981) (interpretation of the indictment cannot ignore the plain language and inferences drawn therefrom). Applying this precedent to Defendants' earlier motion to

1   dismiss the wire fraud counts, the Court ruled that the indictment properly alleged wire

2   fraud. ECF No. 160 at 2, 13.

3       Defendants nonetheless argue that the indictment fails to "detail the

4   characteristics" proving wire fraud's property element and thus fails to provide fair

5   notice. ECF No. 169-1 at 27-28. The Court has already rejected this argument, having

6   previously ruled that "the Government need not allege in the indictment its case theory

7   or the evidence underlying the charges" to satisfy "the 'fair notice' requirement." ECF

8   No. 160 at 15 (quoting *Holmes*, 2020 WL 666563 at *6). Due process does not require

9   that the indictment allege both the elements and the governments' evidence of this

10  element. "The root of the vagueness doctrine is a rough idea of fairness." *Colten v.*

11  *Kentucky*, 407 U.S. 104, 110 (1972). "It is not a principle designed to convert into a

12  constitutional dilemma the practical difficulties in drawing criminal statutes both

13  general enough to take into account a variety of human conduct and sufficiently specific

14  to provide fair warning that certain kinds of conduct are prohibited." *Id.*

15      Here, the indictment both correctly alleges the elements of the offense and

16  provides notice of what conduct was prohibited, namely hijacking IP addresses. To this

17  end, the indictment identifies the specific property at issue: IP netblocks. ECF No. 1 ¶

18  9. The indictment also alleges facts showing that IP addresses represent something of

19  value to the Defendants: Defendants invested time and money searching for IP

20  addresses that appeared to be inactive; Defendants impersonated the rightful registrants

21  with the goal of obtaining use of the registrants' IP addresses; and Defendants used IP

22  addresses to send at least thousands of commercial emails. *Id.* at ¶¶ 2, 5-7. Defendants'

23  attempt to find ambiguity between IP addresses and the right to use IP addresses is

24  unavailing. ECF No. 169-1 at 28-29. That Defendants fraudulently obtained the IP

25  addresses in order to exercise a fraudulently obtained property right—the right to use—

26  has no bearing on the property charged in the indictment, i.e. IP addresses.

27

28

While Defendants disagree that IP addresses constitute property, there is no indication that Defendants are unaware of the charges at issue or the "property" the United States is alleging. To the contrary, Defendants have filed two separate motions contesting that IP addresses are property, evidencing that the indictment "fairly inform[ed] [them] of the charge against which [they] must defend." *Hamling*, 418 U.S. at 117. Defendants may disagree that IP addresses constitute property—a fact that can be litigated post-trial—but their motions confirm that they are fully aware of the charges against which they must defend. The indictment therefore provided detailed notice to Defendants of what conduct was at issue and why.

### 3. Defendants Knew IP Addresses Represented a "Valuable Entitlement" and "Something of Value"

A motion to dismiss an Indictment as vague should be denied where "[t]here is no indication that [defendants] were not fully aware of the nature of the charges against them." *United States v. Christopher*, 700 F.2d 1253, 1257 (9th Cir. 1983); *cf. Parker v. Levy*, 417 U.S. 733, 756 (1974) (precedent does not "suggest[] that one who has received fair warning of the criminality of his own conduct from the statute in question is nonetheless entitled to attack it because the language would not give similar fair warning with respect to other conduct . . . .").

Defendants' own actions establish that they understood that IP addresses were a "valuable entitlement" or "something of value." An article circulated among Defendants in June 2012 also shows that Defendants were aware of both ARIN's position on IP ownership and the debate over whether this position applied to pre-ARIN legacy IP addresses. Defendants' decision to acquire legacy IP addresses at a below-market rate via suspicious contracts that omitted any mention of IP addresses, and to use fictitious names and stolen identities to conceal and facilitate their use of these IP addresses indicates they knew their behavior was prohibited. They therefore cannot claim the statute was vague as applied to them.

1    The government will present evidence at trial showing that Defendants
2    understood that IP addresses represented "something of value" or a "valuable
3    entitlement" during the commission of their offense. For example, in January 2011,
4    Pacas received an email from his boss addressed to Daniel Dye (charged elsewhere),
5    asking Dye for specifics regarding "some IP space you are looking to sell."
6    ADCONION-GJ-EXS-00133 to 135. In response, Dye sent information from ARIN's
7    website for four netblocks (including those for Sierra Semiconducor and EDUCOM,
8    discussed below) that included information showing the netblocks were registered in
9    the early 1990s, pre-ARIN. *Id*. Dye's email quoted a sales price of $125,000 per
10   netblock and noted, "You would be purchasing the full block, domain name, etc. It is
11   not a lease." *Id*. A subsequent reply stated, "Pete [Pacas] would like to discuss the IP
12   space opportunity with you." *Id*.

13        A paid invoice shows that Defendants' employer wired Dye's employer $125,000
14   on March 2, 2011 for the netblock assigned to Open Business Systems (charged in
15   Count 9, ECF No. 1 ¶ 9 (hereafter the "OBS netblock")). ADCONION-GJ-EXS-00380.
16   The sales agreement, however, identified it as a "domain sale." ADCONION-
17   GETADS-012-GA-PC-00008. On March 7, 2011, Dye emailed Pacas the domain name,
18   password and email address he would need to control the OBS netblock. ADCONION-
19   GJ-EXS-00382. That same day and again on March 15, 2011, defendant Qayyum
20   emailed coconspirator Vincent Tarney (charged elsewhere) information for the OBS
21   netblock that included false names for the personal point of contact, false telephone
22   numbers, and physical addresses that resolved to a mail forwarding service rather than
23   Defendants' actual business address. ADCONION-GJ-EXS-00284 to 285, 810 to 812.
24   Qayyum copied Pacas and Bychak on both emails to Tarney. *Id*. On March 16, 2011,
25   Qayyum emailed Tarney and copied Pacas, asking "if we should allow more time before
26   we can start mailing, we are too excited to wait ☺!" ADCONION-GJ-EXS-00286.
27   Emails sent to Bychak in January 2014 indicate that Defendants' employer was still

28

using the OBS netblock to send commercial email almost three years later and that in early 2014 they used the netblock to send approximately 2.6 million commercial emails. ADCONION-GJ-EXS-00768 to 69.

In June 2012, Dye, Bychak and others exchanged emails discussing Pre-ARIN netblocks that Dye's company was offering for $55,000 each, including a block registered to Sierra Semiconductor (charged in count 6, ECF No. 1 ¶ 9 (hereafter the "Sierra Semi netblock")). AMOBEE1207870 to 72. In the email exchange, Defendants' coworker noted, "We always need new [IP addresses]. I have ccd Jake [Bychak] on this email. Jake [Bychak] runs our ops team and can take it from here." *Id*. Bychak forwarded the email to Manoogian and Qayyum along with a link to an article about legacy IP addresses, noting that it had "interesting info on Pre–Arin [sic] space" and that he was "going to do more investigation into this as well." AMOBEE1207868 to 70; Ex. F, Lindsey, ComputerWorld, *Protect Your Pre-1997 IP Address*, https://www.computerworld.com/article/2514777/protect-your-pre-1997-ip-address.html. The article, written in December 2010 by Defendants' expert witness, Marc Lindsey, discussed the history of pre-ARIN netblocks and summarized the pros and cons of registering legacy netblocks with ARIN via a Legacy RSA. The article cautioned legacy registrants that, "waiving the legal right to assert ownership interests in their IP addresses could have significant economic consequences for legacy address holders if future judicial decisions hold that assigned IP addresses are, indeed, property." Ex. F at 3.

In response, Qayyum replied to Bychak, "Price seems very attractive but there can be other risks associated. Let me know if I can help!" *Id*. Despite these risks, on August 14, 2012, Bychak told Dye they wanted the Sierra Semi netblock and told him to "[s]end over the documentation and we'll get everything started." AMOBEE1284099. After DYE sent Defendants the contract, Bychak asked Manoogian to review it. AMOBEE1284097. The contract was for a domain name, sierrasemi.com,

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

-39-

and did not mention IP addresses. GETADS-025-00018, 0004, 0008, 0009, 00028. On August 17, 2012, Defendants' company wired $55,000 to Dye's company for the netblock. ADCONION-GJ-EXS-00389. A November 2013 email received by Bychak shows Defendants' employer used the Sierra Semi netblock to send over 8 million commercial emails. ADCONION-GJ-EXS-00671. An email sent by Manoogian shows that Defendants' employer continued to use the Sierra Semi netblock to send commercial email into 2014. ADCONION-GJ-EXS-00269.

In February 2013, Defendants purchased a third netblock from Dye's company (the "EDUCOM" netblock). The contract, which Bychak signed, agreed to pay $55,000 for the domain name sura.net and made no mention of IP addresses. ADCONION-GETADS-025-00001 and 4. Contemporaneous emails, however, show the agreement was for use of the IP address range 163.253.0.0/16 registered to EDUCOM. ADCONION-GJ-EXS-00374, 433 to 440. The true registrant for this netblock range had listed the point of contact as J.B.H. at an email address assigned to the domain sura.net. *Id.* On February 11, 2013, Qayyum emailed Manoogian a LOA for the EDUCOM netblock with the instructions "Please print and sign!" ADCONION-GJ-EXS-00443 to 444. Attached for Manoogian to sign was an LOA with J.B.H.'s name and her sura.net email address. *Id.* That same day, Manoogian received an email containing a copy of the signed LOA sent using J.B.H.'s name from her sura.net email using the domain name Defendants had purchased from Dye. ADCONION-GJ-EXS-00445 to 446. The email falsely purported to be from J.B.H. *Id.* On February 21, 2013, Qayyum emailed Manoogian and Bychak the password for the J.B.H. sura.net email account. ADCONION-GJ-EXS-00820. On January 23, 2014, Manoogian sent an email to a group that included Bychak and Qayyum letting them know the EDUCOM netblock had been blocked and flagged as a "Hijacked IP block," but telling them "[w]e can continue use for now." ADCONION-GJ-EXS-00824 to 25. In March 2014, Bychak emailed Manoogian and their boss a spreadsheet showing that they had made over

$50,000 that month using the netblocks acquired from Dye. ADCONION-GJ-EXS-00050.

While these facts are a fraction of the evidence the government will introduce at trial, they illustrate both why an as-applied challenge is premature and why there is at least a colorable dispute over whether Defendants knew or could have known that IP addresses represented a "valuable entitlement" or "something of value" for purposes of the wire fraud charges. These emails show that Defendants believed the ability to control legacy IP addresses was worth thousands of dollars and that they knew IP addresses had value, insofar as they enabled them to make money sending millions of commercial email messages. Even assuming that *Carpenter* had not rejected the argument that property for purposes of § 1343 must be subject to ownership, 484 U.S. at 26, Qayyum sent an email in April 2011 stating, "We [] own the IPs" assigned to the OBS netblocks. ADCONION-GJ-EXS-00290. Similarly, on July 29, 2013, Bychak emailed Defendants' boss regarding the netblocks purchased from Dye, which are at the heart of the indictment, telling her "we own them now" and they "can be used over and over again to generate revenue… [T]hese are some of the cheapest IPs around. A class B from [Dye's company] has a 1 time $50K payment, whereas most other [comparable netblocks] we purchase on a [month-to-month] contract and are around $65-85k." ADCONION-GJ-EXS-00888. Defendants' own statements unambiguously demonstrate that they understood that IP addresses represented something of value, and therefore demonstrate that their as-applied vagueness challenge is premature and their factual assertions are subject to reasonable dispute.

### D.   Defendants' Fair Notice Argument Lacks Merit

Defendants state they are making two separate Constitutional arguments: void-for-vagueness under the Fifth Amendment and "fair notice" under the Sixth Amendment. ECF No. 169-1 at 1. The distinction between these two arguments collapses upon inspection of the case Defendants rely on, *United States v. Lanier*, 520

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice

1   U.S. 259 (1997). Defendants also cite to *Dowling* in support of their argument that

2   Defendants could not have reasonably known their conduct was illegal. For the

3   following reasons, both lines of argument fail to support a separate fair notice challenge.

4             1.   <u>No Separate Fair Notice Requirement Justifies Dismissal</u>

5          Defendants do not explain how the fair notice doctrine is distinguishable from

6   the void-for-vagueness doctrine and their argument often blends the two. The Supreme

7   Court case they appear to rely on for this distinction, *United States v. Lanier*, involved

8   the prosecution of a Chancery Court Judge for sexually assaulting women in violation

9   of 18 U.S.C. § 242. Section 242 criminalizes depriving a victim of "any rights,

10  privileges, or immunities secured or protected by the Constitution or laws of the United

11  States . . . ." Prior to trial, the defendant moved to dismiss the indictment on the ground

12  that § 242 was void for vagueness. 520 U.S. at 262. On appeal, an en banc Sixth Circuit

13  panel held the statute was ambiguous, in part, because it failed to identify which

14  criminal statutes were included "within its coverage" and no prior decision involving

15  § 242 had expressly held it covered the conduct at issue. *Id*. at 263.

16         After granting certiori "to review the standard for determining whether particular

17  conduct falls within the range of criminal liability under § 242," the Supreme Court

18  reversed. *Id*. at 263-64. In considering the statute, the Supreme Court pointed out that

19  the particular issue with § 242 was that, "in lieu of describing the specific conduct it

20  forbids," its "general terms incorporate constitutional law by reference." *Id*. at 265. As

21  a result of the delegation, the statute failed to "delineate the range of forbidden conduct

22  with particularity." *Id*. The Supreme Court then turned to "the fair warning

23  requirement," which included but was not limited to "the vagueness doctrine." *Id*. at

24  266. This requirement also included a "junior version of the vagueness doctrine," the

25  canon of strict construction, as well as a prohibition on "novel construction of a criminal

26  statute." *Id*. The Supreme Court noted, however, that the courts do not impose this

27  tripartite "fair notice requirement" "when the accused is charged with violating a 'right

28

which has been made specific [] by the express terms of the Constitution or laws of the United States. . . .'" *Id*. at 267 (citations omitted).

Here, the wire fraud charges do not incorporate by reference any other law or constitutional provision. The "fair notice requirement" described in *Lanier* therefore does not apply, and the issue before the Court is only whether the statute is void for vagueness on its face or as applied. Nonetheless, Defendants argue that the indictment violates fair notice because property for purposes of the wire and mail fraud statutes must have "long been recognized as property," irrespective of what Defendants knew and believed. ECF No. 169-1 at 15, 20. This argument misstates the law. *Lanier* rejected the Sixth Circuit's requirement that a prior decision have specifically applied § 242 to the criminal conduct at issue. 520 U.S. at 263-64. As discussed above, the Ninth Circuit has also directly rejected the argument that a property interest must be "traditionally recognized" to satisfy § 1343. *Ali*, 620 F.3d at 1068. Similarly, principles of statutory construction require the Court to give words their plain and ordinary meaning, *Leocal*, 543 U.S. at 9, which is why a long-standing statute like wire fraud can keep pace with an evolving society. Consequently, even as early as 1978, the wire fraud statute's property element included software systems. *Seidlitz*, 589 F.2d at 160 ("there was sufficient evidence from which the jury could find that the WYLBUR [software] system was 'property'" under Section 1343); *see also United States v. Wang*, 898 F. Supp. 758, 760–61 (D. Colo. 1995) ("copyrighted computer program containing confidential source code" was property under Section 1343); *United States v. Riggs*, 739 F.Supp. 414, 418-19 (N.D. Ill. 1990) ("computer text file" containing Bell South's E911 data was property under Section 1343).

More contemporaneously, wire fraud's property element also applies to software applications, or "apps," as well as cryptocurrencies like Bitcoin. *See, e.g., United States v. Sams*, 769 Fed. Appx. 769 (11th Cir. 2019) (social media app); *United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019) (Bitcoin); *United States v. Kim*, 2018 WL 3599019

(N.D. Ill. 2018) (cryptocurrencies Bitcoin and Litecoin). Defendants' circular argument that wire fraud's property element can only cover IP addresses if it previously applied to IP addresses in an earlier wire fraud case therefore fails as a matter of law and logic. For the foregoing reasons, their fair notice challenge to the indictment's wire fraud counts should be denied.

### 2.   Defendant's Reliance on *Dowling* Is Unwarranted

In both their current and prior briefing on wire fraud's "property" element, Defendants rely heavily on the Supreme Court's decision in *Dowling*. *Dowling*, however, did not define "property" for purposes of 1343 and does not apply to this case or justify dismissal. *Dowling* considered The National Stolen Property Act, 18 U.S.C. § 2314, and did not consider "property" for purposes of §§ 1343 or 1341. 473 U.S. at 208, 213, 226 ("We granted certiorari to resolve an apparent conflict among the Circuits concerning the application of [§ 2314] to interstate shipments of bootleg and pirated sound recordings and motion pictures whose unauthorized distribution infringed valid copyrights.") The issue before the *Dowling* Court was whether copyright fell within § 2314's prosecution for "goods, wares, [or] merchandise" that were "stolen, converted, or taken by fraud." *Id.* at 216. *Dowling* considered the implications of the government's theory of whether bootlegged goods were subject to § 2314 "in the field of copyright and in kindred fields of intellectual property law," and in no way considered what constituted property for purposes of the mail and wire fraud statutes. *Id.* at 226; *see Wang*, 898 F. Supp. at 760–61 (recognizing that *Dowling* does not control wire fraud's definition of property and finding that a "copyrighted computer program containing confidential source code" was, in fact, "property" under § 1343); *see also* H.R. Rep. 105-339, 3 (Congress enacted the "No Electronic Theft (NET) Act" in 1997 to "reverse the practical consequences of [a district court decision] which held, inter alia, that electronic piracy of copyrighted works may not be prosecuted under the federal wire fraud statute").

While the government still believes that *Kremen* is more persuasive than *Dowling* for why IP addresses represent a "valuable entitlement" and "something of value," the bottom line is that the Supreme Court has defined "property" for purposes of the wire and mail fraud statutes. This definition, unlike either *Kremen* or *Dowling*, governs any adjudication of whether IP addresses are property under § 1343. This definition also forestalls any pretrial void-for-vagueness challenge involving wire fraud's property element and serves as the template for the jury instruction the Court will likely give regarding this element. Because the law in this regard is settled and the facts are for the jury to decide, Defendants' constitutional challenges to the wire fraud charges should be denied.

## VI.   CONCLUSION

For the reasons outlined above, the Court should not grant Defendants' motion to dismiss, take judicial notice of their proffered evidence, or hold a substantive pre-trial hearing on whether IP addresses represent a "valuable entitlement" or "something of value" and thereby constitute property for purposes of the wire fraud statute. Rather, the prudent and lawful course of action is to consider any such argument via a Rule 29 motion after the government has had the opportunity to present its own evidence.

DATED: June 8, 2020                    Respectfully Submitted,


                                       ROBERT S. BREWER, JR.
                                       United States Attorney

                                       *Sabrina L. Feve*
                                       SABRINA L. FEVE
                                       Assistant United States Attorney

Gov. Opp. to Defs.' Mot. to Dismiss the Wire Fraud
Counts under Void-for-Vagueness & Fair Notice