**EXHIBIT INDEX**

Government Response In Opposition To Defendants' Motion To Dismiss The
Wire Fraud Counts For Fifth Amendment Due Process & Sixth Amendment Notice
Violations

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | Transcript of February 20, 2020 Hearing | 1-58 |
| B | Transcript of April 8, 2020 Hearing | 59-77 |
| C | Mueller, Internet Governance, *ARIN Stumbles into the Nortel-Microsoft IP Address Deal*, https://www.internetgovernance.org/2011/04/15/arin-stumbles-into-the-nortel-microsoft-ip-address-deal/ | 78-84 |
| D | Marsan, Network World, *Does ARIN have the Right to Approve all IPv4 Address Sales?*, https://www.networkworld.com/article/2203104/does-arin-have-the-right-to-approve-all-ipv4-address-sales-.html | 85-89 |
| E | Curran, Quora, *How can MIT sell their IPv4 Address Space for Millions of Dollars when they Theoretically don't "own" the Addresses?*, https://www.quora.com/How-can-MIT-sell-their-IPv4-address-space-for-millions-of-dollars-when-they-theoretically-dont-own-the-addresses | 90-91 |
| F | Lindsey, ComputerWorld, *Protect Your Pre-1997 IP Address*, https://www.computerworld.com/article/2514777/protect-your-pre-1997-ip-address.html | 92-101 |

# Exhibit A

```
12:51:14   1                    UNITED STATES DISTRICT COURT

           2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

           3

           4   UNITED STATES OF AMERICA,           .
                                                   .
           5        PLAINTIFF,                      . NO.18-CR-4683-GPC
                                                   .
           6             V.                         . FEBRUARY 20, 2020
                                                   . 1:00P.M.
           7   JACOB BYCHAK,                        .
               MARK MANOOGIAN,                      .
           8   MOAMMED ABDUL QAYYUM,                .
               PETR PACAS.                          .
           9                                        .
12:51:14        DEFENDANTS.                         .
          10   . . . . . . . . . . . . . . . . . .. SAN DIEGO, CALIFORNIA

          11
                              TRANSCRIPT OF MOTION HEARING
          12            BEFORE THE HONORABLE GONZALO P. CURIEL
                               UNITED STATES DISTRICT JUDGE
          13
               APPEARANCES:
          14
               FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
          15                           BY: SABRINA L. FEVE, ESQ.
                                           MELANIE K. PIERSON, ESQ.
          16                           880 FRONT STREET, ROOM 6293
                                       SAN DIEGO, CALIFORNIA  92101
          17
               FOR THE DEFENDANT       LAW OFFICE OF DAVID W. WIECHERT
          18   JACOB BYCHAK:           BY: JESSICA MUNK, ESQ.
                                       115 AVENIDA MIRAMAR
          19                           SAN CLEMENTE, CALIFORNIA  92672

          20   FOR THE DEFENDANT       MINTZ LEVIN
               MARK MANOOGIAN:         BY: RANDY K. JONES, ESQ.
          21                           3580 CARMEL MOUNTAIN ROAD, SUITE 300
                                       SAN DIEGO, CALIFORNIA  92130
          22
               FOR THE DEFENDANT       BIENERT, MILLER & KATZMAN, PLC
          23   MOHAMMED ABDUL QAYYUM:  BY: WHITNEY Z. BERNSTEIN, ESQ.
                                       903 CALLE AMANECER, SUITE 350
          24                           SAN CLEMENTE, CALIFORNIA  92673

          25   ///
```

```
12:51:14    1    (APPEARANCES CONTINUED)

            2    FOR THE DEFENDANT        BIRD MARELLA BOXER WOLPERT NESSIM
                 PETR PACAS:                  DROOKS & LINCENBERG
            3                             BY: NAEUN RIM, ESQ.
                                          1875 CENTURY PARK EAST, SUITE2300
            4                             LOS ANGELES, CALIFORNIA  90067

            5

            6

            7

12:51:14    8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21    COURT REPORTER:         JULIET Y. EICHENLAUB, RPR, CSR
                                         USDC CLERK'S OFFICE
           22                            333 WEST BROADWAY, ROOM 420
                                         SAN DIEGO, CALIFORNIA  92101
           23                            JULIET_EICHENLAUB@CASD.USCOURTS.GOV

           24
                 REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER
           25
```

2

| | | |
|---|---|---|
| 12:51:14 | 1 | SAN DIEGO, CALIFORNIA; FEBRUARY 20, 2020; 1:01 P.M. |
| | 2 | -O0O- |
| | 3 | THE CLERK:  CALLING ITEM NUMBER ONE ON CALENDAR, CASE |
| | 4 | NUMBER 18CR4683, USA VS. JACOB BYCHAK, DEFENDANT NUMBER ONE; IF |
| | 5 | I CAN HAVE THE APPEARANCE OF THE ATTORNEY PLEASE. |
| | 6 | MS. MUNK:  GOOD AFTERNOON, YOUR HONOR.  JESSICA MUNK |
| | 7 | ON BEHALF OF JACOB BYCHAK WHO IS PRESENT IN COURT. |
| | 8 | THE COURT:  GOOD AFTERNOON. |
| | 9 | THE CLERK:  DEFENDANT NUMBER TWO, MARK MANOOGIAN. |
| | 10 | MR. JONES:  GOOD AFTERNOON.  RANDY JONES ON BEHALF OF |
| | 11 | DEFENDANT MARK MANOOGIAN WHO IS ALSO PRESENT IN COURT. |
| | 12 | THE COURT:  GOOD AFTERNOON. |
| | 13 | THE CLERK:  DEFENDANT NUMBER THREE, MOHAMMED ABDUL |
| | 14 | QAYYUM. |
| 13:02:38 | 15 | MS. BERNSTEIN:  GOOD AFTERNOON, YOUR HONOR.  WHITNEY |
| | 16 | BERNSTEIN ON BEHALF OF MR. QAYYUM WHO IS PRESENT BEFORE THE |
| | 17 | COURT. |
| | 18 | THE COURT:  GOOD AFTERNOON. |
| | 19 | THE CLERK:  AND DEFENDANT NUMBER FOUR, PETR PACAS. |
| | 20 | MS. RIM:  GOOD AFTERNOON, NAEUN RIM ON BEHALF OF PETR |
| | 21 | PACAS WHO IS PRESENT BEFORE THE COURT. |
| | 22 | THE COURT:  GOOD AFTERNOON. |
| | 23 | MS. PIERSON:  AND MELANIE PIERSON AND SABRINA FEVE ON |
| | 24 | BEHALF OF THE UNITED STATES. |
| | 25 | THE COURT:  GOOD AFTERNOON TO ALL.  WE'RE HERE ON A |

13:03:01  1   MOTION TO DISMISS WIRE FRAUD COUNTS AND TO STRIKE WIRE FRAUD

  2   ALLEGATIONS IN COUNT ONE FOR FAILURE TO STATE AN OFFENSE, AND

  3   THE COURT HAS REVIEWED THE MOVING PAPERS, THE RESPONSE AND

  4   REPLY, I'VE ALSO VIEWED A NUMBER OF THE CITED CASES.  AND I

  5   HAVE SOME QUESTIONS.  I THINK THE PARTIES HAVE DONE AN

  6   OUTSTANDING JOB IN BRIEFING THE ISSUES PRESENTED.  BUT THE WAY

  7   I SEE IT, THERE'S TWO CRITICALLY IMPORTANT ISSUES.

  8          ONE IS WITH RESPECT TO IP ADDRESSES AND WHETHER OR

  9   NOT THEY QUALIFY OR CONSTITUTE PROPERTY FOR PURPOSES OF THE

10   MAIL FRAUD STATUTES AND OR WIRE FRAUD AND -- I SHOULD SAY WIRE

11   FRAUD; AND THEN THE SECOND QUESTION RELATES TO THE QUESTION OF

12   THE QUESTION OF A CONVERGENCE, AND UNDER *LEW*, WHETHER OR NOT

13   THE FALSE STATEMENTS AND MISREPRESENTATIONS NEED TO BE DIRECTED

14   TO THE PERSON, THE ENTITY, THAT ENDS UP LOSING SOME PROPERTY OR

13:04:35 15   MONEY.

16          SO WITH RESPECT TO THE IP ADDRESSES AS PROPERTY, I

17   UNDERSTAND THAT THERE ARE TWO CASES THAT ARE RELIED UPON THE

18   PARTIES RESPECTIVELY.  THERE ARE A NUMBER OF ADDITIONAL BUT THE

19   PRIMARY CASES THAT PROVIDE SOME GUIDANCE ARE *DOWLING* ON THE

20   DEFENSE SIDE RELATING TO COPYRIGHTS AND WHETHER OR NOT

21   COPYRIGHTS QUALIFY AS A PROPERTY IN A SEPARATE OR DIFFERENT

22   CONTEXT BUT WHETHER OR NOT THE COURT WAS PREPARED TO FIND THAT

23   COPYRIGHTS AFFORD A CONCRETE ENOUGH OR DEFINITE ENOUGH BENEFIT

24   TO QUALIFY AS PROPERTY; AND THEN THE NINTH CIRCUIT DECISION IN

25   -- I'M NOT SURE IF IT'S *KREMEN* OR *KREMEN*, AND THAT INVOLVED A

4

13:05:42  1    DOMAIN NAME AND APPLYING CALIFORNIA LAW THAT THE NINTH CIRCUIT

2    CONCLUDED THAT DOMAIN NAME INDEED QUALIFIED AS PROPERTY.

3         I DON'T THINK ANYONE DISPUTES THAT WHAT WE HAVE IS

4    SOMEWHERE IN THE MIDDLE AND THAT THERE ARE A NUMBER OF

5    ASSERTIONS REGARDING WHAT ARIN'S POSITION HAS BEEN WITH RESPECT

6    TO IP ADDRESSES, AND THEN THE GOVERNMENT PROVIDES PERHAPS SOME

7    NUANCE OBSERVATIONS ABOUT MR. CURRAN'S DECLARATIONS PREVIOUSLY

8    FILED AND QUERY WHETHER OR NOT THE COURT SHOULD CONSIDER MR.

9    CURRAN'S DECLARATIONS FOR PURPOSES OF THESE PROCEEDINGS WHERE

10   IT'S THE INDICTMENT THAT'S BEING CHALLENGED.

11        AT THIS POINT, I'M MORE ON THE SIDE OF *DOWLING*, THAT

12   WHAT WE HAVE WITH RESPECT TO IP ADDRESSES AND THE RIGHTS THAT

13   ARE PROVIDED ARE MORE SIMILAR TO COPYRIGHTS IN BEING A BUNDLE

14   OF RIGHTS THAT ARE PROVIDED, THAT THEY ARE NOT AS ABSOLUTE AS A

13:07:26  15   DOMAIN NAME.  THEY DO NOT INVOLVE AS MUCH ACTIONS, CREATION BY

16   A PERSON WHO OBTAINS THE RIGHTS TO A DOMAIN NAME.  THE FACT

17   THAT ARIN ASSERTS THAT IT HAS CERTAIN RIGHTS TO TERMINATE THE

18   RIGHTS OF AN IP ADDRESS OR NETBLOCK HOLDER SUGGESTS THAT

19   THERE'S MORE LIMITATIONS IN THE CASE OF IP ADDRESSES OR

20   NETBLOCKS THAN THERE IS IN THE CASE OF DOMAIN NAMES.

21        AND SO AT THIS POINT I'D LIKE TO HEAR FIRST FROM THE

22   GOVERNMENT BECAUSE, AS I STATED, I THINK AT THIS POINT I'M

23   SIDING MORE WITH THE *DOWLING* ANALYSIS AND FINDING THAT THAT IS

24   MORE SALIENT THAN THAT PROVIDED BY *KREMEN*.  SO WITH THAT, I'LL

25   HEAR FROM YOU.

13:08:41   1          MS. FEVE:  YOUR HONOR, I'D START BY LOOKING AT RULE

2     12.  AND RULE 12 SAYS THAT IN A MOTION TO DISMISS, WHICH IS

3     WHAT'S BEFORE THE COURT, WE LOOK AT THE FOUR CORNERS OF THE

4     INDICTMENT.

5          THE COURT:  AND I'M PREPARED TO DO THAT.

6          MS. FEVE:  AND THERE'S NO QUESTION THAT THE

7     INDICTMENT ALLEGES PROPERTY.  SO WHEN YOU USUALLY SEE A MOTION

8     TO DISMISS -- WE SEE 1325'S ALL THE TIME.  WHAT THE FEDERAL

9     DEFENDERS HAVE KIND OF VERY DILIGENTLY AND STEADILY POINTED OUT

10    IS THAT IN THE 1325 CHARGE WE NEEDED TO ALLEGE THAT THE

11    DEFENDANT WAS NOT UNDER PRIOR OR OFFICIAL RESTRAINT OR THAT WE

12    NEEDED TO ALLEGE THAT THERE WAS SCIENTER, THAT THE DEFENDANT

13    TOOK A CONSCIOUS TOWARDS ENTERING THE COUNTRY WITHOUT

14    AUTHORIZATION.  IN THIS CASE, IF WE LOOK JUST AT THE

13:09:27  15    INDICTMENT, THERE IS NO QUESTION THAT WE HAVE ALLEGED

16    PROPERTY.  SO --

17          THE COURT:  BUT IS IT ENOUGH THAT YOU JUST MERELY

18    ALLEGE PROPERTY WHERE, IN FACT, LOOKING AT WHAT THE PROPERTY IS

19    OR THE ALLEGED PROPERTY IS -- THE IP ADDRESS/NETBLOCKS -- THAT

20    THE COURT WOULD, AS A THRESHOLD MATTER, DETERMINE WHETHER AS A

21    MATTER OF LAW THESE NETBLOCKS QUALIFY AS PROPERTY?

22          MS. FEVE:  IT IS, YOUR HONOR, BECAUSE UNLESS YOU ARE

23    PREPARED TO ISSUE A DETERMINATION ABOUT WHETHER A NETBLOCK IS

24    PROPERTY WITH NO FINDINGS OF FACT AND TO DO IT SIMPLY BY

25    ANALOGIZING IT TO *DOWLING* OR TO *KREMEN*, FIRST YOU'RE GOING TO

6

13:10:09 1  REQUIRE SOME FACTUAL PREDICATE FOR WHAT AN IP ADDRESS IS

2  BECAUSE EVEN BY THE COURT'S TENTATIVE YOU SAY, I FIND THEM

3  SOMEWHERE IN THE MIDDLE AND MORE LIKE IT.

4  AND MY QUESTION WOULD BE:  BASED ON WHAT FACTS?

5  BECAUSE WE CAN TALK ABOUT WHAT IP ADDRESSES ARE, AND IF THE

6  COURT IS SAYING, I'M RELYING ON WEINSTEIN OR I'M RELYING ON

7  THESE PRIOR JUDICIAL DETERMINATIONS ON WHAT AN IP ADDRESS IS

8  AND HOW IT FUNCTIONS TO EXPLAIN WHY I THINK IT'S A COPYRIGHT,

9  THEN WE CAN ADDRESS THOSE QUESTIONS AS MATTERS OF LAW.  BUT IF

10  THE COURT IS ACTUALLY MAKING FACTUAL FINDINGS, IF IT'S

11  REFERRING TO THE DECLARATION OF JOHN CURRAN WHICH IS OUTSIDE

12  THE SCOPE OF THE INDICTMENT --

13  THE COURT:  AND I'M NOT.

14  MS. FEVE:  SO, AGAIN, IF WE'RE LOOKING AT THE

13:10:51 15  INDICTMENT -- AND AGAIN, I APPRECIATE YOUR POINT WHICH IS THAT

16  IF THERE IS A DISPOSITIVE CASE ON THIS ISSUE SIMILAR TO -- I

17  APOLOGIZE, I FORGET THE NAME OF THE BUT ONE OF THE CASES THE

18  DEFENDANTS CITED IN THEIR REPLY BRIEF INVOLVED A DEFENDANT'S

19  POSSESSION OF EAGLE FEATHERS.

20  THE COURT:  POSSESSION OF WHAT?

21  MS. FEVE:  EAGLE FEATHERS.

22  THE COURT:  I DON'T KNOW IF I LOOKED THAT ONE UP.

23  MS. FEVE:  SO THEY TALKED ABOUT THERE WERE DEFENDANTS

24  WHO BROUGHT A MOTION TO DISMISS SAYING THAT PROSECUTING THEM

25  FOR POSSESSION OF EAGLE FEATHERS WAS ON ITS FACE AN UNLAWFUL

7

13:11:20  1    INTERFERENCE WITH THEIR FIRST AMENDMENT RIGHTS TO PRACTICE

        2    THEIR RELIGION AS THEY SAW FIT.  IN THIS CASE THE MOTION WAS

        3    ACTUALLY DENIED, BUT THE REASON WHY THE COURT SAID, I DON'T

        4    EVEN NEED TO LOOK AT THE FACTS IS BECAUSE WE LITERALLY HANDLED

        5    THESE EXACT SAME SET OF FACTS AND ARGUMENT IN A PRIOR CASE AND

        6    CITED A DIFFERENT NINTH CIRCUIT ARGUMENT WHERE THEY PREVIOUSLY

        7    EVALUATED AND CONSIDERED THE ARGUMENT THAT IF YOU WERE

        8    PROSECUTED FOR THE UNLAWFUL POSSESSION OF EAGLE FATHERS WAS IT,

        9    IF YOU WERE A MEMBER OR A PUNITIVE MEMBER OF A NATIVE AMERICAN

       10    TRIBE, AN INTERFERENCE WITH YOUR FIRST AMENDMENT RIGHT, AND THE

       11    COURT HAD DONE A VERY DETAILED-ANALYSIS ABOUT WAS IT THE LEAST

       12    RESTRICTIVE MEANS OF PROTECTING A LEGITIMATE POLICY GOAL.  SO

       13    THERE, BECAUSE THERE WAS THIS VERY SQUARE CONVERGENCE BETWEEN

       14    THE FACTS PRESENTED IN THAT CASE AND THE FACTS IN ANOTHER CASE,

13:12:07 15    THE COURT SAID WE ARE COMFORTABLE TREATING THIS AS A MATTER OF

       16    LAW.

       17         BUT THAT WAS ALSO BY INVOKING PRIOR FACTUAL FINDINGS.

       18    AND HERE -- I WOULD DISPUTE THE IP ADDRESSES ARE MORE LIKE

       19    COPYRIGHTS, BUT I ALSO RECOGNIZE THAT TO ENGAGE IN THAT

       20    ARGUMENT I AM BY NECESSITY GOING TO REFER TO FACTS OUTSIDE THE

       21    SCOPE OF THE INDICTMENT.  SO I JUST WANT TO BEGIN BY SAYING, WE

       22    HAVE TRIED IN OUR MOTION TO PRACTICE WHAT WE BELIEVE THE COURT

       23    SHOULD BE DOING ITSELF WHICH IS TO BE LOOKING AT THE FACE OF

       24    THE INDICTMENT:  DID WE PROPERLY ALLEGE THE ELEMENTS?  IS THERE

       25    A CASE THAT IS SQUARELY ON THE FOUR CORNERS OF OUR CASE AS

8

13:12:49  1  PLEAD THAT SHOWS THAT AS A MATTER OF LAW, NO MATTER WHAT FACTS

2  WE PUT BEFORE THE COURT, WE CANNOT MEET OUR LEGAL BURDEN?

3        THEY HAVE NOT PRESENTED THAT CASE BECAUSE AS THEY

4  WANT TO POINT OUT, WHEN THEY'RE ARGUING FOR THE RULE OF LENITY,

5  THEY'RE SAYING THERE'S AN ABSENCE OF DIRECT AND CONTROLLING

6  PRECEDENT.  THERE IS AN ABSENCE OF DIRECT AND CONTROLLING

7  PRECEDENT; BUT THERE IS NOT AN ABSENCE OF LEGAL PRECEDENT.  FOR

8  YOUR HONOR TO SAY THERE IS NO PROPERTY INTEREST HERE WOULD BE

9  IN CONFLICT WITH THE *GLOBAL NAPS* DECISION OUT OF MASSACHUSETTS

10  WHERE THE COURT SPECIFICALLY FOUND THAT IP ADDRESSES WERE

11  PROPERTY.  IT WOULD --

12        THE COURT:  WELL, THEY FOUND IT IN A DIFFERENT

13  CONTEXT THOUGH, DIDN'T IT?

14        MS. FEVE:  SO WHAT IS THE CONTEXT, YOUR HONOR?

13:13:30  15  BECAUSE AGAIN, IF IT'S NOT ON THE FACE OF THE INDICTMENT --

16        THE COURT:  I DON'T THINK ANYONE DISPUTES THAT IP

17  ADDRESS, THAT NETBLOCKS CONFER SOME ENTITLEMENT, BENEFITS AND

18  RIGHTS.  BUT THE QUESTION WOULD BE, UNDER EVEN *KREMEN*, THE

19  THREE-FACTOR TEST WHETHER OR NOT THE THIRD ELEMENT WOULD BE

20  PRESENT WITH RESPECT TO THE PUNITIVE OWNER MUST HAVE

21  ESTABLISHED A LEGITIMATE CLAIM TO EXCLUSIVITY.

22        MS. FEVE:  BUT THERE IS A LEGITIMATE CLAIM TO

23  EXCLUSIVITY.  SIMILAR TO -- SO THE DEFENDANTS IN THEIR REPLY

24  BRIEF BROUGHT UP TELEPHONE NUMBERS, AND THEY MENTIONED A STATE

25  CALIFORNIA CASE AND A SEVENTH CIRCUIT CASE AND ONE OTHER CASE.

9

13:14:17  1   THEY DID NOT MENTION A HOST OF OTHER CASE -- THE FIRST CIRCUIT,

2   FIFTH CIRCUIT, DISTRICT COURTS IN VIRGINIA AND FLORIDA -- BUT

3   MOST NOTABLY HERE IN CALIFORNIA WHERE JUDGE WHELAN ADDRESSED

4   WHETHER TELEPHONE NUMBERS COULD BE PROPERTY FOR PURPOSES OF

5   EVALUATING A MOTION TO DISMISS AND HELD THAT IN FACT THE

6   PLAINTIFFS COULD BRING A CLAIM FOR CONVERSION OF TELEPHONE

7   NUMBERS, FINDING A POSSESSORY INTEREST; AND EVEN IF YOU LOOK AT

8   THE SEVENTH CIRCUIT DECISION, THE *1-800-FLOWERS* DECISION THE

9   DEFENDANTS REPLY ON, JUDGE EASTERBROOK THERE DELIBERATELY PUTS

10  THE WORD "PROPERTY" IN QUOTATION MARKS BECAUSE HE SAYS PRE-1997

11  THERE IS NO QUESTION YOU HAD A POSSESSORY INTEREST, AND HE

12  OVERTURNS THE DISTRICT COURT BECAUSE HE SAYS YOU ABSOLUTELY

13  COULD SUE TO ENFORCE A CONTRACT FOR BENEFITS THAT YOU GOT BY

14  SELLING YOUR PHONE NUMBER.

13:15:04  15      SO WHAT WE SEE IS THAT ACROSS THE DISCIPLINES THERE

16  ARE POSSESSORY INTERESTS WHERE EVEN IF IT'S NOT IN PERPETUITY

17  AND FOREVER, WHETHER IT'S A LEASEHOLD, WHETHER IT'S A LICENSE

18  THAT IS HELD BY A PRIVATE PARTY -- WE ALL UNDERSTAND THAT WHEN

19  YOU HAVE A BROADCAST LICENSE YOU DON'T NECESSARILY HAVE THAT

20  LICENSE FOREVER AND THAT IT'S BEEN GRANTED TO YOU BY THE STATE,

21  SIMILAR TO HOW THEY'RE ARGUING IT MAY HAVE BEEN GRANTED BY THE

22  AUTHORITY THAT PRECEDED ARIN; HOWEVER, THE SUPREME COURT HAS

23  REPEATEDLY RECOGNIZED THAT THOSE INTERESTS, EVEN IF THEY ARE,

24  "A," NOT PHYSICAL, AND "B," NOT NECESSARILY IN PERPETUITY, ARE

25  CLEARLY PROPERTY RIGHTS THAT ARE RECOGNIZED AND PROTECTED UNDER

10

13:15:47  1    ALL THE FRAUD STATUTES.

2              THE COURT:  WHICH RAISES THE SECOND QUESTION WHICH

3         IS, THE PROPERTY RIGHT TO WHO?  CERTAINLY, THERE IS, I THINK,

4         THE ARGUMENT THAT THE IP ADDRESSES, THE NETBLOCKS PROVIDE A

5         POSSESSORY INTEREST OF SOME TYPE, THIS BUNDLE OF RIGHTS FOR THE

6         REGISTRANT OR THE INDIVIDUAL THAT IS AWARDED THAT; AND THEN

7         THAT BRINGS UP THE *LEW* ISSUE WITH RESPECT TO WHETHER OR NOT THE

8         FRAUDULENT STATEMENT, THE MISREPRESENTATION, IS DIRECTED AT THE

9         HOLDER OF THE RIGHT.

10             MS. FEVE:  AND I'M HAPPY TO ADDRESS *LEW*, BUT I WANT

11        TO MAKE SURE I FOLLOW UP ON ONE POINT WHICH IS, YOUR HONOR, WE

12        DID NOT SUBMIT OVER ONE HUNDRED PAGES OF SUPPORTING DOCUMENTS.

13        IF THE COURT WANTS OR FEELS THAT IT IS REQUIRED TO HAVE A

14        HEARING, WE'RE PREPARED TO DO SO.  BUT THE REASON I SAY THIS IS

13:16:41  15   THAT WHEN I HEAR YOU DESCRIBING AN IP ADDRESS AND WHY IT'S MORE

16        ANALOGOUS WITH A COPYRIGHT, I AM CONFUSED BECAUSE A DOMAIN

17        NAME, YOU CAN HAVE ONE DOMAIN NAME JUST AS YOU CAN HAVE ONE IP

18        ADDRESS, WHEREAS EVERY SINGLE ONE OF YOU US CAN HAVE THE SAME

19        SONG.

20             IF WE HAVE A COPY OF A BEYONCE SONG, I CAN HAVE THE

21        ALBUM, YOU CAN HAVE THE ALBUM, EVERYONE CAN HAVE THE ALBUM; WE

22        CAN LISTEN TO THE ALBUM AT DIFFERENT TIMES.  MY USE AND CONTROL

23        AND ENJOYMENT OF MY BEYONCE ALBUM IN NO WAY, SHAPE OR FORM

24        INTERFERES WITH YOURS.  AND THAT'S BECAUSE THE ONLY THING THAT

25        PROTECTS THAT ALBUM, TO THE EXTENT THAT IT'S NOW IN DIGITAL

13:17:19   1    FORM AS PROPERTY, IS THIS LEGAL ARTIFICE CALLED A COPYRIGHT.  I

2    CAN'T JUST DISTRIBUTE IT WILLY-NILLY BECAUSE IT IS COPYRIGHT

3    PROTECTED.  THAT IS NOT TRUE OF AN IP ADDRESS.  UNLIKE WITH A

4    BEYONCE ALBUM WHERE EVERY SINGLE ONE OF US COULD BE LISTENING

5    TO IT AT ANY TIME WITH NO DISRUPTION TO OTHERS USE AND

6    ENJOYMENT, ONLY ONE OF US CAN USE AN IP ADDRESS.  AND THERE IS

7    NO WAY THAT THE INTERNET WORKS IF IT IS ANYTHING OTHER THAN

8    THAT CASE.  AND THAT IS WHY IT'S MORE LIKE A DOMAIN NAME

9    BECAUSE A DOMAIN NAME IS ACTUALLY A SHADOW OF AN IP ADDRESS.

10    THE ONLY THING THAT GIVES A DOMAIN NAME VALUE AND USE

11    IS WHEN YOU ASSIGN IT TO AN IP ADDRESS.  OTHERWISE, IT'S LIKE

12    SAYING I CAN MARKET THE *1-800-FLOWERS* PHONE NUMBER, BUT IF THAT

13    DOESN'T ACTUALLY CORRESPOND TO MY PHONE NUMBER, IT'S JUST A

14    BRAND NAME, AND IT'S ARGUABLY CONFUSING BECAUSE IT'S NOT

13:18:08 15    ACTUALLY GOING TO TAKE YOU TO MY COMPANY.  SO THE REASON I'M

16    EMPHASIZING THE FACTUAL NATURE IS TO MAKE IT CLEAR WHY AN IP

17    ADDRESS, IN *KREMEN*, LIKE A DOMAIN NAME, IS EXCLUSIVE AND IT

18    CANNOT BE USED, AND IT'S NOT SOMETHING THAT'S JUST SIMPLY A

19    BUNDLE OF RIGHTS WHERE IT'S KIND OF AMORPHOUS AND REQUIRES A

20    LEGAL FICTION TO DETERMINE HOW EXCLUSIVE OR NON-EXCLUSIVE IT

21    IS.

22    THE IP ADDRESS HAS INTRINSIC PHYSICAL PROPERTIES AS

23    FAR AS HOW THE INTERNET AND THE TECHNOLOGY OF THE INTERNET

24    WORKS.  SO IF THE COURT IS GOING TO SAY IT IS NOT PROPERTY,

25    IT IS GOING -- THE COURT WILL REACH THAT QUESTION ON THE LEGAL

12

13:18:45    1   MERITS ON THE FACE OF THE INDICTMENT, BUT IT'S TO SAY, THAT

2   WILL HAVE FAR-REACHING IMPLICATIONS FOR MANY CONTRACTUALISTS.

3   SO I WANT, TO THE BEST I CAN, AS AN ADVOCATE, TO MAKE SURE IF

4   THAT'S WHERE YOU WANT TO GO, I WOULD LIKE TO HAVE AN ACTUAL

5   HEARING BECAUSE I HEAR YOU REFERRING TO JOHN CURRAN'S

6   DECLARATION, AND I'D LIKE TO GIVE YOU SOME CONTEXT TO WHY HE

7   SAID WHAT HE SAID --

8           THE COURT:  I DON'T THINK WE NEED TO GO THERE.

9           MS. FEVE:  AGAIN, IF WE'RE NOT GOING TO THE FCC 2010

10   WORKING PAPER -- WHICH ON ITS FACE SPECIFICALLY SAYS THIS DOES

11   NOT BIND EVEN THE FCC OR ANY OF THE COMMISSIONERS, THIS IS A

12   THOUGHT PIECE DESIGNED TO STIMULATE CONVERSATION -- TO THE

13   EXTENT WE KEEP HEARING FROM THE DEFENDANTS THAT EVERYTHING IS

14   UNDISPUTED AND WE'RE COLLATERALLY ESTOPPED AND WE ARE BOUND,

13:19:27   15   THE FCC DOCUMENT ON THE VERY FIRST PAGE SPECIFICALLY SAYS

16   OTHERWISE.  SO IF THE COURT IS GOING TO FIND AS A MATTER OF LAW

17   WITH NO CONTROLLING PRECEDENT THAT AN IP ADDRESS IS OR IS NOT

18   LIKE SOMETHING, ON SOME LEVEL YOU ARE GOING TO NEED FACTS TO

19   EXPLAIN THAT RATIONALE ABSENT A CONTROLLING PRECEDENT WHERE

20   THEY HAVE ALREADY REACHED THOSE FACTS AND YOU ARE BOUND BY

21   THOSE DETERMINATIONS, AND THERE'S NO DAYLIGHT BETWEEN THOSE

22   FACTS AND OURS.

23           SO THAT IS WHY HERE IT'S TO SAY -- ONE OF THE THINGS

24   THE DEFENDANTS ARGUE IN THEIR REPLY BRIEF IS WE -- UNDER THE

25   1985 *SHORTT*, KIND OF, SAC DECISION THEY SAY, WELL, IF WE MOVE

```
13:20:07   1    FOR AN EVIDENTIARY HEARING AND THAT HEARING WOULD IN NO WAY

           2    INVOLVE FACTS THAT WOULD SUBJECT TO DISPUTE AT TRIAL AND IF WE

           3    AGREE THAT WE WOULD NOT BE PREPARED TO ARGUE THAT WHETHER OR

           4    NOT AN IP ADDRESS QUALIFIES AS PROPERTY SHOULD BE SUBMITTED TO

           5    A JURY, THEN THEY CAN PROPERLY PUT THAT ARGUMENT BEFORE YOU AND

           6    EXPLAIN WHY IT IS THAT THEY BELIEVE THE FACTS ABOUT WHETHER OR

           7    NOT IP ADDRESSES ARE PROPERTY IS SO DIVISIBLE FROM THE

           8    QUESTIONS OF FACT THAT WOULD BE PRESENTED AT TRIAL.  AND THEY

           9    WOULD ALSO BE REQUIRED TO FLAT OUT SAY, WE DON'T THINK THIS IS

          10    A QUESTION FOR THE JURY, BECAUSE IF WHETHER OR NOT IP ADDRESS

          11    ARE QUESTIONS THAT SHOULD BE SUBMITTED TO THE JURY, THEN IT

          12    SHOULD CERTAINLY NOT BE ADJUDICATED ON A MOTION TO DISMISS.

          13         SO AGAIN, TAKING A STEP BACK, I HEAR YOU SAYING, I'M

          14    LOOKING AT KREMEN AND I'M LOOKING AT DOWLING; AND I HEAR YOU

13:21:05  15    TELLING ME THE MASSACHUSETTS CASE, FOR WHATEVER REASON, DOESN'T

          16    COUNT; AND THE BANKRUPTCY COURT PROCEEDINGS WHERE THEY HAVE

          17    AUCTIONED OFF IP ADDRESSES, TREATING THEM AS PROPERTY, DON'T

          18    COUNT.

          19         THE COURT:  LET ME ASK YOU THIS:  COPYRIGHTS ARE ONES

          20    THAT I WOULD IMAGINE CAN BE ASSIGNED, CAN BE TRANSFERRED, CAN

          21    BE SUBJECT OF BANKRUPTCY PROCEEDINGS --

          22         MS. FEVE:  I DON'T KNOW ABOUT THAT, YOUR HONOR,

          23    BECAUSE FIRST THEY ARE -- I DON'T KNOW WHO ISSUES -- I DON'T

          24    REMEMBER -- I'M NOT AN EXPERT ON COPYRIGHT LAW SO I DON'T KNOW

          25    IF IT GOES OUT OF THE COPYRIGHT PATENT'S OFFICE OR WHAT THEIR
```

14

13:21:43   1   RULES AND REGULATIONS ARE.  SO AGAIN, THESE ARE FACTS THAT ARE

2   BEYOND THE SCOPE OF OUR INDICTMENT WHICH I'M NOT PREPARED TO

3   ARGUE OR PUT BEFORE THE COURT.  WHAT I AM SUBMITTING TO THE

4   COURT IS THAT IF WE LOOK AT THE CASES THAT DO LOOK AT

5   INTANGIBLE PROPERTY RIGHTS -- BECAUSE THERE'S NO DISPUTE THAT

6   WE'RE TALKING ABOUT INTANGIBLE PROPERTY RIGHTS, WE'RE NOT

7   TALKING ABOUT HONEST SERVICES FRAUD, WE'RE NOT TALKING ABOUT

8   MONEY -- IF WE LOOK AT THE CASES THAT ARE ADDRESSING INTANGIBLE

9   PROPERTY RIGHTS, THEY ARE FREQUENTLY CONCERNED ABOUT POSSESSORY

10   INTERESTS, AND THEY ARE NOT REQUIRING THAT THOSE POSSESSORY

11   INTERESTS BE FOR SOMETHING THAT IS PHYSICAL OR THAT IS FOREVER,

12   AND WE'VE PUT MANY OF THOSE CASES BEFORE THE COURT.

13               AND I JUST WANT TO PULL UP *CLEVELAND* BECAUSE, IF YOU

14   RECALL *CLEVELAND*, THERE THE CONTEXT WAS A LICENSE OBTAINED FROM

13:22:56   15   THE STATE.  AND ONE OF THE THINGS *CLEVELAND* WAS CAREFUL TO SAY

16   IS THAT THE MAIL FRAUD AND THE FRAUD STATUTES HAVE AT THEIR

17   ORIGIN THE DESIRE TO PROTECT INDIVIDUAL PROPERTY RIGHTS.  IT

18   DOES NOT SAY EXCLUSIVE OWNERSHIP.  AND ANY BENEFIT FROM WHICH

19   THE GOVERNMENT DERIVES FROM THE STATUTE MUST BE LIMITED TO THE

20   GOVERNMENT'S INTEREST AS A PROPERTY HOLDER.  SO THEY'RE TALKING

21   ABOUT BEING A PROPERTY HOLDER.  AT NO POINT IS THE PROPERTY

22   HOLDER SOMEONE WHO MUST HAVE IT FOREVER.  *DOWLING* IS THE

23   OUTLIER.  *DOWLING* IS NOT THE NORM.  AND ONE OF THE REASONS WHY

24   *DOWLING* IS THE OUTLIER IS THAT *DOWLING* SHARES IN COMMON

25   SOMETHING WITH MANY OF THE CASES YOU HAVE SEED INVOLVING HONEST

13:23:36   1    SERVICES FRAUD OR CASES LIKE *CLEVELAND* WHERE THE FRAUD IS ON

          2    THE GOVERNMENT OR LIKE *LEW*, OR AGAIN, THE FRAUD IS ON THE

          3    GOVERNMENT.

          4           SO IN *DOWLING*, WE HAVE A COPYRIGHT WHICH IT IS

          5    COMPLETELY INTANGIBLE AND THERE IS NO REAL WORLD LIMIT ON HOW

          6    MANY TIMES SOMETHING COULD BE PHYSICALLY LAWFULLY DUPLICATED.

          7    IN *CLEVELAND*, IN *LEW*, IN SEVERAL OTHER CASES, WE HAVE THE

          8    GOVERNMENT ISSUING A LICENSE OR A VISA.  IT IS SOMETHING THAT

          9    THE GOVERNMENT CAN ISSUE AS MANY TIMES AS IT WANTS BECAUSE ON

         10    SOME LEVEL IT IS A LEGAL ARTIFICE AND THE ONLY REASON IT IS NOT

         11    A LEGAL FICTION IS BECAUSE OF THE RULES SURROUNDING IT

         12           THE COURT:  I'M NOT SURE I UNDERSTAND YOU

         13    DISTINGUISHING *DOWLING*.  YOU SAID WITH A COPYRIGHT YOU HAVE

         14    UNTOLD NUMBERS OF ITEMS THAT ARE COPYRIGHTED.  IS THAT WHAT

13:24:30  15    YOU'RE SAYING?

         16           MS. FEVE:  SO THE LEGAL PROTECTION OF A COPYRIGHT IS

         17    SAYING YOU CAN'T DUPLICATE THIS.

         18           THE COURT:  "THIS."  YOU CAN'T MAKE ONE COPY --

         19           MS. FEVE:  YOU CAN'T MAKE A COPY OF THIS UNLESS YOU

         20    PAY ME FOR MY COPYRIGHT.  SO THE COPYRIGHT ITSELF IS SIMILAR TO

         21    A LICENSE.  THERE IS NOTHING PHYSICAL OR INTRINSIC ABOUT IT.

         22    IT IS THE GOVERNMENT SAYING YOU GAVE US WHATEVER YOUR

         23    APPLICATION WAS AND WE GAVE YOU A COPYRIGHT, JUST AS IN *LEW* WE

         24    GAVE YOU A VISA.

         25           THE COURT:  WE RECOGNIZE THIS INTELLECTUAL

16

13:25:01  1    PROPERTY.

2              MS. FEVE:  WE RECOGNIZE THIS INTELLECTUAL PROPERTY.

3              THE COURT:  AND *CARPENTER* TELLS US THAT PROPERTY IS

4    NOT LIMITED TO TANGIBLE PROPERTY.  SO, SO FAR SO GOOD.

5              MS. FEVE:  RIGHT.  SO FAR SO GOOD.  BUT WHERE *DOWLING*

6    SAYS THERE'S A DIFFERENCE IS THAT THERE IS NOTHING TO PREVENT

7    THE DISSEMINATION AND THE COPYING OTHER THAN THE COPYRIGHT.

8    AND SO HERE --

9              THE COURT:  THAT'S NOT THE REASON THE *DOWLING* COURT

10   REACHED ITS CONCLUSION, IS IT?

11             MS. FEVE:  I BELIEVE IT IS, YOUR HONOR.  I BELIEVE A

12   CONSIDERABLE AMOUNT OF THEIR DISCUSSION IS ABOUT THE FACT THAT

13   IT COULD BE COPIED AND THAT THERE WAS NOTHING INTRINSIC TO IT

14   OTHER THAN THE KIND OF LEGAL CONCEDE OF THE --

13:25:45  15             THE COURT:  THE COURT SAID, A COPYRIGHT LIKE OTHER

16   INTELLECTUAL PROPERTY COMPRISES A SERIES OF CAREFULLY DEFINED

17   AND CAREFULLY DELIMITED INTEREST TO WHICH THE LAW AFFORDS

18   CORRESPONDINGLY EXACT PROTECTIONS.  I GUESS ONE CAN ARGUE THAT

19   HERE THERE'S ARIN THAT HAS CRAFTED WITH SPECIFICITY CERTAIN

20   RIGHTS AND THEN CERTAIN LIMITATIONS.

21             MS. FEVE:  WELL, FIRST, IP ADDRESS AREN'T

22   INTELLECTUAL PROPERTY.  THAT'S ONE OF THE FIRST, MOST IMPORTANT

23   DISTINCTIONS.

24             THE COURT:  WOULDN'T IT BE A STRONGER ARGUMENT THAT

25   SOMETHING IS DESERVING OF BEING VIEWED AS PROPERTY TO THE

17

13:26:27  1  EXTENT THAT IT IS INTELLECTUAL PROPERTY, THAT IT'S SOMEONE'S

2  DESIGN, SOMEONE'S CREATION?

3       MS. FEVE:  YOUR HONOR, FOR PURPOSES OF THE INTANGIBLE

4  PROPERTY STATUTES, THAT'S NOT WHERE THEY HAVE GONE.  WHERE THEY

5  HAVE GONE IS, IS THIS INTANGIBLE?  CAN YOU HAVE EXCLUSIVE USE?

6  AND WHAT I UNDERSTOOD THE DISTINCTION IN *DOWLING* BEING IS

7  INTELLECTUAL PROPERTY IS INHERENTLY DIFFERENT BECAUSE THE ONLY

8  THING TO PREVENT OR MAINTAIN EXCLUSIVITY IS THE STATE'S

9  RECOGNITION OF THE INTELLECTUAL PROPERTY.  ARIN IS NOT CREATING

10  SOMETHING BY ITS RECOGNITION.  ARIN IS A TRAFFIC COP WHO IS

11  SAYING YOU CAN GO FORWARD AND YOU CAN'T.  BUT THEY ARE

12  FUNCTIONING IN A WAY THAT'S SIMILAR TO OTHER THIRD PARTIES THAT

13  CAN KIND OF REGULATE AND MAINTAIN A REGISTRY.

14       IF WE DO TAKE A STEP BACK AND LOOK AT THE PHONE

13:27:16  15  NUMBERS, AGAIN, THEY HAVE A VERY, VERY DIFFERENT REGULATORY

16  HISTORY SO WE NEED TO BE CAREFUL ABOUT THEIR TECHNICAL

17  SIMILARITIES.  BUT THE REASON WHY WE'RE SAYING THIS IS VERY

18  DIFFERENT THAN *DOWLING* IS THAT ARIN DOESN'T CREATE THE

19  INTELLECTUAL PROPERTY, AND IT DOESN'T RECOGNIZE IT, AND

20  THEREFORE, CONFER SOME BENEFIT.  ARIN IS A SUCCESSOR AND

21  INTEREST TO MULTIPLE -- IACA AND BEFORE THAT YOU HAD DARPA.

22  AND THE FACT IS YOU COULD HAVE NONE OF THESE PEOPLE, BUT IT'S

23  JUST THAT THEN YOU WOULD HAVE CHAOS.  YOU WOULD HAVE SOME

24  PEOPLE WHO WOULD ANNOUNCE IP'S AND THEN OTHER PEOPLE WHO WOULD

25  TRY TO HIJACK THEM, AND THEN THERE WOULD BE NO REGISTRY WHERE

18

13:27:56  1  PEOPLE COULD GO LOOK WHO IS THE RECOGNIZED REGISTRY.

2  THE COURT:  I GUESS AT THIS POINT THE FACT WE'RE EVEN

3  TALKING ABOUT ARIN WE ARE IN FACT GOING OUTSIDE THE FOUR

4  CORNERS OF THE INDICTMENT WHICH LEADS ME THEN TO ASK THE

5  DEFENSE -- AND BY THE WAY, THIS ARGUMENT WITH RESPECT TO

6  WHETHER OR NOT WE HAVE ENOUGH FACTS HERE, WHETHER OR NOT

7  THERE'S SUFFICIENT UNDISPUTED FACTS AND THAT WE WOULD REQUIRE

8  SO MUCH MORE AS FAR AS FACTS IS SOMETHING THAT I DID NOT

9  OBSERVE IN THE GOVERNMENT'S RESPONSE.

10  BUT I DO APPRECIATE THAT AS A THRESHOLD MATTER THAT

11  THAT IS SOMETHING THAT THE COURT WOULD HAVE TO ENTERTAIN AND

12  HAVE TO PROVIDE A SUFFICIENT FACTUAL PREDICATE TO SUPPORT AN

13  ORDER DISMISSING THE INDICTMENT.  AT THE SAME TIME, SINCE

14  EVERYONE WAS FOCUSED ON THE SUBSTANCE OF THESE ISSUES, THAT'S

13:28:55 15  WHY I BEGAN MY QUERY WITH THAT; BUT HAVING SAID THAT, LET ME

16  HEAR FROM THE DEFENSE WITH RESPECT TO THIS THRESHOLD QUESTION

17  OF WHETHER OR NOT THERE IS SUFFICIENT FACTS BEFORE THE COURT SO

18  THAT IT COULD ISSUE A RULING ON THIS MOTION.

19  MS. MUNK:  YES, YOUR HONOR.  I'M LOOKING AT THE PHONE

20  BECAUSE I PULLED UP RULE 12 BECAUSE THE GOVERNMENT SAID RULE 12

21  SAYS THE COURT MUST STAY WITHIN THE FOUR CORNERS OF THE

22  INDICTMENT.  IT DOES NOT SAY THAT ANYWHERE.  IN FACT, IF YOU

23  LOOK AT RULE 12(D), WHAT IT SAYS IS THE COURT MUST DECIDE EVERY

24  PRETRIAL MOTION BEFORE TRIAL UNLESS IT FINDS GOOD CAUSE TO

25  DEFER RULING.  IT THEN SAYS, WHEN FACTUAL ISSUES ARE INVOLVED

19

13:29:34   1    IN DECIDING A MOTION, THE COURT MUST STATE ITS ESSENTIAL

2    FINDINGS ON THE RECORD.  SO THE RULE ACTUALLY CONTEMPLATES

3    CERTAIN PRETRIAL MOTIONS WHERE THE COURT MAY HAVE TO MAKE

4    FINDINGS OF FACT.

5         WE DID ADDRESS THIS IN OUR REPLY, BUT I WILL JUST

6    KIND OF SUMMARIZE WHAT THE CASES IN THE NINTH CIRCUIT HAVE SAID

7    ABOUT THIS.  IT'S TRUE THAT THE COURT SHOULD TAKE THE

8    ALLEGATIONS IN THE INDICTMENT AS TRUE IN A PRETRIAL MOTION

9    WHERE THE COURT IS BEING ASKED TO DECIDE AN ISSUE OF LAW.  AND

10   I WANT TO MAKE THAT CLEAR THAT THIS IS WHAT WE'RE DEALING WITH.

11   THE QUESTION OF WHETHER AN IP ADDRESS IS PROPERTY UNDER WIRE

12   FRAUD STATUTE, THAT'S AN ISSUE OF STATUTORY CONSTRUCTION AND IT

13   IS AN ISSUE OF LAW.  IT'S NOT A QUESTION FOR THE JURY.  IT'S

14   NOT A QUESTION THAT WILL EVER GO TO THE JURY.  THE JURY DOES

13:30:24  15   NOT GET TO DECIDE WHETHER OR NOT SOMETHING IS QUOTE, UNQUOTE,

16   PROPERTY AND WE KNOW THAT FROM, FIRST -- WELL, I WON'T CITE ALL

17   THE CASES.

18        BUT ALL OF THE CASES WHERE THE SUPREME COURT HAS

19   ADDRESSED THESE QUESTIONS OR SIMILAR QUESTIONS -- *MCNALLY*,

20   *SKILLING*, *DOWLING* -- THE COURT IS CONSIDERING AS A MATTER OF

21   LAW WHETHER COPYRIGHTS OR INTANGIBLE OBJECTS ARE PROPERTY AND

22   THOSE ARE NOT QUESTIONS THAT THEY DEFERRED TO THE JURY.  SO

23   BECAUSE THIS IS A QUESTION OF LAW, IF THERE ARE ANY FACTS THAT

24   THE COURT NEEDS TO MAKE THIS DETERMINATION, THE COURT CAN

25   CONSIDER THOSE FACTS.  IF THEY'RE UNDISPUTED, WE DON'T NEED TO

13:31:09  1   HAVE AN EVIDENTIARY HEARING.  IF THEY ARE DISPUTED, THAT MAY BE

2   SOMETHING THAT THE COURT FINDS NECESSARY.

3          THE COURT:  LET ME HAVE YOU RESPOND TO THE ARGUMENT

4   THAT WE DON'T HAVE A DETERMINATIVE CASE, WE DON'T HAVE

5   PRECEDENT, THAT STANDS FOR THE PROPOSITION THAT THESE

6   IP/NETBLOCKS DO NOT QUALIFY AS PROPERTY AND THAT, IN FACT, YOU

7   HAVE ONE MAGISTRATE, I BELIEVE, IN A CASE PROVIDING THE VIEW

8   THAT THESE NETBLOCKS WOULD CONSTITUTE PROPERTY; SO THAT, GIVEN

9   THE STATE OF THE LAW, THAT WE OURSELVES DON'T HAVE ENOUGH FACTS

10  BEFORE US WITH RESPECT TO THINGS LIKE ARIN AND LEGACY AND WHAT

11  ALL THAT TRANSLATES INTO.  WHY DO YOU THINK WE HAVE SUFFICIENT

12  FACTS ON THE RECORD BASED UPON WHAT'S IN THE INDICTMENT WHEN

13  THERE'S NO REFERENCE TO ARIN AND THE LIMITATIONS THAT OTHERWISE

14  ARIN MAY PLACE ON BENEFICIARIES OF THESE ADDRESSES?

13:32:27  15         MS. MUNK:  YES, YOUR HONOR.  THERE IS A LOT TO

16  ADDRESS THERE.  FIRST, I WANT TO ADDRESS THIS ISSUE OF THE

17  MAGISTRATE DECIDING THAT AN IP ADDRESS IS PROPERTY.  THERE'S NO

18  SUCH DECISION.  THE GOVERNMENT CHARACTERIZED A DECISION IN A

19  CASE CALLED *KREMEN V. COHEN*.  THIS IS A CASE THAT WENT ON FOR

20  YEARS AND YEARS ABOUT A DOMAIN CALLED SEX.COM.  I HAVE THE

21  ORDER HERE THAT THE GOVERNMENT CITED.  IT DOESN'T RULE THAT IP

22  ADDRESS ARE PROPERTY.  IT SIMPLY SAYS THAT THEY CAN BE

23  TRANSFERRED.  I CAN HAND A COPY TO THE COURT AND ALSO THE

24  GOVERNMENT.

25         THE COURT:  DIDN'T THEY RELY ON *GLOBAL NAPS VERSUS*

22

21

13:33:02  1    *VERIZON*?

       2                MS. MUNK:  YES, YOUR HONOR.  THAT'S A CASE WE CITED

       3    AS WELL.  MAY I APPROACH, YOUR HONOR?

       4                THE COURT:  YES.

       5                MS. MUNK:  ALL OF THE CASES THAT DEALT WITH THE ISSUE

       6    OF WHETHER IP ADDRESSES, WHETHER THERE IS ANY KIND OF RIGHT TO

       7    AN IP ADDRESS, THEY HAVE NOT COME TO THE CONCLUSION THAT THEY

       8    ARE PROPERTY.  THERE'S NOT A CASE THAT SAYS, WELL, A BANKRUPTCY

       9    CODE REQUIRES THAT ONLY PROPERTY CAN BE, YOU KNOW, TRANSFERRED

      10    IN AN ASSET SALE, SO IN ORDER FOR SOMETHING TO BE TRANSFERRED

      11    IT HAS TO BE PROPERTY.  THAT'S NOT WHAT THESE CASES HOLD.  THEY

      12    HOLD THAT SOMEONE HAS A RIGHT TO TRANSFER AN IP ADDRESS WHEN

      13    THEY GO BANKRUPT, AND THOSE IP ADDRESSES CAN HAVE VALUE.

      14                THAT IS NOT A HOLDING THAT IP ADDRESS ARE PROPERTY.

13:33:55 15    THIS IS WHY SEVENTH CIRCUIT CASE THAT WE CITED IN OUR REPLY

      16    REGARDING *1-800-FLOWERS* IS SO IMPORTANT BECAUSE WHAT THAT CASE

      17    EXPLAINS IS THAT YOU CAN HAVE A RIGHT TO SELL SOMETHING SUCH AS

      18    A PHONE NUMBER, SUCH AS AN IP ADDRESS, AND HAVE A RIGHT TO GET

      19    MONEY FOR THAT, BUT THAT DOESN'T MAKE THAT IP ADDRESS OR PHONE

      20    NUMBER A PROPERTY RIGHT.  IT'S THE EXACT ISSUE HERE.  JUST LIKE

      21    -- AND THE ANALOGY THE SEVENTH CIRCUIT GAVE WAS A FOOTBALL

      22    TEAM.  YOU HAVE A RIGHT TO TRADE A FOOTBALL PLAYER FOR VALUE,

      23    BUT YOU DON'T OWN A FOOTBALL PLAYER.  THE FACT YOU CAN TRANSFER

      24    SOMETHING IN EXCHANGE FOR MONEY DOES NOT MAKE IT A PROPERTY

      25    RIGHT FOR THE PURPOSES OF CRIMINAL WIRE FRAUD.

13:34:39    1          OBVIOUSLY, OVERARCHING THAT ENTIRE ANALYSIS IS THE

2    FACT WE'RE NOT DEALING WITH BANKRUPTCY CASES.  WE'RE DEALING

3    WITH A FELONY CRIME, AND WE HAVE FOUR YOUNG MEN SITTING IN HERE

4    WITH HAVING COMMITTED A CRIME, AND IF THEY ARE TO BE HELD TO A

5    JURY TRIAL ON WHETHER OR NOT THEY COMMITTED WIRE FRAUD, THERE

6    NEEDS TO BE ABSOLUTE CLARITY AS TO WHETHER OR NOT AN IP ADDRESS

7    IS PROPERTY.  THAT'S A BIG DISTINCTION BETWEEN NOT JUST THE

8    BANKRUPTCY CASES BUT ALSO THE NINTH CIRCUIT CASE *KREMEN*.

9          BUT JUST GOING BACK TO THE COURT'S QUESTION ABOUT

10    WHAT'S IN THE INDICTMENT THAT'S SUFFICIENT FOR THE COURT TO

11    RULE ON THIS ISSUE, FIRST, OBVIOUSLY OUR POSITION IS THAT THE

12    COURT CAN CONSIDER ALL THE EXHIBITS THE DEFENSE SUBMITTED ALONG

13    WITH MOTION, BUT SECOND, IF THE COURT DETERMINES IT CANNOT,

14    THEN GOVERNMENT RUNS INTO A DIFFERENT PROBLEM UNDER RULE 12,

13:35:27   15    RULE 12(B)(3) LOWER CASE ROMAN NUMERAL THREE, WHICH REQUIRES

16    THE INDICTMENT TO BE SUFFICIENT, AND IF IT'S NOT, THEN THE

17    COURT MUST DISMISS IT FOR LACK OF SUFFICIENCY.

18          THE CASE, THE SEMINAL CASE ON THIS IS *US V. CECIL*,

19    C-E-C-I-L, ALSO CITED IN THE REPLY, WHICH SAID THAT IF THE

20    INDICTMENT -- THAT THERE ARE MULTIPLE FACTORS, BUT IT'S ON PAGE

21    14 OF THE REPLY.  I'M SORRY.  I'M ACTUALLY ON THE WRONG PAGE

22    WHICH IS WHY I'M HAVING TROUBLE.  IT'S ON PAGE 13 OF THE REPLY,

23    AND WHAT IT SAYS IS THAT IN ORDER FOR AN INDICTMENT TO BE

24    SUFFICIENT IT MUST HAVE A SUFFICIENT DESCRIPTION OF THE CHARGES

25    TO ENABLE HIM TO PREPARE HIS DEFENSE, TO ENSURE THAT HE IS

24

23

13:36:18  1  PROSECUTED ON THE BASIS OF FACTS PRESENTED TO THE GRAND JURY,

2  TO ENABLE HIM TO PLEAD JEOPARDY AGAINST A LATER PROSECUTION AND

3  TO INFORM THE COURT OF THE FACTS ALLEGED SO THAT THE COURT CAN

4  DETERMINE THE SUFFICIENCY OF THE CHARGE.

5          SO IF THE FACTS IN THE INDICTMENT AS ALLEGED ARE NOT

6  ENOUGH FOR THE COURT TO DECIDE IS AN IP ADDRESS PROPERTY, AND

7  AT THIS POINT THEY'RE NOT BECAUSE THE INDICTMENT DOES NOT

8  EXPLAIN WHAT AN IP ADDRESS REALLY IS; IT CERTAINLY DOESN'T

9  ADDRESS ANY FACTS THAT WOULD SATISFY THE PROPERTY AS THEY CLAIM

10  APPLIES WHICH IS THE THREE-PART TEST IN *KREMEN*; IF NONE OF

11  THOSE FACTS ARE ALLEGED, THEN IT CAN'T BE THAT THE COURT

12  DOESN'T GET TO DECIDE THE ISSUE.  IT MEANS THAT THE COURT

13  EITHER MUST HEAR UNDISPUTED FACTS TO ALLOW THE COURT TO MAKE

14  THIS DECISION OR THE COURT MUST DISMISS THE INDICTMENT FOR

13:37:08  15  INSUFFICIENCY.  SO EITHER WAY, THE WIRE FRAUD CHARGES HAVE TO

16  BE DISMISSED UNDER EITHER OF THE RULE 12 PROCEDURES.

17          I WANT TO ADDRESS OTHER POINTS BUT I --

18          THE COURT:  ALL RIGHT.  LET ME HEAR FROM THE

19  GOVERNMENT WITH RESPECT TO UNDER WHAT CIRCUMSTANCES, IF ANY,

20  THE COURT COULD DIRECT AN ADDITIONAL RECORD TO BE DEVELOPED

21  WITH RESPECT TO ARIN AS TO THE AGREEMENTS THAT -- WELL, I GUESS

22  PRE-1997 THERE WEREN'T AGREEMENTS -- BUT THE UNDERSTANDINGS

23  THAT EXISTED AS TO WHAT RIGHTS WERE CONFERRED AND WHAT

24  OBLIGATIONS ALSO EXISTED BY BEING CONFERRED THESE IP ADDRESS

25  RIGHTS.

24

13:38:22   1          MS. FEVE:  YOUR HONOR, ON PAGE FIVE OF OUR BRIEF WE

2    TALKED ABOUT THE LEGAL STANDARD AND DIRECTED THE COURT TO

3    SEVERAL DECISIONS -- THE 2002 *BOREN* DECISION, THE 1996 *JENSEN*

4    DECISION AND 1982 *BUCKLEY* DECISION, ACTUALLY AS WELL *INRYCO*.

5    IN ALL OF THOSE DECISIONS, WHAT THE COURTS WERE REALLY ADAMANT

6    ABOUT IS THAT WE LOOK IN A PRETRIAL MOTION TO DISMISS -- THE

7    DISTRICT COURT IS BOUND BY THE FOUR CORNERS OF THE INDICTMENT.

8    THAT WAS *BOREN*.  AND IN *JENSEN*, THE QUOTE WAS THE COURT SHOULD

9    NOT CONSIDER EVIDENCE NOT APPEARING ON THE FACE OF THE

10   INDICTMENT.  THEY ALSO ADDED IN *JENSEN* THERE IS NO SUMMARY

11   JUDGMENT PROCEDURE IN CRIMINAL CASES WHICH IS FUNCTIONALLY WHAT

12   I BELIEVE THE DEFENDANTS ARE ARGUING FOR.

13          AND IF WE KEEP GOING AND WE LOOK AT *BUCKLEY* AND WE

14   LOOK AT *INRYCO*, WHAT WE SEE IS THAT CONSISTENTLY THE NINTH

13:39:15  15   CIRCUIT SAYS THAT WHEN YOU BRING A MOTION TO DISMISS THE CHARGE

16   IT'S BECAUSE YOU HAVE FAILED TO SUFFICIENTLY PLEAD THE CHARGE.

17   NO ONE IS ARGUING THAT WE INSUFFICIENTLY FAILED TO PLEAD THE

18   CHARGE.  AND EVEN IF WE LOOK AT SOME OF THE CASES THE

19   DEFENDANTS HAVE CITED LIKE *BONALLO*, THE 1988 DECISION NINTH

20   CIRCUIT DECISION, THEY SAY IF THE INDICTMENT SETS FORTH THE

21   ELEMENTS OF THE ILLEGAL SCHEME AND THE TIME AND PLACE WHERE THE

22   WITHDRAWALS OCCURRED -- WHICH IN OUR CASE WOULD BE IF YOU

23   LOOKED AT THE MANNER AND MEANS -- THE DEFENDANT, THEREFORE,

24   KNEW OF THE CONDUCT HE WAS BEING ACCUSED OF AND COULD

25   ADEQUATELY PREPARE A DEFENSE.

25

13:39:47  1          WE HAVE ADEQUATELY ALLEGED THIS, AND AS FAR AS IF WE

2    ARE GOING TO START LOOKING AT FACTS THAT ARE OUTSIDE OF THE

3    RECORD, THE ONLY LEGAL AUTHORITY THAT THE DEFENDANTS HAVE PUT

4    FORWARD FOR THAT POSITION WAS IN THEIR REPLY BRIEF WHICH WE

5    OBVIOUSLY RECEIVED OVER THE LONG WEEKEND.  I HAVE NOT HAD A

6    CHANCE TO EXHAUSTIVELY REVIEW IT, RESEARCH THE CASES CITING IT,

7    BUT THIS -- LET ME PULL UP THE CASE -- THIS 1985 DECISION,

8    *SHORTT ACCOUNTANCY CORPORATION* WHICH IS THE FIRST TIME THAT

9    THEY HAVE RAISED IT --

10          MS. MUNK:  IT'S ACTUALLY IN THE MOTION AS WELL.

11          MS. FEVE:  YOUR HONOR, WHAT *SHORTT* SAYS IS ACTUALLY I

12   DON'T BELIEVE SO STRONG FOR THEM.  IT SAYS THAT A MOTION

13   REQUIRING FACTUAL DETERMINATIONS MAY BE DECIDED BEFORE TRIAL

14   IF, QUOTE, TRIAL OF THE FACTS SURROUNDING THE COMMISSION OF THE

13:40:38  15   ALLEGED OFFENSE WOULD BE OF NO ASSISTANCE IN DETERMINING

16   VALIDITY OF THE DEFENSE, AND THAT QUOTE IS TO *UNITED STATES*

17   *VERSUS COVINGTON* WHICH IS A 1969 SUPREME COURT DECISION.  THE

18   NINTH CIRCUIT IN *SHORTT ACCOUNTANCY CORP* GOES ON TO SAY, IF AN

19   ISSUE RAISED IN A PRETRIAL MOTION IS NOT ENTIRELY SEGREGABLE

20   FROM THE EVIDENCE TO BE PRESENTED AT TRIAL BUT ALSO DOES NOT

21   REQUIRE REVIEW OF A SUBSTANTIAL PORTION OF THAT EVIDENCE, THE

22   DISTRICT COURT HAS DISCRETION TO DEFER DECISION ON THE MOTION.

23   SO I BELIEVE --

24          THE COURT:  DISCRETION TO DEFER UNTIL?

25          MS. FEVE:  TO DEFER DECISION ON THE MOTION.

13:41:13   1           THE COURT:  UNTIL TRIAL?

         2           MS. FEVE:  YES, UNTIL TRIAL, YOUR HONOR.

         3           THE COURT:  DO YOU BELIEVE THAT THIS QUESTION ABOUT

         4   AN IP AND NETBLOCKS CONSTITUTING PROPERTY IS THAT PROPERLY

         5   PRESENTED TO THE JURY FOR CONSIDERATION, OR DO YOU AGREE THAT

         6   IT'S A MATTER OF LAW DETERMINATION?

         7           MS. FEVE:  LOOK, IN AN ABUNDANCE OF CAUTION, I WOULD

         8   ALWAYS ARGUE THAT IT'S A MIXED QUESTION OF FACT AND LAW BECAUSE

         9   HERE WE ARE GOING TO HAVE TO PUT FACTS BEFORE THE COURT

        10   REGARDING THE HISTORY OF ARIN, WHO ARIN IS, WHAT IT IS, WHAT IT

        11   DOESN'T DO, HOW DOES THE INTERNET WORK, WHAT HAVE OTHER CASES

        12   IN DISTRICTS DONE THAT HAVE ADJUDICATED THIS.  AND JUST SO I

        13   CAN MAKE SURE I'M TRACKING THE JUDGE'S ARGUMENT, YOU REFERENCED

        14   A MAGISTRATE JUDGE.  THE MASSACHUSETTS DECISION WE RELIED ON,

13:41:58  15   *GLOBAL NAPS*, JUDGE ZOBEL IS A DISTRICT JUDGE WHO ISSUED THAT

        16   DECISION.

        17           THE COURT:  YOU'RE CORRECT.

        18           MS. FEVE:  AND IN THERE, SHE CLEARLY SPENT A GREAT

        19   DEAL OF TIME FAMILIARIZING HERSELF WITH IP ADDRESSES WITH HOW

        20   THEY WORKED, WITH WHAT A NETBLOCK IS, WITH HOW VALUABLE THEY

        21   COULD BE, AND IF WE'RE GOING TO HAVE THAT TYPE OF HEARING, THE

        22   DEFENDANTS ARE THE MOVING PARTY WHERE IT'S INCUMBENT UPON THEM

        23   TO FRAME WHY THEY BELIEVE THE FACTS ARE ENTIRELY SEGREGABLE.

        24   WE'RE NOT UNWILLING TO HAVE THE HEARING IF EVERYONE AGREES THE

        25   FACTS ARE ENTIRELY SEGREGABLE AND IF EVERYONE AGREES THAT THIS

27

| | | |
|---|---|---|
| 13:42:39 | 1 | IS NOT GOING TO BE A QUESTION SUBMITTED TO THE JURY.  WE WANT |
| | 2 | TO BE EFFICIENT WITH THE COURT'S TIME, AND IF THIS WILL |
| | 3 | STREAMLINE THE TRIAL, TO THE EXTENT WE GET TO TRIAL, WE'RE |
| | 4 | CERTAINLY OPEN TO DOING IT.  BUT AS FAR AS A MOTION TO DISMISS, |
| | 5 | THIS IS NOT THE PROPER WAY TO DO IT, TO SAY THERE ARE A HUNDRED |
| | 6 | PAGE THAT YOU CAN JUDICIALLY NOTICE UNDER A VARIETY OF |
| | 7 | THEORIES; PARTICULARLY WHERE, AGAIN, THE FCC DOCUMENT THEY RELY |
| | 8 | ON SPECIFICALLY SAYS ON ITS FACE THAT IT IS NOT BINDING. |
| | 9 | AND SO TO THE EXTENT THAT THE COURT IS CONCERNED THAT |
| | 10 | BECAUSE THERE'S A NON-GOVERNMENTAL ORGANIZATION THAT BY ITS OWN |
| | 11 | TERMS ARGUES IT HAS CERTAIN POSSESSORY INTERESTS, WE CAN GO |
| | 12 | THERE; BUT PART OF WHY I'M SAYING THERE'S CONTEXT FOR ARIN IS |
| | 13 | THAT THAT HAS BEEN ARIN'S POSITION.  FOR BETTER OR WORSE, IT |
| | 14 | HAS ALSO BEEN A VERY UNSUCCESSFUL POSITION.  ARIN SOUGHT TO |
| 13:43:34 | 15 | BLOCK THE TRANSFER THAT IS THE SUBJECT OF THE *GLOBAL NAPS* |
| | 16 | DECISION ASSERTING THE RIGHTS THAT THE DEFENDANTS NOW QUOTE. |
| | 17 | AND THE PARTIES TO THAT TRANSACTION SAID, WE DISAGREE AND WE'RE |
| | 18 | GOING TO GO FORWARD AND THREATEN LITIGATION.  AND ULTIMATELY |
| | 19 | ARIN BLINKED AND SAID, FINE, WE'LL BLESS THIS TRANSACTION.  BUT |
| | 20 | ALL OF THOSE FACTS, ALL OF THAT BACKGROUND, ALL OF THE WAYS IN |
| | 21 | WHICH ARIN MAY OR MAY NOT ACTUALLY HAVE THIS RIGHT THAT IT |
| | 22 | ASSERTS ARE FAR OUTSIDE THE SCOPE OF THE INDICTMENT. |
| | 23 | THE COURT:  I AGREE. |
| | 24 | MS. BERNSTEIN:  YOUR HONOR, MAY I RESPOND TO A COUPLE |
| | 25 | OF THE POINTS? |

28

| | | |
|---|---|---|
| 13:44:18 | 1 | THE COURT:  YES.  WOULD YOU DO ME A FAVOR?  WOULD YOU |
| | 2 | PLACE THAT MICROPHONE CLOSER? |
| | 3 | MS. BERNSTEIN:  IS THAT BETTER? |
| | 4 | THE COURT:  YES. |
| | 5 | MS. BERNSTEIN:  THE IDEA THAT THE COURT WOULD BEGIN |
| | 6 | CONSIDERING ALL THIS BACKGROUND ABOUT THE PRE-LITIGATION |
| | 7 | HISTORY OF THE CASE THE GOVERNMENT IS CITING IS PART OF, I |
| | 8 | THINK, THE PROBLEM.  I THINK WE'VE GONE TOO FAR ASTRAY.  NO ONE |
| | 9 | IS DISPUTING WHAT THE LEGAL STANDARD IS FOR COURT TO CONSIDER |
| | 10 | UNDER RULE 12.  WHAT WE ARE SAYING, THOUGH, IS THAT WHETHER OR |
| | 11 | NOT AN IP ADDRESS CONSTITUTES PROPERTY IS PURELY A LEGAL |
| | 12 | QUESTION, AND THE GOVERNMENT -- IT'S NOT FOR A JURY |
| | 13 | DETERMINATION.  THIS ISN'T SOMETHING WE'D HAVE A SPECIAL |
| | 14 | VERDICT FORM AND MAKE THESE SAME ARGUMENTS TO THE JURY. |
| 13:44:50 | 15 | THE COURT:  WHAT ABOUT A MIXED QUESTION OF LAW AND |
| | 16 | FACT? |
| | 17 | MS. BERNSTEIN:  I DON'T THINK IT'S THAT EITHER, YOUR |
| | 18 | HONOR.  I MEAN, WHETHER OR NOT AN AN IP ADDRESS -- IT'S AN |
| | 19 | ISSUE OF STATUTORY CONSTRUCTION WHICH ALSO IMPLICATES THE RULE |
| | 20 | OF LENITY.  BUT EVEN IN THE GOVERNMENT'S PLEADING, I WAS STRUCK |
| | 21 | ON PAGE SIX HOW THE GOVERNMENT ARGUES IN ITS DISCUSSION OF THE |
| | 22 | LEGAL STANDARD THAT WE ALSO HAVE TO TAKE INTO ACCOUNT, QUOTE, |
| | 23 | EXISTING REALITIES WHICH INCLUDE COMMON UNDERSTANDINGS OF IP |
| | 24 | ADDRESSES AND DOMAIN NAMES.  I THINK THE GOVERNMENT TOOK THAT |
| | 25 | POSITION BECAUSE THEY WANTED TO DISCUSS DOMAIN NAMES AND |

29

13:45:26  1   ANALOGIZE DOMAIN NAMES.  NOW THE GOVERNMENT IS SEEMINGLY TAKING

2   THE POSITION THAT THIS IS NOT A QUOTE, UNQUOTE, EXISTING

3   REALITY.  AND THAT FLIP-FLOPPING IS A PROBLEM AND HAS BEEN A

4   PROBLEM THAT PLAGUED EVERY MOTION IN EVERY STAGE OF THIS

5   PROCEEDING.

6         HERE, WHAT WE HAVE ARE UNDISPUTED FACTS.  I THINK WE

7   LAID THOSE OUT PRETTY CLEARLY ON PAGE SIX OF OUR MOTION.

8   THEY'RE OUTSIDE OF THE INDICTMENT, BUT THEY'RE NOT IN DISPUTE.

9   UNDER *PHILLIPS* AND UNDER *COVINGTON,* THEY ARE THINGS THAT THIS

10  COURT CAN RELY UPON AS A BASIS FOR AN ORDER TO DISMISS ON THIS

11  MOTION AND THOSE FACTS ARE THAT, IN SUPPORT OF ITS PROSECUTION,

12  THE GOVERNMENT SUBMITTED ITS DECLARATION FROM ARIN THAT TOOK

13  THE POSITION THAT IP ADDRESS ARE NOT PROPERTY; TWO, THAT ARIN

14  HAS PUBLICLY TAKEN THE POSITION THAT IP ADDRESSES ARE NOT

13:46:11 15  PROPERTY IN VARIOUS DOCUMENTS, PUBLICATIONS AND LEGAL

16  PROCEEDINGS; THREE, FEDERAL AGENCIES REPEATEDLY AFFIRM THAT IP

17  ADDRESS ARE NOT PROPERTY AND STATE THAT THEY AGREE WITH ARIN'S

18  POLICIES; FOUR, THE IP ADDRESS IN THE INDICTMENT ARE LEGACY

19  THAT WERE NOT EVEN SUBJECT TO A LEGACY REGISTRATION AGREEMENT.

20  AND THE GOVERNMENT DOESN'T DISPUTE THESE BECAUSE THE ACCURACY

21  CANNOT BE REASONABLY QUESTIONED.  AND UNDER FEDERAL RULE OF

22  EVIDENCE 201(C)(2), THE COURT MUST TAKE JUDICIAL NOTICE, AND

23  THERE IS NOTHING THAT EXEMPTS JUDICIAL NOTICE FROM A MOTION

24  UNDER RULE 12.

25         SO TO THE COURT'S EARLIER QUESTION OF WHAT CAN FORM

30

13:46:53   1   THE BASIS OF AN ORDER, IT'S THOSE FACTS.  AND THE GOVERNMENT IS

2   TRYING TO MUDDY THE WATERS BY SUGGESTING THAT ARIN'S POSITION

3   HASN'T BEEN SUCCESSFUL IS NEITHER HERE NOR THERE.  IT'S A

4   POSITION THAT THE GOVERNMENT HAS PROFFERED TO THE COURT,

5   REPEATEDLY STAKED OUT, AND IF WE'RE NOT GOING TO DISPOSE OF

6   THIS MOTION ON QUESTION ONE AS TO OUR ARGUMENT THAT IP

7   ADDRESSES LEGALLY AS A MATTER OF LAW DO NOT CONSTITUTE

8   PROPERTY, THEN WE GET TO THE ISSUE THAT WAS RAISED BY MY

9   CO-COUNSEL EARLIER WHICH IS THAT THERE ARE A LOT OF CONFLICTING

10   POSITIONS THAT ARE BEYOND DISPUTE, AND THIS IS VAGUE.  SO WE'RE

11   IN ANOTHER REALM UNDER A DIFFERENT SECTION OF RULE 12 FOR

12   DISMISSAL.

13   THE COURT:  WELL, THE OTHER ISSUE THAT I FLAGGED, AND

14   WE HAVEN'T HAD AN OPPORTUNITY TO ADDRESS IS THE QUESTION OF *LEW*

13:47:40   15   AND TO WHAT EXTENT *LEW* REQUIRES THAT THE THING OF VALUE, THE

16   PROPERTY, BE TAKEN FROM THE PERSON WHO WAS THE VICTIM, RIGHT,

17   THE ISSUE OF CONVERGENCE.  AND I KNOW THE GOVERNMENT HAS SOUGHT

18   TO DISTINGUISH *LEW* BASED ON THE FACTS, HAS TRIED TO, IF NOT

19   DISTINGUISH *LEW,* TO PERHAPS CALL THE COURT'S ATTENTION TO THE

20   FACT THAT IT IS AN OUTLIER WITH RESPECT TO HOW COURTS OF APPEAL

21   HAVE VIEWED THIS; BUT AT THE SAME TIME, FROM WHAT I CAN TELL,

22   *LEW* THE STATE OF THE LAW ON THIS QUESTION AT THIS TIME.

23   LET ME HEAR FROM MS. FEVE WITH RESPECT TO *LEW* AND WHY

24   UNDER *LEW* THE COURT SHOULD NOT FIND THAT AT THIS POINT THE

25   GOVERNMENT HAS NOT SUFFICIENTLY ALLEGED THE CONVERGENCE BETWEEN

31

13:48:47  1  THE FALSE REPRESENTATION AND THE INDIVIDUAL WHO WAS THE

2  VICTIM.

3          MS. FEVE:  YOUR HONOR, SO I CAN TRACK, WHEN YOU SAY

4  "CONVERGENCE" -- I KNOW THE DEFENDANTS' MOTION CHALLENGED THE

5  MATERIALITY.  THAT WAS MY UNDERSTANDING OF HOW THEY WERE

6  FRAMING IT.

7          THE COURT:  WHICH I THINK IS ADDITIONAL ARGUMENT --

8          MS. FEVE:  JUST SO I'M TRACKING, WHAT DO YOU MEAN BY

9  "CONVERGENCE" THEN?

10          THE COURT:  SO AS I UNDERSTAND *LEW*, IT PROVIDES THAT

11  IT'S NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE DEFENDANT

12  OBTAINED MONEY OR PROPERTY FROM THE VICTIM OF THE DECEIT.  SO

13  HERE, AS I UNDERSTAND IT, YOU'RE SAYING THAT THE VICTIM OF THE

14  DECEIT IS THE HOSTING COMPANY; IS THAT WHAT YOU'RE SAYING?

13:49:29 15          MS. FEVE:  SO YOUR HONOR, THIS IS WHERE I WANT TO BE

16  CAREFUL BECAUSE THERE ARE SERIOUS ALLEGATIONS ABOUT USING THE

17  WORD "VICTIM" IN THE CONTEXT OF THE CONFIDENTIAL SOURCE

18  LITIGATION.  WHEN WE'RE LOOKING AT THE MOTION TO DISMISS THE

19  WIRE FRAUD CHARGE, I'M LOOKING AT "VICTIM" PURELY FOR -- BY THE

20  WAY, "VICTIM" IS NOT ONE OF THE ELEMENTS WE HAVE TO PLEAD IN

21  THE WIRE FRAUD CHARGE.  SO I'M TRYING TO MAKE SURE I TRACK IT,

22  AND I WANT TO MAKE IT CLEAR THAT THE GOVERNMENT IS MINDFUL THAT

23  HOW WE DISCUSS A VICTIM FOR PURPOSES OF THE WIRE FRAUD STATUTE

24  IS NOT GOING TO BE THE SAME AS IT IS FOR THE MANDATORY VICTIMS'

25  RESTITUTION OR THE CRIME VICTIMS' RESTITUTION ACT OR FOR

32

13:50:10  1    PURPOSES OF SENTENCING. SO I DON'T WANT US TO BE SANDBAGGED.

2    WHICH IS TO SAY, I'M TRYING TO ADDRESS THIS PARTICULAR

3    ITERATION ABOUT THE COURT'S QUESTION ABOUT "VICTIM."  AND

4    AGAIN, LOOKING AT THE FRAUD STATUTE, WE HAVE PROPERLY PLEAD THE

5    STATUTE, AND THERE'S NOTHING IN *LEW* THAT REQUIRES US TO PLEAD A

6    CAUSALITY OR DIRECTIONALITY THAT I UNDERSTAND IT TO BE STATING

7    AND THAT'S CERTAINLY NOT WHAT THE NINTH CIRCUIT MODEL JURY

8    INSTRUCTION HOLD.

9         SO KIND OF DIGGING DOWN INTO THE COURT'S CONCERN WITH

10   WHAT I THINK YOU'RE EQUATING WITH CONVERGENCE, IF I'M NOT

11   MISTAKEN, THE SECTION OF *LEW* THAT THE PARTIES ARE RELYING ON IS

12   ON PAGE 221 UNDER CAPTIONS ENTITLED DISCUSSION ONE, MAIL FRAUD.

13   AND IT SAYS, SEVERAL PARAGRAPHS DOWN WHERE IT SAYS, WHILE IT IS

14   TRUE THAT AFTER *MCNALLY* THE ELEMENTS OF MAIL FRAUD REMAIN

13:51:08  15   UNCHANGED EXCEPT THE INTENT OF THE SCHEME MUST BE TO OBTAIN

16   MONEY OR PROPERTY, THE COURT MADE IT CLEAR -- AND THIS IS

17   REFERRING TO *MCNALLY*, SUPREME COURT -- THAT THE INTENT MUST BE

18   TO OBTAIN MONEY OR PROPERTY FROM THE ONE WHO IS DECEIVED,

19   QUOTE, THE WORDS TO DEFRAUD COMMONLY REFERRED TO WRONGING ONE

20   IN HIS PROPERTY RIGHTS BY DISHONEST METHODS OR SCHEMES AND

21   USUALLY SIGNIFY THE DEPRIVATION OF SOMETHING OF VALUE BY TRICK,

22   DECEIT, CHICANE OR OVERREACHING.  I OMITTED THE INTERNAL

23   QUOTES, BUT THE INTERNAL QUOTES, AS THE CITATION IN *LEW* MAKES

24   CLEAR ARE TO *HAMMERSCHMIDT*.  SO IF WE ACTUALLY TURN TO *MCNALLY*

25   AND THE PRECISE CITATION THAT *LEW* IS RELYING ON, IT IS ON PAGE

33

13:51:45  1    358 OF THE *MCNALLY* DECISION, AND WE KNOW EXACTLY WHERE TO GO

2    BECAUSE WE KNOW IT'S WHERE *MCNALLY* IS DIRECTLY CITING

3    *HAMMERSCHMIDT* AND THAT PARAGRAPH, WHICH IF YOU HAVE A WESTLAW

4    COPY IS GOING TO HAVE THE BOLD 1 NEXT TO IT, BEGINS:  AS THE

5    COURT LONG AGO STATED, HOWEVER, THE WORDS, QUOTE, TO DEFRAUD,

6    END QUOTE, COMMONLY REFER TO WRONGING ONE IN HIS PROPERTY

7    RIGHTS BY DISHONEST METHODS OR SCHEMES, AND QUOTE, AND USUALLY

8    SIGNIFY THE DEPRAVATION OF SOMETHING OF VALUE BY TRICK, DECEIT,

9    CHICANE OR OVERREACHING.  AND THAT'S THE ENTIRETY OF THE QUOTE

10   AND REFERENCE TO *HAMMERSCHMIDT*.  WHAT'S NOTABLE HERE IS THAT AT

11   NO POINT DOES *MCNALLY* INTRODUCE THIS NEW ELEMENT OF BUT, LIKE,

12   WHO YOU HAVE TO DIRECT THE DECEIT AT.

13         AND I BELIEVE IN LOOKING AT LEW AND LOOKING AT LEW'S

14   INTERPRETATION OF THIS PARTICULAR QUOTE FROM *MCNALLY* THAT THE

13:52:41  15   NINTH CIRCUIT'S *ALI* DECISION IS INSTRUCTIVE BECAUSE THERE *ALI*

16   SPENT CONSIDERABLE TIME DISCUSSING *MCNALLY, CARPENTER*,

17   *PASQUANTINO* WHICH FORM THIS QUAD OF SUPREME COURT CASES GETTING

18   INTO THE MEAT OF WHAT DOES MONEY OR PROPERTY MEAN FOR PURPOSES

19   OF MAIL OR WIRE OR BANK FRAUD STATUTES.  AND HERE WHAT THEY

20   REALLY EMPHASIZE IS THIS QUOTE FROM *CLEVELAND* THAT THE RIGHT TO

21   PAYMENT DEPENDS ON, QUOTE, PROPERTY IN THE HANDS OF THE VICTIM,

22   END QUOTE.  AND WHAT WE SEE IN MANY OF THESE DECISIONS,

23   PARTICULARLY I BELIEVE IN JUDGE GINSBURG'S DECISION IN

24   *PASQUANTINO,* BUT ALSO IN *CLEVELAND,* IS THAT IN ASSESSING

25   WHETHER OR NOT SOMETHING IS PROPERTY DEPENDS ON WHO IS THE

34

13:53:29 1   PROPERTY HOLDER BECAUSE A LICENSE ISSUED BY THE GOVERNMENT IS

2   NOT PROPERTY, BUT A LICENSE HELD BY AN INDIVIDUAL IS.

3        AND THIS IS PART OF WHY WE KEEP SEEING THROUGHOUT THE

4   CASE LAW THIS PHRASE WHICH *ALI'S* QUOTE FROM *CLEVELAND* OF

5   PROPERTY IN THE HANDS OF THE VICTIM, LOOKING AT WHO IS THE

6   HOLDER OF THE PROPERTY INTEREST TO ASSESS WHETHER OR NOT THAT

7   PROPERTY INTEREST IS COGNIZABLE UNDER THE FRAUD STATUTES.  AND

8   THAT IS ONE OF THE REASONS, YOUR HONOR, WHY WE BELIEVE *LEW* IS

9   DISTINGUISHABLE BECAUSE FIRST AND FOREMOST, IF YOU LOOK JUST AT

10   THE PARAGRAPH AFTER THE ONE I READ TO YOU THE NEXT LINE SAYS,

11   THIS CASE IS INDISTINGUISHABLE FROM *MCNALLY.*  IN *MCNALLY,* AS

12   HERE, THE DEFENDANTS DID OBTAIN MONEY IN CONNECTION WITH THE

13   WRONGDOING TOWARD THE GOVERNMENT.

14        AGAIN, WHAT *LEW* IS SAYING IS JUST LIKE IN *CLEVELAND*

13:54:22 15   AND THE SIMILAR DECISIONS WHERE THE FRAUDULENT

16   MISREPRESENTATION IS DIRECTED TO THE GOVERNMENT AND THE THING

17   OBTAINED FROM THE GOVERNMENT IS ARGUABLY OR ARGUABLY NOT

18   PROPERTY, THAT WHAT WE SEE THE COURT ADDRESSING REPEATEDLY IS

19   DOES THIS THING QUALIFY AS PROPERTY WHEN HELD BY THE

20   GOVERNMENT; AND DISTINGUISHING, SAYING, YES, WELL, THE LICENSE

21   COULD BE PROPERTY IF HELD BY A PRIVATE PARTY -- THAT'S WHAT WE

22   SEE IN *CLEVELAND* -- BUT NOT IF IT'S HELD BY THE GOVERNMENT.

23   BUT *PASQUANTINO* GOES ONE STEP FURTHER AND IT SAYS ACTUALLY

24   BEING THE GOVERNMENT ISN'T ENOUGH; IT CAN STILL BE A PROPERTY

25   INTEREST.  THE QUESTION IS, IS IT A REGULATORY INTEREST LIKE A

13:55:03  1   LICENSE OR IS IT A REVENUE INTEREST LIKE ANTICIPATED TAX

2   PROCEEDS.  THAT'S WHY IN *PASQUANTINO,* UNLIKE IN *CLEVELAND,* THE

3   SUPREME COURT ACTUALLY DOES RECOGNIZE A PROPERTY RIGHT, BUT

4   WHAT WE SEE IN THIS RECITATION IN *MCNALLY* AND THIS EXPRESS

5   INVOCATION OF *MCNALLY* WHERE THE NINTH CIRCUIT SAYS THERE IS NO

6   DAYLIGHT BETWEEN US AND *MCNALLY* IS BECAUSE WE ARE ONLY

7   ANALYZING WRONGDOING DIRECTED TOWARD THE GOVERNMENT.

8            AND I BELIEVE THAT IF YOU UNDERSTAND THAT, THAT IS

9   WHY IN THE HANDS OF SOMEONE IS TO SAY THEY ARE REFERENCING ALL

10   OF THESE CASES TO SAY, IS A VISA IN THE HANDS OF THE GOVERNMENT

11   PROPERTY?  NO.  COULD IT BE PROPERTY IN THE HANDS OF A PRIVATE

12   PARTY?  YES, BUT WE ONLY ADDRESS FOR PURPOSES OF THE FACTS

13   BEFORE US WHETHER OR NOT IT'S PROPERTY IN THE HANDS OF THE

14   GOVERNMENT.  THAT'S WHY, YOUR HONOR, WE THINK IT'S

13:55:52  15   DISTINGUISHABLE.  WE ALSO THINK IT'S INSTRUCTIVE THAT JUDGE

16   KAGAN'S DECISION IN *LOUGHRIN* DIRECTLY ADDRESSES THIS ISSUE, IS

17   ALSO DISPOSITIVE AND CERTAINLY CONTROLLING ON THIS COURT, AND

18   THAT THERE THE FACTS WERE A DEFENDANT PRESENTED FRAUDULENT

19   CHECKS TO TARGET.  TARGET HONORED THE CHECKS, LET THE DEFENDANT

20   USE THEM TO BUY THINGS.  THE DEFENDANT THEN LEFT THE STORE,

21   THEN PROMPTLY TURNED AROUND, CAME BACK, RETURNED THEM AND GOT

22   THE RETURN FOR CASH.  THEN JUDGE KAGAN GOES THROUGH THIS

23   LENGTHY DISCUSSION OF WHETHER OR NOT IT IS FATAL TO THE CHARGE

24   THAT THE MISREPRESENTATION WAS MADE TO TARGET AND NOT TO THE

25   BANK BECAUSE THE DEFENDANT WAS CHARGED WITH BANK FRAUD.

36

13:56:39  1  ULTIMATELY, WHAT SHE SAID IS THAT'S OKAY.

2       AND LET ME PULL UP THE DECISION SO I GET THE RIGHT

3  QUOTE FOR YOU, YOUR HONOR.  BUT SHE SPECIFICALLY ADDRESSES THE

4  SITUATION WHERE THIRD PARTIES ARE HOLDING THE PROPERTY FOR

5  ANOTHER AND WHETHER OR NOT UNDER DEFENDANT'S ARGUMENT THAT IS

6  SOMEHOW FATAL AND BASICALLY SAYS THAT CAN'T BE THE CASE, AND IN

7  FACT, IT ISN'T BECAUSE THAT'S WHAT THE DECISION REACHES.  BUT

8  LET ME JUST PULL IT UP.  SO IF WE LOOK AT -- IT'S PAGE 357, AND

9  IF YOU'RE LOOKING AT THE ACTUAL DECISION IT WILL HAVE THE HEAD

10  NOTE FOR FOUR, WHERE SHE SAYS THE TEXT OF THE BANK FRAUD

11  STATUTE PRECLUDES *LOUGHRIN'S* ARGUMENT.  THE CLAUSE FOCUSES

12  FIRST ON THE SCHEME'S GOAL, OBTAINING BANK PROPERTY, AND

13  SECOND, ON THE SCHEME'S MEANS, A FALSE REPRESENTATION.

14       IN THE SAME PARAGRAPH SHE SAYS, BUT NOTHING IN THE

13:57:36 15  CLAUSE ADDITIONALLY DEMANDS THAT A DEFENDANT HAVE A SPECIFIC

16  INTENT TO DECEIVE A BANK.  IN PARTICULAR, THE CLAUSE COVERS

17  PROPERTY OWNED BY THE BANK BUT IN SOMEONE ELSE'S CUSTODY AND

18  CONTROL, SAY, A HOME THAT THE BANK ENTRUSTED TO A REAL ESTATE

19  COMPANY AFTER FORECLOSURE; THUS, A PERSON VIOLATES THE BANK

20  FRAUD'S PLAIN TEXT BY DECEIVING A NON-BANK CUSTODIAN INTO

21  GIVING UP BANK PROPERTY THAT IT HOLDS.  THERE IS NO WAY TO

22  SQUARE THE ARGUMENT BEING SUBMITTED TO THE COURT WITH JUSTICE

23  KAGAN'S DECISION IN LOUGHRIN.  AND IMPORTANTLY, ONE PLACE ON

24  WHICH THE PARTIES HAVE FULL AGREEMENT IS THAT THE MAIL FRAUD,

25  THE BANK FRAUD AND THE WIRE FRAUD CASES ARE ALL PRECEDENTIAL

13:58:21  1    AND INFORMATIVE WITH RESPECT TO ONE ANOTHER.

2              THAT IS WHY WE GIVE SO MUCH WEIGHT AND DO NOT SIT

3         HERE AND SAY, WELL, THAT WAS A MAIL FRAUD STATUTE, THIS IS A

4         BANK FRAUD STATUTE, THIS IS WHY THEY'RE DISTINGUISHABLE.  WE

5         UNDERSTAND THAT AS A BODY OF LAW WE ARE TO TREAT THEM AS HAVING

6         VERY LITTLE DAYLIGHT BETWEEN THEM.  SO THAT IS WHY I SAY IF YOU

7         ACTUALLY READ *LEW* AND THE CITATION IT RELIES ON IN *MCNALLY,* IF

8         YOU GIVE CREDENCE TO THE FACT THAT THE NINTH CIRCUIT PANEL IN

9         *LEW* FOUND THAT THERE WAS NO DISTINGUISHING FACTUAL

10        CIRCUMSTANCES BETWEEN *LEW* AND *MCNALLY,* AND IF YOU APPRECIATE

11        THAT OUR SITUATION IS DISTINGUISHABLE FROM *MCNALLY* BECAUSE

12        THERE IS NO ARGUMENT THAT THERE WAS ANY FRAUDULENT

13        MISREPRESENTATION DIRECTED TO THE GOVERNMENT, AND WHEN YOU LOOK

14        AT THE *MCNALLY* LINE OF CASES, THAT IS THE HALLMARK OF *MCNALLY.*

13:59:09  15        WE ARE IN *CARPENTER* TERRITORY BECAUSE AT NO POINT IS

16        ANYONE ARGUING THAT THE GOVERNMENT WAS DECEIVED OR WAS SOMEHOW

17        A PARTY OR AN ACTOR TO DECEIT.  THE GOVERNMENT IS NOT PART OF

18        THE FRAUDULENT SCHEME.  AND THAT IS WHY OUR CASE IS MORE, IS

19        BETTER ADDRESSED UNDER *CARPENTER* AND ITS PROGENY AND NOT UNDER

20        THE *MCNALLY* LINE OF CASES.  BUT FINALLY, EVEN IF YOU WERE TO

21        LOOK AT THIS *LEW* AND THIS DECISION FROM THE NINTH CIRCUIT, WE

22        ARE BOUND BY THE 2014 SUPREME COURT DECISION IN *LOUGHRIN.*

23             SO FOR THOSE REASONS, YOUR HONOR, THAT IS WHY,

24        FALLING BACK ON MY ORIGINAL POSITION WHICH IS THE GOVERNMENT

25        HAS PROPERLY PLEAD MATERIALITY.  IF YOU LOOK AT THE FACE OF THE

13:59:54   1   INDICTMENT, ON THE FACE OF THE INDICTMENT, THERE IS NO ARGUMENT

2   THAT THERE IS A DEFECT IN THE PLEADING.  TO THE EXTENT

3   THE DEFENDANTS WOULD LIKE MORE SPECIFICITY, THEY HAVE FILED A

4   MOTION FOR A BILL OF PARTICULARS THAT THE COURT HAS ALREADY

5   ADJUDICATED, AND THAT IS ONE OF THE REASONS WHY THE PROPER

6   RESPONSE THERE IS TO SAY, DO YOU KNOW WHAT THE ELEMENTS ARE?

7   YES.  HAVE WE GIVEN VOLUMINOUS DISCOVERY?  YES.  HAVE WE TOLD

8   THE DEFENDANTS AS OF NOVEMBER 2018 WHEN WE DID OUR FIRST ROUND

9   OF PRODUCTION, HERE ARE ALL OF THE GRAND JURY EXHIBITS THAT

10   WERE SUBMITTED TO THE GRAND JURY WITH REGARD TO SPECIFICITY,

11   WITH REGARD TO DETAILS, WITH REGARD TO QUESTIONS ABOUT WHAT THE

12   FACTS ARE, WE MADE THOSE GRAND JURY EXHIBITS WITHIN WEEKS OF

13   THEIR ARREST.  THEY'VE HAD OVER A YEAR TO REVIEW THEM.  AND IF

14   THEY LOOK AT THEM CLOSELY, THEY'LL SEE IN GRAND JURY EXHIBIT

14:00:41   15   68, IN GRAND JURY EXHIBIT 69, THAT WHAT THEY WILL SEE IS THERE

16   ARE LOA'S AND THEN --

17         MR. JONES:  OBJECTION, YOUR HONOR.  I'M SORRY.  THIS

18   HAS NOTHING TO DO WITH THE MOTION HERE.  WE'RE GETTING INTO

19   ARGUMENT THAT HAS NOTHING TO DO WITH THIS MOTION.  I'LL OBJECT

20   TO COUNSEL DIVERGING THE COURT EVEN FURTHER OFF THE POINT.  THE

21   COURT ASKED A SIMPLE QUESTION AND COUNSEL HAS NOT ANSWERED A

22   SIMPLE QUESTION, NOT ONE OF THE SIMPLE QUESTIONS YOU'VE ASKED

23   HER.

24         THE COURT:  THANK YOU, MR. JONES.  THE OBJECTION IS

25   OVERRULED.  TO THE EXTENT THAT AT SOME POINT I CONCLUDE THAT

14:01:13   1   WHAT'S BEEN PROVIDED ISN'T EITHER SALIENT OR HELPFUL, I'LL LET

2   YOU KNOW.  BUT AT THIS POINT, LET ME HEAR FROM THE DEFENSE WITH

3   RESPECT TO *LOUGHRIN* AND WHETHER OR NOT *LOUGHRIN* DOES WHAT MS.

4   FEVE ASSERTS THAT IT DOES, THAT IT SOMEHOW OR ANOTHER, IF NOT

5   AMENDS IT, PROVIDES FURTHER NUANCE AS TO HOW THE COURT SHOULD

6   REVIEW THE *LEW* CASE.  WHO WOULD LIKE TO TAKE UP THE EXCHANGE?

7          MS. RIM:  I'M GOING TO SPECIFICALLY ADDRESS *LOUGHRIN.*

8   THEN I'LL ALLOW MS. MUNK TO ADDRESS THE REST OF THE COURT'S

9   INQUIRY ABOUT *LEW.*  SO *LOUGHRIN* IS A RECENT SUPREME COURT CASE

10  ABOUT THE BANK FRAUD STATUTE WHICH IS SLIGHTLY DIFFERENT.  THE

11  COURT DISCUSSES THE ACTUAL TEXT OF THE STATUTE, AND THERE'S A

12  DISTINCTION BETWEEN DEFRAUDING A BANK AND THEN THE STATUTE OF

13  WIRE FRAUD WHICH CRIMINALIZES TAKING PROPERTY FROM ANYONE BY

14  MEANS OF DECEIT.  AND I THINK THAT THE KEY DISTINCTION HERE IS

14:02:25  15  THE DIFFERENCE BETWEEN A FALSE STATEMENT SLASH

16  MISREPRESENTATION AND DECEIT.  IT'S ACTUALLY, *LOUGHRIN* IS NOT

17  INCONSISTENT WITH *LEW.*  IT'S NOT INCONSISTENT WITH NINTH

18  CIRCUIT LAW.  *LOUGHRIN* SIMPLY STATES WHAT OTHER NINTH CIRCUIT

19  DECISIONS HAVE STATED WHICH IS THAT IN ORDER TO DECEIVE

20  SOMEBODY YOU DON'T HAVE TO HAVE MADE THE MISREPRESENTATION TO

21  THEM DIRECTLY.

22          SO IN THE EXAMPLE THAT THE GOVERNMENT DISCUSSED

23  REGARDING THE FACTS IN *LOUGHRIN,* AND THE DEFENDANT HAD PROVIDED

24  A CHECK TO TARGET INSTEAD OF THE BANK, AND THE DECEIT IN THE

25  CHECK WAS DIRECTLY GIVEN TO TARGET.  BUT THAT DOESN'T MEAN THAT

40

| 14:03:04 | 1 | THE BANK WAS NOT THE TARGET -- SORRY, NO PUN INTENDED -- WAS |
| | 2 | NOT THE TARGET OF THE DEFENDANT'S DECEIT.  THE DEFENDANT KNEW |
| | 3 | THAT THE BANK WOULD HAVE TO, WOULD RELY ON WHATEVER INFORMATION |
| | 4 | IT WAS GOING TO RECEIVE FROM TARGET.  AND SO THAT'S ACTUALLY |
| | 5 | NOT DIFFERENT FROM OTHER NINTH CIRCUIT CASE THAT'S HAVE |
| | 6 | DISCUSSED THIS ISSUE.  THE CASE, US V. *ALI*, REGARDING MICROSOFT |
| | 7 | TALKS ABOUT THIS AND TALKS ABOUT THIS SPECIFICALLY WITH RESPECT |
| | 8 | TO *LEW*.  THE CASE HELD THAT IT DIDN'T OVERRULE *LEW.* IT SAID |
| | 9 | THAT IN THAT CASE ALSO THE DEFENDANTS HAD NOT MADE A DIRECT |
| | 10 | MISREPRESENTATION TO MICROSOFT; THEY HAD MADE A |
| | 11 | MISREPRESENTATION TO THE PEOPLE THAT PURCHASED MICROSOFT RETAIL |
| | 12 | STORES FROM.  AND *ALI* SAID IT DOESN'T MAKE A DIFFERENCE BECAUSE |
| | 13 | YOU WERE STILL TARGETING THE DECEIT TOWARDS MICROSOFT. |
| | 14 | THAT'S THE DISTINCTION HERE, YOUR HONOR.  THE QUOTE, |
| 14:04:04 | 15 | UNQUOTE, VICTIM WHO OWNED THE PROPERTY, THE ALLEGED PROPERTY |
| | 16 | HERE WHICH IS AN IP ADDRESS, ARE THE LEGACY HOLDERS OF THESE |
| | 17 | NETBLOCKS.  AND THERE'S NO ALLEGATION IN THE INDICTMENT, NOR IN |
| | 18 | FACT OR IN ANY OTHER EVIDENCE THAT THE DEFENDANTS KNEW THESE |
| | 19 | LEGACY HOLDERS WERE STILL IN EXISTENCE OR WERE TARGETING THEM |
| | 20 | AS THE OBJECT OF THEIR DECEIT.  AND THAT BEGS THE QUESTION AS |
| | 21 | TO WHETHER THEY WERE DECEIVING ANYONE AT ALL BECAUSE, BRINGING |
| | 22 | IT BACK FULL CIRCLE TO MATERIALITY, IT'S NOT CLEAR THAT THE |
| | 23 | HOSTING COMPANY THAT RECEIVED THE LOA BELIEVED IT WAS AUTHENTIC |
| | 24 | OR WAS DECEIVED. |
| | 25 | BUT I DON'T WANT TO GET OFF TRACK.  THAT'S THE |

14:04:44  1    DIFFERENCE BETWEEN *LOUGHRIN* AND *LEW* WHICH IS THAT ONE IS

2    TALKING ABOUT THE MEANS OF A DECEIT WHICH IS AN ACTUAL

3    AFFIRMATIVE STATEMENT DIRECTLY TO THE PERSON OR ENTITY WHERE

4    THE PROPERTY IS COMING FROM WHICH IS DISTINCT FROM BEING THE

5    TARGET OF DECEIT ITSELF WHICH DOES NOT REQUIRE A FALSE

6    STATEMENT DIRECTLY TO THAT PERSON, AND I CAN RESTATE THAT IF IT

7    WAS CONFUSING.

8         THE COURT:  SO WAS THE FOCUSING OF *LOUGHRIN*

9    MATERIALITY OR THE ELEMENT OF INTENT TO DEFRAUD THE BANK?

10         MS. RIM:  I BELIEVE THE ELEMENT -- I MEAN, IT'S NOT

11    AN ELEMENT AS IN A PHRASE SPECIFICALLY IN THE STATUTE.

12    ACTUALLY, LET ME TAKE THAT BACK.  THE PHRASE IS, BY MEANS OF.

13    YOU HAVE TO HAVE OBTAINED THE PROPERTY BY MEANS OF DECEIT.

14    THIS IS WHAT'S STATED IN THE NINTH CIRCUIT JURY INSTRUCTIONS ON

14:05:38  15    WIRE FRAUD AS WELL; THIS IS THE SAME FOR BANK FRAUD.  IT'S NOT

16    BY MEANS OF A FALSE STATEMENT OR MISREPRESENTATION ONLY.  IT'S

17    BY MEANS OF DECEIT, CHICANERY, AN INTENT TO DECEIVE AND CHEAT

18    SOMEBODY.  THAT DECEIT AND THAT INTENT TO DECEIVE HAS TO BE

19    TARGETED AT THE ENTITY OR PERSON WHOSE PROPERTY IS THE OBJECT

20    OF THE FRAUD AND IS GOING TO BE DEPRIVED OF THAT PROPERTY OR

21    OBJECT.

22         MS. MUNK:  AND YOUR HONOR, I WILL ADDRESS *LEW*.  THE

23    COURT IS CORRECT THAT *LEW* IS BINDING ON THIS COURT.  IT IS GOOD

24    LAW, AND I THINK IT'S VERY CLEAR THE GOVERNMENT KNOWS THEY'RE

25    GOING TO LOSE UNDER *LEW;* SO THEY'RE TRYING TO BACK PEDAL AND

42

14:06:24  1  TRY TO MAKE ALL THESE DISTINGUISHING THINGS THAT ACTUALLY DON'T

2  EXIST.  I THOUGHT WHAT MS. FEVE HAD READ TO THE COURT WAS VERY

3  TELLING BECAUSE THIS IS BINDING LAW ON THIS COURT.  THE COURT

4  DISCUSSING *MCNALLY* MADE IT CLEAR THE INTENT MUST BE TO OBTAIN

5  MONEY OR PROPERTY FROM THE ONE WHO IS DECEIVED.

6         THEN IT GOES TO SAY:  THE WORDS TO DEFRAUD COMMONLY

7  REFER TO WRONGING ONE AND HIS PROPERTY RIGHTS BY DISHONEST

8  METHODS OR SCHEMES.  THIS IS CRUCIAL, YOUR HONOR, BECAUSE

9  ESSENTIALLY THE GOVERNMENT'S ARGUMENT IS THAT THE IP NETBLOCKS

10  ARE PROPERTY AND THE OWNER OF THOSE NETBLOCKS WHO HAVE THE

11  PROPERTY INTEREST IN THOSE NETBLOCKS, THEY ARE THE ORIGINAL IP

12  HOLDERS, THE LEGACY IP HOLDERS BACK IN THE EARLY '90S.

13  ACTUALLY, MS. FEVE IN THIS COURT IN APRIL TALKED ABOUT HOW THEY

14  WOULD BE THE VICTIMS, BUT THERE'S NO ALLEGED DECEIT ON THE IP

14:07:25  15  HOLDERS IN THE INDICTMENT; AND IN FACT, THE GOVERNMENT HAS

16  NEVER EVEN MADE THAT REPRESENTATION.  THEY MADE THE OPPOSITE.

17         AND LOOKING AT OUR EXHIBIT "I," IT'S PAGE 29, AND

18  JUST FOR THE RECORD, YOUR HONOR, EXHIBIT "I" IS I THINK MAYBE

19  60 PAGES.  IT'S A TRANSCRIPT FROM THE HEARING THAT WE HAD ON

20  THE CONFIDENTIAL INFORMANT MOTION BACK IN APRIL.  I THINK IT

21  WAS APRIL 30TH, 2019.  AND THAT'S ONE OF THE REASONS WHY OUR

22  BRIEFING WAS SO LENGTHY BECAUSE WE WANTED TO PUT THIS HEARING

23  TRANSCRIPT IN THE RECORD BEFORE THE COURT.  BUT ON PAGE 29,

24  LINE 4, MS. FEVE TALKS ABOUT:  I THINK THE MOST OBVIOUS VICTIMS

25  ARE THE INDIVIDUALS WHO ARE THE REGISTRANTS OF THESE IP

14:08:14   1    NETBLOCKS WHO HAD THEIR PROPERTY USED WITHOUT THEIR CONSENT.

2    AND THEN IF YOU GO DOWN A LITTLE BIT MORE AT LINE 13

3    SHE SAYS:  THEY HAVE BEEN INDIVIDUALS WHOSE IDENTITIES AND

4    PROPERTIES WERE USED WITHOUT PERMISSION.  THAT IS DIFFERENT

5    THAN DECEIT.  DECEIT IS INDUCING SOMEBODY TO GET PROPERTY OR

6    MONEY.  SO WHEN YOU LOOK AT THE INDICTMENT -- ACTUALLY, THE

7    ONLY, THE ONLY FRAUD ALLEGED IN THE INDICTMENT UNDER THE WIRE

8    FRAUD COUNTS IS AT PARAGRAPH 6, AND THE ONLY ALLEGED RECIPIENT

9    OF THAT DECEIT AND FRAUD IS THE HOSTING COMPANIES.  IT SAYS, IT

10   WAS FURTHER PART OF THE SCHEME AND ARTIFICE TO DEFRAUD THAT THE

11   DEFENDANTS CREATED AND SENT LETTERS TO INTERNET HOSTING

12   COMPANIES, FRAUDULENTLY MAKING IT APPEAR THAT THE REGISTRANT OF

13   THE IP ADDRESS HAD AUTHORIZED THE DEFENDANTS TO USE THE IP

14   ADDRESSES.  THAT'S ALSO WHAT THE GOVERNMENT ARGUES IN ITS

14:09:13   15   BRIEF.

16   THE ENTIRE OPPOSITION NEVER TALKS ABOUT THE ORIGINAL

17   IP HOLDERS BEING DECEIVED OUT OF THEIR PROPERTY.  THERE'S NO

18   FACTS TO THAT.  THE GOVERNMENT KNOWS THERE'S NO FACTS TO THAT.

19   THE GOVERNMENT DOESN'T ALLEGE THAT IN THE INDICTMENT.  IT'S NOT

20   ALLEGED BY THE GOVERNMENT IN COURT.  IN FACT, THE OPPOSITE IS

21   TRUE, YOUR HONOR.  SO IT'S JUST VERY CLEAR THE INDICTMENT

22   DOESN'T -- IT FAILS TO STATE AN OFFENSE.  AND I BELIEVE MS.

23   FEVE EARLIER SAID WE'RE NOT CHALLENGING WHETHER THE INDICTMENT

24   IS SUFFICIENTLY PLEAD THIS.  THAT'S ALSO INCORRECT.  WE

25   ABSOLUTELY ARE.  WE REPEATEDLY BRIEFED THAT THE INDICTMENT

44

14:09:52   1   FAILS TO STATE AN OFFENSE, AND IT FAILS TO STATE THAT THE ONE

2   WHO ACTUALLY HAD THE PROPERTY, THE IP NETBLOCKS, IS THE ONE WHO

3   IS DECEIVED.

4        THEY'RE NOT ALLEGING IT.  THE INDICTMENT DOESN'T SAY

5   THAT.  AND YOUR HONOR IS BOUND BY *LEW*, AND UNDER *LEW*, THE

6   GOVERNMENT LOSES.  THE INDICTMENT FAILS TO STATE AN OFFENSE FOR

7   WIRE FRAUD BECAUSE THERE'S NO ALLEGATION THAT THE PROPERTY WAS,

8   THE DECEIT OCCURRED FROM THE ONE WHO HELD THE PROPERTY.  SO I'M

9   HAPPY TO ANSWER ANY QUESTIONS ON THAT, YOUR HONOR.  BUT I

10  ACTUALLY THINK UNDER THIS SPECIFIC ISSUE, THE PROPERTY ISSUE, I

11  UNDERSTAND IS A LITTLE BIT MORE CHALLENGING, BUT THIS IS PRETTY

12  CLEAR.  AND IF THE COURT DOESN'T EVEN WANT TO DECIDE WHETHER OR

13  NOT THIS IS PROPERTY, I DON'T THINK THE COURT HAS TO BECAUSE

14  THE COURT CAN DISMISS UNDER *LEW* AND I THINK SHOULD DISMISS

14:10:42  15  UNDER *LEW* BECAUSE THE INDICTMENT FAILS TO STATE AN OFFENSE FOR

16  WIRE FRAUD.

17        THE COURT:  ALL RIGHT.  MS. FEVE, YOUR RESPONSE?

18        MS. FEVE:  YOUR HONOR, THE PARTIES BOTH AGREE THAT

19  *ALI*, THE NINTH CIRCUIT 2010 DECISION, IS INSTRUCTIVE.  AND I

20  APPRECIATE MS. RIM JUST GAVE YOU HER PERSPECTIVE ON IT.  WHAT'S

21  CHALLENGING FOR THE COURT IS THAT WE ACTUALLY AGREE ON --

22  THERE'S NO DISPUTE ABOUT THE FACTS OF *ALI*.  WHAT I DON'T

23  UNDERSTAND AND I READ DIFFERENTLY IS THAT IN *ALI* I READ AS

24  CHALLENGING THEIR ENTIRE PREMISE BECAUSE WHAT HAPPENS IN *ALI* IS

25  THE DEFENDANTS SAY, WE DID NOT MISLEAD MICROSOFT, WE DID NOT

46

45

14:11:23 1    SUBMIT THE MISREPRESENTATION TO THEM.  AND THE NINTH CIRCUIT

2    SAYS, THAT DOESN'T MATTER.  AND IF THAT ISN'T WHAT MATTERS,

3    THEN WE'RE CORRECT TO INTERPRET *LEW* AS REFERENCING *MCNALLY* AND

4    ITS DEFINITION OF PROPERTY.

5            THE COURT:  WALK ME THROUGH THAT AGAIN IN TERMS OF

6    WHY YOU THINK *MCNALLY* SOMEHOW OR ANOTHER WATERS DOWN OR --

7            MS. FEVE:  SURE.  AND WE CAN TIE IT BACK TO *MCNALLY*

8    AS WELL.  SO WANTING TO UNDERSTAND *LEW* I WENT TO WHAT I BELIEVE

9    -- AND THE DEFENDANTS WILL NO DOUBT CORRECT ME IF I'M WRONG --

10   IS THE RELEVANT CITATION, AND I UNDERSTOOD THE RELEVANT

11   CITATION TO BE ON PAGE 221 AND FOR IT TO BE --

12           THE COURT:  IT'S THE PARAGRAPH THAT BEGINS, WHILE IT

13   IS TRUE THAT AFTER *MCNALLY* THE ELEMENTS OF MAIL FRAUD REMAIN

14   UNCHANGED EXCEPT THAT THE INTENT OF THE SCHEME MUST BE TO

14:12:26 15  OBTAIN MONEY OR PROPERTY, THE COURT MADE IT CLEAR THAT THE

16   INTENT MUST BE TO OBTAIN MONEY OR PROPERTY FROM THE ONE WHO IS

17   DECEIVED.

18           MS. FEVE:  RIGHT.  AND SO HERE THEY ARE DESCRIBING

19   *MCNALLY,* AND I DON'T KNOW THAT THEY ARE ACTUALLY REACHING A

20   DISPOSITIVE QUESTION OF LAW WHICH WOULD BE BINDING ON THE

21   COURT, BUT AGAIN, I'M LOOKING AT THEIR WORDS AND WHAT THEY ARE

22   SAYING *MCNALLY* SAYS; AND SO I TAKE THEIR QUOTE AND I LOOK AT

23   *MCNALLY* AND THAT'S ON PAGE 358, BY THEIR OWN TERMS, OF *MCNALLY,*

24   AND IT'S EASIER FOR US BECAUSE SINCE THEY ARE QUOTING

25   *HAMMERSCHMIDT* WE KNOW EXACTLY WHERE TO GO ON PAGE 358 OF

46

14:13:06  1   *MCNALLY,* AND WE LOOK AND FIND THE PARAGRAPH.  AGAIN, IT'S HEAD

2   NOTE NUMBER ONE.  I'M SURE THE COURT HAS IT BEFORE YOU SO I

3   WON'T READ IT TO YOU AGAIN. BUT I'M LOOKING AT THAT PARAGRAPH

4   WHERE IT SAYS NOTHING ABOUT THIS NEW AND SOMEHOW ALLEGEDLY

5   BINDING PRECEDENT THAT YOU CANNOT COMMIT WIRE FRAUD IF YOU DO

6   NOT DECEIVE THE PROPERTY RIGHTS HOLDER, THE DECEPTION MUST BE

7   TARGETING THEM.

8          AND PART OF WHY I THINK *ALI* SAYS, HEY, WE CAN ALL GET

9   ALONG AND THIS CAN ALL MAKE SENSE IS THAT THEY ARE REFERENCING

10   *MCNALLY,* AND THEY ARE THE ONES WHO ARE DRAWING SIGNIFICANT

11   INFERENCES AND SPENDING CONSIDERABLE TIME ON THAT PHRASE I

12   BROUGHT TO THE COURT'S ATTENTION FROM *CLEVELAND* ABOUT, QUOTE,

13   PROPERTY IN THE HANDS OF THE VICTIM.  SO THEY SPEND SEVERAL

14   PARAGRAPHS -- FIRST, THEY KIND OF VERY METHODICALLY GO THROUGH

14:14:05  15   *MCNALLY*, *CARPENTER*, *CLEVELAND*, *PASQUANTINO.*  AND THEY TALK

16   ABOUT HOW *PASQUANTINO* IS SIGNIFICANT BECAUSE IN THAT CASE --

17          THE COURT:  I GUESS IT TAKES SO LONG TO UNPACK YOUR

18   VIEW OF *MCNALLY* THAT I'M HAVING PROBLEMS LATCHING ON TO

19   SOMETHING FROM *MCNALLY* THAT WOULD CONVINCE ME THAT THIS

20   STRAIGHTFORWARD LANGUAGE IN *LEW* SHOULD BE GIVEN EFFECT.

21          MS. FEVE:  FIRST, I WOULD SAY 2010 NINTH CIRCUIT

22   --THAT'S NOT WHAT THE NINTH CIRCUIT SAYS BECAUSE THEY SAID YOU

23   DID NOT HAVE TO DECEIVE MICROSOFT.  SO IF THEY'RE RIGHT IF *LEW*

24   IS BINDING PRECEDENT  --

25          THE COURT:  I'LL BE FRANK.  I HAVE NOT REVIEWED THE

47

14:14:55  1    MICROSOFT CASE.  I HAVE ABOUT 12 CASES HERE, AND THERE'S A LOT

       2    HERE, AND I WILL LOOK CLOSELY AT MICROSOFT AND SEE WHETHER OR

       3    NOT MICROSOFT, IN FACT, AFFECTS THE CONTINUED EFFECT OF THE *LEW*

       4    CASE.

       5         MS. FEVE:  ONE OTHER POINT THAT I'M CONCERNED ABOUT

       6    IS THAT THEY MAKE ONE CHALLENGE ON PROPERTY; THEY MAKE ANOTHER

       7    CHALLENGE ON MATERIALITY.  BUT IN THEIR ARGUMENT ABOUT

       8    MATERIALITY, THEY'RE NOT RELYING ON MATERIALITY CASES.  THEY'RE

       9    RELYING ON PROPERTY CASES.

      10         THE COURT:  I'M NOT EVEN ON THE MATERIALITY.

      11         MS. FEVE:  BUT YOUR HONOR, *LEW* IS THE MATERIALITY

      12    ARGUMENT.  THAT'S THE ONLY MATERIAL ARGUMENT THEY MAKE IN THEIR

      13    BRIEF, UNLESS I'M WRONG.

      14         THE COURT:  I GUESS YOU DESCRIBE IT AS MATERIALITY

14:15:47 15    WHEREAS I'M LOOKING AT IT IN TERMS OF WHAT'S DESCRIBED BY THE

      16    SEVENTH CIRCUIT AS CONVERGENCE, AND THE CONVERGENCE LOOKS AT

      17    THE FALSE STATEMENT, WHERE IT'S DIRECTED; AND WITH RESPECT TO

      18    WHERE IT'S DIRECTED IS THAT THE VICTIM, IS THAT WHERE THE

      19    PERSON ENDED UP LOSING SOMETHING?  AND SO HERE, FROM WHAT I

      20    UNDERSTAND, YOU'RE INDICATING THAT THE FALSE STATEMENT WAS MADE

      21    TO THE HOST, BUT THE PROPERTY INTEREST IS THE ONE FROM THE IP

      22    NETBLOCK OWNER.  AND SO WE HAVE ALL OF THIS SPACE BETWEEN THEM

      23    THAT WE DON'T HAVE THIS CONNECTION, AND UNLIKE SOME OF THE

      24    OTHER CASES EVEN WITH THE TARGET AND THE BANK CASE WHERE YOU

      25    MAYBE DON'T HAVE AN ACTUAL MISREPRESENTATION TO THE BANK, BUT

48

14:16:41 1    CERTAINLY WITH RESPECT TO THE BANK IT IS THE BANK THAT HAS LOST

2    SOMETHING AS A RESULT OF THE FALSE REPRESENTATION THAT I THINK

3    IN SOME WAY IS CONSTRUCTIVELY VIEWED AS BEING EXTENDED TO THE

4    BANK.  HERE, THE PARTY -- NOT THE PARTY -- THE ENTITY THAT HAS

5    THE STAKE, THAT HAS THE PROPERTY INTEREST IS NOT IN ANY WAY

6    AFFECTED IN TERMS OF THE FALSE REPRESENTATION BEING DIRECTED AT

7    THEM.  AND SO I'M JUST TRYING TO WRAP MY HEAD AROUND HOW THESE

8    CASES SUPPORT YOUR POSITION.

9           MR. JONES:  IT'S OUR POSITION THAT THEY DO NOT

10   SUPPORT THE POSITION.

11          MS. RIM:  MAY I CLARIFY SOMETHING ABOUT THESE CASES?

12          THE COURT:  YES.

13          MS. RIM:  I DO AGAIN WANT TO MAKE THE DISTINCTION.

14   WE'RE NOT ARGUING THAT THERE HAS TO BE CONVERGENCE BETWEEN A

14:17:37 15   FALSE STATEMENT TO THE VICTIM DIRECTLY.  THAT'S NOT WHAT THE

16   LAW SAYS.  BUT THE DECEIT HAS TO BE DIRECTED AT THE QUOTE,

17   UNQUOTE, VICTIM.  THAT'S CONSISTENT WITH *ALI* WHICH IS THE

18   MICROSOFT CASE, AND *LOUGHRIN.*  I'LL EXPLAIN WHY.  *LOUGHRIN*, IF

19   YOU LOOK AT THE LANGUAGE, I WANT TO SAY, ON 2395 OR 366

20   DEPENDING ON WHICH STAR YOU'RE LOOKING AT --

21          THE COURT:  WHAT PAGE AGAIN?

22          MS. RIM:  ONE STAR 366 OR DOUBLE STAR 2395.  ON

23   WESTLAW, IT'S PAGE EIGHT, ON THE MIDDLE OF THE RIGHT COLUMN.

24          THE COURT:  DID YOU SAY 366?

25          MS. RIM:  366 OR 2395.  I WANT TO DIRECT THE COURT'S

49

14:18:48  1   ATTENTION TO THE SECOND TO THE LAST SENTENCE OF THAT PARAGRAPH

2   WHICH SAYS, *LOUGHRIN'S* OWN CRIME AS WE HAVE EXPLAINED IS ONE

3   SUCH SCHEME BECAUSE HE MADE FALSE STATEMENTS IN THE FORM OF

4   FORGED AND ALTERED CHECKS THAT A MERCHANT WOULD IN AN ORDINARY

5   COURSE OF BUSINESS FORWARD TO A BANK FOR A PAYMENT.

6           AND THAT'S THE SAME AS THE MICROSOFT CASE.  I WILL

7   JUST SUMMARIZE FOR YOU, YOUR HONOR, BUT BASICALLY IN THAT CASE,

8   *ALI*, THE NINTH CIRCUIT NOTED THAT DEFENDANTS HAD MADE

9   MISREPRESENTATIONS DIRECTLY TO MICROSOFT BEFORE.  WHEN THAT

10  DIDN'T WORK, THEY WENT THE ROUND ABOUT WAY AND PURCHASED STORES

11  THAT MICROSOFT HAD GIVEN LICENSE TO SELL THEIR PRODUCTS AT A

12  DISCOUNT PREVIOUSLY.  THEY DIDN'T INFORM MICROSOFT THAT THESE

13  DEFENDANTS WHO MICROSOFT HAD REJECTED BEFORE ARE NOW PURCHASING

14  THOSE STORES.  WHAT THE COURT WAS FINDING, IN BOTH OF THESE

14:19:36  15  CASES, EVEN THOUGH THE MISREPRESENTATION WASN'T STATED DIRECTLY

16  TO MICROSOFT OR THE BANK, IT WAS INDIRECTLY ESSENTIALLY

17  CONVEYED TO THEM, OR THE RESULT WAS THAT THERE WAS DECEIT OF

18  THE BANK AND MICROSOFT EVEN THOUGH THE STATEMENT WAS NOT

19  DIRECTLY STATED.  SO THAT'S A CRUCIAL POINT BECAUSE WE'RE NOT,

20  WE DON'T WANT THE COURT TO THINK THAT WE'RE CLAIMING THE LAW IS

21  SOMETHING DIFFERENT.  YOU'RE GOING TO FIND CASES THAT CLEARLY

22  STATE THIS.  YOU DON'T HAVE TO HAVE THE FALSE STATEMENT

23  DIRECTED TOWARDS THE VICTIM.  BUT --

24          THE COURT:  BUT NOT THE STATEMENT, BUT IN TERMS OF

25  THE SCHEME THAT IT ENDS UP BEING DIRECTED AT THE VICTIM, AT THE

50

14:20:16  1    HOLDER WHO LOSES SOME PROPERTY OR MONEY.

       2           MS. RIM:  CORRECT.  AND THERE'S NO ALLEGATION HERE

       3    THAT THE LOA, WHICH AGAIN THERE IS A DISPUTE AS TO WHETHER IT

       4    WAS AN INSTRUMENT OF DECEIT, BUT LET'S SAY THAT IT WAS FOR THIS

       5    ARGUMENT, THERE IS NO ALLEGATION THAT BY PROVIDING THE

       6    ALLEGEDLY FORGED LOA TO THE HOSTING COMPANY THAT SOMEHOW IN THE

       7    ORDINARY COURSE OF BUSINESS WOULD HAVE GONE TO THE LEGACY IP

       8    HOLDER OR ASSUMES THAT THE DEFENDANTS EVEN KNEW THE LEGACY IP

       9    HOLDER ORGANIZATIONS WHICH WHICH WERE ALL CORPORATIONS WERE

      10    STILL IN EXISTENCE AT ALL.  SO THAT, IN OUR VIEW, IS A CRUCIAL

      11    DISTINCTION BETWEEN THIS AND *LOUGHRIN,* FOR EXAMPLE, AND IT'S

      12    WHAT PUTS IT SQUARELY IN THE AMBIT OF *LEW.*

      13           AND JUST BEYOND THAT, YOUR HONOR, WE'RE MAKING THIS

      14    ARGUMENT UNDER THE ASSUMPTION THAT THE PROVIDING OF THE LOA IS

14:21:11 15    SOMEHOW A MEANS BY WHICH ONE CAN ACQUIRE THE PROPERTY RIGHT,

      16    AND THAT'S ALSO IN DISPUTE BECAUSE PROVIDING THE LOA SIMPLY

      17    ALLOWS A PERSON TO HAVE THAT IP ADDRESS, QUOTE, UNQUOTE,

      18    ANNOUNCED ON THE INTERNET; AND FIRST, IT'S PROBLEMATIC THAT THE

      19    INDICTMENT DOES NOT EXPLAIN WHAT ANNOUNCEMENT IS.  IT'S

      20    PROBLEMATIC THAT EXPLAINING WHAT ANNOUNCEMENT IS WILL PROBABLY

      21    TAKE AN EXPERT.  BUT WHAT'S NOT IN DISPUTE IS THAT THE

      22    ANNOUNCEMENT DOESN'T TRANSFER AN IP ADDRESS FROM ONE PERSON TO

      23    ANOTHER.  IT MAY BE WHAT ALLOWS ONE TO USE AN IP ADDRESS, BUT

      24    THAT IS NOT A TRANSFER OF PROPERTY.  IT'S NOT THE MEANS BY

      25    WHICH SOMEONE OBTAINS PROPERTY.  SO I MEAN THAT'S A SEPARATE

51

14:21:58   1    ISSUE BUT IT'S ALSO -- YOU KNOW, I'LL JUST STOP.  THANK YOU.

         2            THE COURT:  SO IN MICROSOFT, YOU STATED THAT THERE

         3    THE COURT FOUND THAT THIS FALSE REPRESENTATION WAS IN DIRECTLY

         4    CONVEYED TO THE VICTIM WHICH WAS MICRO SOFT.

         5            MS. RIM:  YES.  AND YOU KNOW, LET'S NOT FORGET THAT

         6    FOR WIRE FRAUD IT'S NOT JUST MISREPRESENTATIONS; ONE CAN ALSO

         7    DECEIVE THROUGH OMISSIONS.  WHAT HAPPENED IN THE *ALI* CASE WAS

         8    THAT DEFENDANTS WERE TRYING TO SELL MICROSOFT SOFTWARE AT THE

         9    TEACHER/STUDENT DISCOUNT, EVEN THOUGH THEY WERE NOT SELLING

        10    THEM TO TEACHERS AND STUDENTS.  AND WHEN MICROSOFT FOUND OUT,

        11    THEY TERMINATED THEIR AGREEMENT WITH THEM.  SO THEN WHAT THE

        12    DEFENDANTS DID IS THEY WENT AND BOUGHT OTHER STORES THAT

        13    ALREADY HAD THAT AGREEMENT, DIDN'T TELL MICROSOFT AND SO

        14    MICROSOFT HAD ALREADY ALLOWED THOSE STORES TO GET

14:22:57  15    STUDENT/TEACHER DISCOUNTS.  THEN THE DEFENDANT CONTINUED TO

        16    SELL THEM WITHOUT INFORMING MICROSOFT, HEY, WE'RE THE SAME

        17    PEOPLE THAT YOU KIND OF CUT OFF BEFORE.  SO THAT'S CLEARLY A

        18    DIFFERENT SITUATION BECAUSE IN THAT SCENARIO, EVEN IF THE

        19    DEFENDANTS ARE NOT STATING A MISREPRESENTATION AFFIRMATIVELY TO

        20    MICROSOFT, THEY ARE CLEARLY TARGETING MICROSOFT AS THE OBJECT

        21    OF DECEIT.

        22            THE COURT:  THAT CORRESPONDS TO *LEW* TO THE EXTENT

        23    THAT *LEW* SAYS THE INTENT MUST BE TO OBTAIN MONEY OR PROPERTY

        24    FROM THE ONE WHO IS DECEIVED, AND SO THEN, THERE'S AN INTENT TO

        25    OBTAIN MICROSOFT'S PROPERTY, THAT IS, THEIR SOFTWARE, FROM THE

52

14:23:43  1   ONE WHO IS DECEIVED.  HOW DO YOU RECONCILE THAT LAST PART OF

2   THAT?

3           MS. RIM:  YOUR HONOR, THE PROPERTY RIGHT IN *LEW* WAS

4   THE ADDITIONAL MONEY THAT MICROSOFT WOULD HAVE BEEN ENTITLED TO

5   HAD THE SOFTWARE BEEN SOLD AT THE RETAIL VALUE AS OPPOSED TO

6   THE DISCOUNTED TEACHER/STUDENT VALUE.  SO IT'S NOT THE SOFTWARE

7   ITSELF THAT WAS THE PROPERTY.  IT WAS THE MONEY, THE ADDITIONAL

8   MONEY THAT MICROSOFT ITSELF WOULD HAVE BEEN ENTITLED TO.

9           THE COURT:  I THINK I GET THAT.  BUT IT SAYS, FROM

10   THE ONE WHO IS DECEIVED.

11           MS. RIM:  RIGHT.  AND SO WHAT *ALI* SAYS IS FURTHER, IT

12   ACTUALLY SAYS, UNDER *LEW* MICROSOFT MUST BE THE VICTIM FROM WHOM

13   PROPERTY WAS TAKEN.  AGAIN, WE HAVE NO TROUBLE FINDING

14   SUFFICIENT EVIDENCE TO SHOW THAT MICROSOFT WAS DEPRIVED OF ITS

14:24:31  15   RIGHT TO PAYMENT OR ITS SOFTWARE AND THAT DEFENDANTS DEPRIVED

16   MICROSOFT OF THIS MONEY OR PROPERTY.  SO THE COURT IN *ALI* IS

17   NOT OVERRULING *LEW,* IT'S DISTINGUISHING *LEW,* IT'S APPLYING *LEW.*

18   SO THERE'S NO INCONSISTENCY BECAUSE THE LANGUAGE IN *LEW* IS NOT

19   THAT THE PROPERTY MUST BE OBTAINED BY THE RECIPIENT OF THE

20   FALSE STATEMENT; IT'S BY THE VICTIM OF THE DECEIT.  AND *ALI* IS

21   ENTIRELY CONSISTENT WITH THAT AND SO IS *LOUGHRIN.*

22           THE COURT:  ANYTHING FURTHER?

23           MS. FEVE:  YOUR HONOR, THE PROPERTY WAS TAKEN FROM

24   THE LAWFUL HOLDERS.  ONLY ONE PERSON CAN EXERCISE CONTROL OVER

25   AN IP ADDRESS.  SO WHEN THEY OBTAINED CONTROL, THE DEFENDANTS

53

```
14:25:10    1    HAD TAKEN CONTROL FROM THE LAWFUL POSSESSORS OF THOSE IP

            2    NETBLOCKS.  IT WAS BY MEANS OF A MISREPRESENTATION TO A SERIES

            3    OF INTERVENING PARTIES, SIMILAR TO THE FACTS IN ALI AND

            4    LOUGHRIN.  WITH REGARD TO THE COURT'S FINAL QUESTION, I'VE BEEN

            5    FRAMING THIS SECOND ARGUMENT AS MATERIALITY BECAUSE WHEN I READ

            6    THE DEFENDANTS' OPENING BRIEF ON PAGE TWO, THEY VERY CRISPLY

            7    SET OUT TWO ARGUMENTS.  "A," WAS THAT WE FAILED TO PLEAD WIRE

            8    FRAUD AS A MATTER OF LAW BECAUSE IP ADDRESSES AREN'T A

            9    PROPERTY; AND "B," IS EVEN IF IP ADDRESS NETBLOCKS ARE

           10    PROPERTY, THE INDICTMENT DOES NOT ALLEGE THE DEFENDANTS

           11    OBTAINED THE NETBLOCKS MY MEANS OF MATERIAL MISREPRESENTATIONS.

           12         SO WE, FOR A MOTION TO DISMISS HAVE TO HAVE FAILED TO

           13    PROPERLY PLEAD THE INDICTMENT, AND I BELIEVE THAT WAS THE

           14    ARGUMENT THEY WERE MAKING AND THAT WAS THE ARGUMENT UNDER WHICH

14:26:06   15    THEY SUBMITTED LEW TO THE COURT'S ATTENTION.  SO I APPRECIATE

           16    THE CONVERGENCE, BUT JUST TO SAY FOR WHY WE'VE BEEN EMPHASIZING

           17    THERE WAS THE PROPERTY ARGUMENT AND THE MATERIALITY ARGUMENT,

           18    IT'S BECAUSE WE WERE TRYING TO TRACK THEIR BRIEF ITSELF.

           19         THE COURT:  ALL RIGHT.  THANK YOU.  ALL RIGHT.  SO --

           20         MS. BERNSTEIN:  IF I CAN JUST ADD ONE FINAL POINT, I

           21    THINK WHAT KICKED OFF THE MOST RECENT DISCUSSION WAS YOUR

           22    HONOR'S QUESTION THAT ASKED IF THE GOVERNMENT AGREED THAT THE

           23    VICTIM WAS THE HOSTING COMPANY.  AND I WOULD JUST DIRECT THE

           24    COURT VERY CLEARLY TO PAGE 12 OF THE GOVERNMENT'S OPPOSITION

           25    WHERE IT SAYS THAT THE INDICTMENT SUFFICIENTLY ALLEGES THAT THE
```

14:26:51   1   SCHEME WAS TO DEFRAUD BY SUBMITTING FALSE LETTERS TO INTERNET

2   HOSTING COMPANIES, THE ENTITIES THE DEFENDANTS DECEIVED.  SO

3   EVEN THE MOST RECENT STATEMENT THAT WANTS TO BROADEN THAT TO A

4   DIFFERENT GROUP OF PURPORTED VICTIM AND A DIFFERENT GROUP OF

5   PURPORTED RECIPIENTS OF THE DECEIT TO SATISFY THE ELEMENTS OF

6   WIRE FRAUD, THAT'S NEW.  AND EVERY TIME WE TALK ABOUT THIS,

7   IT'S NEW.  AND THERE IS SOME SERIOUS DUE PROCESS CONCERNS WITH

8   THE FACT THAT THIS IS AN EVER-EVOLVING THEORY THAT THE

9   INDICTMENT DOES NOT PLEAD, THAT IS INCONSISTENT WITH CASE LAW,

10   THAT IS INCONSISTENT WITH GOVERNMENT POSITIONS IN THIS CASE AND

11   ELSEWHERE.  THANK YOU.

12           MR. JONES:  YOUR HONOR, JUST ONE POINT TO ADD TO

13   THAT.  AND ALSO, WITH RESPECT TO SOME OF THE FACTS THAT THE

14   GOVERNMENT HAS PUT IN THEIR MOVING PAPERS CAUSES US CONCERN AS

14:27:41  15   WELL.  THE FACT THAT THEY'RE ALLEGING THAT OUR CLIENTS RECEIVED

16   MILLIONS OF DOLLARS FROM THIS SCHEME, THESE THINGS ARE JUST

17   BEING MADE UP, YOUR HONOR.  THERE'S NO FACTS TO THAT.  WE'VE

18   SEEN NO DISCOVERY, NO DISCOVERY THAT SHOW OUR CLIENTS MADE

19   MILLIONS OF DOLLARS FOR WHATEVER SCHEME THE GOVERNMENT PURPORTS

20   THAT THEY HAVE CONCOCTED.  SO WE BELIEVE THAT FOR ALL THE

21   REASONS CO-COUNSEL HAS STATED, WE BELIEVE THIS INDICTMENT MUST

22   BE DISMISSED.

23           THE COURT:  ALL RIGHT.  THANK YOU.  SO AS YOU ALL

24   KNOW, WE HAVE A LITTLE BIT OF A BACK UP.  THE ORDER ON THE

25   VAGUENESS QUESTION, ISSUES, THAT'S IN FINAL FORM.  WE

55

14:28:25    1    ANTICIPATE WE'LL ISSUE THAT WITHIN THE NEXT THREE OR FOUR DAYS.

         2    AND THEN AT THAT POINT THEN WE WILL TAKE THIS MATTER UNDER

         3    SUBMISSION -- WELL, AS OF THIS MOMENT WE WILL, BUT AS OF THE

         4    NEXT COUPLE OF DAYS WE'LL FOCUS OUR ATTENTION ON THIS.  BUT I

         5    AM AWARE THAT I OWE YOU AN ORDER, AND I WILL PROVIDE THAT TO

         6    YOU.  THE PRESS OF BUSINESS HAS BEEN PRETTY HEAVY LATELY.  SO

         7    AT THIS POINT, LET'S SET THE MATTER FOR FURTHER STATUS HEARING.

         8    WHAT MAKES SENSE?  YOU WANT TO KNOW THE COURT'S RULINGS ON BOTH

         9    SETS OF MOTIONS, AND SINCE I HAVE 30 DAYS TO TAKE THE MATTER

        10    UNDER SUBMISSION, WE'LL SET A STATUS AND PERHAPS WE CAN EVEN DO

        11    A TELECONFERENCE JUST SO WE CAN GET A SENSE OF WHERE WE ARE AND

        12    WHAT IS NEXT.  SO TODAY IS THE 20TH.  WE'LL SET IT FOR -- LET'S

        13    SET IT IN 27 DAYS ON THE 18TH OF MARCH AT 1 P.M.  THAT WILL BE

        14    A TELECONFERENCE, AND THEN KIMMI WILL GIVE YOU INSTRUCTIONS ON

14:30:05   15    HOW TO CALL IN.

        16         MS. MUNK:  YOUR HONOR, IS THAT SOMETHING THE

        17    DEFENDANTS SHOULD BE ON THE CALL AS WELL?

        18         THE COURT:  YOU CAN WAIVE THE APPEARANCE OF YOUR

        19    CLIENT IF THEY WANT TO PARTICIPATE.  OBVIOUSLY, THEY CAN, BUT

        20    IF THEY ARE OTHERWISE UNAVAILABLE, THAT'S FINE.  AND THEN IS

        21    THERE ANYTHING ELSE FROM THE GOVERNMENT?

        22         MS. PIERSON:  WE ASK THE COURT EXCLUDE TIME BETWEEN

        23    NOW AND THEN.

        24         THE COURT:  YES, THAT'S WHAT I SAID.  I'M TAKING THE

        25    MATTER UNDER SUBMISSION AND FINDING EXCLUDABLE TIME.  AND TO

56

14:30:46   1   THE EXTENT THAT WE NEED TO DO IT SPECIFICALLY, IT WILL BE UNDER

2   3161(H)(1)(D), AND ACTUALLY 3161(H)(1)(H), THE PROCEEDINGS ARE

3   UNDER ADVISEMENT.  ALL RIGHT.  THANK YOU, ALL.

4            (MATTER CONCLUDED.)

5

6

7                  C-E-R-T-I-F-I-C-A-T-I-O-N

8

9        I HEREBY CERTIFY THAT I AM A DULY APPOINTED, QUALIFIED
    AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES
    DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT
10  TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;
    THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY
11  STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES
    WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL
12  CONFERENCE.

13           DATED: MARCH 6, 2020, AT SAN DIEGO, CALIFORNIA.

14

15                  /S/ JULIET Y. EICHENLAUB
                    JULIET Y. EICHENLAUB, RPR, CSR
16                  OFFICIAL COURT REPORTER
                    CERTIFIED SHORTHAND REPORTER NO. 12084

17

18

19

20

21

22

23

24

25

57

# Exhibit B

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,      .
                                    .
 5                Plaintiff,        . No. 18-cr-4683-GPC
                                    .
 6                v.                . April 8, 2020
                                    . 1:00 p.m.
 7   JACOB BYCHAK,                  .
     MARK MANOOGIAN,                .
 8   MOHAMMED ABDUL QAYYUM,         .
     PETR PACAS,                    .
 9                                  .
                  Defendants.       . San Diego, California
10   . . . . . . . . . . . . . . . .

11              TRANSCRIPT OF TELEPHONIC STATUS HEARING
12            BEFORE THE HONORABLE GONZALO P. CURIEL
                    UNITED STATES DISTRICT JUDGE
13

14

15   APPEARANCES:

16   For the Plaintiff:    United States Attorney's Office
                           By: MELANIE K. PIERSON, ESQ.
17                         880 Front Street, Room 6293
                           San Diego, California 92101
18
     For the Defendant     Law Office of David W. Wiechert
19   JACOB BYCHAK:         By: DAVID W. WIECHERT, ESQ.
                           115 Avenida Miramar
20                         San Clemente, California 92672

21   For the Defendant     Mintz Levin
     MARK MANOOGIAN:       By:  RANDY K. JONES, ESQ.
22                         3580 Carmel Mountain Road, Suite 300
                           San Diego, California 92130
23

24   ///

25
```

```
 1   APPEARANCES (CONTINUED):

 2

 3   For the Defendant       Bienert, Miller & Katzman, P.L.C.
     MOHAMMED ABDUL          By:  WHITNEY Z. BERNSTEIN, ESQ.
 4   QAYYUM:                      JAMES RIDDET, ESQ.
                             903 Calle Amanecer, Suite 350
 5                           San Clemente, California 92673

 6

 7   For the Defendant       Bird Marella Boxer Wolpert
     PETR PACAS:               Nessim Drooks & Lincenberg
                             By:  NAEUN RIM, ESQ.
 8                                GARY S. LINCENBERG, ESQ.
                             1875 Century Park East
 9                           Suite 2300
                             Los Angeles, California 90067

10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:         Chari L. Bowery, RPR, CRR
                             USDC Clerk's Office
23                           333 West Broadway, Suite 420
                             San Diego, California 92101
24                           chari_bowery@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1              SAN DIEGO, CALIFORNIA; APRIL 8, 2020; 1:00 P.M.

 2                              -o0o-

 3              THE COURT:  Good afternoon.  May I please have

 4    appearances by defense counsel.

 5              MR. WIECHERT:  Good afternoon, Your Honor.  This is

 6    David Wiechert on behalf of defendant Jacob Bychak, who is also

 7    present on the call.

 8              THE COURT:  All right.

 9              MR. JONES:  Good afternoon, Your Honor.  Randy Jones

10    on behalf of Mark Manoogian.  He is also on the phone.

11              THE COURT:  All right.  Good afternoon, Mr. Jones.

12              MS. RIM:  Good afternoon.  Naeun Rim and Gary

13    Lincenberg on behalf of Petr Pacas, who is also on the call.

14              THE COURT:  All right.

15         And Ms. Bernstein, are you also on the line?

16              MS. BERNSTEIN:  Yes, Your Honor.  Good afternoon.

17    It's myself and Mr. Riddet on behalf of Mr. Qayyum, who is not

18    present; you waived his appearance.

19              THE COURT:  All right.  And on behalf of the

20    government?

21              MS. PIERSON:  Melanie Pierson on behalf of the United

22    States.

23              THE COURT:  All right.  Good afternoon.  And is that

24    it, Ms. Pierson?

25              MS. PIERSON:  Yes.  That's it.
```

```
 1          THE COURT:  All right.  So, then, we are here on a

 2   telephonic status hearing, and we issued an order this morning

 3   addressing the motion that was under submission.  And given

 4   that order and that ruling, at this point, are there discovery

 5   issues to address?  Is there a trial date that is being sought

 6   by either side?

 7          MS. RIM:  Your honor, Naeun Rim on behalf of

 8   Mr. Pacas.

 9     We are wanting to discuss those items, but before we go

10   there, we had discussed raising with the Court a discrepancy

11   between, respectfully, the Court's order from this morning and

12   the CAN-SPAM order in terms of what the Court was willing to

13   consider that was outside of the indictment.

14     And I think the consensus is that we would like to submit

15   some briefing on that issue.  Specifically, the extraneous

16   documents for both motions were eventually disclaimed.  For the

17   CAN-SPAM motion, which was a question about statutory

18   construction regarding the word "registrant" and a question of

19   law, the Court considered documents from ARIN, documents from

20   ARIN's website, documents from articles written by

21   representatives of ARIN.

22     And then, in this current order, the Court considered the

23   question of the definition of "property," which is also a

24   question of law and a statutory construction, and the Court

25   declined to consider the same category of documents.
```

1    So, to provide some clarity, we wanted to propose a

2  briefing schedule on that issue.

3         THE COURT:  Ms. Pierson, you are in agreement with

4  that?

5         MS. PIERSON:  Well, this is the first I have heard of

6  it, so, no.  I mean, I think that the Court's order was well

7  thought out, and you know, we are prepared to defend it, and

8  you know, we will -- if there's further briefing, that would be

9  the province of the Court.  So, we will defer to the Court on

10  that.

11         THE COURT:  Well, I don't see the value of further

12  briefing on this issue.

13    Ultimately, the CAN-SPAM issues and motion and the present

14  one, relating to what constitutes "property," are two separate

15  issues.  It may employ the same vehicle as far as a motion to

16  dismiss, but with respect to what the Court is being asked to

17  do, in the face of clear instruction to look at the four

18  corners of the indictment, I cannot imagine that further

19  briefing would affect my ultimate final decision on this, given

20  the nuances, given the disputes that exist, as to what the

21  precise conditions of these pre-ARIN registrants was.

22    So, unless there was some joint agreement between the

23  government and defense counsel that you believe that it was

24  imperative, that it was necessary in order to put this matter

25  to rest, I am not at this point prepared to entertain further

1    briefing.

2          MR. WIECHERT:  And I think, Your Honor -- this is

3    David Wiechert on behalf of Mr. Bychak -- one of the reasons we

4    were thinking is, since the order came out this morning and we

5    are still digesting it, the first points in terms of denying

6    the motion, the Court finds that at this time it lacks the

7    factual record necessary to determine whether IP addresses

8    assigned prior to the creation of the ARIN on December 22,

9    1997, are property for purposes of wire fraud statutes.

10         And if there was supplemental briefing to expand that

11   factual record, that might at least preclude the need for a

12   trial on of all those issues if it was determined that really

13   there was no basis for dispute as to what these IP addresses

14   are and what they aren't.

15         THE COURT:  And I think that's a different issue or

16   question, which is what is the best fashion to proceed with

17   respect to this open question.  Because, certainly, the Court

18   hasn't made a final determination that the IP blocks are or are

19   not property.  I haven't done that.

20         But, instead, I have followed the law that limits what the

21   Court can consider, and then it does leave open the question,

22   all right; so, then, how will we confront this question?  How

23   will we decide it?  Is it best left to occur at trial, after

24   the government's case in chief?  Is this something that should

25   rest in the jury's determination following the Court's

```
 1    instruction on what qualifies as property?  Or is this one of
 2    those cases where a pre-trial evidentiary hearing would be
 3    appropriate?
 4        So, if that's the essential -- the gist of what you all
 5    want to take up, I think that's appropriate.
 6            MR. WIECHERT:  And I think Your Honor is following up
 7    on what our thought was -- and this was put in our brief --
 8    which is that the decision -- the issue of whether or not an IP
 9    address is property or not is not going to be one that is for
10    the jury's determination; it is going to be the Court
11    instructing the jury that it is property under the wire fraud
12    statute, and that is going to be part of the jury instruction.
13    And I am sure the government is going to propose that is part
14    of the jury instruction.
15        So, whether we have that debate in the context of a jury
16    instruction debate or whether we have that in the context of
17    this motion, I think it is an issue that we should decide
18    earlier rather than later because it pretty much is (inaudible)
19    in the case.  And if we are right, that these IP addresses that
20    are pre-ARIN are not property under the statute, that those
21    issues should not be placed in front of the jury.  But we
22    should know that before this jury is ever impaneled because we
23    will have decided one way or the other whether it is a matter
24    of law -- you will have decided one way or another whether it
25    is a matter of law they are property.
```

1          Given the, kind of, what has been going on health-wise,

2     quarantine-wise, it may be a good use of our time, since we

3     can't do things in open court or in front of juries at this

4     point, to set up a schedule to have an evidentiary hearing on

5     the question of whether or not these IP addresses are property.

6          THE COURT:  So, I don't have a problem with allowing

7     the parties to propose a means to address this issue and for

8     all sides to be heard on this.  And then, in that way, we can

9     have a well-thought-out and considered means of addressing

10    this.  I may not agree with defense counsel or I may agree with

11    defense counsel.  But I think, certainly, it does make sense to

12    think about this a little bit closer given what is at stake,

13    given the questions.

14         So, how much time would you like?

15         Ms. Pierson, did you want to be heard?

16         MS. PIERSON:  Well, I guess I wanted to jump in here

17    and say, you know, having given more than 10 seconds of thought

18    to it now, listening to the discussion, it does seem that, you

19    know, that the Court's consideration of the material outside

20    the record in the first instance was correct because it was a

21    motion to void for vagueness, so the Court needs, then, to look

22    at ordinary definitions of words and stuff that are outside the

23    indictment to find meaning.

24         This is -- this was different.  And now that they are

25    proposing, again, essentially trying to get a second bite at

 1   the apple, I would think that what we are talking about here is

 2   a motion in limine; in other words, should this be presented to

 3   the jury or should it be decided by the Court.

 4       So I think that do we need a separate substantive motion,

 5   or is this simply something that we could do with motions in

 6   limine in advance of trial?

 7          THE COURT:  That is one way to describe it, as a

 8   motion in limine.  It is a threshold determination.  And as far

 9   as the timing of it, I don't see any problem with having this

10   entertained well in advance of trial versus a month before

11   trial.

12       So, whatever we want to call it, either an in limine

13   motion or a motion regarding proposed resolution of this

14   issue -- I think the motion in limine is probably the thing

15   that's most, you know, similar to what we are talking about

16   here.

17       I am prepared to allow the defense to essentially file

18   this motion in limine, focusing -- if not exclusively, almost

19   exclusively on these kind of fact-dependent questions, these

20   issues regarding at what point would the Court be invading the

21   province of the jury, what all is agreed upon, what more is

22   needed in order to allow the Court to render a decision

23   regarding the multi-factor test that the Ninth Circuit has

24   employed.

25       So, with that said, is there anything else that the

1  defense wants to bring to my attention before we talk about a

2  briefing schedule?

3          MR. WIECHERT:  I think, Your Honor, in terms of the

4  briefing schedule -- well, we should discuss with the

5  government the briefing schedule.

6      And before we go into other things, such as a trial date

7  down the road, one of the things that we will be discussing

8  with the government is if the Court was to rule in our favor

9  that the IP addresses that are at issue in this case are not

10 properly under the wire fraud statute, whether that is an issue

11 that the government would want to take up with the Ninth

12 Circuit or whether the government would just want to go to

13 trial on the remaining CAN-SPAM counts.  That's kind of up to

14 them.  But if they were to take it up, then that would push out

15 things significantly.

16     So, from our standpoint, we think we should tee up the

17 property issue sooner than later because it affects

18 substantially how we try this case, half the counts in this

19 case.

20         THE COURT:  All right.

21         MR. WIECHERT:  And the notion that we are trying to

22 get a second bite at the apple I think, just based on the

23 Court's comment, that's not the way the Court sees it.

24         THE COURT:  No, I don't see it as that, because I

25 see, ultimately, I kicked the can down the road.  And what you

1    all are asking me to do is take a closer look at the can before

2    trial, and I don't think that's unreasonable.

3            MR. WIECHERT:  So, perhaps we should meet and confer

4    with the government on a briefing schedule on whether we call

5    it a motion in limine or motion to supplement the record or

6    motion to instruct the jury that these -- that this isn't

7    property under the fraud statute.  The motion can be

8    constituted a number of different ways or called a number of

9    different things, but we all know what the issue is.

10           THE COURT:  But what I don't want is a second bite at

11   the apple.  I don't want it to be a situation where, then, the

12   arguments that have been made are being repeated.

13      What I want to focus on is, given the prohibition, the

14   general prohibition on just looking at the four corners, within

15   the four corners of the indictment, what do we have here that

16   can be agreed upon and stipulated?  What do we have here that

17   is otherwise available through a very circumscribed, limited

18   hearing, which would allow the Court to take up this issue

19   without invading the province of the jury?  So that's what I am

20   focused on.  Again, I don't want to rehash the earlier

21   arguments that have already been made.

22           MS. PIERSON:  See, I see this, frankly, as inviting a

23   mini trial.

24           THE COURT:  That could be the government's response.

25   And I get that.  And I am not looking for a mini trial, and I

1    think I kind of suggested that in our order.

2         But at the same time, we haven't had this fully fleshed

3    out.  And I am prepared -- and, granted, I have thought about

4    this in terms of, "Okay.  What will this look like going

5    forward?"

6         So, to the extent that you all want to help me get a

7    better view of what the future looks like, I am good with that.

8         Why don't we -- go ahead.  I am sorry.

9              MS. RIM:  I'm sorry.  Naeun Rim on behalf of Petr

10   Pacas.

11        I just wanted to ask if maybe once -- one of the first

12   steps could be what part of our factual record the government

13   disputes because that's never really been specified, and it

14   might --

15             THE COURT:  And perhaps that's the meet and confer.

16   The defense is going to have to identify what in their mind

17   does the job, what carries the day for you being able to show

18   that these netblocks are not property.  And then see to what

19   extent the government is prepared to agree to one or more of

20   the facts in that factual predicate.  And as to the remaining

21   facts, what the defense believes it would take in order for

22   that to be presented to the Court in a manner consistent with

23   the law.

24        And then, you know, the government will respond and say,

25   "No, what is being contemplated is, essentially -- if not a

1    mini trial, it is a pretrial, full presentation of all of the

2    evidence, which under the circumstances is unjustified."

3         So, is there any reason why we can't have a briefing

4    schedule where the defense will meet and confer with the

5    government, look at what they have in hand and what they need,

6    and file something by the second or third week of May?

7              MS. PIERSON:  That's acceptable to the United States.

8              THE COURT:  All right.  Can the defense file this

9    motion in limine by May 15?

10             MS. RIM:  That's fine for Mr. Pacas.  We can confer

11   with the government, if the Court would like, about the

12   specific date, since there's so many of us.

13             THE COURT:  For right now, since nature abhors a

14   vacuum, let me give you a date of 5/15 for the moving papers.

15   And then the government can have until June 5th for a response.

16   And then a reply can be filed by June 12.  And we can set the

17   matter for a hearing on June 26th.

18        And if the parties, after meeting and conferring, end up

19   with something that's different from this but you agree upon, I

20   am happy to entertain that.

21             MS. BERNSTEIN:  Thank you, Your Honor.  This is

22   Whitney Bernstein.

23        In terms of the June 26 hearing, are we setting that date

24   in time or do you want to wait on that?

25             THE COURT:  Let's make it June 26 at -- let's do

 1   this.  Make it June 25, a Thursday, at 1:00 p.m.  And keeping

 2   in mind that that may end up -- go ahead.

 3          MS. BERNSTEIN:  I am sorry.  I am looking at my

 4   calendar.  I have a hearing in Sacramento at 10:00 a.m. that

 5   day, assuming the world is back to normal.

 6          THE COURT:  And that's a big "if."

 7       But we will do it June 26 at 2:30.

 8          MS. BERNSTEIN:  Okay.

 9          THE COURT:  And then I will grant you the ability to

10   waive your clients' appearance at that hearing.  As of this

11   moment, that will be an in-person hearing.

12       Is there anything else to address at this moment?

13          MR. JONES:  Your Honor, this is Randy Jones on behalf

14   of Mark Manoogian.

15       I know that the bigger issue is the issue of property, but

16   I wanted to go back to the government's contention that the

17   Court's consideration of material facts outside of the record

18   of the CAN-SPAM motion to dismiss was different than what is in

19   this motion.

20       Does the Court agree with that?

21          THE COURT:  Certainly, it was different.  And keeping

22   in mind that there was a lot that was filed and presented and,

23   at the end of the day, the Court saw that what we had was this

24   dispute between these experts as to what was and what wasn't.

25   And, at the end of the day, I relied essentially on dictionary

1    definitions, which are wholly appropriate where there's a

2    void-for-vagueness argument.

3         So, like I said before, that was a motion to dismiss on

4    different grounds.  There were different considerations.  And

5    the Court had different prohibitions and different

6    considerations to take into account.

7         So, that's why, at this point, the fact that I did it then

8    or that I allowed any number of things to be filed -- and

9    keeping in mind that I didn't rely upon 98 percent of them --

10   to me, doesn't change the conclusion.  All right?

11              MR. JONES:  Okay.

12              THE COURT:  All right.  So, then, with that, that

13   will conclude these proceedings.

14        If something comes up between now and May or June and we

15   need to have another status conference, just reach out to

16   Kimmi, and we will put you on calendar for a teleconference.

17   All right?

18              MS. PIERSON:  Can I just ask one thing?

19              THE COURT:  Yes.

20              MS. PIERSON:  There was some -- there was a

21   suggestion by the defense that there might be a motion to

22   suppress statements from one of the defendants, and I just want

23   to be sure, is that something that is still looming out there,

24   or is that something we can also address at this time?

25              THE COURT:  Yes.  Is that something that's looming?

```
 1            MS. BERNSTEIN:  Yes, Your Honor.  This is Whitney
 2   Bernstein.  And that is something that we do intend to file.
 3            THE COURT:  All right.  Well, let me give you the
 4   same briefing schedule for that that I just gave for this
 5   motion in limine.  Okay?
 6            MS. BERNSTEIN:  Okay.
 7            THE COURT:  All right.
 8            MS. PIERSON:  Sure.
 9            MR. JONES:  Your Honor, this is Randy Jones again.
10      I wanted to note, there was some discussion somewhere
11   along the line that we should be thinking of superseding the
12   indictment.  Is that something that the government is intending
13   to do?
14            THE COURT:  Ms. Pierson?
15            MS. PIERSON:  At this point, we are unable to do that
16   because of the absence of the grand jury, so I don't see that
17   happening.
18            THE COURT:  You don't see that happening in the
19   foreseeable future; but that is something you are still
20   contemplating that you could do?
21            MS. PIERSON:  At this stage, I don't see it
22   happening.
23            THE COURT:  All right.  Well, if you change your mind
24   and if the circumstances change, then please inform defense
25   counsel as soon as that happens.
```

1          MS. PIERSON:  Absolutely.

2     Can I ask one more question?

3          THE COURT:  Yes.

4          MS. PIERSON:  Are there any other defense motions out

5    there looming besides this motion to suppress statements?

6          MS. BERNSTEIN:  Since the discovery production

7    continues to be rolling, I think in order for us to know if

8    there's any further motions we intend to bring, we need to know

9    if there's any further discovery that you intend to produce.

10         THE COURT:  At this point, there's none that have

11   been identified, and you are reserving the right to raise

12   something else if discovery disclosures --

13         MS. PIERSON:  If there's new discovery, that would be

14   fine, if you have to file something based on that.  But we are

15   not -- in gathering information to prepare for trial, there

16   will be additional information.  But as I sit here now, I can't

17   think of anything.  We have -- everything we have, we have been

18   turning it over immediately.

19         THE COURT:  Very good.

20    I have a sentencing to -- a change of plea and sentencing,

21   and I have the parties in court right now.  So, stay safe and

22   take care and hope to see you soon.  Bye-bye.

23         ALL:  Thank you, Your Honor.

24    (End of proceedings at 1:30 p.m.)

25                         -o0o-

C-E-R-T-I-F-I-C-A-T-I-O-N

I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with rules and requirements of the United States Judicial Conference.

DATED:  May 22, 2020, at San Diego, California.


/s/  Chari L. Bowery
_____
Chari L. Bowery
CSR No. 9944, RPR, CRR

# Exhibit C



# ARIN stumbles into the Nortel-Microsoft IP address deal

Posted on April 15, 2011 by Milton Mueller  |  **IG Institutions**, **Internet Identifiers**

Something extraordinary happened today in the Internet economy. It is now official: legacy IPv4 address holders – that is, organizations and companies who received their IP addresses before ARIN existed and are not under one of its Registration Services Agreement contracts – have property rights in their v4 address blocks. They can sell them to whoever they like. And the institution that insists that no such property rights can ever exist – the American Registry for Internet Numbers (ARIN) has been incorporated into an agreement that legally ratifies this.

Background: in March, as part of its bankruptcy proceedings, Nortel announced a $7.5 million deal in which Microsoft agreed to acquire a group of IPv4 address blocks that Nortel had picked up from various companies that it had acquired over the years. The Nortel-Microsoft deal was a shock to the Regional Internet Registries, the nonprofit entities that currently govern address allocation. After all, it is a cardinal tenet of certain members of this community that IP addresses are not property and cannot and should not be traded privately. This community does recognize, after three years of battle, that IPv4 addresses *must* be traded now that they have become scarce. But trades, they believe, should only occur through ARIN's own "specified

Case 3:18-cr-04683-GPC Document 176-1 Filed 06/08/20 PageID.1874 Page 81 of 102

transfer policy." Many of us warned ARIN that its transfer policy was too bureaucratic and required the transacting parties to put at risk too much control over valuable assets. But these warnings could not overcome the general hostility to market trades within ARIN.

The Nortel-Microsoft deal appeared to confirm the critics' doubts about the viability of ARIN's transfer policy. Why didn't these major players make their deal through ARIN? Many people assumed that ARIN would object and stop the deal, or find a way to pull it into its own transfer process. If so, the old regime of IP address governance would be preserved – and even strengthened.

Well, ARIN did intervene. But it is now evident that ARIN had almost no leverage over the process. It was so desperate to prevent a private market from developing that it bent or broke its own policies in an effort to insert itself into the deal in whatever minimal way it could.

ARIN did not actually object to the deal, as it lacked the standing required to change the agreement. ARIN was not able to get Nortel to sign a contract with ARIN so that it could participate in its transfer process. ARIN did not succeed in getting Nortel to give up any claim of ownership rights over the legacy blocks. ARIN did not even require Microsoft to prove that it "needed" the addresses.

What, then, did ARIN get? It got Microsoft – the buyer of the addresses – to sign a Legacy Registration Services Agreement (LRSA).

An LRSA is a contract designed to gradually bring legacy address holders into ARIN's contractual regime. It makes the holder a dues-paying member of ARIN. And though section 9 of the contract makes the signatory agree that "Legacy Applicant does not have any property rights in or to the Included Number Resources," in fact it does convey stronger than normal property rights because, compared to the RSA, the LRSA strictly limits the conditions under which ARIN can take the address resources away from the holder. As ARIN's own web site says, "Note that ARIN will not reclaim unutilized address space from legacy holders who sign this [L]RSA, nor will ARIN attempt to take away legacy resources from organizations who choose not to sign it."

In getting MS to sign an LRSA, ARIN can claim some kind of a minor, tactical victory. The resources it received from Nortel are now more or less in the contractual regime, and the transaction did not sideline ARIN entirely. ARIN has not been entirely excluded from the emerging private market for IPv4 addresses.

But at what cost was this victory achieved? Numerous aspects of ARIN's policies and procedures were broken in this hasty attempt to insert itself into the transaction. First, ARIN's transfer policy stipulates that recipients (buyers) are supposed to sign an RSA, not an LRSA. The RSA is a much more powerful instrument of ARIN, allowing it to reclaim resources that are not needed (although that power is almost never used). By giving Microsoft an LRSA, it gave it a virtual property right over the transferred address resources. Moreover, language in the contract gives Microsoft "Sellers Rights," which strengthen its rights even further (see below). There are very few imaginable circumstances under which ARIN could reclaim the transferred addresses, or prevent MS from onselling them. Furthermore, the recipient of a transfer is supposed to go through a needs assessment. MS did not go through a needs assessment. It just bought the addresses.

Perhaps for this reason, ARIN's news release announcing the deal misleadingly announced that Microsoft has signed an RSA. While it's true that RSA can be a generic term for any contract within ARIN, Microsoft signed an LRSA, not an RSA, and the difference is huge.

The contracts and legal documents surrounding the Nortel bankruptcy transactions are all online, so there need be no mystery about what happened today. The key facts are in a document called Exhibit D, BLACKLINE AMENDED PURCHASE AGREEMENT, which is in Docket 5252. In that agreement, it says that "the sale will vest the Purchaser with all of Seller's Rights in and to the Legacy Number Blocks." Seller's rights are defined as "Seller's exclusive right to use the Legacy Numbers Blocks, Seller's exclusive right to transfer the Legacy Number Blocks, and any other legal and equitable rights that Seller may have in and to, the Legacy Number Blocks." While it doesn't say "property rights," it uses the economic definition of what property rights do, instead.

The documents also make it clear that the Nortel deal was brokered by a company called Addrex. Addrex is engaged in a broader campaign to transform the structure of IP address governance, in a way that would subject ARIN to competition in some of its services. A representative of Addrex and a representative of ARIN will participate in what now promises to be an even more exciting discussion at the GigaNet conference May 5.

# 6 thoughts on "ARIN stumbles into the Nortel-Microsoft IP address deal"



**ANONYMOUS**

April 16, 2011 at 14:00

Milton –

There's such a multitude of errors with your posting that one wonders where to start in responding. For sake of the readers, I'll focus on one matter for now, specifically your assertion that "Legacy IPv4 address holders … have PROPERTY RIGHTS" in their v4 address blocks." (emphasis added)

To be clear, ARIN has never asserted that registrants have no rights with respect address blocks registered to them; that would actually run contrary to one of the key goals of the registry itself in making address blocks available for exclusive use of the registrant. As part of the registry services offered by ARIN, address block holders have various rights (such as the right to be the exclusive registrant, to update their registration information, and even the right to transfer their address blocks to another party), all in compliance with policies developed by the community. The rights to do these things in ARIN"s registration database are quite real, but do not create a "personal property interest" in the IP addresses.

Arguing that one "owns" IP addresses is akin to arguing that you "own" the number on the coat check tag you were given; you were actually assigned the unique number for a particular purpose, and while one might argue that you have certain rights to it, the tag becomes meaningless when removed from the system.

As a result of our involvement, the references in the documents filed by the parties have been changed accordingly, e.g. "all of the Seller's right, title and interest in and to the Legacy Number Blocks" is now "Seller's Rights in and to the Legacy Number Blocks". ARIN's intervention was simply to clarify the status of IP addresses, and we are pleased that the parties will perform the transfer in compliance with the community developed policies.

Despite your rhetoric to the contrary, the ARIN community encourages a limited *market-based* approach to improving utilization of IP number resources, including developing the specified transfer policy to allow qualified recipients to obtain additional address space from other registrants as needed. This is a perfect example of how private-sector, community-based leadership can evolve Internet policy as needed to adapt to changing circumstances yet still maintain the Internet stability that we all value.

ARIN remains quite able and willing to intervene in the future if it should prove necessary to protect these principles.

/John

Case 3:18-cr-04683-GPC Document 176-1 Filed 06/08/20 PageID.1877 Page 84 of 102

John Curran
President and CEO
ARIN



## ANONYMOUS

April 16, 2011 at 16:26

What economists call "property rights" involve the right to use, the right to benefit from use, the right to exclude and the right to transfer (sell) . True, ARIN's policies have always upheld exclusivity of use (as it must), but it has sought to deny or severely limit the right to sell. ARIN's recent transfer policy was in many respects a good faith effort to fix that. But now you have to ask yourself why major players in the internet economy have refused to use it. Running out in front of the parade and issuing a press release claiming that the parties did use your policy, when they manifestly did not, constitutes a form of denial that does not bode well for ARIN.



## ANONYMOUS

April 18, 2011 at 11:21

Milton –
We've had only this one major use of the specified transfer policy because **we are still issuing IPv4 address space in the region**. Organizations that have documented need can still obtain an address block from ARIN in accordance with community-developed policy. We'll start seeing an increase in transfers over the coming months, and should be able to see how successful these policies are.
Whereas it's very difficult to extrapolate a trend line with only one data point, I applaud your innovation in this area.
/John
John Curran
President and CEO
ARIN



## ANONYMOUS

April 18, 2011 at 23:12

John,
Stop pretending. This was not a use of the specified transfer policy.

Case 3:18-cr-04683-GPC   Document 176-1   Filed 06/08/20   PageID.1878   Page 85 of 102



**ANONYMOUS**

April 18, 2011 at 23:31

Milton –

As I indicated in your other post, this transfer did not start out as a use of the specified transfer policy, but today as revised is definitely making use of that policy.

Best wishes,

/John

John Curran

President and CEO

ARIN



**RICHARD SEXTON**

December 27, 2012 at 20:28

"You can't sell IP addresses"

Uh-huh. You can't fucking steal them either.

Mankind evolved from mob rule to governance, and Internet policy will as well; when "service to the community" ends up being a justification for theft, you know it's long overdue.

Comments are closed.

## ABOUT THE AUTHOR



## Milton Mueller

Milton Mueller is a founder of IGP an internationally prominent scholar specializing in the political economy of information and communication. He is the author of Will the Internet Fragment? (Polity, 2017), Networks and States: The global politics of Internet governance (MIT Press, 2010) and Ruling the Root: Internet Governance and the Taming of Cyberspace (MIT Press, 2002)

84

# Exhibit D

**The New Digital Workplace: The New Reality Is Now. Learn More.**

UNITED STATES ▾

# Does ARIN have the right to approve all IPv4 address sales?

Nortel/Microsoft deal highlights questions surrounding ARIN's authority over IPv4 trades

By Carolyn Duffy Marsan

Network World  |

MAY 11, 2011 5:00 AM PST

A U.S. bankruptcy court in Delaware recently approved Nortel's sale of 666,624 IPv4 addresses to Microsoft for $7.5 million. Despite this precedent, a debate is raging in Internet policy circles about how sales of IPv4 addresses -- particularly the largest blocks of IPv4 address space issued before the Internet became popular -- will proceed in the future.

**DETAILS:** Need IPv4 addresses? Get 'em here

On one side of the debate is the American Registry for Internet Numbers (ARIN), the regional Internet registry for North America, which is trying to assert authority over all IPv4 address transfers in the region.

> **[ Now see the hidden cause of slow internet and how to fix it.]**

Arguing against ARIN's right to approve all IPv4 address sales in the region are lawyers, entrepreneurs and other experts who say that some IPv4 address holders have the right to sell their IPv4 addresses to whomever they choose without prior approval from ARIN.

The crux of the issue is whether legacy IPv4 address holders -- particularly those that received large blocks of IPv4 address space before ARIN was founded in 1997 and never entered into a legal agreement with ARIN -- must seek ARIN's approval to sell their IPv4 address space.

Nortel was a legacy IPv4 address space holder that never signed a contract with ARIN and didn't seek ARIN's approval to sell its unused address space to the highest bidder. However, the buyer of Nortel's address space, Microsoft, ended up signing a contract with ARIN after the deal was struck.

The bankruptcy court's approval of the Nortel/Microsoft deal is viewed by many as the beginning of a vibrant market for legacy IPv4 address space.

Charles Lee, president of Addrex, a startup that was the sole dealmaker for the Nortel/Microsoft sale, says the judge's ruling in the Nortel case has clear implications for future sales.



***SponsoredPost*** Sponsored by CIS
What You Need to Know About Hybrid Cloud Environments

"We believe that the recognition of a legacy number block holder's exclusive rights to use, transfer and sell these assets is a watershed moment," Lee says. "It means that the pejorative term 'black market' is a thing of the past, and the creation of an open, legitimate secondary market for the sale of number blocks, under a legal framework, is now undisputed."

However, the Nortel/Microsoft deal didn't follow ARIN's stated IPv4 address transfer policy to the letter, so many observers are questioning how future trades will occur.

IPv4 sales are "not cut and dried. The Nortel/Microsoft deal was the beginning of a process by which we will work this out," says Professor Milton Mueller of the School of Information Studies at Syracuse University and a committee member of the Internet Governance Project.

Mueller adds that ARIN's "part in the Nortel/Microsoft deal was an improvisation, and it deviated from what they expected to happen ... ARIN learned about this deal just the same way that you and I did ... and then they scrambled to the bankruptcy court. Suddenly the sale agreement was amended and had all this stuff about ARIN in it."



***SponsoredPost*** Sponsored by Microsoft
5 signs that you need a technology refresh

Marc Lindsey, a partner with Washington, D.C., law firm Levine, Blaszak, Block & Boothby, says the issue of whether legacy IPv4 address holders like Nortel own "intangible property rights" hasn't been decided by the courts. But he adds that the Nortel bankruptcy judge's ruling "declaring that Nortel possessed the exclusive right to use and transfer its legacy numbers comes pretty close."

The issue of intangible property rights "is an interesting legal question and as a practical matter in the marketplace will have a big impact on value" of IPv4 address blocks, Lindsey says.

Legacy address holders – including IBM, General Electric, Xerox and MIT – received large blocks of IPv4 address space, some as big as 16.7 million addresses, before ARIN was founded. Most legacy address space holders are U.S. companies, universities and government agencies.

**BY THE NUMBERS:** The evolution of the Internet

The majority of legacy address holders have not signed Legacy Registration Services Agreements (LRSAs) with ARIN, despite pressure from ARIN over the past few years for them to do so. LRSAs are less stringent than the typical contracts network operators sign with ARIN, which are called RSAs for Registration Services Agreements.

John Curran, president and CEO of ARIN, says more than 500 legacy IPv4 address holders have signed LRSAs with ARIN, but that an estimated 10,000 to 20,000 have not.

Lindsey says legacy IPv4 address holders haven't signed LRSAs because "there is not a value proposition for them."

Mueller points out that Nortel's sale of IPv4 addresses to Microsoft did not follow ARIN's stated policies about how IPv4 trades are supposed to occur, starting with the fact that Nortel hadn't signed an LRSA.

"According to ARIN's policy, the seller comes to them and signs an LRSA, and then ARIN confirms they are the legitimate owner of the address block. … Then the buying party is supposed to sign a standard RSA. This buyer is also supposed to go through a formal needs assessment by ARIN. Nothing like that happened in this case," Mueller says. "Nortel completely refused to sign any contract with ARIN, and Microsoft signed an LRSA, not an RSA."

Mueller guesses that Microsoft signed an LRSA under pressure from ARIN because "it doesn't cost them a lot. It weakens their rights a tiny bit, but it keeps ARIN happy and it keeps the registry whois database intact. I bet they wanted to appear that they are not total renegades.''

Lawyers say the Nortel/Microsoft deal demonstrates that legacy IPv4 address sellers that haven't signed an LRSA or RSA don't need ARIN's approval to sell their IPv4 address space. But they say Microsoft's decision to sign an LRSA makes it unclear whether buyers of legacy IPv4 address space must agree to ARIN's terms.

"What's not clear from this is what would happen if a legacy IPv4 number buyer decides not to voluntarily agree to enter into an RSA or LRSA with ARIN," Lindsey says. "In my view, applying the reasoning in the [bankruptcy judge's] order, a buyer would obtain all of the exclusive rights of the seller free of any of ARIN's policies. ARIN could not assert authority over those numbers to revoke or reassign them, but ARIN could refuse to update its records, including the whois database.''

Curran says ARIN won't update the IPv4 address entries in its whois database when a trade occurs that isn't in compliance with its transfer policies. He points out that more than 10 IPv4 address sales have followed ARIN's policies in the past month, even though the Nortel/Microsoft deal has gotten all of the press.

"We have had more than 10 other transfers happen, and all of them have been where the seller has come to us with the buyer," Curran says, adding that all of these transfers have happened in the last month. "The precedent is in the other direction. All of those [address blocks] were transferred in compliance with our requirements."

The reason some legacy IPv4 address sellers don't want to follow ARIN's transfer policies is that ARIN requires buyers to demonstrate "need" for IPv4 address space just as they would for a regular IPv4 address allocation. Critics see this as an unnecessary condition on the sale.

"I've been warning the [regional Internet registries] that they need to set up a very open market exchange system, and the overriding policy goal was to make sure people that had addresses and wanted to get rid of them could do so easily and quickly, and people who wanted addresses could be able to get them straightforwardly," Mueller says, adding that he has "never been a big fan of the needs assessment."

Curran argues that ARIN's needs assessment for IPv4 address allocations is valuable because it takes into account past allocations, historical rates of network growth and other important data. He says ARIN processes hundreds of requests per month and on occasion rejects a request because need hasn't been demonstrated.

However, Curran says that ARIN has had "no abandoned transfers" because of a buyer's failure to pass the needs assessment. Curran reiterates that ARIN supports legacy IPv4 address sales because "if we can get underutilized IPv4 address blocks into use, that gives people breathing room for the transition to IPv6."

One issue that everyone agrees upon is that legacy IPv4 address sales are going to continue to be a hot topic for the foreseeable future.

IPv4 trading "is going to be important for a long time because of the flaws in the dual-stack migration policy," Mueller says. "You don't save any IPv4 addresses until 94% of the world networks are on IPv6. At the rate people are going to IPv6, we're not going to be anywhere near that point for 10 or 20 years. We're going to be needing a lot of IPv4 addresses."


## Learn more about this topic

Need IPv4 addresses? Get 'em here (http://www.networkworld.com/news/2011/042511-ipv4-sales.html)

The evolution of the Internet (http://www.networkworld.com/slideshows/2009/020909-evolution-internet.html)

ARIN is A-OK with sales of IPv4 addresses (http://www.networkworld.com/community/blog/arin-ok-sales-ipv4-addresses)

*Join the Network World communities on* Facebook *and* LinkedIn *to comment on topics that are top of mind.*

---

*Follow*      

Copyright © 2011 IDG Communications, Inc.

# Exhibit E

Case 3:18-cv-04683-CRC   Document 176-1   Filed 06/08/20   PageID.1885   Page 92 of 102

Search for questions, people, and topics                                    Sign In

ARIN    Internet Assigned Numbers Authority (IANA)    IPv4 Address Exhaustion

IP Address Management    Property Rights    IP Addresses    Massachusetts Institute of Technology

## How can MIT sell their IPv4 address space for millions of dollars when they theoretically don't "own" the addresses?

Ad by Squarespace

**Need a stunning site to open your business online?**

Start with any website template and customize it to fit your needs. Try Squarespace today.

Learn More

### 2 Answers

 John Curran, President and CEO at American Registry for Internet Numbers
Answered Apr 27, 2017 · Author has **81** answers and **242.6k** answer views

First, it's important to realize what an IP address block is, and what it is not...

IP address blocks in The Internet Numbers Registry System    don't exist as physical entities, they don't convey any authority over the routing tables of the various ISPs in the Internet, and they aren't a recognized form of intellectual property.

What we do know is that assignment of IP address blocks from Internet number registry have been made to organizations since the very beginning of the Internet, and once these assignments are made, the policies of the registry preclude the same block from being assigned to another party. The value of the IP address blocks is the coordination value that they provide – while in theory you can configure your routers with any IP addresses you wish, the reality is that you'll find it far easier to interoperate if you configure with addresses that no one else is using.

When someone is assigned an IP address block from the Internet number registry, they get some some rights; for example, the right to be the only party associated with the IP address block, the right to update their entry in the registry with newer contact info, etc., and the ability to transfer those rights to another party in accordance with registry policy. You can have rights to something without owning the underlying property – so just as one can have, for example, oil rights to a piece of land without owning the land (and often can sell those rights to a third party), IP address holders have rights an entry in registry and can sell those rights to others.

MIT has a set of rights to their entire address block, and are transferring their rights to some of that space to other parties.

1k views · View 18 Upvoters · Answer requested by Phillip Remaker

### Related Questions                                    More Answers Below

Who owns IPv4 addresses and why?

Why does MIT have 2/24 IPv4 addresses?

How much does a Class A (2^24 addresses) IPv4 network address space cost?

Why doesn't MIT give up its unused IP addresses? From my understanding, Stanford had more than one class A as well, but it returned these to t...

How much money did MIT get for selling some of their IP addresses to Amazon?

 Cella James
Answered Oct 29, 2019

You can also sell out the ipv4 and generate revenue from your IPs. Their many platforms available who are helping users of IPv4 to switch to IPv6 and sell their IPv4.

## Related Questions

Who owns IPv4 addresses and why?

Why does MIT have 2/24 IPv4 addresses?

How much does a Class A (2^24 addresses) IPv4 network address space cost?

Why doesn't MIT give up its unused IP addresses? From my understanding, Stanford had more than one class A as well, but it returned these to t...

How much money did MIT get for selling some of their IP addresses to Amazon?

Should I sell my Class C block of IPv4 addresses?

# Exhibit F

OPINION

# Protect your pre-1997 IP address

With IPv4 space running out any day now, is your legacy IP address space safe?

By Marc Lindsey

Computerworld  |

DEC 10, 2010 6:00 AM PST

If your company obtained its IP address space before 1997, you have probably received several letters from the American Registry for Internet Numbers Ltd. (ARIN) encouraging you to enter into a contractual agreement to protect the IP address. But should you sign it?

ARIN's contract is called the Legacy Registration Services Agreement (Legacy RSA). It proposes to give companies contractual guarantees, including grandfathering of certain protected rights; continued use -- at no extra charge, at least for now -- of IP address services like "in-addr" and "whois" listings; reduced annual fees compared with those of ARIN's regular IP address holders; and future fee waivers, in exchange for returning unused IP address space.

But be careful -- there are several issues you should consider before signing up for this.

**[ Further reading: Google's Chromium browser explained ]**

The information and advice in this piece are based on my experience advising legacy address holders in connection with their participation in the Legacy RSA program. I've been working with legacy holders since the beginning of the program in 2007, and my representation has included leading negotiations with ARIN on behalf of clients. As part of this effort, I've also had informal consultations with ARIN's lead counsel and its directory of registry services.

# Some history

Since Dec. 22, 1997, ARIN has been the authorized administrator of IPv4 address allocations and services in North America. ARIN is one of five regional Internet address registries, all operating under the authority of ICANN. ARIN obtained this authorization through a delegation from InterNIC, which previously handled the assignment and administration of domain names and IP

addresses. (InterNIC itself was organized in 1993 by the National Science Foundation and Network Solutions Inc., a private company awarded the government contract to provide IP address services.)

Before 1993, IP addresses were assigned through the Internet Assigned Numbers Authority (IANA).

 Under the rules of InterNIC and IANA, Internet service providers and certain end users were allocated or assigned IP address blocks directly, subject only to industry-accepted best practices and Internet community standards. There were no contractual obligations between the registries and these legacy IP address holders.

By the time ARIN appeared on the scene, even as early as 1997, there was concern within the Internet community about possible IPv4 address space exhaustion. To protect against that, ARIN adopted policies designed to discourage IP address hoarding and to promote space reuse. Under ARIN's policy, for example, ISPs that obtain direct allocations of IPv4 addresses require each of their downstream customers to show that it has used at least 80% of its previously assigned IPv4 addresses before receiving any new ones.



*SponsoredPost*  Sponsored by Comcast Business
Managing the Suddenly Distributed Workforce

Similarly, end users who want to receive additional assignments of IPv4 network space from ARIN must demonstrate that they are using at least 80% of their current addresses, will use at least 25% of the requested addresses immediately and will use 50% of the new addresses within one year of the request, based on reasonable and documented network growth projections.

Failure to comply with ARIN's resource conservation policies could result in the revocation of some of an organization's IPv4 addresses.

Page 1 of 4   

OPINION

# Protect your pre-1997 IP address

With IPv4 space running out any day now, is your legacy IP address space safe?

By Marc Lindsey

Computerworld  |

DEC 10, 2010 6:00 AM PST

**‹    Page 2 of 4    ›**

# The legacy registration program

Registrants that obtained IP addresses directly from ARIN after 1997 entered into service agreements that fall under ARIN's jurisdiction, and are therefore subject to ARIN's resource utilization policies. But it is unclear whether IP address registrations of legacy IP address holders -- those that happened before 1997 -- were ever formally transferred to ARIN. ARIN has never claimed that it has control over these legacy IP addresses, but at the same time, it has never conceded that it lacks the authority either.

In an effort to harmonize the policies across all IP address allocations -- legacy and non-legacy -- and to cement ARIN's jurisdiction over the legacy address holders, ARIN launched its Legacy RSA program in late 2007. The deadline for signing up for this program is Dec. 31, 2011 -- recently extended by ARIN for an additional year. The costs are $100 per year through 2013, with potential increases after that, but by no more than $25 per year.



*SponsoredPost*  Sponsored by AMD
NVv4 Expands Virtualization Opportunities for Financial Services

To participate, a legacy IP address holder must submit an application to ARIN. Participation in the program is voluntary and is limited to the original registrants and subsequent transferees that can prove -- with supporting documentation -- to ARIN that their legacy IP addresses were obtained lawfully from an original registrant.

Finding any documentation about original address registrations is difficult for many legacy registrants. If companies address the documentation issue with ARIN in advance, gaps in their registration records may not necessarily prevent them from participating in the Legacy RSA program. But ARIN does not state what "supporting documentation" means.

After ARIN approves the application, the legacy address holder and ARIN may then enter into the Legacy RSA.

# Should your company sign the Legacy RSA?

To entice legacy address holders to formalize their relationships with ARIN and accept its policies on a voluntary basis, ARIN offers address holders several benefits through contractual guarantees embodied in the Legacy RSA. Key contractual guarantees include grandfathering of certain protected rights; continued use -- at no extra charge, at least for now -- of IP address services like "in-addr" and "whois" listings; reduced annual fees when compared to ARIN's regular IP address holders; and future fee waivers in exchange for returning unused IP address space.

### The argument for

Grandfathering protected rights is a core Legacy RSA benefit promoted by ARIN. The central protected rights are as follows:

- The terms and conditions of the Legacy RSA, including the vested/protected rights unique to legacy address holders, trump any conflicting current ARIN policies and any future policies adopted by ARIN.
- The Legacy RSA automatically renews in one-year increments unless (a) ARIN terminates it for cause, or (b) the applicant terminates it for convenience or for cause (i.e., due to ARIN's material breach). If the legacy applicant terminates for cause, the legacy applicant reverts to the status (and rights and benefits) it enjoyed prior to entering into the Legacy RSA.
- ARIN may not terminate a Legacy RSA for its convenience.
- ARIN agrees not to reduce the services it provides to the legacy IP addresses.


- ARIN promises that it will not revoke unused legacy IP address resources – absent a breach of the Legacy RSA by the legacy applicant. However, under its existing policies, ARIN may refuse to issue *new* IPv4 address space to any legacy IP address holder that has not met ARIN's utilization requirements for its existing IPv4 network block.

- If a company signs up for the current Legacy RSA, it may switch to any subsequent Legacy RSA that may be more favorable, at the address holder's option.

‹   Page 2 of 4   ›

## SHOP TECH PRODUCTS AT AMAZON

**SPONSORED LINKS**

Work from wherever you need with Cisco Webex. Sign up for free.

The 5 Attributes of R&D Leaders Who Drive Digital Transformations

10,000 new VPN connections, 1 solution to secure them. NETSCOUT, get protected.

When the lifeline of your company depends on staying connected, trust NETSCOUT

Join the IDG TECH(talk) Community, an exclusive online network where IT experts find resources to enhance their knowledge and career.

As business changes, your VPN performance doesn't have to. Learn how NETSCOUT can help

Online Master of Science in Information Systems at Northwestern University

dtSearch® instantly searches terabytes of files, emails, databases, web data. See site for hundreds of reviews; enterprise & developer evaluations

Copyright © 2020 IDG Communications, Inc.

The New Digital Workplace: The New Reality Is Now. Learn More.

OPINION



# Protect your pre-1997 IP address

With IPv4 space running out any day now, is your legacy IP address space safe?

By Marc Lindsey

Computerworld  |

DEC 10, 2010 6:00 AM PST

**‹   Page 3 of 4   ›**

The implication for any legacy IP address holder refusing to enter into the Legacy RSA by the Dec. 31, 2011, deadline is that ARIN may deny them the benefits of the guaranteed rights, and they will, as a result, be subject to future enforcement action by ARIN.

What might that future enforcement action be? ARIN could materially diminish the value or limit the use of legacy IP address services not protected by the Legacy RSA program. If, for example, ARIN removes or obfuscates a holdout's IP address registration records from the reverse DNS database (officially, the "in-addr.arpa domain records"), the host names associated with the legacy IPv4 addresses may not be discoverable through reverse DNS.

ARIN could also obscure information about holdouts from ARIN's routing registry. The routing registry allows ISPs to retrieve accurate and current routing policy information, which in turn helps them configure and manage their networks to effectively route their customers' Internet traffic. Further, holdouts that want to transfer their unused IPv4 addresses to third parties may have trouble convincing potential transferees to pay full value for "gray-market" addresses when addresses are also available in an ARIN-approved transfer market.

The specter of having their legacy IP address allocation revoked creates significant concerns for legacy IP address holders who might otherwise be inclined to reject the Legacy RSA because, among other negatives, applicants must waive any and all claims of ownership in their IP addresses. At the moment, this concern should not influence any organization's decision to accept or reject the Legacy RSA offer. ARIN has stated publicly that it currently has no plans to revoke the IP addresses assigned to legacy IP address holders that do not participate in the program.



However, ARIN has also acknowledged that its plans in this regard could change if it adopts new policies or legal requirements. So, in other words, ARIN is saying it won't revoke the IP addresses of legacy holders that don't sign up -- for now -- but that policy could change down the road.

98

And, in fact, revocation of IP addresses registered to entities that don't comply with ARIN's policies is an enforcement remedy laid out in ARIN's existing policy manual. However, ARIN is unlikely to go this far for legacy holders that don't sign up -- unless they are also engaging in some other prohibited activity, such as selling addresses on eBay.

Indeed, ARIN's authority to revoke legacy IP addresses, enforce its current policies against legacy IP address holders or change the services provided for legacy IP addresses is unclear and untested. It is likely that ARIN calculated that concerned legacy address holders would see the benefit of signing the Legacy RSA in exchange for eliminating the risk that ARIN might otherwise try to revoke their legacy IP addresses.

Even without enforcement action by ARIN, there are risks for companies that do not join the rest of the Internet community by voluntarily submitting their number resources to ARIN's stewardship. As attention to the IPv4 exhaustion problem continues to increase, legacy registrants -- particularly those with the largest networks -- will be scrutinized publicly about their utilization in the face of scarcity. Signing and complying with the Legacy RSA would allow them to deflect criticism by highlighting that they are accountable members of the Internet community acting in accordance with ARIN's policies.

**The argument against**

Entering into the Legacy RSA requires legacy IP address holders to give up current benefits associated with their pre-ARIN registrations. Under the agreement, legacy applicants must waive any and all claims of ownership in their IP addresses. The status of IP addresses as "property" has been the subject of considerable policy debate in the industry and remains an unresolved legal question. Still, waiving the legal right to assert ownership interests in their IP addresses could have significant economic consequences for legacy address holders if future judicial decisions hold that assigned IP addresses are, indeed, property.

ARIN's policy position is that IP addresses (like telephone numbers) are a shared public resource and that ARIN is a steward of those resources. In ARIN's view, IP address holders are conditionally assigned the use of IP addresses for as long as they need and use them, subject to continued compliance with the Internet community's policies that are adopted and enforced by ARIN and the other regional Internet registrars.

The Legacy RSA obligates legacy IP address holders to comply with ARIN's policies, which may change over time. Refusing to enter into the agreement may not shield legacy address holders from future attempts by ARIN to enforce its policies. Nevertheless, legacy address holders that do not sign the Legacy RSA preserve their ability to argue that ARIN lacks authority to alter or diminish property rights claimed in their IP addresses.

Another consideration is that legacy holders outside of the agreement are not required to pay fees to ARIN, and Legacy RSA agreement signers are.

< Page 3 of 4 >

The New Digital Workplace: The New Reality Is Now. Learn More.

OPINION

UNITED STATES ▾

# Protect your pre-1997 IP address

With IPv4 space running out any day now, is your legacy IP address space safe?

By Marc Lindsey

Computerworld |

DEC 10, 2010 6:00 AM PST

---

‹    Page 4 of 4

---

# Impact on transferability

The non-transferability of IP addresses has been a fundamental ARIN policy. In accordance with its standard transfer policy, IP addresses may not be assigned or transferred without ARIN's prior and express permission.

Some legacy registrants have -- without regard to ARIN's policies -- freely transferred their space to third parties, including their joint ventures, outsourcing vendors and corporate spin-offs. For years, there has also been considerable speculation in the Internet community about the existence of a "black market" of IPv4 space.

Legacy registrants that have not signed a Legacy RSA could, by relying on the legal theory that ARIN's transfer restriction policies do not apply to them, participate in this unsanctioned IPv4 market without the black market stigma. As a condition of the Legacy RSA, participating legacy registrants give up the flexibility to engage in these liberal IP address transfer practices.

The Legacy RSA provides participating legacy IP address holders with one exception to ARIN's general non-transferability policy: They may assign their legacy IP addresses along with the Legacy RSA to their successors (without ARIN's consent) by notifying ARIN of the transfer, provided that the successors obtain controlling interests in the previous legacy address holder.

In addition, although ARIN has historically prohibited the sale of IP addresses, it recently adopted a new transfer policy that, under certain circumstances, permits IP address registrants to transfer their *unused* address space to third parties in return for compensation. Legacy registrants may participate in this "white market" for IPv4 addresses only if they enter into either a Legacy RSA or a standard RSA covering the addresses to be transferred.

# Conclusion

The current legacy agreement program is set to expire June 30, 2011. At the moment, it is not clear what will happen to rogue legacy IP address holders after that. ARIN could enhance the legacy program benefits to encourage greater participation, extend the program as is (which it has done twice already) or attempt to enforce its standard policies aggressively against holdouts (for example, demanding that they return unused address space).

Only ARIN knows what's next, and it is holding its cards very close to the vest.

So, what should companies with legacy address space do?

- Review your company's information in ARIN's <u>WHOIS database</u>, and confirm that the point of contact (POC) information records are accurate. ARIN sends communications to registrants via the POC's information in the WHOIS database.

- Find out whether your organization received an offer from ARIN to sign the Legacy RSA and obtain a copy of the letter and offer (check the in-box of the e-mail address for the POC in the WHOIS database).

- Submit the Legacy RSA to your senior network operations and legal teams to assess whether the pros outweigh the cons for the organization, and decide whether to sign up, reject ARIN's offer or wait until the deadline to see what ARIN's next move will be.

- Start <u>migrating to IPv6</u>. It's a good idea for architectural reasons -- IPv4 is not natively compatible with IPv6, so without some translation or tunneling technology, at some point organizations that use only IPv4 for their Web presence and Internet access won't be able to reach, or be reached by, end users or organizations that use <u>IPv6</u>. Also, ARIN would not likely deny a legacy registrant IPv6 addresses if it doesn't sign the Legacy RSA. Under its policies it could, but creating roadblocks to IPv6 migration runs counter to ARIN's primary goal of getting everyone switched over.

For most companies, the accept/reject/stall decision won't be easy. It's key for organizations to evaluate their options fully under current market and policy conditions, and then plan a strategy that protects their interests in, and maximizes the utility of, their <u>valuable -- and scarce -- IPv4 number resources</u>.

*Marc Lindsey is a partner at Washington law firm <u>Levine, Blaszak, Block & Boothby LLP</u>. Contact him at <u>mlindsey@lb3law.com</u>.*

Copyright © 2010 IDG Communications, Inc.

 Page 4 of 4

## YOU MAY ALSO LIKE

Recommended by