**WIECHERT, MUNK & GOLDSTEIN, PC**
David W. Wiechert, SBN 94607
Jessica C. Munk, SBN 238832
27136 Paseo Espada, Suite B1123
San Juan Capistrano, CA 92675
Telephone: (949) 361-2822
Email: dwiechert@wmgattorneys.com
          jessica@wmgattorneys.com
          william@wmgattorneys.com

*Attorneys for Jacob Bychak*

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKYAND POPEO, P.C.**
Randy K. Jones, SBN 141711
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone: (858) 314-1510
Email: rkjones@mintz.com

Daniel J. Goodrich, BBO 692624 (Pro Hac)
Ryan Dougherty, BBO 703380 (Pro Hac)
1 Financial Center
Boston, MA 02111
djgoodrich@mintz.com
rtdougherty@mintz.com

*Attorneys for Mark Manoogian*

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
Thomas H. Bienert, Jr., SBN 135311
James D. Riddet, SBN 39826
Whitney Z. Bernstein, SBN 304917
Carlos A. Nevarez, SBN 324407
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Email: tbienert@bklwlaw.com
          jriddet@bklwlaw.com
          wbernstein@bklwlaw.com
          cnevarez@bklwlaw.com

*Attorneys for Mohammed Abdul Qayyum*

**BIRD MARELLA BOXER WOLPERT NESSIM DROOKS LINCENBERG RHOW P.C.**
Gary S. Lincenberg, SBN 123058
Nicole R. Van Dyk, SBN 261646
Darren L. Patrick, SBN 310727
Alexis A. Wiseley, SBN 330100
1875 Century Park East, Floor 23
Los Angeles, CA 90067
Telephone: (310) 201-2100
Email: glincenberg@birdmarella.com
          nvandyk@birdmarella.com
          dpatrick@birdmarella.com
          awiseley@birdmarella.com

*Attorneys for Petr Pacas*

Case No. 18-CR-4683-GPC

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-4683-GPC |
| Plaintiff, | Honorable Gonzalo P. Curiel |
| v. | **SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTIONS FOR RECONSIDERATION AND TO COMPEL** |
| JACOB BYCHAK, et al., | *[Declaration of Nicole R. Van Dyk and Motion to Seal filed concurrently herewith under seal.]* |
| Defendants. | Date:  November 18, 2021<br>Time: 2:00 p.m.<br>Dept.: 2D |

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION .................................................................................... 1

II.   BACKGROUND ..................................................................................... 2

    A.   Factual Background ...................................................................... 2

        1.   The SI Set the Government's Investigation in Motion
           in 2013. ................................................................................ 2

        2.   The SI Facilitated the Government's Communication
           with CY as Early as 2014. ................................................ 2

        3.   The SI Worked Closely and Continuously with
           the Government From the Outset of the Investigation
           to Today. ............................................................................. 3

    B.   Procedural Background. ................................................................. 6

III.   REGARDLESS OF HIS FORMAL DESIGNATION, THE SI
HAS FUNCTIONED AS AN INFORMANT SINCE 2013 AND
INFORMATION REGARDING HIS INVOLVEMENT WITH
THE GOVERNMENT MUST BE DISCLOSED. ............................................ 8

IV.   EVIDENCE SUGGESTS THAT SPAMHAUS AND ITS
AGENTS ARE STATE ACTORS. ............................................................ 11

V.   THE SI'S IDENTITY AND EVIDENCE REGARDING
SPAMHAUS IS DICOVERABLE UNDER RULE 16 AND *BRADY* ........... 13

    A.   Legal Standard ............................................................................ 13

    B.   The SI's Identity Should be Disclosed Because it is Material
to the Defense. ........................................................................... 15

        1.   The SI's Identity is Material Under Rule 16 and *Brady* ............. 15

        2.   The Qualified Informant Privilege Must Yield to
           Defendants' Due Process Right. ....................................... 17

    C.   Discovery Relating to Spamhaus and the SI is Material Because
it is Necessary to Defendants' Constitutional Challenges. .................. 19

        1.   Discovery is Relevant to Motions Regarding the
           Warrantless Seizure of Company A's Documents. ..................... 21

        2.   Discovery is Relevant to Motions Regarding the SI's
           Invasion of the Defense Camp. ........................................ 24

VI.   CONCLUSION ..................................................................................... 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Brady v. Maryland,*
  373 U.S. 83 (1963) ..................................................................*passim*

*Giglio v. United States,*
  405 U.S. 150 (1972) ....................................................... 14

*Horn v. City of New Haven,*
  No. 3:18-CV-1502 (JAM), 2019 WL 3006540
  (D. Conn. July 9, 2019) ................................................. 12

*Kastigar v. United States,*
  406 U.S. 441 (1972) ................................................ 1, 8, 20

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ....................................................... 14

*Limone v. United States,*
  497 F. Supp. 2d 143
  (D. Mass. 2007) ............................................................. 9

*Quezada v. Scribner,*
  No. CV047532RSWLMLG, 2013 WL 12340383
  (C.D. Cal. Feb. 20, 2013) ............................................. 10

*Roviaro v. United States,*
  353 U.S. 53 (1957) ................................................... 17, 18

*United States v. Ackerman,*
  831 F.3d 1292 (10th Cir. 2016) ................................... 12

*United States v. Aguilar,*
  831 F. Supp. 2d 1180 (C.D. Cal. 2011) .................... 14, 15

*United States v. Armstrong,*
  517 U.S. 462 (1996) ....................................................... 20

*United States v. Barcelo,*
  628 F. App'x 36 (2d Cir. 2015) .................................... 13

*United States v. Bell*,
   506 F.2d 207 (D.C. Cir. 1974)..................................................................18

*United States v. Blackwell*,
   No. 3:07-CR-00044-TMB, 2007 WL 9698053
   (D. Alaska June 22, 2007) ...........................................................10, 18

*United States v. Budziak*,
   697 F.3d 1105 (9th Cir. 2012) ...............................................................25

*United States v. Danielson*,
   325 F.3d 1054 (9th Cir. 2003) ...............................................................24

*United States v. Gonzalo Beltran*,
   915 F.2d 487 (9th Cir. 1990) .................................................................17

*United States v. Mazzarella*,
   784 F.3d 532 (9th Cir. 2015) .................................................................23

*United States v. Muniz-Jaquez*,
   718 F.3d 1180 (9th Cir. 2013) .........................................................14, 20

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000) ...................................................18

*United States v. Nobles*,
   422 U.S. 225 (1975) ..............................................................................24

*United States v. Olsen*,
   704 F.3d 1172 (9th Cir. 2013) ...............................................................14

*United States v. Pesaturo*,
   519 F. Supp. 2d 177 (D. Mass. 2007)...................................................19

*In re Pratt*,
   69 Cal. App. 4th 1294 (1999)...................................................................9

*United States v. Price*,
   566 F.3d 900 (9th Cir. 2009) ............................................................5, 14

*United States v. Prieto-Villa*,
   910 F.2d 601 (9th Cir. 1990) .................................................................20

*United States v. Reed*,
   15 F.3d 928 (9th Cir. 1994) .............................................................21, 22

Case No. 18-CR-4683-GPC

SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES

*United States v. Reilly*,
    224 F.3d 986 (9th Cir. 2000) ............................................................... 23

*United States v. Sager*,
    227 F.3d 1138 (9th Cir. 2000) ............................................................. 14

*United States v. Segal*,
    No. 02-CR-112, 2004 WL 830428
    (N.D. Ill. Apr. 16, 2004) ..................................................................... 25

*United States v. Shaffer*,
    789 F.2d 682 (9th Cir. 1986) ................................................................ 2

*United States v. Soto-Zuniga*,
    837 F.3d 992 (9th Cir. 2016) ..............................................13, 14, 19, 20

*United States v. Struckman*,
    611 F.3d 560 (9th Cir. 2010) ............................................................... 17

*United States v. Sudikoff*,
    36 F. Supp. 2d 1196 (C.D.Cal.1999) ...............................................14, 20

*United States v. Walther*,
    652 F.2d 788 (9th Cir. 1981) ...........................................................11, 21, 22

*United States v. Ward*,
    No. 4:19-CR-00101-DCN, 2021 WL 738825
    (D. Idaho Feb. 25, 2021) ..................................................................... 19

*United States v. Wirth*,
    No. CRIM. 11-256 ADM/JJK, 2012 WL 1110540
    (D. Minn. Apr. 3, 2012)........................................................................ 25

*United States v. Wolfenbarger*,
    No. 16-CR-00519-LHK-1, 2018 WL 4913753
    (N.D. Cal. Oct. 10, 2018) ...............................................................20, 21

*USA v. Conner*,
    No. 15-CR-00296-HSG-1, 2015 WL 8482205
    (N.D. Cal. Dec. 10, 2015) ................................................................... 18

**Other Authorities**

Fed. R. Crim. P. 16 ...............................................................................*passim*

Fed. R. Crim. P. 16(a)(1)(E)(i) ..................................................................... 13, 19

Fed. R. of Evid. Rule 502 ............................................................................ 19

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

On September 20, 2021, Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum and Petr Pacas (collectively, "Defendants") filed two motions: a motion for reconsideration of this Court's April 30, 2019 order denying Defendants' request to disclose the identity of the Spamhaus Informant ("SI") (Dkt. 282-1), and a motion to compel discovery of additional communications between the Spamhaus Project and the Government (Dkt. 281-1) (together, the "Motions").

The Motions seek: (i) disclosure of the SI's identity in order to interview and potentially call the SI as a trial witness, to interview and cross examine other witnesses with whom he interacted, and to seek discovery of his communications with potential trial witnesses; and (ii) discovery regarding Spamhaus's and the SI's cooperation with the Government in other investigations in order to mount challenges under the Fourth, Fifth and Sixth Amendments, based on the warrantless seizure of Company A's internal documents and the invasion of the defense camp, and to request an evidentiary hearing to determine the extent of the resulting taint pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972).

Defendants submit this Supplemental Memorandum of Points and Authorities in further support of the Motions to address three questions raised by the Court at the October 4, 2021 hearing: *first*, when did the SI became a Government informant; *second*, did the Spamhaus Project function as a state actor, rendering the SI, as its employee, a state actor; and *third*, in light of those facts, is discovery of the SI's identity and material regarding Spamhaus's and the SI's cooperation with the Government discoverable under Rule 16 or *Brady*. (Oct. 4, 2021 H'rg Tr. 25:7-23.)

As explained below, the documents suggest that the SI was an FBI informant as early as 2013, and that Spamhaus and the SI functioned as state actors throughout the Government's investigation and prosecution of this case. The documents further reveal that the Government has in its possession unlawfully obtained internal

1   Company A documents that were passed from a Company A insider to the SI. The
2   documents also reveal that the SI has been monitoring defense counsel's online
3   research, and providing information about defense counsel's search terms to the
4   Government. The fact that the Government possesses these documents at all
5   "indicates the *'tip of an iceberg'* of evidence" that should be revealed under *Brady*.[1]
6   The Motions should therefore be granted.

7   **II.    BACKGROUND**

8       As an initial matter, a detailed chronology of the SI's involvement in the
9   Government's investigation and prosecution of this case, as well as the procedural
10  history of Defendants' efforts to obtain the relief sought in the Motions, is necessary
11  to fully address the Court's questions.

12      **A.    Factual Background**

13          **1.    The SI Set the Government's Investigation in Motion in 2013.**

14      The SI approached the FBI with information about allegedly "hijacked" IP
15  addresses more than eight years ago. On July 12, 2013, the FBI interviewed the SI.
16  (Declaration of Nicole Van Dyk ("Van Dyk Decl."), Ex. 1 (ADCONION-DISC02-
17  REPORTS-00980.)[2]  During that interview, the SI identified Company A as a target
18  for the FBI's investigation and suggested the FBI bring charges under the CAN-
19  SPAM Act. (*Id.* at 981.) The FBI's 302 Report referred to the SI as "S-00091118."
20  (*Id.* at 980.)  Over the following years, the SI continued to help the government build
21  its case, supplying the FBI with information about Company A and Defendants, and
22  helping to facilitate the Government's access to witnesses and evidence.

23          **2.    The SI Facilitated the Government's Communication with**
24              **CY as Early as 2014.**

25      Beginning in at least 2014—***before*** the FBI collected any "objective" evidence

---

27  [1]  *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (emphasis added).
28  [2]  Exhibits are submitted under seal as attachments to the Van Dyk Declaration.

related to this case—the SI helped the FBI recruit a "*vital*" insider from Company A (hereafter, "CY"), and acted as a liaison between CY and the Government throughout the investigation.  For example:

- On May 22, 2014, the SI emailed FBI Special Agent Chabalko ("Chabalko") about a "[Company A] informant"—believed to be CY—who has been "sending us a ton of info since September 2013," and "knows all of the people we'll be talking about." (Van Dyk Decl., Ex. 2 at ADCONION-DISC26-03284.) *Chabalko encouraged the SI to facilitate the Government's access to CY*, explaining that "[t]his would be *vital to our investigation*" and asking, "*would he be willing to meet with us?*" (*Id.* at 3283 (emphasis added).)  The SI introduced the FBI to CY *before* it had collected any "objective" evidence.  (*Id.* at 3284.)

- On June 2, 2014, the SI provided Chabalko a "list of IPs announced by Hostwinds on behalf of [Company A]," and indicated that *he received information from a Company A insider who has "intimate knowledge" of and "dislikes everyone" at Company A.* (Van Dyk Decl., Ex. 3 at ADCONION-DISC02-REPORTS-01014, 1015-1016.)  The 302 Report referred to the SI as "S-00091118."  (*Id.* at 1011.)

- On June 7, 2014, the SI emailed Chabalko, letting him know that "*[CY] is willing to talk*," and assuring him that he "[d]oes not know anything except one of *our partners* is looking into [Company A]."  (Van Dyk Decl., Ex. 4 at ADCONION-DISC26-02006 (emphasis added).)

### 3. The SI Worked Closely and Continuously with the Government From the Outset of the Investigation to Today.

The SI's involvement with the Government began prior to his introduction of CY and continued during and after he facilitated the Government's contact with CY. During that time, the SI identified each of the Defendants and key witnesses in the case, instructed the Government who to interview and subpoena, and identified the netblocks that the Government intends to present in its case-in-chief.  For example:

- On July 15, 2013, the SI sent the FBI a report about various IP addresses, including some of those that form the basis for the charges in the indictment. (Van Dyk Decl., Ex. 5 at ADCONION-DISC02-REPORTS-00984)  The FBI's contemporaneous 302 Report referred to the SI as "S-00091118."  (Van Dyk Decl., Ex. 6 at ADCONION-DISC02-REPORTS-00982.)

- On October 18, 2013, the SI emailed the FBI a spreadsheet containing a list of "hijacked IP blocks," including those the Government has placed at issue in this case.  (Van Dyk Decl., Ex. 7 at ADCONION-DISC02-REPORTS-01004)  The contemporaneous FBI Report referred to the SI as "S-00091118."  (*Id.*)

- On June 2, 2014, the SI provided the FBI with "numerous documents," including a dossier containing "profiles of individuals" purportedly "associated with spamming companies." (Van Dyk Decl., Ex. 3 at ADCONION-DISC02-REPORTS-01017)[3]

- On May 16, 2014—days before he introduced CY—the SI emailed Chabalko, writing: "The guy at [Company A] that is arranging all the hijacks is *Mark Manoogian … if you can subpoena [him] you will find a goldmine of info*." (Van Dyk Decl., Ex. 8 at ADCONION-DISC26-03281 (emphasis added).)

- On June 11, 2014, Chabalko prepared a 302 Report memorializing his June 2, 2014 interview with the SI, stating that *Spamhaus "works with law enforcement to identify and pursue spammers worldwide"* and, as such, the SI provided "a list of IPs announced by Hostwinds on behalf of [Company A]," including those in the indictment. (Van Dyk Decl., Ex. 3 at ADCONION-DISC02-REPORTS-01011, 14-15 (emphasis added).)

- On November 30, 2014, the SI sent Chabalko more information about Company A and Defendants. (Van Dyk Decl., Ex. 9 at ADCONION-DISC26-03295.) The contemporaneous 302 Report again referred to the SI as "S-00091118." (Van Dyk Decl., Ex. 10 at ADCONION-DISC02-REPORTS-01018.)

Based on information from the SI, the FBI issued its first search warrant for Mark Manoogian's Company A email account on December 23, 2014—*after it had received information from CY through the SI*. (Van Dyk Decl., Ex. 11 at ADCONION-DISC04-SW-00001)   In the warrant, Chabalko explained the case background and technical aspects of netblocks "[a]ccording to information provided by [the SI]." (*Id.* at 7.)

As the investigation progressed, and even after the Indictment was filed, the SI continued to act as a liaison between CY and the FBI, and continued to pass along information obtained through CY's warrantless seizure of Company A's internal emails, including some that were protected by the attorney-client privilege:

- On December 28, 2015, the SI received more internal Company A emails from CY. (Van Dyk Decl., Ex. 12 at ADCONION-DISC42-00028, 32.)

- On September 27, 2017, the SI emailed Chabalko, explaining that *CY provided "internal [Company A] emails"*—including emails involving

---

[3]   The dossier that the SI prepared and provided to the Government in June 2014 did not mention Defendants Bychak or Qayyum. (*See* Van Dyk Decl., Ex. 30 at ADCONION-DISC39-01752.)

Company A's in-house counsel—which, according to the SI, "implicat[e] various people of doing various things."  (Van Dyk Decl., Ex. 13 at ADCONION-DISC26-02119 (emphasis added).)[4]

- On October 12, 2017, the SI sent Chabalko "interesting emails" that he received from CY (Van Dyk Decl., Ex. 14 at ADCONION-DISC27-00001), and told Chabalko that he "*emailed [CY] and asked him to contact you*."  (Van Dyk Decl., Ex. 15 at ADCONION-DISC25-00841.)[5]

- On November 8, 2018, the SI emailed Chabalko, encouraging him to "*[r]ead the linda_libel.txt email in particular*"—one of the internal Company A emails that CY sent to the SI.  (Van Dyk Decl., Ex. 16 at ADCONION-DISC26-03542.)

- On August 25, 2021, the SI emailed Chabalko, writing: "I found the [CY] email documents, and to avoid any potential attorney/client privilege issues (even though they were sent voluntarily by [CY] and not by their attorney herself), I will only provide the headers of the emails as well as a summary of the contents to provide some context." (Van Dyk Decl., Ex. 12 at ADCONION-DISC42-00010.)

The SI also shared with the Government Spamhaus's non-public resources, as well as the SI's technical know-how, contacts, and detailed reports about Company A throughout the investigation. For example:

- On June 4, 2014, the SI provided the Government with the passwords to search Spamhaus's ROKSO database, including the "classified records," which are not available to the public.  (Van Dyk Decl., Ex. 17 at ADCONION-DISC26-03702.)

- On February 24, 2015, the SI emailed Chabalko with a list of his "contacts from within ARIN."  (Van Dyk Decl., Ex. 18 at ADCONION-DISC26-03344.)  When Chabalko asked whether he could "drop [the SI's] name," the SI replied, "of course."  (*Id.*)

- On August 11, 2017, the SI emailed Chabalko "general information about [Company A's] systems (where you might go to find evidence of

---

[4]   Notably, there is no indication that the Government advised the SI at this time, or at any time thereafter, not to share privileged information.  Further, as the Court correctly noted at the October 4, 2021 hearing, the fact that the SI asked Chabalko if he "want[ed] to see these emails" does not disprove that Spamhaus and the SI functioned as state actors at this time.  (Oct. 4, 2021 H'rg Tr. 27:20-28:19.)

[5]   The Government's argument that it did not have this information prior to October 12, 2017 is irrelevant.  (Oct. 4, 2021 H'rg Tr. 21:23-22:2.)  "The suppression prong of *Brady* may be met … even though a 'record is not conclusive as to whether the individual prosecutor [or investigator] ... actually possessed' the *Brady* material." *United States v. Price*, 566 F.3d 900, 910 (9th Cir. 2009) (brackets in original).

mailing from the hijacked ranges)," and added, "I'll be sending a LOT more information soon."  (Van Dyk Decl., Ex. 19 at ADCONION-DISC26-00046.)

Finally, the SI has been actively involved in the prosecution, counseling the Government regarding its responses to Defendants' motions and overall case strategy, and providing information regarding defense counsel and their research efforts in preparation for trial.  For example:

- On June 24, 2020, the SI emailed Chabalko regarding the Government's theory in opposing Defendants' motion to dismiss.  (*See* Van Dyk Decl., Ex. 20 at ADCONION-DISC26-02029.)

- On August 1, 2021, the SI informed the Government that "***every one of the four [defense] law firms used email filtering systems which subscribed to Spamhaus data feeds***."  (Van Dyk Decl., Ex. 21 at ADCONION-DISC39-00004 (emphasis added).)

- On August 5, 2021, the SI provided Chabalko with detailed rebuttals to the arguments set forth in Defendants' briefs, including Dkts. 70-1, 71-1, 83 and 257-1.  (Van Dyk Decl., Ex. 22 at ADCONION-DISC39-01817.)

- On September 21, 2021, the SI emailed Chabalko, listing the search dates and ***search terms used in the ROKSO database by someone "working for [Company A] and possibly their counsel***."  (Van Dyk Decl., Ex. 23 at ADCONION-DISC45-00001 (emphasis added).)

- On September 26, 2021, the SI informed the Government that the "defense attorney[s] [are] … relying on Spamhaus for information on his guilty spamming client," and ***provided the Government with the search terms, timestamp, IP address and physical location of the attorneys conducting the search***. (Van Dyk Decl., Ex. 24 at ADCONION-DISC46-00001.)

- On September 28, 2021, the SI emailed Chabalko to inform him of the "Backpage mistrial," indicating that "the defense attorneys will have plenty of time to prepare for this trial."  (Van Dyk Decl., Ex. 25 at ADCONION-DISC47-00001.)

**B.**   **Procedural Background.**

Since the Indictment was filed on October 31, 2018 (Dkt. 1), the parties have briefed multiple discovery motions. As the Government made its piecemeal productions over the last three years, the basis for these motions has shifted as new discovery has revealed additional facts.

On March 15, 2019, Defendants moved to compel discovery relating to the SI.

This motion was based solely on documents in the Government's first four productions. Based on these early productions, Defendants began to suspect that "***the [SI] has essentially acted as an investigative agent for the FBI since 2013***." (Dkt. 71-1 at p. 16 (emphasis added))

On July 30, 2021, following 32 more Government productions, Defendants filed another motion to compel. The motion was based on newly produced documents revealing that the SI served as a liaison between CY and the FBI, and sent internal Company A documents that were obtained via a warrantless search to the FBI. (Dkt. 257-1) This time, Defendants sought identification of all documents in the Government's possession that came from CY in order to determine whether the Government had obtained those documents in violation of the Fourth Amendment. The Court granted Defendants' request. (Dkt. 275.)

On September 20, 2021, based on the Government's response, Defendants moved to compel discovery relating to Spamhaus's history of cooperating with governmental investigations in order to establish that Spamhaus is a state actor. (Dkt. 281-1.) While this motion was pending, the Government produced a new document revealing that the SI had intentionally invaded the defense camp in an attempt to help the Government respond to Defendants' motions. (*See* Van Dyk Decl., Ex. 24 at ADCONION-DISC46-00001.) As a result, Defendants requested leave to file a reply addressing the newly produced documents, raising concerns about not only the potential Fourth Amendment violations, but also potential Fifth and Sixth Amendment violations. (Dkt. 288.)

Also on September 20, 2021, Defendants filed a motion for reconsideration of the Court's April 30, 2019 order denying disclosure of the SI's identity on the basis of "newly discovered evidence." (Dkt. 282-1.) The newly discovered evidence revealed close and continuous cooperation between the SI and the Government starting in May 2014 and continuing to the present, as well as the SI's name, which the Government inadvertently produced. (*Id.* at 3-4.) This information was included

in the Government's 26th through 47th productions, starting on February 12, 2021, nearly two years after the Court first considered Defendants' request.  (*Id.*)[6]

Against this backdrop, Defendants seek (i) formal disclosure of the SI's identity in order to attempt to interview and potentially call the SI as a trial witness, to interview and cross-examine other witnesses with whom he interacted, and to seek discovery of his communications with potential trial witnesses; and (ii) discovery relating to the SI and Spamhaus's relationship with the Government in order to mount constitutional challenges under the Fourth, Fifth and Sixth Amendments based on the warrantless seizure of Company A's internal documents and invasion of the defense camp, and to request a *Kastigar* hearing to determine the extent of the resulting taint.[7]

## III. REGARDLESS OF HIS FORMAL DESIGNATION, THE SI HAS FUNCTIONED AS AN INFORMANT SINCE 2013 AND INFORMATION REGARDING HIS INVOLVEMENT WITH THE GOVERNMENT MUST BE DISCLOSED.

The Motions seek, among other things, information showing the extent of the relationship between the SI and the Government, including the Government's informant file for the SI, and any documents or communications involving the Government and/or Spamhaus that show when the SI began informing the Government about this or other cases.  The Government sought to avoid those disclosures with the eleventh-hour revelation that, despite the SI's close and

---

[6]   Contrary to the Government's assertion, the Motions rest on far more than just two emails.  (*See* Dkt. 283 at 2)  The Government has produced roughly one thousand emails involving the SI and the Government between 2013 and the present, the bulk of which were produced *after* the original motions regarding the SI had been filed. Defendants focus on certain documents to illustrate the extent of the SI's involvement.

[7]   Defendants initially requested "information and documents reflecting all instances in which Spamhaus has assisted federal agencies in other matters." (Dkt. 281-1 at 2) Consistent with the Court's instructions at the October 4, 2021 hearing, the requests herein are limited to information required to establish the constitutional claims.

continuous involvement in the case since its inception eight years ago, and despite the "CHS" number that had appeared on reports related to the SI from the inception of his cooperation, the SI was "not officially a [confidential informant] for the FBI until 10/12/18." (Van Dyk Decl., Ex. 26 at ADCONION-DISC40-00001.) But the factual and procedural history of this issue demonstrates that the Government's disclosure—made for the first time in a 302 Report generated on August 11, 2021—is irrelevant at best, and pretextual at worst. The timing of the SI's formal designation should not foreclose discovery relating to the SI's relationship with the Government.

Even if taken at face value, the Government's failure to formally designate the SI as a confidential information until October 2018—nearly five years after the SI approached the Government, but less than one month before the indictment was filed—creates a grossly inaccurate impression as to the scope of the SI's activities during the Government's investigation. Thus, the question of whether Defendants are entitled to discovery regarding the SI should focus "less on whether [the SI] fit[s] within a particular definition of the word 'informant' and more on the value to the defense of information regarding various aspects of [the SI's] close relationship with [the Government]." *In re Pratt*, 69 Cal. App. 4th 1294, 1316, 82 n.18 (1999). *See, e.g.*, *Limone v. United States*, 497 F. Supp. 2d 143, 166 n.44 & 198 (D. Mass. 2007), *aff'd on other grounds*, 579 F.3d 79 (1st Cir. 2009) (explaining that the "[informant's] relationship with his FBI handlers in fact continued until 1990" because, although the informant had been "officially closed," and later "officially reopened," "as far as [the informant] knew, he remained open the entire time—as he was in constant contact with the FBI"); *Pratt*, 69 Cal. 4th at 1311 (finding a due process violation where the government suppressed evidence of informant's "relationship with law enforcement," explaining that "[the government's] testimony that Butler had only acted as a 'police informant' for him for 'about a week before August 10, 1969' . . . *left a grossly inaccurate impression . . . as to the scope of Butler's activities*") (emphasis added).)

1    The documents show that the SI's involvement in the investigation was
2  substantial, regardless of when the FBI "officially" assigned the SI an informant
3  number.  The SI began collaborating with the FBI to investigate Company A and
4  Defendants as early as July 2013.  (*See supra* at 2.)  At the case agent's urging, the SI
5  then helped the FBI recruit a "***vital***" insider from Company A in 2014, acted as a
6  liaison between the insider and the FBI throughout the entire investigation, and
7  identified each of the Defendants, key witnesses and netblocks at issue in the case and
8  even directed the Government how to charge this case.  (*Id*. at 2-5.)  The SI also shared
9  Spamhaus's non-public resources, and provided technical know-how, contacts, and
10  detailed reports about Company A and Defendants throughout the investigation.  (*See*
11  *id*. at 5-6.)

12    The procedural history in this case further undermines the Government's new
13  narrative.  Defendants first argued that "***the [SI] has essentially acted as an***
14  ***investigative agent for the FBI since 2013***" on March 15, 2019.  (Dkt. 71-1 at p. 16
15  (emphasis added).)  Yet, the Government waited until August 2021—*more than two*
16  *years later*—to correct the apparently "misleading impression" that the SI has served
17  as an informant for the FBI since 2013.  (Dkt. 283-1 ¶ 8.)

18    Accordingly, regardless of when the SI was formally assigned a "CHS"
19  number, the defense is entitled to discovery showing the extent of the relationship
20  between the SI and the Government given the fact that the SI worked hand-in-glove
21  with the Government for five years developing this case.  *See, e.g.*, *Quezada v.*
22  *Scribner*, No. CV047532RSWLMLG, 2013 WL 12340383, at *7 (C.D. Cal. Feb. 20,
23  2013), *report and recommendation adopted*, No. CV047532RSWLMLG, 2013 WL
24  12340382 (C.D. Cal. Apr. 5, 2013) (finding that "[i]nformation demonstrating the
25  extent of the relationship between [an informant] and the [Government] … should
26  have been disclosed"); *United States v. Blackwell*, No. 3:07-CR-00044-TMB, 2007
27  WL 9698053, at *2 (D. Alaska June 22, 2007) (ordering pretrial discovery of "any
28  agreement outlining the type of cooperation expected or setting forth the rules which

the informant is expected to follow while working for law enforcement" and "any agent's informant file addressing use of the informant in the instant case").

## IV. EVIDENCE SUGGESTS THAT SPAMHAUS AND ITS AGENTS ARE STATE ACTORS.

A private organization is an "instrument of the state" if the government's involvement is "either directly as a participant or indirectly as an encourager of the private [organization's] actions."  *United States v. Walther*, 652 F.2d 788, 791 (9th Cir. 1981).  Both publicly available information and documents produced in discovery suggest that such a relationship exists between Spamhaus and the Government.

*First*, proclamations of collaboration—both by Spamhaus and the FBI—are indicative of the state actor relationship.  For example, Spamhaus touts itself as a member of the "Law Enforcement task force" that "works closely" with law enforcement agencies such as the FBI to "assist[] investigations into spam senders, phishing, botnets and malware operations, and compil[e] . . . evidence on spam gangs and spam operations."[8]  Further, in 2006, the FBI's then Assistant Deputy of the Cyber Division testified before Congress that the FBI planned "to combat the growing threat of cyber-crime" alongside the "Spamhaus Project" and other organizations.[9]

*Second*, Spamhaus has historically undertaken significant investigative duties and key roles in FBI investigations.  For example, in 2008, Spamhaus "made a listing for [an undercover FBI agent] as being a top spammer" in order to bolster the FBI agent's credibility in a sting operation that led to the arrest of individuals associated with the "DarkMarket."[10]  In 2011, in connection with the arrest of individuals

---

[8]  Spamhaus, About Spamhaus, https://www.spamhaus.org/organization/ (last visited October 12, 2021).

[9]  *See* FBI, Testimony to House Committee on Small Business Regulatory Reform and Oversight Subcommittee, https://archives.fbi.gov/archives/news/testimony /small-business-cyber-security.

[10]  *See* Elinor Mills, Q&A: FBI agent looks back on time posing as a cybercriminal, CNET Tech (June 29, 2009), https://www.cnet.com/tech/services-and-software/q-a-

allegedly associated with a "cyber ring," the FBI credited Spamhaus as one of its "private sector partners."[11]  And, in 2015, Spamhaus again "partner[ed]" with the FBI to bring various charges, including wire fraud, against a defendant.[12]  Consistent with this pattern, the FBI in this case has acknowledged that Spamhaus "***works with law enforcement to identify and pursue spammers worldwide***" (Van Dyk Decl., Ex. 3 at ADCONION-DISC02-REPORTS-01011 (emphasis added)), and the SI himself has represented to other Government witnesses that Spamhaus partnered with the FBI in connection with its investigation in this case.  (*See id.*, Ex. 4 at ADCONION-DISC26-02006 (SI told CY "one of ***[Spamhaus's] partners*** is looking into [Company A]") (emphasis added)).

*Third*, throughout the course of this investigation and prosecution, Spamhaus shared its resources (*see, e.g.*, Van Dyk Decl., Ex. 17 at ADCONION-DISC26-03702; *id.* Ex. 18 at ADCONION-DISC26-03344) and provided technical assistance, research and training to the Government in order to build its case against Defendants (*see, e.g.*, *id.*, Ex. 19 at ADCONION-DISC26-00046).  *See United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016) (deeming NCMEC a state actor, explaining that, among other things, it "provide[s] forensic technical assistance . . . to law enforcement" and "provide[s] training . . . to law enforcement agencies").  These actions have made Spamhaus and its employees an "arm of the prosecution."  *Horn v. City of New Haven*, No. 3:18-CV-1502 (JAM), 2019 WL 3006540, at *3 (D. Conn. July 9, 2019), *aff'd sub nom. Horn v. Stephenson*, 11 F.4th 163 (2d Cir. 2021) (concluding that a witness working "on behalf of law enforcement and as an arm of

---

fbi-agent-looks-back-on-time-posing-as-a-cybercriminal/.

[11]  *See* FBI, Operation Ghost Click, November 9, 2011, https://www.fbi.gov/news/stories/international-cyber-ring-that-infected-millions-of-computers-dismantled.

[12]  Department of Justice, Bugat Botnet Administrator Arrested and Malware Disabled (October 13, 2015), https://www.justice.gov/opa/pr/bugat-botnet-administrator-arrested-and-malware-disabled (specifically identifying Spamhaus as a partner in the FBI's investigation).

the prosecution team" was subject to *Brady* requirements); *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (acknowledging that "[an] … informant could be found to be a member of the prosecution team," explaining that "[t]he relevant inquiry is what the person *did*, not who the person *is*") (emphasis in original).[13]

In sum, a factual basis exists to infer that there is a significant and longstanding relationship between Spamhaus and the Government.  Discovery regarding this relationship is material under Rule 16 and directly relevant to the question of whether Spamhaus and its employees acted on the Government's behalf during the FBI's investigation, including in connection with the warrantless seizure of Company A's internal documents, and the intrusions into the defense camp.  Defendants therefore seek documents and communications reflecting Spamhaus's collaboration with the Government, including information concerning any shared resources, and the extent to which the Government provides funding to Spamhaus and has knowledge of Spamhaus's activities.

## V.    THE SI'S IDENTITY AND EVIDENCE REGARDING SPAMHAUS IS DICOVERABLE UNDER RULE 16 AND *BRADY*.

### A.    Legal Standard

Rule 16(a) of the Federal Rules of Criminal Procedure requires the Government to make available, upon a defendant's request, documents and other information that is "material to preparing the defense" and "within the government's possession, custody, or control."  Fed. R. Crim. P. 16(a)(1)(E)(i).  To obtain discovery under Rule 16, Defendants need only make a threshold showing of materiality.  *United States v. Soto-Zuniga*, 837 F.3d 992, 1003 (9th Cir. 2016). "Materiality is a '*low threshold*' that is 'satisfied so long as the information . . . would . . . help[]' to prepare a defense."

---

[13]  Unlike the witness in *Barcelo*, the SI has not only provided information to the Government, but has also played an extensive role in the investigation and in determining investigation or trial strategy.  *Cf. Barcelo*, 628 F. App'x at 39.

1  *Id.* (quoting *United States v. Hernandez–Meza*, 720 F.3d 760, 768 (9th Cir. 2013)
2  (emphasis added))  "Rule 16 is thus broader than *Brady*."  *United States v. Muniz-*
3  *Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013).

4        Under *Brady* and its progeny, "suppression by the prosecution of evidence
5  favorable to an accused upon request violates due process where the evidence is
6  material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963)
7  (emphasis added); *see also Giglio v. United States*, 405 U.S. 150, 153 (1972) (same);
8  United States Attorneys' Manual ("USAM") § 9-5.001(B) ("Government disclosure
9  of material exculpatory and impeachment evidence is part of the constitutional
10 guarantee to a fair trial.").  "*[I]f doubt exists, it should be resolved in favor of the*
11 *defendant and full disclosure made*."  *Price*, 566 F.3d at 913 n.14 (citing *United*
12 *States v. Sudikoff*, 36 F. Supp. 2d 1196, 1197-98 (C.D.Cal.1999) (emphasis added)).
13 Thus, the Government's "speculative prediction about the likely materiality of
14 favorable evidence . . . should not limit the disclosure of such evidence" in the pretrial
15 context.  *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013) ("[I]t is just
16 too difficult to analyze before trial whether particular evidence ultimately will prove
17 to be 'material' after trial"); *Sudikoff*, 36 F.Supp.2d at 1197-98 (explaining that the
18 standard of whether evidence would change the outcome "obviously cannot be
19 applied by a trial court facing a pretrial discovery request.").

20       The Ninth Circuit has recognized that "facts demonstrating a skewed or biased
21 investigation may constitute *Brady* material that a Defendant is entitled to obtain and
22 a jury permitted to consider."  *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1203
23 (C.D. Cal. 2011); *see also Kyles v. Whitley*, 514 U.S. 419, 442 n. 13 (1995) (discussing
24 the utility of attacking government investigations as "shoddy"); *United States v.*
25 *Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) ("Details of the investigatory process
26 potentially affected [the case agent's] credibility and, perhaps more importantly, the
27 weight to be given to evidence produced by his investigation.").  Moreover, such
28 evidence is relevant to a court's "exercise [of] its supervisory power 'to implement a

remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct.'" *Aguilar*, 831 F. Supp. 2d at 1206 (citing *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)); *see also Aguilar*, 831 F. Supp. 2d at 1182 (dismissing indictment, finding that the government "improperly reviewed e-mail communications between one Defendant and her lawyer, [and] recklessly failed to comply with its discovery obligations").

## B. The SI's Identity Should be Disclosed Because it is Material to the Defense.

### 1. The SI's Identity is Material Under Rule 16 and *Brady*.

The SI's identity should be disclosed under Rule 16 and *Brady* because it is both material to the preparation of the defense and is likely to lead to the discovery of exculpatory evidence for at least two reasons.

***The SI has enabled, strongly influenced, and directed the investigation, preparation and prosecution of this case.*** As set forth above, there is ample evidence showing that the SI has substantially influenced the Government's investigation and prosecution of this case since its inception in 2013 by, *inter alia*, identifying witnesses, evidence, and avenues for investigation; facilitating communication between witnesses and the Government; and supplying Spamhaus's private resources to develop the Government's technical understanding of the issues in this case. (*Supra* at 1-5.) There is also ample evidence that the SI's investigative efforts have, at times, been conducted through improper means, including passing stolen Company A documents to the Government, summarizing the contents of attorney-client privileged communications and providing that information to the lead case agent, and surveilling defense counsel's research on Spamhaus's website and providing details regarding the timing and content of that research to the Government. (*Id.* at 4-6.) And, there is further ample evidence that the SI was motivated by deep animus towards Company A and Defendants, and communicated that animus to the

Government.   (*See, e.g.* Van Dyk Decl., Ex. 22 at ADCONION-DISC39-01826 (claiming that Company A "brib[ed] . . . a Spamhaus team member" and stole "documents and trade secrets . . . from Spamhaus"); *see also id.* at ADCONION-DISC39-01819 (claiming that "[Defendant Qayyum] even personally lied to Spamhaus in May/June 2012")).

Defendants are entitled to challenge the strength of the Government's investigation at trial, including whether it was developed through shoddy methods, influenced by investigative bias, or driven by the vendettas of a key informant.  To fully develop that defense, Defendants need to know the SI's identity to interview him or other witnesses about his bias and involvement with the Government, question those witnesses about those facts at trial (either by cross-examination or calling them as defense witnesses), and to subpoena records related to the SI from Spamhaus or other witnesses that would reflect such information.

***The SI's role in shaping the testimony of trial witnesses is directly relevant to their credibility.***  In addition to the SI's general role in shaping the Government's investigation, the evidence produced thus far in discovery reflects that the SI was particularly involved in gathering information from individuals who are potential trial witnesses.  Among other things, the manner in which the SI may have shaped the knowledge, opinions, and testimony of these individuals is relevant to the credibility of those witnesses—regardless of whether the SI testifies himself.

As one example, the SI introduced CY to the FBI in 2014 and acted as a liaison between CY and the FBI throughout the entire investigation.  (*Supra* at 2-5.)  What did the SI say to CY to induce his cooperation?  What information did the SI give to CY to supplement his "knowledge" of the facts?  Did the SI offer any inducements to CY to influence his testimony?[14]  All of these questions are relevant to the credibility

---

[14]  The discovery reveals that the SI used these tactics with other potential witnesses by inducing them to provide information about Company A and Defendants as a condition to removing them from Spamhaus's ROKSO database.  (*See, e.g.*, Van Dyk

of CY's testimony at trial.  But the defense is severely hampered in its ability to investigate them without using the SI's identity.  Defense counsel cannot adequately interview or question CY about his communications with the SI if they do not know the SI's name.  Nor can they subpoena communications between the SI and CY that may not have been provided to the Government.[15]

### 2.     The Qualified Informant Privilege Must Yield to Defendants' Due Process Right.

"Where the disclosure of an informer's identity, or of the contents of his communication, is ***relevant and helpful*** to the defense of an accused, or is essential to a fair determination of a cause, the [government's] privilege [to withhold the informer's identity] must give way."  *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957) (emphasis added).  "[D]ue process concerns undergird the *Roviaro* requirement."  *United States v. Struckman*, 611 F.3d 560, 577, 580 (9th Cir. 2010) (Berzon, J., concurring).  As such, there is "***no fixed rule***."  *Roviaro*, 353 U.S. at 62 (emphasis added).  Rather, the analysis "calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense."  *Id.*  Further, *Roviaro* does not require a showing of materiality; it simply requires a "***minimal threshold showing***" that the informant's identity could be relevant.  *Struckman*, 611 F.3d at 580 (emphasis added).  The Ninth Circuit balances three factors to assess whether identifying information should be disclosed: "(1) the degree of the informant's involvement in the criminal activity; (2) the relationship between the defendant's asserted defense and the likely testimony of the informant; and (3) the Government's interest in non-disclosure."  *United States v. Gonzalo Beltran*, 915 F.2d 487, 488-89 (9th Cir. 1990).  On balance, and in light of the newly

_____

Decl. Ex. 27 at ADCONION-DISC39-00838.)

[15]  As explained in Defendants' initial Motion to Compel, the SI also communicated with at least one other witness, the owner of Hostwinds, which is the hosting company alleged to be the victim of the wire fraud counts.  (*See* Dkt. 71-1 at 12-13)

produced documents, these factors favor disclosure.

*First*, an informant's participation in the alleged crime is not a precondition to disclosure. *See Roviaro*, 353 U.S. at 62 (explaining that there is no "fixed rule"); *United States v. Bell*, 506 F.2d 207, 219 (D.C. Cir. 1974) ("We do not suggest that the informant's participation in those events is a precondition to disclosure") (citing *Roviaro*, 353 U.S. at 62)).

*Second,* given the SI's extensive collaboration with the Government and involvement with potential trial witnesses, information regarding the SI is critical to the defense's ability to challenge the Government's investigation and impeach likely trial witnesses. Those considerations are especially critical in a case such as this, where the evidence against Defendants is highly circumstantial. The Government's case will rise and fall on the credibility of witnesses who can testify as to Defendants' alleged knowledge and intent to defraud. *See United States v. Blackwell*, No. 3:07-CR-00044-TMB, 2007 WL 9698053, at *2 (D. Alaska June 22, 2007) (ordering disclosure "in order to test the informant's credibility and to investigate the informant's allegations"). Further, the fact that the Government does not intend to call the SI at trial is irrelevant because *Defendants* could conceivably call the SI at trial or rely on the SI to impeach the credibility of other trial witnesses. *See USA v. Conner*, No. 15-CR-00296-HSG-1, 2015 WL 8482205, at *5 (N.D. Cal. Dec. 10, 2015) (finding that "[t]he government's representation that it does not intend to call the Informant at trial is … unavailing" because "Defendant conceivably could want to call the Informant at trial himself"). Thus, the relationship between the defense and the SI's likely testimony weighs in favor of disclosure.

*Third*, the Government has identified no specific threat looming over the SI. *See United States v. Nachamie*, 91 F. Supp. 2d 565, 573 (S.D.N.Y. 2000) (ordering disclosure of informant's identity where the case involves charges of "fraud—not narcotics trafficking or murder"). This is particularly important given that Defendants

*already know* the SI's identity.[16]  *See United States v. Ward*, No. 4:19-CR-00101-DCN, 2021 WL 738825, at *3 (D. Idaho Feb. 25, 2021) (ordering disclosure, explaining that the "fact that the CI's identity is ***already known*** … weigh[s] in favor of granting [defendant's] request for additional information") (emphasis added); *United States v. Pesaturo*, 519 F. Supp. 2d 177, 186 (D. Mass. 2007) (ordering disclosure, explaining that "[t]he safety concerns posed by disclosure . . . [are] more speculative than real" because "Defendant ***already knows*** the informant's identity" and, "[i]f the 'Defendant were truly intent on creating a danger to [the informant], he would have been able to do so'") (emphasis added).  Further, because Defendants seek only to question other witnesses—all of whom ***already know*** that the SI is an informant because the SI recruited them[17]—the Government's concern for others who "might have cause to resent" the SI (Dkt. 283 at 17) are unfounded, and limited disclosure will not impact other FBI investigations.  Defendants' need to adequately prepare for trial outweighs the Government's interest in nondisclosure.

## C.    Discovery Relating to Spamhaus and the SI is Material Because it is Necessary to Defendants' Constitutional Challenges.

Defendants also seek discovery in order to mount constitutional challenges under the Fourth, Fifth and Sixth Amendments, based on the warrantless seizure of Company A's internal documents and the invasion of the defense camp.  "Rule 16(a)(1)(E) permits discovery to determine whether evidence in a particular case was obtained in violation of the Constitution and is thus inadmissible." *Soto-Zuniga*, 837 F.3d at 1001, 1005 (ordering discovery of "checkpoint statistics" and "an evidentiary hearing on the checkpoint's constitutionality").  As explained below, the requested discovery goes towards establishing the threshold requirements for Defendants'

---

[16]  Federal Rule of Evidence 502 prohibits Defendants from using the SI's identity because Defendants learned it through the Government's inadvertent disclosure.

[17]  Indeed, the SI even gave the Government permission to "drop [his] name" during the investigation.  (Van Dyk Decl., Ex. 18 at ADCONION-DISC26-03344.)

1   anticipated constitutional challenges.  As such, Defendants' requests easily clear the
2   "*low threshold*" for materiality under Rule 16.  *Id.* at 1003 (emphasis added).[18]

3       Likewise, under *Brady*, the pretrial discovery sought in the Motions "might
4   reasonably be considered favorable to [Defendants'] case." *Sudikoff*, 36 F. Supp. 2d
5   at 1201.   Evidence is "favorable" to Defendants' case if it "relates to guilt or
6   punishment" and "tends to help the defense by either bolstering the defense's case or
7   impeaching prosecution witnesses." *Id.* at 1199.  Here, the requested discovery could
8   lead to a suppression motion and *Kastigar* hearing.  Because "suppression hearings
9   are often as important as the trial itself," the Ninth Circuit recognizes "[t]he unique
10  importance of suppression motions to the ***determination of guilt***."  *United States v.*
11  *Prieto-Villa*, 910 F.2d 601, 610 (9th Cir. 1990)  (emphasis added)).   Thus, the
12  discovery sought "relates to guilt" and, if it results in suppression of the ill-gotten
13  evidence, "tends to help the defense."  Defendants' pretrial discovery requests are
14  therefore also material under *Brady*.[19]

15      Here, to mount constitutional challenges, Defendants must establish that the
16  Government had knowledge of and acquiesced in the SI's activities.  *United States v.*
17  *Wolfenbarger*, No. 16-CR-00519-LHK-1, 2018 WL 4913753, at *4 (N.D. Cal. Oct.
18  10, 2018) (explaining that "Defendant will have to show that the FBI had knowledge
19  of and encouraged Xoom, Yahoo, or NCMEC's pattern of search activity . . . and had
20  acquiesced in such activity in order to deem such entities agents of the state. Thus,

---

22  [18]  The Government's reliance on *United States v. Armstrong*, 517 U.S. 462, 456
23  (1996) to distinguish between "sword" claims and "shield" claims is misplaced. (Dkt.
    283 at 9.)  As the Government acknowledges, the Ninth Circuit has limited the holding
24  in *Armstrong* to selective prosecution cases.  (*Id.* at 10 (citing *Soto-Zuniga*, 837 F.3d
    at 1000-1001)).  In any event, Defendants intend to use the discovery for the purpose
25  of both challenging the Government's conduct *and* case-in-chief.

26  [19]  Although the documents produced by the Government provide sufficient "facts
27  which would tend to show that the Government is in possession of information helpful
    to the defense," Defendants still require further discovery to bolster their factual
28  showing on these threshold requirements.  *Muniz-Jaquez*, 718 F.3d at 1183.

discovery of the activities and communications of these entities with the FBI is warranted."). As set forth below, Defendants have already identified evidence suggesting that the Government was aware of and acquiesced in constitutional violations by the SI. The Court should order the production of materials showing the extent of Spamhaus and the SI's relationship with the Government in other investigations,[20] and any constitutional violations by the SI or Spamhaus in other investigations because such evidence is material to the Government's knowledge of, and acquiescence to similar violations in this case.[21] *See Walther*, 652 F.2d at 793 (explaining that, while "[t]he [government] had no prior knowledge that this particular search would be conducted and had not directly encouraged [the informant] to search this overnight case," "***[the informant's] prior experience with the [government] provides proof of the government's acquiescence in the search***") (emphasis added); *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994) (finding Fourth Amendment violation where "[the government] ***definitely 'knew of and acquiesced' in [informant's] search***") (emphasis added).

### 1. Discovery is Relevant to Motions Regarding the Warrantless Seizure of Company A's Documents.

The FBI learned on May 22, 2014 that the SI had obtained internal Company

---

[20] For example, descriptions of the SI in affidavits, or intra-governmental communications in which agents from one investigation are introducing the SI to agents in another investigation typically would summarize the length and scope of SI's efforts on behalf of the Government.

[21] Unlike the "speculative fishing expedition" that the Court rejected in *Wolfenbarger*, the requests here are narrowly tailored and directly related to Defendants' anticipated constitutional challenges. *Cf.* 2018 WL 4913753, at *5 (seeking "any document(s) showing the case number or investigation number, for all investigations and prosecutions in the United States resulting from the … investigation involving Xoom, Yahoo, the FBI … or another federal or state law enforcement agency" and "all reports and documents generated between 2013 and 2018 by the FBI … and/or any other agency").

A documents involving Defendants from CY.  (Van Dyk Decl., Ex. 2 at ADCONION-DISC26-03284.)  At that point, the Government was placed on notice that information provided by the SI might be tainted by information from the illegally obtained documents[22], resulting in a potential Fourth Amendment violation if the SI (then acting on behalf of the Government), continued to convey information it received from CY to the Government.  Yet, the SI continued to liaise between the CY and the Government, and received additional documents from CY on December 28, 2015, which the SI ultimately passed onto the Government.  (*Id.*, Ex. 12 at ADCONION-DISC42-00010, 28, 32)[23]  This evidence alone is sufficient to establish a basis to believe that the Government acquiesced in the SI's unlawful conduct and easily meets the materiality threshold to seek additional discovery of this information.

Troublingly, the emails between the SI and the Government further show that the Government made no attempt to discourage the collection of Company A's internal documents.  In fact, even after the SI asked the case agent whether he "want[ed] to see these [attorney/client privilege] emails," the SI shared them with the Government.  (Van Dyk Decl., Ex. 13 at ADCONION-DISC26-02119)  *See Reed*, 15 F.3d at 931 (finding Fourth Amendment violation where "[the government] definitely 'knew of and acquiesced' in [informant's] search … and ***made no attempt to discourage him***") (emphasis added); *Walther*, 652 F.2d at 793 (affirming suppression of evidence obtained in violation of the Fourth Amendment, explaining that "[w]hile the [government] had no prior knowledge that this particular search would be

---

[22]  Despite this knowledge, Chabalko relied on information he learned from the SI in his affidavit for a search warrant issued in December 2014.  (*Id.*, Ex. 11 at ADCONION-DISC04-SW-00007.)

[23]  The fact that the SI received these documents from CY on December 28, 2015—two years after CY apparently left Company A—does not mean that they were not a product of the illegal search.  Defendants believe that CY was "stealing documents and then giving them to the [SI], not at that moment in time but … trickling it out over the course of time, over subsequent years."  (Oct. 4, 2021 H'rg Tr. 36:11-15.)

conducted," the informant had conducted such a search in the past and did so "***with no discouragement from the [government]***") (emphasis added).

Further, Fourth Amendment problems exist regardless of whether the Government intends to use the Company A documents at trial. *United States v. Mazzarella*, 784 F.3d 532, 541 (9th Cir. 2015) (rejecting "the government's declaration that none of the exhibits introduced at trial were from documents obtained by [the warrantless search]" and remanding for evidentiary hearing regarding warrantless seizure of company documents by an informant). This is clearly so because "[t]he exclusionary rule bars the introduction of 'derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint.'" *Id.* Similarly, the Government's claim that the prosecuting attorney did not receive the Company A documents obtained by the warrantless search likewise does not resolve the issue. (*See* Dkt. 283-1 ¶ 6) *See Mazzarella*, 784 F.3d at 540 (explaining that, "[w]hile one FBI agent testified that he did not recall receiving any copied documents from [the informant], further discovery is necessary").[24]

Moreover, the Government's suggestion that the inevitable discovery rule forecloses Defendants' potential Fourth Amendment challenge is without merit. (*See* Dkt. 283 at 6) The inevitable discovery rule only applies in circumstances where the government can establish that the legal process for obtaining the ill-gotten documents would have been "the next and only step available" in the investigation. *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000). Because it cannot, the Government

---

[24] For the same reason, the Court should give no weight to the SI's unverified assertions in a September 21, 2021 email that "Spamhaus never encouraged [CY] to send any internal documents" and "[t]he government did not know about the 'intrusive conduct' in the form of 'purloined' emails until they received them (YEARS after this case had already been built by search warrant information)." (Van Dyk Decl., Ex. 23 at ADCONION-DISC45-00003; *see also* Dkt. 283-1 ¶ 12.)

1    makes no attempt to argue that it could meet this standard.

2          **2.    Discovery is Relevant to Motions Regarding the SI's Invasion**

3                  **of the Defense Camp.**

4          Similarly, the Government became aware on September 27, 2017 that the SI

5    had obtained privileged documents. (*Supra* at 4-5.)  At that point, the Government

6    knew that the SI (acting on the Government's behalf) might obtain and convey more

7    privileged information in the future, potentially in violation of Defendants' Fifth and

8    Sixth Amendment rights.  *See United States v. Danielson*, 325 F.3d 1054, 1068 (9th

9    Cir. 2003), *as amended* (May 19, 2003) (explaining "once the [government] learned

10   … that [informant] had obtained trial strategy information (and therefore knew that

11   he might learn more such information in future conversations), the prosecution team

12   was on notice of a potential Sixth Amendment violation if [the informant], now acting

13   on behalf of the government, continued to [provide information]").

14         Yet the SI continued to highlight privileged and work product information for

15   the Government, apparently without rebuke or warning for years.  On November 8,

16   2018, the SI encouraged Chabalko to read a privileged email titled "linda_libel.txt."

17   (*Supra* at 5.)  And most recently, the SI used Spamhaus data to share information

18   about the searches that multiple defense attorneys conducted on the Spamhaus

19   website, including the dates and times defense counsel searched the website, their

20   search terms, IP addresses, and the physical location from which defense counsel

21   conducted the searches—in other words, the metadata pertaining to defense counsels'

22   pretrial research.  (*Id*. at 6.)  Such conduct is not only unethical and inappropriate, but

23   is an intrusion into the defense camp that revealed counsel's research and preparations

24   for trial.[25]  *See United States v. Nobles*, 422 U.S. 225, 238 (1975) (explaining that the

25   ───────────────────

26   [25] The Government knew about the SI's propensity to provide such invasive search
     information prior to receiving defense counsel's pretrial research. The SI sent

27   Chabalko similar search information relating to another potential Government witness
     earlier in the investigation.  (*See* Van Dyk Decl., Ex. 28 at ADCONION-DISC26-

28   03813 (Sept. 15, 2017 email explaining that the searches "***give[] you an idea of what***

work product doctrine "assur[es] the proper functioning of the criminal justice system is even more vital" than its role as a bar to discovery in civil litigation.) *United States v. Wirth*, No. CRIM. 11-256 ADM/JJK, 2012 WL 1110540, at *4 (D. Minn. Apr. 3, 2012) (concluding that document metadata, "almost by definition, shows the [attorneys'] mental processes … by revealing the [attorneys'] … decisions and steps" and, therefore, constitutes "'opinion work product' entitled to stronger protection than other types of work product"); *United States v. Segal*, No. 02-CR-112, 2004 WL 830428, at *8 (N.D. Ill. Apr. 16, 2004) (concluding that "[t]he search terms used … provide a window into the attorney's thinking" and "indicate that [the attorney] was researching the claims at the heart of the present litigation"). There is nothing in the record to suggest that the Government ever instructed the SI to stop providing privileged information or obtaining Defendants' work product.

This evidence already suggests that the Government has acquiesced in the SI's constitutional violations. But, at a minimum, it is smoke that supports taking discovery for further evidence of fire. Because that evidence can include materials showing the totality of the Government's involvement with a cooperator and the Government's knowledge of other similar constitutional violations, the Court should order the production of records showing the extent of Spamhaus and the SI's relationship with the Government, and any records related to violations by the SI or Spamhaus in other investigations.

## VI. CONCLUSION

Defendants' discovery requests satisfy the materiality threshold under Rule 16 and *Brady*. As such, "the district court should not merely defer to government assertions that discovery would be fruitless." *United States v. Budziak*, 697 F.3d 1105, 1112–1113 (9th Cir. 2012). Accordingly, the Motions should be granted.

---

***they were up to***" and noting that, "[i]f possible we'd like to keep this kind of thing a secret." (emphasis added)); *id.*, Ex. 29 at ADCONION-DISC26-02780 (Jul. 10, 2018 email noting that the search terms indicate what the searcher "seems worried about").

1

2

                 Respectfully submitted,

3   Dated:  October 18, 2021      **BIRD, MARELLA, BOXER, WOLPERT,**

4                          **NESSIM, DROOKS, LINCENBERT &**
                          **RHOW, P.C.**

5                      By:   *s/ Nicole Rodriguez Van Dyk*

6                           Nicole Rodriguez Van Dyk
                           Gary S. Lincenberg

7                           Darren L. Patrick
                           Alexis A. Wiseley

8                           *Attorneys for Petr Pacas*

9   Dated:  October 18, 2021      **WIECHERT, MUNK & GOLDSTEIN, PC**

10                     By:   *s/ Jessica C. Munk*

11                       Jessica C. Munk
                       David W. Wiechert

12                       *Attorneys for Jacob Bychak*

13   Dated:  October 18, 2021      **BIENERT KATZMAN**

14                      **LITTRELL WILLIAMS LLP**

15                     By:   *s/ Whitney Z. Bernstein*

                       Whitney Z. Bernstein

16                       Thomas H. Bienert, Jr.
                       James D. Riddet

17                       Carlos A. Nevarez
                     *Attorneys for Mohammed Abdul Qayyum*

18

19   Dated:  October 18, 2021      **MINTZ, LEVIN, COHN, FERRIS,**
                      **GLOVSKY AND POPEO, P.C.**

20                     By:   *s/ Randy K. Jones*

21                       Randy K. Jones
                       Daniel J. Goodrich (Pro Hac)

22                       Ryan Dougherty (Pro Hac)
                     *Attorneys for Mark Manoogian*

23

24

25

26

27

28

1

## CERTIFICATE OF AUTHORIZATION
## TO SIGN ELECTRONIC SIGNATURE

2

3
        Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative

4
Policies and Procedures of the United States District Court for the Southern District

5
of California, I certify that the content of this document is acceptable to counsel for

6
Defendants and that I have obtained authorization from Jessica C. Munk, Whitney

7
Z. Bernstein and Randy K. Jones to affix their electronic signatures to this

8
document.

9

10
                                        Respectfully submitted,

11
DATED: October 18, 2021                 /s *Nicole R. Van Dyk*

12
                                        Nicole R. Van Dyk
                                        Gary S. Lincenberg

13
                                        Darren L. Patrick
                                        Alexis A. Wiseley

14

15
                                        Bird, Marella, Boxer, Wolpert, Nessim,
                                        Drooks, Lincenberg & Rhow, P.C.

16
                                        *Attorneys for Defendant Petr Pacas*

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

Counsel for Defendants certify that the foregoing pleading has been electronically served on the following parties by virtue of their registration with the CM/ECF system:

Sabrina L. Feve

Assistant U.S. Attorney

sabrina.feve@usdoj.gov


Melanie K. Pierson

Assistant U.S. Attorney

melanie.pierson@usdoj.gov


Candina S. Heath

DOJ

candina.heath2@usdoj.gov

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Respectfully submitted,

DATED: October 18, 2021          /s *Nicole R. Van Dyk*

Nicole R. Van Dyk
Gary S. Lincenberg
Darren L. Patrick
Alexis A. Wiseley

Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
*Attorneys for Defendant Petr Pacas*