RANDY S. GROSSMAN
Acting United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
Assistant U.S. Attorneys
California Bar No. 112520/226590
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Fax: (619) 546-0631
Email:Melanie.Pierson@usdoj.gov/Sabrina.Feve@usdoj.gov

CANDINA S. HEATH
Senior Counsel
Texas Bar No. 09347450
Computer Crime and Intellectual Property Section
U.S. Department of Justice
Washington, D.C. 20005
Tel: (202) 307-1049
Email: Candina.Heath2@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JACOB BYCHAK et. al.,<br><br>Defendants. | Case No. 18cr4683-GPC<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL MOTIONS TO COMPEL DISCOVERY AND FOR RECONSIDERATION OF DENIAL OF MOTION TO COMPEL DISCOVERY REGARDING THE IDENTITY OF THE SOURCE OF INFORMATION AT SPAMHAUS** |

# I.

## INTRODUCTION

The fatal factual flaws in defendants' motions to compel discovery relating to Spamhaus and the Spamhaus Source (SS) are that: 1) the allegedly illegal search committed by a former Company A employee, CY, occurred no later than mid-2013, weeks before the government first met with SS and years before SS received the "purloined" emails; 2) contemporaneous emails show that SS did not send CY's emails to the FBI until 2017, four years after the alleged search occurred; 3) search warrant affidavits and grand jury exhibits show that the government never used or relied on CY's emails; and 4) the government's case centers on defendants' own emails, not CY or SS, and the voluminous records obtained via grand jury subpoenas issued in 2016.

The core legal deficiencies with defendants' motion are two-fold. First, their briefing does not articulate a theory of defense, let alone show how the requested discovery is relevant to their defense at trial, which they must do to demonstrate the information sought is material. *United States v. Gonzalo Beltran*, 915 F.2d 487, 489 (9th Cir. 1990). Second, even if they demonstrated materiality, the authorized remedy would be *in camera* review, not disclosure.  *Id.* at 488-89; *United States v. Henderson*, 241 F.3d 638, 645 (9th Cir. 2000).

While the Court could conduct an *in camera* review in an abundance of caution, the evidentiary record before it neither justifies nor requires judicial intervention. The hundreds of pages submitted in support of this episodic and ever-expanding discovery request contain no actual evidence of the government tasking SS or CY to do anything, let alone something illegal or unethical. Similarly, all the available evidence indicates that, even if the Court were to interview SS, SS would say the same thing SS has consistently said, namely that "Spamhaus does not act under the direction of the FBI or any other government agency.  Information given to us was not 'stolen' but freely given to us by CY who claims he was not under any NDA[,] was free to give us the emails, and [] was

*Government's Response to Defendants' Motion to*
*Reconsider Denial of Motion to Compel Discovery*                    *18cr4683-GPC*

motivated by [Company A] constantly lying and defaming him.  He was not aware of any FBI investigation at the time." [ECF 295, Ex. 21.]

II.

PROCEDURAL BACKGROUND

On March 13, 2019, defendants filed a joint motion to compel discovery of SS's identity. [ECF 71.] The government filed its opposition on March 29, 2019, and defendants filed their reply on April 12, 2019. [ECF 74, 83.] On April 30, 2019, the Court denied defendants' motion to compel. [ECF 93.]

On July 30, 2021, defendants moved to compel discovery of the identity of documents obtained by SS from a suspected Company A informant. [ECF 257.] On August 6, 2021, the government filed its opposition [ECF 265.] During oral argument, defendants broadened their request and sought disclosure of SS's Confidential Human Source (CHS) file. [Hrg Tr. of Aug. 20, 2021, p. 10.] On August 20, 2021, the court granted defendants' motion in part, ordering the government to ask SS to identify which documents SS had received from CY (the suspected Company A informant) and then provided to the government. [ECF 275.]

On September 20, 2021, defendants moved to compel discovery regarding all assistance the United States has ever received from Spamhaus and for reconsideration of the denial of the motion to compel discovery of SS's identity. [ECF 281, 282.] The government filed a consolidated response to both motions on September 27, 2021. [ECF 283.] On October 1, 2021, defendants moved for leave to file a reply to the government's opposition. [ECF 288]. On October 4, 2021, the Court denied defendants' request to file a reply, but allowed them to file a supplemental brief to which the government could respond, directing the parties to "tak[e] note of the areas where the court expressed questions or concerns so that we can focus on the most salient questions before the court." [Hrg Tr. Of Oct. 4, 2021, p.54.]

III.

## STATEMENT OF RELEVANT FACTS

Defendants' motion advances a series of misconceptions that portray SS as the puppet master of an otherwise clueless prosecution team to try to demonstrate the materiality of SS's identity.  To correct the record, the government provides the following factual background along with a timeline and evidentiary citations, attached as Exhibit 1.

A. **The Spamhaus Source did not act at the direction of the government at the time of CY's private search.**

At the heart of defendants' motion is the argument that the government conducted a warrantless search when CY "purloined" Company A emails from his then-employer. To prevail, defendants must show that, *at the time of the search*, the private searcher (i.e., CY) acted at the direction or encouragement of the government. *United States v. Sherwin*, 529 F.2d 1, 6 (9th Cir. 1976) (*en banc*). It is undisputed that CY left his employer, an affiliate of Company A (hereafter, Company B), in mid-2013. [ECF 283, EX 3; Adconion-Disc02-Reports-00928.[1]] The eleven emails CY allegedly "purloined" from Company A were sent between June 2011 and May 2013. *Id.* To suppress these emails (which the government is not using in its case-in-chief), defendants must show that, in mid-2013, CY took documents from Company A without authority at the government's direction or encouragement. To connect these dots, defendants hypothesize that SS directed or encouraged CY's search *and* acted as a government informant in or before mid-2013. [ECF 295 at 8.[2]] To support this theory, defendants rely on reports produced in discovery wherein SS was inadvertently identified by a CHS number, including the report of the FBI's initial interview of SS, conducted by the FBI's Baltimore field office on July 12, 2013. [ECF 295, p.1-2.] This

[1] The government's discovery citations reference the first page of the document and not the entire page range.

[2] The government's citations to defendants' brief refer to the page number in the document's footer and not to the number in the ECF header.

reliance is misplaced for four reasons. First, CY left Company B in mid-2013 and the last "purloined" email was from May 2013. The FBI could not have directed SS or CY to act (or discouraged them from acting) prior to meeting them. Rather, by the time the FBI first met with SS, any potential private search by CY had already occurred.

Second, the defense has received the FBI report clarifying how and when a CHS number was inadvertently substituted for SS's name *at the time of redaction* for discovery purposes. [ECF 295, Ex. 26.] This report explained that another FBI field office first designated SS as a CHS on October 12, 2018, pursuant to SS's involvement in an unrelated investigation.[3] Defense counsel has since received redacted copies of the original FBI reports, which identified SS by name and not by CHS number. [Adconion-Disc38-00001; Adconion-Disc39-00038.] Rather than acknowledge that they are relying on a scrivener's error to make a factual argument, defendants dismiss the original reports as "irrelevant" and "pretextual" and insist that these discovery-redacted reports are proof that SS was always a CHS. [ECF 295, p.8.]

Third, the best evidence of SS's status during the investigation's stages are not the 302s inadvertently redacted in late 2018, but rather the 2014 and 2015 search warrant affidavits that contemporaneously described SS as a Confidential Witness (CW). *See* Gov. Exs. 2 and 3 (filed under seal). The term "Confidential Human Source," or CHS, is an FBI term-of-art that refers to a formalized relationship. In the search warrant affidavits, the FBI would have described SS as a CHS had that been true. Instead, the affiant identified SS as

---

[3] Two weeks before a San Diego grand jury indicted this case, an unrelated FBI field office designated SS as a CHS pursuant to an investigation opened by that office and created a FBI file for SS's CHS activities relating to their separate investigation. The FBI's San Diego field office has no "file" detailing any agreement between SS and the San Diego FBI because San Diego did not task SS to take any action in this case. Defendants' motion for discovery of SS's CHS file will not gain further information on the actions of SS in this case. [See Decl. of AUSA Melanie Pierson, attached hereto.] Rather, defendants already possess the emails and reports of contact between SS and the San Diego FBI that relate to this case. The records sought by defendants that have not already been produced in discovery consist solely of contacts between Spamhaus and SS and the FBI relating to other cases.

*Government's Response to Defendants' Motion to Reconsider Denial of Motion to Compel Discovery*                    *18cr4683-GPC*

a CW. By only submitting the first three pages of the 2014 search warrant affidavit, defendants ignore the evidence showing that agents vetted SS's information by corroborating it against open-source records and through interviews with a second CW in July 2014, who, unlike SS, had direct knowledge of the criminal conduct. *Id.*

Fourth, the defense's claim that it needs to interview SS about whether SS was a CHS in 2013 ignores SS's consistent denials. As the Court is aware, SS has sent multiple unsolicited emails to the government that reveal SS's awareness that SS's emails will be produced to the defense. In these emails, SS unambiguously stated the following:

- 8/1/2021: "FBI never requested that [CY] or Spamhaus needed to do anything. . . Spamhaus does not act under the direction of the FBI or any other government agency." [ECF 295, Ex. 21.]

- 8/5/2021: "I don't get paid anything and the FBI doesn't tell me what to do and vice versa. . . The prosecution doesn't ask for my advice, and if they could tell me what to do, they'd probably tell me to stop sending this stuff." [ECF 295, Ex. 22.]

- 9/21/2021: "Spamhaus never encouraged [CY] to send internal emails . . . . Spamhaus didn't think the internal emails were particularly important. . . . [and] the internal emails were not even sent to law enforcement for three years after receiving them." [ECF 293, Ex. 14.]

Despite these express disavowals, defendants insist it is "grossly inaccurate" not to describe SS as a CHS, [ECF 295, p.9], and that they need to interview SS to learn more. Similarly, despite discovery of over 1,000 pages of emails between SS and the FBI in this investigation, the defense offers no emails wherein the FBI tasked SS with obtaining *any* evidence in this case, much less internal Company A documents.

B.     SS did not recruit a "vital" Company A insider.

The discovery provided to defendants demonstrates that SS did not help the FBI recruit a "vital" Company A insider, as the defense claims. [ECF 295, p.2.] Rather, the evidence shows that the FBI *failed* to recruit a Company A insider and relied instead on

interviews with victims, third parties, and former employees until June of 2017, when the government began subpoenaing Company A employees to testify before the grand jury. [Adconion-Disc38-00003.]

Defendants do not dispute that CY left Company B's employment in mid-2013. [Adconion-Disc02-Reports 00928.] In September 2013, CY's former boss, JM, told Spamhaus that CY was responsible for spamming activities that Spamhaus had attributed to Company B. [ECF 295, EX 27.] That same month, "an anonymous informant" (ANON-1) whom SS believed to be CY began sending Spamhaus information about Company A and Company B in what SS believed was an effort to rebut JM's attempt to blame CY. [ECF 295, Ex. 2 and 3.] ANON-1 used an anonymized email address, which SS provided to the FBI on June 2, 2014, one week after having told the FBI that that ANON-1 "doesn't know anything about THIS investigation." *Id.* On June 3, 2014, the FBI emailed ANON-1 at the anonymized email address. ANON-1 responded with questions about how ANON-1 could remain anonymous. [Adconion-Disc39-01779.] The FBI responded with a request to meet on or about June 11, 2014, and never received any further response or any documents or information from ANON-1. *Id.*

Three years later, on September 27, 2017, SS emailed the FBI, "so far I have not included anything our informants have given us" and then asked, "Do you want to see these emails?" [ECF 295, Ex. 13.] On October 12, 2017, SS sent the FBI eleven emails obtained from CY. [ECF 295, Ex. 14.] It is undisputed that the first meeting between CY and the FBI occurred on December 18, 2017, in the presence of CY's counsel. [Adconion-Disc02-Reports 00928.] Between the last email with ANON-1 on June 11, 2014, and CY's meeting with the government on December 18, 2017, there is no evidence of any contact between CY and the government. Rather, he only documents provided by CY to the government are the eleven emails sent to the FBI by SS on October 12, 2017, and four documents provided by CY's counsel in January 2018. [Adconion-Disc39-01781.] CY's limited cooperation through counsel rebuff the notion that he was a "vital" insider, let alone one recruited by SS.

C.   The government learned that SS had received Company A
     <u>records from CY two weeks before SS provided them to the FBI</u>.

Despite SS's emails from 2017 ("so far I have not included anything our informants have given us") and 2021 ("[Spamhaus] waited YEARS before sending [CY's emails] over to the FBI") in which SS unambiguously stated SS did not provide CY's emails to the government prior to October 2017, the defense speculates that, in May 2014, "the Government was placed on notice that information provided by [SS] might be tainted by information from [CY's] illegally obtained documents" and therefore "acquiesced in [SS's] unlawful conduct." [ECF 295, p.21.]

Their speculation rests on a May 22, 2014 email from SS to the FBI wherein SS stated that, since September 2013, Spamhaus had received "a ton of info" from ANON-1. SS's email described ANON-1 as someone who "knows all of the people we'll be talking about and everything about their operations." [ECF 295, Ex. 2.] SS's email did not, however, attach any documents or mention any internal Company A documents. The FBI's response to SS said they could discuss ANON-1 on June 2, 2014, when the FBI's San Diego field office had its first interview with SS. In the seven-page report of that interview, SS described ANON-1 as someone "with intimate knowledge of [Company A] operations" who had provided "information only a former employee would know;" however, there was no mention of Company A documents possessed by ANON-1, much less documents provided by ANON-1 to SS such that the government would have known of an alleged illegal search by May 2014. [ECF 295, EX 3.]

To nonetheless argue that the government was "on notice" of CY and/or SS's illegal search and thus "acquiesced" to a subsequent illegal search, the defense contrives a scenario in which SS received "additional" purloined emails from CY with the government's knowledge and consent. [ECF 295, p.22.] Defendants' scenario in which these "additional" emails supplement unidentified earlier purloined emails rests on a misreading of an August 25, 2021 email in which SS, pursuant to the Court's order, identified the eleven emails SS received from CY and provided to the FBI. [ECF 295, Ex. 12.] In this August 2021 email, SS identified December 29, 2015 as the date that Spamhaus

received the allegedly purloined emails. The unrefuted evidence, however, shows that SS did not provide these emails to the government until October 2017 and there is no evidence of any other purloined emails that were previously shared with the government and would have thereby put them on notice of an alleged warrantless search.

Undeterred by this lack of evidence, defendants further speculate that, because SS's August 2021 email summarized the contents of CY's eleven emails, SS must have also summarized the emails prior to sending them to the FBI in October 2017. [ECF 295, p.4.] There is simply no evidence to support this assumption. In spite of possessing over 1,000 pages of communications between SS and the FBI related to this case, the defense cannot identify any communication where CY's documents were summarized or otherwise passed to the FBI prior to October 2017.

D.   <u>SS did not mastermind the government's case</u>.

To amplify SS's role in the investigation, the defense argues that SS identified the government's "key witnesses," "instructed the Government who to interview and subpoena," and counseled "the Government regarding its responses to Defendants' motions and overall case strategy." [ECF 295, p.10,13.] Defendants' insinuation that the agents and prosecutors served as mere pawns of SS's machinations ignores the expertise required to build and litigate a complex cybercrime case. Glossing over the actual work, some of which is described below, enables defendants to mischaracterize the investigation as relying on a non-testifying source, SS, rather than on the testimony of percipient witnesses, coconspirators, and victims, as well as the defendants' own emails – which are the crux of the case and, unlike any of CY's emails, were presented to the grand jury. (Defendants received all the grand jury exhibits in discovery in December 2018.) Indeed, the fact that the grand jury investigation spanned nearly five years is further evidence that SS's information did not provide the government with the evidence needed for its prosecution.

Even in the investigation's early stage, the discovery shows that the FBI had begun independently interviewing percipient witnesses who corroborated SS's initial tip. In

August 2013, the FBI interviewed an employee of a major Internet Service Provider (ISP) who had identified a hijacked netblock (the "Telalink" netblock) used by Company A to send spam. [Adconion-Disc02-Reports 00031.] By July 2014, the FBI had interviewed and subpoenaed records from PH, whose hosting company had received multiple fraudulent LOAs from Company A. The subpoenaed records included a fraudulent LOA for the hijacked Telalink netblock, which defendant Mark Manoogian had emailed to PH from his Company A email account. [Adconion-Disc02-Reports 00039; Adconion-Disc04-SW-00009.] In October 2014, the FBI interviewed Telalink's owners, who confirmed that the Telalink LOA sent by Manoogian was fraudulent and that they had not authorized Manoogian or Company A to use their IP netblock. [Adconion-Disc02-Reports 00057.]

Based on this evidence and additional open-source records, the FBI obtained a warrant in December 2014 to search Manoogian's Company A email account. [Ex. 2; Adconion-Disc04-SW-00001.] The defense chose to submit only the first three pages of the search warrant affidavit in support of its motion to suggest that the warrant relied on SS and, by implication, CY, rather than on independent evidence gathered by the FBI. [ECF 295, Ex. 11.] The defense similarly ignored the May 2015 search warrant that authorized the FBI to search the emails of coconspirator Daniel Dye and four additional Company A employees.[4] [Adconion-Disc04-SW-00020.] Both affidavits, however, demonstrate that the investigation did not rely on CY, a Company A insider, or even SS. *Id.* Rather, it centered on emails sent by Manoogian and his codefendants regarding their use of hijacked netblocks to send spam, such as an email from Qayyum to Manoogian on February 11, 2013, which attached a forged LOA with the instructions, "Please print and sign." [Adconion-Disc04-SW-00035.]

Defendants' insistence that SS "continued to act as a liaison between CY and the FBI" throughout the investigation [ECF 295, p.3-4.], and that this relationship, rather than

---

[4] The May 2015 search warrant discussed Manoogian's emails with codefendants Qayyum and Bychak but did not seek warrants for their accounts because the company that hosted Company A's emails advised the FBI that the codefendants' accounts had been deleted. ADCONION-DISC04-SW-00034.

*Government's Response to Defendants' Motion to*
*Reconsider Denial of Motion to Compel Discovery*

*18cr4683-GPC*

defendants' own emails, was material to the investigation ignores the case's actual trajectory. On September 9, 2016, the FBI approached defendant Qayyum to seek his cooperation. [Adconion-Disc18-00003.] On September 13, 2016, Qayyum told the FBI that he did not want to assist with its investigation. *Id.* On September 19, 2016, recognizing that the investigation into Company A was no longer covert, the government served subpoenas for internal emails and company records on Company A and its affiliate partners. [ADCONION-DISC02-00020.] In June 2017, as part of the now-overt grand jury investigation, the government began subpoenaing Company A employees to testify before the grand jury. [Adconion-Disc38-00003.] The evidence produced in response to this grand jury investigation, which the government's 257 grand jury exhibits distill and highlight, shows that CY and his emails as well as SS's second-hand tips were peripheral to the investigation and that SS's information was repeatedly corroborated by percipient witnesses with actual knowledge of the crimes. Any insinuation that SS was a *de facto* member of the prosecution team is therefore unfounded.

>      E.      Spamhaus Has an Independent Mission to Combat Spam
>              and Does Not Act at the Direction of the FBI.

Spamhaus was founded in 1998 in London, England, as a private non-profit organization dedicated to fighting spam and "related cyber threats such as phishing, malware, and botnets."[5] Spamhaus is located and registered as a Not-For-Profit Limited Liability Company in Andorra.[6] Spamhaus does not have a U.S. presence and is not a law-enforcement entity.[7] Spamhaus does not receive income or generate profits, does not have customers, and is not involved in commerce.[8] Spamhaus's mission is to track and report accurate information regarding spam and related cyber threats,[9] which it then offers free to

---

[5]  https://www.spamhaus.org/organization/.

[6]  https://www.spamhaus.org/organization/statement/013/popular-myths-about-spamhaus https://www.spamhaus.org/faq/section/Organization.

[7]  https://www.spamhaus.org/organization/statement/003/case-answer-e360insight-vs.-the-spamhaus-project; https://www.spamhaus.org/faq/section/ROKSO%20FAQ.

[8]  https://www.spamhaus.org/organization/statement/013/popular-myths-about-spamhaus.

[9]  https://www.spamhaus.org/organization/.

the worldwide public, including to ISPs, government and military organizations, security vendors, corporations, academia, and industry.[10] The data compiled by Spamhaus includes the IP addresses associated with the sending of spam, and the entities controlling, using, or owning those IP addresses. Spamhaus's publicly-available databases protect, as of October 2021, over 3 billion user mailboxes in over 18 countries.[11] This anti-spam mission demonstrates that Spamhaus has a legitimate independent motivation for obtaining and compiling data, making that data available to the public, and for passing tips or information received from other private parties to law enforcement or other regulatory agencies.

The SBL (Spamhaus Block List) Advisory is a database of known or verified spam sources (i.e., IP addresses that violate Spamhaus's policy for acceptance of inbound email).[12]  Entities that are repeat offenders are listed in the Spamhaus database ROKSO (Register of Known Spam Operations). While much of the information in the ROKSO database is publicly available, Spamhaus provides additional information to law enforcement and other investigative or regulatory agencies through a secure portal. Agencies currently able to access this secure portal include (UK) NCA, National Cyber Crime Security Centre;(USA) NCFTA, the FBI, the USSS, the US Marshal's Service, the FTC, the IRS, the USPIS, the U.S. Army, the DOE, and various State AG offices; (Netherlands) OPTA;(Australia) ACMA;(New Zealand) DIA; and (Switzerland) Cybercrime Coordination Unit.[13] Consistent with Spamhaus's independent mission, SS advised the parties in an unsolicited August 1, 2021 email that "Spamhaus does not act at the direction of the FBI or any other government agency." [ECF 295, Ex. 21.]

F.      Spamhaus collects and shares data about users
        of its website pursuant to its privacy policy.

Spamhaus has a privacy policy found on its website,[14] which explains what data it collects, maintains, and makes accessible to other entities. Specifically, Spamhaus advises

---

[10] https://en.wikipedia.org/wiki/The_Spamhaus_Project.
[11] https://www.spamhaus.org/organization/.
[12] https://www.spamhaus.org/faq/section/Spamhaus%20SBL.
[13] https://www.spamhaus.org/faq/section/ROKSO%20FAQ.
[14] https://www.spamhaus.org/organization/privacy/.

users that user data is collected simply by interacting with its website and that it collects the following information on any individual or entity accessing its site based on its terms of service and implied consent: (1) identity data including first name, last name, and username or similar identifier, (2) contact data, including postal address, delivery address, email address, and telephone numbers, (3) technical data, including IP address, the user's login data, browser type and version, time zone setting and location, browser plug-in types and versions, operating system and platform and other technology on the devices the user uses to access the Spamhaus website, (4) profile data, including the user's username and password, requests made by the user, and any account preferences, (5) usage data, including information about how the user uses the Spamhaus website, products, and services, and (6) marketing and communications data, including the user's preferences in receiving marketing from Spamhaus and third parties related to Spamhaus and the user's communication preferences.[15]

## IV.

## DEFENDANTS' DISCOVERY MOTIONS SHOULD BE DENIED

Defendants' motions to seek discovery of SS's identity and any record bearing on Spamhaus's relationship to the entire U.S. government should be denied.

A.    SS's identity is privileged and immaterial to the defense.

1.    *The Informant Privilege applies to SS*

"The government has a limited privilege to withhold the identity of confidential informants" unless "disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause..." *United States v. Sai Keung Wong*, 886 F.2d 252, 255 (9th Cir. 1989) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)).

The burden of proof is on defendants to show a need for disclosure. Mere suspicion that information will prove helpful is insufficient to require disclosure. *United States v. Buffington*, 815 F.2d 1292, 1299 (9th Cir. 1987); *see also United States v. Santiago*, 46 F.3d

---

[15] *Id.*

885, 894 (9ᵗʰ Cir. 1995) ("Neither a general description of the information sought nor conclusory allegations of materiality suffice."). The "mere suspicion" that an informant has information that will prove "relevant and helpful or will be essential to a fair trial" is not enough to warrant disclosure. *United States v. Amador Galvan*, 9 F.3d 1414, 1417 (9th Cir. 1993). Mere speculation that an informant might have helpful information is not sufficient to overcome the public interest in the protection of the identity of informants. *United States v. Marshall,* 532 F. 2d 1279, 1282 (9th Cir. 1976).

To evaluate whether the helpfulness of the information sought outweighs "the public interest in protecting the flow of information concerning the commission of crimes," *Buffington*, 815 F.2d at 1299, the courts "examine three factors: (1) the degree of the informant's involvement in the criminal activity; (2) the relationship between the defendant's asserted defense and the likely testimony of the informant; and (3) the government's interest in nondisclosure." *United States v. Gonzalo Beltran*, 915 F.2d 487, 488–89 (9th Cir. 1990). A defendant's apparent knowledge of the identity of the informant adds no weight to his side of the balance scales. *Id*.

Under this three-part test, defendants have not met and cannot meet their burden of proof. First, SS was not involved in the criminal activity and has no direct knowledge of the crimes charged. SS's remoteness contrasts starkly with the type of informant whose identity is considered material. *See Roviaro*, 353 U.S. at 64 (ordering disclosure where "the Government's informer was the sole participant, other than the accused, in the transaction charged."); *United States v. Palmer*, 245 Fed.Appx. 720, 723 (9ᵗʰ Cir.2007) (denying disclosure of informant's identity because informant was only involved in one meeting with defendant and agents and was otherwise not involved in defendant's criminal activity).

Second, defendants have not asserted a particular defense other than an early suggestion of a potential *mens rea* defense. SS has no knowledge of what the defendants knew, and defendants do not claim otherwise. SS is also not going to testify in the government's case-in-chief and the defendants' representation that they may "*potentially* call [SS] as a trial witness," [ECF 295, p.8.] (emphasis added), rings hollow given their

failure to describe either SS's likely testimony or a theory of defense to which SS's testimony would be relevant.

Third, SS has expressed fear that disclosure of SS's identity will lead to "harassment by spammers and cyber criminals," vexatious litigation, and potential cyberattacks on SS and Spamhaus. [ECF 295, Ex. 22; ADCONION-DISC45-00005.] These concerns are not academic.[16] Moreover, exposing SS would compromise SS's ability to continue providing information to the FBI in connection with other, open matters. *See United States v. Bickle*, No. 2:10-CR-00565-PMP, 2011 WL 1098969, at *1 (D. Nev. Mar. 22, 2011) (recognizing government's "substantial interest in protecting [sources'] identit[ies] . . . so that [they] can be used in future investigations and so that subsequent informants freely come forward.")

2.   *Defendants fail to distinguish* <u>Gonzalo Beltran</u>
       *or otherwise satisfy their burden of proof.*

Despite citing *Gonzalo Beltran*'s three-step analysis for determining whether the informant's privilege applies [ECF 295, p.17.], defendants contend there is "no fixed rule" and that the law "does not require a showing of materiality." *Id*. In this legal vacuum, they argue they have met an undefined "minimal threshold showing" of relevance.[17] Defendants argue they have met their burden based on their allegations that SS: 1) "directed the investigation, preparation and prosecution of this case," 2) "shape[ed] the testimony of [unspecified] trial witnesses" and thus has information "relevant to their credibility,"

---

[16] *See* Constantin, NETWORKWORLD, *DDoS attack against Spamhaus was reportedly the largest in history*, https://www.networkworld.com/article/2164810/ddos-attack-against-spamhaus-was-reportedly-the-largest-in-history.html; Lee, Ars Technica, *Appeals judges berate spammer for "ridiculous," "incompetent" litigation*, https://arstechnica.com/tech-policy/2011/06/appeals-judges-berate-spammer-for-ridiculous-litigation/); Linford, Spamhaus.org, *Case Dismissed: Ames & McGee v The Spamhaus Project*, https://www.spamhaus.org/organization/statement/014/case-dismissed-ames-mcgee-v-the-spamhaus-project.

[17] The requirement for a "minimal threshold showing of relevance" applies to whether the court should hold an *in camera* hearing with the informant, and not whether disclosure itself should occur. *United States v. Henderson*, 241 F.3d 638, 645 (9th Cir. 2000), as amended (Mar. 5, 2001) (internal citations and quotation marks omitted).

3) participated in "the warrantless seizure of Company A's internal documents," and 4) "inva[ded the] defense camp." [ECF 295, p.15, 19.] None of these four arguments satisfy the three-part test articulated in *Gonzalo Beltran*, 915 F.2d at 488–89, or related Ninth Circuit precedent.

With regard to their first allegation, the evidence shows that SS did not mastermind the government's five-year investigation either during the covert period during which it interviewed third parties and obtained search warrants for six email accounts, or during the overt period when it subpoenaed almost 2 million documents from Company A and its affiliates, obtained grand jury testimony from  multiple Company A employees, and secured guilty pleas from two cooperating coconspirators. They also point to no "testimony [from SS] that would [] help[] [them] establish outrageous government conduct, entrapment, or lack of knowledge" such that SS's alleged intertwining with the prosecution team would be relevant. *Sai Keung Wong*, 886 F.2d at 256.

Defendants' second allegation, that SS's identity is crucial to securing impeachment testimony, fails to specify either which witnesses SS would impeach or how, and therefore fails to "show more than a mere suspicion that the informant has information which will prove relevant." *Henderson*, 241 F.3d at 645. The Ninth Circuit has also held that informants' potential impeachment materials "do not satisfy the requirement of specific facts, beyond allegations, relating to materiality." *Santiago*, 46 F.3d at 894-95 (citing *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir.1990)); *see also United States v. Salyer*, 271 F.R.D. 148, 157 (E.D. Cal. 2010), No. CR. S-10-0061 LKK (G, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010) ("requests which are designed to generally cast for impeachment material [] are not material. Such requests are simply speculative inquiries without basis in fact to believe that the information acquired will be significantly helpful." (citation omitted)). The need for disclosure of an informant is far less compelling when sought in connection with issues not bearing on guilt. *United States v. Fields*, 113 F.3d 313, 324 (9th Cir.1997); *see also United States v. Flaherty*, 295 F. 3d 182, 202 (2nd Cir.

1 2002) (disclosure is not warranted when the informant could only undermine the credibility
2 of government witnesses).

3     A court's decision whether to disclose an informant's identity frequently hinges on
4 the degree to which the informant's potential testimony relates to the defense at trial. In
5 *Sai Keung Wong*, the court discussed the defenses raised (i.e., lack of knowledge,
6 entrapment, outrageous government conduct) before concluding that the informant's
7 testimony would not be helpful and denying disclosure. 886 F. 2d at 256. Similarly, in
8 *Henderson*, the Ninth Circuit held that denial of disclosure was proper because, at best, the
9 informant might be shown to be someone with bias against the defendant, but the informant
10 could not contradict any of the evidence produced by the government. 241 F.3d at 645
11 (citing *United States v. Spires*, 3 F.3d 1234, 1238 (9th Cir. 1993)).

12     Defendants' third allegation, that SS conducted a warrantless search with the
13 government's acquiescence, relies on a willful disregard of the facts. The uncontested
14 record shows that CY conducted the original search prior to leaving his employer in mid-
15 2013. "[O]nce a private search is completed, the subsequent involvement of government
16 agents does not retroactively transform the original intrusion into a governmental search."
17 *US v. Kline*, 112 Fed.Appx.562, 563-64 (9th Cir. 2004); *see also Sherwin*, 529 F.2d at 6;
18 *United States v. Veatch*, 674 F.2d 1217, 1221 (9th Cir. 1981).

19     The relevance of SS's involvement in CY's allegedly improper search also does not
20 relate to defendants' defense, but instead bears on a hypothetical motion to suppress. The
21 informant's privilege, however, "has never been held to require the disclosure of an
22 informant's identity at a suppression hearing." *United States v. Raddatz*, 447 U.S. 667, 679
23 (1980) (citations omitted); *see also Buffington*, 815 F.2d at 1298-99 ("the Due Process
24 Clause does not always require the disclosure of an informant's identity at a suppression
25 hearing"); *United States v. Napier*, 436 F.3d 1133, 1136-39 (9th Cir. 2006) (denying
26 motion to compel informant's identity for purposes of supporting a motion to suppress).

27     The final flaw with defendants' notion that disclosure of SS's identity will lead to
28 the suppression of both the eleven CY emails that the government is not using in its case-

in-chief *and* the thousands of emails subpoenaed from Company A, its affiliates, and other third parties, is their blithe dismissal of the inevitable discovery doctrine. [ECF 295 at 24 ("Because it cannot, the government makes no attempt to argue that it could meet th[e] [inevitable discovery] standard.").] The government's subpoenaing Company A records days after defendants and their employer learned of its investigation is the type of "routine procedure[]" taken in complex fraud investigations like this case. *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000). Moreover, the decision to subpoena these records is the opposite of the situation in *Reilly*, where the court faulted the "federal agents' unexplained failure to secure a search warrant." 224 F.3d at 995. Here, the government obtained multiple warrants and it was only after exhausting its ability to investigate the targets covertly that it went overt and used "the only available procedure," i.e. subpoenas, to inspect the email accounts for Bychak, Qayyum, and Pacas, which had been deleted from the third-party hosting company and were therefore unavailable to search via warrants. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1400 (9th Cir. 1989).

Defendant's fourth allegation, that SS "inva[ded the] defense camp" misleadingly conflates two disparate legal teams and ignores Spamhaus's publicly-stated privacy policy. Defendants incorrectly argue that SS acted unethically by reading and sharing CY emails that included his employer's outside counsel, LG. This decision is consistent with the documents produced in discovery that show that LG repeatedly engaged in non-legal operations and unprivileged communications that are reflected, for example, in the approximately 300+ pages of emails that LG produced in response to a September 2016 grand jury subpoena and the 200+ pages of emails that CY's employer produced, following an internal privilege review, for records that specifically included LG. [ADCONION-GOODMAN-CROWLEY-0001; TELIC-GOODMAN-0001.] Absent a declaration from CY's former employer disputing the filter team's conclusion that CY's emails were unprivileged, defendants cannot show SS "obtained privileged documents." [ECF 295, p.24.]

*Government's Response to Defendants' Motion to Reconsider Denial of Motion to Compel Discovery*                    *18cr4683-GPC*

As for the defense's accusation that SS committed "unethical and inappropriate" conduct by reviewing Spamhaus's own records, *id.*, this argument ignores Spamhaus's unambiguous privacy policy that advises users it collects information that includes their names, technical data, and request information. Defense counsel are experienced and competent attorneys and therefore presumed to be familiar with the technology that they use. *See, e.g.,* American Bar Association ("ABA") Formal Op. 466 (2014) ("it is important for a lawyer to be current with technology . . . . [and] a lawyer who uses an [electronic communication] network in his practice should review the terms and conditions, including privacy features – which change frequently – prior to using such a network.") Here, not only were defense counsel presumably familiar with Spamhaus's privacy policy, they undoubtedly exercised heightened scrutiny of the third-party website's privacy policy when they accessed it given that they have previously described Spamhaus as "a vigilante organization." [ECF 71, p.16.]

When the defense subpoenas documents for trial from a third party like Spamhaus, they cannot claim the third party invaded the defense camp by also sharing the subpoenaed information with the government. For example, while *ex parte* applications to the court explaining the need for a Rule 17 subpoena for trial records may be kept confidential to protect the defense's trial strategy, the subpoena itself and the responsive records are typically provided no such protection. *See United States v. Sellers*, 275 F.R.D. 620 (D. Nev. 2011) (allowing *ex parte* application for records produced prior to trial to protect trial strategy, but ordering the records disclosed to both parties). Similarly, while a questionnaire prepared by counsel in advance of an interview may be protected by work-product, the actual interview questions and responses are not. *See, e.g., Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (attorney "communications made in the presence of, or shared with, third-parties destroys the confidentiality of the communications") (internal citation omitted); *United States v. Reyes*, 239 F.R.D. 591, 598 (N.D. Cal. 2006) ("attorney work-product privilege is not absolute and may be waived, for example, when an attorney . . . reveals it to an adversary to gain an advantage in litigation")

*Government's Response to Defendants' Motion to Reconsider Denial of Motion to Compel Discovery*                    *18cr4683-GPC*

1  (citing *United States v. Nobles*, 422 U.S. 225, 239–40 (1975)). SS's unsolicited sharing of
2  data collected by Spamhaus pursuant to its privacy policy is indistinguishable from any
3  other disclosure of information shared with a third party by the defense and therefore no
4  invasion of the defense camp occurred.

B.    Defendants have not shown that Spamhaus's relationship
      with the government is material to their defense.

The defense seeks discovery of every communication between every Spamhaus
representative and every government agency, ever, to bolster their Fourth Amendment
challenge. This request fails for the same reasons that discovery relating to SS should be
denied: Spamhaus, like SS, did not obtain the "purloined" emails until December 2015
(long after any private search had occurred), was not a *de facto* member of the prosecution
team, and is irrelevant to any proffered theory of defense. Under Rule 16, "defendants are
entitled to the discovery of only those materials that are relevant to the defendant's
response to the Government's case in chief." *United States v. Chon*, 210 F.3d 990, 995 (9th
Cir. 2000) (affirming district court decision denying broad requests for information relating
to a potential Posse Comitatus Act challenge because the requested records represented a
"far reaching fishing expedition" and "were not relevant to the charges".) Defendants'
broad request for Spamhaus records should therefore be denied.

At the October 4, 2021 hearing, defendants argued that, because Spamhaus was like
the National Center for Missing and Exploited Children (NCMEC), it was presumptively
an extension of the government and discovery was therefore warranted. In their brief, this
argument relies on a passing reference to *United States v. Ackerman*, 831 F.3d 1292 (10th
Cir. 2011) and a footnote quoting *United States v. Wolfenbarger*, 2018 WL 4913753 (N.D.
Cal.).[18] [ECF 295, p.12, n.21.].

---

[18]  The government addressed *Wolfenbarger* on pages 10-11 of its previous response, [ECF
283], and will not repeat the argument here. A recent Ninth Circuit case analyzing
*Ackerman*, *United States v. Wilson*, 13 F. 4th 961 (9th Cir. 2021), which defense counsel
referred to at the hearing, is inapplicable here as *Wilson* held that NCMEC had not
conducted a private search and did not otherwise factor into the Court's Fourth Amendment
analysis.

*Government's Response to Defendants' Motion to*            *18cr4683-GPC*
*Reconsider Denial of Motion to Compel Discovery*

1    Neither case supports defendants' claim that Rule 16 justifies discovery of every
2    Spamhaus record in the government's possession. In *Ackerman*, the Tenth Circuit
3    determined that NCMEC was a government entity in part because it was endowed with law
4    enforcement powers beyond those of private citizens. 831 F.3d at 1296. NCMEC, unlike
5    Spamhaus, is authorized by a federal statute that requires private parties to provide it with
6    information and is funded primarily by the U.S. government. *Id.* None of these factors
7    apply to Spamhaus, which is a non-profit foreign entity that possesses no statutory powers,
8    rights, or responsibilities, is self-funded through fees, not funded by the U.S. government
9    and, to the extent it has ever sought government funding, did so from the *UK* government
10   where it is located.[19]

11   Defendants have not shown either that Spamhaus is analogous to NCMEC or
12   relevant to their theory of defense. Their request is thus akin to the speculative fishing
13   expeditions rejected by both *Chon* and *Wolfenbarger*, which this Court has thus far denied
14   in this case. The defense is in full possession of all the records of communications between
15   SS and the FBI related to this case. The records of what SS or Spamhaus may have
16   communicated with other FBI offices on other cases provides no evidence to advance any
17   defense that might be raised to the charges in this case, so this request should be denied.
18   //
19   //

---

[19] https://www.spamhaus.org/organization/funding/.

*Government's Response to Defendants' Motion to
Reconsider Denial of Motion to Compel Discovery*                    *18cr4683-GPC*

V.

CONCLUSION

Defendants' motions to compel discovery of SS's identity and all records reflecting or relating to a relationship between Spamhaus and the federal government rely on a series of factual inaccuracies. Defendants have failed to demonstrate that the information they seek is relevant to their defense and ignored the legal precedent that dictates that, had they demonstrated materiality, *in camera review*, rather than disclosure, would be the appropriate remedy. For the foregoing reasons, the United States respectfully requests that defendants' motions to compel be denied.

DATED: November 1, 2021

Respectfully submitted,

RANDY S. GROSSMAN
Acting United States Attorney

/s/Melanie Pierson
Assistant United States Attorney

/s/Sabrina Fève
Assistant United States Attorney

/s/Candy Heath
Senior Counsel
Computer Crime and Intellectual Property Section
Department of Justice, Criminal Division