RANDY S. GROSSMAN
Acting United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
Assistant U.S. Attorneys
California Bar No. 112520/226590
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Fax: (619) 546-0631
Email:Melanie.Pierson@usdoj.gov/Sabrina.Feve@usdoj.gov

CANDINA S. HEATH
Senior Counsel
Texas Bar No. 09347450
Computer Crime and Intellectual Property Section
U.S. Department of Justice
Washington, D.C. 20005
Tel: (202) 307-1049
Email: Candina.Heath2@usdoj.gov

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>JACOB BYCHAK et. al.,<br>Defendants. | Case No. 18-CR-4683-GPC<br><br>**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT** |

## I.

## Introduction

The defense motion to dismiss for outrageous government conduct fails for two overarching reasons: 1) the government did not review privileged communications or otherwise invade the work-product privilege; and 2) the alleged misconduct involving

Spamhaus's website were actions by a private person, the Spamhaus Source (SS), who was not acting at the direction of the government, and no prejudice occurred as a result.

The defendants' allegations regarding violations of attorney-client privilege rest upon three assumptions. First, that the inclusion of LG, an outside counsel for both Company A and Company B, on any email with Company A or Company B employees automatically establishes that email as privileged. Second, that, by extension, any email between LG and a non-lawyer spam consultant, AB, is also automatically privileged. Third, that the government deliberately ignored the existence of this privilege before reviewing and producing these emails in discovery. These assumptions are factually and legally unsupported.

The two emails identified by the defense as "facially" privileged involve an attorney, LG, with whom no defendant has a personal attorney-client relationship, and so provide no basis for the assertion of a violation of the defendant's right to counsel. Moreover, those two emails were not privileged communications. Rather, as District Judge Barry Ted Moskowitz ruled in a written order of February 6, 2019, issued pursuant to the government's grand jury investigation, the communications involving LG and the consultant AB related to business activities, rather than legal issues, and were therefore neither privileged nor work product. Judge Moskowitz's finding that LG was acting in a business, rather than a legal capacity, defeats any alleged "facial" privilege for emails involving either her or her consultant, AB, and the litigation culminating in Judge Moskowitz's Order shows that the government acted properly. Similarly, the prosecution team did not review the unsolicited LG emails that SS provided to the FBI until after a filter review had determined the communications were not privileged. Defendants' claims that the government's actions were improper are therefore unfounded.

The defenses' assertions regarding SS's alleged misconduct are also infirm. While SS did provide the government with unsolicited logs of AB's queries of the Spamhaus

publicly available website prior to indictment, neither those queries nor any of the work undertaken by AB were privileged. Rather, Judge Moskowitz found that AB's work with and for LG was business related, and not covered by attorney client privilege or work product. Again *unsolicited*, SS sent one email to the government in September of 2021, containing two individual two-word search terms attributed to two defense counsel's firms used to query the Spamhaus website, and was advised by the government not to provide that sort of information in the future. The government also immediately produced SS's email to the defense, along with SS's other unsolicited emails. To the extent that search terms may be covered by work-product privilege, the privilege was waived by disclosure to an adverse third party (Spamhaus), which resulted in disclosure to another adverse party (the United States). Moreover, no defense strategy can be gleaned from the fact that one counsel's firm queried the Spamhaus website using the name of its client and the other counsel's firm queried the Spamhaus website for the name of the company that employed the individual who supplied the netblocks, so the defense can show neither prejudice nor gross misconduct.

## II.

### Relevant Facts[1]

On November 14, 2017, a federal grand jury subpoena was issued to an internet marketing consulting firm operated by AB for records it possessed relating to services it performed for various entities, including Company A and Company B. The firm was retained through outside counsel, LG, to assist with the deliverability of emails and avoidance of blocking by anti-spam organizations. In response to the subpoena, on February 2, 2018, the consulting firm provided a small number of documents. When the

---

[1] The facts in this section are set forth in more detail in the Declaration of Assistant U.S. Attorney Melanie K. Pierson, filed under seal, in connection with this responsive pleading.

government expressed its belief that compliance with the subpoena was incomplete, AB indicated that he had withheld (and transferred to LG at her direction) numerous documents that were responsive to the subpoena. AB provided a letter from LG, stating that her clients (Company A and Company B) were asserting attorney-client and work product privileges. By letter of February 13, 2018, the government advised the consulting firm that a privilege log was required, and that legal action to compel compliance with the subpoena might be taken.

On February 15, 2018, the government was contacted by outside counsel representing AB. On February 21, 2018, AB's counsel stated that he had reviewed the withheld documents and did not find them to be privileged. On February 23, 2018, AB's counsel provided the government with a disc containing approximately 600 additional records, in compliance with the subpoena. After receipt of the disc, the case agents began reviewing the documents. When the agents noticed that the production included emails with LG, the agents stopped their review, and consulted with the U.S. Attorney's Office. An interview with AB was requested to explore the relationship between the consulting firm, outside counsel, and the clients, so that the government could be assured again that the documents were not privileged before the review of the records continued.

On April 12, 2018, the interview occurred, and AB stated that although he contracted with LG to provide the consulting services, he performed no services for LG. Instead, he provided advice to LG's clients, transmitted through LG, about how to ensure the deliverability of their commercial email and how to avoid having it blocked as spam. AB stated that he was not an employee or agent of either client, had never communicated with anyone or acted on behalf of either client company, and was never informed of any pending or anticipated litigation involving either client company.

Thereafter, on April 25, 2018, the government filed a motion with Judge Moskowitz, seeking to have the court determine the issue of privilege related to the

4

documents produced by AB's consulting firm pursuant to the subpoena. On June 1, 2018, the court declined to rule on the motion, finding no case or controversy existed, and noted that courts were not permitted to provide advisory opinions.

On June 15, 2018, counsel for Company A and Company B filed a motion with Judge Moskowitz seeking a protective order preventing the government from reviewing the documents subpoenaed from AB's consulting firm, based on claims of attorney-client and work product privilege. The government filed a responsive pleading on August 9, 2018, to which replies were filed on September 19, 2018and the court heard argument on November 7, 2018.

On February 6, 2019, Judge Moskowitz issued a written order[2] (the "BTM Order"). Judge Moskowitz denied Company A and Company B's motion for a protective order, finding that the documents were not protected either by attorney-client privilege or by the work-product doctrine, because they were prepared for a business rather than a legal purpose, and not in anticipation of litigation. After receiving the Court's findings that no privileges existed, the government reviewed the records.

On October 12, 2017, FBI Special Agent Chabalko contacted the U.S. Attorney's Office and advised that he had received an email from a Spamhaus source (SS) with an attached zip file, which SS represented might contain emails with an attorney. Although the emails had been provided to SS by a third party, which generally operates as a waiver of any privilege, no further review of the emails was conducted, pending a review by a filter team or the development of additional facts regarding the origin of the emails. No effort was made to have a filter team review the emails or to develop facts regarding the origin of the emails at that time, because there was no reason to believe that such effort would produce evidence relevant to the prosecution of the four defendants.

---

[2] This Order is attached to the Declaration of Assistant U.S. Attorney Melanie K. Pierson, and filed under seal.

As part of the government's efforts to meet its discovery obligations, the U.S. Attorney's Office directed Special Agent Chabalko to provide the prosecutors with "all" emails between himself and SS. In response, Agent Chabalko electronically provided hundreds of pages of records. As the prosecutors were reviewing the email information provided to the FBI by SS, to process the same for production in discovery, a zip file was found which contained an email from outside counsel for Company A (LG). Review of the remaining materials was commenced by a filter team. The materials released by the filter team were disclosed to the defense in the discovery productions, and included the emails at issue in this motion involving LG. One of the email threads alleged to be privileged was also produced to the government via subpoena by both AB's consulting firm and Company B.

On September 21, 2021, Special Agent Chabalko forwarded to the U.S Attorney's Office an approximately 11-page email he received unsolicited from SS earlier in the day, in which SS responded to the public filings that the defense submitted. In the email, SS noted various search terms used by AB to query the Spamhaus website, which, in the opinion of SS, were related to this case. This email was immediately produced as discovery. That same day, the prosecution consulted an ethics advisor.

On Sunday, September 26, 2021, Special Agent Chabalko forwarded another unsolicited email he had received from SS, which set forth two queries[3] of the Spamhaus website attributed to the IP addresses of two law firms representing two of the defendants in this case. One query was for the name of the law firm's client, a named defendant in this case. The other query was for the name of the company that employed Daniel Dye, who is one of the defendants' co-conspirators. SS's email also was immediately produced as discovery, and thereafter, the prosecutors again consulted an ethics advisor.

---

[3] Neither the queries by AB nor the queries by the defense firms will be a part of the government's evidence in its case in chief.

1   Nothing in the discussions with the ethics advisor in September and October of 2021

2   led prosecutors to believe that any government misconduct had occurred. In spite of the

3   lack of evidence of any misconduct, on October 18, 2021, the government contacted SS

4   and requested that SS not send further information about any defense counsel's queries of

5   Spamhaus's website to avoid even the appearance of impropriety.

### III.

### Memorandum of Points & Authorities

A. <u>Relevant Legal Standard</u>

9   The dismissal of an indictment because of outrageous government conduct may be

10  predicated on alternative grounds: a violation of due process or the court's supervisory

11  powers." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991). To support

12  dismissal on due process grounds, a defendant must show government conduct that "is so

13  grossly shocking and so outrageous as to violate the universal sense of justice." *Id*. (citing

14  *United States v. O'Connor*, 737 F.2d 814, 817 (9th Cir. 1984)). That is, "the government's

15  conduct" must be "so excessive, flagrant, scandalous, intolerable, and offensive as to

16  violate due process." *United States v. Edmonds*, 103 F.3d 822, 825 (9th Cir. 1996) (citing

17  *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir.1993)). With respect to a Fifth

18  Amendment due process violation stemming from intrusion into the attorney-client

19  relationship, to constitute outrageous government conduct a defendant must demonstrate:

20  (1) the government was objectively aware of an on-going, personal attorney client

21  relationship, (2) the government deliberately intruded into that relationship, and (3) as a

22  result, the defendant suffered actual and substantial prejudice. *United States v. Stringer*,

23  535 F. 3d 929, 941 (9th Cir. 2008).

24  "Dismissal of an indictment with prejudice" under the court's supervisory power

25  "necessarily implicates separation-of-powers principles" and represents the "most severe

26  sanction possible." *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992).

Accordingly, dismissal of an indictment on these grounds is a "drastic" and "disfavored" remedy, and is "impermissible absent 'a clear basis in fact and law for doing so.'" *Id*.; *United States v. Ross*, 372 F.3d 1097, 1110 (9th Cir. 2004). To justify an exercise of the court's supervisory powers in this context, a defendant must show outrageous government misconduct that is both "flagrant" and causes him "substantial prejudice." See *Ross*, 372 F.3d at 1110; *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988).

For the reasons discussed below, the defense has not come close to making any of these showings.

B. Defendants Have Failed to Establish Conduct by a Government Agent

Regardless of the basis for dismissal, the defense must first establish conduct by someone acting as an agent of the government. Where the activities alleged to be outrageous government conduct involve conduct by an informant, the first step in the inquiry is to determine whether the informant was an agent of the government at the time of the alleged outrageous actions. *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991). There is nothing improper about the disclosure of defense trial strategy to the government by a person who "was not working on behalf of the government." *United States v. Danielson*, 325 F.3d 1054, 1068 (9th Cir. 2003).

The Ninth Circuit has held that "a person does not become a government agent until his activities are under the direction and supervision of law enforcement officers." *Restrepo*, 930 F.2d at 713 (citing *United States v. Busby*, 780 F. 2d 804 (9th Cir. 1986)). In *United States v. Simpson*, 813 F. 2d 1462, 1467-1468 (9th Cir. 1987), the court held that dismissal of the indictment was unwarranted, noting that "passive tolerance of private informant's questionable conduct [is] less egregious than the conscious direction of government agents typically present in outrageous conduct challenges." *See also United States v. Ryan*, 548 F. 2d 782, 791 (9th Cir. 1976) (private person was not acting as an agent for the government when there was no evidence that informant consulted with the

government prior to approaching the defendant). "Due process is not violated unless the conduct is attributable to and directed by the government." *United States v. Barrera Moreno*, 951 F. 2d 1089, 1092 (9th Cir. 1991).

Unlike this case, in the cases cited by the defense there was no dispute regarding whether the informant was acting at the behest of the government when the Constitutional violations occurred. To determine whether a third party is acting on behalf of the government for purposes of evaluating whether a Constitutional violation has occurred,[4] the Ninth Circuit has set forth a two-part test: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the action intended to assist law enforcement efforts or further his own ends. *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994). In looking at step two, if a private party has dual motives, that is a "legitimate, independent motivation to further its own ends" and a desire to assist law enforcement, the Ninth Circuit requires the Court to determine whether "the government's participation" was "so extensive" as to rise to the level of a Constitutional violation. *United States v. Cleaveland*, 38 F.3d 1092, 1094 (9th Cir. 1994).

Regarding the first prong of the test, whether the government knew of and acquiesced in the intrusive conduct, there is no evidence that the government affirmatively directed SS to: 1) obtain emails from CY, let alone emails involving LG, 2) provide emails from CY's email account involving LG to the government, or 3) search Spamhaus's own computer logs for queries of the Spamhaus website attributed to the defense. Moreover, when SS provided these unsolicited materials, the government did not acquiesce to the receipt of privileged information. Rather, the government sought and obtained a court

---

[4] No precedent could be found describing a test for when a third party would be considered a government agent for purposes of evaluating a violation of the Sixth Amendment right to counsel or the Fifth Amendment right to due process. The test for evaluating when a private person is considered a government agent for purposes of analysis of a Fourth Amendment violation is most analogous.

9

order that determined that LG's communications with AB were non-privileged business-related communications before reviewing them (see Section C.2., below), and employed a filter team for the LG emails provided by SS. Finally, any potential privilege involving the defense queries of Spamhaus's records was waived by disclosure of the query to Spamhaus, which was and remains an adverse third party as evidenced by the defendants' work emails and court filings attacking Spamhaus. (See Section C.3., below). The defense has therefore not met the first prong of *Reed*.

Turning to Reed's second prong, whether the party performing the action intended to assist law enforcement efforts or further his own ends, SS and Spamhaus[5] collected the information with the intent to further their own ends, that is, to prevent the sending of "spam," which Spamhaus defines as "unsolicited bulk[6] email."[7] The Spamhaus goal of eliminating all unsolicited commercial email goes well beyond what is criminally prohibited under the CAN-SPAM Act, which is fraud and false statements in connection with multiple commercial email messages. In fact, when the CAN-SPAM Act was passed in 2003, Spamhaus, created in 1998, described the Act's "attempts to regulate rather than ban" spam to be a "serious mistake" that will result in "increasing spam volumes and the numbers of spammers[8]."

---

[5] Spamhaus itself does not block any emails. The commercial emails do not touch Spamhaus' network, and are not intercepted or re-routed by Spamhaus. Instead, internet service providers voluntarily employ filters which use algorithms relying in part on information on whether particular IP addresses have been listed on the Spamhaus block lists for having sent what Spamhaus deemed to be spam. The filters, at the option of the service provider, may elect to accept, reject, or flag the email for further filtering. www.spamhaus.org/Section/Legal20%Questions/#107.

[6] Spamhaus defines "bulk" as meaning "the message is sent as part of a larger collection of messages with identical content."

[7] www.spamhaus.org/faq/Section/Glossary/#181.

[8] www.spamhaus.org/organization/statement/005/spamhaus-position-on-can-spam-act-of-2003

That Spamhaus and SS obtained information on consultant AB and attorney LG is consistent with their independent motive to further their own ends. According to the defense's exhibits, SS described AB as a "former Spamhaus volunteer," claiming "to help spammers get Spamhaus SBL listings resolved for payment," who "still claims to be a 'Spamhouse Insider'" even though he was "fired in 2008." SS said that AB "sold his clients personal information about Spamhaus employees and volunteers, which they have used as a form of blackmail by implied threats." LG was described by SS as someone who "works with 'Spamhaus informant' [AB]" and helps "clients clean up any problems with Spamhaus when caught spamming." Decl. of Gary Lincenberg, Exs, p. 28-29. Regardless of the truth of these statements, they provide evidence of a powerful motive, independent of any intent to assist the government, for SS and Spamhaus to obtain information regarding AB and LG. In the face of such strong evidence of independent motives of Spamhaus and SS to obtain the information complained of, and the lack of any affirmative direction by the government to do so, it cannot be said that the government's participation was "so extensive" as to rise to the level of a Constitutional violation.

C. <u>The Materials Obtained are Not Protected by Privilege</u>.

The party asserting attorney-client privilege has the burden of proof to establish all eight elements of the privilege, that is: (1) legal advice of any kind was sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications related to that purpose, (4) the communications were made in confidence (5) the communications were made by the client, (6) the communications were to be permanently protected, at the client's insistence (7) from disclosure by the client or by the legal adviser, and (8) the protection has not been waived. *United States v. Martin*, 278 F. 3d 988 (9th Cir. 2002). The fact that a person is a lawyer does not automatically make communications with them privileged. *United States v. Chen*, 99 F. 3d 1495, 1501 (9th Cir. 1996). The defendants in this case, at a minimum, are unable to establish elements 1, 2, and 8.

1.   <u>The Defendants Have No Protected Attorney-Client Relationship with LG</u>

In *Martin*, the Ninth Circuit found no attorney-client privilege was breached, in part because the defendant had failed to establish the existence of a personal attorney-client relationship. The attorney at issue was the general counsel for a corporation, and, as the court noted, the corporation's privilege does not automatically extend to employees or officers. *See also United States v. Plache*, 913 F. 2d 1375, 1380-1382 (9th Cir. 1990) (attorney-client privilege with lawyer and accountant hired by lawyer cannot be asserted by officer who hired them because the privilege is held by the corporation).

In *United States v. Graf*, 610 F.3d 1148, 1161 (9th Cir. 2010), the Ninth Circuit adopted a five-part test to determine if a corporate employee holds a joint privilege over communications with corporate counsel. The elements, which must be established by the defendant, are: (1) he approached the attorneys for the purpose of seeking legal advice; (2) when he did so, he made it clear to the attorneys that he was seeking legal advice in his individual rather than in his representative capacity; (3) the attorneys saw fit to represent him personally, knowing a conflict could arise; (4) his conversations with the attorneys were in confidence; and (5) the substance of his conversations with the attorneys did not concern matters within the corporation or the general affairs of the corporation.

In this case, the defense acknowledges that the privilege holders with respect to communications with LG are the corporate entities, Company A and Company B. [ECF No. 329-1, p. 9, fn. 7]. Accordingly, because there was no personal attorney-client relationship between LG and the defendants, and no evidence that any of the individual defendants approached LG to represent them in their individual capacity (or any of the *Graf* factors, for that matter), they cannot claim a violation of their own Constitutional rights for any intrusion into the attorney-client relationship with LG. Because their claim of attorney-client privilege with LG fails, so must their claim of work product protection

for any work done on behalf of LG by consultant AB, since any insight into the thought processes of LG did not expose any legal strategy to which they were a party.

2. <u>The Communications with LG and AB were for a Business, Not Legal, Purpose</u>

"In order to show that a communication relates to *legal* advice, the proponent of the privilege must demonstrate that the 'primary purpose' of the communication was securing legal advice." *Chevron Corp.,* 1996 WL 264769, cited within *United States v. ChevronTexaco Corporation*, 241 F. Supp 2d 1065, 1076 (N.D. Cal, 2002) (emphasis in original). For documents that might serve both a business and litigation purpose, documents that reflect reasoning about strategies or analysis for litigation are viewed as protected legal communications, while documents that discuss only the logistics or mechanics of implementing the strategy are considered to be unprotected business records. *Id*. at 1085. Here, the two emails from LG identified by the defense as "facially privileged" serve primarily a business purpose, as they are, at most, a discussion of how to implement the strategy of avoiding adverse economic consequences from a listing on the Spamhaus block list.

For materials prepared by agents or investigators on behalf of attorneys to qualify for protection under the work product doctrine, they must be prepared: (1) in anticipation of litigation, and (2) by or for another party, or that party's representative. *In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management)*, 375 F. 3d 900, 907 (9th Cir. 2004). In this case, Judge Moskowitz ruled in February 2019 that LG's communications with AB served a business purpose and, accordingly, neither LG's nor AB's communications with each other were protected by attorney-client privilege or work-product.

Judge Moskowitz found no attorney-client privilege based on his determination that the communications at issue "involve gathering information about Spamhaus, rather than interpreting information from [Company A] or [Company B] to assist [LG] in providing

13

legal advice." [BTM Order, p. 11]. Judge Moskowitz determined that the terms of the contract between LG and AB, along with the representations of the parties "demonstrate the primary purpose of the [ ] communications was to provide business advice," which were not covered by attorney-client privilege. [BTM Order, p. 12]. Judge Moskowitz found that the parties' communications were "primarily concerned with gathering information about a non-profit's [Spamhaus] blacklist to preserve their business model and reputation, not to defend against or pursue litigation." Judge Moskowitz further noted that the work performed by AB for LG did not involve AB interpreting information from the clients for LG, as required for attorney-client privilege to provide protection for third party consultants, citing, among others, the opinion of this court in *Cohen v. Trump*, 2015 WL 3617124 *17 (S.D. Cal. June 9, 2015).

Judge Moskowitz also found the work product privilege to be inapplicable to the documents involving LG and AB because the material was not prepared in anticipation of litigation. Judge Moskowitz noted that Company A emphasized that Spamhaus did not submit to the jurisdiction of the United States and does not litigate in the United States, making the possibility of any litigation with Spamhaus remote. Moreover, he found that the duties for which LG had been hired (to devise strategies to circumvent Spamhaus' blacklist, gather industry intelligence and mitigate reputational harm, among others) were just as well done by non-lawyers. [BTM Order, p. 15]. He therefore concluded that the work product doctrine was also inapplicable.

The two emails involving LG that the defendants' claim to be "facially privileged" are the same type of LG emails that Judge Moskowitz found to be related to business, rather than legal, advice and therefore not covered by attorney-client privilege. In fact, a version of the email thread identified as defense Exhibit 13A was provided to the government pursuant to subpoena by both Company B and AB's firm. This overlap

14

demonstrates that both the Company B and Judge Moskowitz recognized the email was not privileged.

The two LG emails cited by the defense convey LG's thoughts on how to respond to a Spamhaus block listing and echo the responses drafted by AB for Company B. In prior communications between AB and LG, which Judge Moskowitz found not to be privileged, AB recommended a strategy that involved providing false information to Spamhaus, as he stated in one email "the difference is intentional, because the intent is to obfuscate rather than clarify," and in another asked if someone will "cooperate in a subterfuge to dispense with the Spamhaus issue" that would require the cooperator "to send correspondence which is, let's say, imaginative in the extreme." (See Exhibits 2 and 3, filed under seal, with the Declaration of Assistant U.S. Attorney Melanie Pierson.)

The LG emails cited by defense are also not protected by the work-product privilege for the reasons cited by Judge Moskowitz. They involve strategies to avoid the Spamhaus block list and to avoid reputational damage with business partners. They include no suggestion of potential litigation, and could have been performed by non-lawyers. As such, as found by Judge Moskowitz, they are business communications that are not protected by the work-product privilege.

While Judge Moskowitz declined to reach the crime-fraud issue because he found the documents were not privileged, these types of communications implicate the crime-fraud exception to the attorney-client privilege. Under the crime-fraud exception, communications are not privileged where (1) the client was engaged in or planning to engage in a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme, and (2) the communications are sufficiently related to and in furtherance of the intended or present continuing illegality. *In Re Grand Jury Investigation,* 810 F. 3d 1110, 1113 (9th Cir. 2016). In the emails for which the defense claims privilege, it is suggested that false information be provided to the anti-spam organization, in order to

15

allow the client to continue doing business. These emails could also be viewed as in furtherance of the scheme charged in this case, which involved disguising the identity of the entity in control of the IP addresses by impersonating the true registrants, supporting a crime-fraud exception.

### 3. SS's Unsolicited Emails Did Not Violate Work Product Privilege.

#### a. The Defense Has Not Demonstrated Any Documents Qualify as Work Product

The work product doctrine was designed to protect attorney's mental impressions and legal theories. *Upjohn v. United States*, 449 U.S. 383 (1981). The defense argues that the search terms used by the defense to query the publicly available Spamhaus website are work product, citing *United States v. Segal*, 2004 WL 830428 *8 (N.D. Ill. 2004). *Segal* is easily distinguishable because the search terms found to be work product in *Segal* involved an attorney's legal research of the Lexis/Nexis legal database, and the legal opinions generated by the research. Such records would clearly provide a window into counsel's mental processes and legal theories. In contrast, knowledge of a defense query of the Spamhaus database, in one case, for the name of a named defendant and, in another, for the name of the company that putatively sold the netblocks, provides no window into counsel's mental processes or legal strategy, nor does it provide the government with any tactical advantage.

The defense also claims work-product privilege based on the metadata associated with the queries, citing *United States v. Wirth*, 2012 WL 1110540 *4 (D. Minn. 2012), which is also factually distinguishable. In *Wirth*, the records at issue were drafts of summaries of interview reports, where the metadata would reveal the drafter's "decisions and steps," and "might include creation and editing dates, author and user names, comments, and historical data identifying specific document modifications." *Id*. In this case, the metadata the defense seeks to protect is the date of the query, the duration of the

16

connection to Spamhaus's own website and database, the IP address used to connect to Spamhaus's website and database, and the account holder for that IP address. Such information again provides no insight to counsel's mental processes or legal strategies. Accordingly, the defense search terms and metadata in this case should not be afforded work product protection.

> b. <u>Any Potential Work Product Privilege Was Waived</u>.

Any work product privilege that might exist is waived when disclosed to a third party as that would enable an adversary to gain access to the information. *Westinghouse Electric v. Republic of the Philippines*, 951 F. 2d 1424, 1428 (3rd Cir. 1991). Disclosure to a third party waives the work product privilege if the disclosure substantially increases the possibility of the opposing party obtaining the information. *United States v. ATT*, 642 F. 2d 1285 (D.C. Cir. 1980). Once a party has disclosed work product to an adversary, it has waived work product protection as to all other adversaries. *McMorgan v. First California Mortgage*, 931 F. Supp 703, 709 (N.D. Cal. 1996) (citing *Westinghouse,* 951 F. 2d at 1429). *See also, Nidec v. Victdor Co. of Japan,* 249 F.R.D. 575, 578 (N.D. Cal. 2007) (work product privilege waived by disclosure to third parties which results in disclosure to adverse party).

In *United States v. Sanmina Corporation*, 968 F. 3d 1107, 1121 (9th Cir. 2020), the Ninth Circuit held that disclosure of work product to a third party waives the protection of the privilege when disclosure is made to "an adversary in litigation" or "has substantially increased the opportunities for potential adversaries to obtain the information." Disclosing work product to a third party may waive the protection where "such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary." *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 605 (D.C. Cir. 2001). "The voluntary disclosure of attorney work product to an adversary or a conduit to

an adversary waives work-product protection for that material." *United States v. Deloite*, 610 F. 3d 129, 140 (D.C. Cir. 2010).

Assuming *arguendo*, that the search terms used by AB and individuals from the defense firms for Manoogian and Pacas constitute attorney work product, that privilege was waived upon the disclosure of the search terms to Spamhaus, an adversary. Company A, Company B, AB, and the individual defendants have consistently portrayed and treated Spamhaus as an adverse party. For example, Companies A and B hired LG and AB to avoid having their IP addresses associated with the Spamhaus block list, and any resulting harm to their reputation and client relationships. In the litigation regarding the consultant records, Company A claimed that Spamhaus "has continuously interfered with its business" by listing affiliates, domains and IP addresses on its block lists, and Company B noted that appearing on the Spamhaus ROKSO list "significantly impacted [its] ability to operate as a business." [BTM order, p. 3]. During this litigation, defense counsel has described Spamhaus as a "vigilante organization," on a mission to harm their clients. [ECF 71, p. 16]. Indeed, Spamhaus views itself as adverse to anyone such as the defendants who send unsolicited bulk email, even if such conduct might be legal under the CAN-SPAM Act.

Both AB and defense counsel chose to expose their IP addresses and session time when they visited Spamhaus's website and took no steps to mask or otherwise anonymize the Internet connection *they* initiated to call up the website. Similarly, they took no measures to anonymize their actions when they voluntarily queried the records on the Spamhaus public database. They took such action in spite of the unambiguous privacy policy of Spamhaus, posted on its website, which advises users that Spamhaus collects visitor information that includes visitors' names, technical data, and request information. The defendants were also aware that Spamhaus was providing information to the government in this case. Because they chose to disclose their alleged work product (i.e.

search terms and associated metadata) to an adverse party, the defendants can no longer claim work product protection, as whatever privilege may have existed has been waived.

D. <u>No Sixth Amendment Violation Occurred</u>

"The Ninth Circuit adheres to the bright line rule that the Sixth Amendment right to counsel attaches only upon the initiation of the filing of formal criminal charges." *United States v. Hayes*, 231 F. 3d 663, 675 (9th Cir. 2000), cited within *United States v. SDI Future Health, Inc.*, 464 F. Supp 2d 1027, 1047 (D. Nev. 2006). A violation of the Sixth Amendment right to counsel does not require dismissal of the indictment if less drastic means are available to ensure the defendant gets a fair trial. *United States v. Rogers*, 751 F. 2d 1074, 1078-1079 (9th Cir. 1985). Mere government intrusion into the attorney-client relationship is not of itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant. *United States v. Irwin*, 612 F. 2d 1182, 1187 (9th Cir. 1980). The Ninth Circuit described substantial prejudice as instances where privileged information is introduced at trial, the prosecution obtains the defense plans and strategies, or the government's intrusion destroys the defendant's confidence in his attorney.*,* or other actions which gave the government an advantage at trial. *Id.*

To establish a Sixth Amendment violation based on intrusion into the attorney-client relationship, a defendant must show, "at a minimum, that the government intrusion was purposeful, that there was communication of defense strategy to the prosecution, or that the intrusion resulted in tainted evidence." *United States v. Fernandez*, 388 F. 3d 1199, 1240 (9th Cir. 2004). Where the intrusion results in the prosecution obtaining a particular piece of evidence (for example, an inculpatory statement, a document, or a dead body), the burden is on the defendant to show prejudice, but where the intrusion results in the prosecution obtaining the defendant's trial strategy, the analysis differs. If trial strategy is obtained, the defendant must make a *prima facie* showing that the government acted

19

affirmatively to intrude into the attorney client relationship and thereby to obtain the privileged information, after which the burden shifts to the government to show there was no prejudice to the defendant. *Danielson*, 325 F. 3d at 1070-1071.

The only action cited by the defendants in support of this motion that occurred post-indictment (when the Sixth Amendment right to counsel attached) was SS's unsolicited September 2021 email stating that an individual from one defense attorney's firm queried the Spamhaus public website for its client's name and another queried Spamhaus's website regarding the company that employed a cooperating defendant, Daniel Dye. The alleged intrusion was not, by defendants' own admission, conducted by the government, but by a third party, SS. There is also zero evidence that SS was acting at the direction of the government when SS gathered and shared the information SS obtained from Spamhaus's own records.

In this case, the queries shared by SS (or relating to AB in the past) were not protected by any privilege, as any work product privilege that might otherwise exist had been waived by disclosure of the search terms to an adverse party (Spamhaus). As such, there was no intrusion into the attorney client relationship at all, and there can be no cognizable violation of the defendants' Sixth Amendment rights.

The defense, quoting from loose language in cases where the agency of the informant was not in dispute, misunderstands it burden and argues that the intent of the informant to intentionally intrude into the attorney client relationship to obtain privileged material is dispositive. In actuality, to establish a Sixth Amendment violation, it is the intent of *a government agent* to obtain privileged material that is paramount. This was made clear by the Ninth Circuit in *Restrepo*, when it found that when the activities alleged to be outrageous government conduct involve actions by an informant, the first step in the inquiry is to determine whether the informant was an agent of the government at the time of the alleged outrageous actions. *Restrepo*, 930 F2d. at 712.

Because there is no evidence that the post-indictment collection by SS of Spamhaus database queries was at the direction of or solicited by the government, the defense argues that the government should be held responsible for the actions of SS because it acquiesced to the receipt of similar information regarding AB's pre-indictment searches of Spamhaus's website and databases. But "passive tolerance of private informant's questionable conduct [is] less egregious than the conscious direction of government agents typically present in outrageous conduct challenges." *Simpson*, 813 F. 2d at 1467-1468. Far from acquiescing to the receipt of privileged information from AB, instead the government sought and obtained a court order finding the material involving AB was not privileged under either attorney-client or work product privilege.

Moreover, the defendants have not alleged substantial prejudice from the alleged intrusion. As a result of SS's unsolicited emails, the government learned that an individual at one defense counsel's firm conducted a query involving the name of its client, while another queried the name of Dye's employer. In previous communications with the government, defense counsel suggested that one defense might involve portraying the defendant's co-conspirator Dye as the mastermind of the scheme. Accordingly, it is nearly impossible to imagine how knowing of these search terms provided any sort of tactical advantage to the government, or window into a defense strategy not already known to the government, such that the defendants could claim substantial prejudice, as required for the remedy of dismissal of the indictment. *Irwin*, 612 F. 2d at 1187.

The defense, citing *Danielson*, 325 F. 3d at 1071, attempts to shift the burden to the government to show the absence of prejudice, claiming to have made a *prima facie* case that the government intentionally reviewed privileged material. Putting aside the fact that none of the material reviewed by the government was actually protected by privilege, the defense ignores the fact that that government, prior to indictment, sought permission of the court to review the LG and AB communications. Moreover, that permission was

21

granted by Judge Moskowitz, in spite of claims by the privilege holders that the documents were protected by both attorney-client and work product privileges. Judge Moskowitz found that the relationship between LG and AB was business-related, which did not justify the protection of attorney-client or work product privilege.

The defense further ignores the fact that the prosecution team did not review the "facially privileged" LG emails that CY sent to SS, who, years later, sent to the FBI, until a filter team had reviewed and cleared them. While FBI Agent Chabalko did forward the emails to a prosecutor, he did so at the insistence of the prosecutor that he provide "all" emails with SS for review, at a time when the defense was demanding discovery relating to SS. When a prosecutor discovered the emails involving LG, a filter team was immediately deployed. No prior review of these emails by a filter team had been conducted because they were not viewed as related to the conspiracy involving the four defendants. These emails resurfaced only when communications with SS were under review to determine if any of them should be disclosed to the defense. Moreover, the prosecution team sought the advice of ethics advisors after receiving the unsolicited email from SS of defense counsel's Spamhaus search terms in this case. Nothing in the results of the filter team review, the review by Judge Moskowitz, or by the ethics advisors suggested that the prosecution team had improperly reviewed privileged materials. Although there was no violation of the attorney-client or work product privilege involved, the government nonetheless asked SS not to provide such information in the future, to avoid even the appearance of impropriety. As such, the motion to dismiss based on allegations of a violation of the defendants' Sixth Amendment rights must be denied.

E. No Fifth Amendment Violation Occurred.

A defendant's Fifth Amendment right to due process can be asserted based on pre-indictment conduct. To obtain dismissal of the charges for outrageous government conduct based on a violation of the Fifth Amendment right to due process, the government

misconduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson,* 647 F.3d 1196, 1209 (9th Cir. 2011) (quoting *Restrepo,* 930 F.2d at 712); *United States v. Pedrin*, 797 F.3d 792, 795–96 (9th Cir. 2015).

With respect to a Fifth Amendment due process violation stemming from intrusion into the attorney-client relationship, to constitute outrageous government conduct the Ninth Circuit, in *United States v. Stringer,* 535 F. 3d 929, 941 (9th Cir. 2008), adopted the three elements first enunciated by the Third Circuit in *United States v. Voigt*, 89 F. 3d 1050, 1067 (3rd Cir. 1995): (1) the government was objectively aware of an on-going, personal attorney client relationship, (2) the government deliberately intruded into that relationship, and (3) as a result, the defendant suffered actual and substantial prejudice.

The defendants cannot meet any of the three *Voigt/Stringer* elements. As set forth above in Section C.1., the defendants had no "on-going personal attorney-client relationship" with LG, the attorney involved in the "facially privileged" emails, a fact which the defense has acknowledged but totally ignored its legal effect. The only on-going personal attorney-client relationships that exist are those between the defendants and their attorneys in this criminal case. There was no deliberate intrusion by the government into privileged information between the defendants and their counsel of record, because any privilege that might have attached was waived upon its disclosure to Spamhaus, an adverse third party. Moreover, the defendants have failed to identify any actual and substantial prejudice suffered by the unsolicited disclosure of the search terms, which were only the name of a defendant and the company that employed their co-conspirator, Daniel Dye. Instead, the defense speculates about potential advantages that occurred in other cases and improperly argue that the burden has shifted to the government to prove the absence of prejudice. Accordingly, the motion to dismiss based on a violation of the defendants' Fifth Amendment right to due process must fail.

//

23

F. <u>There is No Basis for the Court to Exercise its Supervisory Powers.</u>

The court may also use its inherent supervisory powers to dismiss an indictment for government conduct that falls short of a Fifth or Sixth Amendment violation. To do so, the court must find that the government misconduct is both: (1) flagrant, and (2) causes substantial prejudice to the defendant. *United States v. Simpson*, 927 F. 2d 1088, 1091 (9th Cir. 1991); *United States v. Chapman*, 524 F. 3d 1073, 1087 (9th Cir. 2008). The standard for dismissal on this ground is "extremely high." *United States v. Smith,* 924 F.2d 889, 897 (9th Cir. 1991). Dismissals are "limited to extreme cases in which the government's conduct violates fundamental fairness." *United States v. Gurolla,* 333 F.3d 944, 950 (9th Cir. 2003).

Accidental or merely negligent conduct is insufficient to establish flagrant misconduct, but flagrant misconduct can include conduct that evidences a reckless disregard for the prosecution's constitutional obligations. *Chapman* at 1085. In *Chapman*, the court dismissed the indictment after the prosecutor failed to disclose during trial rap sheets and cooperation agreements of witnesses, including witnesses who had testified and been released, and had flagrantly lied to the court, falsely stating that the documents had in fact been provided in discovery. No such conduct occurred in this case.

In this case, the government embraced and sought guidance regarding its constitutional obligations. As set forth above, the government employed a filter team to review the emails involving LG prior to their review by the prosecution team. When Companies A and B claimed attorney-client and work-product privilege regarding documents responsive to a grand jury subpoena, the government sought an order of the court, which ultimately found that the documents lacked the protection of privilege, prior to review by the prosecution team. When the defense complained of intrusion into the attorney-client relationship after SS made unsolicited disclosure of the defense search of the Spamhaus website, the prosecution sought the advice of an ethics advisor. Nothing in

the results of the judicial review, filter team review, or ethics review suggested that the prosecution team had in any way disregarded its constitutional obligations or abridged the defendants' constitutional rights. Accordingly, the government's conduct was completely appropriate and the defense accusations of flagrant misconduct are unfounded.

Moreover, in making the argument for dismissal based on flagrant government misconduct, the defense failed to address the second requirement, a showing by the defense of "substantial prejudice." Unlike *Chapman*, where the defense could clearly point to an inability to use important impeachment materials at trial, the defendants in this case have not alleged any specific prejudice suffered as a result of the alleged misconduct. This is because, simply put, the defense has suffered no prejudice from the conduct alleged, much less the level of "substantial prejudice" required for dismissal. Accordingly, dismissal on this basis should also be denied.

G. The Remedies Sought by the Defense Are Inappropriate.

The Ninth Circuit traditionally has identified two remedies for outrageous government conduct: 1) dismissal of the indictment, which is drastic, disfavored, and thus used only in the most egregious cases; or 2) suppression at trial of evidence improperly obtained. *See, e.g., Rogers,* 751 F.2d at 1078–79. *United States v. Haynes*, 216 F. 3d 789, 796 (9th Cir. 2000) (quoting *United States v. Morrison,* 449 U.S. 361, 365 (1981) for the proposition that the "remedy characteristically imposed" when the government obtains evidence in violation of the Fifth or Sixth Amendment "is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongly admitted").

In this case, there is no evidence to support the extreme remedy of dismissal. Instead, the evidence shows that the government sought advice from the court, a filter team, and an ethics advisor, none of which indicated that any errors had been made by the

25

prosecution. Against this backdrop, the conduct of the government cannot be viewed as so outrageous as to shock the conscience or violate fundamental fairness to justify dismissal.

The defense suggests that the court consider other remedies, including removal of the lead prosecutor, allowing the defense to depose trial witness that were exposed to tainted evidence, and requiring the government to provide summaries of the testimony of its witnesses and an exhibit list, citing *United States v. Horn*, 29 F. 3d 754, 759 (1st Cir. Cir. 1994). This case is nothing like *Horn*. In *Horn*, the lead prosecutor directed a paralegal to make a duplicate copy for the government of a small subset of documents that the defense had requested to be copied out of the 10,000 documents in discovery, without the knowledge of defense counsel. When the defense discovered the duplicates, a motion to seal was immediately filed with the court. While the motion was pending, the prosecutor reviewed and discussed the documents, and used them to prepare a trial witness. After the court granted the motion to seal, in direct defiance of the court's order, the prosecutor made a second set of the documents for her own use, signed an affidavit "of questionable veracity," and made statements that the court deemed to "lack candor." No such improper conduct has occurred in this case. Instead, after seeking advice from the court, a filter team, and an ethics advisor, no problems were identified with the conduct of the prosecution team. Thus, none of the other remedies suggested by the defense are appropriate.

H. No Evidentiary Hearing is Required.

There is no dispute of facts this court must resolve to decide this motion. The defense concedes, as it must, that the privilege holder for any attorney-client communications involving attorney LG are Companies A and B, not the defendants. [ECF No. 329-1, p. 9, fn. 7]. Because the defendants have no personal attorney-client relationship with LG, there can be no violation of their Sixth Amendment right to counsel involving disclosure of emails with LG. Moreover, there is also no dispute that AB and

26

two of the defense firms in this case chose to provide their search terms to Spamhaus, an adverse party, who provided them to the United States. Any potential work product privilege that might exist with respect to the disclosure of the search terms was thereby waived or invaded by a third party. The defense has the burden of proof of establishing all the elements of the privilege, including the absence of waiver, so the hearing requested by the defense to "put the government to its burden of proof" is unnecessary. Because this court can resolve these motions based on the undisputed facts, no evidentiary hearing is required.

## IV.

## Conclusion

Based on the foregoing, the government requests that the court deny the defendant's motion to dismiss the indictment for outrageous government conduct without requiring an evidentiary hearing.

27