RANDY S. GROSSMAN
United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
Assistant U.S. Attorneys
California Bar No. 112520/226590
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Fax: (619) 546-0631
Email:Melanie.Pierson@usdoj.gov/Sabrina.Feve@usdoj.gov

CANDINA S. HEATH
Senior Counsel
Texas Bar No. 09347450
Computer Crime and Intellectual Property Section
U.S. Department of Justice
Washington, D.C. 20005
Tel: (202) 307-1049
Email: Candina.Heath2@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JACOB BYCHAK (1),<br>MARK MANOOGIAN (2),<br>ABDUL MOHAMMED QAYYUM (3), and<br>PETR PACAS (4),<br><br>Defendants. | Case No.: 18cr4683-GPC<br><br>**UNITED STATES' SECOND NOTICE OF EXPERT WITNESSES AND WITNESSES WITH EXPERTISE** |

COMES NOW the plaintiff, United States of America, by and through its counsel, Randy S. Grossman, United States Attorney, and Assistant United States Attorneys Melanie K. Pierson, Sabrina L. Fève, and Computer Crime and Intellectual Property Section Senior Counsel Candy Heath, and hereby files its Second Notice of Expert Witnesses and Witnesses with Expertise.

INTRODUCTION

Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure and Federal Rules of Evidence 702, 703, and 705, the United States hereby provides notice of its intent to elicit the testimony during its case-in-chief of two forensic accounting expert witnesses: (1) David E. Benkert, and (2) Jeffrey H. Kinrich. Copies of their *curricula vitarum* were provided to the defense in discovery on March 2, 2022. A summary of Mr. Kinrich's and Mr. Benkert's backgrounds and proposed testimonies are set out below. The United States reserves the right to offer additional testimony by these experts, or other expert witnesses, pursuant to Federal Rules of Evidence 701 through 705, and for these experts to amend or adjust their opinions and bases therefor, based on information perceived by or made known to the experts before or during trial.

This case concerns the "use of fraudulently acquired IP addresses to send commercial email messages" in furtherance of a conspiracy to violate the CAN-SPAM and wire fraud statutes. ECF No. 1 at para. 2(c). In particular, according to the Indictment's CAN-SPAM counts, the IP addresses listed in Counts 6 through 10 of the Indictment were used to send more than 2,500 commercial email messages during any 24-hour period, 25,000 during any 30-day period, or 250,000 during any one-year period. *Id.* at para. 9.

As evidence of the conspiracy's use of IP addresses and motive for doing so, the United States intends to offer the testimony of Mr. Kinrich and Mr. Benkert. In 2019, Mr. Kinrich and Mr. Benkert helped Company A calculate that it generated approximately $4.9 million from the company's use of IP addresses that defendants identified via co-conspirator Daniel Dye and his employer, GetAds (hereafter, the "GetAds IPs").[1] Mr. Kinrich and Mr. Benkert's findings are documented in their report, which the government

---

[1] The government has not retained either Mr. Kinrich or Mr. Benkert, and each witness will appear and testify pursuant to a trial subpoena. In January 2020, Mr. Kinrich and Mr. Benkert assisted Company A with a review that ultimately led to Company A forfeiting $4,939,526 to the government in May 2020 as fraudulent proceeds generated by sending over 10 billion electronic email messages from the GetAds IPs.

produced to defendants, along with the materials upon which their report relied, on July 8, 2020.

The experts used their specialized knowledge to calculate the amount of revenue derived from the GetAds IPs. To do so, they segregated "external email" revenue from "internal email" revenue, because Company A only used the GetAds IPs for internal email campaigns.[2] After calculating the percentage of internal email sent using the GetAds IPs, and multiplying that percentage against the relevant period's internal email revenue, they concluded the proceeds were approximately $4.5-$5 million.

Through Mr. Kinrich and Mr. Benkert's testimony, the government will show that the GetAds IPs obtained by defendants were used to make millions of dollars sending billions of commercial email messages. This testimony is relevant and material to both the CAN-SPAM and wire fraud counts insofar as it will help show that the conspiracy arranged to send the requisite volume of commercial emails and provided a motive for the fraudulent scheme.

**A. David E. Benkert**

<u>Overview of Relevant Background</u>

Mr. Benkert is a Senior Managing Director in Ankura Consulting's Disputes and Economics practice. For over three decades, he has advised clients on financial, regulatory, and compliance oversight issues. These activities have included financial accounting investigations, expert witness testimony, damage calculations, disclosures, and financial performance reviews. Mr. Benkert has provided these services for organization management, boards of directors for public, non-public entities and not-for-profit organizations. Mr. Benkert has provided deposition, trial testimony, and presentations to Federal and State Regulators. Mr. Benkert is a Certified Public Accountant and certified in

---

[2] As will likely be established through the testimony of past and present Company A employees, "external email" refers to commercial email sent by Company A affiliates and "internal email" refers to commercial email sent by Company A.

Financial Forensics.  Additional details are available in Mr. Benkert's C.V., which has been produced in discovery.

Summary of Testimony

Mr. Benkert, based on his specialized knowledge, will explain how he calculated the amount of Company A's internal revenue pool, which was used to determine the revenue generated from use of the GetAds IPs. The government anticipates that Mr. Benkert will explain that he analyzed Company A financial statements, general ledger records, and records stored and managed using software called "Direct Track" and "CAKE" to establish the internal email revenue. The government anticipates that Mr. Benkert will explain that he identified the time frame during which Company A used the GetAds IPs to generate revenue and then estimated the internal email revenue generated during this time.  In particular, the government anticipates that Mr. Benkert will testify that Company A used the GetAds IPs to generate revenue from June 2011 through March 2014.

The government also anticipates that Mr. Benkert will testify that he determined the internal email revenue by subtracting external email revenue from the general ledger records, rather than calculating them directly, because Company A did not directly track internal email revenue throughout the relevant period. The government anticipates that Mr. Benkert will testify that, during the June 2011 through March 2014 period, Company A's general ledger data showed total email revenue of $317,253,029, its affiliate tracking records showed total external email revenue of $219,710,703, and, through basic subtraction, the total internal email revenue for this period would have been $97,542,326. The government anticipates that Mr. Benkert will further testify that he was able to attribute the total internal email revenue figure of $97,542,236 to four specific time frames, specifically: $49,096,047 in June 2011 through February 2012; $33,418,691 in March 2012 through December 2012; $12,895,297 in January 2013 through December 2013; and $2,132,291 in January 2014 through March 2014.

//

### B. Jeffrey H. Kinrich

<u>Overview of Relevant Background</u>

Mr. Kinrich has over four decades of consulting experience with business clients and individuals on engagements involving applications of financial and economic analysis, accounting, business valuation, and statistics. Mr. Kinrich specializes in damage quantification and valuation in the areas of commercial litigation and intellectual property. Mr. Kinrich has testified frequently on damages, valuation, and accounting issues in numerous state and federal courts. He is a Certified Public Accountant and holds an Accreditation in Business Valuation. Additional details are available in Mr. Kinrich's C.V., which has been produced in discovery.

<u>Summary of Testimony</u>

Mr. Kinrich's testimony, based on his specialized knowledge, will explain how he calculated Company A's estimated revenue from use of the GetAds IPs. The government anticipates that Mr. Kinrich will explain that he analyzed data from Company A's monthly operational reports, which the company and its employees referred to as "BlackMail reports." The BlackMail reports documented the volume of internal emails delivered by specific IP blocks from Company A's mailing system.[3] The government anticipates that Mr. Kinrich will explain that he used the BlackMail reports, in conjunction with the internal email revenue calculations, to estimate the revenue from the GetAds IPs.

The government anticipates that Mr. Kinrich will testify that, prior to March 2012, there was either no BlackMail data or only incomplete data. The government anticipates that Mr. Kinrich will explain how he calculated the volume of internal email sent via the GetAds IPs during the June 2011 through February 2012 time frame without the BlackMail reports. The government anticipates that Mr. Kinrich will testify that, for the March 2012 through March 2014 time frame, he calculated the volume of internal email sent via the

---

[3] The government has previously produced to the defense the approximately 18,715 BlackMail reports that it obtained via grand jury subpoena from Company A. As a courtesy, an electronic index with the bates numbers of these BlackMail reports will be provided to the defense along with this notice.

GetAds IPs using the BlackMail reports data. The government anticipates that Mr. Kinrich will testify that he applied these volume calculations against the overall internal email revenue calculations to calculate the revenue generated through use of the GetAds IPs as follows:

| Time Period | Internal Email Rev. | GetAds IPs % Use | GetAds Revenue[4] |
|---|---|---|---|
| 6/2011 – 2/2012 | $49.096 million | ~3.3% | ~$1.620 million |
| 3/2012 – 12/2012 | $33.419 million | ~3.3% | ~$1.275 million |
| 1/2013 – 12/2013 | $12.985 million | ~11.7% | ~$1.514 million |
| 1/2014 – 3/2014 | $2.132 million | ~27.9% | ~$480,000 |

The government further anticipates that Mr. Kinrich will testify that Company A business records, including the BlackMail reports, show that Company A used the GetAds IPs to send over 1.3 billion commercial emails in January 2014, and over 493,000 commercial emails in February 2014.

DATED: March 10, 2022

Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

/s/Melanie K. Pierson
Assistant United States Attorney

/s/Sabrina L. Fève
Assistant United States Attorney

/s/Candy Heath
Senior Counsel
Computer Crime and Intellectual Property Section
Department of Justice, Criminal Division

---

[4] At trial, the government anticipates that Mr. Kinrich's testimony will describe the revenue and volume calculations as a range.