**BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS LINCENBERG & RHOW P.C.**
Gary S. Lincenberg, SBN 123058
Nicole R. Van Dyk, SBN 261646
Darren L. Patrick, SBN 310727
Alexis A. Wiseley, SBN 330100
1875 Century Park East, Floor 23
Los Angeles, CA 90067
Telephone: (310) 201-2100
Email: glincenberg@birdmarella.com
          nvandyk@birdmarella.com
          dpatrick@birdmarella.com
          awiseley@birdmarella.com

*Attorneys for Petr Pacas*

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
Thomas H. Bienert, Jr., SBN 135311
James D. Riddet, SBN 39826
Whitney Z. Bernstein, SBN 304917
Carlos A. Nevarez, SBN 324407
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Email: tbienert@bklwlaw.com
          jriddet@bklwlaw.com
          wbernstein@bklwlaw.com
          cnevarez@bklwlaw.com

*Attorneys for Mohammed Abdul Qayyum*

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKYAND POPEO, P.C.**
Randy K. Jones, SBN 141711
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Telephone: (858) 314-1510
Email: rkjones@mintz.com

Daniel J. Goodrich, BBO 692624 (Pro Hac)
Ryan Dougherty, BBO 703380 (Pro Hac)
1 Financial Center
Boston, MA 02111
djgoodrich@mintz.com
rtdougherty@mintz.com

*Attorneys for Mark Manoogian*

**WIECHERT, MUNK & GOLDSTEIN, PC**
David W. Wiechert, SBN 94607
Jessica C. Munk, SBN 238832
27136 Paseo Espada, Suite B1123
San Juan Capistrano, CA 92675
Telephone: (949) 361-2822
Email: dwiechert@aol.com
          jessica@wmgattorneys.com

*Attorneys for Jacob Bychak*

1
2
3
4
5
6
7
8
9
10
11

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JACOB BYCHAK, *et al.*,<br><br>    Defendants. | Case No. 18-CR-4683-GPC<br>Honorable Gonzalo P. Curiel<br><br>**DEFENDANTS' MOTION IN LIMINE NO. 3:**<br><br>**TO PRECLUDE THE GOVERNMENT FROM IMPROPERLY RELYING ON THE NORTEL TRANSACTION AT TRIAL TO PROVE DEFENDANTS' STATE OF MIND WHEN ACQUIRING IP ADDRESSES FROM GETADS**<br><br>Date:  April 7, 2022<br>Time: 1:00 p.m.<br>Dept.: 2D |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on April 7, 2022, at 1:00 p.m., or as soon

thereafter as the matter may be heard in the courtroom of the Honorable Gonzalo P.

Curiel, United States District Court Judge, located at 221 West Broadway, San

Diego, California 92101, Courtroom 2D, Defendants Jacob Bychak, Mark

Manoogian, Mohammed Abdul Qayyum, and Petr Pacas (collectively,

1  "Defendants") hereby move the Court to preclude the government from arguing at

2  trial that because Company A purchased certain internet protocol ("IP") addresses

3  from its vendor, GetAds, between 2011 and 2013 for less than $2 per IP address—

4  whereas Microsoft paid $11 per IP address in connection with the Nortel

5  Transaction (as hereinafter defined) in 2011—Defendants knew or should have

6  known that the purportedly "below-market" GetAds IP addresses had been

7  unlawfully obtained, "stolen," or "hijacked."

8      This Motion *In Limine* No. 3 is based on Federal Rules of Evidence 104(b),

9  403 and 704, this Notice of Motion, the below Memorandum of Points and

10  Authorities, the Indictment, and such other and further argument and evidence as

11  may be presented to the Court at the hearing on this matter.

12

13  Dated:  March 24, 2022

**BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.**

14

15  By:  *s/ Gary S. Lincenberg*
      Gary S. Lincenberg
16      Nicole Rodriguez Van Dyk
      Darren L. Patrick
17      Alexis A. Wiseley
      *Attorneys for Petr Pacas*

18

19  Dated:  March 24, 2022      **WIECHERT, MUNK & GOLDSTEIN, PC**

20  By:  *s/ Jessica C. Munk*
      Jessica C. Munk
21      David W. Wiechert
      *Attorneys for Jacob Bychak*

22

23  Dated:  March 24, 2022

**BIENERT KATZMAN LITTRELL WILLIAMS LLP**

24

25  By:  *s/ Whitney Z. Bernstein*
      Whitney Z. Bernstein
26      Thomas H. Bienert, Jr.
      James D. Riddet
27      Carlos A. Nevarez
      *Attorneys for Mohammed Abdul Qayyum*

28

2

1    Dated:  March 24, 2022          **MINTZ, LEVIN, COHN, FERRIS,**
2                                    **GLOVSKY AND POPEO, P.C.**

3                                    By:  *s/ Randy K. Jones*
                                         Randy K. Jones
4                                        Daniel J. Goodrich (Pro Hac)
                                         Ryan Dougherty (Pro Hac)
5                                        *Attorneys for Mark Manoogian*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.     INTRODUCTION**

3          Defendants Jacob Bychak, Mark Manoogian, Mohammed Abdul Qayyum,

4    and Petr Pacas (collectively, "Defendants") are charged with wire fraud based on

5    allegations that they "fraudulently acquired" certain internet protocol ("IP")

6    addresses that Company A purchased from GetAds between 2011 and 2013.  (*See*

7    Indictment ¶ 2(c)).  In arguing that IP addresses qualify as "property" within the

8    meaning of the wire fraud statute, the government has relied on an unrelated, third-

9    party transaction in 2011 in which Nortel Networks, Inc.—a debtor in the Delaware

10   Bankruptcy Court—sold its rights "in and to" 666,624 legacy IP addresses to

11   Microsoft for $7.5 million, or approximately $11 per IP address (the "Nortel

12   Transaction").[1]

13         Defendants anticipate that the government will also seek to use the Nortel

14   Transaction at trial as purported state-of-mind evidence related to Defendants'

15   acquisition of IP addresses from GetAds.  Specifically, the government may seek to

16   argue that because Company A purchased IP addresses from GetAds for less than $2

17   per IP address—whereas Microsoft paid $11 per IP address in the Nortel

18   Transaction—Defendants knew or should have known that their "below-market" IP

19   addresses had been unlawfully obtained, "stolen," or "hijacked."  Indeed, the

20   government recently identified Sandra Brown—a Nortel representative at the time

21   of the Nortel Transaction—as an anticipated expert witness to "render opinions on

22   the value of IP addresses and the factors affecting or influencing value during the

23   times relevant to the conspiracy timeframe."  *See* ECF No. 340.

24         The government should be excluded from using the Nortel Transaction—or

25   Sandra Brown's anticipated testimony about it—as purported evidence of

26

27   [1]  *See In re Nortel Networks Corp.*, Case No. 09-10138 (Bankr. D. Del. 2010), D.I.

28   5315 (Sale Order); D.I. 5252-1 (Amended Purchase Agreement).

Defendants' state of mind for numerous reasons.

*First*, for the Nortel Transaction to have any relevance to the Defendants' intent, the government would have to establish a large number of predicate facts which are now absent from the record. These include: (1) Defendants' actual knowledge of the Nortel Transaction; (2) Defendants' subjective belief that the Nortel Transaction's $11-per-IP-address price represented the objective "value" of the IP addresses that Company A purchased from GetAds; (3) facts demonstrating that Microsoft paid "fair value" in the Nortel Transaction; and (4) facts demonstrating that the market valued the GetAds IP addresses at a higher price than Company A paid. Without evidence of these predicate facts (which the government has failed to establish), the Nortel Transaction is irrelevant to the Defendants' state of mind while transacting business with GetAds, and should be excluded under Rule 104(b) if offered for that purpose.

*Second*, the government's reliance on the Nortel Transaction as evidence of criminal intent would be highly prejudicial and confusing, and should therefore excluded under Rule 403. The fact that Microsoft is a giant, well-known company might cause a juror to infer—without independent evidence—not only that Defendants were aware of the Nortel Transaction, but that the $11-per-IP price was an objective "market" standard applicable to all buyers and sellers. Further, the Nortel Transaction has little to no probative value here. Defendants played no role in the Nortel Transaction, nor were they experts in the field of brokering or valuing IP addresses. At most, Company A acquired certain IP addresses for the sole purpose of conducting its email marketing business.

## II. BACKGROUND

### A. The Wire Fraud Counts in the Indictment Accuse Defendants of Scheming to Acquire Inactive IP Addresses

On October 31, 2018, the government brought felony criminal wire fraud and CAN-SPAM Act charges against four employees of a large digital advertising

company ("Company A").  The premise of the Indictment is that Defendant employees, who were responsible for leasing or purchasing IP addresses on behalf of Company A, allegedly "acquired" IP addresses for Company A that were in actuality registered to other companies.  (Indictment ¶ 2.)  One dispute at trial will revolve around whether Defendants believed they were purchasing legitimate IP addresses from the government's cooperating witness Daniel Dye and his company, GetAds; or whether, as the government alleges, Defendants knew the addresses to be "stolen".  Defendants deny the government's characterization of the events.

**B.    The Government Relies on the Nortel Transaction To Support The Wire Fraud Counts In the Indictment**

The government has relied on the Nortel Transaction in its prior briefing as purported evidence that IP addresses are "something of value" and, therefore, qualify as "property" within the meaning of the wire fraud statute—which Defendants dispute.  *See*, *e.g.*, Government's 6/26/20 *Response In Opposition to Defendants' Motion to Dismiss the Wire Fraud Counts for Fifth Amendment Due Process & Sixth Amendment Due Process Violations*, ECF No. 176, at 28-29 (referring to the "$7.5 million sale of 660,000 IPv4 addresses from Nortel to Microsoft" as evidence that IP addresses have monetary value).

Defendants dispute the government's characterization of the Nortel Transaction as evidence that IP addresses are "property."  In fact, the American Registry of Internet Numbers (ARIN) intervened in the Nortel bankruptcy case, took the position that IP addresses are ***not*** property, and insisted on modifications to the Microsoft-Nortel purchase agreement and the proposed sale order (both of which the bankruptcy court accepted), including crossing out the following sentence: "~~The Internet Numbers are property of the Seller's bankruptcy estate~~."  *See In re Nortel Networks Corp.*, Case No. 09-10138 (Bankr. D. Del. 2010), D.I. 5252-5 (Blackline Sale Order) at p. 8; *see also id.*, D.I. 5252-4 (Blackline Purchase Agreement) (conforming changes).

C.      **The Government Identifies Sandra Brown—A Nortel Insider—As An Expert Witnesses**

On March 10, 2022, the government filed its *First Notice of Expert Witnesses and Witnesses with Expertise*, which named Sandra Brown—a representative of Nortel at the time of the Nortel Transaction—as an anticipated expert witness at trial.  *See* ECF No. 340.  The disclosure states, in relevant part:

> Sandra Brown is the president and founder of IPv4 Market Group (https://ipv4marketgroup.com). Since its creation in May 2011, IPv4 Market Group has been a full-service broker of IPv4 netblocks, and specializes in IPv4 transfers from sellers to buyers in ARIN, RIPE, and APNIC regions. Prior to creating IPv4 Market Group, Ms. Brown worked as the Director of IT Engineering at Nortel Networks Corporation (Nortel) from January 2010 through May 2011. ***In May 2011 while at Nortel, Ms. Brown orchestrated the very first commercial transfer, a $7.5 million sale of 660,000 IPv4 addresses from Nortel to Microsoft, which inspired the creation of IPv4 Market Group. Since that first commercial sale, Ms. Brown and IPv4 Market Group have completed over 700 transfers of blocks of IP addresses.***
>
> […]
>
> ***Ms. Brown will describe a typical transaction to sell, purchase, or lease an IP block, as well as the paperwork, time, and resources involved from the 2011-time frame to present-day. Ms. Brown will discuss the industry's standards and practices at or near the dates of the transfers of the netblocks at issue in this case.***
>
> […]
>
> Based on her extensive experience in brokering IPv4s and negotiating and consummating the sale, purchase, or lease of IP netblocks, the government anticipates she will testify that IP addresses are unique, can be sold, and the registered users and/or purchasers of IP addresses can have exclusive possession, use, and control. She will further testify that a sale of a block of IP addresses conveys the rights, title, and interest of the block, and IP addresses have value. ***Relying on her subject matter expertise, and considering the 700 transactions by IPv4 Market Group from 2011 to current-day, Brown will render opinions on the value of IP addresses and the factors affecting or influencing value during the times relevant to the conspiracy timeframe.***

(*See id*. at pp. 5-6 (emphasis added).)

## III.   ARGUMENT

The government should be precluded from arguing at trial that because Company A purchased IP addresses from GetAds for less than $2 each—whereas

Microsoft paid $11 per IP address in connection with the Nortel Transaction—Defendants knew or should have known that the GetAds IP addresses were purportedly tainted or had been unlawfully obtained, "stolen," or "hijacked."

First, under Rule 104(b), evidence that is only conditionally relevant cannot be admitted into evidence unless the condition for relevancy has been met. *See* FRE 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later"). Here, the conditions for relevancy are many and varied. The government would have to prove that Defendants were not only aware of the Nortel Transaction, but believed that the $11-per-IP-address price represented fair value. Moreover, the government would have to prove that Microsoft actually paid "fair value" in the Nortel Transaction, *and* that the GetAds IP addresses were "worth" the same amount. Without evidence of each of these predicate facts, the Nortel Transaction would have no relevance to the Defendants' state of mind while transacting business with GetAds.[2]

Second, under Rule 403, even evidence with marginal relevance should be excluded if its probative value is outweighed by "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence." FRE 403. The Court "has wide latitude in making Rule 403 decisions." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992). The rule "recognizes that as the probative value of evidence decreases, the potential increases

---

[2] To the extent that Ms. Brown's testimony is offered as an opinion about Defendants' state of mind, it must also be excluded under Rule 704. *See* FRE 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."); *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980) (in wire fraud cases, "there is no fraudulent scheme without specific intent").

for it to be substantially outweighed by the dangers identified in the rule." *United States v. Rewald*, 889 F.2d 836, 853 (9th Cir. 1989).

Here, the probative value of the Nortel Transaction is vanishingly low and—even if the government were able to prove each of the predicate facts for its relevancy to Defendants' state of mind when acquiring IP addresses from GetAds—would be unduly prejudicial if offered for that purpose. The Nortel Transaction is a single, third-party transaction with no ties to the facts alleged in the Indictment or to Company A's email marketing business. Yet, jurors might falsely impute knowledge of this transaction, and a purported understanding of the $11-per-IP price as an objective market valuation, simply based on Microsoft's size, name recognition, and overall influence in the tech industry. Furthermore, Company A is a California-based email marketing company, not a multinational behemoth like Microsoft. Because it operates in a different sector of the economy, and has far fewer resources, its commercial activities are not comparable to those of a Fortune 20 company.

## IV.   CONCLUSION

Defendants' Motion in Limine No. 3 should be granted.

Respectfully submitted,

Dated:  March 24, 2022

**BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.**

By:  *s/ Gary S. Lincenberg*
       Gary S. Lincenberg
       Nicole Rodriguez Van Dyk
       Darren L. Patrick
       Alexis A. Wiseley
       *Attorneys for Petr Pacas*

Dated:  March 24, 2022

**WIECHERT, MUNK & GOLDSTEIN, PC**

By:  *s/ Jessica C. Munk*
       Jessica C. Munk
       David W. Wiechert
       *Attorneys for Jacob Bychak*

9

1

2    Dated:  March 24, 2022              **BIENERT KATZMAN**
                                         **LITTRELL WILLIAMS LLP**
3
                                         By:  *s/ Whitney Z. Bernstein*
4                                              Whitney Z. Bernstein
                                               Thomas H. Bienert, Jr.
5                                              James D. Riddet
                                               Carlos A. Nevarez
6                                              *Attorneys for Mohammed Abdul Qayyum*

7
     Dated:  March 24, 2022              **MINTZ, LEVIN, COHN, FERRIS,**
8                                        **GLOVSKY AND POPEO, P.C.**

9                                        By:  *s/ Randy K. Jones*
                                               Randy K. Jones
10                                             Daniel J. Goodrich (Pro Hac)
                                               Ryan Dougherty (Pro Hac)
11                                             *Attorneys for Mark Manoogian*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATION OF AUTHORIZATION TO SIGN SIGNATURE</u>

The undersigned counsel of record for Defendant Petr Pacas certifies that the content of this document is acceptable to each of the Defendants' counsel whose electronic signature appears thereon, and that I have obtained their authorization to sign this document on their behalf.

*s/  Darren L. Patrick*
Darren L. Patrick

DEFENDANTS' MOTION IN LIMINE NO. 3