IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


UNITED STATES,             :
                              :
             Plaintiff  :
                              :
         vs.         :  NO.  18-cr-4683-GPC
                              :
JACOB BYCHAK, et al.,    :
                              :
            Defendants :


VIDEOTAPED TRIAL DEPOSITION OF STEPHEN A. DORN


Taken in the Edward N. Cahn U.S. Courthouse & Federal Building, Conference Room 3600, 504 West Hamilton Street, Allentown, Pennsylvania, on Wednesday, September 15, 2021, commencing at 10:34 a.m., before Steven R. Mack, Registered Merit Reporter, and Bill Heilman, Videographer.


* * *

GALLAGHER REPORTING & VIDEO, LLC
Mill Run Office Center
1275 Glenlivet Drive, Suite 100
Allentown, PA  18106
(610)439-0504 / (800)366-2980
GallagherReporting@Verizon.net

APPEARANCES:

    U.S. DEPARTMENT OF JUSTICE
    CRIMINAL DIVISION
    By:  CANDINA S. HEATH, ESQ.
    1301 New York Avenue NW
    John C. Keeney Building
    Washington, DC 20530
    candina.heath2@usdoj.gov
     -- For the Plaintiff

    WIECHERT, MUNK & GOLDSTEIN, PC
    By:  JESSICA C. MUNK, ESQ.
    27136 Paseo Espada
    Suite B1123
    San Juan Capistrano, CA 92675
    jessica@wmgattorneys.com
     -- For Defendant Jacob Bychak

    MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND
    POPEO, P.C.
    By:  RANDY K. JONES, ESQ.
      MARK J. GOODRICH, ESQ.
    3580 Carmel Mountain Road
    Suite 300
    San Diego, CA 92130
    rkjones@mintz.com
     -- For Defendant Mark Manoogian

    BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C.
    By:  NICOLE R. VAN DYK, ESQ.
    1875 Century Park East, 23rd Floor
    Los Angeles, CA 90067-2561
    nvandyk@birdmarella.com
     -- For Defendant Peter Pacas

        * * *
    GALLAGHER REPORTING & VIDEO, LLC
      Mill Run Office Center
    1275 Glenlivet Drive, Suite 100
      Allentown, PA  18106
     (610)439-0504 / (800)366-2980

    GallagherReporting@Verizon.net

```
APPEARANCES:   (CONT'D.)

                BIENERT KATZMAN LITTRELL WILLIAMS, LLP
                By:   CARLOS A. NEVAREZ, ESQ.
                601 West 5th Street
                Suite 720
                Los Angeles, CA 90071
                cnevarez@bklwlaw.com
                 -- For Defendant Mohammed Abdul Qayyum

ALSO PRESENT:

                Andy Stengel, FBI agent

ALSO PRESENT REMOTELY:

                Melanie Pierson, Esq.
                Sabrina Feve, Esq.
                Ryan T. Dougherty, Esq.
                Darren L. Patrick, Esq.
                James D. Riddet, Esq.
                Ray Christenson, IT
                Dominick Bellizzie, IT
```

* * *

GALLAGHER REPORTING & VIDEO, LLC

Mill Run Office Center

1275 Glenlivet Drive, Suite 100

Allentown, PA  18106

(610)439-0504 / (800)366-2980

GallagherReporting@Verizon.net

INDEX TO WITNESSES

STEPHEN A. DORN

    By Ms. Heath  (Direct)                    13
    By Mr. Jones  (Cross)                     62
    By Ms. Munk   (Cross)                    167
    By Ms. Heath  (Redirect)                 168
    By Mr. Jones  (Recross)                  172
    By Ms. Heath  (Redirect)                 175

INDEX TO GOVERNMENT EXHIBITS

    Exhibit 6        Registration information for    55
                     class B address of 167.87.0.0

    Exhibit 40       Authorization to               44
                     Announce/Re-Announce IP
                     address dated 6/28/13

    Exhibit 190      Color photograph of a man      50

    Exhibit 191      Color photograph of a man      50

    Exhibit 192      Color photograph of a man      50

    Exhibit 193      Color photograph of a man      50

    Exhibit 194      Color photograph of a man      50

    Exhibit 195      Color photograph of a man      50

    Exhibit 196      Fax dated 5/13/93 from         16
                     Stephen A. Dorn and
                     Application for Internet
                     Network Number

    Exhibit 197      Letter from Network Solutions  24
                     dated 5/17/93

    Exhibit 198      Stephen A. Dorn's Siemens      42

                     business card

INDEX TO GOVERNMENT EXHIBITS (CONT'D.)

Exhibit 208      Photocopy of driver's license    53
                 of Stephen A. Dorn for two
                 time periods

Exhibit 209      Document with the subject:       58
                 Hijacked ARIN Legacy block -
                 Moore Products Co.

Exhibit 211      RIPE Database query service      59
                 for IP 167.87.0.0.


INDEX TO DEFENDANT'S EXHIBITS

Exhibit A        Email dated 5/20/21 from          87
                 Steve Dorn to Glenn Booth

Exhibit B        Email dated 5/31/21 from         103
                 Steve Dorn to Glenn Booth

Exhibit C        Emails dated 6/6/21 and          118
                 6/8/21 between Steve Dorn and
                 Glenn Booth







9

13

(The witness was duly sworn.)

DIRECT EXAMINATION

BY MS. HEATH:

Q.          Please state your name for the record,
your full name.

A.          Stephen Alan Dorn.

Q.          And do you reside in or around the
Allentown, Pennsylvania, area?

A.          I resi -- yes.

Q.          Are you married?

A.          Yes.

```
 1    Q.          How long?

 2    A.          I can't remember.  It's 15, 16 years,

 3    something like that.

 4    Q.          Any children?

 5    A.          No.

 6    Q.          Are you currently employed?

 7    A.          No.

 8    Q.          And are you retired?

 9    A.          Yes.

10    Q.          How long have you been retired?

11    A.          Since 2007.

12    Q.          And what type of occupation did you have

13    prior to retiring?

14    A.          I was a manager of computer networks and

15    operations for a company called Moore Products

16    Company since 1975.  And in the year 2000 Siemens

17    purchased our company, and I worked for Siemens up

18    until the year 2006 as --

19    Q.          And what --

20    A.          -- as a computer -- manager of computer

21    networks and operations was my title.

22    Q.          And approximately when did you retire?

23    A.          The last time I worked was in Janu --

24    January 2007.

25    Q.          And are you testifying today in response
```

 1    to a subpoena you received from the Government?

 2    A.          Yes, I am.

 3    Q.          Are you on any medications at this time

 4    that would impair your ability to testify?

 5    A.          No, I am not.

 6    Q.          And have you received any promises or

 7    benefits from the Government in exchange for your

 8    testimony?

 9    A.          No.

10    Q.          Could you tell a little bit about your

11    educational background.

12    A.          I have a four-year degree from Albright

13    College in mathematics and -- and went to work in

14    1975 --

15    Q.          And you said --

16    A.          -- after I graduated.

17    Q.          -- you worked in the IT field?

18    A.          Correct.

19    Q.          Did you receive various trainings along

20    the way?

21    A.          Yes.  A lot of it was self-training, and

22    then there were some courses that I took through the

23    company sending me off to training courses.

24    Q.          And you indicated that you started with

25    Moore Products in 1975; is that correct?

```
 1   A.          Correct.

 2   Q.          Let me turn your attention to 1993.

 3   Were you employed at Moore Products at that time?

 4   A.          Yes.

 5   Q.          And what was your title in 1993?

 6   A.          I think -- can I look in the paperwork

 7   here?

 8   Q.          Are you needing to refresh your

 9   recollection --

10   A.          Yes.

11   Q.          -- with a document?

12   A.          Yes.

13   Q.          Which document would assist you in

14   refreshing your recollection?  If you go to

15   Exhibit 196?

16   A.          Yes.  In Exhibit 196, yes.

17   Q.          And does -- was Exhibit 196 something

18   prepared by you back in 1993?

19   A.          Yes.

20   Q.          And does it have an indication in there

21   as to what your title was at that time?

22   A.          Yes.

23   Q.          And what was your title at that time?

24   A.          Stephen A. Dorn, supervisor of technical

25   services and computer operations.
```

```
 1   Q.          Give us a little background or tell us a
 2   little bit about what Moore Products did,
 3   specifically focused in 1993.
 4   A.          We were a manufacturer of industrial
 5   controls.  And we were based out of Pennsylvania but
 6   had sales offices throughout the United States and
 7   also international locations in Canada and England.
 8   We had some sales offices and locations in Australia
 9   and Singapore, and -- that's about as much as I can
10   remember from there.
11   Q.          Do you have any idea as to how many
12   people were employed by Moore Products at that time?
13   A.          To the best of my recollection, I'd say
14   around 1200 worldwide.
15   Q.          In 1993 did you have internet
16   connectivity?
17   A.          No.
18
19
20
21   Q.          Were you able to communicate with other
22   individuals by email?
23   A.          Within our office, yes.
24   Q.          And how was that?
25   A.          How was that?
```

```
 1   Q.          Yeah, how did that happen?
 2   A.          We had a mainframe computer running
 3   manufacturing software.  People that had the ability
 4   to sign in via a dumb terminal could have an email
 5   account, and they could just email themselves
 6   locally.  We had no external communications.
 7   Q.          And what is a dumb terminal?
 8   A.          It's -- it's just something you can go
 9   up, and it just has a display and a keyboard; and
10   you can hit the return button, and it comes up, and
11   it says give me your user name and password.  You
12   need to sign in, and it connects you to the
13   mainframe computer.  There's no -- there's no
14   personal computer or any of that kind of stuff.
15   Q.          In order to communicate with one another
16   were there IP addresses needed?  At that time.
17
18
19   A.          At the time our email was done via a
20   communications to a mainframe.  So everybody logged
21   in to the mainframe and they were on their own
22   private network, and they could communicate, but all
23   the mail was stored on the mainframe.
24   Q.          Was that sufficient for Moore Products
25   to continue to operate in 1993?
```

1   A.          No.

22   Q.                  You said that your company was

23   able to communicate with one another through the

24   mainframe.

25   A.          Correct.

```
1    Q.          Was that sufficient to continue to

2    operate and grow as you've mentioned?

3    A.          No.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19   Q.          What did Moore Products need to do at

20   that point?

21

22

23

24

25   A.          Moore Products needed to grow.
```

```
 1   Q.          Let me refer you to Government's
 2   Exhibit 196.  Do you recognize that?
 3   A.          Yes.
 4   Q.          And what is that?
 5   A.          This is an application that myself and
 6   my boss wrote for a network address registration so
 7   that our internal network could get attached to the
 8   growing and the new -- newly infantile internet as
 9   we know it today.
10   Q.          And this is a document you prepared
11   along with your boss?
12   A.          Yes.
13   Q.          And who was your boss at that time?
14   A.          His name was Jeffrey Richards.
15   Q.          And was it -- why was it necessary to
16   make an application for this, for IP addresses?
17   A.          At the time we were --
18
19
20   A.          At the time we were -- had our own
21   internal network, and all these devices that we were
22   adding and the personal computers, all the other
23   devices, we were now at a point where we had
24   exceeded the amount of IP addresses that we could --
25   which is 255, which we could use in our own private
```

1    network. Plus we were going to be attaching all

2    the sales offices around the country, around the

3    world onto the internet.

4    In doing so, we needed to increase the amount of

5    IP -- TCP/IP addresses that we had, and in order

6    to do this we applied to Network Solutions, which

7    was the registration services at the time in

8    1993, for a class B, as in baker, IP address

9    network.

10   Q.   And what is a class B IP network?

11   A.   A class B IP address network is one that

12   could give you up to -- it's roughly 65,000 IP

13   addresses that you could use to grow your company

14   with.

15   Q.   What did you have prior to applying for a

16   class B internet network?

17   A.   We had a non-routable class C address. A

18   class C address is a -- an address structure of

19   such that you can have 255 network devices

20   attached to one network; and everybody could know

21   who everybody else is, and they could route

22   information back and forth and also communicate

23   thusly. I'll call it like this: A class C address

24   is -- is 255 people living in their own

25   community and being able to communicate with

1    everybody.

1

2

3

4     Q.          Were you able to obtain a class B

5     network number?

6     A.          Yes.

7     Q.          Let me refer you to Government's

8     Exhibit 197.

9     A.          Okay.

10    Q.          Do you recognize that document?

11    A.          Yes.

12    Q.          And what is that document?

13    A.          A document that we -- was sent from

14    Network Solutions in response to our application

15    that we had just sent them a few days before.  And

16    it says that --

17    Q.          Well, before you read from it, is this

18    something that you received from Network Solutions?

19    A.          Yes.  The date is 17 May,

20    nineteen-nine -- 1993 up at the top.

21

22

23

24

25

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10    Q.           And was Government's Exhibit 196 and

11    197, were they documents kept in your control or

12    your custody during your time at Moore Products?

13    A.           Yes.

14    Q.           And are these true and correct documents

15    from Moore Products?

16    A.           Yes.

17                     MR. JONES:   Objection.

18                     MS. HEATH:   Is there --

19                     MR. JONES:   They're not documents

20    from Moore Products, but objection, lack of

21    foundation.

22

23

24

25
```

BY MS. HEATH:

Q.          Let me ask it this way:  Was
Government's Exhibit 196 and 197 documents prepared
and used in the ordinary course of business at Moore
Products?

A.          The documents in question were documents
for submission to Network Solutions for a class B IP
address string.  I had to fill out the questions
that were required by Network Solutions in order to
solicit them for a network -- a class B network.

                    In response to the -- in response
to my application, and I say my -- our -- from Moore
Products Company, we were granted a class B IP
address network from the company called Network

27

```
 1    Solutions, which at the time was in charge of
 2    internet registration.
 3                    In response to the application, on
 4    the -- on a letter of May 17th, 1993, I received
 5    from Network Solution -- and when I say I, and Moore
 6    Products Company, received this letter stating that
 7    we have been granted a class B IP address network.
 8    Q.          Mr. Dorn, I -- I appreciate the
 9    explanation, and that helps clarify Government's
10    Exhibits 196 and 197.   Did Government's Exhibits 196
11    and 197, were they maintained in the ordinary course
12    of business of Moore Products?
13                    MR. JONES:   Objection.
14                    MS. VAN DYK:   Objection:   lacks
15    foundation.
16                    MR. JONES:   In particular to 197.
17                    MS. VAN DYK:   And compound.
18    A.          These documents were kept at Moore
19    Products Company and shared with everybody, the
20    network administrators throughout the rest of the
21    organization, stating the fact that we were granted
22    a class B IP address
23
24
25                    MR. JONES:   Move to strike as
```

1    nonresponsive and lack of foundation as to 197.

16    BY MS. HEATH:

17    Q.          And in your position at Moore Products

18    you were able to maintain care, custody, and control

19    over Government's Exhibits 196 and 197, correct?

23    A.          These documents were sent to Moore

24    Products Company and maintained and stored in filing

25    cabinets at Moore Products Company.

1          MS. HEATH:   The Government offers

2   Government's Exhibits 196 and 197 into evidence.

3          MR. JONES:   Objection:   lack of

4   foundation with respect to 197 in particular,

5   compound, and lack of personal knowledge.

6          MS. MUNK:   And hearsay.

7   Q.          Mr. Dorn, let me refer you to

8   Government's Exhibit 196.  What was the date of the

9   application for the class B internet address network

10  number?

11  A.          May 13th, 1993.

12  Q.          And you were the sender on this

13  document; is that correct?

14  A.          Yes.

15

16

17

18

19  Q.          Your name appears as Stephen A. Dorn.

20  Is that how you would normally refer to yourself?

21  A.          Yes.  Professionally that's how I would

22  sign all my documents.

23  Q.          And on the first page of Government's

24  Exhibit 196 it has your name with the title

25  "Supervisor, Technical Services & Computer

```
 1  Operations," correct?
 2  A.          Correct.
 3  Q.          Was that your title at that time?
 4  A.          Yes.
 5  Q.          On page 2 of the document, it appears to
 6  be addressed to Network Solutions.  Is that correct?
 7  A.          Correct.
 8  Q.          And what was Network Solutions?
 9
10
11
12  A.          Network Solutions was the organization
13  at that time that was responsible for all internet
14  addresses maintained and assigned.  So we need to --
15  we needed to fill out the questionnaire as we did
16  here on all -- all of these, which there's eight
17  questions that needed to be answered and submitted
18  to Network Solutions in order to solicit them and
19  get an IP address registered to Moore Products
20  Company.
21
22
23
24
25
```

1

2

3

4

5

6

7

8   Q.          No. 2:  It says "no nic handle at this

9   time."  What does that mean?

10

11

12   A.          A NIC handle to the best of my ability

13   was the fact that we didn't have anybody registered

14   with Net -- Network Solutions as a -- like a user ID

15   would be today.  None of us within Moore Products

16   Company had a NIC handle.

17   Q.          And your name is the only name that

18   appears on this in answer to the question No. 2,

19   correct?

20   A.          Correct.

21   Q.          You indicate the address for Moore

22   Products Company that -- Sumneytown Pike; is that

23   correct?

24   A.          Yes.  S-u-m-n-e-y-t-o-w-n.

25   Q.          Okay.  And that's Spring House,

```
1    Pennsylvania?
2    A.          Correct.
3    Q.          There's a network mailbox.  Is that the
4    network that you discussed earlier as far as the
5    addressing system for Moore Products?
6    A.          The network mailbox --
7
8
9    A.          The network mailbox SMTP, percent sign,
10   quote, DORNSA@MPCDP3, end quote, that was the
11   mainframe email and was not connected out to the
12   outside world whatsoever.  That was just our
13   internal email.
14   Q.          Okay.
15
16
17
18
19
20
21
22   Q.          The Network Name Recommendation is
23   "mpco.com."  Do you see that?
24   A.          Correct.
25   Q.          What was that for?
```

1    A.          They needed a network name, and at the

2    time we thought it was the best thing to see; MPCO

3    standing for Moore Products Company.

4

5

6

7

8

9

10

11   Q.          And let me refer you to Government's

12   Exhibit 197.  And what was the date that you

13   actually received the class B network number?

14   A.          17 May, 1993.

15

16

17

18

19   Q.          Is that the date on the top of the

20   Government's Exhibit 197?

21   A.          Correct.

22   Q.          Is it addressed to you?

23   A.          Yes.

24   Q.          What was the network number that you

25   were given?

34

```
1    A.            167.87.0.0.

2

3

4

5

6

7

8    Q.            And how many numbers did you receive in

9    this network?

10   A.            Again, it's roughly 65,000.
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

37

```
15   Q.              Was the acquisition of a class B network
16   system important for your company?
17   A.              Yes.
18                   MS. MUNK:  Object:  vague.
19                   MS. VAN DYK:  Objection:  vague.
20                   MR. JONES:  Asked and answered.
21   Q.              And why was that?
22                   MR. JONES:  Objection:  relevance,
23   asked and answered.
24                   MS. VAN DYK:  Vague and personal
25   knowledge and lacks foundation.
```

38

A.              A class B network address was necessary
in order for our company to grow and be successful
and compete in the -- in the world of process
controls.  It allowed us to put our sales offices in
remote locations online and allowed them to
communicate to the internet directly.

              MR. JONES:  Move to strike as
nonresponsive.

1

2

3    Q.          The assignment of the class B network

4    number 167.87.0.0 through 167.87.255.255, was that

5    internet range allowed to be used by any other

6    company or any other individual?

7                    MR. JONES:  Objection:  lack of

8    foundation, misstates the evidence contained on 197,

9    is vague, lack of personal knowledge.

10                   MS. VAN DYK:  Calls for a legal

11   conclusion.

12   A.          The document that we see here was a

13   document from Network Solutions that assigned the

14   class B IP address network of 167.87 to Moore

15   Products Company and Moore Products Company alone.

16                   MR. NEVAREZ:  Strike as

17   nonresponsive.

18

19

20

21

22

23

24

25

1

2

3

4

5

6    Q.          You mentioned that in 2000 the Siemen

7    Corporation acquired Moore Products; is that

8    correct?

9

10

11

12   A.          In the year 2000 Siemens purchased Moore

13   Products Company.

14   Q.          And were you still working at Moore

15   Products Company at that time?

16   A.          Correct, yes.

17   Q.          What was your title at the time of the

18   Siemens Corporation acquisition?

19   A.          Manager of computer operations and

20   networks.

21   Q.          And what did that job entail?

22   A.          It entailed maintaining our global

23   network, as well as our internal network at the

24   corporate headquarters, and all of the operations on

25   a day-to-day basis of our manufacturing computer

1    software that ran the business.

2    Q.          When Siemens Corporation acquired Moore

3    Products, did your title change?

4    A.          No.  I -- I still remained computer --

5    manager of computer operations and networks,

6    networks and operations.

7    Q.          And what became of the title of the

8    company Moore Products?

9    A.          Due to the fact that Siemens purchased

10   Moore Products, the name of Moore Products and all

11   the assets thereof of Moore Products Company were

12   purchased and assumed by Siemens,

13

14                MR. JONES:  Objection:  lack of

15   foundation, lack of personal knowledge, calls for

16   speculation, and vague.

17                MS. VAN DYK:  And nonresponsive.

18   Q.          How long did you work for Siemens

19   Corporation?

20   A.          Until 2006.

21   Q.          And with regard to the transition, was

22   there any change of location, change of business as

23   far as your personal day-to-day involvement?

24

25

1   A.          Everything -- everything was changing.

2   We got assimilated into their network.  There was a

3   project that had us go through and re-address our

4   entire network in order to fit into the now Siemens

5   network.

6                   And day-to-day operations?  A lot

7   were the same and some were different because of

8   Siemens now owned us, so we played by the rules that

9   Siemens dictated to us.

10  Q.          Let me show you Government's

11  Exhibit 198.  And what is -- do you recognize

12  Government's Exhibit 198?

13  A.          Yes.  That is my business card.

14  Q.          Is that a business card from the time

15  that you were working for Siemens?

16  A.          Yes.

17  Q.          And is that a business card that you --

18  you used on a daily basis for the business?

19  A.          Yes.

20  Q.          Is everything on that card true and

21  correct?  And I know it has been redacted, but

22  everything that shows on the card, is that true and

23  correct?

24  A.          Yes.

25

```
 1
 2                    MS. HEATH:  The Government offers
 3     Government's Exhibit 198 into evidence.
 4
 5
 6     Q.          Now, how long did you work for Siemens?
 7     A.          Until the year 2006.
 8     Q.          And was this business card accurate from
 9     2000 when you were acquired -- or Moore Products was
10     acquired by Siemens to the time that you ended your
11     involvement with Siemens?
12     A.          Yes.
13     Q.          Now, the address remains the same on
14     this:  the Sumneytown Pike in Spring House,
15     Pennsylvania; is that correct?
16     A.          Correct.
17     Q.          That the -- the name is the same as we
18     saw on the previous document:  Stephen A. Dorn; is
19     that correct?
20     A.          Correct.
21     Q.          And the title provided on the document,
22     is that the title that you had while working for
23     Siemens?
24     A.          Yes.
25     Q.          You have an email address on there:
```

1  steve.dorn@sea.siemens.com.  Was that your email
2  address at the time?
3  A.        Yes.
4  Q.        Now, the SEA before Siemens, what did
5  that stand for?
6  A.        Siemens Energy & Automation.  It's like
7  a division of -- Siemens is so large that they have
8  different divisions.
9  Q.        Now, after the Siemens acquisition of
10  Moore Products, was there any part of Moore Products
11  that continued on separately from Siemens?
12
13
14
15
16
17
18  A.        No.  Everything that was owned by Moore
19  Products Company was purchased by Siemens.
20              MS. VAN DYK:  Move to strike as
21  nonresponsive, and lacks personal knowledge, lacks
22  foundation.
23  Q.        Let me refer you to Government's Exhibit
24  No. 40.  Do you recognize that exhibit?
25  A.        No.

45

```
1    Q.          Were you ever shown this exhibit?

2    A.          Can you repeat the question, please?

3    Q.          Were you ever shown this exhibit?

4

5    A.          In the -- in the year 2015 I was

6    contacted by an FBI agent and shown this document.

7

8

9

10

11   Q.          Now, is that your signature on the

12   document?

13   A.          No.

14   Q.          Is that your normal signature block that

15   you use professionally?

16   A.          No.

17

18

19

20   A.          Anything that I sign professionally was

21   Stephen A. Dorn and not Steve Dorn.

22   Q.          Now, at the top of the letter it's dated

23   June 28th, 2013.  Were you working for Moore

24   Products in 2013?

25   A.          No.
```

46

```
 1    Q.          Did Moore Products even exist in 2013?

 2    A.          No.

 3    Q.          Were you even working for Siemens in

 4    2013?

 5    A.          No.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Q.          Did anybody ever contact you prior to
```

```
 1   June 28th, 2013, or around that time to get your
 2   authority to sign this letter?
 3   A.          No.
 4
 5
 6
 7   Q.          Did anybody around June 28th, 2013, ask
 8   for permission to use your name in a letter such as
 9   this?
10
11   A.          No.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Q.         Do you see in Government's Exhibit 40

21   that it is the same IP address that was provided to

22   you or assigned to you in Government's Exhibit 197?

23

24

25

```
 1    A.          Yes.

 2    Q.          And it indicates at the -- just above

 3    the signature that -- it says, "I certify that I am

 4    authorized on behalf of Moore Products to execute

 5    this letter of agency."  Do you see that statement?

 6    A.          Yes.

 7    Q.          Did you have any authorization in June

 8    of 2013 to sign anything on behalf of Moore

 9    Products?

10

11

12    A.          No.

13    Q.          At the bottom of the letter it appears

14    to have an address for some entity.  Do you see

15    that?

16    A.          Yes.

17    Q.          Was that the correct address for Moore

18    Products when Moore Products did exist?

19    A.          No.

20    Q.          Why is that?

21    A.

22                                            it says

23    Sunnytown Pike, S-u-n, as in Nancy, -n, as in Nancy,

24    -y-t-o-w-n Pike.  Moore Products Company was at

25    Sumneytown Pike; S-u-m, as in Mary, -n, as in Nancy,
```

1    -e-y-t-o-w-n Pike.

2

3

4

5

6    Q.          Were you aware of any other Steve Dorns

7    that worked for Moore Products or Siemens during the

8    time that you worked for Moore Products or Siemens?

9    A.

10

11

12   A.          There was nobody at Moore Products

13   Company by the name of Steve Dorn.  I am unable to

14   answer that question because of the fact Siemens is

15   such a global company, and they could very well have

16   another Steve Dorn.  I have no clue.

17

18

19

20

21   Q.          Let me refer you to Government's

22   Exhibits 190 through 195 and ask if you have had a

23   chance to look at these photographs before coming

24   into this room today.

25   A.          They were provided to me in an email,

```
 1    and I have reviewed them, as I am doing now again.
 2    Q.          Do you recognize any of those
 3    individuals?
 4    A.          No.
 5    Q.          Do you recognize any of the names of
 6    these companies?  Hostwinds, H-o-s-t-w-i-n-d-s.
 7    A.          No.
 8    Q.          Adconion, A-d-c-o-n-i-o-n.
 9
10
11    A.          No.
12    Q.          Amobee, A-m-o-b-e-e.
13    A.          No.
14
15    Q.          GetAds, G-e-t-a-d-s.
16
17    A.          No.
18    Q.          CoreXchange, the C-o-r-e-X-c-h-a-n-g-e.
19
20    A.          No.
21    Q.          Do you recognize the names of these
22    individuals?  Jacob Bychak.
23    A.          No.
24    Q.          Mark Manoogian.
25    A.          No.
```

```
1    Q.          Mohammed Abdul Qayyum.

2    A.          No.

3    Q.          Peter Pacas.

4    A.          No.

5    Q.          Daniel Dye.

6    A.          No.

7    Q.          Vincent Tarney.

8    A.          No.

9    Q.          Did any of these individuals or entities

10   contact you regarding the transfer of the block --

11

12   Q.          -- 167.87.0.0?

13   A.          No.

14   Q.          Did you ever authorize any of these

15   individuals or entities to use your name?

16

17

18

19   A.          No.

20   Q.          Did you ever authorize any of these

21   individuals or entities to sign Government's

22   Exhibit 40 on your behalf?

23

24

25
```

1

2   A.          No.

3

4   Q.          Did you personally ever transfer or

5   attempt to transfer the IP block 167.87.0.0 through

6   167.87.255.255 to any other person?

7

8

9

10

11  A.          No.

12  Q.          Let me refer you to Government's

13  Exhibit 208, and ask you if you recognize that.

14  A.          Yes.

15  Q.          And what is Government's Exhibit 208?

16  A.          They're copies of my driver's license.

17  Q.          And there are two different licenses

18  presented there; is that correct?

19  A.          Correct.

20  Q.          Do they represent different time frames?

21  A.          Yes.

22  Q.          Unfortunately, they're redacted.  Is --

23  do you recall the time frames that these two

24  driver's licenses represent?

25  A.          The first one was from 2009 to -- and

54

```
 1    it's usually four to -- four to five years, so it
 2    would be 2013, 2014.  And then the second one would
 3    be when the termination of the first one was, which
 4    would again be 2014 till 2017.
 5
 6
 7    Q.          Do these driver's licenses, are they --
 8    are they accurate driver's licenses?
 9    A.          Yes.
10    Q.          Did you provide copies of these to the
11    Government?
12    A.          Yes.
13                    MS. HEATH:  The Government would
14    offer into evidence Government's Exhibit 208.
15
16
17    Q.          On each driver's license in Government's
18    Exhibit 208 there appears to be a signature; is that
19    correct?
20    A.          Correct.
21    Q.          Is that your accurate signature?
22    A.          Yes, it is, Stephen A. Dorn.  That's the
23    way I sign it, all official documents.
24
25
```







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MS. HEATH:   Pass the witness.



1

2                    First of all, just so I'm clear,

3    you worked at Moore from 1975 to 2000, correct?

4    A.           Correct.

5    Q.           And I believe you testified that during

6    the time that you worked there from 1975 to 2000

7    Moore had about 1200 employees?

8    A.           To the best of my recollection, yes.

9    Q.           And when you started there in 1975, how

10   many employees would you say Moore had?

11   A.           I can't answer that.

12   Q.           Okay.  Did they have less than 1200 in

13   1975, or did they always have 1200 employees during

14   the 25 years that you worked there?

15   A.           I can't answer that.

16   Q.           Okay.  You also said that the -- when

17   Moore was purchased by Siemens in 2000, that Siemens

18   was a global company; isn't that correct?

19   A.           Siemens was a global company and still

20   is.

21   Q.           Okay.  And I believe you testified that

22   Siemens had thousands of employees worldwide,

23   correct?

24   A.           Correct.

25   Q.           20,000?  Do they have 20,000 or more?

1   A.          You'd have to check with Siemens.

2   Q.          I know, but your testimony is that they

3   had thousands of employee -- employees.  So when you

4   said that they -- you testified that they had

5   thousands of employees, how many thousands of

6   employees were you referring to?

7

8   A.          You'd have to check with Siemens.

9   Q.          I understand, and we will do that, but

10  I'm asking you.  When you made that statement that

11  there were thousands of employees, how many

12  thousands of employees were you referring to when

13  you made that statement?

14

15

16  A.          Yes.  Again, check with Siemens for --

17  to get exact numbers.

18  Q.          Okay.  But is your -- is your testimony

19  that they had more employees than Moore Products did

20  at the time you left Moore Products in 2000?

21  A.          Correct.

22  Q.          Okay.  And when you left Moore Products

23  in 2000, you went to work at Siemens for another

24  two -- six years, correct?

25  A.          In the year 2000 Siemens purchased Moore

1    Products Company.

2    Q.          Right.

3    A.          So everything that was Moore Products

4    Company and Moore Products Company related was now

5    owned by Siemens.

6    Q.          Right.  And in fact --

7    A.          And they owned the employees.

8    Q.          Right.  So in fact you testified that

9    Moore Products ceased to exist when Siemens acquired

10   them in 2000, correct?

11   A.          Everything that was Moore Products

12   Company related was now owned by Siemens.

13   Q.          And as you testified, that Moore

14   Products ceased to exist when they were acquired by

15   Siemens; isn't that correct?

16   A.          I testified that -- and I'm not going to

17   say anything more.  Can you clarify it again and ask

18   the question?

19   Q.          You testified on direct examination that

20   at the time Siemens acquired Moore Products that

21   Moore Products ceased to exist as a company; isn't

22   that correct?

23   A.          I testified . . . if that's what you say

24   I testified, you must have more in your notes than I

25   do.

```
 1   Q.          Okay.  All right.
 2   A.          So as far as in the year 2000 Siemens
 3   purchased Moore Products Company.  Moore Products
 4   Company and anything relating to Moore Products
 5   Company and all the assets now belonged to Siemens.
 6   Q.          And that was as of 2000, correct?
 7   A.          Yes.
 8   Q.          And -- and when you -- and you started
 9   to work at Siemens instead of Moore Products in
10   2000; isn't that correct?
11   A.          Yes.
12   Q.          Your business card in fact was changed
13   from a Moore Products business card to a Siemens
14   business card; isn't that correct?
15   A.          Correct.
16   Q.          And you said -- you testified that when
17   you started working at Siemens you had the same job
18   that you had over at Moore Products but with a
19   different company, correct?
20   A.          I had the same job title, now with
21   Siemens.
22   Q.          And it was the same responsibilities
23   that you had at Moore Products, did you carry those
24   over to Siemens?
25   A.          I had those responsibilities and other
```

```
 1    ones that Siemens had dictated that I needed to do.

 2    Q.           Okay.  And you have no idea how many

 3    employees Siemens had at the time you went over to

 4    Siemens in 2000, correct?

 5    A.           I have no actual numbers.  I know that

 6    their location in Alpharetta, Georgia, was larger

 7    than ours and that they had more -- Siemens Energy &

 8    Automation, our division, had many more employees

 9    than Moore Products Company.

10    Q.           How much larger was Siemens' operation

11    in Alpharetta, Georgia, than it was in -- here in

12    Pennsylvania?

13

14    A.           I have no clue.

15    Q.           Can you give me an estimate, your best

16    estimate, as to how many employees were in

17    Alpharetta?

18

19

20    A.           You'd have to -- you'd have to check

21    with Siemens Alpharetta.  They were the corporate

22    headquarters.

23    Q.           During the time that you worked for

24    Siemens from 2000 to 2006 how many times did you go

25    down to the Alpharetta operations?
```

```
 1
 2    A.            Two, three times --
 3    Q.            Okay.
 4    A.            -- possibly.
 5    Q.            Is that -- you said possibly.  You don't
 6    know whether or not --
 7    A.            It's two, three times.  It was many
 8    years ago, sir.
 9    Q.            Okay.  You left Siemens in 2006,
10    correct?
11    A.            Correct.
12    Q.            So that would have been about 15 years
13    ago, correct?
14    A.            If my mathematics is correct, yes.
15    Q.            Okay.  And so when you went down to
16    Alpharetta, was there -- how would you describe
17    their operations in relations to the operations here
18    that you left when you first went over to Siemens
19    with Moore Products?
20
21    Q.            Was it bigger or smaller?
22
23    A.            Can you clarify the question?  Because I
24    don't understand what's going on.
25    Q.            Did the Alpharetta operations have more
```

1    employees than the Moore Products/now Siemens

2    operation?

3    A.          Did the Alpharetta.  With respect to IT

4    operations or --

5    Q.          No.  Total employees.

6    A.          With Siemens?  In Alpharetta and the

7    Georgia area there there's a couple of -- yes.

8    Q.          They had more?

9    A.          I am unable to answer that totally, a

10   hundred percent what the number is

1

2    Q.          How many times, sir, did you go to the

3    operations in Munich, Germany?

4    A.          Never.

5    Q.          Okay.  But would you agree that the

6    operations in Munich was a lot larger employ -- they

7    had more employees in Munich than they had over here

8    in Pennsylvania?

9

10   A.          Yes.

11   Q.          And I believe you testified because of

12   the size of the operation of Siemens that there

13   could have been someone named Steve Dorn in their

14   operations, correct?

15   A.          You'd have to check with Siemens.

16   Q.          I know.  But you testified that there

17   could be a Steve Dorn out of all these employees

18   that Siemens has.  Isn't that what you testified to,

19   sir?

20

21   A.          I did not want to lie and say there was

22   nobody, so I told you there could be.

23   Q.          And so your --

24   A.          But I did not know the answer to that

25   question.

```
 1   Q.          So your testimony then, sir, is that
 2   there could be a Steve Dorn working at Siemens other
 3   than yourself?
 4   A.          It's a global company.
 5
 6
 7
 8
 9
10   Q.          So it's your testimony that there could
11   be a Steve Dorn out of all the employees employed by
12   Siemens, you just don't know for sure.  Is that your
13   testimony, sir?
14   A.          There possibly could be.
15   Q.          Okay.  So let me ask you this:
16   You've -- you've spoken with the Government in this
17   case, correct, prior to today?
18   A.          Yes.
19   Q.          How many times have you personally
20   spoken with either a government attorney or a
21   government agent, FBI or otherwise?  How many times
22   since -- before today?
23   A.          Can you please make that a more specific
24   question?
25   Q.          You said that you were contacted I
```

1  believe for the first time by an FBI agent in 2015.

2  Is that the first time you were contacted by a

3  government agency regarding this case?

4  A.          Yes.

5  Q.          Okay.  And so since 2015 you've been

6  contacted by FBI agents, correct?

7  A.          Yes.

8  Q.          And you've been contacted by government

9  lawyers, correct?

10  A.          Yes.

11  Q.          And you've been contacted by telephone,

12  correct?

13  A.          Yes.

14  Q.          You've communicated with them via email,

15  correct?

16  A.          Yes.

17  Q.          Have you -- and you've seen them in

18  person, correct?

19  A.          Please clarify that?

20  Q.          You've had personal meetings,

21  face-to-face meetings with either agents that

22  represent the government, FBI agents here or from

23  California or in Pennsylvania or government lawyers,

24  you've had personal visits from them --

25

1

2

3

4    A.          I've had one visit from an FBI agent to

5    serve the subpoena.

6    Q.          Okay.  Is that the only time you've had

7    a visit from an FBI agent in person?

8    A.          Face to face?  Yes.

9    Q.          Okay.  And what was that FBI agent's

10   name?

11   A.          Glenn.  I think his last name is Booth.

12   I would -- I would ask you to verify that with the

13   Department of Justice.

14   Q.          And his name you believe is Glenn Booth?

15   A.          You're correct.

16   Q.          Okay.  Between 2015 and today's date,

17   how many phone calls would you say you've had

18   with -- well, let me ask you this:  Did you have any

19   phone calls with Glenn Booth?

20   A.          Yes.

21   Q.          How many phone calls would you say

22   you've had with Glenn Booth since he served the

23   subpoena on you in 2015?

24   A.          Potentially a half dozen.

25   Q.          So at least a half dozens, six?

```
 1   A.          Yes.

 2   Q.          Okay.  Telephone calls?

 3   A.          Yes.

 4   Q.          All right.  Since 2015?

 5   A.          Correct.

 6   Q.          Have you had any telephone calls with

 7   any other FBI agents?

 8   A.          Other than this morning when my

 9   chauffeur picked me up.  (indicating)

10   Q.          Okay.  So the answer is you've had no

11   other telephone calls with -- you've had no

12   telephone calls with any other FBI agents other than

13   Mr. Glenn Booth?  I'm sorry.  Visits, personal

14   visits other than those six times?

15   A.          Can you restate that and -- and put a

16   date upon it so I can answer it correctly?

17

18

19

20

21

22

23

24

25
```

1

2    Q.          Okay.  Let me slow it down for you.

3    When was the first time that you had contact of any

4    kind with the FBI or any government agents or

5    attorneys regarding this matter?

6    A.          In 2015.

7    Q.          Okay.  Since 2015 how many times have

8    you met face to face with any FBI agents?

9    A.          Once.

10   Q.          Okay.  Since 2015 how many times have

11   you met face to face with any government attorneys?

12   A.          Zero.

13   Q.          Okay.  Since 2015 how many phone calls

14   have you had with FBI agents?

15   A.          A half dozen.

16   Q.          And those phone calls were with who?

17   A.          The first one was with an agent by the

18   name of Rosemary Vesci.

19   Q.          And do you recall when that phone call

20   was?

21   A.          No.  It was in 2015.

22   Q.          Okay.  Sometime in 2015?

23   A.          Correct.

24   Q.          And what was the next call that you had?

25   Who else did you speak with?

```
 1   A.           I -- the next agent that I spoke with
 2   was a Glenn Booth.
 3   Q.           Okay.  And how many calls have you had
 4   with Glenn Booth since 2015?
 5   A.           Again that would be in the half dozen.
 6   Q.           So you had six --
 7   A.           Yes, I had one -- one with Rosemary and
 8   a total of six altogether with Rosemary and Glenn.
 9   Q.           So you would have had five with Glenn
10   Booth, correct?
11   A.           Roughly, yes.
12   Q.           Okay.  Any other FBI agents did you have
13   phone calls with?
14   A.           No.
15   Q.           All right.  Did you have email
16   communications with any FBI agents?
17   A.           Yes.
18   Q.           Since 2015.
19   A.           Yes.
20   Q.           And can you give me an estimate of the
21   number of emails that -- communications you had with
22   FBI agents?
23   A.           No.  You have -- you probably have them
24   on record, and I would refer to your knowledge of
25   how many I had.
```

```
1   Q.          Who did you communicate from the FBI via
2   email with?
3   A.          Glenn.
4   Q.          Glenn?
5   A.          I also tried to communicate to an agent
6   out in San Diego as I was instructed, and that
7   person never responded, and I could not tell you
8   that person's name.
9
10
11
12
13
14
15  Q.          Okay.  Again, your first contact with
16  the government regarding this case was in 2015.
17  A.          Correct.
18  Q.          Prior to today's date, September the
19  15th, 2021, how many other communications have you
20  had with any government lawyers or agents in this
21  case?
22
23
24  A.          Yeah, I -- I've had numerous
25  communications back and forth with both FBI Agent
```

1    Glenn Booth and also with Department of Justice

2    personnel.

3    Q.          And who at the Department of Justice did

4    you communicate with?

5

6    A.          I don't have all their names on the top

7    of my head.

8    Q.          Well, give me the names you remember.

9

10   A.          The lawyer here that's representing the

11   Department of Justice today.

12   Q.          Okay.  Ms. Heath?

13   A.          Correct.

14   Q.          Who else?

15   A.          A Lisa Thakker.

16   Q.          A Lisa Thakker?

17   A.          Correct.

18   Q.          And do you know which office Ms. Thakker

19   was out of?

20   A.          I believe -- I believe it's San Diego,

21   but I don't know the structure of -- of the

22   Department of Justice.

23   Q.          Did you -- did you have a communication

24   via email or telephone or otherwise with Assistant

25   U.S. Attorney Melanie Pierson?

1    A.          Yes.

2

3

4    Q.          Okay.  That was a yes?  How many times

5    have you communicated with Ms. Pierson?

6    A.          I --

7

8    A.          I can't tell you.  I don't know.

9    Q.          Okay.  Have you had any communications

10   involving AUSA Sabrina Feve?

11   A.          Any communications.

12

13

14   Q.          We're talking about emails, telephone

15   calls, any sort of communications with AUSA Sabrina

16   Feve.  I notice that you recognized her name and

17   spoke her name --

18   A.          Sabrina.

19   Q.          -- this morning for the video.

20   A.          She was -- she was the one I did a video

21   call with Candace and Sabrina.  Okay.

22   Q.          So you did a video call with Ms. Heath

23   and Ms. Feve?  When was that video call?

24   A.          A couple days ago.

25   Q.          Okay.  And what was the nature of that

```
 1    video call that you had with government lawyers?

 2    Without telling me the specifics, but what was the

 3    nature of that call two days ago?

 4    A.          Just --

 5

 6

 7    A.          Just to introduce themselves.

 8    Q.          And was that the first time you ever met

 9    either one of them?

10    A.          Correct.

11    Q.          Okay.  What did you do, if anything, to

12    prepare for today's deposition?

13    A.          Just reviewed the documents and some of

14    my emails, which were numerous.

15    Q.          When you say "some of your emails, which

16    were numerous," how many emails would you say you

17    reviewed in preparation for today's deposition?

18    A.          I can't answer that question.  You

19    probably have all the copies and can answer it

20    better than me.

21    Q.          Can you -- well, you said you reviewed

22    them, and I take it -- when did you review them?

23    A.          Last night just went through them.

24    Q.          Okay.  So last night.  Can you give me

25    an estimate of how many emails you reviewed last
```

81

```
 1    night in preparation for today's deposition?

 2

 3    A.          I can't -- I can't tell you the number

 4    because they all ran together.

 5    Q.          So you -- since last night you forgot

 6    how many emails you reviewed?

 7    A.          Since last night, I reviewed them, they

 8    were in my stack of emails.  I cannot tell you the

 9    number.

10    Q.          Can you give me an approximate number,

11    your best estimate?

12

13

14    A.          Twenty.  You know, 15, 20.  I don't

15    know.

16    Q.          Okay.  And -- and did someone provide

17    you those emails?

18    A.          I had copies of them.

19    Q.          And who provided you copies of those

20    emails?

21    A.          Myself.

22    Q.          Where did you get the email?  You just

23    printed them from your computer?

24    A.          No.  I don't print things.  I just

25    reviewed them from my computer.
```

82

```
1    Q.          So you reviewed them off your computer?
2    A.          Correct.
3    Q.          And I take it those emails are still on
4    your computer, correct?
5    A.          Correct.
6
7    A.          Correct.
8    Q.          Okay.  And you said you reviewed
9    documents.  What documents did you review in
10   preparation for today's deposition?
11   A.          The documents that I reviewed were the
12   ones that we saw in the witness list -- or in the
13   list.
14   Q.          That you -- that you talked about on
15   direct examination this morning?
16   A.          Correct.
17   Q.          Did you review any other documents?
18   A.          No.
19   Q.          Now, I think you testified that you
20   received photographs that you just reviewed today
21   via an email.
22   A.          Correct.
23   Q.          When -- when did you first receive an
24   email that contained those photographs?
25   A.          Within the last week.
```

```
 1   Q.          And who sent you that email?

 2   A.          A defense attorney.

 3   Q.          Who?

 4   A.          Or I'm sorry, not defense.  A Department

 5   of Justice person.

 6   Q.          Which person was that?

 7   A.          She's present here today.  (indicating)

 8   Q.          Okay.  Did you review -- how many

 9   documents did you review in preparation for today's

10   hearing?

11   A.          Just the documents that were included in

12   this morning's testimony.

13

14

15

16

17

18

19

20

21

22

23   Q.          Other than the documents that you

24   reviewed through -- from Ms. Heath, the emails that

25   you reviewed last night . . .
```

84

```
 1    A.          Yes.

 2    Q.          Okay.  Are there any other documents or

 3    emails or were there any other times that you

 4    reviewed any documents or emails related to this

 5    case since 2015?

 6    A.          No.

 7

 8

 9

10    Q.          Okay.  One of the emails you sent, sir,

11    is it true is back in May of -- May 20, 2021, an

12    email from you -- you have a verizon.net account,

13    correct?

14    A.          Correct.

15    Q.          And in that email -- you sent an email

16    to Glenn Booth, and the subject was "Phone Call,"

17    and it's dated May 20, 2021.  And you say, "Glenn,

18    with respect to voice mail from the other day" --

19

20

21

22

23

24    Q.          "With respect to voice mail from the

25    other day," what voice mail did you have that was
```

1   re -- that you were referring to on May 20th?

2   A.          I have no clue --

3   Q.          Okay.

4   A.          -- at this point in time.

5   Q.          I'm sorry?

6   A.          At this point in time I cannot answer

7   that question.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22              MR. JONES:  Okay.  Let the record

23  show that I've given counsel a copy of an email from

24  Mr. Dorn to Glenn Booth dated Thursday, May 20 of

25  2021 at 5:03 p.m.  It's listed at the bottom, this

87

```
 1    is discovery we received from the Government,
 2    ADCONION-DISCOVERY32-00009, ADCONION-DISCOV32-00010.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15    BY MR. JONES:
16    Q.          Mr. Dorn, let me hand you Defendant's
17    Exhibit No. A.  Please review that document, sir.
18    And when you had a chance, when you've had a chance
19    to do so, just let me know.
20
21
22    A.          Okay.
23    Q.          Sir, Mr. Dorn, so you've had an
24    opportunity to review Defense Exhibit A?
25    A.          All right.
```

88

```
 1    Q.          Is that a yes?
 2    A.          Yes.
 3    Q.          Okay.  And so, sir, do you recognize
 4    this as an email that you sent to Mr. Booth back in
 5    May of this year?
 6    A.          Yes.
 7    Q.          Okay.  And in this email, the subject is
 8    "Phone Call."  You see that?  Where it says the
 9    subject line, "Phone Call"?  It's in the header
10    under Mr. Booth's name.  It says "From:  Steve Dorn;
11    Sent:  Thursday, May 20, '21, 5:03 p.m.; To:  Booth,
12    Glenn; Subject:  [External Email] - Phone Call."
13    A.          Okay.
14
15
16
17
18
19    A.          I see it.
20    Q.          Okay.  Do you remember typing him this
21    email?
22    A.          I recognize the email.
23    Q.          Okay.  An email that you would have sent
24    to Mr. Booth, correct?
25    A.          Yes.
```

```
 1   Q.            Okay.  And in the first line you say,
 2   "Glenn, with respect to voice mail from the other
 3   day."  What voice mail were you referring to there,
 4   sir?
 5   A.            I'm --
 6
 7   A.            Absolutely I'm not -- I'm not sure.
 8   Q.            Okay.
 9   A.            Because of the fact it's been so long
10   ago, I just can't remember.
11   Q.            Okay.  The next line you say, "I have
12   had horrible email conversations" --
13
14
15   Q.            -- "with your fellow Federal Officers of
16   the Court in San Diego."
17
18
19   Q.            How many -- how many emails have you --
20   actually have you -- did you -- were you referring
21   to there that you had with -- with fellow federal
22   officers in the court in San Diego?
23   A.            I'm sure you have the number exactly.  I
24   just don't know.
25   Q.            Okay.  But you wrote this email,
```

```
1    correct?

2    A.           Correct.

3    Q.           And you've identified it as an email

4    that you sent to Mr. Glenn Booth, correct?

5    A.           At the time, yes.

6                 MR. JONES:  We'll move for

7    admission of E -- of A at this time.

8                 MS. HEATH:  Objection:  no

9    relevance to the case.

10   Q.           And you said that -- so you -- sir, you

11   can't -- you can't -- you don't remember how many

12   email conversations you're referring to in this

13   email of May 2021?

14   A.           Can you -- can you please state that so

15   I can understand it and answer?

16   Q.           I just want to be clear.  You have no

17   idea how many email communica -- conversations

18   you're referring to in this email; is that your

19   testimony?

20   A.           With respect to what?

21   Q.           In the first question where you said "I

22   have had horrible email conversations with your

23   fellow Federal Officers of the Court in San Diego."

24   My question was, sir, how many email conversations

25   were you referring to when you wrote this?
```

1

2    A.          I don't know.  There was -- there was --

3    there was a few, definitely a few.  I -- you have

4    the number, I don't.

5    Q.          No, I don't have the number.

6

7

8

9

10

11

12

13   Q.          How many email conversations had you had

14   with Glenn's fellow federal officers of the court in

15   San Diego when you wrote this email on May 20, 2021?

16   A.          At the time?

17   Q.          Yes.

18   A.          We were going back and forth with

19   emails.

20   Q.          So how many would you say you had, how

21   many conversations?

22   A.          I'll pull --

23

24   A.          To pull out a number, a half dozen

25   again.  Could be right, could be wrong.

92

1    Q.              Okay.   And then you also said, "I

2    informed them that any future communications should

3    be done by San Diego personnel in person."

4                    Why did you write that, sir?

5                    MS. HEATH:   Objection:   relevance.

6

7

8    A.              Because of the fact they were going to

9    force me to fly to San Diego.

10   Q.              Okay.  In fact you say, "This is because

11   they need to feel the pain that they would be

12   putting me through by forcing me to appear in person

13   by flying coast to coast when there is technology is

14   available to do the same thing remotely."

15                   MS. HEATH:   Objection from reading

16   from a document not in evidence.

17   Q.              Do you remember saying that, sir?

18   A.              Can you restate the question again?

19   Q.              That next sentence, why don't you read

20   it for me that begins with the word "this is."

21                   MS. HEATH:   Objection to the

22   witness reading from a document not in evidence.

23

24

25

1

2          MS. HEATH:   Objection:

3   argumentative.

4   A.          "This is because they need to feel the

5   pain that they will be putting me through by forcing

6   me to appear in person by flying coast to coast when

7   there is technology available to do the same thing

8   remotely."

9   Q.          Okay.  You remember saying that?

10  A.          It's in front of me here in writing that

11  I wrote it back on May 20th.

12  Q.          Okay.  Do you know why you said that?

13  A.          Because of the fact that it would be

14  pain -- very much painful for me to fly coast to

15  coast when there's technology available such as

16  videoconferencing and the likes to be able to

17  testify here on the East Coast and have it present

18  in the -- out on the West Coast.

19  Q.          And that was in response to them telling

20  you that the trial was set for November of 2021,

21  correct?

22  A.          Yes.

23  Q.          And that you were a witness, they were

24  going to call you as a witness in that case in that

25  trial, correct?

94

1    A.           Correct.

2    Q.           And then the last sentence of that first

3    paragraph, can you read that sentence beginning with

4    "I am also."

5    A.           "I am also requesting to be taken off

6    the witness list,

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Q.           Okay.  Let's go to the -- to the next

25   paragraph and the second sentence from the bottom of

95

1   that second paragraph that says, "I also do not

2   trust the prosecutor."   Could you read that, please.

3   A.          "I also do not trust the prosecutor to

4   have my back on any witness stand, which is why I

5   wish to be removed from the witness list.   She" --

6                 MS. HEATH:   Objection to reading

7   from a document not in evidence.

8   Q.          And then read the next sentence after

9   that, sir.

10  A.          "She comes across to me as only wanting

11  victories in her court cases."

12                MS. HEATH:   Objection to reading

13  from a document not in evidence.

14  Q.          Sir, when you wrote this email in May,

15  which prosecutor were you referring to?

16                MS. HEATH:   Objection:   relevance.

17  A.          Melanie.

18  Q.          Is that Ms. Pierson, Melanie Pierson?

19  A.          Correct.

20                MS. HEATH:   Objection:   relevance.

21  A.          Correct.

22  Q.          And -- and what, if anything, did

23  Ms. Pierson say or do to make you feel that -- that

24  she would not have your back on any witness stand?

25                MS. HEATH:   Objection:   relevance.

1   A.              I didn't -- I don't know Ms. Pierson,

2   and she was unsympathetic to the fact that I wanted

3   to do a remote -- or check into being able to do a

4   remote testimony in this case, and she wanted -- she

5   insisted that I fly to San Diego to do an in-person

6   testimony.

7   Q.              And is it your testimony that her

8   insistence upon your flying to San Diego for the

9   trial in November 2021 was the reason that you say

10  "I do not trust the prosecutor to have my back on

11  any witness stand"?

12                  MS. HEATH:   Objection:   relevance.

13  A.              We did not have a very good

14  communications between both of us.

15  Q.              What -- what do you mean by that, sir?

16                  MS. HEATH:   Objection:   relevance.

17  A.              She was unsympathetic to the point of

18  doing a remote testimony.

19  Q.              And her lack of sympathy to your request

20  for remote testimony is the reason that you say you

21  do not trust her?

22                  MS. HEATH:   Objection:   relevance.

23

24                  MS. HEATH:   Objection:   relevance.

25  A.              That would be -- that would be correct.

97

1    Q.              And isn't it true, sir, that one of the

2    reasons that you didn't want to travel to San Diego

3    at -- in November of 2021 is because you told the

4    prosecutor that you had personal vacation planned?

5                    MS. HEATH:  Objection:  relevance.

6    A.              It's my understanding that I -- I did

7    everything that's necessary in order to get this

8    done today, and the Court has ruled in my favor of

9    having medical disabilities that would be

10   detrimental to my travel to California.

11

12

13   Q.              And -- and the approval from the Court

14   came after this email; isn't that correct?

15   A.              Correct.

16   Q.              Okay.  So at the time you wrote this

17   email, in addition to your medical conditions you

18   also indicated to the Government that you had

19   vacation pan -- personal vacation plans that your

20   wife would be upset if you had to cancel; isn't that

21   correct?

22                   MS. HEATH:  Objection:  relevance,

23   outside the evidence.

24   A.              Can you show me, show me where I said

25   that?

1

2

3

4

5

6

7

8

9

10

11

12          In this one that we're on now,

13  Exhibit A, still in paragraph 2, the last sentence

14  of that paragraph, you said -- you stated, "She

15  comes across to me as only wanting victories in her

16  court cases."

17              At the time you wrote this email

18  in May of 2021, how many times had you spoken with

19  Ms. Pierson?

20          MS. HEATH:   Objection --

21

22          MS. HEATH:   -- from reading from a

23  document not in evidence and relevance.

24  A.       None.

25  Q.       How many email conversations had you had

1    with Ms. Pierson, prior to this May 20 date?

2    A.          Four, five.

3    Q.          So based on those four -- did you have

4    any other kind of communications with her prior to

5    this May 20, '21, date?

6              MS. HEATH:   Objection:   relevance.

7    A.          Just the emails.

8    Q.          So no phone calls, correct?

9    A.          I did not make a phone call to her, no.

10   Q.          Did she make a phone call to you?

11   A.          I don't remember.

12   Q.          Do you remember having any telephone

13   conversations with her prior to May 20, 2021?

14             MS. HEATH:   Objection:   relevance.

15   A.          No.

16   Q.          Okay.  You do recall that you had email

17   communications with her prior to May 20, 2021,

18   correct?

19   A.          I'd have to go back and look at my

20   emails.

21   Q.          Okay.  But do you recall as you sit here

22   today having email communications with Ms. Pierson

23   prior to May 20, 2021?

24             MS. HEATH:   Objection:   relevance.

25   A.          According to the email that I'm looking

100

1    at here, this exhibit, I must have, yes.

2

3

4

5

6    Q.              You made the statement that, you wrote

7    that "She comes across to me as only wanting

8    victories in her court cases," correct?

9                    MS. HEATH:    Objection:    relevance.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7    Q.            Okay.  In the third paragraph there you
 8    ask Mr. Booth to "Please share this email with your
 9    superiors in the Federal Court system, as no one
10    else is looking at my best interest at this time.
11    As I stated before, I did not own the asset, Siemens
12    owned the asset in 2013 when the document your
13    office showed me was forged."
14                  You remember writing that?
15    A.            Yes, and that's correct.
16    Q.            So you did not own the asset?
17    A.            That's correct.  Sie --
18    Q.            And the asset that you were talking
19    about is the net block that Ms. Heath spoke with you
20    about earlier, correct?
21    A.            That is correct.
22    Q.            All right.  And then on the --
23    continuing with that, it says, "I am not the victim,
24    they are."
25    A.            I'd like to back up here.  It says that
```

102

1    the document was forged.

2    Q.            Right.   "The document your office showed

3    me was forged."

4    A.            Correct.

5    Q.            Are you a handwriting expert, sir?

6                          MS. HEATH:   Objection:   relevance.

7    A.            I am --

8    Q.            Are you a handwriting expert, sir?

9                          MS. HEATH:   Objection:   relevance.

10   A.            It was forged because the Sunnytown

11   Pike --

12   Q.            The question, sir --

13   A.            -- is incorrect.

14   Q.            Excuse me.

15   A.            Moore Products Company was not there,

16   and that was not my signature.

17                         MR. JONES:   Okay.   Move to strike.

18   Q.            The question is, are you a handwriting

19   exemplar expert, sir?   Yes or no?

20   A.            No.

21   Q.            Okay.

22                         MS. HEATH:   Please mute your --

23   mute your phone.

24                         MR. JONES:   So move to strike that

25   last answer as nonresponsive.

1    Q.          But going on it says, "I am not the

2    victim, they are."  That's your statement to the

3    Government, correct?

4    A.          That's correct.

5

6

7

8

9

10                  All right.  And then I'm going to

11   show you the next in -- in order for the defense.

12   This will be Defense Exhibit B.  This is an email

13   dated May 31st, 2021, from Steve Dorn to Glenn

14   Booth.

15                  (Defendant's Exhibit B was marked

16   for identification.)

17

18

19

20

21

22

23

24                  MR. JONES:  We give a copy, let

25   the record reflect I'm giving a copy of Defendant's

1   Exhibit B to Government counsel.  And I'm also

2   handing -- I can't roll it back out there.  I handed

3   a copy of Defendant's B to the -- to the witness.

4   BY MR. JONES:

5   Q.          Sir, please review Defense Exhibit B.

6   A.          Am I allowed to look at this?

7   Q.          Yes.  I want you to review it, please.

8   Take your time.

9                    Mr. Dorn, have you had an

10  opportunity to completely review Defense Exhibit

11  No. B?

12  A.          Yes.  It's an email.

13  Q.          It's an email.  Is -- would you agree

14  that this is an email from you dated Monday, May

15  31st, 2021, at 3:50 p.m. to Glenn Booth?

16  A.          Yes.

17  Q.          And the subject is "[External Email] -

18  Voice Mail Response."  Is that correct?

19  A.          Correct.

20  Q.          Is this a true and correct copy of the

21  email, sir?

22  A.          It seems to be.

23  Q.          All right.  So looking at the email, do

24  you recall writing this email to Mr. Dorn on May

25  31st?

```
 1

 2

 3

 4

 5

 6

 7

 8

 9    Q.            Do you recall writing this email to

10    Mr. Booth on May 31st, two-twenty -- 2021, at 3:50

11    p.m.?

12                        MS. HEATH:   Objection:   relevance.

13    A.            It's -- it's an email I sent to him.  Do

14    I recall writing it?

15    Q.            Okay.

16    A.            It's there.

17    Q.            Okay.  But this is an email that you

18    would agree that you wrote, correct?

19    A.            Correct.

20    Q.            All right.  Let's go to the paragraph

21    that begins with the number 1.  Do you see that,

22    sir?

23    A.            Yes.

24    Q.            Can you read the first      sentences in

25    that paragraph.
```

1          MS. HEATH:   Objection:   reading

2    from a document not in evidence.

3    A.          "With the USDA treating me as a

4    criminal, I wish to be removed as a victim from the

5    witness list in this case.   I am not the victim

6    since I did not own the asset.  Siemens owned the

7    asset and is -- is the victim.  Also, the company in

8    question, Moore Products Company, was no longer in

9    existence after being purchased by Siemens, which

10   again means that Siemens is the victim."

11   Q.          Okay.

12              MR. JONES:  That's it?  Okay.

13          MS. HEATH:   Objection from reading

14   from a document not in evidence.

15              MR. JONES:  We move for admission

16   of Defense Exhibit B at this time.

17          MS. HEATH:   Objection:   relevance.

18   BY MR. JONES:

19   Q.          Sir, let's go now to the second

20   paragraph that begins with the number 2.   And if you

21   don't mind, could you read that entire paragraph

22   beginning with that is indicated -- designated as

23   num -- with the number 2.

24   A.          "I am not available to testify until at

25   least December 13th due to scheduled vacation time."

1          MS. HEATH:   Objection:   reading

2    from a document not in evidence.

3    Q.          You can continue, sir.

4    A.          "This is my first time away from home

5    since 2019 with all the COVID virus problems.   We

6    are traveling by car in order to stay safe.   The

7    inconvenience of this entire court case which has no

8    effect on me should be -- should not come in front

9    of my mental well being."

10   Q.          Okay.

11          MS. HEATH:   Objection:   reading

12   from a document not in evidence.

13   Q.          So at the time you wrote this email on

14   May 31st you had scheduled vacation time, correct?

15   A.          Correct.

16          MS. HEATH:   Objection:   relevance.

17   Q.          And where were you going, sir?

18          MS. HEATH:   Objection:   relevance.

19

20

21

22

23

24          MS. HEATH:   Objection.

25   Q.

108

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Q.             Mr. Dorn, the last question I asked you

1   is regarding your scheduled vacation that you

2   mention on -- in Defendant's Exhibit No. B, the

3   email dated May 31st, 2021.   I asked you where you

4   were going on this vacation.   I believe your

5   testimony is that you are not going to answer that

6   question.   Is that correct?

7   A.              It's a personal issue.

8   Q.              Okay.   So your -- your answer is that

9   you're not going to answer that question, correct?

10  A.              It's a personal issue.

11  Q.              So you refuse to answer that question,

12  correct?

13  A.              Correct.

14              MR. JONES:   Okay.   Just for the

15  record, there have been a number of answers and

16  objections raised this morning that we believe were

17  improper and unacceptable.   I'm, therefore, going to

18  leave this deposition open and reserve our right to

19  seek guidance from the judge on those -- on that

20  response and any of those other responses.

21  Q.              So I'll move on, sir.   So with respect

22  to this scheduled vacation.

23

24

25

19   Q.            Okay, sir.   In this email, if you look
20   at paragraph 3, it has the number 3?   Can you read
21   that paragraph to us.
22                     MS. HEATH:   Objection:   reading
23   from a document not in evidence.
24   A.            "I intend to solicit the judge directly
25   to be removed from case by writing letter to Court.

112

1  In this case I will convey to him that I feel --

2  convey to him my feelings of being treated like a

3  criminal by the USDA.  I feel that strongly about

4  this issue."

5  Q.          Sir, did you write a letter to the

6  Court?

7  A.          No.

8

9

10

11

12

13

14          And in this -- going back to

15  paragraph 3, you said again you feel like you're

16  being treated like a criminal by the USDA.  You

17  meant the federal -- did you -- who did you mean by

18  USDA just so we're clear?

19  A.          The attorney on -- Ms. Pierson.

20  Q.          Okay.  And you felt like Ms. Pierson was

21  treating you like a criminal because she was not

22  sympathetic to your concerns about having to fly to

23  California for the trial, correct?

24  A.          Because she was unsympathetic to the

25  fact that there's a way to re -- for me to testify

1    remotely without having to fly to California.

2    Q.            Well, sir, you're aware that in criminal

3    trials that a defendant is constitutionally entitled

4    to confront the witnesses against him or her?

5    A.            I was not prior to all this.

6    Q.            Okay.  But that did Ms. -- did

7    Ms. Pierson advise you that that is the reason that

8    the Government needed you to travel to California to

9    appear in person?

10   A.            Yes.

11   Q.            Okay.  And so once she told you that,

12   that obviously didn't change your opinion as to

13   whether or not you should come to California and

14   appear in person, correct?

15   A.            Can you restate that again?  I lost you

16   halfway through.

17   Q.            Yeah.  When she told you that the

18   defendants have a constitutional right to have

19   witnesses to appear in person so that they can

20   confront them in person --

21   A.            Um-hum.

22   Q.            -- did that change your opinion as to

23   whether or not you should fly to California or not?

24                 MS. HEATH:   Objection:   relevance.

25

1

2

3

4

5

6

7

8

9

10

11    Q.              I take it, sir, you expressed your

12    concerns to Ms. Pierson?

13                        MS. HEATH:  Objection:  relevance.

14    Q.          Correct?

15    A.          Yes, I did.

16    Q.          And did you express those concern -- I

17    take it this email to Mr. -- Mr. Booth, you also

18    expressed those concerns to Glenn Booth through this

19    email, correct?

20                        MS. HEATH:  Objection:  relevance.

21    A.          Is this -- this is what you're referring

22    to here in the email?  Yes.

23    Q.          Yeah.  So you expressed your concerns to

24    Mr. Booth in addition to Ms. Pierson, correct?

25                        MS. HEATH:  Objection --

1   A.              Yes.

2                       MS. HEATH:  -- relevance.

3   Q.          Did you express your concerns to any

4   other government agents or attorneys?

5                       MS. HEATH:  Objection:  relevance.

6   A.          I really don't remember.  I don't

7   believe so, but I don't remember.

8   Q.          Okay.  Let's go to the --

9   A.          It's been a long time ago.

10  Q.          It's been May 2021, and now we're here

11  in September of 2021.  So let the record reflect --

12                      MS. HEATH:  Objection:  sidebar.

13

14

15

16

17

18

19

20

21

22

23

24

25

3  Q.          And the question is, why has it been
4  four months of hell?  And then when you answer that,
5  the next question would be, who has caused this hell
6  for you?
7                    MS. HEATH:  Objection:  compound
8  question, relevance.
9  A.          The fact of the matter that I'm sitting
10  here having to testify is significantly causing me
11  problems.  I -- that's it.
12  Q.          What kind of problems is your testifying
13  here today in Allentown, Pennsylvania, causing you?
14                    MS. HEATH:  Objection:  relevance.
15  A.          Anxiety.
16  Q.          I understand, sir.  Let me just ask you
17  one more question on this email.
18
19                    On the second page of this, just
20  so we're clear, the last -- almost next to the last
21  sentence, in capital letters you wrote:  "Finally,
22  Siemens is the owner of the asset and is the
23  victim."  You remember writing that, page 2 of that?
24  A.          Yes.  As I stated earlier, Siemens owned
25  the asset of the IP address and is the victim here.

```
1
2
3
4
5
6    Q.          They need your testimony to say that you
7    did not sign that, that document that we just saw
8    that --
9    A.          Yes.
10   Q.          -- was presented?  Okay.
11   A.          That was a complete forgery.
12   Q.          Okay.  So the gov --
13               MS. VAN DYK:  Objection.
14   Q.          Did the government tell you it was a
15   forgery?
16   A.          Nope.  I told.
17   Q.          Okay.  So you -- that's your word
18   "forgery," correct?  Is that your word, sir,
19   "forgery"?
20   A.          I don't know the complete definition of
21   forgery if you're trying to hang me up on that.
22   Q.          No.  I'm just asking.  Is that your word
23   or is that a word that came out of the mouths of the
24   agents?
25   A.          No.  It was my word.
```

1  Q.          Okay.  All right.  Let me show you the

2  next item in Defense Exhibit No. C.  Or No. C --

3  Defense C.  This is an email dated June 8th.

4                  (Defendant's Exhibit C was marked

5  for identification.)

6                  MR. JONES:  For the record I'm

7  going to hand you a copy of Defense Exhibit C, and

8  I'm going to give -- no, no, that one goes to him

9  and a copy goes to counsel.

10  BY MR. JONES:

11  Q.          Sir, you can take Defense Exhibit C, and

12  please review it, and let me know when you're

13  finished.

14

15

16

17

18

19

20

21

22

23

24  BY MR. JONES:

25  Q.          Sir, have you had a chance to review it,

 1    or you still need more time?

 2    A.          I question the validity of some of this

 3    email.

 4    Q.          Okay.  The question first, sir, have you

 5    had a chance to review the -- the Defense Exhibit C?

 6    A.          I've had a chance to -- to look at it.

 7    Q.          Okay.  Well, let me ask you a couple

 8    questions.

 9    A.          And I would like -- I would like to be

10    able to review it again --

11    Q.          Okay.

12    A.          -- at a further -- at a further time

13    during this question.

14    Q.          Yeah, you can keep the document in front

15    of you because I'll be referring to it.  But you've

16    had a chance to review it?

17    A.          Yes.

18    Q.          And is it an email from you -- a series

19    of communications.  One between you and Glenn Booth,

20    Agent Glenn Booth starting on June 6, 2021, if you

21    look at page 2?

22                MR. JONES:  And just for the

23    record, this is ADCONION-DISCOVERY32-00003 and

24    ADCONION-DISCOVERY32-00004 that defense received in

25    the production of discovery from the Government.

1   Q.              So, sir, looking at page 2 of this

2   document?  If you could turn to page 2 of the

3   document, sir?

4   A.              Yes, and that's where I have a question.

5   Q.              Okay.  And if you look, it says, "On

6   6/6/2021, 10:16 -- 10:06 PM, Steve Dorn wrote."  Do

7   you recall writing this message to Glenn Booth?

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Q.          Okay.  Do you recall in paragraph 2 that

reads, "Bearing item No. 1 in mind, please arrange

to take me off the witness list, as I will only

testify under duress caused by the states attorney.

Don't I have a fifth -- don't I have Fifth Amendment

1    rights to refuse to testify?  I did not own the

2    asset.  Siemens owned it and should be responsible

3    for any issues involving the asset.  Any

4    documentation to that fact that I did own it was

5    forged by criminals."

6                    MS. HEATH:  Objection.

7    Q.          Do you remember -- do you recall

8    making -- writing this in an email to Mr. Dorn or

9    making that statement?

10                   MS. HEATH:  Objection:  relevance.

11   Q.          Booth, Mr. Booth.  I'm sorry.

12   A.          I've written it down here in the fact

13   that "Siemens owned it and should be responsible.

14   Any documentation to the fact I did own it was

15   forged by criminals."

16   Q.          Okay.  So you recall making that

17   statement as it appears in writing that to Mr. Booth

18   as indicated in paragraph No. 2, correct?

19   A.          Correct.

20

21   Q.          Okay.

22

23   Q.          And then paragraph No. 3:  "I will not

24   be available on November 30th as you well know from

25   our prior conversations."

1

2   Q.              "I am on a prepaid vacation after close

3   to two years of this COVID environment.  I would not

4   travel on an airplane to due -- due to health and

5   COVID reasons.  I will not be in Pennsylvania on the

6   November 30th date of the subpoena.  I also suffer

7   from anxiety and depression, and this whole witness

8   subpoena is causing me major problems."

9              Do you recall telling Mr. Booth --

10  making that statement to Mr. Booth?

11              MS. HEATH:  Objection:  relevance.

12  A.         And that is the statement and that's

13  what's written down here,

14

15

16

17

18

19

20

21

22  Q.              So this prepaid vacation is the one that

23  we just discussed about you going two days' drive

24  from Pennsylvania, correct?

25  A.              Correct.

125

```
 1   Q.              And you said you would not travel on an
 2   airplane.  Correct?
 3                        MS. HEATH:  Objection:  relevance.
 4   A.        Correct.
 5
 6
 7                        MS. HEATH:  Objection:  relevance,
 8   speculation, assumes facts not in evidence.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2

 3

 4

 5   Q.           Okay.   In paragraph No. 5 it says, "I

 6   want nothing to do with the states attorney.   The

 7   judge should know this and allow me to be removed

 8   from the witness list.   I was also not a victim as

 9   it states on the subpoena.   How can this be done?"

10                      Do you recall writing that to

11   Mr. Booth?

12                      MS. HEATH:   Objection:   reading

13   from a document not in evidence and --

14   A.           Yeah, it's writ -- it's written here.

15   Q.           So if it's written, that means you wrote

16   it, correct?

17   A.           Yes.

18   Q.           Okay.   And in this -- in this exhibit

19   you also put in capital letters:   "I do not want to

20   be involved with this case."   Isn't that true?

21

22

23   A.           And where is that located?

24   Q.           If you look at the second page, the

25   first complete paragraph?
```

```
 1   A.              Okay.
 2   Q.              It begins with "I will sign any legal
 3   document."   The last sentence -- or next-to-last
 4   sentence says, "This is why I do not want to be
 5   involved with this case."
 6   A.              Can you -- can you read the whole
 7   paragraph to me, please?
 8                   MS. HEATH:  Objection:  reading
 9   from a document not --
10   Q.              No.  I want to ask you, did you say you
11   did not want to be involved with this case?
12                   MS. HEATH:  Objection:  reading
13   from a document not an exhibit -- not in evidence
14   and also --
15   Q.              Do you recall saying --
16                   MS. HEATH:  -- irrelevant to the
17   case.
18                   MR. JONES:  I'm sorry.
19                   MS. HEATH:  Go ahead.
20   Q.              Okay.  Do you recall -- did you write
21   that?  It's in this email, so that meant you wrote
22   it, correct?  "I do not want" -- it's in capital
23   letters:  "I do not want to be involved with this
24   case."
25
```

1

2

3    A.          Since the people --

4    Q.          Did you write that, sir?

5    A.          Since the --

6    Q.          Did you write --

7    A.          I wrote the fact that the --

8    Q.          -- "I do not want to be" -- excuse me,

9    sir.  Sir?

10   A.          Yes.

11   Q.          Please give me the courtesy of letting

12   me ask the question before you answer what you want

13   to answer.  The question is:  "I do not want to be

14   involved with this case," you wrote that, correct?

15   A.          Yes.

16

17

18

19

20

21

22

23

24

25

Q.          Let's go back to the first page, sir, of
this document, D -- I mean C, the first page?

There is a header at the bottom of
the page:  "From Steve Dorn; Tuesday, June 8, 2021,
12:51 and 10 seconds a.m.: to Glenn Booth, [External
Email] - Voice Mail Again."  Do you see that, sir?

A.          Yes.

Q.          And do you see in the first paragraph,
and you -- is this a true and correct copy of the
email that you wrote to Mr. Dorn on June 8, 2021?

A.          Please reask the question.

Q.          Is this a true and correct copy of the
email that you sent to Mr. Dorn -- Mr. Booth on June
8, 2021, at 12:51 a.m.?

A.          Since you -- since you have a copy of
it, that must have been -- must be that I wrote it.

Q.          So will you -- will you acknowledge for
the record that this is a true and correct copy of
the email that you wrote on that day?

A.          The entire email, yes.

1    Q.           Okay.   And in the first paragraph in
2    bold -- I mean in cap -- in cap letters you wrote,
3    "I will not be available on November 30th and refuse
4    to fly to San Diego."
5                           MS. HEATH:   Objection:   relevance,
6    reading from a document not in evidence.
7    Q.          Do you recall writing that to Mr. Booth?
8    A.          Because technology is available, yes.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    A.

2    Q.          When did you get communication with the

3    Court -- have communication with the Court regarding

4    your medical condition?

5                    MS. HEATH:   Objection:   relevance.

6    This issue has already been ruled on by the Court.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                        I'm asking you on

1    June 8 had you had a communication with the Court

2    saying that you could not -- you did not need to

3    travel to San Diego?

4                        MS. HEATH:   Objection:   relevance.

5    A.          No.

6    Q.          Okay.   So on June 8 when you say to

7    Mr. Booth that you refuse to fly to San Diego, did

8    you consider on June 8 taking the train to San

9    Diego?

10                       MS. HEATH:   Objection:   relevance,

11   assuming facts not in evidence.

12   A.          I would not take a train, no.

13   Q.          So you did not consider taking a train,

14   correct?

15   A.          No, sir.

16   Q.          All right.   Let's go to -- down further

17   in that email, the second paragraph beginning with

18   the number 3.   You say to Mr. -- actually, you say

19   "As for topic of conversation for the phone call."

20   What phone call were you referring to there, sir?

21

22   A.          I can't -- I don't remember -- I don't

23   recollect, I could remember.

24   Q.          Okay.   And you go on to say, "The

25   document from Rosemarie is attached."   What document

1    did you attach?

2

3    A.          The document that was attached was in

4    the Government's --

5                        THE WITNESS:  Should I?

6                        MS. HEATH:  (Nodding head up and

7    down.)

8    Q.          Yeah, you can tell me what exhibit the

9    Government showed you.

10   A.          Forty.

11   Q.          So on June 8 you had received Government

12   Exhibit No. 40 from the Government through Rosemarie

13   who was a federal agent with the U.S. Government?

14   A.          That's incorrect.

15   Q.          Okay.  Well, you tell me where you got

16   it from.

17   A.          This is a copy of the document that I

18   got back in 2015 from Rosemarie in that one

19   communication with her back in 2015.

20   Q.          Okay.  Just so I'm --

21   A.          When this -- when all this stuff

22   started.

23   Q.          So just so I'm clear, you said that you

24   received a subpoena from the Government in 2015,

25   correct?

1

2    A.          No.

3

4

5

6

7

8    Q.          So I believe -- let me see if I can

9    recall.  That was the first contact that you had

10   with the Government in 2015, correct?

11   A.          Correct.

12   Q.          And that was with Rosemarie?  And I

13   don't know if you gave me her last name, but what

14   was her last name?

15   A.          I -- you'd have to look it up.

16   Q.          Okay.  But she was a federal -- an FBI

17   agent?

18   A.          Yes.

19   Q.          And did you meet with her in person?

20   A.          No.

21   Q.          And did you -- was it an email

22   communication?

23   A.          Yes.

24   Q.          And -- and this email communication was

25   the first time you had communication with Rosemarie

1   or anybody from the FBI?

2   A.          Yes.

3   Q.          Okay.  And did they explain to you why

4   they were contacting you in 2015?

5   A.          Yes.  Just to -- just to verify my

6   signature.

7   Q.          Okay.  So they sent you Government

8   Exhibit No. 40 out of the blue, correct?

9   A.          Correct.

10  Q.          Okay.  And on June 8, 2021, some almost

11  six years later, you were going to have a phone call

12  and the topic of the conversation was the document

13  that Rosemarie gave you in 2015?

14

15

16  A.          I -- can you restate the question?

17  Q.          I said you received a document that is

18  referenced in this email you said from Rosemarie,

19  correct?

20  A.          Correct.

21  Q.          And you said that you received this,

22  first received this document from Rosemarie in 2015.

23  A.          Correct.

24  Q.          And we're now in June of 2021 --

25  A.          Okay.

```
 1   Q.          -- based on this email, and you're
 2   referencing the document that you received from
 3   Rosemarie in 2015, correct?
 4   A.          Correct.
 5   Q.          Between 2015 and 2021 did you discuss
 6   the document that you received from Ms. Rose -- from
 7   Rosemarie in 2015 with any federal agents?
 8   A.          No.
 9
10   Q.          Okay.
11   A.          No.
12   Q.          Did you discuss the document that you
13   received from Rosemarie in 2015 that is referenced
14   in this email dated June 2021 with any government
15   attorneys or lawyers from the Department of Justice?
16   A.          Can you -- can you put the dates on that
17   again, please?
18   Q.          2015 until June 2021, did you have any
19   conversations with any government attorneys or DOJ
20   attorneys about the document that you received out
21   of the blue from FBI Agent Rosemarie in 2015?
22   A.          Between 2015 and June 8th.
23   Q.          Between that time, yes.
24
25
```

A.          I definitely didn't have any
communications, and if I did, it might have been a
month or so before.

Q.          A month before June?

A.          I -- you have all the emails, and you
can put everything together and tell me the time
frame.

Q.          No, sir.  You are a witness who
apparently is supposed to have personal knowledge of
the incidents that are being questioned, so we have
to get the information from you.  We can't just
produce documents.  So that's why --

Q.          -- that's why I have to ask you
questions.

A.          Then I -- then I'd like to have access
to all the emails I have on my computer.

1

2    Q.          Do we have permission to search your

3    computer, sir?

4    A.          No.

5    Q.          Okay.  Well, you have the emails.

6

7

8    Q.          When you received this document that you

9    referred to in this email of June 8, 2021, did you

10   have any conversations with Agent Rosemarie about

11   that document?

12   A.          Can you ask the question again?  Because

13   I'm -- I just need the question asked again.

14   Q.          All right.  Let me slow down.

15

16

17

18

19

20

21

22

23

24

25

```
1    BY MR. JONES:

2    Q.          So you said that regarding the document

3    that is referenced on this email dated June 8, 2021,

4    that says "As for topic of conversation for the

5    phone call, the document from Rosemarie is

6    attached."

7    A.          Correct.

8    Q.          And you said that that was the first

9    communication of any kind from any government

10   agency -- government agent or attorney regarding

11   this matter, in 2015 when you received an email from

12   Rosemarie; is that correct?

13   A.          Correct.

14   Q.          And you said in that email there was a

15   document attached, correct?

16   A.          Correct.

17   Q.          And that would be Exhibit 40 that you

18   were shown by government counsel today, correct?

19   A.          Correct.

20   Q.          And when you received this email from

21   Rosemarie, Agent Rosemarie, did you have any

22   conversation with her after you received this

23   document and email from Rosemarie?

24   A.          Yes.  I had a phone call with her.

25   Q.          Was it the same day that you received
```

1    the document that you had the phone call?

2    A.          It's 2015.  I don't know.

3    Q.          So you can't remember?  You can't

4    remember whether it was the same day or not?

5    A.          In 2015?  No.

6    Q.          Okay.  So between the phone call that

7    you -- how many phone calls did you have with

8    Rosemarie about the document that she sent to you in

9    2015?

10   A.          One.

11   Q.          Okay.  And other than that one phone

12   call, between 2015 and June 8, 2021, did you have

13   any other phone calls with any other government

14   agents or attorneys about the document that

15   Rosemarie sent to you on that day?

16

17

18   A.          I don't believe so.

19   Q.          Okay.  So after this email of June 8,

20   2021, referencing the document that Rosemary --

21   Agent Rosemary attach -- sent to you attached to an

22   email in 2015, did -- was there a phone call that

23   occurred after June 8 about this document?

24   A.          I can't remember.

25   Q.          Okay.  Looking at the email further,

1    looking at the paragraph that begins with the number

2    3, it says, "Your attorneys and Siemens attorneys

3    should have documentation that Moore Products Co did

4    not exist in 2013."

5

6    Q.          Do you remember writing that?

7

8

9    A.          Yes.

10   Q.          Okay.  And then No. 5, paragraph No. 5,

11   "Since there was no Moore Products Company, the

12   title provided under my signature is bogus."

13                    That was your statement and

14   opinion, correct?

15

16

17   A.          The document that we're discussing here

18   then, it's No. 40, has an executive vice president

19   of IT operations as my title on this document, to

20   which I -- it is definitely a title which I never

21   had in my working career.

22   Q.          All right.  But on June 8, 2021, you

23   stated, "Since there was no Moore Products Company,

24   the title provided under my signature is bogus,"

25   correct?

1

2

3    A.          The title is bogus because I never held

4    that title.

5    Q.          I understand that.  But I'm saying that

6    you wrote this sentence that says "Since there was

7    no Moore Products Company, the title provided under

8    my signature is bogus," correct?

9    A.          Yes, because Moore Products Company was

10   owned by Siemens.

11

12

13

14

15

16

17

18   Q.          Okay.  And looking above that, that last

19   email that's dated June 8, 2021, 12:22 p.m. from you

20   to Glenn Booth says, "Yes.  I will wait for your

21   call."

22

23

24   Q.          Do you recall having a conversation with

25   Glenn Booth, telephone conversation with Glenn Booth

1    regarding the document that Rosemarie sent to you in

2    2015 on Tuesday, June 8, 2021?

3    A.          I had a phone call with Glenn Booth.

4    Q.          Did you have -- did you speak with any

5    other FBI agents or government attorneys on that

6    call?

7    A.          No.

8    Q.          Okay.  How long did that call last?

9

10   A.          I don't know.

11   Q.          Sir, with respect to the net blocks or

12   the net -- I'm sorry.  And just so -- just so I'm

13   clear, one last thing about your communications with

14   the Government.  When is the last -- prior to this

15   morning before the start of this deposition, when

16   was the last conversation you had with a government

17   agent or government attorney involved in this case?

18

19   A.          The last communication I had was with

20   the Department of Justice (indicating) lawyer.  She

21   sent me all the information.  (indicating)  And that

22   was it.

23   Q.          Did -- and that was when?  When did you

24   receive -- when did you have the communication with

25   Ms. Heath?

1

2

3   A.          Last Friday was the last communication I

4   had with her about this case.  I emailed her Monday

5   night to give her recommendations on a restaurant

6   since she had to travel here.

7   Q.          And in that Friday conversation, was

8   that by telephone, a videoconference?

9

10  A.          A videoconference.

11  Q.          And was there any -- were there any

12  other federal agents or government attorneys on that

13  videoconference with you and Ms. Heath?

14

15  A.          Sabrina.

16  Q.          AUSA Sabrina Fave?  Feve?  I'm sorry.

17  A.          I'm unfamiliar with her last name, I

18  don't have that.  But it was Sabrina.

19  Q.          An attorney from the U.S. Attorney's

20  Office in California?

21  A.          Correct.

22  Q.          Okay.  Other than -- was there anyone

23  else with you, Ms. Heath, and Ms. Feve on that

24  videoconference?

25  A.          No.

```
 1    Q.            Okay.  And how long did that
 2    videoconference last?
 3    A.            An hour.
 4    Q.            Okay.  And during that hour did you
 5    review the documents that Ms. Heath had shown -- had
 6    sent to you?
 7    A.            Yes.
 8    Q.            Okay.  And were you asked questions
 9    about those documents?
10    A.            Yes.
11    Q.            Okay.  And did both Ms. -- Ms. Feve and
12    Ms. Heath both asked you questions about this
13    document, these documents?
14    A.            Yes.
15    Q.            Okay.  Now let's go to I think it's --
16    you have the binder in front of you.  It's
17    Government Exhibit 196.  Could you turn to that one,
18    please, sir?  Do you have that before you, sir?
19    A.            Yes.
20                        MR. JONES:  And this is for the
21    record ADCONION-DISC32-00020, 00021, and 00022.
22    Q.            Do you see that three-page document in
23    front of you, sir?
24    A.            Yes.
25    Q.            Okay.  And I believe you testified that
```

```
 1    this was the application that you made to Network
 2    Solutions in May of 1993; is that correct?
 3    A.          Correct.
 4    Q.          Okay.  And there's no signature on this
 5    application, is there?
 6    A.          No.
 7    Q.          Okay.  And when you submitted the
 8    application, what was your title again?
 9    A.          Supervisor of technical services and
10    computer operations.
11    Q.          And how big was the company at that
12    time?
13    A.          Again I'll reference the 1200.
14    Q.          Okay.  And -- and who was your
15    supervisor at that time?
16    A.          Per the statement I made earlier today,
17    Jeffrey Richards.
18    Q.          And what was Jeffrey -- Jeffrey
19    Richards' role or title?
20    A.          He was the head of the data processing
21    department.  IT department we would call him.
22    Q.          You weren't the president of the
23    company, correct?
24    A.          No.
25    Q.          And in 1993 how long had you been with
```

1    the company?

2    A.            Since 1975.

3    Q.            Okay.  And when you were -- in 1993 what

4    were your role -- what was your role and

5    responsibilities in the company?

6    A.            I was supervisor of technical services

7    and computer operations.

8    Q.            And what does that mean?  What do you

9    do, what were your duties?

10   A.            The network that we had in-house, I was

11   in charge of that as well as anything technically

12   that was going on on the network, and also the

13   day-to-day computer operations of the manufacturing

14   company that I worked for.

15   Q.            And when you say you were in charge of

16   the network, can you be a little bit more specific

17   and tell us what you actually do.

18   A.            Whatever was necessary to be attached to

19   the network, we had to run the wiring, physical

20   wiring, because back in that time there was no WiFi.

21   And we had to make sure that they were within

22   specifications and the devices that we attached to

23   the network would be able to communicate on our

24   internal network, and also the mainframe and -- the

25   terminals that attached to the mainframe needed to

```
 1    be on -- on a separate network.

 2    Q.          And when you say devices, can you be

 3    more specific?

 4    A.          I will reference --

 5    Q.          If you just recall.  We have the

 6    documents.  You don't have to --

 7    A.          I will reference the document which

 8    tells you what's --

 9    Q.          So you don't have any personal knowledge

10    right now as to what the devices were, you have to

11    read from the paper?

12    A.          The fact that I want to be correct is --

13    and to make sure you understand.  It says personal

14    computers, workstation, mini-computers, large

15    mainframes currently existing on the same network.

16    Q.          So basically the computers there at a

17    facility in -- in Pennsylvania, correct?

18    A.          Correct.

19    Q.          And this was all for internal purposes

20    only, correct?

21    A.          Yes.

22    Q.          And how many people did you supervise as

23    your -- in your role as manager of this department?

24    A.          It's a long time ago.  I just don't

25    remember.
```

1    Q.          So you don't --

2    A.          A half -- half dozen.

3    Q.          So you don't remember if you -- do you

4    recall if you had people that worked under, that

5    reported to you?

6    A.          Excuse me?

7    Q.          Do you recall if you had people in 1993

8    that reported to you?

9    A.          Yes, I did.

10   Q.          How many people reported to you in 1993,

11   approximately?

12   A.          A half dozen.

13   Q.          When you -- after you completed this

14   application, I take it you mailed it to Network

15   Solutions?

16   A.          If you take a look at the cover letter,

17   it is a fax.

18   Q.          So you faxed it, the old fax machine.

19   All right.  At the time you faxed this application

20   did you pay any application fees upon filing of this

21   application or faxing this application?

22   A.          No.

23   Q.          Okay.  When you -- if you go back to the

24   letter, if you look at Government Exhibit 197.  Can

25   you turn to that, please, sir?  Do you have that in

```
 1   front of you, sir?

 2   A.          Yes.

 3   Q.          And I believe this is a -- you

 4   identified this as a letter that you received from

 5   Network Solutions, correct?

 6   A.          Correct.

 7                    MR. JONES:  And this is for the

 8   record ADCONION-DISC32-00023.

 9   Q.          Do you see that at the bottom, sir?

10   Just make sure we're on the same page.  Is that

11   correct?

12   A.          Yeah, whatever that means, yes.

13   Q.          Yeah, that's the number.  And it says

14   Government Exhibit 197, correct?

15   A.          Correct.

16   Q.          And did you receive this letter via fax

17   or via the mail?

18   A.          I am not sure.

19   Q.          Okay.  And according to this letter, it

20   says that "MPCO has been assigned Class B net number

21   167.87.0.0," correct?

22   A.          Correct.

23   Q.          There's no "slash 16" included on this

24   letter, correct?

25   A.          This letter was sent to us from Network
```

1   Solutions.

2   Q.          Right.  And -- and again it says in the

3   first sentence after Dear Stephen A. Dorn, "MPCO has

4   been assigned Class B net number 167.87.0.0,"

5   correct?

6   A.          Correct.

7   Q.          Okay.  There's no "slash 16" at the end

8   of that number; is that correct?

9   A.          You can see that it's not on the

10  document.

11  Q.          Okay.  And in this letter is there any

12  purported time or use restrictions on the net blocks

13  contained in this letter?  Is there anywhere in this

14  letter that puts any time or use restrictions on the

15  net blocks?  And you could take your time and review

16  it.

17  A.          They reference an RFC-826, which I don't

18  know what that is.  And --

19  Q.          So --

20  A.          -- as far as I know.

21  Q.          Yeah.  So -- so on this letter, on the

22  face of this letter there's no purported time or use

23  restrictions on the net blocks contained in this

24  letter; isn't that correct?

25  A.          Within this letter?  Yes, except for the

1    reference of the RFC-826.

2    Q.          Okay.  And you don't know what RFC-826

3    is as you sit here today, do you?

4    A.          No.

5    Q.          Okay.  And you received this letter,

6    it's dated -- well, the date of the letter is May

7    17, 1993, which would have been four days after you

8    faxed the application over to them; is that correct?

9    A.          Correct.

10   Q.          Did you receive it on May 17th or did

11   you receive it some other -- after May 17th?

12   A.          I can't answer that.

13   Q.          And do you recall if you received it

14   through the mail or via fax?

15   A.          I can't answer that either.

16   Q.          Okay.  Do you recall whether or not you

17   paid or Moore Products paid any money to Network

18   Solutions for this net block?

19   A.          I did not pay anything because I was

20   doing this for Moore Products Company.

21   Q.          Okay.

22   A.          I worked for Moore Products Company, and

23   we did not pay Network Solutions any amount of

24   money.

25   Q.          Okay.  And in your application, if you

1  go to -- back to 196?  And Government Exhibit 196.

2  And I want you to -- this is the complete

3  application that you faxed over to Network Solutions

4  on behalf of Moore Products Company?

5  A.        Correct.

6  Q.        Okay.  There were no other documents

7  that you sent over with respect to this application,

8  correct?

9  A.        This is the application that we sent.

10 Q.        Okay.  In this application is there any

11 offer on behalf of Moore Products for any

12 consideration for the net blocks?

13 A.        Can you -- can you reask that question

14 again, please?

15 Q.        All right.  In your application did

16 Moore Products offer any consideration to Network

17 Solutions for the net block?

18 A.        No.

19 Q.        And you stated that in January 2000

20 Moore Products Company merged with Siemens Energy &

21 Automation Incorporation.  Is that correct?

22 A.        I stated that in the year 2000 Siemens

23 purchased Moore Products Company.

24 Q.        Okay.  So as you sit here today you

25 don't know whether it was January 2000?

1    A.            That's also correct.  The record of when

2    Siemens purchased Moore Products Company is on file

3    with the SEC.

4    Q.            And when is the last time you reviewed

5    those filings?

6    A.            I have not.

7    Q.            Have you ever reviewed those filings?

8    A.            No.

9    Q.            Okay.  So -- so you don't know whether

10   the filings say that they purchased as you say all

11   assets or they just purchased the stock of Moore

12   Products.  Because you've not reviewed the

13   documents, correct?

14   A.            The -- the agreement of sale was such

15   that anything that was Moore Products Company

16   related or any of the assets thereof were purchased

17   by Siemens.

18   Q.            You mentioned an agreement of sale.  Did

19   you draft the agreement of sale?

20   A.            No.

21   Q.            Did you review the agreement of sales at

22   the time it was signed?

23   A.            I did not, but I have been in contact

24   with Siemens -- or excuse me, Moore Products Company

25   executives who negotiated the agreement of sales.

```
1    Q.          Okay.  And when -- when did you -- when
2    did you -- when did you talk to the executives at
3    Moore Company about the agreement of sale?
4    A.          Within the last couple months.
5    Q.          Oh, so you spoke with someone else about
6    this case from Moore?  And who was that?
7    A.          His name was Robert Wisniewski.
8    Q.          How do you spell Robert's last name?
9    A.          W-i-s-n-i-e-w-s-k-i, something like
10   that.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BY MR. JONES:

Q.          Mr. Dorn, I just have just a few more
questions for you regarding the sales agreement that
you were mentioning.  Just so we're clear, you
didn't prepare any sales agreements between Moore
Products and Siemens, correct?

A.          Nope.

Q.          And so any information that you have

1   about the sales agreement comes from what someone

2   told you about it, correct?

3   A.          Yes, that's what -- that's what we were

4   told when --

5

6

7

8

9

10

11

12

13

14

15

16

17                  So after the merger you -- you

18   said that you kept the same title as manager of

19   computer networks and operations for Siemens; is

20   that correct?

21   A.          Yes.

22   Q.          And you left Siemens in 2006, correct?

23   A.          Correct.

24   Q.          Why did you leave in 2006?

25   A.          Downsizing.

1   Q.          And when you were at Siemens, who did

2   you report to?

3   A.          A gentle -- down in Alpharetta, Georgia,

4   was our corporate headquarters, a gentleman by the

5   name of Howard Judon.

6   Q.          Howard who?

7   A.          Judon.

8   Q.          Okay.  And again you don't know how many

9   employees were in the Alpharetta headquarters

10  office, do you?

11  A.          The exact number?  No.

12  Q.          Okay.  To your knowledge, between 2000

13  and 2006 do you know if this net block was ever used

14  by Siemens?

15  A.          There was a project in 2000 to remove

16  this net block that you -- class B address --

17  Q.          Sir --

18  A.          -- from --

19  Q.          I'm sorry.

20  A.          -- from the -- from the Moore Products

21  Company network and to put Moore Products Company

22  that was purchased onto the Siemens global network.

23  Q.          And do you know if that was ever done?

24  A.          Yes.

25  Q.          Do you know if that was done properly?

159

1    A.          Yes.

2    Q.          Okay.  How do you know that?

3    A.          There was a project that -- that

4    corporate headquarters.  A project plan drew up and

5    executed, and everything was successfully removed

6    from the class B 167.87 network and put into the

7    Siemens global network so we could communicate with

8    Siemens through their global network and be

9    successful as a com -- as an entity of Siemens.

10   Q.          So -- so you're sure that that was

11   properly done?

12   A.          Yes.

13   Q.          So if you were to be made aware that

14   Siemens was contacted by the FBI in 2015 and said

15   that there had been an improper transfer, that they

16   never received that at that time?

17              MS. HEATH:  Objection:  relevance,

18   speculation.

19   A.          I have absolute --

20   Q.          Are you -- are you aware of that?  Yes

21   or no?

22   A.          No.

23   Q.          Okay.  Are you aware that Siemens was

24   not even aware, Siemens headquarters, the folks in

25   IT in Munich, were not aware that the net block

1    existed until they were told about it by an FBI

2    agent in October 2015?

3                    MS. HEATH:   Objection:

4    irrelevant, improper impeachment.

5    A.          My -- my project plan was with the

6    Siemens Alpharetta people, not with Siemens Germany.

7    Q.          Okay.  And do you know if -- because

8    Siemens Alpharetta is -- is attached to Siemens

9    globally, right?

10   A.          Correct.

11   Q.          Okay.  And would it -- are you aware

12   that the Siemens systems were checked for this net

13   block, and they were not aware that they had that

14   net block until they were told by an FBI agent in

15   October 2015; are you aware of that, sir?

16   A.          No.

17

18

19

20

21   Q.          So you're not aware that Siemens did not

22   even know the existence of a net block until they

23   were told by FBI agents in 2015?

24

25

161

A.          Siemens in Alpharetta knew about the IP

address block.



Q.          And that's based on your personal

knowledge, sir?

A.          Yes.

1

2    Q.         Okay.  So you don't know -- don't know

3    what Siemens headquarters knows, correct?

4    A.         That's correct.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Q.         So looking at 190, did the Government

21    show you that photograph?

22    A.         Which photograph are we talking about?

23    Q.         On Government Exhibit 190.

24    A.         Are they at different numbers?  I'm

25    sorry.

```
1    Q.          If you look at --

2    A.          Oh, okay.

3    Q.          -- the bottom of the --

4    A.          Oh, okay.

5    Q.          -- page there, it said -- can you read?

6    Does it say Government Exhibit?

7    A.          Okay, 190.  Okay.

8    Q.          190.  The same pictures that Ms. Heath

9    showed you about two hours ago.

10   A.          Okay.

11   Q.          And I think you identified them,

12   correct, as people that you've never met before,

13   right?

14   A.          Correct.

15   Q.          So looking at Government Exhibit No. 90,

16   have you ever spoken to this person before?

17   A.          No.

18   Q.          Have you ever met this person before?

19   A.          No.

20   Q.          Has this person ever made any

21   representations to you to give him or someone else

22   the net block?

23   A.          No.

24   Q.          Okay.  Let's look at 191.  Do you have

25   that one in front of you?
```

```
 1   A.          Yes.
 2   Q.          And this was a photograph shown to you
 3   by Ms. Heath.  Have you ever met this person?
 4   A.          No.
 5   Q.          Have you ever spoken with this person?
 6   A.          No.
 7   Q.          Has this person ever made any
 8   representations to you to give him or someone else
 9   the IP net block that you referenced today?
10   A.          No.
11   Q.          All right.  Let's look at Government
12   Exhibit No. 192.  Have you ever met this person
13   before?
14   A.          No.
15   Q.          Have you ever spoken to this person
16   before?
17   A.          No.
18   Q.          Has this person ever made any
19   representations to you for you to give him or
20   someone else the net block?
21   A.          No.
22   Q.          Okay.  And let's go to Government
23   Exhibit No. 193.  Have you ever met this person
24   before?
25   A.          Hang on.
```

```
 1   Q.          I'm sorry.

 2   A.          No.

 3   Q.          Have you ever spoken with this person

 4   before?

 5   A.          No.

 6   Q.          Has this person ever made any

 7   representations to you for you to give him or

 8   someone else the IP net blocks as you referenced

 9   today?

10   A.          No.

11   Q.          Okay.  Have you ever met a person by the

12   name of Jacob Bychak?

13   A.          No.

14   Q.          Have you ever spoken with a person named

15   Jacob Bychak?

16   A.          No.

17   Q.          Has a person named Jacob Bychak ever

18   made any representations to you for you to give him

19   or someone else the IP net block?

20   A.          No.

21   Q.          Have you ever met Mark Manoogian?

22   A.          No.

23   Q.          Have you ever spoken to Mark Manoogian?

24   A.          No.

25   Q.          Have -- has a person named Mark
```

1    Manoogian ever made any representations to you for

2    you to give him or someone else the net block that

3    you referenced today?

4    A.          No.

5    Q.          Have you ever met a person named Abdul

6    Qayyum?

7    A.          No.

8    Q.          Have you ever spoken to a person named

9    Abdul Qayyum?

10   A.          No.

11   Q.          Have you ever -- has a person named

12   Abdul Qayyum ever made any representation to you for

13   you to give him or someone else the IP net blocks

14   that you referenced today?

15   A.          No.

16   Q.          Have you ever met a person named Peter

17   Pacas?

18   A.          No.

19   Q.          Have you ever spoken to a person named

20   Peter Pacas?

21   A.          No.

22   Q.          Have you -- has a person named Peter

23   Pacas ever made any representations to you for you

24   to give him or someone else the IP net block?

25   A.          No.

```
 1                          MR. JONES:  Okay.  Sir, thank you.
 2   I believe my colleagues might have a few more
 3   questions for you.  Thank you.
 4
 5
 6
 7                              *  *  *
 8                      CROSS EXAMINATION
 9   BY MS. MUNK:
10   Q.          Good afternoon, Mr. Dorn.  My name is
11   Jessica Munk, and I represent Jacob Bychak.
12                  You are testifying here today
13   because the Government served you with a subpoena;
14   is that correct?
15   A.          Correct.
16   Q.          And you have not been served a subpoena
17   by the defense, correct?
18   A.          Correct.
19                      MS. MUNK:  Okay.  I don't have any
20   other questions.
21                      MR. JONES:  Anybody?
22                      MR. NEVAREZ:  No.
23                      MR. JONES:  Okay.  Pass the
24   witness.
25                              *  *  *
```



REDIRECT EXAMINATION

BY MS. HEATH:



170

20    Q.         And throughout the questioning on the

21    Defense Exhibits A, B, and C, you make statements in

22    these emails concerning that Siemens is the owner of

23    the asset, correct?

24    A.         Yes.

25    Q.         And you were asked multiple times by the

```
 1    defense about Siemens owning this asset, correct?
 2    A.          Correct.
 3    Q.          Why were you calling it an asset?
 4
 5
 6    A.          Because being assigned the IP address of
 7    167.87, a class B address, allowed Moore Products
 8    Company to expand and grow and grow globally.  And
 9    we considered it an asset, and it was an asset that
10    we had at Moore Products Company.  So it allowed us,
11    the company, to grow and our network to expand.
12    Q.          And was part of your job dealing with
13    the allocation of those IP addresses to various
14    devices or individuals within Moore Products?
15
16
17    A.          Part of --
18
19    A.          Part of my job responsibilities was to
20    maintain our network for Moore Products Company and,
21    as it grew, make sure that we were able to
22    communicate not only within ourselves but within the
23    network, the internet itself.
24    Q.          And from your --
25    A.          Go ahead.
```

```
 1   Q.          And from your observations about, as you

 2   just testified to, the growth of Moore Products,

 3   after receiving this class B network block, did

 4   receiving this network block have value to Moore

 5   Products?

 6

 7

 8

 9

10

11

12

13

14   A.          If we were not allowed to expand our

15   network using this class B network, we would not

16   have been profitable and we would not have been able

17   to support our manufacturing organization of Moore

18   Products Company.

19                    MS. HEATH:  Pass the witness.

20                         * * *

21                    RECROSS EXAMINATION

22   BY MR. JONES:

23   Q.          Sir, regarding the 167.87.00, can you

24   turn to Government Exhibit 006?

25   A.          Okay.
```

1

2

3

4

5            Government Exhibit 197 that counsel

6    spoke about.  It's the letter from Network

7    Solutions?

8    A.         Yes.

9    Q.         Show -- sir, can you show me on the

10   letter where it says that this net block contains

11   65,000 IP addresses?

12   A.         In technical understanding of a --

13   Q.         I'm not asking you for your technical

14   understanding, sir.  I'm asking you --

15

16

17   Q.         I'm asking you --

18

19

20   Q.         I'm asking you to look at this letter,

21   Government Exhibit 197 dated May 17, 1993, and tell

22   me where on this letter that is stated -- is sitting

23   before you does it say that this net block

24   167.87.0.0 includes 65,000 IP addresses.

25   A.         Knowing what a class B address is --

```
1    Q.          That's not the question, sir.

2    A.          I wish the --

3                     MS. HEATH:   Objection.   Would you

4    allow --

5                     MR. JONES:   I'm sorry.

6                     MS. HEATH:   -- allow the witness

7    to answer the question?

8                     MR. JONES:   No.   Again, I'm going

9    to object to this witness being evasive and not

10   answering the questions.   I am, therefore, going to

11   leave this deposition open at the conclusion to

12   reserve my right to seek guidance from the Court on

13   these responsive -- responses by this witness.

14   BY MR. JONES:

15   Q.          Again, sir, for the third time I'm going

16   to ask you:  On this exhibit, Government No. 197,

17   where does it say that this net block 167.87.0.0

18   contains 65,000 IP addresses?  Are the words and

19   numbers "65,000 IP addresses" anyone -- anywhere on

20   this document?

21   A.          No.

22                     MR. JONES:  Okay.  Pass the

23   witness.

24                     * * *

25                     REDIRECT EXAMINATION
```

BY MS. HEATH:

Q.         And for final recross on that very question, what does class B net number mean?

A.         A class B network number allows you to have 255 class C networks, which are 255 addresses each.  So in doing the calculation and understanding in network terms what this means, that's 255 times 255 network addresses.

Q.         In fact just as you said, in the letter in the paragraph that starts "It is suggested," it talks about the 255 IP addresses in class C networks, correct?

A.         Correct.

                    MS. HEATH:  Pass the witness.

                    MR. JONES:  We're done with this witness.

176

MR. JONES:  But I do -- but I do want to leave the record open regarding the answers and objections that were raised this morning during this deposition, to reserve my right to seek guidance from the judge on those evasive and nonresponsive answers.

_____, 2021


                I hereby certify that the evidence

and proceedings are contained fully and accurately

in the notes taken by me of the testimony of the

within witness who was duly sworn by me and that

this is a correct transcript of the same.




                _____
                Steven R. Mack
                Registered Merit Reporter
                Certified Realtime Reporter
                Notary Public

**A**

A-d-c-o-n-i-o-n
51:8
A-m-o-b-e-e
51:12
a.m 1:19 12:21
61:22,24
129:10,19
Abdul 3:5 7:14
52:1 166:5,9
166:12
ability 15:4 18:3
31:12
able 10:16 17:21
19:18,23 22:25
24:4 27:23
28:18 35:17,20
55:2 93:16
94:20 96:3
119:10 130:18
147:23 156:9
171:21 172:16
absolute 159:19
Absolutely 89:7
access 137:16
account 18:5
84:12
accurate 43:8
54:8,21
accurately 178:8
acknowledge
129:22
acquired 40:7
41:2 43:9,10
65:9,14,20
acquisition
37:15 40:18
44:9
actual 67:5
Adconion 51:8
ADCONION-...
145:21
ADCONION-...
150:8
ADCONION-...
87:2
ADCONION-...
119:23
ADCONION-...

119:24
ADCONION-...
87:2
add 103:6
adding 20:6
21:22
addition 97:17
114:24
additional 62:8
address 4:9,11
21:6 22:9,11
22:17,18,24
23:9,12,18,19
23:20 26:19,25
27:7,22 29:9
30:19 31:21
35:14,15 36:4
38:1,11,19
39:14,21 40:3
43:13,25 44:2
48:6,21 49:14
49:17 56:6,11
56:12,13 57:5
57:19 58:24
59:6,7,23 60:9
116:25 158:16
161:9 169:2
171:6,7 173:25
addressed 30:6
33:22
addresses 18:16
20:8,13 21:16
21:24 22:5,13
23:11,15,25
30:14 34:22,25
35:17,20 36:2
168:19 169:4
169:15,18
170:8 171:13
173:11,24
174:18,19
175:8,11,14
addressing 32:5
administrators
27:20
admissibility
62:12
admission 90:7
106:15

admonishment
108:12
advise 113:7
afternoon
167:10
agency 49:5
72:3 139:10
agent 3:7 45:6
71:21 72:1
73:4,7 74:20
75:17 76:1
77:5,25 119:20
122:9 133:13
134:17 136:21
138:10 139:10
139:21 140:21
143:17 160:2
160:14
agent's 73:9
agents 72:6,21
72:22 74:7,12
75:4,8,14
76:12,16,22
77:10,20 115:4
117:24 136:7
140:14 143:5
144:12 160:23
ago 68:8,13
79:24 80:3
89:10 115:9,14
148:24 163:9
agree 62:21,22
70:5 104:13
105:18
agreed 103:19
agreement
85:22 103:22
118:21 154:14
154:18,19,21
154:25 155:3
156:20 157:1
agreements 6:6
156:22
ahead 118:19
127:19 171:25
176:11
air 125:17
airplane 124:4
125:2

al 1:8 13:2
Alan 13:20
Albright 15:12
Allentown 1:17
1:24 2:23 3:23
12:25 13:22
116:13
allocation
171:13
allow 37:10
126:7 173:15
174:4,6
allowed 20:9
37:8 38:4,5
39:5 104:6
114:4 125:22
171:7,10
172:14
allowing 114:8
allows 175:7
Alpharetta 61:1
67:6,11,17,21
67:25 68:16,25
69:3,6 158:3,9
160:6,8 161:8
161:23
altogether 76:8
Amendment
122:25
Amobee 51:12
amount 21:24
22:5 34:24
152:23
analogy 35:19
analysis 35:19
Andy 3:7
Angeles 2:17 3:4
announce 48:5
Announce/Re-...
4:10
answer 31:18
32:18 33:4
37:5,8,12
50:14 63:11,15
69:9,16 70:24
74:10,16 75:1
80:18,19 85:6
85:17 90:15
102:25 108:5,7

108:12 109:5,8
109:9,11
110:20 111:3
116:4,18
128:12,13
152:12,15
173:16 174:7
answered 20:5
30:10,17 34:14
37:13,20,23
39:24 44:14
45:18 49:11
52:18,24 55:6
55:7 57:16,22
61:6,11 64:14
70:20 71:6,8
94:18 110:5
122:15 128:1
131:24 142:2
142:12 144:2
160:25 161:7
170:14,16
175:5,19
answering
174:10
answers 37:11
109:15 177:6
177:10
anxiety 116:15
124:7
anybody 8:19
9:8,10,17,22
31:13 46:25
47:7 135:1
138:19 167:21
175:25
apologize
157:16
apparently
137:9
appear 58:1
92:12 93:6
113:9,14,19
168:14
appearance
176:15 177:2
APPEARAN...
2:1 3:1
appears 8:6

29:15,19 30:5
31:18 49:13
54:18 123:17
**application** 4:19
21:5,16 24:14
26:23 27:3
29:9 146:1,5,8
149:14,19,20
149:21,21
152:8,25 153:3
153:7,9,10,15
**applied** 22:6
**applying** 22:15
33:5
**appreciate** 27:8
**approval** 97:13
**approximate**
81:10
**approximately**
14:22 115:13
149:11 170:7
**area** 13:22 69:7
**arguing** 69:19
70:1 138:1
**argumentative**
91:9 93:3
138:7 161:7
**ARIN** 5:4
**arrange** 122:22
**asked** 20:5 30:9
34:14 37:13,20
37:23 39:23
44:13 45:17
49:10 52:18,23
55:6,7 57:15
57:22 61:6,11
64:14 69:23
71:6 94:17
108:25 109:3
109:25 122:15
127:25 138:13
142:2,11,15
144:2 145:8,12
160:25 161:7
168:9 170:14
170:16,25
175:5,19
**asking** 62:6
64:10 69:11

98:2 100:11
117:22 121:3
121:14 125:12
125:23,24
131:25 161:2
170:3 173:13
173:14,17,20
**asset** 38:20,24
101:11,12,16
101:18 106:6,7
116:22,25
123:2,3 170:23
171:1,3,9,9
**assets** 41:11
66:5 154:11,16
**assigned** 30:14
35:16 38:18
39:13 40:4
47:14 48:7,22
56:10,21 57:4
57:5 58:2,13
59:24 150:20
151:4 157:13
168:18,20
169:9 171:6
**assignment**
38:10 39:3
**assimilated** 42:2
**assist** 16:13
**Assistant** 78:24
**assumed** 41:12
**assumes** 125:8
**assuming**
121:18 132:11
134:3 160:20
162:11
**Atlanta** 61:2
161:24
**attach** 20:9
133:1 140:21
**attached** 21:7
22:19 132:25
133:3 139:6,15
140:21 147:18
147:22,25
160:8
**attaching** 22:1
**attempt** 53:5
**attention** 16:2

**attorney** 6:23
7:3 71:20
78:25 83:2
112:19 120:20
122:1,9,24
126:6 139:10
143:17 144:19
**Attorney's** 8:7
8:14 11:1,7,11
11:13,16,24
144:19
**attorneys** 75:5
75:11 115:4
136:15,19,20
140:14 141:2,2
143:5 144:12
**AUSA** 79:10,15
144:16
**Australia** 17:8
**authentication**
58:21 59:4,20
60:13
**authenticity**
50:4
**authority** 46:6
47:2
**authorization**
4:10 46:13
49:7
**authorize** 52:14
52:20
**authorized** 49:4
**authorizes** 47:13
48:4,14
**Automation**
44:6 67:8
153:21
**available** 19:8
24:1 92:14
93:7,15 94:20
106:24 123:24
130:3,8
**Avenue** 2:3
**aware** 50:6
113:2 159:13
159:20,23,24
159:25 160:11
160:13,15,21
161:2,3,4,17

|  | **B** |  |

**B** 4:9 5:10 22:8
22:10,11,16
23:2,3,9,12,25
24:4 26:18,21
26:24 27:7,22
29:9 33:5,13
35:7 36:7,23
37:15 38:1,10
38:19 39:3,14
56:6 103:12,15
104:1,3,5,11
106:16 109:2
122:16 150:20
151:4 158:16
159:6 168:18
169:2 170:7,21
171:7 172:3,15
173:25 175:3,7
**B1123** 2:8
**back** 16:18
22:22 23:23
34:15 56:5
58:2 61:25
77:25 84:11
88:4 91:18
93:11 95:4,24
96:10 99:19
101:25 104:2
108:21 110:2
112:9,14
120:22 122:5
122:11 129:3,6
133:18,19
147:20 149:23
153:1 155:16
156:15 157:12
**background**
15:11 17:1
**badgering** 138:6
**baker** 22:8
**based** 17:5 99:3
100:13,17
101:1 136:1
161:13 168:20
**basically** 148:16
**basis** 40:25
42:18 100:24
**Bearing** 122:22

**becoming** 19:8
**beeping** 24:23
**beginning** 94:3
106:22 132:17
**begins** 92:20
105:21 106:20
127:2 141:1
169:3
**behalf** 7:23 13:4
46:7,14 49:4,8
52:22 153:4,11
176:21
**Beleez** 8:17
**belief** 100:15
**believe** 40:10
63:5,21 70:11
72:1 73:14
74:22 78:20,20
109:4,16 115:7
131:24 134:8
140:18 145:25
150:3 167:2
**Bellizzie** 3:12
8:18 10:25
11:23 12:1
**belonged** 66:5
**benefits** 15:7
**best** 17:13 31:5
31:12 33:2
34:16 63:8
67:15 81:11
101:10 120:20
122:1,10
**better** 80:20
**Bienert** 3:2 7:13
**big** 146:11
**bigger** 68:21
**Bill** 1:20 6:21
12:20
**binder** 145:16
162:14
**Bird** 2:15 7:10
**bit** 15:10 17:2
147:16
**block** 5:4 45:14
47:14 52:10
53:5 56:21
58:2,13 101:19
152:18 153:17

157:13 158:13
158:16 159:25
160:13,14,22
161:4,9 163:22
164:9,20
165:19 166:2
166:24 168:11
172:3,4 173:10
173:23 174:17
**blocks** 143:11
151:12,15,23
153:12 165:8
166:13
**blue** 135:8
136:21
**bogus** 141:12,24
142:3,8
**bold** 130:2
**Booth** 5:9,11,13
73:11,14,19,22
74:13,20 76:2
76:4,10 78:1
84:16 86:24
88:4,11,24
90:4 101:8
103:14 104:15
105:5,10 108:7
114:17,18,24
119:19,20
120:7,11,24
122:3,9,9,12
122:18 123:11
123:11,17
124:9,10
126:11 129:10
129:18 130:7
132:7 142:16
142:20,25,25
143:3
**Booth's** 88:10
**boss** 21:6,11,13
**Boston** 7:3
**bottom** 36:10
49:13 86:25
94:25 129:8
150:9 163:3
**bought** 60:4
**BOXER** 2:15
**break** 61:19

138:16,20
155:12,15,15
155:20,25,25
156:8
**brief** 61:23
108:20 156:14
**bringing** 20:12
**building** 1:16
2:4 12:24
19:13
**business** 4:24
20:10 25:23
26:10 27:12
28:4 41:1,22
42:13,14,17,18
43:8 66:12,13
66:14 108:4
**button** 18:10
**Bychak** 1:8 2:9
7:7 13:2 51:22
165:12,15,17
167:11 176:24

---

**C**

**C** 2:4,7 5:12
22:17,18,23
23:23 33:7
35:8,14,22
36:4 118:2,2,3
118:4,7,11
119:5 129:7
170:21 175:8
175:14
**C-o-r-e-X-c-h-...**
51:18
**CA** 2:8,13,17
3:4
**cabinets** 28:25
**CAD** 19:5
**CAD/CAM** 19:5
**Cahn** 1:15
**calculation**
169:17 175:9
**calculations**
170:17
**California** 1:2
8:8,15 72:23
97:10 112:23
113:1,8,13,23

114:8 125:6,18
126:2 130:13
144:20
**call** 9:1 22:23
75:19,24 79:21
79:22,23 80:1
80:3 84:16
88:8,9,12
93:24 99:9,10
132:19,20
135:11 139:5
139:24 140:1,6
140:12,22
142:21 143:3,6
143:8 146:21
**call-in** 9:9
**called** 14:15
26:25 34:19
**calling** 171:3
**calls** 20:23 34:12
35:12 38:16
39:10,22 41:15
46:9,16,21
48:16 50:10,18
55:8 61:14
73:17,19,21
74:2,6,11,12
75:13,16 76:3
76:13 79:15
99:8 140:7,13
169:12,22
170:11 172:7
**Canada** 17:7
**cancel** 97:20
**Candace** 13:4
79:21
**CANDINA** 2:3
**candina.heath...**
2:5
**Candy** 6:12
**cap** 130:2,2
**Capistrano** 2:8
**capital** 116:21
126:19 127:22
**Caption** 13:1
**car** 107:6
**card** 4:24 42:13
42:14,17,20,22
43:8 66:12,13

66:14
**care** 28:18
**career** 141:21
**Carlos** 3:2 7:12
**Carmel** 2:12
**carry** 66:23
**case** 13:1 60:7
71:17 72:3
74:20 77:11,16
77:21 83:19
84:5 90:9
93:24 96:4
106:5 107:7
108:9 111:25
112:1 114:3
126:20 127:5
127:11,17,24
128:14 129:2
143:17 144:4
155:6
**cases** 95:11
98:16 100:8,15
100:17 101:1
114:5,6
**caused** 116:5
122:24
**causing** 116:10
116:13 124:8
**ceased** 65:9,14
65:21 157:8,14
**Center** 1:23
2:22 3:21
**Century** 2:17
**Certified** 178:16
**certify** 49:3
178:7
**chance** 50:23
87:18,18
118:25 119:5,6
119:16
**change** 41:3,22
41:22 113:12
113:22
**changed** 66:12
**changing** 42:1
**characterizati...**
36:14
**charge** 27:1
147:11,15

**chat** 11:22 12:6
**chauffeur** 74:9
**check** 64:1,8,16
67:20 70:15
96:3
**checked** 160:12
**children** 14:4
**Christenson**
3:11 8:12,13
8:24,25 9:11
9:14 10:21
11:20 12:3,9
**city** 23:13,13
34:16
**clarify** 27:9
65:17 68:23
72:19
**class** 4:9 22:8,10
22:11,16,17,18
22:23 23:2,3,9
23:12,23,25
24:4 26:18,21
26:24 27:7,22
29:9 33:5,7,13
35:7,8,14,22
36:4,7,23
37:15 38:1,10
38:19 39:3,14
56:6 150:20
151:4 158:13
159:6 168:18
169:2 170:7
171:7 172:3,15
173:25 175:3,7
175:8,14
**clear** 62:10 63:2
69:21 74:17
90:16 112:18
116:20 130:22
133:23 143:13
156:21
**clients** 162:9
**close** 124:2
**clue** 50:16 67:14
85:2
**cnevarez@bkl...**
3:4
**coast** 92:13,13
93:6,6,14,15

93:17,18
**Code** 23:13
35:19
**COHN** 2:10
**colleague** 7:19
**colleagues** 62:8
167:2
**College** 15:13
**Color** 4:12,13,14
4:15,16,17
**com** 159:9
**come** 107:8
113:13 155:16
**comes** 18:10
95:10 98:15
100:7,14,24
157:1
**coming** 50:23
110:8
**commencing**
1:18
**communica**
90:17
**communicate**
17:21 18:15,22
19:23 22:22,25
38:6 77:1,5
78:4 147:23
159:7 171:22
**communicated**
72:14 79:5
**communication**
78:23 120:18
131:2,3 132:1
133:19 134:22
134:24,25
139:9 143:19
143:24 144:3
**communicatio...**
17:18 18:6,20
19:16 20:8
23:16,17 76:16
76:21 77:10,19
77:25 79:9,11
79:15 92:2
96:14 99:4,17
99:22 100:18
101:1 119:19
130:23 137:2

143:13
**community**
22:25
**companies** 51:6
**company** 14:15
14:16,17 15:23
19:6,9,22 20:6
22:13 25:5,6
26:24,25 27:6
27:19,23 28:24
28:25 30:20
31:16,22 33:3
36:23 37:16
38:2 39:6,15
39:15,18 40:4
40:5,13,15
41:8,11 44:19
46:11,17 48:4
48:14 49:24
50:13,15 56:11
60:4 61:3,7,8
63:18,19 65:1
65:4,4,12,21
66:3,4,5,19
67:9 71:4
102:15 106:7,8
115:23 141:11
141:23 142:7,9
146:11,23
147:1,5,14
152:20,22
153:4,20,23
154:2,15,24
155:3 157:9,14
158:21,21
171:8,10,11,20
172:18
**Company's**
39:19
**compare** 54:24
**compete** 38:3
**complete** 117:11
117:20 126:25
153:2
**completed**
149:13
**completely**
104:10
**complicated**

62:12
**compound**
26:16 27:17
28:15,22 29:5
57:2 59:10
72:25 73:2
77:22 83:21
84:8 100:21
116:7 140:17
160:19
**computer** 14:14
14:20,20 16:25
18:2,13,14
24:23 29:25
40:19,25 41:4
41:5 81:23,25
82:1,4 128:17
137:17,21
138:3 146:10
147:7,13
157:19
**computer-aided**
19:5
**computers**
21:22 148:14
148:16
**concern** 114:16
**concerning**
170:22
**concerns** 112:22
114:12,18,23
115:3
**concluded**
177:20
**concludes** 176:4
177:19
**conclusion**
38:17 39:11,23
46:22 48:17
50:3 174:11
**condition** 131:4
**conditions** 97:17
**conducted** 12:23
**Conference** 1:16
**conferring**
87:20
**confront** 113:4
113:20
**confused** 122:6

**confusing** 74:23
**connected** 32:11
**connectivity**
17:16
**connects** 18:12
**consid** 61:5
**consider** 23:10
23:10 38:19
125:16 126:1
130:12 132:8
132:13
**consideration**
38:22 153:12
153:16
**considered**
23:12 61:8
171:9
**constant** 169:4
**constitutional**
113:18
**constitutionally**
113:3
**contact** 46:25
52:10 74:18
75:3 77:15
134:9 154:23
**contacted** 45:6
71:25 72:2,6,8
72:11 159:14
**contacting** 135:4
**contained** 39:8
82:24 121:14
151:13,23
178:8
**contains** 173:10
174:18
**continue** 18:25
19:18 20:1
28:3 107:3
**continued** 44:11
**continuing**
101:23
**control** 25:11
28:18
**controls** 17:5
38:4
**conversation**
132:19 135:12

139:4,22
142:24,25
143:16 144:7
**conversations**
89:12 90:12,17
90:22,24 91:13
91:21 98:25
99:13 123:25
136:19 138:10
**convey** 112:1,2
**coordinate**
60:19
**copies** 53:16
54:10 80:19
81:18,19
**copy** 86:6,10,23
103:24,25
104:3,20 118:7
118:9 129:14
129:17,20,23
133:17
**CoreXchange**
47:13 48:5
51:18
**corporate** 40:24
60:16,25 67:21
158:4 159:4
161:22
**Corporation**
40:7,18 41:2
41:19
**correct** 15:18,25
16:1 19:25
25:1,14 28:5
28:19 29:13
30:1,2,6,7
31:19,20,23
32:2,24 33:21
36:7,8 40:8,16
42:21,23 43:15
43:16,19,20
49:17 53:18,19
54:19,20 57:3
57:19,20,21,23
58:12,16,23
59:6,8 60:10
63:3,4,18,23
63:24 64:21,24
65:10,15,22

66:6,10,14,15
66:19 67:4
68:10,11,13,14
70:14 71:17
72:6,9,12,15
72:18 73:1,15
74:5,21 75:23
76:10 77:17
78:13,17 80:10
82:2,4,5,7,16
82:22 84:13,14
88:24 90:1,2,4
93:21,25 94:1
95:19,21 96:25
97:14,15,21
99:8,18 100:8
100:19 101:15
101:17,20,21
102:4 103:3,4
104:18,19,20
105:18,19
107:14,15
109:6,9,12,13
112:23 113:14
114:14,19,24
115:14 117:18
123:18,19
124:24,25
125:2,4 126:16
127:22 128:14
129:14,17,23
130:24 131:9
132:14 133:25
134:10,11
135:8,9,19,20
135:23 136:3,4
139:7,12,13,15
139:16,18,19
141:14,25
142:8 144:21
146:2,3,23
148:12,17,18
148:20 150:5,6
150:11,14,15
150:21,22,24
151:5,6,8,24
152:8,9 153:5
153:8,21 154:1
154:13 156:23

157:2,20,22,23
160:10 162:3,4
163:12,14
167:14,15,17
167:18 168:16
170:8,23 171:1
171:2 175:15
175:16 176:15
176:17,18,19
176:21,22
178:11
correctly 74:16
counsel 13:6
32:15 61:18
62:24 69:22
74:23 86:16,23
87:3 104:1
108:6,8,11
118:9 139:18
155:11 162:8
173:5
country 22:2
111:10,13
couple 11:2 69:7
79:24 111:2,7
111:17 112:9
119:7 155:4
couple-minute
156:8
course 25:23
26:10 27:11
courses 15:22,23
court 1:1 6:15
6:18 13:8
89:16,22 90:23
91:14 95:11
97:8,13 98:16
100:8,15,16,25
101:9 107:7
108:10,14
111:25 112:6
124:14 125:10
125:12,21,25
130:17,24
131:3,3,6,10
131:12,15,19
131:22 132:1
174:12
Court's 108:11

courtesy 69:22
128:11
Courthouse
1:16 12:24
cover 149:16
COVID 107:5
114:1 124:3,5
created 45:10
creating 20:7
creation 58:12
criminal 2:2
94:7,10,15,16
106:4 112:3,16
112:21 113:2
114:5 120:21
122:4,11
criminals 123:5
123:15
cross 4:3,4 62:2
62:7 85:25
103:23 118:22
167:8 168:5,9
168:23 169:11
169:22 170:12
172:7
current 12:21
108:18 156:12
176:3 177:18
currently 14:6
148:15
custody 25:12
28:18

_____

D

D 3:11 129:7
D-o-r-n 6:13
daily 42:18
Daniel 7:2,20
52:5
Darren 3:10
9:24 10:1,3
data 146:20
Database 5:6
date 12:22 24:19
29:8 33:12,17
33:19 57:6,13
58:12 73:16
74:16 77:18
99:1,5 118:17

124:6 131:12
131:12,13
152:6
dated 4:11,18,21
5:9,10,12
45:22 84:17
86:24 103:13
104:14 109:3
118:3 136:14
139:3 142:19
152:6 173:21
dates 136:16
day 84:18,25
89:3 129:24
139:25 140:4
140:15
day-to-day
40:25 41:23
42:6 147:13
days 24:15
79:24 80:3
152:7
days' 111:18
124:23
DC 2:4
deal 60:24
dealing 171:12
dealings 161:25
dealt 60:25
Dear 151:3
December
106:25
decide 107:22
defendant 2:9
2:14,18 3:5
86:1 113:3
176:23
Defendant's 5:8
85:11,12,13,15
87:5,11,14,16
103:15,25
104:3 109:2
118:4 122:15
122:16
defendants 1:9
6:5 113:18
176:14
defense 83:2,4
87:24 103:11

103:12 104:5
104:10 106:16
108:8,11 118:2
118:3,7,11
119:5,24
167:17 170:21
171:1
defense's 103:18
definitely 55:18
91:3 137:1
141:20
definition
117:20
degree 15:12
department 2:2
6:12 13:5
38:23 39:1
73:13 78:1,3
78:11,22 83:4
136:15 143:20
146:21,21
148:23
depicted 57:13
deposition 1:12
12:23 13:4
62:15 80:12,17
81:1 82:10
103:19 107:22
108:13 109:18
118:16,17
124:15 125:22
143:15 174:11
176:4,14,15,25
177:3,8,19,20
depression
124:7
describe 23:2
34:16 68:16
described 33:8
design 19:5
designated
106:22
determine 55:2
detrimental
97:10
devices 20:7,9
21:21,23 22:19
147:22 148:2
148:10 171:14

dictated 42:9
67:1
Diego 2:13 6:24
77:6 78:20
89:16,22 90:23
91:15 92:3,9
96:5,8 97:2
130:4 132:3,7
132:9
different 42:7
44:8 53:17,20
66:19 162:24
Digital 12:20
direct 4:3 13:16
65:19 82:15
directly 38:6
60:24 111:24
161:25
disabilities 97:9
discovery 87:1
119:25
discuss 136:5,12
discussed 32:4
124:23
discussing
141:17
discussion 33:6
87:10
display 18:9
disrespected
94:13
distinguishment
35:7
District 1:1,2
8:8,15
division 2:2 44:7
61:1 67:8
161:23
divisions 44:8
doc 89:14
document 5:4
16:11,13 21:10
24:10,12,13
26:14 29:13,18
30:5 34:6,13
39:12,13 41:12
43:18,21 45:6
45:8,10,12
46:18 49:22

58:1,11 59:22
84:20 87:17
88:17 89:18
92:16,22 95:7
95:13 98:23
101:12 102:1,2
106:2,14 107:2
107:12 111:23
117:5,7 119:14
120:2,3 121:12
121:15,20
125:9,11
126:13,22
127:3,9,13
128:1 129:7
130:6 132:25
132:25 133:3
133:17 135:12
135:17,22
136:2,6,12,20
138:8,11 139:2
139:5,15,23
140:1,8,14,20
140:23 141:8
141:16,17,19
142:2,23 143:1
145:13,22
148:7 151:10
168:15,17,23
174:20
documentation
123:4,14 141:3
documented
125:21 130:17
documents
24:21,24,25,25
25:11,14,19,22
26:9,17,17
27:18 28:23
29:22 54:23
57:16 80:13
82:9,9,11,17
83:9,11,13,16
83:23 84:2,4
85:25 86:2
125:25 137:12
145:5,9,13
148:6 153:6
154:13

doing 22:4 23:16
51:1 63:1
96:18 152:20
175:9
DOJ 136:19
Dominick 3:12
8:12,17 9:2,4,6
10:7,9,11,11
10:13,17,20,22
11:3,14,19
12:12
Dominicks
10:18
Dorn 1:12 4:2
4:18 5:2,9,11
5:12 6:13,23
7:2,5 8:10 13:3
13:14,20 16:24
27:8 29:7,15
29:19 43:18
45:21,21 50:13
50:16 54:22
55:17,18 56:14
62:4 70:13,17
71:2,11 86:24
87:16,23 88:10
103:13 104:9
104:24 105:5
108:7,25 120:6
120:16 121:9
121:25 123:8
129:9,15,18
142:16 151:3
156:19 167:10
168:3
Dorn's 4:23
Dorns 50:6
DORNSA@M...
32:10
dot 169:17
Dougherty 3:10
7:18,19
Downsizing
157:25
dozen 73:24
75:15 76:5
91:24 149:2,12
dozens 73:25
draft 154:19

drew 159:4
drive 1:24 2:23
3:22 111:18
124:23
driver's 5:2
53:16,24 54:7
54:8,17,25
55:17
drives 112:9
DROOKS 2:16
due 41:9 106:25
114:1 124:4,4
duly 13:10,14
178:10
dumb 18:4,7
duress 122:24
duties 147:9
Dye 52:5
Dyk 2:16 7:8,9
8:22 10:3
18:18 19:20
20:22 23:6
26:1,13 27:14
27:17 28:7,13
28:22 30:11
31:7 32:7
33:10,18 35:4
37:3,19,24
38:16 39:10,25
41:17,25 42:25
43:4 44:17,20
45:19 46:23
47:17,21 48:9
48:12,18,25
50:10 51:9,14
51:16,19 52:16
52:25 53:3
55:20 56:1
58:5,19 59:10
103:21 117:13
118:20 156:7
168:21,25
169:13 170:10
176:20

101:20 116:24
146:16
East 2:17 93:17
edited 121:13
educational
15:11
Edward 1:15
effect 107:8
eight 30:16 31:1
31:4
either 71:20
72:21 80:9
152:15
Electric 61:9
email 5:9,10
17:22 18:4,5
18:19 32:11,13
43:25 44:1
50:25 59:7
72:14 76:15
77:2 78:24
81:22 82:21,24
83:1 84:12,15
84:15 86:23
88:4,7,12,21
88:22,23 89:12
89:25 90:3,12
90:13,17,18,22
90:24 91:13,15
95:14 97:14,17
98:17,25 99:16
99:22,25
100:17 101:1,8
103:12 104:12
104:13,14,17
104:21,23,24
105:4,9,13,17
107:13 109:3
111:19 114:17
114:19,22
115:14 116:17
118:3 119:3,18
120:24 121:8
122:13,18
123:8 127:21
129:11,15,18
129:24,25
132:17 134:21
134:24 135:18

—————— E ——————

E 90:7
e-y-t-o-w-n 50:1
earlier 32:4 33:8

136:1,14 138:9
139:3,11,14,20
139:23 140:19
140:22,25
142:16,19
**emailed** 144:4
**emails** 5:12
17:18 76:21
79:14 80:14,15
80:16,25 81:6
81:8,17,20
82:3 83:14,17
83:24 84:3,4
84:10 89:19
91:19 99:7,20
137:5,17 138:5
170:22
**employ** 70:6
**employed** 14:6
16:3 17:12
56:20 71:11
**employee** 64:3
**employees** 63:7
63:10,13,22
64:3,5,6,11,12
64:19 65:7
67:3,8,16 69:1
69:5 70:7,17
71:11 158:9
**employment**
60:18
**en** 161:21
**ended** 43:10
**Energy** 44:6
67:7 153:20
**England** 17:7
**entail** 40:21
**entailed** 40:22
**entire** 42:4
106:21 107:7
129:25
**entities** 52:9,15
52:21
**entitled** 113:3
**entity** 49:14
159:9
**environment**
20:15 124:3
**equipment**

23:17
**Espada** 2:7
**Esq** 2:3,7,11,12
2:16 3:2,9,9,10
3:10,11
**estimate** 67:15
67:16 76:20
80:25 81:11
**et** 1:8 13:2
**evasive** 174:9
177:9
**eventually** 20:15
**everybody** 10:6
18:20 20:12,14
22:20,21 23:1
27:19 177:12
**evidence** 26:6
29:2 39:8 43:3
53:8 54:14
62:13 84:20
88:18 89:18
92:16,22 95:7
95:13 97:23
98:8,23 106:2
106:14 107:2
107:12 111:23
121:18 125:8
126:13,22
127:13 128:2
130:6 132:11
134:4 141:8,16
142:2,23
160:20 161:20
162:11 170:13
178:7
**exact** 64:17
158:11
**exactly** 89:23
170:5
**exam** 168:5
**examination**
13:16 62:2,7
65:19 82:15
103:23 118:23
167:8 168:1,9
169:11 172:7
172:21 174:25
**examined** 13:15
**exceeded** 21:24

**exceeds** 168:22
169:11,21
170:12 172:6
175:5,18
**exchange** 15:7
85:22 118:17
118:22
**exchanged**
103:20
**exclusive** 39:19
**excuse** 102:14
128:8 149:6
154:24 157:14
**execute** 49:4
**executed** 159:5
**executive** 141:18
**executives**
154:25 155:2
**exemplar**
102:19
**exhibit** 4:8,10,12
4:13,14,15,16
4:17,18,20,23
5:2,4,6,9,10,12
16:15,16,17
21:2 24:8
25:10 26:9
28:2 29:8,24
33:12,20 38:9
42:11,12 43:3
44:23,24 45:1
45:3 47:15
48:3,7,20,22
52:22 53:13,15
54:14,18,25
55:2,23,23
56:19 57:14,18
57:25,25 59:16
59:17 85:9,14
87:6,8,9,11,14
87:17,24 98:13
100:1 103:12
103:15 104:1,5
104:10 106:16
109:2 118:2,4
118:7,11 119:5
122:16,16
126:18 127:13
133:8,12 135:8

139:17 145:17
149:24 150:14
153:1 162:23
163:6,15
164:12,23
168:10 172:24
173:4,5,21
174:16
**exhibits** 4:7 5:1
5:8 27:10,10
28:19 29:2
50:22 85:22
103:18,20,22
118:16,22
170:21
**exist** 46:1,11,18
49:18 65:9,14
65:21 141:4
157:8,15
**existed** 160:1
**existence** 106:9
115:24 160:22
**existing** 148:15
**expand** 171:8,11
172:14
**expel** 10:23
**expert** 55:8,10
55:14,15 102:5
102:8,19
**explain** 135:3
**explained**
125:10
**explanation**
27:9
**explore** 125:5
**express** 114:16
115:3
**expressed**
114:11,18,23
**extended** 69:22
**external** 18:6
23:24 88:12
104:17 129:10

_____
**F**
**F-e-v-e** 8:7
**face** 73:8,8 75:8
75:8,11,11
151:22

**face-to-face**
72:21
**facility** 148:17
**fact** 27:21 31:13
38:18 41:9
49:22 50:14
57:6 60:15
65:6,8 66:12
89:9 92:8,10
93:13 94:19
96:2 110:23
112:25 115:21
116:9 120:25
121:8,21 123:4
123:12,14
128:7 148:12
175:12
**facts** 48:24
121:18 125:8
132:11 134:3
160:20 161:3
162:11,17
**fake** 49:22 50:3
**false** 48:15
**far** 32:4 35:7
41:23 59:7
66:2 111:15
117:4 151:20
**Fave** 144:16
**favor** 97:8
124:14
**fax** 4:18 149:17
149:18 150:16
152:14
**faxed** 149:18,19
152:8 153:3
**faxing** 149:21
**FBI** 3:7 45:6
71:21 72:1,6
72:22 73:4,7,9
74:7,12,19,20
75:4,8,14
76:12,16,22
77:1,10,25
134:16 135:1
136:21 143:5
159:14 160:1
160:14,23
**feature** 12:6

36:23
**federal** 1:16
12:23,24 74:19
89:15,21 90:23
91:14 94:9
101:9 112:17
133:13 134:16
136:7 144:12
**feel** 92:11 93:4
94:6,8,9,14,15
95:23 112:1,3
112:15
**feelings** 112:2
**fees** 149:20
**fellow** 89:15,21
90:23 91:14
**felt** 94:12 112:20
**FERRIS** 2:10
**Feve** 3:9 8:7
79:10,16,23
144:16,23
145:11
**field** 15:17
**fifth** 122:25,25
**figured** 38:23
**file** 41:13 154:2
**filing** 28:24
149:20
**filings** 154:5,7
154:10
**fill** 26:19 30:15
30:22 31:4
**final** 175:2
**finally** 59:15
116:21
**fine** 110:12
169:25
**finish** 156:9
**finished** 94:22
118:13
**firm** 6:24 7:9,12
**first** 6:11 29:23
34:17 35:15
53:25 54:3
63:2 68:18
72:1,2 74:18
75:3,17 77:15
80:8 82:23
89:1 90:21

94:2 105:24
107:4 119:4
126:25 129:3,6
129:7,13 130:1
134:9,25
135:22 139:8
151:3
**fit** 42:4
**five** 54:1 76:9
99:2 100:17
155:18 156:4
**five-minute**
155:19
**Floor** 2:17
**Florida** 112:10
112:13
**fly** 92:9 93:14
96:5 112:22
113:1,23 130:4
132:7
**flying** 92:13
93:6 96:8
**focused** 17:3
**folks** 159:24
**follows** 13:15
**force** 92:9
**forcing** 92:12
93:5
**forged** 101:13
102:1,3,10
117:5 123:5,15
**forgery** 46:19
117:11,15,18
117:19,21
**forgot** 81:5
**forth** 22:22
77:25 91:18
**Forty** 133:10
**foun** 39:1 60:2
**foundation**
18:17 23:8
25:9,21,25
26:14,15 27:15
28:1,14,21
29:4 30:11,25
32:8 33:18
34:4 35:2,11
35:25 36:15
37:25 38:13

39:2,8,23
40:11 41:15
44:22 46:9,24
47:22 48:12,19
50:4,18 53:3
54:16 55:9,14
55:21 56:2
57:1,11 58:8
58:19 59:3,19
60:12 169:1,11
169:23 170:16
171:16 172:8
175:5
**four** 54:1,1 99:2
99:3 100:17
105:24 115:13
115:13,15,16
115:17 116:1,4
152:7 169:3
176:18
**four-year** 15:12
**fourth** 34:20
35:6,17,21
36:2,6 169:5
**frame** 137:7
**frames** 53:20,23
**Friday** 85:22
103:20 118:18
144:3,7
**front** 59:23
93:10 107:8
119:14 145:16
145:23 150:1
162:15 163:25
**full** 13:19
**fully** 178:8
**further** 119:12
119:12 132:16
140:25
**future** 27:24
92:2

———————
**G**
———————
**G-e-t-a-d-s**
51:15
**GALLAGHER**
1:23 2:22 3:20
**GallagherRep...**
1:25 2:25 3:25

**General** 61:9
**gentle** 158:3
**gentleman** 158:4
**Georgia** 61:1
67:6,11 69:7
158:3
**Germany** 60:9
60:15,17,20,24
70:3 160:6
161:21,22
162:1
**GetAds** 51:15
**getting** 19:8
**give** 17:1 18:11
22:12 38:10
67:15 76:20
78:8 80:24
81:10 103:24
108:15 118:8
128:11 138:17
144:5 155:18
163:21 164:8
164:19 165:7
165:18 166:2
166:13,24
167:3 169:7
170:18
**given** 33:25
35:15 38:18
86:23
**giving** 103:25
**Glenlivet** 1:24
2:23 3:22
**Glenn** 5:9,11,13
73:11,14,19,22
74:13,20 76:2
76:4,8,9 77:3,4
78:1 84:16,17
86:24 88:12
89:2 90:4
103:13 104:15
114:18 119:19
119:20 120:7
120:11 121:2
122:9 129:10
142:20,25,25
143:3
**Glenn's** 91:14
**global** 40:22

50:15 63:18,19
71:4 158:22
159:7,8
**globally** 19:12
60:17 160:9
171:8
**GLOVSKY**
2:10
**go** 6:9,14 16:14
18:8 42:3
67:24 70:2
86:13,15 94:24
99:19 105:20
106:19 108:16
115:8 118:19
127:19 129:3,6
132:16,24
145:15 149:23
153:1 156:6
164:22 171:25
176:10
**goes** 34:11,19
118:8,9 162:16
**going** 11:1 12:1
22:1 27:22
28:8 61:17,18
61:21 62:6
65:16 68:24
71:8 84:21
85:9 91:18
92:8 93:24
103:1,10
107:17 108:1,5
108:19 109:4,5
109:9,17 110:5
110:17 111:4,7
112:8,14 118:7
118:8 124:23
135:11 147:12
155:12,14
156:13 157:12
157:15 162:6
173:3 174:8,10
174:15
**GOLDSTEIN**
2:6
**good** 6:22 7:1,5
7:8,11 96:13
138:18 167:10

**Goodrich** 2:12
7:1,2,20 85:14
85:16 86:10
87:9 122:3
173:1
**gotten** 36:23
**gov** 117:12
**government** 4:7
5:1 15:1,7 29:1
43:2 54:11,13
62:25 69:22
71:16,20,21
72:3,8,22,23
74:19 75:4,11
77:10,16,20
80:1 85:9 87:1
94:8 97:18
103:3,17 104:1
113:8 115:4
117:14 118:15
119:25 121:12
121:13 133:9
133:11,12,13
133:24 134:10
135:7 136:14
136:19 139:9
139:10,18
140:13 143:5
143:14,16,17
144:12 145:17
149:24 150:14
153:1 162:20
162:23 163:6
163:15 164:11
164:22 167:13
172:24 173:5
173:21 174:16
177:13
**Government's**
21:1 24:7
25:10 26:9
27:9,10 28:2
28:19 29:2,8
29:23 33:11,20
38:9 42:10,12
43:3 44:23
47:15 48:3,7
48:20,22 50:21
52:21 53:12,15

54:14,17,24
55:1,22,23
56:18 57:14,18
57:24,25 59:16
59:17 133:4
168:10
**graduated** 15:16
**granted** 26:24
27:7,21
**grew** 171:21
**grow** 20:2,11,25
22:13 27:23
38:2 171:8,8
171:11
**growing** 19:2,6
20:6 21:8
**growth** 172:2
**guidance** 109:19
174:12 177:9
**guys** 155:24,25

_____

**H**

**H-o-s-t-w-i-n-...**
51:6
**hackers** 128:18
**half** 73:24,25
75:15 76:5
91:24 149:2,2
149:12
**halfway** 113:16
**Hamilton** 1:17
12:24
**hand** 86:20
87:16 118:7
**handed** 104:2
**handing** 104:2
**handle** 31:8,12
31:16
**handwriting**
102:5,8,18
**hang** 117:21
164:25
**happen** 18:1
**happened** 60:4
**happening**
114:2
**harassing** 129:4
**head** 60:16 78:7
120:12 133:6

146:20
**header** 88:9
121:1,8 129:8
**heading** 120:15
**headings** 120:12
**headquarters**
40:24 60:16,25
67:22 158:4,9
159:4,24
161:22 162:3
**health** 124:4
**hear** 9:6 37:14
86:1 110:13
**hearing** 9:10
12:4 83:10
**hearsay** 29:6
57:12 58:9,20
59:3,20 60:13
**Heath** 2:3 4:3,4
4:5 6:3,9,12
7:15,24 8:2,6
8:13,19 9:4,13
9:16,19,21
10:1,5,10,19
10:24 11:3,8
11:12,18,22,25
12:5,8,11,14
12:17 13:4,17
25:18 26:7
28:16 29:1
32:19 37:8
43:2 54:13
61:16 64:7,14
67:13,18 68:1
68:20,22 69:15
69:17,19,25
70:9,20 71:5
72:25 73:2
74:22 77:13,22
78:5,9,12 79:2
79:7,12,22
80:5 81:2,12
82:6 83:18,20
83:24 84:7,19
84:23 85:18,21
86:4,8,17 87:5
88:14,17 89:6
89:13,17 90:8
91:1,6,8,12,23

92:5,15,21
93:2 94:11,17
95:6,12,16,20
95:25 96:12,16
96:22,24 97:5
97:22 98:7,20
98:22 99:6,14
99:24 100:4,9
100:20 101:3,5
101:19 102:6,9
102:22 103:17
105:12 106:1
106:13,17
107:1,11,16,18
107:24 108:3
108:10 109:23
109:25 110:7
110:10,12,15
110:20 111:5
111:22 112:11
113:24 114:13
114:20,25
115:2,5,12,18
116:7,14
118:14 121:17
122:14 123:6
123:10,20,22
124:1,11 125:3
125:7,14,19
126:3,12,21
127:8,12,16,19
127:25 129:4
130:5,14,25
131:5,17,23
132:4,10,21
133:2,6 134:1
134:3,6 135:14
136:9,24
137:13,20,24
138:1,6,15,19
140:16 141:5,7
141:15 142:1
142:11,14,22
143:9,18,25
144:1,9,13,14
144:23 145:5
145:12 155:13
155:17,19,23
156:3 159:17

160:3,17,19,24
161:6,19
162:10,16
163:8 164:3
168:2 172:19
173:15 174:3,6
175:1,21 176:5
176:9,12,18
177:4,13
**Heilman** 1:20
6:21 12:20
**held** 87:10 142:3
**hell** 115:15,16
115:17 116:1,4
116:5
**helps** 27:9
**Hey** 176:5
**Hi** 7:18 8:24
**Hijacked** 5:4
**hit** 18:10
**Hold** 176:7
**home** 107:4
**hop** 11:1
**hope** 62:23
**hopefully** 156:8
**hopping** 11:5
12:2
**horrible** 89:12
90:22
**hosting** 8:25
**Hostwinds** 51:6
**hour** 145:3,4
**hours** 163:9
**House** 19:11
31:25 43:14
56:12,13
**household** 23:19
23:19
**Howard** 158:5,6
**hundred** 69:10
**hung** 121:21

_____

**I**

**ID** 31:14
**idea** 17:11 67:2
90:17
**identification**
87:12 103:16
118:5

**identified** 9:9
10:6 90:3
150:4 162:17
163:11
**identify** 6:10
7:16 9:3,6 10:2
10:13
**impair** 15:4
**impeachment**
160:4
**important** 36:22
37:16
**improper**
109:17 159:15
160:4 175:19
**in-house** 19:3
147:10
**in-person** 96:5
**incidents** 137:10
**included** 6:5
83:11 150:23
**includes** 173:24
**inconvenience**
107:7
**Incorporation**
153:21
**incorrect** 102:13
133:14 161:1
**increase** 22:4
**INDEX** 4:1,7
5:1,8
**indicate** 31:21
33:5
**indicated** 15:24
97:18 106:22
123:18 168:11
**indicates** 49:2
168:17
**indicating** 74:9
83:7 120:13
143:20,21
**indication** 16:20
**individual** 39:6
**individuals** 7:16
17:22 51:3,22
52:9,15,21
60:20 171:14
**industrial** 17:4
**infantile** 21:8

**information** 4:8
22:21 55:24
56:5,18,19
57:4 58:12,17
58:24 59:17
107:23 110:16
110:22 125:10
137:11 143:21
156:25
**informed** 92:2
**inquiry** 56:6
**insisted** 96:5
**insistence** 96:8
**installed** 19:8
**installing** 19:9
19:11
**instruct** 32:16
**instructed** 77:6
**instructing**
108:7
**integrating**
20:14
**intend** 85:25
111:24
**intended** 62:20
118:16,22
**interest** 101:10
120:20 122:1
122:10
**internal** 21:7,21
32:13 40:23
147:24 148:19
**international**
17:7
**internet** 4:19
17:15 21:8
22:3,16 24:2
27:2 29:9
30:13 33:6
36:21 38:6
39:5 114:3
171:23
**InterNIC** 36:10
36:16
**introduce** 11:15
80:7
**introduction**
12:16
**involved** 126:20

127:5,11,23
128:14 129:2
143:17 169:15
**involvement**
41:23 43:11
**involving** 79:10
123:3
**IP** 4:10 5:6
18:16 21:16,24
22:5,8,10,11
22:12 23:9,18
26:18,24 27:7
27:22 30:19
35:14 38:11
39:14,21 40:3
48:5,21 53:5
56:10,11 57:5
59:23 116:25
161:8 164:9
165:8,19
166:13,24
168:19 169:2,4
169:18 170:7
171:6,13
173:11,24
174:18,19
175:14
**irrelevant** 23:5
31:11 37:2,7
38:21 50:11
52:17 53:8
54:16 55:8
69:11 127:16
128:1 130:15
144:2 160:4
171:5 175:20
**issue** 74:23
107:19 109:7
109:10 112:4
131:6
**issues** 62:14
123:3
**item** 118:2
122:22

**J**

**J** 2:12
**Jacob** 1:8 2:9
7:6 51:22

165:12,15,17
167:11
**James** 3:11 9:11
9:13,16,19,20
**Janu** 14:23
**January** 14:24
153:19,25
**Jeffrey** 21:14
146:17,18,18
**Jessica** 2:7 7:6
167:11
**jessica@wmg...**
2:9
**job** 40:21 66:17
66:20 171:12
171:19
**John** 2:4
**joined** 9:25
**joining** 7:20
**Jones** 2:11 4:3,5
6:8,22,23 7:19
8:23 9:2 10:12
11:4,14 12:12
17:20 19:14,19
20:4,17,21,23
21:18 23:4,7
25:2,8,17,19
25:24 26:4,12
26:15 27:13,16
27:25 28:6,10
28:12,15,20
29:3,17 30:9
30:24 31:10
32:15,21 33:15
34:3,12 35:1,9
35:11,24 36:11
36:13,17,19
37:1,4,6,10,13
37:20,22 38:7
38:12,21,25
39:7,22 40:9
41:14,24 44:13
45:4,17 46:8
46:15,20 47:10
48:16,23 50:2
50:17 52:17
53:7 54:6,15
55:5,7,11,13
55:25 56:2,9

56:16,22,25
57:15,22 58:4
58:7,15,18,25
59:2,18,21
60:1,8,14,21
60:23 61:4,6
61:10,14,17
62:3,5 71:7
84:21 85:10,12
85:15,20,23
86:5,9,12,15
86:19,22 87:7
87:13,15,20
90:6 102:17,24
103:24 104:4
106:12,15,18
108:6,15,23,24
109:14,24
110:4,9,11
111:1,6 114:9
118:6,10,24
119:22 124:20
127:18 128:22
128:25 130:10
138:23 139:1
145:20 150:7
155:11,14,18
155:21,24
156:10,17,18
162:12,19
167:1,21,23
168:22 169:10
169:21 170:9
170:11,15
171:4,15,18
172:6,22
173:18 174:5,8
174:14,22
175:4,18,22
176:1,7,16
177:1,5,16
**Juan** 2:8
**judge** 62:14,16
62:18,21
107:22 109:19
111:24 126:7
177:9
**Judon** 158:5,7
**June** 45:23 47:1

47:7 49:7
118:3 119:20
129:9,15,18
130:12,22
131:8,19,21
132:1,6,8
133:11 135:10
135:24 136:14
136:18,22
137:4 138:9
139:3 140:12
140:19,23
141:22 142:16
142:19 143:2
**jury** 107:23
**Justice** 2:2 6:13
12:21 13:5
73:13 78:1,3
78:11,22 83:5
136:15 143:20

**K**

**K** 2:11
**Katzman** 3:2
7:13
**Keeney** 2:4
**keep** 119:14
176:5
**kept** 25:11 27:18
157:18
**keyboard** 18:9
**kind** 18:14 75:4
99:4 116:12
139:9
**knew** 131:11
161:8
**know** 10:8,12,15
10:17,17,19,22
21:9 22:20
24:2 36:18
42:21 62:11
64:2 67:5 68:6
70:16,24 71:12
78:18,21 79:8
81:14,15 85:24
86:2 87:19
89:24 91:2
93:12 96:1
117:20 118:12

121:11 123:24
125:11 126:7
134:13 140:2
143:10 151:18
151:20 152:2
153:25 154:9
156:8 158:8,13
158:23,25
159:2 160:7,22
161:17 162:2,2
162:5 169:20
169:25 170:3
**Knowing** 173:25
**knowledge**
28:21 29:5
35:5,12,25
36:15 37:25
38:15 39:9
40:2 41:15
44:16,21 50:20
56:3 59:13,20
60:2,10,13
76:24 91:11
137:9 148:9
157:11 158:12
161:14 172:13
**known** 20:16
**knows** 10:11
162:3

**L**

**L** 3:10
**lack** 25:9,20,24
26:15 28:1,21
28:21 29:3,5
30:25 34:3
35:2,11,12,24
35:25 36:14,15
38:12 39:1,1,7
39:9,23 40:11
41:14,15 44:15
46:9 50:4,17
50:19 53:3
54:16 55:8,14
56:2,3 57:1
58:7 59:20
60:1,13 96:19
169:10,22
170:15 171:16

172:8,12 175:4
**lacks** 26:13
27:14 28:13
30:11 32:7
33:18 37:25
38:14 40:1
44:21,21 46:23
47:22 48:12,18
55:21 57:11
58:19 59:12
168:21,25
**large** 34:16 44:7
148:14
**larger** 67:6,10
70:6
**late** 118:15
**law** 6:24 7:9,12
**lawyer** 62:13
78:10 143:20
**lawyers** 72:9,23
77:10,20 80:1
136:15
**lead** 62:6
**leading** 28:9,10
34:5 39:25
48:13 171:15
172:10 175:17
**leave** 109:18
157:24 174:11
177:6
**left** 12:9,12
64:20,22 68:9
68:18 157:22
**Legacy** 5:4
**legal** 24:3 38:16
39:10,23 46:21
48:17 50:3
127:2
**let's** 6:9 94:24
105:7,20
106:19 115:8
129:3,6 132:16
145:15 163:24
164:11,22
**letter** 4:20 27:4
27:6 33:17
45:22 47:2,8
47:12 49:5,13
111:25 112:5

125:22 149:16
149:24 150:4
150:16,19,24
150:25 151:11
151:13,14,21
151:22,24,25
152:5,6 168:20
173:3,6,10,20
173:22 175:12
**letters** 116:21
126:19 127:23
130:2
**letting** 128:11
**LEVIN** 2:10
**license** 5:2 53:16
54:17 55:17
**licenses** 53:17
53:24 54:7,8
55:1
**lie** 70:21
**likes** 93:16
**LINCENBERG**
2:16
**line** 9:9,22 36:9
88:9 89:1,11
**Lisa** 78:15,16
**list** 82:12,13
94:6 95:5
106:5 122:23
126:8
**listed** 13:6 86:25
**little** 15:10 17:1
17:2 147:16
155:15
**Littrell** 3:2 7:13
**living** 22:24
**LLC** 1:23 2:22
3:20 12:21
**LLP** 3:2
**locally** 18:6
19:12,12
**located** 126:23
161:23
**location** 19:12
41:22 67:6
**locations** 17:7,8
38:5
**logged** 18:20
**long** 14:1,10

41:18 43:6
89:9 115:9
143:8 145:1
146:25 148:24
**longer** 106:8
115:23 157:10
**look** 16:6 50:23
59:15 99:19
104:6 111:19
115:19 119:6
119:21 120:5
121:8 126:24
134:15 149:16
149:24 163:1
163:24 164:11
173:20
**looking** 99:25
101:10 104:23
120:1 140:25
141:1 142:18
162:20 163:15
170:19
**looks** 11:20 56:4
**Los** 2:17 3:4
**lost** 113:15
**lot** 15:21 42:6
70:6
**love** 24:2
**lunch** 138:20
155:25 156:1

**M**

**machine** 149:18
**machines** 19:5
**Mack** 1:19 6:19
13:8 178:15
**mail** 18:23 20:15
23:20 84:18,24
84:25 89:2,3
104:18 129:11
150:17 152:14
**mailbox** 32:3,6,9
**mailed** 149:14
**mailing** 56:12
**mainframe** 18:2
18:13,20,21,23
19:10,17,24
32:11 147:24
147:25

mainframes
148:15
maintain 28:18
171:20
maintained
27:11 28:24
30:14
maintaining
40:22
major 24:2
124:8
making 120:23
121:15 123:8,9
123:16 124:10
man 4:12,13,14
4:15,16,17
manager 14:14
14:20 40:19
41:5 148:23
157:18
Manoogian 2:14
6:25 7:4 51:24
62:5 165:21,23
166:1 177:1
manufacturer
17:4
manufacturing
18:3 40:25
147:13 172:17
Marella 2:15
7:10
mark 2:12,14
6:25 51:24
62:5 85:9
165:21,23,25
marked 87:11
103:15 118:4
married 13:24
Mary 49:25
match 55:3
mathematics
15:13 68:14
matter 62:6 75:5
116:9 139:11
mean 31:9 39:1
96:15 105:5
109:25 112:17
129:7 130:2
138:19 147:8

175:3
means 106:10
126:15 150:12
175:10
meant 112:17
127:21
medical 97:9,17
131:4
medications
15:3
meet 134:19
meeting 7:16
10:23 12:10
meetings 72:20
72:21
Melanie 3:9
7:22 78:25
95:17,18
mental 107:9
mention 109:2
mentioned 20:2
40:6 49:21
154:18
mentioning
156:21
merged 153:20
157:9
merger 157:7,17
Merit 1:19
178:16
message 120:7
met 75:8,11 80:8
163:12,18
164:3,12,23
165:11,21
166:5,16
microphone
167:6
mike 13:12
Mill 1:23 2:22
3:21
mind 69:18,23
106:21 120:20
122:2,10,22
mini-computers
148:14
Mintz 2:10 6:24
7:3,20
minute 98:6,10

109:23
minutes 11:2
155:18 156:4
Misremember...
134:6
misstates 21:19
26:5,14 33:16
39:8 47:18,19
47:21 48:10,23
52:25 53:7
169:13 170:12
Mister 176:8
Mohammed 3:5
7:14 52:1
moment 108:15
Monday 104:14
144:4
money 152:17
152:24
month 137:3,4
months 115:13
115:14,15,16
115:16,17
116:1,4 155:4
Moore 5:5 14:15
15:25 16:3
17:2,12 18:24
20:19,25 24:25
25:4,6,12,15
25:20,23 26:3
26:10,23 27:5
27:12,18 28:3
28:17,23,25
30:19 31:15,21
32:5 33:3
38:10 39:14,15
39:18,19,20
40:4,7,12,14
41:2,8,10,10
41:11 43:9
44:10,10,18
45:23 46:1,7
46:11,14,17
47:12 48:4,14
49:4,8,17,18
49:24 50:7,8
50:12 56:11,20
58:2,13,24
60:4 63:3,7,10

63:17 64:19,20
64:22,25 65:3
65:4,9,11,13
65:20,21 66:3
66:3,4,9,13,18
66:23 67:9
68:19 69:1
102:15 106:8
115:23 141:3
141:11,23
142:7,9 152:17
152:20,22
153:4,11,16,20
153:23 154:2
154:11,15,24
155:3,6 156:22
157:8,10
158:20,21
168:20 171:7
171:10,14,20
172:2,4,17
morning 6:22
7:1,5,8,11 74:8
79:19 82:15
109:16 143:15
177:7
morning's 83:12
Mountain 2:12
mouths 117:23
move 19:14
27:25 35:1
38:7 39:2
44:20 46:20,21
50:2,17 55:20
56:15 57:8
60:5 61:10
90:6 97:12
102:17,24
106:15 109:21
114:9 124:21
128:21,22,25
130:10,20
161:11 173:18
MPCO 33:2
150:20 151:3
168:17
mpco.com 32:23
multiple 170:25
multiplication

34:23
Munich 70:3,6,7
159:25
Munk 2:6,7 4:4
7:5,6 10:8 11:6
11:10 18:17
23:8 25:3 26:2
26:5 28:8 29:6
34:5 37:18
38:14 40:1
44:15 47:16,19
48:8,10 49:10
52:11,18,23
53:9 55:4,6
56:15,17,23
57:2,11 58:9
58:21 59:1,3,9
59:12,19 60:5
60:12,22 85:11
87:8,21 97:11
103:8 117:2
118:19 124:18
124:21 128:21
128:23 130:20
161:11 167:9
167:11,19
170:14 172:12
175:17 176:24
mute 11:19
102:22,23
muted 8:1,5

N

n 1:15 49:23,25
name 6:17,23
7:2,6,12 8:16
8:20 12:20
13:3,18,19
18:11 21:14
29:15,19,24
31:17,17 32:22
33:1 41:10
43:17 47:8
50:13 52:15
56:7 62:4
73:10,11,14
75:18 77:8
79:16,17 88:10
120:9 134:13

134:14 144:17
155:7,8 158:5
165:12 167:10
**named** 70:13
165:14,17,25
166:5,8,11,16
166:19,22
**names** 8:9 51:5
51:21 78:6,8
**Nancy** 49:23,23
49:25
**nature** 79:25
80:3
**necessary** 20:10
21:15 38:1
62:23 97:7
147:18
**need** 18:12
20:19 30:14
74:24,24 92:11
93:4 108:13
110:8 117:6
119:1 132:2
138:13 155:15
176:13
**needed** 18:16
20:25 22:4
30:15,17 33:1
67:1 113:8
117:1,4 147:25
**needing** 16:8
**needs** 37:10
108:11 138:20
**negotiated**
154:25
**NESSIM** 2:15
**net** 31:14 101:19
143:11,12
150:20 151:4
151:12,15,23
152:18 153:12
153:17 157:13
158:13,16
159:25 160:12
160:14,22
161:4 163:22
164:9,20 165:8
165:19 166:2
166:13,24

168:10,18
170:7 173:10
173:23 174:17
175:3
**network** 4:19,20
17:19 18:22
19:3,10,10
20:7,9 21:6,7
21:21 22:1,6,9
22:10,11,16,19
22:20 23:18,24
24:5,14,18
26:18,20,21,21
26:25,25 27:5
27:7,20 29:9
30:6,8,12,18
30:21 31:14
32:3,4,6,9,22
33:1,6,13,24
34:9 35:18
36:9,24 37:15
38:1,10 39:3
39:13,14 40:23
40:23 42:2,4,5
56:21 58:13
146:1 147:10
147:12,16,19
147:23,24
148:1,15
149:14 150:5
150:25 152:17
152:23 153:3
153:16 158:21
158:22 159:6,7
159:8 169:2
171:11,20,23
172:3,4,15,15
173:6 175:7,10
175:11
**networks** 14:14
14:21 19:4
40:20 41:5,6
157:19 175:8
175:15
**Nevarez** 3:2
7:11,12 8:21
28:11 35:10
39:16 47:4
50:19 56:24

57:8 58:6,14
58:16 61:12
167:22 172:10
176:17,19,22
**never** 70:4 77:7
141:20 142:3
159:16 161:24
161:25 163:12
**new** 2:3 19:7
20:9 21:8
114:7
**newly** 21:8
**next-to-last**
127:3
**nic** 31:8,12,16
**Nicole** 2:16 7:9
**night** 80:23,24
81:1,5,7 83:15
83:25 144:5
**nineteen-nine**
24:20
**Nodding** 133:6
**non-routable**
22:17
**nonresponsive**
19:15 20:18
25:9 28:1 35:2
38:8 39:2,17
41:17 44:21
46:21 48:19
50:3,18 55:21
56:17 57:9
60:6 61:11
97:12 102:25
114:10 117:3
124:19,20
128:23 130:11
130:21 161:12
173:19 177:10
**Nope** 117:16
156:24
**normal** 45:14
**normally** 29:20
**Notary** 178:17
**Note** 47:4
**notes** 65:24
178:9
**notice** 79:16
**November** 93:20

96:9 97:3
123:24 124:6
130:3
**num** 106:23
**number** 4:19
24:5 29:10
33:6,13,24
36:3,24 38:10
39:4 47:14
59:7 69:10
76:21 81:3,9
81:10 89:23
91:4,5,10,24
105:21 106:20
106:23 109:15
111:20 132:18
141:1 150:13
150:20 151:4,8
157:13 158:11
168:18 169:8
169:18 170:7
170:19 175:3,7
**numbers** 34:8
34:17,18 64:17
67:5 162:24
174:19
**numerous** 77:24
80:14,16
**nvandyk@bir...**
2:18
**NW** 2:3

———————
**O**
———————
**oath** 107:21
**object** 18:17
26:2 28:8
37:18 49:10
52:23 59:19
60:5,12 83:18
85:18 97:11
124:18 161:11
173:15 174:9
175:17
**objecting** 62:25
**objection** 6:6
17:20 19:19,20
20:4,17,21,22
21:18 23:4,5
25:2,3,8,17,20

25:24 26:12,13
27:13,14 28:6
28:7,20 29:3
29:17 30:9,24
31:7,10 32:7
32:16,17 33:10
33:15 34:3,12
35:9,10,24
36:11,13,17
37:1,6,11,19
37:22 38:12,21
39:7,22 40:9
41:14,24 42:25
43:4 44:13
45:17 46:8,15
46:20 47:4,10
47:16,17 48:8
48:9,16,23
51:9,14,16,19
52:11,16 53:7
54:6,15 55:4,5
55:11,13,25
56:1,9,22,23
56:24 57:15
58:4,5,6,14,15
58:25 59:1,2
59:18 60:1,21
61:4,10 64:7
64:15 67:13,18
68:1,20,22
69:15,17,25
70:9,20 71:5
72:25 73:2
74:22 77:13,22
78:5,9 79:2,7
79:12 80:5
81:2,12 82:6
83:20 84:7,19
86:4 88:14
89:6,13,17
90:8 91:1,6,12
91:23 92:5,15
92:21 93:2
94:17 95:6,12
95:16,20,25
96:12,16,22,24
97:5,22 98:7
98:20 99:6,14
99:24 100:4,9

100:20 101:3,5
102:6,9 103:8
105:12 106:1
106:13,17
107:1,11,16,18
107:24 108:3
111:22 112:11
113:24 114:13
114:20,25
115:5,12,18
116:7,14 117:2
117:13 121:17
122:14 123:6
123:10,20
124:1,11 125:3
125:7,14,15,19
126:3,12,21
127:8,12,25
128:21 129:4
130:5,14,25
131:5,17,23
132:4,10,21
133:2 134:1
135:14 136:9
136:24 137:13
137:20,24
138:6 140:16
141:5,7,15
142:1,11,22
143:9,18 144:1
144:9,14
159:17 160:3
160:17,24
161:6,19
162:10,16
168:22 169:10
169:21 170:9
170:10 171:4
171:15 172:6
174:3 175:4,18
**objections** 59:9
62:17,19
109:16 177:7
**objects** 103:18
118:15
**obligation**
103:22 118:21
**observations**
172:1

**obtain** 24:4
**obviously**
113:12
**occupation**
14:12
**occurred** 140:23
**octet** 34:18,20
35:6,17,21
36:2,5 169:5
169:16
**octets** 34:19
35:16 169:3
**October** 160:2
160:15 161:5
**offend** 62:20
**offer** 54:14
153:11,16
**offers** 29:1 43:2
**office** 1:23 2:22
3:21 6:24 7:3
8:7,14 10:4
11:7,11,13,13
11:16 17:19,23
78:18 101:13
102:2 144:20
158:10
**officers** 89:15,22
90:23 91:14
94:9
**offices** 17:6,8
22:2 38:4
**official** 54:23
**Oh** 10:10 155:5
163:2,4 167:3
**okay** 6:3,9 9:21
10:5 11:14
12:11,18 24:9
25:7 31:25
32:14,21 34:15
34:16 36:5,22
61:17,20 63:12
63:16,21 64:18
64:22 66:1
67:2 68:3,9,15
69:16,24 70:5
71:15 72:5
73:6,9,16 74:2
74:10,17 75:2
75:7,10,13,22

76:3,12 77:15
78:12 79:4,9
79:21,25 80:11
80:24 81:16
82:8 83:8,13
84:2,10 85:3
85:20,23 86:9
86:19,22 87:22
88:3,7,13,20
88:23 89:1,8
89:11,25 92:1
92:10 93:9,12
94:8,22,24
97:16 98:5,9
99:16,21 100:2
101:7 102:17
102:21 103:5
105:15,17
106:11,12
107:10 109:8
109:14 110:7
111:1,1,19
112:8,13,20
113:6,11 115:8
117:10,12,17
118:1 119:4,7
119:11 120:5
120:10,14,17
121:4,11,22,24
122:21 123:16
123:21 124:16
126:5,18 127:1
127:20 128:16
128:19 130:1,9
131:21 132:6
132:24 133:15
133:20 134:5
134:16 135:3,7
135:10,25
136:10 138:5
138:23,24
140:6,11,19,25
141:10 142:18
143:8 144:22
145:1,4,8,11
145:15,25
146:4,7,14
147:3 149:23
150:19 151:7

151:11 152:2,5
152:16,21,25
153:6,10,24
154:9 155:1,11
155:13,17,23
156:10,11
157:5,6 158:8
158:12 159:2
159:23 160:7
160:11,18
162:2,5,19
163:2,4,7,7,10
163:24 164:22
165:11 167:1
167:19,23
172:25 174:22
176:2
**old** 149:18
**once** 75:9
113:11
**ones** 67:1 82:12
**online** 38:5
**open** 109:18
174:11 177:6
**operate** 18:25
19:18 20:2
**operation** 67:10
69:2 70:12
**operations**
14:15,21 16:25
30:1 40:19,24
41:5,6 42:6
67:25 68:17,17
68:25 69:4
70:3,6,14
141:19 146:10
147:7,13
157:19
**opinion** 55:8,10
113:12,22
141:14
**opportunity**
87:4,24 104:10
**opposed** 125:17
**order** 18:15
20:10 22:6
26:20 28:3
30:18 38:2
42:4 62:13,18

97:7 103:11
107:6
**ordinary** 25:23
26:10 27:11
**organization**
19:2 27:21
30:12 38:20,24
56:8 172:17
**outside** 32:12
97:23 98:7
161:23
**owned** 42:8
44:18 56:10
65:5,7,12
101:12 106:6
116:24 123:2
123:13 142:10
**owner** 116:22
170:22
**owning** 171:1

**P**

**P.C** 2:11,16
**p.m** 86:25 88:11
104:15 105:11
108:21 120:19
142:19 156:12
156:15 176:3
177:18
**PA** 1:24 2:23
3:23 56:12
**Pacas** 2:18 7:10
52:3 166:17,20
166:23 176:21
**page** 29:23 30:5
116:19,23
119:21 120:1,2
126:24 129:3,6
129:7,9 150:10
163:5
**paid** 152:17,17
**pain** 92:11 93:5
93:14
**painful** 93:14
**pan** 97:19
**paper** 148:11
**paperwork** 16:6
**paragraph** 94:3
94:25 95:1

98:13,14 101:7
105:20,25
106:20,21
111:20,21
112:15 120:19
122:21 123:18
123:23 126:5
126:25 127:7
129:13 130:1
132:17 141:1
141:10 175:13
**Park** 2:17
**part** 44:10
111:12 171:12
171:17,19
**particular** 6:5
24:21,24 27:16
29:4 142:15
162:17
**parties** 103:19
**parties'** 85:21
**Paseo** 2:7
**pass** 61:16 167:5
167:23 172:19
174:22 175:21
**passed** 124:13
**password** 18:11
**Patrick** 3:10
9:25 10:1,3
**pay** 149:20
152:19,23
**PC** 2:6
**pending** 103:9
**Pennsylvania**
1:17 11:16,25
12:25 13:22
17:5 32:1
43:15 67:12
70:8 72:23
110:24 111:10
111:15 116:13
124:5,24 125:6
125:18 126:1
130:13 148:17
**people** 17:12
18:3 19:3
22:24 114:4,8
128:3,17
148:22 149:4,7

149:10 160:6
163:12
**percent** 32:9
69:10
**periods** 5:3
**permission** 47:8
137:23 138:2
**person** 53:6
72:18 73:7
77:7 83:5,6
92:3,12 93:6
113:9,14,19,20
134:19 162:18
163:16,18,20
164:3,5,7,12
164:15,18,23
165:3,6,11,14
165:17,25
166:5,8,11,16
166:19,22
**person's** 77:8
**personal** 18:14
21:22 28:21
29:5 35:4,12
35:25 37:24
38:14,22 39:9
40:1 41:15,23
44:15,21 50:20
56:3 59:12,20
60:2,13 72:20
72:24 74:13
97:4,19 107:19
108:4 109:7,10
137:9 148:9,13
161:13 172:12
**personally** 53:4
71:19
**personnel** 78:2
92:3
**Peter** 2:18 7:10
52:3 166:16,20
166:22 176:21
**phone** 7:21 9:1,9
9:12,22 59:7
73:17,19,21
75:13,16,19
76:13 84:16
88:8,9,12 99:8
99:9,10 102:23

132:19,20
135:11 139:5
139:24 140:1,6
140:7,11,13,22
143:3
**Photocopy** 5:2
**photograph**
4:12,13,14,15
4:16,17 162:21
162:22 164:2
**photographs**
50:23 82:20,24
83:17 162:8,13
**physical** 147:19
**picked** 74:9
**pictures** 163:8
**piece** 129:1
**Pierson** 3:9 7:22
7:22 78:25
79:5 95:18,18
95:23 96:1
98:19 99:1,22
112:19,20
113:7 114:12
114:24
**Pike** 31:22 43:14
49:23,24,25
50:1 56:13
102:11
**Plaintiff** 1:6 2:5
**plan** 159:4 160:5
**planned** 97:4
**plans** 97:19
**played** 42:8
**please** 7:16 10:2
10:24 12:19
13:18 19:21
37:14 45:2
48:2 61:21
71:23 72:19
77:14 87:17
90:14 95:2
100:23 101:8
102:22 104:5,7
105:1,8 108:18
118:12 122:22
127:7 128:11
129:16 136:17
145:18 149:25

153:14 156:12
176:3 177:18
**plow** 156:5
**Plus** 22:1
**PM** 120:6
**point** 20:20
21:23 85:4,6
96:17 113:25
121:25
**points** 114:4
**POPEO** 2:11
**posed** 108:8
**position** 28:17
**possible** 10:15
31:5
**possibly** 68:4,5
71:14
**Potentially**
73:24
**prepaid** 124:2
124:16,22
**preparation**
80:17 81:1
82:10 83:9
**prepare** 80:12
156:22
**prepared** 16:18
21:10 25:22
26:9 125:9
**presence** 176:25
177:2
**present** 3:6,8
6:10 9:5 83:7
93:17
**presented** 53:18
117:10
**president**
141:18 146:22
**previous** 43:18
**print** 81:24
**printed** 81:23
**prior** 14:13
22:15 46:25
71:17 77:11,18
99:1,4,13,17
99:23 100:18
101:2 103:19
113:5 123:25
143:14 176:13

**private** 18:22
21:25 107:19
**probably** 76:23
80:19
**problems** 107:5
116:11,12
124:8 125:20
125:24 130:16
131:11
**proceeding**
10:14,16
**proceedings**
178:8
**process** 38:3
**processing**
146:20
**produce** 85:25
137:12
**production**
118:15 119:25
**Products** 5:5
14:15 15:25
16:3 17:2,12
18:24 20:19,25
25:4,6,12,15
25:20,23 26:3
26:11,24 27:6
27:12,19 28:3
28:17,24,25
30:19 31:15,22
32:5 33:3
38:11 39:15,15
40:4,7,13,15
41:3,8,10,10
41:11 43:9
44:10,10,19
45:24 46:1,7
46:11,14,17
47:13 48:4,14
49:4,9,18,18
49:24 50:7,8
50:12 56:11,20
58:2,13 60:4
64:19,20,22
65:1,3,4,9,11
65:14,20,21
66:3,3,4,9,13
66:18,23 67:9
68:19 102:15

106:8 115:23
141:3,11,23
142:7,9 152:17
152:20,22
153:4,11,16,20
153:23 154:2
154:12,15,24
156:23 157:8
157:10 158:20
158:21 168:20
171:7,10,14,20
172:2,5,18
**Products'** 24:25
58:24
**Products/now**
69:1
**professionally**
29:21 45:15,20
**profitable**
172:16
**project** 42:3
158:15 159:3,4
160:5
**promises** 15:6
**proper** 56:19,25
**properly** 158:25
159:11
**prosecutor** 95:2
95:3,15 96:10
97:4
**protocols** 114:1
**provide** 54:10
81:16 85:24
86:2 110:16
**provided** 43:21
48:21 50:25
55:16 81:19
85:19 141:12
141:24 142:7
**providing**
110:22
**Public** 178:17
**pull** 91:22,24
**purchased** 14:17
40:12 41:9,12
44:19 63:17
64:25 66:3
106:9 153:23
154:2,10,11,16

158:22
**purported**
151:12,22
**purpose** 45:7
103:23 110:18
**purposes** 148:19
**put** 13:12 19:4
38:4 74:15
126:19 136:16
137:6 158:21
159:6 169:18
176:13
**puts** 151:14
**putting** 20:13
92:12 93:5
111:5

--- **Q** ---

**Qayyum** 3:5
7:14 52:1
166:6,9,12
176:23
**query** 5:6
**question** 19:21
26:17 31:2,18
33:4 37:9,12
37:14 45:2
48:1 50:14
61:13 65:18
68:23 69:11
70:25 71:24
73:3 74:25
77:23 80:18
83:21 84:8,22
85:7 90:21,24
92:18 100:11
100:21,22
102:12,18
103:9 105:1,8
106:8 108:5,12
108:25 109:6,9
109:11 110:14
110:15,21,21
111:4 112:8
115:25 116:3,5
116:8,17 119:2
119:4,13 120:4
120:8,17
121:14,19

122:6 125:13
125:16 128:12
128:13 129:16
131:1,24
135:16 138:12
138:13 140:17
153:13 160:19
162:7 168:12
173:16 174:1,7
175:3
**questioned**
137:10
**questioning**
170:20
**questionnaire**
30:15,22 31:2
**questions** 26:19
30:17 31:1,5
62:7,9 69:14
69:23 108:8
111:2,8 119:8
137:15 145:8
145:12 156:20
167:3,20
174:10
**quick** 155:15
**quote** 32:10,10

--- **R** ---

**R** 1:19 2:16
178:15
**R-i-d-d-e-t** 9:15
**raised** 109:16
115:25 177:7
**ran** 41:1 81:4
**Randy** 2:11 6:23
7:19 62:5
**range** 39:5,21
168:19 169:7
**Ray** 3:11 8:11
8:12,13,24
10:15,19 12:5
**re-address** 42:3
**re-announce**
47:13 48:5
**read** 12:16
24:17 92:19,23
92:24,25 94:3
95:2,8 105:24

106:21 111:20
127:6 148:11
163:5
**reading** 84:19
88:15 89:13,17
92:15,22 95:6
95:12 98:22
106:1,13 107:1
107:11 111:22
126:12,22
127:8,12 128:1
130:6 141:7,15
142:1,22
**reads** 122:22
**really** 115:6
**Realtime** 178:16
**reask** 122:7
129:16 153:13
**reason** 96:9,20
113:7
**reasons** 97:2
98:3 124:5
**reassigned**
59:24
**recall** 53:23
75:19 99:16,21
104:24 105:4,9
105:14 120:7
120:23 121:15
121:25 122:5,8
122:12,17,21
123:7,16 124:9
126:10 127:15
127:20 130:7
131:13 134:9
142:24 148:5
149:4,7 152:13
152:16 168:12
**receive** 15:19
34:8 82:23
143:24 150:16
152:10,11
**received** 15:1,6
24:18 27:4,6
33:13 82:20
87:1 119:24
121:12 133:11
133:24 135:17
135:21,22

136:2,6,13,20
138:8 139:11
139:20,22,25
150:4 152:5,13
159:16
**receiving** 103:18
172:3,4
**recess** 61:23
108:20 156:14
**recognize** 8:19
21:2 24:10
42:11 44:24
51:2,5,21
53:13 55:23
59:16 88:3,22
**recognized**
79:16
**recollect** 132:23
**recollection** 16:9
16:14 17:13
63:8
**Recommendat...**
32:22
**recommendati...**
144:5
**reconsider**
110:16,21
**record** 12:19
13:7,18 61:21
61:25 62:11,13
62:18,21,23
76:24 86:13,16
86:22 87:10
103:25 108:16
108:22 109:15
110:2 111:5
115:11 118:6
119:23 129:23
145:21 150:8
154:1 156:13
156:16 176:13
177:6
**recorded** 62:16
**recording** 62:16
**recross** 4:5
172:21 175:2,6
175:19
**redacted** 42:21
53:22

**Redirect** 4:4,5
  168:1 174:25
**refer** 21:1 24:7
  29:7,20 33:11
  44:23 50:21
  53:12 55:22
  57:24 76:24
**reference** 34:15
  146:13 148:4,7
  151:17 152:1
**referenced**
  135:18 136:13
  139:3 164:9
  165:8 166:3,14
**referencing**
  136:2 140:20
**referred** 138:9
**referring** 64:6
  64:12 85:1
  89:3,20 90:12
  90:18,25 95:15
  114:21 119:15
  132:20
**reflect** 56:19
  103:25 115:11
**refresh** 16:8
**refreshing** 16:14
**refuse** 109:11
  123:1 130:3
  132:7
**regard** 41:21
  58:24 122:15
**regarding** 52:10
  58:1 62:12
  72:3 75:5
  77:16 109:1
  131:3 139:2,10
  143:1 156:20
  172:23 177:6
**regis** 57:5
**registered** 1:19
  30:19 31:13
  59:24 178:16
**registration** 4:8
  21:6 22:7 27:2
  36:10,21 56:4
  57:6
**rehabilitation**
  175:20

**rel** 36:19
**relate** 83:19
**related** 65:4,12
  84:4 107:23
  154:16
**relating** 66:4
**relations** 68:17
**relevance** 37:22
  41:24 47:10
  51:10 54:16
  57:1 58:7,18
  60:14,21 61:12
  61:14 64:7
  67:13,18 68:1
  68:20,22 70:9
  71:5 78:5,9
  79:3,7,13 80:6
  81:2,12 82:6
  83:20 84:7,23
  89:6 90:9 91:1
  91:23 92:5
  94:11 95:16,20
  95:25 96:12,16
  96:22,24 97:5
  97:22 98:23
  99:6,14,24
  100:9,20 101:5
  102:6,9 105:12
  106:17 107:16
  107:18 108:3
  112:11 113:24
  114:13,20
  115:2,5,18
  116:8,14
  121:17 122:14
  123:10,22
  124:11 125:3,7
  125:15,19
  126:3,21 130:5
  130:25 131:5
  131:17,23
  132:4,10,21
  133:2 135:15
  136:25 140:16
  143:9,18 144:9
  144:14 159:17
  160:20,25
  161:6,20
**relevant** 36:20

  50:5 86:3,6
**relied** 28:3
**remained** 41:4
**remains** 43:13
**remember** 14:2
  17:10 78:8
  88:20 89:10
  90:11 92:17
  93:9 98:2
  99:11,12
  101:14 115:6,7
  116:23 123:7
  132:22,23
  140:3,4,24
  141:6 148:25
  149:3
**remind** 107:21
**remote** 38:5
  94:20 96:3,4
  96:18,20
  100:12 124:15
  125:22
**remotely** 3:8
  92:14 93:8
  113:1 114:5,8
**remove** 10:16
  158:15
**removed** 10:14
  95:5 106:4
  111:25 126:7
  159:5
**repeat** 19:21
  37:5 45:2 48:1
  48:2 100:22
**repeats** 37:11
**report** 158:2
**reported** 149:5
  149:8,10
  161:24
**reporter** 1:20
  6:15,18,18
  13:8 178:16,16
**REPORTING**
  1:23 2:22 3:20
**represent** 6:25
  7:4,6,10,13
  13:6 53:20,24
  62:5 72:22
  167:11

**representation**
  166:12
**representations**
  163:21 164:8
  164:19 165:7
  165:18 166:1
  166:23
**representing**
  12:20 78:10
**request** 96:19
**requesting** 94:5
**required** 26:20
  85:24
**requirement**
  30:22
**requiring** 20:7
**research** 114:1
**researched**
  114:7
**reserve** 109:18
  174:12 177:8
**resi** 13:23
**reside** 13:21
**respect** 29:4
  69:3 84:18,24
  89:2 90:20
  109:21 143:11
  153:7
**respond** 11:21
  12:4 107:20
  110:6 161:18
**responded** 77:7
**response** 14:25
  24:14 26:22,22
  27:3 93:19
  104:18 109:20
**responses**
  109:20 174:13
**responsibilities**
  66:22,25 147:5
  171:19
**responsible**
  30:13 123:2,13
**responsive**
  174:13
**rest** 27:20
**restate** 74:15
  92:18 105:1,7
  113:15 135:16

**restaurant**
  144:5
**restrictions**
  151:12,14,23
**retire** 14:22
**retired** 14:8,10
**retiring** 14:13
**return** 18:10
**review** 62:16
  80:22 82:9,17
  83:8,9 86:7,16
  87:4,17,24
  104:5,7,10
  118:12,25
  119:5,10,16
  121:20 145:5
  151:15 154:21
**reviewed** 51:1
  80:13,17,21,25
  81:6,7,25 82:1
  82:8,11,20
  83:15,16,24,25
  84:4 154:4,7
  154:12
**RFC-826** 151:17
  152:1,2
**RHOW** 2:16
**Richards** 21:14
  146:17
**Richards'**
  146:19
**Riddet** 3:11 9:12
  9:14,16,18,19
  9:20,20
**right** 10:5 12:14
  26:4 39:19
  62:4 65:2,6,8
  66:1 74:4
  76:15 77:9
  85:8 87:25
  91:25 101:22
  102:2 103:10
  104:23 105:20
  109:18 110:10
  113:18 118:1
  121:7 131:7
  132:16 138:14
  141:22 148:10
  149:19 151:2

153:15 155:16
156:17 160:9
161:10 163:13
164:11 174:12
176:10 177:8
**rights** 38:11,13
123:1
**RIPE** 5:6
**rkjones@mint...**
2:14
**Road** 2:12
**Robert** 155:7
**Robert's** 155:8
**Rodriguez** 7:9
**role** 146:19
147:4,4 148:23
**roll** 104:2
**room** 1:16 6:10
6:11 12:13
50:24
**Rose** 136:6
**Rosemarie**
132:25 133:12
133:18 134:12
134:25 135:13
135:18,22
136:3,7,13,21
138:10 139:5
139:12,21,21
139:23 140:8
140:15 143:1
**Rosemary** 75:18
76:7,8 140:20
140:21
**roughly** 22:12
34:10 76:11
**route** 22:21
23:17,24 24:1
**rule** 62:14,18
**ruled** 97:8
124:14 131:6,8
131:10
**rules** 42:8 62:12
**ruling** 131:15,18
131:22
**run** 1:23 2:22
3:21 147:19
**running** 18:2
**Ryan** 3:10 7:18

**S**

**S** 2:3
**S-u-m** 49:25
**S-u-m-n-e-y-t-...**
31:24
**S-u-n** 49:23
**Sabrina** 3:9 7:24
8:6 79:10,15
79:18,21
144:15,16,18
**safe** 107:6
**sale** 154:14,18
154:19 155:3
**sales** 17:6,8 22:2
38:4 154:21,25
156:20,22
157:1
**San** 2:8,13 6:24
77:6 78:20
89:16,22 90:23
91:15 92:3,9
96:5,8 97:2
130:4 132:3,7
132:8
**saw** 43:18 82:12
117:7
**saying** 35:21
92:17 93:9
122:8 127:15
132:2 142:5
**says** 18:11 24:16
31:8 34:6
36:10 47:12
48:4 49:3,22
55:17 88:8,10
94:12 95:1
101:23,25
103:1 120:5,15
120:19 121:1,9
126:5 127:4
139:4 141:2
142:6,20
148:13 150:13
150:20 151:2
173:3,10
**scheduled**
106:25 107:14
108:1 109:1,22
111:8

**scope** 168:23
169:11,22
170:12 172:7
175:5,19
**SEA** 44:4
**search** 138:2
**sec** 41:13 138:17
154:3 168:6
**second** 12:19
54:2 61:21,22
94:25 95:1
106:19 108:16
108:18,19
116:19 126:24
132:17 156:12
156:13 176:3,6
176:7 177:17
**seconds** 129:10
**see** 8:10 32:23
33:2 39:12
45:9 47:15
48:3,20 49:5
49:14 57:6
88:8,16,19
98:4 105:21
120:25 121:15
129:11,13
134:8 145:22
150:9 151:9
168:15
**seek** 108:11
109:19 174:12
177:8
**seen** 72:17 170:4
170:4
**self-training**
15:21
**sender** 29:12
120:9
**sending** 15:23
**sent** 24:13,15
28:23 83:1
84:10,15 88:4
88:11,23 90:4
105:13 121:1
125:21 129:18
135:7 140:8,15
140:21 143:1
143:21 145:6

150:25 153:7,9
**sentence** 92:19
94:2,3,25 95:8
98:13 116:21
127:3,4 142:6
151:3
**sentences**
105:24
**separate** 148:1
**separately** 44:11
**September** 1:18
12:22 77:18
115:11
**series** 119:18
**serve** 73:5
**served** 73:22
74:21 167:13
167:16
**server** 20:15
**service** 5:6
**services** 16:25
22:7 29:25
36:10,21 146:9
147:6
**set** 93:20 118:17
**share** 101:8
103:22
**shared** 27:19
**shortly** 12:2
**show** 8:2 42:10
85:8 86:6,18
86:23 97:24,24
98:1,11 103:11
118:1 162:13
162:21 173:9,9
**showed** 101:13
102:2 133:9
162:8 163:9
**shown** 45:1,3,6
45:8 139:18
145:5 164:2
**shows** 8:4 42:22
54:5 56:7 60:7
60:9
**side** 69:13,13
**sidebar** 69:15,17
69:25 86:4
91:8,12 115:12
125:14 137:20

**Sie** 101:17
**Siemen** 40:6
**Siemens** 4:23
14:16,17 40:12
40:18 41:2,9
41:12,18 42:4
42:8,9,15 43:6
43:10,11,23
44:4,6,7,9,11
44:19 46:3
50:7,8,14
59:25 60:4,15
60:16,18 61:3
63:17,17,19,22
64:1,8,16,23
64:25 65:5,9
65:12,15,20
66:2,5,9,13,17
66:21,24 67:1
67:3,4,7,21,24
68:9,18 69:1,6
70:12,15,18
71:2,12 101:11
106:6,9,10
115:22 116:22
116:24 123:2
123:13 141:2
142:10 153:20
153:22 154:2
154:17,24
156:23 157:9
157:10,12,19
157:22 158:1
158:14,22
159:7,8,9,14
159:23,24
160:6,6,8,8,12
160:21 161:8
161:16,21,22
161:23 162:3
170:22 171:1
**Siemens'** 60:9
67:10
**sign** 18:4,12
29:22 32:9
45:20 46:6,14
47:2 49:8
52:21 54:23
55:19 117:7

127:2
**signature** 36:9
   36:14 45:9,11
   45:14 49:3
   54:18,21,25
   55:1,16 102:16
   135:6 141:12
   141:24 142:8
   146:4
**signatures** 55:3
**signed** 55:18
   154:22
**significantly**
   116:10
**similar** 23:20
   120:11
**Singapore** 17:9
**sir** 68:8 69:12,24
   70:2,19 71:1
   71:13 84:10
   87:17,23 88:3
   89:4 90:10,24
   91:7 92:4,17
   95:9,14 96:15
   96:23 97:1
   98:11 102:5,8
   102:12,19
   103:9 104:5,21
   105:22 106:19
   107:3,17,20,25
   109:21 111:7
   111:19 112:5
   113:2 114:11
   115:17,25
   116:16 117:18
   118:11,25
   119:4 120:1,3
   121:11 128:4,9
   128:9,19 129:6
   129:11 130:22
   132:15,20
   137:8 138:3
   143:11 145:18
   145:18,23
   149:25 150:1,9
   158:17 160:15
   161:14 162:14
   167:1 172:23
   173:9,14 174:1

174:15
**sit** 99:21 152:3
   153:24
**sitting** 59:22
   116:9 173:22
**situation** 23:23
**six** 64:24 73:25
   74:14 76:6,8
   135:11
**size** 70:12
**slash** 34:2
   150:23 151:7
   168:11 169:20
   169:24 170:5
**slow** 75:2 138:14
**smaller** 68:21
**SMTP** 32:9
**software** 18:3
   41:1
**solely** 103:22
**solicit** 26:21
   30:18 111:24
**Solution** 27:5
**Solutions** 4:20
   22:7 24:14,18
   26:18,20 27:1
   30:6,8,12,18
   30:21 31:14
   36:9 39:13
   146:2 149:15
   150:5 151:1
   152:18,23
   153:3,17 173:7
**sorry** 8:16 24:22
   74:13 83:4
   85:5 105:6
   123:11 127:18
   143:12 144:16
   158:19 162:12
   162:25 165:1
   174:5 176:9
**sort** 79:15
**Southern** 1:2
   8:8,15
**speak** 57:16
   75:25 143:4
**speaks** 29:18
   34:13 168:23
**specialist** 11:1

11:11,24
**specific** 71:23
   77:14 83:22
   147:16 148:3
**specifically** 17:3
   75:1 114:6
**specifications**
   147:22
**specifics** 80:2
**speculation**
   20:24 34:13
   35:13 41:16
   46:9,16 50:11
   50:18 60:8
   61:15 67:19
   81:13 100:5
   125:8 159:18
   160:25 161:20
   169:12,22
   170:11 172:8
**spell** 155:8
**spelling** 57:19
**spoke** 76:1
   79:17 101:19
   155:5 173:6
**spoken** 71:16,20
   98:18 163:16
   164:5,15 165:3
   165:14,23
   166:8,19
**Spring** 19:11
   31:25 43:14
   56:12,13
**stack** 81:8
**stand** 36:16 44:5
   95:4,24 96:11
**standing** 33:3
**start** 143:15
**started** 15:24
   63:9 66:8,17
   133:22
**starting** 19:3
   119:20
**starts** 32:18
   142:16 175:13
**state** 13:18
   62:11 90:14
   110:24 111:9
   111:15 114:7

115:20
**stated** 98:14
   101:11 116:24
   141:23 153:19
   153:22 173:22
**statement** 49:5
   64:10,13 100:3
   100:6,13 103:2
   120:24 121:15
   123:9,17
   124:10,12
   141:13 146:16
**statements**
   170:21
**states** 1:1,5 7:23
   13:2 17:6
   120:19 122:1,9
   122:24 126:6,9
**stating** 27:6,21
   74:25 100:24
   122:12,17
**stay** 107:6
**Stengel** 3:7
**stenographic**
   13:7
**Stephen** 1:12
   4:2,18,23 5:2
   6:13 13:14,20
   16:24 29:15,19
   43:18 45:21
   54:22 55:17
   151:3
**Steve** 5:9,11,12
   13:3,8 45:21
   50:6,13,16
   55:18 70:13,17
   71:2,11 88:10
   103:13 120:6
   120:16 121:9
   129:9 142:16
**steve.dorn@s...**
   44:1
**Steven** 1:19 6:19
   178:15
**stipulation** 6:4
   62:17
**stipulations** 6:7
**stock** 154:11
**stop** 108:13

169:12
**stored** 18:23
   28:24
**street** 1:17 3:3
   12:25 35:20
   56:12
**streets** 23:14,14
   34:22
**strike** 19:14
   27:25 35:1
   38:7 39:2,16
   44:20 46:21
   50:2,17 55:20
   56:15 57:8
   60:6 61:11
   97:12 102:17
   102:24 114:9
   124:21 128:24
   128:25 130:10
   130:20 157:15
   161:12 173:18
**string** 23:9
   26:19
**strongly** 112:3
**structure** 22:18
   78:21
**stuff** 18:14
   133:21 157:12
**subject** 5:4
   84:16 88:7,9
   88:12 104:17
**submission**
   26:18
**submitted** 30:17
   125:25 146:7
**subpoena** 15:1
   73:5,23 74:21
   124:6,8 126:9
   133:24 167:13
   167:16
**suburb** 61:2
**succeed** 20:11
**successful** 27:23
   38:2 159:9
**successfully**
   23:21 159:5
**suffer** 124:6
**sufficient** 18:24
   19:17 20:1

suggested 175:13
Suite 1:24 2:8,13 2:23 3:3,22
Sumneytown 31:22 43:14 49:25 56:13 57:19
Sunnytown 49:23 102:10
superiors 101:9
supervise 148:22
supervisor 16:24 29:25 146:9,15 147:6
supplement 19:10
support 8:14 172:17
supposed 137:9
sure 10:21 62:24 71:12 86:14 89:7,23 98:4 108:17 147:21 148:13 150:10 150:18 159:10 168:7,7 171:21
swear 13:9
sworn 13:10,15 178:10
sympathetic 112:22
sympathy 96:19
system 32:5 37:16 101:9
systems 160:12

**T**

T 3:10
table 6:14 69:13 69:13
take 23:11 61:18 62:6 80:22 82:3 104:8 108:14 114:11 114:17 118:11 118:19 122:23 130:13,18

132:12 138:15 138:20 149:14 149:16 151:15 155:12,15 156:8 168:6
taken 1:15 13:4 61:23 94:5 108:20 156:14 178:9
talk 155:2
talked 82:14
talking 11:18 79:14 101:18 162:22
talks 175:14
Tarney 52:7
TCP/IP 20:8,13 22:5
technical 16:24 29:25 146:9 147:6 173:12 173:13
technically 121:7,7 147:11
technology 19:7 92:13 93:7,15 94:20 130:8
telephone 72:11 74:2,6,11,12 78:24 79:14 99:12 142:25 144:8
tell 15:10 17:1 77:7 79:8 81:3 81:8 111:9 117:14 133:8 133:15 137:6 147:17 170:5 173:21
telling 80:2 93:19 121:25 124:9
tells 148:8
terminal 18:4,7
terminals 147:25
termination 54:3
terms 175:10

testified 13:15 40:10 63:5,21 64:4 65:8,13 65:16,19,23,24 66:16 70:11,16 70:18 82:19 83:14 145:25 170:6 172:2
testify 15:4 86:1 93:17 106:24 112:25 114:4,8 116:10 120:22 122:5,12,24 123:1
testifying 14:25 91:7,11 116:12 167:12
testimony 15:8 21:19 33:16 47:20,22 48:11 53:1 62:15 64:2,18 71:1 71:10,13 83:12 83:16 90:19 94:21 96:4,6,7 96:18,20,23 100:12 101:4 109:5 117:1,4 117:6 134:7 169:14 178:9
Thakker 78:15 78:16,18
thank 9:21 32:21 108:23 111:3,4 156:17 167:1,3 168:8 177:4
Thanks 13:12
thereof 41:11 154:16
thing 33:2 92:14 93:7 143:13 176:12
things 81:24 114:2 115:20
think 8:1 11:4 12:3 16:6 33:16 34:23,24 71:7 73:11

82:19 105:3 110:4 145:15 155:22 163:11 170:17,18 173:4
third 34:18 35:6 36:5,6 101:7 169:5,16 174:15
thought 33:2
thousands 63:22 64:3,5,5,11,12
three 35:16 68:2 68:7 115:16
three-page 145:22
Thursday 86:24 88:11
thusly 22:22
till 54:4
time 5:3 6:7,8 12:21 14:23 15:3 16:3,21 16:23 17:12 18:16,19 21:13 21:17,20 22:8 25:12 27:1 30:3,13 31:9 33:2 34:6 40:15,17 42:14 43:1,5,10 44:2 45:4 47:1 50:8 53:20,23 63:6 64:20 65:20 67:3,23 71:9 72:1,2 73:6 74:18 75:3 80:8 85:4,6 86:7 90:5,7 91:16 97:16 98:17 101:10 104:8 106:16 106:25 107:4 107:13,14 108:2,18 113:25 115:9 119:1,12 125:24 134:25 136:23 137:6

146:12,15 147:20 148:24 149:19 151:12 151:14,15,22 154:4,22 156:12 157:12 159:16 174:15 176:3 177:18
times 34:24 67:24 68:2,7 70:2 71:19,21 74:14 75:7,10 79:4 84:3 98:18 170:18 170:25 175:10
title 14:21 16:5 16:21,23 29:24 30:3 40:17 41:3,7 43:21 43:22 66:20 141:12,19,20 141:24 142:3,4 142:7 146:8,19 157:18
today 14:25 20:16 21:9 24:2 31:15 50:24 71:17,22 77:11 78:11 82:20 83:7,14 97:8 99:22 116:13 139:18 146:16 152:3 153:24 164:9 165:9 166:3,14 167:12
today's 12:22 73:16 77:18 80:12,17 81:1 82:10 83:9
told 70:22 97:3 113:11,17 117:1,16 157:2 157:4,5 160:1 160:14,23 161:4
top 24:20 33:19 45:22 78:6
topic 132:19

135:12 139:4
**total** 46:19 69:5
76:8
**totally** 48:15
49:22 69:9
**train** 125:5,17
126:1 130:13
130:18 132:8
132:12,13
**training** 15:23
35:25
**trainings** 15:19
**tran** 62:15
**transcript**
178:11
**transfer** 52:10
53:4,5,10
159:15
**transition** 41:21
**travel** 97:2,10
113:8 124:4
125:1,20
130:17 131:11
132:3 144:6
**traveling** 107:6
125:5,17 126:1
**treated** 112:2,16
**treating** 106:3
112:21
**treats** 120:21
122:4,10
**trial** 1:12 93:20
93:25 96:9
112:23
**trials** 113:3
**tried** 77:5
**true** 25:14 42:20
42:22 84:11
97:1 104:20
126:20 129:14
129:17,23
**trust** 95:2,3
96:10,21
**trying** 11:21
12:4 115:19
117:21
**Tuesday** 129:9
142:16 143:2
**turn** 16:2 120:2

145:17 149:25
172:24
**Twenty** 81:14
**two** 5:2 24:21,24
34:17,18 53:17
53:23 54:25
64:24 68:2,7
80:3 124:3,23
163:9
**two-twenty**
105:10
**type** 14:12 61:8
**typing** 88:20

**U**

**U.S** 1:15 2:2 8:7
8:14 10:25
11:6,11,13,15
11:23 13:5
23:20 78:25
133:13 144:19
**Um-hum** 113:21
**unable** 50:13
69:9
**unacceptable**
109:17
**understand**
62:24 63:1
64:9 68:24
90:15 116:16
121:3 131:1
142:5 148:13
**understanding**
97:6 173:12,14
175:9
**understands**
32:19
**unfamiliar**
144:17
**Unfortunately**
53:22
**United** 1:1,5
7:23 13:1 17:6
**unsympathetic**
94:19 96:2,17
100:11 112:24
**upgrading**
20:15
**upset** 97:20

**USDA** 106:3
112:3,16,18
**use** 21:25 22:13
34:25 35:17
36:3 39:19
40:5 45:15
47:8 52:15
151:12,14,22
**user** 18:11 31:14
**usually** 54:1

**V**

**v** 13:2
**vacation** 97:4,19
97:19 106:25
107:14 108:1
109:1,4,22
110:17,22
111:8 112:9
124:2,16,22
**vague** 17:20
18:18 19:20
20:4,23 23:6,7
25:3 28:11,12
28:20 30:24
31:7 33:10,16
34:4,13 35:2
35:12 36:1
37:3,4,7,18,19
37:24 38:13,25
39:1,9 41:16
41:25 42:25
43:4 44:17
45:4,19 46:8
46:15 47:5
48:25 50:10
52:11,16,25
53:9 56:1,3,25
57:2 58:8,16
59:4,11,21
60:22,23 77:13
77:23 79:12
83:21 84:8
136:9 140:17
171:18 172:8
**validity** 119:2
120:8
**value** 172:4,9
**Van** 2:16 7:8,9

8:22 10:3
18:18 19:20
20:22 23:6
26:1,13 27:14
27:17 28:7,13
28:22 30:11
31:7 32:7
33:10,18 35:4
37:3,19,24
38:16 39:10,25
41:17,25 42:25
43:4 44:17,20
45:19 46:23
47:17,21 48:9
48:12,18,25
50:10 51:9,14
51:16,19 52:16
52:25 53:3
55:20 56:1
58:5,19 59:10
103:21 117:13
118:20 156:7
168:21,25
169:13 170:10
176:20
**various** 15:19
19:4 20:9
171:13
**vary** 169:5
**verbatim** 48:6
**verify** 73:12
135:5
**verizon.net**
84:12
**Vesci** 75:18
**vice** 141:18
**victim** 101:23
103:2 106:4,5
106:7,10
115:22,23
116:23,25
126:8
**victories** 95:11
98:15 100:8,15
100:16,25
**video** 1:23 2:22
3:20 6:2,4
12:19 79:19,20
79:22,23 80:1

**videoconference**
144:8,10,13,24
145:2
**videoconferen...**
93:16
**videographer**
1:20 6:1,15,16
6:20,20 12:15
12:18 13:11
61:20,24 86:14
86:20 108:17
108:21 156:11
156:15 167:5
175:24 176:2
176:10 177:11
177:15,17
**VIDEOTAPED**
1:12
**Vincent** 52:7
**virus** 107:5
**visit** 73:4,7
**visits** 72:24
74:13,14
**voice** 9:23 84:18
84:24,25 89:2
89:3 104:18
129:11
**vs** 1:7

**W**

**W-i-s-n-i-e-w-...**
155:9
**wait** 32:17
142:20
**waiting** 110:2
**waive** 176:14
**waives** 176:24
177:2
**want** 6:16 10:8
10:22 12:15
13:11 62:10
70:21 86:7,12
86:15 90:16
97:2 98:10
104:7 124:18
126:6,19 127:4
127:10,11,22
127:23 128:8
128:12,13

129:2 138:21
148:12 153:2
155:17,24,25
156:4,6 177:6
**wanted** 96:2,4
100:16
**wanting** 95:10
98:15 100:7,14
100:25
**Washington** 2:4
**wasn't** 46:10
**way** 15:20 26:8
34:16 54:23
62:20 112:25
121:13
**ways** 170:5
**we'll** 90:6 98:5,9
98:9 155:16
156:9
**we're** 12:4 61:17
61:18,21 63:1
69:21 74:17
79:14 85:8,24
98:12 108:19
110:3 112:18
115:10 116:20
130:22 135:24
141:17 150:10
155:11,14
156:13,21
175:22
**Webex** 7:16,21
8:25 9:5
**Wednesday** 1:18
**week** 82:25
**went** 15:13
64:23 67:3
68:15,18 80:23
125:12
**weren't** 146:22
161:17
**West** 1:17 3:3
12:24 93:18
**western** 111:12
**whatsoever**
32:12
**WIECHERT**
2:6
**wife** 97:20

**WiFi** 147:20
**Williams** 3:2
7:13
**wiring** 147:19
147:20
**wish** 95:5 106:4
121:16,20,20
174:2
**Wisniewski**
155:7
**witness** 6:13 8:1
8:4,11,17 9:24
10:7 11:9 12:7
13:3,9,10
32:16 61:16
69:20 70:1
82:12 91:11
92:22 93:23,24
94:6 95:4,5,24
96:11 104:3
106:5 107:21
110:13,18,23
122:23 124:7
126:8 129:5
133:5 137:8
138:7,17,21
142:14 156:2,6
167:24 172:19
173:16 174:6,9
174:13,23
175:20,21,23
178:10
**witness's** 134:7
**witnesses** 4:1
113:4,19
**WOLPERT**
2:15
**word** 92:20
117:17,18,22
117:23,25
**wording** 94:12
**words** 174:18
**work** 15:13
41:18 43:6
60:19 64:23
66:9
**worked** 14:17
14:23 15:17
25:4 50:7,8

63:3,6,14
67:23 147:14
149:4 152:22
**working** 40:14
42:15 43:22
45:23 46:3,10
46:18 66:17
71:2 141:21
**workstation**
148:14
**world** 22:2
32:12 38:3
114:2
**worldwide**
17:14 61:3,7
63:22
**wouldn't** 111:3
**writ** 126:14
**write** 48:15 92:4
92:6 112:5
127:20 128:4,6
129:1
**writing** 93:10
101:14 104:24
105:4,9,14
111:25 116:23
120:7 123:8,17
126:10 130:7
141:6
**written** 115:20
122:19,19,20
123:12 124:13
126:14,15
**wrong** 91:25
105:3 173:2,4
**wrote** 21:6
89:25 90:25
91:15 93:1,11
95:14 97:16
98:17 100:6
105:18 107:13
115:14 116:21
120:6,16
121:10 126:15
127:21 128:7
128:14 129:15
129:21,24
130:2 142:6,15

**X**

**Y**
**y-t-o-w-n** 49:24
**yeah** 9:4 11:23
12:10 18:1
28:12 47:25
56:16 77:24
83:22 84:9
85:16 86:20
87:13 92:23
98:1 105:7
113:17 114:23
115:25 119:14
126:14 133:8
137:19 138:23
142:13 150:12
150:13 151:21
155:14,21
162:8 167:5
170:2 173:5
176:8
**year** 14:16,18
40:12 43:7
45:5 46:12,17
64:25 66:2
88:5 153:22
**years** 14:2 54:1
63:14 64:24
68:8,12 124:3
135:11
**York** 2:3 114:7

**Z**
**Zero** 75:12
**ZIP** 23:13 35:19

**0**
**0** 34:19,20 169:5
169:16,17
**0.0** 34:17
**00021** 145:21
**00022** 145:21
**006** 172:24

**1**
**1** 34:19 105:21
120:19 122:22
**1:55** 156:12
**10** 129:10

**10:06** 120:6,15
120:19
**10:16** 120:6
**10:34** 1:19
**10:41** 12:21
**100** 1:24 2:23
3:22
**103** 5:10
**11:38** 61:21
**11:58** 61:24
**118** 5:12
**12:22** 142:19
**12:47** 108:18
**12:51** 129:10,19
**1200** 17:14 63:7
63:12,13
146:13
**1275** 1:24 2:23
3:22
**13** 4:3
**1301** 2:3
**13th** 29:11
106:25
**15** 1:18 14:2
68:12 81:14
83:14
**15-minute** 61:18
**15th** 12:22 77:19
**16** 4:18 14:2
34:2 150:23
151:7 168:11
169:20,24
170:5
**167** 4:4
**167.87** 34:18
39:14 59:23
159:16 169:3
171:7
**167.87.0.0** 4:9
5:6 34:1,7,11
39:4 40:3
52:12 53:5
56:6,21 58:1
150:21 151:4
168:11 169:8
173:24 174:17
**167.87.00**
172:23
**167.87.1** 169:16

**167.87.255.255**
39:4 53:6
**168** 4:4
**168.87.0.0** 48:6
**17** 24:19 33:14
152:7 173:21
**172** 4:5
**175** 4:5
**17th** 27:4 152:10
152:11
**18-cr-4683-G...**
1:7
**18-cv-4683-G...**
13:2
**18106** 1:24 2:23
3:23
**1875** 2:17
**190** 4:12 50:22
162:13,20,23
163:7,8
**191** 4:13 162:13
163:24
**192** 4:14 164:12
**193** 4:15 164:23
**194** 4:16
**195** 4:17 50:22
**196** 4:18 16:15
16:16,17 21:2
25:10 26:9
27:10,10 28:2
28:19 29:2,8
29:24 145:17
153:1,1
**197** 4:20 24:8
25:11 26:2,9
27:10,11,16
28:1,2,19 29:2
29:4 33:12,20
38:9 39:8
47:15 48:7,22
57:14 149:24
150:14 168:10
173:5,21
174:16
**1975** 14:16
15:14,25 63:3
63:6,9,13
147:2
**198** 4:23 42:11

42:12 43:3
**1993** 16:2,5,18
17:3,15 18:25
22:8 24:20
25:4 27:4
29:11 33:14
57:4 58:3 59:8
146:2,25 147:3
149:7,10 152:7
157:12 173:21

---
**2**

**2** 30:5 31:8,18
98:13 106:20
106:23 116:23
119:21 120:1,2
122:21 123:18
**2:05** 156:15
**2:25** 176:3
**2:26** 177:18
**20** 81:14 83:14
84:11,17 86:24
88:11 91:15
99:1,5,13,17
99:23 100:19
101:2
**20,000** 63:25,25
**2000** 14:16 40:6
40:12 43:9
63:3,6,17
64:20,23,25
65:10 66:2,6
66:10 67:4,24
153:19,22,25
157:7,14
158:12,15
**2006** 14:18
41:20 43:7
67:24 68:9
157:22,24
158:13
**2007** 14:11,24
**2009** 53:25
**2013** 45:23,24
46:1,4,7,12,14
46:17 47:1,7
49:8 54:2
101:12 141:4
**2014** 54:2,4

**2015** 45:5 72:1,5
73:1,16,23
74:4,21 75:6,7
75:10,13,21,22
76:4,18 77:16
83:15,17 84:5
133:18,19,24
134:10 135:4
135:13,22
136:3,5,7,13
136:18,21,22
139:11 140:2,5
140:9,12,22
143:2 159:14
160:2,15,23
161:5
**2017** 54:4
**2019** 107:5
**2021** 1:18 12:22
77:19 84:11,17
86:25 90:13
91:15 93:20
96:9 97:3
98:18 99:13,17
99:23 100:19
101:2 103:13
104:15 105:10
109:3 115:10
115:11 119:20
129:9,15,19
135:10,24
136:5,14,18
138:9 139:3
140:12,20
141:22 142:17
142:19 143:2
178:4
**20530** 2:4
**208** 5:2 53:13,15
54:14,18,25
**209** 5:4 57:25,25
**20th** 85:1 93:11
**21** 88:11 99:5
**211** 5:6 59:16,17
**23rd** 2:17
**24** 4:20
**25** 63:14
**255** 21:25 22:19
22:24 23:13,14

23:15 34:19,20
34:20,21,22,24
34:24 35:17,20
36:2 169:6,15
169:17,17
170:18,18
175:8,8,10,11
175:14
**27136** 2:7
**28th** 45:23 47:1
47:7

---
**3**

**3** 85:10,14,15
87:8,9 111:20
111:20 112:15
123:23 132:18
141:2
**3:50** 104:15
105:10
**300** 2:13
**30th** 123:24
124:6 130:3
**31st** 103:13
104:15,25
105:5,6,10
107:14 109:3
**3580** 2:12
**3600** 1:16

---
**4**

**40** 4:10 44:24
48:3,20 52:22
55:2,19 133:12
135:8 139:17
141:18
**42** 4:23
**44** 4:10

---
**5**

**5** 126:5 141:10
141:10
**5/13/93** 4:18
**5/17/1993** 57:7
**5/17/93** 4:21
**5/20/21** 5:9
**5/31/21** 5:10
**5:03** 86:25 88:11
**50** 4:12,13,14,15
4:16,17

**504** 1:17 12:24
**53** 5:2
**55** 4:8
**58** 5:4
**59** 5:6
**5th** 3:3

---
**6**

**6** 4:8 55:23,23
56:19 57:18
119:20
**6/28/13** 4:11
**6/6/2021** 120:6
120:15,18
**6/6/21** 5:12
121:9
**6/8/21** 5:12
**601** 3:3
**610)439-0504**
1:25 2:24 3:24
**62** 4:3
**65,000** 22:12
23:11,25 34:10
169:19 170:7
173:11,24
174:18,19

---
**7**

**7** 33:4
**720** 3:3

---
**8**

**8** 129:9,15,19
130:12 131:21
132:1,6,8
133:11 135:10
138:9 139:3
140:12,19,23
141:22 142:19
143:2
**800)366-2980**
1:25 2:24 3:24
**87** 5:9
**8th** 118:3 130:23
131:8,19
136:22 142:17

---
**9**

**90** 163:15
**90067-2561** 2:17

**90071** 3:4
**90s** 19:8
**92130** 2:13
**92675** 2:8

vhois-RWS                                                    https://whois.arin.net/rest/org/MOOREP/pft?s=moorep

**WHOIS-RWS**   IP BLOCK 167.87.0.0

You searched for **moorep**

**Organization**

| | |
|---|---|
| Name | Moore Products Co |
| Handle | MOOREP |
| Street | Mail Stop 500 Sumneytown Pike |
| City | Spring House |
| State/Province | PA |
| Postal Code | 19477 |
| Country | US |
| Registration Date | 1993-05-17 |
| Last Updated | 2011-09-24 |
| Comments | |
| RESTful Link | https://whois.arin.net/rest/org/MOOREP |

| Function | Point of Contact |
|---|---|
| Abuse | SD808-ARIN (SD808-ARIN) |
| Tech | CKN23-ARIN (CKN23-ARIN) |
| Admin | CKN23-ARIN (CKN23-ARIN) |

**Point of Contact**

| | |
|---|---|
| Name | Dorn , Steve |
| Handle | SD808-ARIN |
| Company | |
| Street | Moore Products Co. Sumneytown Pike |
| City | Spring House |
| State/Province | PA |
| Postal Code | 19477 |
| Country | US |
| Registration Date | 1996-04-27 |
| Last Updated | 2001-04-06 |
| Comments | |
| Phone | +1-215-646-7400 (Office) |
| Email | dornsa@moore-solutions.com |
| RESTful Link | https://whois.arin.net/rest/poc/SD808-ARIN |

of 2



GOVERMENT'S
EXHIBIT
18cr4683-GPC
006

11/25/2015 12:15 PM

ADCONION-DISC02-REPORTS-00554

**BGP Letter of Agency**
28th June 2013

**Authorization to Announce / Re-Announce IP Address**

To Whom It May Concern:

Moore Products Co., hereby authorizes CoreXchange, to announce and/or re-announce following route blocks:

167.87.0.0/16

This Agency shall remain in effect until revoked or modified by the above mentioned, in writing.

By signing below, I certify that I am authorized on behalf of Moore Products, to execute this letter of agency.

Steve Dorn
Executive Vice President It Operations

**GOVERMENT'S EXHIBIT**

18cr4683-GPC

**040**

Sunnytown Pike
Spring House, PA 19477

ADCONION-HOSTWINDS-14-18-00140



GOVERNMENT'S
EXHIBIT
18CR4683-GPC

190

ADCONION-DISC33-00004





ADCONION-DISC33-00002





ADCONION-DISC33-00001





ADCONION-DISC33-00005



GOVERNMENT'S
EXHIBIT
18CR4683-GPC

194





GOVERNMENT'S
EXHIBIT
18CR4683-GPC

195

ADCONION-DISC34-00005

 **MOORE**

**MOORE PRODUCTS CO., Spring House, PA 19477**

**TELEFAX**

ATTENTION: Registration Services

Network Solutions
InterNIC Registration Services

FAX#: 703/742-4811

DATE: May 13, 1993

REF.:

COPIES TO:

SENDER: Stephen A. Dorn

FAX# 215-283-6358  (Sales)  ☒

FAX# 215-283-6357  (Purch.)  ☐

FAX# 215-646-6212  (Int'l)  ☐

TOTAL NUMBER OF PAGES __3__ INCLUDING THIS PAGE.

IF YOU DO NOT RECEIVE THE TOTAL NUMBER OF PAGES AS LISTED ABOVE, PLEASE CONTACT (215) 646-7400. Ext. __2370__

Attached is our application for an Internet address.  I have filled in all the questions to the best of my ability.  If there are any problems, please feel free to call me directly at 215/646-7400, Ext. 2446.

Please acknowledge all correspondence via FAX to 215/283-6358, to the attention of Stephen A. Dorn.

Any assistance that can be provided to expedite this request will be greatly appreciated.

Stephen A. Dorn, Supervisor
Technical Services & Computer Operations



GOVERMENT'S
EXHIBIT
18cr4683-GPC

196

ADCONION-DISC32-00020

5/13/93                          Application for Internet Network Number

Network Solutions
InterNIC Registration Services
505 Huntmar Park Drive
Herndon, Va.  22070

1. Presently, our network is not connected to the Internet.  Our intentions
   are to research and get connected to the Internet as soon as feasibly and
   economically possible but this will not be a consideration in this
   application.

2. no nic handle at this time

   Dorn, Stephen A.
   Supervisor Technical Services and Computer Operations

   Moore Products Co.
   Mail Stop 500
   Sumneytown Pike
   Spring House
   Pa.  19477

   215-646-7400, x:2446

   Network mailbox is a SMTP%"DORNSA@MPCDP3"

3. Network Name Recommendation -- mpco.com

4. Corporate/Network Address:  Sumneytown Pike
                               Spring House
                               Pa.   19447

   Name of Organization:  Moore Products Co.

5. We are not a military installation

6. Hosts attached:   current -- 350
                    one year -- 700
                    two years -- 850
                    five years - 1200

7. I am applying for a class B internet network number.  We are a commercial
   manufacturing installation where multi-vendor machines from Personal
   Computers, Workstations, Mini-computers, and large mainframes currently
   exist on the same network.  My class C license that I am presently running
   internally has reached the maximum number of IP addresses available at 255.
   I also have internal routing and subnetting incorporated into our present
   corporate network.  We are replacing dumb terminal devices with workstations
   requiring IP addresses on a daily basis.  After examination of all possible
   alternatives, we have decided to go to a class B addressing structure to
   support our corporate growth needs.  Thusly, we wish to apply for an internet
   address that we can use for this conversion and eventually use it to attach
   to the international network.

ADCONION-DISC32-00021

8. Commercial Network

9. The purpose of the network is to provide a corporate backbone for our manufacturing facility.  It supports all inhouse operations of commercial data processing, CAD/CAM operations, CIM applications,  Novell based engineering software development needs using TCP/IP, desk top publishing systems,  applications engineering software development for product interfacing.  We also support a WAN and that goes nationally and internationally to remote manufacturing locations, other divisions, and sales offices via X.25, T-1, and fractional T-1.  Our company totally relies on the integrity of our Corporate Network.



# NETWORK SOLUTIONS

17-May-93


Stephen A. Dorn
Moore Products Co.
Mail Stop 500
Sumneytown Pike
Spring House, PA  19477


Dear Stephen A. Dorn:

MPCO has been assigned Class B net number 167.87.0.0.

The NIC handle of the technical POC is SAD.

It is suggested that host number zero in any network be reserved (not used), and the host address of all ones (255 in class C networks) in any network be used to indicate a broadcast datagram.

The association between addresses used in the particular network hardware and the Internet addresses may be established and maintained by any method you select.  Use of the address resolution procedure described in RFC-826 is encouraged.

Thanks again for your cooperation!

InterNIC Registration Services



GOVERMENT'S
EXHIBIT
18cr4683-GPC

197

**SIEMENS**

Siemens Energy & Automation, Inc.
Process Industries Division

Mail Stop 500
1201 Sumneytown Pike
Spring House, PA 19477-0900

**Stephen A. Dorn**
Manager
Computer Networks and
Operations

Tel:

steve.dorn@sea.siemens.com
www.sea.siemens.com

**GOVERMENT'S EXHIBIT**
18cr4683-GPC

**198**







GOVERMENT'S
EXHIBIT
18cr4683-GPC

208

ADCONION-DISC32-00018

SBL Detail 

- Home
- SBL
- ROKSO
- Information

Logged in as: charles.chabalko@ic.fbi.gov  -  Logout  -  Contact

# SBL190910 Detail - Spamhaus Law Enforcement Portal

SBL190910 - 167.87.0.0/16

| | |
|---|---|
| **SBL ID** | SBL190910 |
| **IP/CIDR** | 167.87.0.0/16 |
| **ISP** | ARIN |
| **Created** | 2013-07-13 20:25:30 |
| **Modified** | 2018-02-15 05:13:57 |
| **Status** | REMOVED |
| **Spammer** | Amobee |
| **Subject** | Hijacked ARIN Legacy block - Moore Products Co. |
| **Reason** | |

```
NetRange:       167.87.0.0 - 167.87.255.255
CIDR:           167.87.0.0/16
OriginAS:
NetName:        MPCO
NetHandle:      NET-167-87-0-0-1
Parent:         NET-167-0-0-0-0
NetType:        Direct Assignment
RegDate:        1993-05-17
Updated:        2001-04-06
Ref:            http://whois.arin.net/rest/net/NET-167-87-0-0-1

OrgName:        Moore Products Co.
OrgId:          MOOREP
Address:        Mail Stop 500 Sumneytown Pike
City:           Spring House
StateProv:      PA
PostalCode:     19477
Country:        US
RegDate:        1993-05-17
Updated:        2011-09-24
Ref:            http://whois.arin.net/rest/org/MOOREP

OrgAbuseHandle: SD808-ARIN
OrgAbuseName:   Dorn, Steve
OrgAbusePhone:  +1-215-646-7400
OrgAbuseEmail:  dornsa@moore-solutions.com
OrgAbuseRef:    http://whois.arin.net/rest/poc/SD808-ARIN

OrgTechHandle:  CKN23-ARIN
OrgTechName:    No, Contact Known
OrgTechPhone:   +1-800-555-1234
OrgTechEmail:   nobody@example.com
OrgTechRef:     http://whois.arin.net/rest/poc/CKN23-ARIN

Domain Name: GLOSSYWHEREVER.COM
Registry Domain ID: 1850109391_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.domain.com
Registrar URL: www.domain.com
Updated Date: 2014-03-12 13:33:10
Creation Date: 2014-03-11T20:06:53Z
```



GOVERMENT'S
EXHIBIT
18cr4683-GPC

209

ADCONION-GJ-EXS-00780

# Whois IP 167.87.0.0

🦊 whois.com/whois/167.87.0.0

Updated 37 minutes ago

```
% This is the RIPE Database query service.
% The objects are in RPSL format.
%
% The RIPE Database is subject to Terms and Conditions.
% See http://www.ripe.net/db/support/db-terms-conditions.pdf

% Note: this output has been filtered.
%       To receive output for a database update, use the "-B" flag.

% Information related to '167.87.0.0 - 167.87.255.255'

% Abuse contact for '167.87.0.0 - 167.87.255.255' is 'abuse.it @siemens.com'

inetnum:        167.87.0.0 - 167.87.255.255
netname:        DE-SIEMENS-19930517
country:        DE
org:            ORG-SNIC1-RIPE
admin-c:        SNIC1-RIPE
tech-c:         SNIC1-RIPE
status:         ALLOCATED PA
mnt-by:         RIPE-NCC-HM-MNT
mnt-by:         SAG-MNT
mnt-lower:      SAG-MNT
mnt-routes:     SAG-MNT
created:        2015-12-29T16:24:25Z
last-modified:  2016-12-08T14:56:17Z
source:         RIPE

organisation:   ORG-SNIC1-RIPE
org-name:       SIEMENS AG
country:        DE
org-type:       LIR
address:        Otto-Hahn-Ring 6
address:        D-81739
address:        Munich
address:        GERMANY
phone:          +49 (173) 3613276
phone:          +306936888229
abuse-c:        SNIC1-RIPE
mnt-ref:        RIPE-NCC-HM-MNT
mnt-ref:        SAG-MNT
mnt-by:         RIPE-NCC-HM-MNT
mnt-by:         SAG-MNT
created:        2006-05-24T08:54:03Z
last-modified:  2020-12-16T12:34:19Z
source:         RIPE # Filtered

role:           Siemens IP Management
address:        Corporate IT
address:        Otto-Hahn-Ring 6
address:        D-81739 Munich
abuse-mailbox:  abuse.it @siemens.com
admin-c:        GB20085-RIPE
admin-c:        NW2126-RIPE
tech-c:         GB20085-RIPE
tech-c:         NW2126-RIPE
nic-hdl:        SNIC1-RIPE
mnt-by:         SAG-MNT
created:        2006-01-09T11:06:35Z
last-modified:  2016-12-05T15:09:48Z
source:         RIPE # Filtered

% This query was served by the RIPE Database Query Service version 1.101 (ANGUS)
```



GOVERMENT'S
EXHIBIT
18cr4683-GPC

211



**From:** Steve Dorn <dornsa@verizon.net>
**Sent:** Thursday, May 20, 2021 5:03 PM
**To:** Booth, Glenn █████████████████
**Subject:** [EXTERNAL EMAIL] - Phone Call



Glenn,
With respect to voice mail from the other day.  I have had horrible
e-mail conversations with your fellow Federal Officers of the Court in
San Diego.  I informed them that any future communications should be
done by San Diego personnel IN PERSON.  This is because they need to
feel the pain that they will be putting me through by forcing me to
appear in person by flying coast to coast when there is technology is
available to do the same thing remotely.  There are federal cases
documented on the Internet allowing this to happen.  I am also
requesting to be taken off of the witness list as they have made me feel
like I am the criminal.

Unless you have information for me that I have been removed from the
witness list or the trial has been cancelled, then again I must insist
that the San Diego personnel fly east and talk with me in person.  I do
not have a nice gentleman like Glenn Booth located in San Diego to talk
for me like the long arm of the Federal Government does.  I also have a
compromised immune system due to taking a psoriasis medication called
Taltz.  Traveling 6 hours in a plane and a mask would not be good for my
health.  What do I have to do to get the judge to rule in my favor to
not have to make the trip to San Diego?  I also do not trust the
prosecutor to have my back on any witness stand which is why I wish to
be removed from the witness list.  She comes across to me as only
wanting victories in her court cases.

Please share this e-mail with your superiors in the Federal Court system
as no one else is looking at my best interest at this time. As I stated
before, I did not own the asset, Siemens owned the asset in 2013 when

1

the document your office showed me was forged.  I am not the victim,
they are.  Will they have people flying in from corporate headquarters
in Germany?  Heck no, as they have offices in California.  Thusly, I
lose again.

How can this situation be resolved to get to a win/win situation as
right now it is win/lose with the government winning and poor old me losing.
Steve Dorn

2

ADCONION-DISC32-00010



**From:** Steve Dorn <dornsa@verizon.net>
**Sent:** Monday, May 31, 2021 3:50 PM
**To:** Booth, Glenn █████████████
**Subject:** [EXTERNAL EMAIL] - Voice Mail Response

Glenn,
Acknowledging your voice mail from the other day as I have been recovering from knee surgery this week. Please send me your recommendations in an e-mail so I can respond. Here are my feelings about this court case and my recommendation to the court.



1. With the USDA treating me as a criminal, I wish to be removed as a victim and from the witness list in this case. I am not the victim since I did not own the asset. Siemens owned the asset and is the victim. Also, the company in question, Moore Products Co, was no longer in existence after being purchased by Siemens which again means that Siemens was the victim. With respect to being a witness, I do not have anything to add to this case. The USDA will not have my back. I can envision the defense attorney's trying to implement me into their clients crime and me being sent to jail. I want NO part of that!!! Has anyone contacted Siemens to hold them accountable for this whole situation? Probably not because they have access to high price lawyers.

2. I am NOT available to testify until at least December 13th due to scheduled vacation time. This is my first time away from home since 2019 and all the Covid Virus problems. We are traveling by car in order to stay safe. The inconvenience of this entire court case which has no effect on me should not come in front of my mental well being.

3. I intend to solicit the judge directly to be removed from the case by writing letter to his court. In this letter I will convey to him my feelings of being treated like a criminal by the USDA. I feel that strongly about this issue.

1

4. I suffer from a compromised immune system from taking a psoriasis medication called Taltz. That means I constantly wear a mask. I also am going for pulmonary testing of my lungs, after fully recovering from my knee operation, because my breathing gets compromised if I wear my mask too long. There is NO WAY that I could wear a mask for 6 hours in an airplane to stay safe from Covid. There is also NO WAY I would travel to California on an airplane without a mask. My health is definitely more important

5. I suffer from anxiety and depression and take medication for each. Due to all the issues from this court case, my anxiety level is through the roof and the amount of Lorazepam has gone from occasionally to daily. Bottom line, this whole court case is not good for my soon to be 68 year old body.

Finally, SIEMENS IS THE OWNER of the ASSET and is the VICTIM.

Glenn, I really need you to forward this to appropriate management people to get me removed from this case and contact the correct SIEMENS people.
Thanks,
Steve Dorn

ADCONION-DISC32-00008



**From:** Steve Dorn <dornsa@verizon.net>
**Sent:** Tuesday, June 8, 2021 12:22 PM
**To:** Booth, Glenn ▉▉▉▉▉▉▉▉▉▉
**Subject:** Re: [EXTERNAL EMAIL] - Re: Voice Mail Again

Yes. ▉▉▉▉▉▉ I will wait for your call.

On Tuesday, June 8, 2021, 12:09:06 PM EDT, Glenn Booth▉▉▉▉▉▉▉▉▉▉ wrote:

Hi Mr. Dorn. I can chat telephonically today around 4pm.  Does that time work for you?

Glenn

---

**From:** Steve Dorn <dornsa@verizon.net>
**Sent:** Tuesday, June 8, 2021 12:51:10 AM
**To:** Booth, Glenn ▉▉▉▉▉▉▉▉▉▉
**Subject:** [EXTERNAL EMAIL] - Re: Voice Mail Again

Glenn,
I will agree to speak only with you sometime on Tuesday after receiving another disturbing e-mail from the West Coast using words like "Per the subpoena, your appearance in court is mandatory.".
How about 2pm?  Confirm and provide best number using e-mail.  I wish to know what you ideas might be give the fact that I WILL NOT BE AVAILABLE ON NOVEMBER 30TH and REFUSE TO FLY TO SAN DIEGO.

As for topic of conversation for the phone call.  The document from Rosemarie is attached.
1.  The asset in question was owned by Siemens and they should be held accountable for it.  Why do I have to testify at all.  Has anyone pursued this avenue of prosecution in California?  Everyone avoids answering that question.  Perhaps they are too lazy to go that route which will not effect anyone's life.  This is the route to go.
2.  The Letter of Agency document provided by Rosemarie is attached.
3.  Your attorney's and Siemens attorneys should have documentation that Moore Products Co did NOT exist in 2013.  If not, why not?  Reference back to item #1.
4.  I sent copies of my signature back in that time period from expired Drivers Licenses that do not match that signature and was forged.
5.  Since there was no Moore Products Co, the title provided under my signature is bogus.
6.  Finally, here is a new one for your investigative pleasure.  The street address on the bottom of the page is

1

INCORRECT.  The document has a street name of "Sunneytown Pike".  The actual street address of Moore Products Co is "Sumneytown Pike".  The crack lawyers in San Diego did not catch that forgery.

I will sign any legal document stating these facts above here at my house or even at your Ft Washington office, BUT,  I am really very hesitant about doing that since these people are computer hackers.  What type of guarantee does the government provide to protect me from this happening?   That is why I DO NOT WANT TO BE INVOLVED WITH THIS CASE.  Siemens has much better lawyers and can defend against hackers, where I cannot do so.

Finally, I do not want to deal with the lawyers in San Diego.  If they need to talk with me, have them get on a plane and talk to me in person.  There is ton more I would like to say on that issue but will refrain at this time.

Hopefully 2 pm works for you.  If not, later works better for me.
Steve Dorn


On 6/6/2021 10:06 PM, Steve Dorn wrote:

Glenn,
I appreciate your voice mail, however, I still have the same beliefs.

1. The States Attorney does not have my best interest in mind.  She treats me as a criminal and would not have my back if I testify.

2. Bearing item 1 in mind.  Please arrange to take me off the witness list as I will only testify under duress caused by the states attorney.  Don't I have fifth amendment rights to refuse to testify?  I did not own the asset.  Siemens owned it and should be responsible for any issues involving the asset.  Any documentation to that fact I did own it was forged by criminals.

3. I will not be available on November 30th as you well know from our prior conversations.  I am on a prepaid vacation after close to two years of this Covid environment.  I would not travel on an airplane to due health and covid reasons.  I will not be in Pennsylvania on the November 30th date of the subpoena.  I also suffer from anxiety and depression and this whole witness subpoena is causing me major problems.

4. I have already sent an e-mail to your office stating the document that the FBI sent me was forged.  That should be all the government requires.

5. I want nothing to do with the states attorney.  The judge should know this and allow me to be removed from the witness list.  I was also not a victim as it states on the subpoena.  How can this be done?

6. How can I report my issue to the appropriate governmental management team above the States Attorney and to your supervisor if possible.

7. Glenn has been a great person locally in Pennsylvania, but is not the people in California that I dealt that have alienated me from the judicial system.  Please remove me from the witness list to resolve this conflict.  What else do they require from me than a signed statement?  I want nothing to do with any defense attorneys that will try and implicate me when the prosecutor does not have my back.  The fifth amendment would be my only response.

8. Has anyone gotten in touch with Siemens to get the correct witness and victim to serve the subpoena to?  If not, why not.

Please take appropriate measures to get me removed from witness list.  Advise if you have any documents for my review and signature.

Thanks for your thoughtfulness, but I did nothing to deserve all this stress and anxiety in my life.

Steve Dorn

ADCONION-DISC32-00004