# EXHIBIT A

# Ninth Circuit
# Jury Trial Improvement Committee

## Second Report:
## Recommendations and
## Suggested Best Practices

Adopted by the
Judicial Council of the Ninth Circuit
on October 2006

### COMMITTEE MEMBERS

Hon. Susan R. Bolton, Chair
U.S. District Judge
District of Arizona

Hon. Richard C. Tallman
U.S. Circuit Judge
U.S. Ninth Circuit Court of Appeals

Hon. Virginia Phillips
U.S. District Judge
Central District of California

Hon. Anthony Ishii
U.S. District Judge
Eastern District of California

Hon. William Alsup
U.S. District Judge
Northern District of California

Hon. Elizabeth Laporte
U.S. Magistrate Judge
Northern District of California

Hon. Judith McConnell
Presiding Justice
California Court of Appeals

Hon. Michael Brown
Retired Presiding Judge
Pima County, Arizona Superior Court

Hon. John Hannah
Superior Court Judge
Maricopa County, Arizona

Ms. Franny Forsman
Federal Public Defender
District of Nevada

Ms. Debra Wong Yang
U.S. Attorney
Central District of California

Mr. Brian Rekofke
Lawyer Representative
Eastern District of Washington

Ms. Cynthia Jensen
Chief Deputy Clerk
District of Nevada

Ms. Joanne Cook
Jury Administrator
District of Idaho

Dr. Gregory B. Walters
Circuit Executive
Office of the Circuit Executive

Committee Staff:

Dr. Robert E. Rucker
Assistant Circuit Executive
Office of the Circuit Executive

Ms. Kira Gunther
Policy Analyst
Office of the Circuit Executive

# JURY TRIAL IMPROVEMENT COMMITTEE

## Second Report:
## Recommendations and Best Practices

### October 2006

**Goal A. Improve the Use of Jurors**

> **Recommendation I:** Each district court should collect district-specific historical data that can be used to determine reliably how many jurors should be summoned for each trial.

**Goal B. Effectively Use Jurors' Time**

> **Recommendation II:** Communicate to jurors an estimate of the length of the trial in all cases and set time limits in civil cases.

> **Recommendation III:** Consider jurors' needs when establishing and maintaining a jury schedule.

> **Recommendation IV:** Address non-jury matters when jurors are not in the courthouse.

> **Recommendation V:** Use pretrial conferences to maximize efficient use of jurors' time and streamline the trial.

> **Recommendation VI:** Include juror-related training for judges during the new judge orientations and recommend appropriate judicial training be provided by the Federal Judicial Center.

**Goal C. Improve Voir Dire**

> **Recommendation VII:** Provide more and better information about the trial and the judicial process to the potential jurors at the beginning of voir dire.

> **Recommendation VIII:** After court conducted voir dire, attorneys should be permitted to conduct limited supplemental voir dire.

**Goal D. Improve Juror Satisfaction with the Voir Dire Process**

> **Recommendation IX:** Consider including all jurors during the court's voir dire questioning.

**Goal E. Improve Juror Comprehension**

       **Recommendation X:  Permit juror note-taking, and provide individual juror trial books in appropriate cases.**

       **Recommendation XI:  Permit written questions from jurors during civil trials**.

       **Recommendation XII: Provide all jurors with both preliminary and final jury instructions in written form.**

       **Recommendation XIII:  Randomly select alternate juror(s) after closing arguments and instructions**.

       **Recommendation XIV:  Encourage attorneys to use technology for the presentation of trial exhibits in order to improve juror comprehension.**

       **Recommendation XV:  Permit juror discussion of evidence as civil trials progress.**

**Goal F. Take Steps to Address Jurors' Personal Concerns Arising from Jury Service**

       **Recommendation XVI: Incorporate ways to protect juror privacy.**

       **Recommendation XVII: Address jurors' communication needs.**

       **Recommendation XVIII: Explain to jurors their rights regarding post-trial discussion.**

## INTRODUCTION

Chief Judge Mary M. Schroeder established the Ninth Circuit's Jury Trial Improvement Committee to recommend ways to improve juror satisfaction, comprehension and utilization. The committee distributed its first set of recommendations and best practices in April 2004.  The first report generally focused on improving jurors' experience prior to physically coming to the courthouse.

The committee has continued to pursue Chief Judge Schroeder's directions and developed this second set of recommendations and suggested best practices for improving courtroom procedures that will result in better jury trials and improved experiences for our jurors.  When implemented, the committee expects these recommendations will maximize the efficient use of juror time at the courthouse and improve juror experience by facilitating comprehension during the trial.

It should be noted that the following recommendations are based in part upon the responses to a jury questionnaire that was specifically designed and administered for our committee.  More than 7,000 citizens who were summoned for jury duty in the district courts of the Ninth Circuit responded to the questionnaire. Our committee surveyed a variety of citizens: those who arrived at the courthouse but did not participate in voir dire, those who participated in voir dire and were released, and those who participated in a jury trial.  In this report, you will find quotes from these citizens and statistical summaries of their answers to our survey questions. The committee intends to have a website created so that interested parties may access the full survey results.

We would be remiss if we did not point out that the current jury system works well. It is something about which we have every right to be proud, and most citizens recognize the importance of jury service as a civic duty.  Numerous comments from jurors confirm these conclusions.  Seventy-nine percent of those answering our questionnaire responded that they believed their jury service was an important contribution to the community, and 89 percent of those who actually served on a jury agreed or strongly agreed with this statement.  Eighty-four percent of those serving on a jury said it was a positive experience, while only five percent of those serving did not agree that it was a positive experience.[1]

---

[1] A fairly impressive 63 percent of all those who responded to our questionnaire said their experience was positive.

1

> "My jury experience now and in the past has been wonderful.  I appreciate the effort to accommodate my schedule and all involved were so professional.  Thank you so much for your efforts."
>
> "A great learning experience.  Extremely comfortable surroundings.  Delightful personnel at all levels."

However, the committee believes, and as confirmed by the jurors' responses to our questionnaires, there is room for improving juror experience in the fifteen districts comprising our circuit's federal courts.  This need can be seen in the responses to several different questions, particularly when 12 percent of those surveyed said they would try to avoid jury service in the future.

**Goal A. Improve the Use of Jurors**

**Recommendation I: Each district court should collect district-specific historical data that can be used to determine reliably how many jurors should be summoned for each trial.**

It is costly and burdensome to summon far more prospective jurors than will actually be needed.  Districts should minimize this problem by summoning only the number of prospective jurors needed to provide sufficient jurors for the trial(s) scheduled to begin on a specific day.  The determination of a sufficient number of jurors needed can be reliably grounded on the courts' past experiences.  Data can provide the courts with a high degree of predictability in ascertaining an appropriate number that should provide sufficient jurors to conduct a trial.  Currently, all district courts are collecting these data and all that needs to be done is analysis and implementation.

The public's primary contact with the federal courts is through  jury service.  It wastes the time and resources of both the court and the public to summon an excessive number of people, have them wait for hours in the jury assembly room, and then dismiss them without any participation in the process.

During 2005, more than 18,700 prospective jurors appeared at federal courthouses in the Ninth Circuit who did not participate in a jury trial or even take part in voir dire.  The Judicial Conference of the United States has set a goal that each circuit should have no more than 30 percent of prospective jurors appearing at federal courthouses without participating in voir dire or a jury trial.

If the district courts in the Ninth Circuit had reached the Judicial Conference's goal in 2005, approximately 4,000 fewer jurors would have appeared at federal courthouses only to be

dismissed without any participation in the process.

> "Serving on a jury would be a great service and honor, but sitting in a room for 8 ½ hours until 4:14 pm is a waste of time."
>
> "I think that there were too many potential jurors to choose from - approximately 20 of us never made it past the back benches to answer even one question.  Why are so many necessary to select only 13 - when so many didn't respond to anything they just waited/listened?"

There are two main reasons for this problem.  First, judges and jury administrators have overestimated the number of potential jurors needed out of concern that the jury pool will be exhausted.  Second, the court is often notified of a resolution on the morning of the jury selection, which may also be the first scheduled day of the trial.  Active case management can result in earlier notification to the courts of a resolution and, thus, minimize inconvenience to jurors who can be notified in time that they do not need to appear.

Efforts to restrict the number of people summoned to only those who are needed will help each to have a better jury experience.  Eighty-four percent of those who served on a jury said that their jury service was personally worthwhile.  This number dropped to approximately half for those who did not serve on a jury.

The district courts in the Ninth Circuit have experienced professionals who serve as their jury administrators.  These jury administrators often have long institutional memories and access to the court's jury records, and they can greatly assist the judges in determining an appropriate number of citizens to be summoned for a particular trial.

Courts should use the services of the jury administrator to work in conjunction with the court staff  to develop  accurate estimates of the number of potential jurors who may need to be summoned for particular types of cases.  These estimates can be generated by employing the actual number of jurors historically used by either a district or a specific judge.  Some of the district judges in the Ninth Circuit have already successfully used these estimates as resources to more efficiently summon potential jurors.

### *Best Practices*

The committee recommends that districts consider beginning several trials on the same day, pooling jurors, and staggering trial start times in order to reduce the number of people who are unnecessarily called for jury duty.

The committee recommends that the judges hold a final pretrial conference no more than

one to two weeks before the trial is scheduled to begin and require the attorneys to notify the court two court days, at the latest, before the trial is scheduled to start if a resolution has been reached.  In civil cases, district court local rules should authorize imposition of monetary sanctions for failure to comply.  The amount of sanctions can be based on required payment of the prospective jurors summoned for that trial.

Active case management can lessen the inconvenience to the citizens who were summoned, save taxpayers' money, and improve jury utilization.  Encouraging attorneys to give the court notice of a resolution of at least two working days will give the jury administrator time to notify the potential jurors that they will not need to report for jury duty.  In some courthouses, if the judge has not been notified of a potential resolution in a timely manner the clerk is instructed to call the attorneys and confirm whether a resolution has been reached.

Upon receiving news of a resolution, the judge should promptly inform the jury administrator, and, in turn, the jury administrator should inform jurors that they are no longer needed. If appropriate, the courts can utilize the internet and jurors' email addresses as tools to update jurors about their duties.

"I had to drive 5 hours to serve therefore I must come the day before the trial starts.  Then I have to call again after 5:00 p.m. the night before the trial to see if I still need to report.  Fortunately, I still did have to report. If not, I really would have been ticked off and if I understand this: I also would not get money for mileage and hotel room.  Is this right and fair??"

"Short notice that I had to serve the next morning didn't allow me to cancel my appt with 24 hours notice resulting in a $45 charge"

"Having to appear the morning after an evening call to service is ridiculous!  How can you plan anything that quickly?  I had to cancel a job interview.   Being on-call for a month is not acceptable.  Please find another system.  I was not even called to a court room and was released at 9:30 AM.  Again unacceptable."

On the occasions when a panel is summoned and the case resolves that day, the judge should call the panel into the courtroom and explain that their presence was essential to settling the case.  This will only take a few minutes of the judge's time and make the panel feel that their attendance was truly important.

In light of the jury utilization goals established by the Judicial Conference of the United States, the committee believes that each district should keep track of its jury utilization numbers for the district as a whole and for individual judges in the district.  The data on utilization rates should be provided to each judge for review.

4

**Goal B. Effectively Use Jurors' Time**

    **Recommendation II: Communicate to jurors an estimate of the length of the trial in all cases and set time limits in civil cases.**

    The committee recommends that in every jury trial, civil or criminal, the judge should consult with counsel and determine an estimated length for that specific trial.  In a civil case, the court should set time limits.  In a criminal case, the court should set time lines for the length of the trial, acknowledging that time lines in criminal cases need to be flexible.

    Following the court's determination, the court should always inform jurors about the projected length of the trial. This information will help jurors organize their lives around the trial and make accommodations for spouses, children, other dependents, and work-related matters.  Of our surveyed jurors, 98 percent reported that the courts gave the jurors an estimate of how long the trial would last.  Eighty-five percent of surveyed jurors reported the court's estimated length of trial was accurate.

*Best Practices*

    It is the judge's responsibility to provide active case management and monitor each phase of the trial.  To the extent possible, the judge should keep the case moving and ensure the trial is adhering to predetermined time lines. The judge should continually meet with attorneys throughout the course of the trial to discuss case progress.  If time lines are adjusted, the jury should be informed as soon as possible.

    **Recommendation III: Consider jurors' needs when establishing and maintaining a jury schedule.**

    In many courthouses, jurors are required to arrive by  8:00 a.m. or 8:30 a.m. with the trial often not beginning until 9:00 a.m.  Jurors often spend their time waiting in the jury room while the judge works on motions or other matters that have been raised by the attorneys.  Commonly, a trial includes two 15-20 minute breaks, one in the morning and one in the afternoon.  The jurors are usually given a lunch break of 1 ½ hours.  The trial day normally ends around 4:00 p.m. or 4:30 p.m.  Absent other recesses or interruptions, most trial days involve about 5 ½ to 6 hours of evidence taking.

    The committee recommends that judges consider alternative trial schedules to meet the needs of the jury.  Some judges may choose to ask a jury about their specific needs when deciding on a schedule.

    Once a schedule has been established, it is important to closely adhere to the schedule so jurors can plan accordingly.  Extensive breaks and extending beyond the normal trial day can add inconvenience to jurors and make it difficult for jurors to manage their other obligations. Additionally, it is unfair for jurors to be required to report to the courthouse on time only to wait

for the trial to begin.

### *Best Practices*

Given the sacrifices that jury service may exact for many jurors, the committee recommends that judges consider the needs of jurors when deciding on the trial schedule.  Some jurors have indicated that they prefer compressed schedules that begin earlier in the day in order to coordinate work or family obligations.  In districts where jurors travel long distances for jury service, holding the trial over longer, and therefore fewer days, might be preferable.

The committee recognizes that in some situations alternative trial schedules can be beneficial for the jurors, the attorneys, and the judge.  Some judges in the Ninth Circuit's district courts have successfully gone to "compressed jury trial schedules."  One court schedules a 7:30 a.m. start time for the lawyers and a 7:45 a.m. report time for the jurors. Court always starts promptly with the taking of evidence by 8:00 a.m.  The judge provides for two mini breaks, but no lunch break, and ends the trial day by 1:00 p.m.  Judges have reported that they get as much or more accomplished with the compressed schedule as the regularly scheduled trial day, and that attorneys are usually better prepared.

When choosing a trial schedule, it is optimal to include at least five hours of trial time each day.  Researchers Dale Anne Sipes and Mary Elsner Oram examined the average trial day and its relationship to the overall length of the trial. Their data "led to the conclusion that consecutive and longer trial days lead to the ability to conduct trials in fewer total hours." [2]

It is the judge's responsibility to adhere as closely as possible to the established schedule to lessen the inconvenience on jurors. Ten percent of jurors reported staying in court to work past the scheduled ending time, and 19 percent stated there were unscheduled breaks during the trial. Additionally, 24 percent of jurors reported trial breaks extended past the scheduled time.  To the extent possible, maintaining a preset trial schedule allows jurors to plan for employment and care giving responsibilities.

> "Don't tell people they need to be in the jury room by 8:00 a.m. when the door doesn't even open until 8:00. I spent 20 to 30 minutes freezing outside because I wanted to be on time-we don't even start the process until 9:00 a.m."

**Recommendation IV: Address non-jury matters when jurors are not in the courthouse.**

---

[2] Dale Anne Sipes & Mary Elsner Oram, *On Trial: The Length of Civil and Criminal Trials*, 81 (National Center for State Courts 1988).

The committee recommends that in order to respect jurors' time at the courthouse, judges address non-jury matters during those times when the jury's presence is not required in the courthouse. Many proceedings, such as the pre-admission of exhibits or other motions, should be handled in this manner.

### *Best Practices*

Some judges regularly make themselves available to counsel before and/or after the trial day. This arrangement provides time for the judge to meet with the attorneys and address any matters that need attending outside of the jurors' presence. Judges should inform lawyers that this time is allocated to address non-juror related matters.

Judges should require attorneys to address those issues for which the jurors' presence is not necessary outside the hours of jury service. During trial, sidebars should be discouraged in order to reduce the amount of time jurors are present but not engaged in hearing evidence. Issues often raised during sidebars can usually be resolved during pretrial conference, before the jury arrives, or after they have left for the day. Judges are encouraged to have attorneys be in the courtroom at least 30 minutes before the trial is scheduled to begin or have attorneys remain after the trial day has finished. If the judge meets with attorneys before the trial day begins, the judge should be mindful of time and start the trial promptly at the scheduled start time so jurors are not kept waiting.

### **Recommendation V: Use pretrial conferences to maximize efficient use of jurors' time and streamline the trial.**

Judges are encouraged to use pretrial conferences to streamline the jury trial. Pretrial conferences are an effective tool to minimize the inefficient use of jurors' time. The committee believes that pretrial conferences can be beneficial in resolving issues outside of the jurors' presence. These conferences should be used to resolve motions in limine and other expected evidentiary issues, arrange for pre-marking exhibits, establish reasonable time limits, and review attorney-submitted jury instructions. Some judges use the pretrial conference to settle preliminary jury instructions.

### **Recommendation VI: Include juror-related training for judges during the new judge orientations and recommend appropriate judicial training be provided by the Federal Judicial Center.**

The committee believes that new judges would greatly benefit from training concerning juror-related issues such as working with the jury administrator to select an appropriate number of potential jurors to be summoned, voir dire, use of alternative trial schedules, techniques for monitoring time, minimizing sidebars, and other topics designed to enhance jurors' convenience and comprehension.

**Goal C.  Improve Voir Dire**

**Recommendation VII:  Provide more and better information about the trial and the judicial process to the potential jurors at the beginning of voir dire.**

The committee believes that if potential jurors are given as much information about the case as possible, they will better understand the case, and therefore will be better able to respond during the voir dire process.  If jurors are better informed about the case, they are better able to identify personal biases that they would not have considered otherwise.

*Mini-Openings.*

In civil cases, judges should consider offering attorneys the opportunity prior to voir dire to make mini-openings in which each attorney presents a succinct statement of facts.  Mini-openings can enhance the ability of potential jurors to respond fully to voir dire.  According to our surveys, 89% of those who went through voir dire said that only the judge described the case to them.

Mini-openings may also be employed in some criminal cases.  The committee does not believe that mini-openings are appropriate in cases with pro se litigants.

*Case-Specific Questionnaires.*

In cases where the jurors' personal experiences might have a significant impact on their ability to be fair, such as those involving sexual assault, or child pornography, focused questionnaires may be useful.   Such questionnaires can be sent with the jury summons to address issues that potential jurors might feel uncomfortable answering in open court.  When using such questionnaires, consider carefully the possibility that such information could be subject to public disclosure, and manage juror privacy expectations accordingly.

***Best Practices***

The committee discourages the use of generic questionnaires for every trial because they do not offer sufficient benefits to justify the imposition on the jurors, the additional expenditure of staff time, and extra operational costs.  However, it can be beneficial to use questionnaires that will assist in pre-screening potential jurors when the case is anticipated to be unusually long.

**Recommendation VIII: After court-conducted voir dire, attorneys should be permitted to conduct supplemental voir dire.**

Most courts require attorneys to submit a list of proposed voir dire questions prior to the trial so that the judge can use them in voir dire.  Nevertheless, the committee believes that in addition to judge-conducted voir dire, jurors may benefit if judges permit attorney-conducted voir

dire.  Attorneys have an increased familiarity with the facts of the case and may become aware of important questions that should be asked.  Attorney-conducted voir dire should be allowed for a predetermined, limited time or for clearly defined and explained purposes.[3]

The committee believes that the lawyers have a better understanding of the facts of the case and can assist in focusing voir dire on identifying potential biases and in necessary follow-up to prior open-ended responses that might lead to identifying bias.

Attorney conducted voir dire should come after the judge's voir dire and be supplemental and not duplicative.  The limited attorney voir dire should be directed to follow up on questions asked by the judge or any trial-related issues not covered by the judge's voir dire.  However, attorneys should be instructed that they are not to use their limited voir dire merely to repeat questions already asked by the judge.  Attorneys may ask questions to expand on issues previously raised.

One potential hazard of allowing attorney-conducted voir dire is that attorneys may attempt to use their questioning to precondition the jury to their respective cases.  In order to discourage misuse of attorney voir dire, judges are encouraged to set clear guidelines about what kind of questions will be permitted.

In order to improve the quality of voir dire, the committee recommends that both judges and attorneys receive voir dire training.  The committee's survey of the Ninth Circuit district and magistrate judges revealed that the judges do not believe that attorneys do a good job of conducting voir dire.  On the other hand, attorneys complain that judges frequently do not address issues that should be covered during voir dire and that judges' questions do not elicit sufficient information.  It is the committee's belief that both contentions have merit and that an educational component would be beneficial for both judges and lawyers.

### *Best Practices*

Judges should avoid leading questions designed to prompt jurors to say that they can or cannot be fair. Such questions defeat the purpose of supplemental attorney voir dire, which is to elicit candid responses and thereby increase the effectiveness of voir dire.

---

[3] Only 29 percent of jurors reported they were asked questions by the attorneys.

9

**Goal D. Improve Juror Satisfaction with the Voir Dire Process**

**Recommendation IX: Consider including all jurors during the Court's voir dire questioning.**

The committee recommends that, when appropriate,  judges consider including all prospective jurors in the voir dire process.  The committee believes that including all members of the jury pool will improve both the jurors' attentiveness and their satisfaction with the process. Questioning all jurors can also help both sides gather more information about all potential jurors. While time constraints are important to consider, the committee believes that the potential jurors will be more satisfied if all of them are included in the questioning process.

*Best Practices*

Judges should consider ways to explain why some potential jurors may be challenged or excused during the voir dire process, so that those who are excused will be less likely to have negative feelings about the juror selection process.

**Goal E: Improve Juror Comprehension**

**Recommendation X: Permit juror note-taking, and provide individual juror trial books in appropriate cases.**

In order to enhance juror comprehension and memory, the committee recommends that the court always provide a means for juror note-taking.  There are a variety of ways to manage the confidentiality of these notes in order to protect against their misuse.  The court can require that jurors not remove their notes from the courthouse and order that notes be destroyed after the trial.

In appropriate trials, juror trial books should be provided.  Trial books can assist juror note-taking and enhance the juror's memory.  Trial books should include the preliminary jury instructions.  Readily available copies of the key exhibits can result in fewer questions from the jury once they have begun deliberations.  When dealing with technical or complicated concepts, it may prove beneficial to include a glossary in the notebooks to enhance juror recall of testimony, increase comprehension, and reduce confusion during deliberation.  The glossary can be prepared jointly by the trial attorneys.

The committee recognizes that technology is rapidly advancing, and many jurors are incorporating these changes into their lifestyles so jurors may wish to use laptops or other electronic devices to take notes.  The committee currently believes that if the judge should choose to permit electronic devices for note-taking, the devices should be provided by the court.

Given the current security concerns associated with jurors' use of electronic devices, the committee recommends that the Ninth Circuit's Information Technology Committee develop a

policy that addresses these issues regarding use of electronic devices by jurors and that the policy be regularly updated as the technology changes.

### *Best Practices*

The committee believes that in cases where juror trial books are utilized, jurors should be provided with identical books containing pertinent information.  The notebooks might contain such items as:  the preliminary instructions, information on trial procedures with instructions about the court's note-taking policy and its policy about asking questions, selected exhibits that have been admitted by the court, a chart of the courtroom so that jurors will know who the different participants are (this is in addition to a recommended introduction by the judge of courtroom staff and the attorneys), a glossary explaining unfamiliar legal terms created in consultation with attorneys, photographs of witnesses as an aid to memory, and curriculum vitae of expert witnesses.

Parties may provide supplemental materials that can be included in the notebooks during the course of the trial.  These notebooks should be available to the jurors during their deliberations.  The court should instruct the jurors on the appropriate use of the notebooks at the beginning of the trial.

### **Recommendation XI:  Permit written questions from jurors during civil trials.**

The committee recommends that in civil trials judges should instruct jurors that they are permitted to submit written questions to the judge.  Submission of questions can improve the jury's level of attentiveness to the trial and may improve their comprehension.

Jurors should always be permitted to submit questions to the court in civil cases.  The judge should evaluate the best strategy for responding to questions depending on the nature of the trial.  The committee recognizes that judges always retain the right to limit or prohibit the submission of questions if the jurors' questions are inappropriate.

Jurors' questions should be submitted to counsel outside the presence of the jury.  After hearing from counsel, if the judge rules that a juror's question can be asked, then a number of options can be considered.  The court can ask the question as submitted or rephrase it if the question needs to be modified before asking.  The court can also permit the lawyers to decide whether or not they will ask the question.  The parties may agree that the judge can give a stipulated answer in response to a juror's question.

In addition, the preliminary instructions should describe the court's policy on juror submitted questions, including an explanation of why some questions may not be asked.  All jurors' submitted questions should be retained by the clerk as part of the court record whether or not the questions are asked.

Judges may fear that if they permit jurors to submit questions the court will be inundated

with them, but the survey data do not support this concern.  In cases where jurors were permitted to submit questions, the average number of questions submitted was three per trial.

**Recommendation XII: Provide all jurors with both preliminary and final jury instructions in written form.**

Jurors should each be given a copy of jury instructions at the time they are being read by the judge.  Both paper copies and electronic displays can be used for this purpose.  During deliberations, each juror should have a copy of the final written instructions.

The questionnaires revealed that most jurors greatly appreciated receiving copies of jury instructions.  The vast majority of jurors reported they received preliminary instructions, but surprisingly, 39 percent of surveyed jurors reported they did not receive individual copies of the final jury instructions.  Of those jurors who were given final jury instructions, 89 percent said the instructions were helpful or very helpful.

It is noteworthy that 18 percent of the jurors who were surveyed indicated that not all of the jurors could agree about the meaning of the final instructions and an additional 15 percent were uncertain about this.  And, 18 percent said there was confusion about how to reach a verdict, with an additional 16 percent uncertain if there was confusion about how to reach a verdict.

**Recommendation XIII: Randomly select alternate juror(s) after closing arguments and instructions**.

The designation of jurors as alternates at the beginning of criminal trials can cause frustration, reduce the alternates' interest in the trial proceedings, and/or reduce the attentiveness of those who are designated as alternate jurors and who may feel that it is unlikely that they will be involved in deliberations.  The potential for alternates to be less attentive than jurors who know they will be deliberating can be problematic if those alternates are, in fact, needed for deliberation and have not been actively engaged in the case.

The committee recommends that alternate jurors should be selected randomly after closing arguments and instructions, immediately before deliberations, both to improve the attention jurors pay to the process and also to promote a sense of fairness.  To this end, the committee requests that the Judicial Conference consider permitting the random selection of alternates by modifying the *Federal Rules of Criminal Procedure*.  Until any rule change occurs, judges are encouraged to seek a stipulation allowing the use of random selection of alternates in criminal trials.

**Recommendation XIV: Encourage attorneys to use technology for the presentation of trial exhibits in order to improve juror comprehension.**

After an exhibit has been admitted into evidence, jurors should be able to view exhibits

12

simultaneously with related testimony.  Research has demonstrated that visual representations can help jurors better understand and remember the facts of the case and should be presented in either electronic or printed form.  Additionally, the survey results indicate that in trials that utilize large screen or overhead displays, desktop monitors, and/or poster boards, most jurors find these aids helpful or very helpful.

### Recommendation XV: Permit juror discussion of evidence as civil trials progress.

Discussing evidence during the course of the trial can improve juror comprehension and reduce requests for the read-back of testimony.  Accordingly, the committee recommends that jurors in civil trials should be permitted to discuss evidence during the trial on condition that all jurors are present in the jury room.  The court should caution jurors to remain open-minded, not to make a decision before all of the evidence is presented, and not to speak about the trial to anyone outside the jury, see *U.S. v. Klee,* 494 F. 2d, 394 (9th Cir. 1974).

In the Arizona Jury Project study, researcher Shari Diamond videotaped and examined the behaviors of jurors who were permitted to discuss evidence during civil trials.  Her research does not lead to the conclusion that allowing jurors to discuss the case during the trial and before final deliberation leads to premature verdicts.[4]  "Some individual jurors did offer positions on verdicts before official final deliberations began," Diamond reports "but what they said did not necessarily match their final verdicts, and no jury arrived at a group verdict before final deliberations."[5]  Additionally, Professor Diamond found that allowing jurors to discuss the case helped to clear up misunderstandings and increased juror comprehension.

### *Additional best practices to improve juror comprehension*

*Jury Tutorials*

Neutral jury tutorials agreed upon by the parties, such as videos that explain complex or technical issues, can improve juror comprehension in complex cases.  One example is the video released by the FJC that provides an overview of the patent process.

*Interim Statements*

For lengthy civil trials, judges should consider allowing  attorneys to make interim statements that can clarify the facts of the case for jurors.  This strategy can help jurors to better

---

[4] Shari Seidman Diamond & Neil Vidmar, *Juror Discussions During Civil Trials: A study of Arizona's Rule 39(f) Innovation* (2002).

[5] Pat Vaughan Tremmel, *Juries are good decision-makers*, Observer Online (news for the Northwestern University Community) (Feb. 9, 2006).

understand the facts of the case and is especially appropriate when the order of expert testimony might complicate the jurors' understanding. One model would allow each side fifteen minutes to use as they wish.

*Back-to-back expert witnesses*

The committee believes that in appropriate cases, the judge should consider taking expert witnesses out of order to allow back-to-back presentation of experts' opinions.

## Goal F. Take Steps to Address Jurors' Personal Concerns Arising from Jury Service

### Recommendation XVI: Incorporate ways to protect juror privacy.

Judges should be especially sensitive to issues of juror privacy both during the voir dire process and during the trial. Jurors can be identified by a randomized number instead of by name. Using juror numbers for identification can eliminate the need for redacting juror names from the record. Judges or court staff can explain to the jurors that they have been assigned a number to protect juror privacy. The jurors can then wear number tags rather than name tags.

Fifty-five percent of surveyed jurors in the Ninth Circuit reported that their full name was used in court, and 24 percent of those who served on a jury reported they were concerned about people knowing their identity.

> "Depending on the nature of the crime, having one's identity revealed to the defendant could influence juror's objectivity."
>
> "I think there will always be some concern about my name being used because it's a criminal case and we found the defendant guilty."

The committee believes that only limited personal information need be elicited during voir dire. For example, it is normally not necessary to know how many children a juror has or what their ages are. It may be important to know what the juror or other adults living in the household do for their employment, if they are employed, or what work they have previously performed, but it is normally not necessary to know the name of the juror's employer or their home address.

> "I did not feel comfortable saying my full name and what city I live in as well as marriage, kids and work in front of defendant and defendant's friends and family."

14

**Recommendation XVII: Address jurors' communication needs.**

Courts should be sensitive to jurors' communications needs on non-court related issues, such as care of family members or work-related matters.  Such communications should be permitted, if security allows, and if communications do not interfere with the conduct of the trial and the jurors' responsibilities.  Jurors may wish to utilize electronic devices during the time that they are at the courthouse but not in trial, such as before the trial day begins and during breaks. For example, working parents depend on being able to be in contact with their children, teachers, and childcare providers.[6]  Similarly, many jurors, including the self-employed, need to be able to utilize any downtime to respond to pressing work inquiries, to keep abreast of work developments, or to contact clients.  Allowing jurors to address work matters can also help mitigate financial hardship.

Jurors increasingly consider cell phones, emails,  PDAs, laptops, and internet access essential to carrying on their daily lives.[7]  Courts' accommodation of these needs to the extent possible consistent with security needs (including internal court computer security) will improve jurors' satisfaction with their court experience.  At a minimum, jurors would like to be informed in advance which electronic devices are allowed in the courthouse.  Additionally, if a courthouse does not allow cell phones or other electronic devices, the court should endeavor to provide safe and accessible places to store such devices so that jurors can use them during breaks, or if necessary, outside the courthouse.

With the increase in electronic devices, the courts should be vigilant in regularly updating their jury admonitions to include rules about electronic devices in the courtroom, during the trial, and during deliberations.  Given the current level and use of technology, the committee believes that privately operated electronic devices should be turned off whenever jurors are in the courtroom. Additionally, because many of today's cell phones and other electronic communication devices have photographic capabilities, the court may wish to admonish jurors that no photographs should be made while they are in the courthouse.

---

[6] For emergencies while the trial is in session, such as a serious accident to a juror's family member, judges may wish to provide jurors with a contact number at the clerk's office or with the courtroom deputy.

[7] Courthouses, especially the newer ones, have few or no public pay phones.  This has resulted in access to cell phones becoming virtually a necessity for communication.  The Jury Trial Improvement Committee requests that the Circuit's IT Committee promulgate a policy to help the courts address this important and rapidly evolving set of issues.

"I was unable to access any unsecured wireless network for the internet.  I could have been more productive with my laptop computer while waiting in the jury lounge. Wireless access would help mitigate time lost from employment while waiting for jury selection in the jury lounge."

"Provide lockers. My phone was an issue. I need it for transportation, but it has a camera. I am willing to relinquish it to security, however they told me I could not bring it at all."

**Recommendation XVIII: Explain to jurors their rights regarding post-trial discussion.**

Judges should tell the jurors that they can talk about the case with anyone they wish at the conclusion of their jury duty, but they also have the right not to talk about the case.  In high profile cases, it may prove beneficial to the jurors to have information presented on possible juror-media post-trial contacts.

In trials in which the content is especially emotionally charged, the court may wish to provide information on professional counseling for the jurors after the conclusion of the trial. As members of a jury, jurors are eligible to utilize the Federal Employee Assistance Program to receive counseling services and/or referrals.

References

Dale Anne Sipes & Mary Elsner Oram, *On Trial: The Length of Civil and Criminal Trials*, 81 (National Center for State Courts 1988).

Shari Seidman Diamond & Neil Vidmar, *Juror Discussions During Civil Trials: A study of Arizona's Rule 39(f) Innovation* (2002).

Pat Vaughan Tremmel, *Juries are good decision-makers*, Observer Online (news for the Northwestern University Community) (Feb. 9, 2006).

17