RANDY S. GROSSMAN
United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
Assistant U.S. Attorneys
California Bar No. 112520/226590
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Fax: (619) 546-0631
Email:Melanie.Pierson@usdoj.gov/Sabrina.Feve@usdoj.gov

CANDINA S. HEATH
Senior Counsel
Texas Bar No. 09347450
Computer Crime and Intellectual Property Section
U.S. Department of Justice
Washington, D.C. 20005
Tel: (202) 307-1049
Email: Candina.Heath2@usdoj.gov

Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>  v.<br><br>JACOB BYCHAK (1),<br>MARK MANOOGIAN (2),<br>ABDUL MOHAMMED QAYYUM (3), and<br>PETR PACAS (4),<br><br>       Defendants. | Case No.: 18cr4683-GPC<br><br>**UNITED STATES'**<br>**CONSOLIDATED RESPONSES**<br>**IN OPPOSITION TO**<br>**DEFENDANTS' MOTIONS IN**<br>**LIMINE TO:**<br>  **(1) PRECLUDE REFERENCE**<br>     **TO SPAM OR SPAMMERS;**<br>  **(2) PRECLUDE REFERENCE**<br>     **TO MANOOGIAN'S**<br>     **ATTORNEY STATUS;**<br>  **(3) PRECLUDE RELIANCE ON**<br>     **THE NORTEL SALE TO**<br>     **PROVE DEFENDANTS'**<br>     **STATE OF MIND;**<br>  **(4) EXCLUDE REFERENCES**<br>     **TO IDENTITY THEFT;**<br>  **(5) PRECLUDE ARGUMENT** |

THAT USE OF DBAs, P.O. BOXES, & EMAIL ADDRESSES WITH FAKE NAMES IS ILLEGAL;
(6) ATTORNEY-CONDUCTED VOIR DIRE;
(7) PRECLUDE REFERENCES TO CERTAIN PEOPLE AS "VICTIM";
(8) EXCLUDE 404(B) EVIDENCE;
(9) PRECLUDE EXPERT TESTIMONY & REQUEST *DAUBERT* HEARING;
(10) LIMIT GOV. CASE-IN-CHIEF TO 11 NETBLOCKS

COMES NOW the plaintiff, United States of America, by and through its counsel, Randy S. Grossman, United States Attorney, and Assistant United States Attorneys Melanie K. Pierson, Sabrina L. Fève, and Computer Crime and Intellectual Property Section Senior Counsel Candy Heath, and hereby files its Consolidated Responses in Opposition to Defendants' Motions in Limine.

## INTRODUCTION

Defendants have filed ten unsealed motions in limine: Motions in Limine Nos. 1 through 9, and an unnumbered motion to limit the government's case-in-chief to the eleven domains and related netblocks listed in Grand Jury Exhibit 251. The defense has also filed a sealed *ex parte* motion that presumably relates to what evidence the government may offer at trial. [ECF No. 348.] The government opposes all but one of the ten unsealed motions in limine, and does not oppose Defendants' Motion in Limine No. 6, which moves for attorney-conducted voir dire. The government also requests an opportunity to be heard on any additional motions seeking to limit the evidence it may present, or arguments it may make, at trial. The government's consolidated responses to defendants ten unsealed

motions in limine are below. To facilitate the Court's review, the following table is provided:

| Def. MIL # | Docket # | Gov. Response |
|---|---|---|
| No. 1 ("Spam" References) | ECF No. 353 | Page 3 |
| No. 2 (Attorney Status) | ECF No. 353 | Page 6 |
| No. 3 (Nortel Transaction) | ECF No. 349 | Page 7 |
| No. 4 ("Identity Theft") | ECF No. 355 | Page 8 |
| No. 5 (DBAs, PO Boxes) | ECF No. 356 | Page 12 |
| No. 6 (Voir Dire) | ECF No. 357 | Page 15 |
| No. 7 ("Victim" References) | ECF No. 358 | Page 15 |
| No. 8 (Rule 404(b)) | ECF No. 360 | Page 17 |
| No. 9 (Experts Witnesses) | ECF No. 359 | Page 21 |
| (No. 10) (Limit Netblock Refs.) | ECF No. 354 | Page 36 |

## POINTS & AUTHORITIES

**1.  (Def. MIL #1) Use of the Term "Spam" is Appropriate**

Defendants' Motion in Limine No. 1 seeks an order "precluding any reference to 'spam'" during trial. [ECF No. 353-1 at 2.][1] While the defense claims that there is a nefarious inference in using the term "spam" and that the term "reeks of criminality," [ECF No. 353-1 at 6], the court should consider the common definitions. In its first entry, Merriam-Webster defines "spam" as "unsolicited usually commercial messages (such as emails, text messages, or Internet postings) sent to a large number of recipients or posted in a large number of places."[2] The second entry is as a verb, spammed or spamming, "to

---

[1] There is a discrepancy between the page numbers in defendants' original briefs and the page numbers in their briefs' ECF headers. Citations herein are to the page numbers in the ECF headers.

[2] https://www.merriam-webster.com/dictionary/spam.

send or post spam to," and the third entry, of course, is "a canned meat product." Oxford Learner's Dictionaries similarly define "spam" as "advertising material sent by email to people who have not asked for it; advertising material on the internet that is not wanted," and a "cooked meat" product.[3] Such definitions do not prejudice the defendant and do not infer nefarious conduct or a criminal enterprise.

The term "spam" is intrinsic to the offense (indeed the statute is called the CAN-SPAM Act) and intertwined with the proof and the evidence of the criminal conduct. In the CAN-SPAM Act charges, one of the elements the government must prove is that the defendants sent a certain number of commercial email messages in a defined period from the netblocks at issue. The word "spam," in all its iterations or as part of organization names (Spamhaus and Spam Cop), will be before the jury – not because the government chose the term, but because the defendants use the terms in the operation of their criminal scheme. In their communications with one another and with others, the defendants and co-conspirators refer to "CAN-SPAM complaints," "Spam warnings," "Spamhaus," "Spam Cop," and use the word "spam" or iterations thereof. The terms "spam" and "spammer" are entrenched in the vernacular used by the defendants and co-conspirators, and the persons or entities complaining about or attempting to prevent spam.

For example, Company A, the defendants, and the coconspirators routinely received email notifications from "BlackMail Report Generator," which produced daily reports identifying the volume of emails delivered, the "clicks" generated by the emails, and the IP ranges used to send the emails. The government produced over 18,700 reports from the BlackMail Report Generator in discovery. The BlackMail Report Generator also counted the number of emails that "bounced" and broke them down by category, including one entitled, "spam-related." For example, on January 26, 2014, the BlackMail Report Generator reported 8.7 million emails delivered and 1,990,670 bounced as "spam-related." (AMOBEE0069636-642.) In emails between defendants and hosting companies, the term "spam" and "spammers" was used repeatedly. (ADCONION-HOSTWINDS-14-002-

---

[3] https://www.oxfordlearnersdictionaries.com/us/definition/english/spam_1.

00007;    ADCONION-HOSTWINDS-14-003-00001.)    Moreover,    the    defendants themselves received complaints regarding "spam" from consumers, who sent their complaints to the email addresses the defendants created under false names to list as the point of contact for the domains controlling the hijacked IP addresses. (AMOBEE0046956.) The jury cannot properly receive the evidence in this case without seeing the word "spam" repeatedly.

In *Phillips v. NetBlue ,Inc.,* 2007 WL 528722 *5 (N.D. Cal., Feb. 13, 2007), the court rejected a motion *in limine* seeking to prohibit the use of the word "spam." In denying the motion, the court found that "[t]he word "spam" is one of common usage, with a commonly understood meaning. The CAN-SPAM Act, itself, uses the word." *Id.* (citing 15 U.S.C. § 7703(c)). *Id.* Drawing an analogy to murder, the court reasoned,

> [W]hen a defendant is charged with murder, the government tries to prove that the defendant committed the murder, and the defendant tries to refute that accusation. It does not, in the latter example, make the government's use of the word "murder" unfairly prejudicial simply because the word has a negative connotation; its negative connotation has the same source as the prohibition against the behavior it describes.

*Id. Phililips* went on to state that the expert's use of the word "spam" would assist the jury to "make sense of the complicated technical testimony" and therefore had "a significantly probative aspect which is not substantially outweighed by the danger, if any, of it having an unfairly prejudicial effect."

"Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." Advisory Committee's Notes on Fed. Rule Evid. 401, quoted in *Huddleston v. United States*, 485 U.S. 681 (1988); *see also United States v. Vallejo*, 237 F.3d 1008, 1015-16 (9th Cir. 2001). The standard for relevance is a low one. The evidence need only have the tendency to prove or disprove a disputed fact. *United States v. Martinez*, 938 F.2d 1078 (10th Cir. 1991); *see also Crawford v. City of Bakersfield*, 944 F.3d 1070, 1077 (9th Cir. 2019). The terms contested by the defense, "spam" or "spammers," are relevant to the

allegations set out in the indictment and the anticipated proof in this case. The term "spam" is a commonly used shorthand for bulk commercial emails, which the government should be able to use at trial, just as the defendants used the term in conducting business. Accordingly, this motion should be denied.

## 2.  (Def. MIL #2) Defendant's Educational Background is Admissible

Defendants' Motion in Limine No. 2 seeks an order "precluding all references at trial to the fact that Mark Manoogian is an attorney, that he attended law school, or that he represented Company A in any capacity as an attorney…" [ECF No. 353-1 at 3.] Defendant Mark Manoogian fails to cite any authority in support of his proposition that his educational background, or the educational background of any defendant, is not relevant to the jury's consideration of a defendant's intent to purposefully engage in the alleged conduct. Evidence of a defendant's education and training are probative when considering whether a defendant has the appropriate *mens rea* for the offenses charged. "[T]he trier of fact may properly consider the general educational background and expertise of the defendant as bearing on the defendant's ability to form the requisite" intent. *United States v. Fletcher*, 928 F.2d 495, 501-1 (2nd Cir. 1991). The defendant in *Fletcher*, like defendant Manoogian, was a non-practicing attorney. In proving willfulness in tax cases, for example, courts have held that the educational background or prior work experience of a defendant is clearly relevant. *United States v. Daugerdas*, 2010 WL 4967878 *3-4 (S.D. N.Y. Nov. 22, 2010) (defendant's prior experience as a partner at an accounting firm is relevant to the issue of his knowledge and intent) (citing *Cheek v. United States*, 498 U.S. 192, 201 (1991)); *see also United States v. Klausner*, 80 F.3d 55, 63 (2nd Cir. 1996) (defendant's "background as a CPA and his extensive business experience ... demonstrated that he was aware of his duty to report his income taxes").

Just as common sense suggests that the jury can consider a myriad of factors including educational background and work experience when evaluating *mens rea* and determining the lack of ignorance, mistake, or accident, the defendant's lack of education also can be considered by the jury as a mitigating factor. *United States v. Price*, 623 F.2d

587, 592 (9th Cir. 1980) (defendant's lack of business experience and lack of higher education are evidence of lack of intent in mail fraud case). *See also Brown v. Thaler*, 2011 WL 798391 *15 (S.D. Tex. Feb. 28, 2011); *Duffy v. Beard*, 2011 WL 4401681 *8 and 13 (M.D. Penn. Sept. 12, 2011). Accordingly, this motion should be denied.

### 3. (Def. MIL #3) The Nortel Evidence Should Not Be Excluded or Limited

Defendants' Motion in Limine No. 3 seeks to preclude the government from using the difference between what the defendants paid for the hijacked GetAds netblocks (approximately $2 per IP address) and what Microsoft paid for Nortel Networks' netblock (approximately $11 per IP address) as evidence that defendants knew or should have known they were buying stolen goods. [ECF No. 349-1 at 8-9.] The defense contests the government eliciting testimony or evidence regarding the Nortel/Microsoft transaction under Federal Rules of Evidence (FRE or Rule) 104(b)[4] and 403, which occurred during the pendency of the alleged conspiracy. [*Id.* at 9.]

Defendants' first argument is that the government must prove that the defendants were "not only aware of the Nortel Transaction" but also that the transaction represented the fair value of an IP address at the time to satisfy Rule 104(b)'s conditional relevance. [*Id.*] This argument misstates the legal standard for relevance, which is having a "tendency to make a fact more or less probable." Fed. R. Evid. 401(a); *see also* Rule 403 Advisory Committee Notes ([it "is not to be supposed that every" witness or piece of evidence "can make a home run"). Even so, Company A emails from November 2012 show that defendants Manoogian, Bychak, and Mohammed were aware of the Nortel/Microsoft transaction and were using the same netblock brokerage company that had represented Nortel to help defendants find IP addresses they, too, could buy or lease. (ADCONION-EMAILS-MM-00019311-314.) As to the appropriateness of the price paid by Microsoft

---

[4] FRE 104(b): Relevance That Depends on a Fact. When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.

*Government's Consolidated Response & Opposition to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

for the "exclusive rights to use and transfer" the Nortel netblock, the Delaware bankruptcy court had to sign off on the netblock transfer, which signals that the judge found the pricing was fair. [ECF No. 349 at 7.]

Defendants' Rule 403 argument that the price defendants paid for the misappropriated GetAds netblocks is unduly prejudicial is similarly unsupported. The courts have a long history of admitting price information as evidence a defendant knew goods were stolen or misappropriated. *See, e.g., Adolfson v. United States*, 159 F.2d 883, 886-87 (paying a "price disproportionate to" an item's value is permissible circumstantial evidence that defendant knew the item was stolen); *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1180 (9th Cir. 2018) ("unusually low" purchase price was circumstantial evidence that data was stolen); *United States v. Shalash*, 108 F.App'x 269, 286 (6th Cir. 2004) (below-market price is evidence that goods were stolen); *United States v. Smith,* 502 F.2d 1250, 1254 (5th Cir. 1974) (same); *Melson v. United States,* 207 F.2d 558 (4th Cir. 1953) (same). Defendants' assertions that the jury will be confused because Microsoft is bigger, in a different state, and in a different sector of the economy, or somehow blinded by Microsoft's "overall influence" are speculative. Their motion to preclude the government from referring to the Nortel purchase should therefore be denied.

## 4. (Def. MIL #4) Evidence of False Identities is Probative and Admissible

Defendants' Motion in Limine No. 4 seeks "an order precluding the government from presenting evidence, testimony, statements or arguments concerning the uncharged crime of identity theft." [ECF No. 355-1 at 3.] The heart of the fraud in the indicted charges is the defendants' use of Letters of Authorizations (LOAs) sent under false signatures, on behalf of the registrants, supposedly authorizing the defendants to use the hijacked IP addresses. Some of the LOAs involved the forged signature of an actual person listed as the point of contact on the registry for the IP addresses (such as SAD). Other LOAs involved the signature of a fictitious person created by the coconspirators to represent the registrant without the registrant's approval. These forged and fictitious signatures are

critical evidence of criminal intent that the government must be able to present to the jury to establish the elements of the offenses charged.

The defendants in this case are charged with conspiracy (18 U.S.C. §371), wire fraud (18 U.S.C. §1343) and electronic mail fraud (18 U.S.C. §1037). To prevail on the counts charging electronic mail fraud, the government must prove that the defendants "falsely represent[ed] themselves to be the registrant and legitimate successor in interest to the registrant of 5 or more Internet Protocol addresses," which were then used to send spam. The wire fraud charges require the government to prove that the defendants "knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Ninth Circuit Model Jury Instruction 15.35. The indictment alleges the false or fraudulent representations to be "letters to internet hosting companies fraudulently making it appear that the registrant of the IP addresses had authorized the defendants' use of the IP addresses." [ECF No. 1, para. 6.] All the charges require the government to prove that the defendants and their co-conspirators falsely represented themselves to be someone they were not to gain control of the netblocks.

Evidence of identity theft has been admitted as evidence of criminal intent in prosecutions for mail fraud, wire fraud, and bank fraud, where no charges of identity theft were brought, when the evidence explained how the defendant committed the charged offense. In *United States v. Arriaza*, 561 Fed Appx 635 (9th Cir. 2014), in a prosecution for wire fraud, the court upheld the use of "documentary and testimonial" evidence that the defendant "created and processed fake documents" and "notarized documents with the forged signatures of people whose identities had been stolen" as evidence of criminal intent showing the method of committing the fraud. In *United States v. McNeil*, 320 F. 3d 1034, 1039 (9th Cir. 2021), in a prosecution for bank fraud and wire fraud, the court admitted evidence the defendant had "used fake identification to open a bank account in Doe's name and misrepresented himself as Doe to the bank" as evidence of criminal intent, explaining how the offenses were committed. In *United States v. Thompson*, 221 Fed Appx

*Government's Consolidated Response & Opposition*
*to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

622, 623 (9th Cir. 2007), in a prosecution for bank fraud and possession of stolen mail, the court approved the admission of the defendant's "other identity theft-related activities" as evidence of criminal intent under FRE 404(b), where the identity theft was not a part of the offenses charged.

The defense argues that because the defendants have not been directly charged with aggravated identity theft (18 U.S.C. §1028), all "evidence, testimony, statements or arguments" on the subject should be excluded under FRE 403. [ECF No. 355-1 at 6.] This argument ignores the powerful probative value of the defendants' misappropriation of the identity of others as evidence of criminal intent, which goes to the element of a material misrepresentation for wire fraud. While the government is not arguing that the defendants committed the uncharged crime of identity theft, the government does intend to present evidence and argument to the jury that asks jurors to infer intent to defraud when a defendant signs the name of another to a document which allows him to take control of property, knowing he lacks authorization to do so. Indeed, the court in *Thompson* noted that the court properly exercised its discretion when admitting the evidence of other uncharged "identity theft-related activities" after balancing the considerations under FRE 403.

The cases cited by the defense are easily distinguishable. The defense cited *United States v. Rojas*, 2014 WL 12695689 (N.D. Iowa, Oct. 15, 2014), in support of the notion that evidence of false identification was evidence of propensity, rather than evidence of the charged offenses. In *Rojas*, the defendant was charged with fraudulent use of credit cards. The court granted the defense motion *in limine* to exclude evidence that the defendant used false identification to work at a Tyson facility, finding that "Rojas's use of false identification in other circumstances and for other purposes" had little probative value. In this case, the evidence of defendants' use of other people's identities in the LOAs relates directly to the offenses charged involving the netblocks, rather than to an ancillary or unrelated issue, and accordingly is admissible to show criminal intent.

The defense also cites *United States v. Gatewood*, 601 Fed. Appx 580, 582 (9th Cir. 2015) as holding that the district court erred in admitting other acts evidence, which is incorrect. The defense citation is to the dissenting opinion; the panel's majority upheld the admission of the other acts evidence. The defense's citations to *United States v. Hodges*, 770 1475 (9th Cir. 1985) and *United States v. Bradley*, 5 F. 3d 1317 (9th Cir. 1993) are also inapposite. In *Hodges*, the evidence at issue involved allegations of extortion with threats of physical harm that happened after the offenses charged in the indictment, while in *Bradley*, the court examined evidence of an uncharged homicide. Like the other cases cited by the defense in support of this motion, the evidence at issue in those cases "other act evidence" that sought to be admitted under FRE 404(b), and not evidence directly related to and intrinsically intertwined with the charged offenses, as in this case here. It is impossible to explain to the jury how the defendants came to control the netblocks and use them to send spam without also explaining that they sent LOAs under the names of others, falsely stating they were authorized by the registrants to use the netblocks. The evidence of the defendants' use of identities other than their own is not "other act evidence" of the uncharged offense of identity theft offered under FRE 404(b), but instead is direct evidence of the offenses charged in the indictment, and strong evidence of criminal intent.

The Ninth Circuit has noted that "[r]elevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored or sanitized for the occasion, the application of Rule 403 must be cautious and sparing." *United States v. Hankey*, 203 F. 3d 1160, 1172 (9th Cir. 2000) (citation omitted). Defendants' sole legal citation to support their claim that evidence of identity theft creates unfair prejudice that causes jurors to react improperly and emotionally is the *Rojas*, an Iowa district court decision. A Central District of California court, however, has found that "identity theft is not the kind of evidence that would appeal to a jury's sense of outrage or horror, thereby provoking a desire to punish Defendant regardless of the evidence presented." *United States v. Hardgraves*, 2015 WL 13389947

*2 (C.D. Cal. Feb 10, 2015); *see also United States v. Duranseau*, 19 F.3d 1117, 1120-21 (6th Cir. 1994) (probative evidence of defendants' use of aliases and stolen identities outweighed any prejudice). Accordingly, evidence that the defendants used names other than their own to falsely claim they were authorized by the registrants to use the netblocks in this case is relevant, probative of criminal intent, inextricably intertwined with the charged offenses and admissible. Accordingly, this motion should be denied.

5.  **(Def. MIL #5) Evidence of DBAs, P.O. Boxes, and Emails Under Different Names is Not Unduly Prejudicial or Grounds for a Limiting Instruction**

Defendants' Motion in Limine No. 5 seeks: 1) to "preclude the government from framing its evidence and argument in a way that suggest that the use of DBAs, post office boxes, and email addresses under different names is illicit conduct indicative of guilt," and 2) for the Court to "instruct the jury that the mere use of DBAs, post office boxes, and email addresses under different names are lawful and common business practices." [ECF No. 356-1 at 7.] Defendants' motion to limit how the government may "frame" the defendants' use of DBAs, post office boxes, and email addresses under different names is factually and legally unsupported. The factual error is that Defendants' motion incorrectly states that, in a recent meet and confer, the government "conceded that the use of DBAs, post office boxes, and email addresses under different names are lawful and common practices" and "does not contend that the use of DBAs, post office boxes and email addresses under different names is unlawful." [ECF No. 356-1 at 3, 6.] After receiving defendants' motion and supporting declaration, the government discussed the meet and confer representations with defense counsel, who has graciously agreed that the government may correct the record as follows: during the meet and confer, defense counsel did not mention, and the parties did not discuss, defendants' use of email addresses under different names, let alone agree that this practice was lawful or common. As for the DBAs and post office boxes, the parties agree that government did state in the meet and confer that there was nothing inherently illegal about the use of DBAs or post office boxes, but the government argued that it was these items' use in furtherance of the scheme that was

improper. The government therefore did not "concede" that DBAs or post office boxes are common practices that it could not contend were unlawful or illicit. Defendants' "request that the Court hold the government to its representations by precluding the government from framing its evidence and argument in a way that suggest that the use of DBAs, post office boxes, and email addresses under different names is illicit conduct" should therefore be denied. [ECF No. 356-1 at 6.]

Defendants' alternate argument for limiting the government's "framing" of this evidence is that it will violate Rule 403. They argue that "because Company A's use of DBAs, post office boxes, and email addresses under different names is a common and legitimate business practice, evidence of this practice is likely to confuse the issues in this case." [ECF No. 356-1 at 6.] Defendants' concern that the jury will "confuse legitimate business practices with evidence of guilt," [*id.*] is unfounded. DBAs, post office boxes, and email addresses are not the type of evidence that "lure[s] the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). In the instant case, the government contends that the large number of DBAs and post office boxes used by the defendants was unusual and, along with defendants' concerted efforts to hide the identity of who was using the hijacked IP addresses to send spam, evidence of their knowledge and intent. Business practices that may be lawful can nonetheless be "probative of fraudulent intent." *United States v. Joetzki*, 952 F.2d 1090, 1094 (9th Cir. 1991). As for defendants' use of email addresses bearing stolen identities or fake names, the government's position is that this practice is neither common nor presumptively lawful. It is, however, also not unduly prejudicial. *See, e.g., Hardgraves*, 2015 WL 13389947 at *2; *Duranseau*, 19 F.3d at 1120-21.

Finally, neither of the two cases cited by the defense justify their request for a jury instruction "that the mere use of DBAs, post office boxes, and email addresses under different names are lawful and common business practices." [ECF No. 356-1 at 7.] In *United States v. Lui*, 941 F.2d 844, 848 (9th Cir. 1991), the Ninth Circuit ruled that a DEA Agent's testimony regarding drug courier profiles was unduly prejudicial. The government

is not introducing profile evidence in this case, so no corresponding limiting instruction is needed. *United States v. Marr*, No. 14-CR-00580-PJH, 2017 WL 1540815, at \*22 (N.D. Cal. Apr. 28, 2017) was a Sherman Act conspiracy involving bid rigging where the government alleged that defendants' participation in preliminary bidding rounds leading up to the ultimate auction price were overt acts that were themselves illegal. The district court, after pointing out that "overt acts need not be unlawful," disagreed with the government that the preliminary bids were themselves unlawful, ordered the parties to confer on a revised bid rigging jury instruction, and cautioned that, if the government made this argument at trial, the court would give a limiting instruction that the preliminary bidding rounds were not "illegal activities in and of themselves," the "defendants are not charged with a separate crime for participating in the rounds," and the early bidding round were alleged "to have been conducted in furtherance of the bid rigging conspiracy." *Id.*

Here, the government is not arguing that that DBAs, post office boxes, and email addresses are "illegal activities in and of themselves," rather, this evidence of defendants' concerted efforts to hide their true identities behind DBAs and post office boxes, while also using fake and stolen identities in emails and LOAs, bears directly on their knowledge and intent to defraud. In this case, the defendants did not use obviously fake or silly names; they used the names of real people they needed to impersonate, or names that seemed like real employee names, to lead others to believe that they were the netblocks' rightful registrants – which is evidence of an intent to defraud or cheat. To deflect such scrutiny, defendant's proposed instruction deviates from *Marr*'s tentative instruction that on overt act was *not* illegal, but done in furtherance of something illegal, and instead requests the Court impermissibly render a factual finding that DBAs, post office boxes, and email addresses with different names are "common," along with an affirmative legal determination that such practices are universally lawful. Such an instruction would invade the province of the jury and misstate the law and should not be adopted. Accordingly, this motion should be denied.

**6.  (Def. MIL #6) Attorney-Conducted Voir Dire**

The government does not oppose Defendants' Motion in Limine No. 6 requesting Attorney-Conducted Voir Dire. [ECF No. 357.]

**7.  (Def. MIL #7) Use of the Term "Victim" is Appropriate**

Defendants' Motion in Limine No. 8 seeks "an order precluding the government and its witnesses from referring to any individuals as 'victims.'" [ECF No. 358-1 at 8.] To prevail on the charges of wire fraud, the United States must prove the defendants had an "intent to deceive and cheat." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020). Merriam-Webster defines victimizing as (1) "to make a victim of" and (2) "to subject to deception or fraud: cheat." There is no single word other than "victim" that better represents or describes one who was defrauded, deceived, or cheated.

"No clearly established law holds that a prosecutor or a witness cannot call an alleged victim a victim." *Dillard v. Glebe*, No. C14-5026 RJB, 2014 WL 1910001, at *9 (W.D. Wash. May 12, 2014). Courts have permitted the Government to refer at trial to persons or entities who were harmed by the charged crimes as "victims," holding that the Government's use of the term would not be unfairly prejudicial or misleading. See, e.g., *United States v. Pumpkin Seed*, 2008 WL 11450454 (D. S.D. Feb. 22, 2008) ("The Court believes that jurors understand that the Government's position is that a crime in fact occurred, and that the Government's references to … 'victim' [is] merely [a] restatement[] of this party's position in the adversarial contest. Even jurors new to the courtroom are unlikely to be misled or confused by the Government's use of the word 'victim' to describe the alleged victim in this matter."); *United States v. Spensley*, 2011 WL 165835 (C.D. Ill. Jan. 19, 2011) ("The jury will not be unfairly inflamed or prejudiced against Defendant if [he/she] is referred to as a victim …. The court is confident that the jury will be able to fairly judge the case and will follow the court's instructions to it on (1) the government's burden of proof and (2) the Defendant's presumption of innocence."); *United States v. Martinez*, 616 F.2d 185, 187 (5th Cir. 1980) ("A prosecutor is permitted to state what he believes to have been established by the evidence and to comment fairly upon it."); *United*

*States v. Gibson*, 690 F.2d 697, 703 (9th Cir. 1982) ("Because of the losses incurred by these investors, the prosecutor's use of the word 'victim' was fair comment on the evidence.").

Similarly, using the word "victim" is not prejudicial to the defendants when used in the jury instructions. *United States v. Washburn*, 444 F.3d 1007, 1013 (8th Cir. 2006); *see also Server v. Mizell*, 902 F.2d 611, 615 (7th Cir. 1990); *United States v. Granbois*, 119 Fed.Appx. 35, 38–39 (9th Cir. 2004) (Use of the term "victim" in the jury instructions did not mislead the jury into assuming that the defendant was guilty, considering the entirety of the jury instructions).

Just as referring to a defendant as a "defendant" carries with it no presumption of guilt, neither does referring to a victim as a "victim." Thus, the defense's claim that using the term "victim" "would turn the presumption of innocence on its head" is unfounded. [ECF No. 358-1 at 5.] The mere use of the term "victim" does not prejudice the defendants, as "[i]t is rather the manner, context, and frequency in which the term–or any term–is used that can transform a term or question in an argumentative direction." *United States v. Perez*, 2014 WL 12689229, at *9 (C.D. Cal. May 15, 2014) (unpublished mem. decision).

In its motion, the defense relied solely on two cases to support its attempt to eliminate the term "victim" from the parties' or the witnesses' vocabulary during trial, those being *United States v. Idaho Cnty. Light & Power Coop. Assoc., Inc*., 2020 WL 1105091 (D. Idaho Mar. 6, 2020) and *United States v. Lalley*, 2010 WL 3946659 (D. N.J. Oct. 5, 2010). Neither case supports the defense position. In the first case, unlike this case, the government agreed not to use the term "victim." The opinion did not explain why the government agreed, *Idaho Cnty. Light & Power Coop. Assoc., Inc*., 2020 WL 1105091, at *7, so the defense's conjecture that the reason was because "this term is so prejudicial" is both speculative and misleading. [ECF 358-1, p. 6] In the second case relied upon by the defense, the court struck the term "victim" from the indictment. Striking the term "victim" from the indictment was appropriate in that case because the defendant was charged with obstructing a grand jury investigation in violation of 18 U.S.C. § 1512, and the references

*Government's Consolidated Response & Opposition
to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

in the indictment to "victims" were only related to the allegations under investigation by the grand jury, and not to the essential elements of the charged conduct (obstruction). *Lalley*, 2010 WL 3946659, at *3-4. Accordingly, this motion should be denied.

**8.  (Def. MIL #8) The 404(b) Evidence of the AFRINIC Netblocks is Admissible**

Defendants' Motion in Limine No. 8 requests an order to "exclude the government's 404(b) evidence." [ECF No. 360-1 at 9.] Defendants' analysis and argument focus on hijacked African IP netblocks but nonetheless also move to exclude evidence pertaining to the hijacked GetAds netblocks acquired by the defendants through Dye that were not charged in the substantive wire fraud and CAN-SPAM counts, but that are part of the larger conspiracy.

a. Introduction

The defense has known about the evidence showing their clients hijacked IP addresses allocated to Africa for over two years. On December 16, 2019, the government produced a single document in discovery consisting of a South African news article about hijacked African IP addresses, that listed three AFRINIC[5] netblocks previously acquired and used by the defendants (the "AFRINIC netblocks"). On January 13, 2020, the government produced 19 documents in discovery, which solely consisted of documents pertaining to the AFRINIC netblocks. The first document in the production was a five-page writeup summarizing the December 2019 news article and how the accompanying emails and LOAs showed the defendants had paid $89,600 to acquire and use the hijacked AFRINIC netblocks by submitting forged LOAs to Hostwinds, the same provider to whom they had also submitted forged LOAs for the GetAds netblocks. The emails included drafts of the forged LOA that defendant Mark Manoogian sent both to himself, and to coconspirators Jake Bychak and Abdul Mohammed along with the message, "looks official." The accompanying documents also showed that defendant Manoogian provided

---

[5] AFRINIC is the official registry of internet numbers in Africa.

the forged LOA to Hostwinds, who "announced" it and, in turn, received written notice that the associated netblock was "hijacked."[6]

The United States filed notice of its intent to use this evidence pursuant to FRE 404(b) on March 18, 2022, over two months before trial. The defense thereafter filed its motion to exclude this evidence. Their motion did not address in the four-part test for admissibility of evidence under FRE 404(b) set forth in *United States v. Bailey*, 696 F.3d 794, 799 (9th Cir. 2012). Instead, the defendants argue that the evidence should be excluded because the notice was untimely, inadequate, and the evidence is more prejudicial than probative under Rule 403.

b. The Government's Notice was Timely.

Notice provided over two months before trial is timely. *See United States v. Martin*, 2009 WL 997396 *4 (C.D. Cal. Apr. 14, 2009) (official 404(b) notice provided three weeks before trial is timely; *Commonwealth v. Blas*, 2018 WL 2025746 (N. Mariana Is, Apr. 30, 2018) (notice of 404(b) evidence ten days before trial was timely, especially when defendant had the evidence eight months earlier); *United States v. DeAnda*, 2019 WL 2863602 *2 (N.D. Cal. July 2, 2019) (notice of 404(b) evidence four weeks before trial is timely; *United States v. Giacomini*, 2022 WL 393194 (N.D. Cal., Feb 9, 2022) (filing of 404(b) notice 53 days before trial is "more than sufficient notice"). The timeliness of the notice should be evaluated in light of the fact that the defense has been in possession of the evidence related to the AFRINIC netblocks for over two years, and the majority of the evidence was provided in a discrete production with a detailed overview, not buried amidst millions of other unrelated pages of discovery.

c. The Government's Notice was Adequate.

The defense complains that the "government has failed to identify the exhibits and witnesses it would introduce in support of the AFRINIC netblocks." [ECF 360-1, p.3-4.] FRE 404(b) does not require such specificity. "Rule 404(b) requires just two things:

---

[6] Defendants' brief correctly refers to the January 13, 2020, production as "discovery production no. 17." [ECF No. 360-1 at 6.] This production consisted of 33 pages total.

*Government's Consolidated Response & Opposition to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

(1) that, "before trial," the Government "provide reasonable notice" of its intended Rule 404(b) evidence, and (2) that the Government provide notice of "the general nature of any such evidence." Fed. R. Evid. 404(b)(2)(A) & (B). "These requirements do not translate into a rule that the Government *immediately* identify the *particular* Rule 404(b) evidence it intends to use at trial." *United States v. Nance*, 168 F. Supp. 3d 541, 549 (W.D. N.Y. 2016) (emphasis in original). "Nothing in Rule 404(b) requires the government to identify the witnesses who will testify about the Rule 404(b) evidence or the tangible evidence upon which the government may rely to introduce the Rule 404(b) evidence." *United States v. Graham*, 468 F. Supp. 2d 800, 802 (E.D. N.C. 2006). The notice provided by the United States provides reasonable notice of the general nature of the evidence, which is all the Rule requires. Moreover, the United States provided even more specificity in its motion to admit 404(b) evidence and pointed defendants to the January 13, 2020, discovery production that included the overview and primary supporting documents. Accordingly, the defense is well aware of the nature of the evidence the government seeks to present.

### d. The Government Identified Proper Purposes for the 404(b) Evidence.

Government counsel advised the defense during the meet and confer that it intended to present some of this 404(b) evidence through the testimony of the representative of Hostwinds, the hosting company that announced many of the GetAds netblocks, who received the complaint that the AFRINIC netblocks were hijacked and discussed the complaint with the defendants (who continued thereafter to use the netblocks nonetheless), along with emails and other Company A records related to the transactions. This evidence proves criminal intent as well as evidence of absence of mistake or accident regarding the GetAds netblocks.

It is anticipated that the defendants will argue that they were misled by co-conspirators Dye and Tarney regarding their authorization to use the GetAds netblocks. The evidence of how the defendants handled the AFRINIC netblocks, which did not involve either Dye or Tarney, proves that it was no mistake or accident that the defendants

used the GetAds netblocks and in fact knew they lacked authorization from the registrants. It is further anticipated that the defense will argue that the LOAs submitted under the signatures of others were all created by Dye or Tarney. The defendants submitted a LOA signed by "A.S.Y.," supposedly authorizing their use of the AFRINIC netblocks. This will provide further proof that it was no mistake or accident (caused by Dye or Tarney) that the defendants provided the false LOAs for the GetAds netblocks, but instead that the defendants intended to use the false LOAs to deceive hosting companies into believing they were authorized to use the netblocks, providing further evidence of criminal intent. As the Ninth Circuit noted in a case cited by the defense, based on the 404(b) evidence "the jury could reasonably have concluded that [the defendant] did not fall prey twice to the criminal plots of others, but, rather, knowingly and intentionally" committed the charged offenses. *United States v. Plancarte-Alvarez*, 366 F.3d 1058, 1063 (9th Cir. 2004), *opinion amended on denial of reh'g,* 449 F.3d 1059 (9th Cir. 2006) (other grounds). Accordingly, the evidence is offered for a permissible purpose (evidence of knowledge, intent, plan and absence of mistake or accident) and should be admitted.

### e. The Evidence Should Not be Excluded Under Rule 403.

The defendants ask the court to exclude the evidence of the AFRINIC netblocks,[7] simply listing the reasons for possible exclusion within the Rule with virtually no further explanation, and no description of any undue prejudice. The introduction of evidence on the AFRINIC blocks will cause no undue delay or waste of time, as it will be presented

---

[7] In two sentences in the motion, the defense addressed the six netblocks acquired through Dye that were not charged in the substantive counts but were listed in Grand Jury Exhibit 251, arguing they would "dramatically expand the scope of what would otherwise be a succinct and short trial." This is not the case, as the evidence of these additional six GetAds netblocks, like the evidence relating to the AFRINIC netblocks, will be primarily presented by witnesses who will testify about the netblocks charged in the substantive counts, presenting emails and other Company A documents, with the brief exception of witnesses needed to prove that the LOAs were forged. The government has also repeatedly represented its intention to use the netblocks listed in Grand Jury Exhibit 251, which defendants' Motion in Limine No. 1 recognized. [ECF No. 354-1 at 2-3 (seeking to limit IP addresses to those listed in Grand Jury Exhibit 251)].

*Government's Consolidated Response & Opposition
to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

primarily by witnesses who will already be testifying regarding the GetAds netblocks, Company A records and emails, and defendants' interactions with Hostwinds (the hosting company that announced both the AFRINIC netblocks and multiple GetAds netblocks). It will not be a source of confusion, as the court can give a limiting instruction, indicating the proper purposes for which the jurors can consider such evidence. "[A]n appropriate instruction limiting the purpose for which the jury could consider evidence of a defendant's prior conviction" is a factor weighing in favor of admission of Rule 404(b) evidence. *United States v. Montgomery*, 150 F.3d 983, 1001 (9th Cir. 1998), citing *United States v. Arambula-Ruiz*, 987 F.2d 599, 604 (9th Cir. 1993). Accordingly, the probative value of the evidence far outweighs any dangers described by the defense, so the evidence should be admitted. Therefore, the defendants' motion should be denied.

## 9.  (Def. MIL #9) Expert Testimony is Proper & a *Daubert* Hearing is Unwarranted

Defendants' Motion in Limine No. 9 seeks to "partly or entirely preclude the proposed expert testimony" of seven witnesses: Jennifer Rexford, John Curran, Sean Zadig, Michael Ward, Ried Zulager, Peter Holden, and the GoDaddy Custodian of Records. [ECF No. 359-1 at 6.] This motion should be denied.

On March 10, 2022, the government noticed four expert witnesses who would not testify as percipient or lay witnesses, one of whom is Jennifer Rexford, the Chair of Princeton's Computer Science Department. [ECF No. 340 & 341.] For the reasons discussed below, Professor Rexford's testimony is relevant, reliable, and would help the jury better understand the evidence and determine facts in issue. Her testimony, which relies on her knowledge and experience, rather than a methodology or theory, does not require a hearing under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S 579, 589 (1993), and can be ruled upon based on the notice previously lodged with the Court or via voir dire. Defendants' Motion in Limine No. 9 does not challenge any of the government's other designated expert witnesses. [ECF No 359-1.]

In "an abundance of caution," the government also provided notice that six government witnesses would testify regarding "various aspects of their employment" with

Internet Service Providers (ISPs) whose businesses are technical in nature and therefore, arguably, involve "specialized knowledge" that requires pre-trial expert notice under Rule 702. [ECF No. 342 at 2.] These six witnesses are: John Curran, Sean Zadig, Michael Ward, Ried Zulager, Peter Holden, and a subpoenaed GoDaddy Custodian of Records (whom GoDaddy has yet to name). The government does not intend to qualify these six witnesses as experts and does not believe their testimony requires them to be so designated. To the extent that defendants believe that terms like "the Internet," "router," "URL," and "web address" are, in 2022, "not the purview of scientific, technical, or specialized opinion," [ECF No. 359-1 at 11], the parties  agree that employees who testify regarding evidence arising in the course of their employment with technology companies and organizations like ARIN, Yahoo, Cogent, and GoDaddy may do so as lay witnesses.

a. <u>Legal Background</u>

Rule 701 governs lay opinion testimony and provides that, if a witness is "not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 702, in turn, allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. An expert witness may provide opinion testimony if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702

Despite this seemingly stark distinction between expert and lay testimony, the Advisory Committee's notes make clear that the 2000 amendments to Rules 701 and 702 was not intended to prevent percipient witnesses from testifying about things outside the knowledge of ordinary jurors (e.g., the practices of a particular business or industry) without being forced to be qualified as an expert:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of a business without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The [December 1, 2000] amendment does not purport to change this analysis.

Rule 701 Advisory Committee Notes regarding 2000 Amendments.

Consistent with this Advisory Committee note, lay witnesses may testify to conclusions and opinions based on a combination of their personal observations of the subject matter at issue and skills, knowledge, or experience obtained through their vocation. *See e.g., United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014) (law enforcement officers can offer lay opinion testimony based on their "wealth of personal information, experience, and education"); *United States v. Martinez*, 657 F.3d 811, 818–19 (9th Cir. 2011) (upholding admission of lay testimony on the meaning of coded communications by a former member of the Mexican Mafia after establishing the member's "long experience in writing notes for the organization"); *United States v. Crawford*, 239 F.3d 1086, 1090-91 (9th Cir. 2001) (lay witness could opine on meaning of a university's use of a term, based on his experience as university employee); *L.A. Times Commc'ns, LLC v. Dep't of Army*, 442 F. Supp. 2d 880, 887 (C.D. Cal. 2006) (lay witness could testify to consequences of publishing information based on witness's employment and experience within the U.S. Army) (citing *Crawford*, 239 F.3d at 1090-91, and *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995).[8] Likewise, owners of property may

---

[8] *See also United States v. Toll*, 804 F.3d 1344, 1355 (11th Cir. 2015) ("business owner[ ] or officer[ ] may provide lay opinion testimony because of the particularized knowledge that the witness has by virtue of his or her position in the business.") (internal quotations and citations omitted); *Hot Stuff Foods, LLC v. Houston Cas. Co.*, 771 F.3d 1071, 1079 (8th Cir. 2014) (president and former CFO's lay testimony on damages was permissible due to his "intimate knowledge of [company] operations"); *United States v. Cooper*, 375 F.3d 1041, 1045-47 (10th Cir. 2004) (FDIC custodian of records could testify regarding historical and current FDIC recordkeeping practices without being designated as expert witness); *Texas A&M Research Foundation v. Magna Transp., Inc.*, 338 F.3d 394, 403 (5th Cir. 2003) ([R]ule 701 does not preclude testimony by business owners or officers on

*Government's Consolidated Response & Opposition to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

testify as lay witnesses to the value of their property without requiring specialized knowledge. *See Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir. 1976) (in trade secrets case, no error in allowing a plaintiff to testify as to his perceived value of his idea); *W. Oilfields Supply Co. v. Goodwin*, 461 Fed.Appx. 624, 626 (9th Cir. 2011) (farmer may testify as to his expected crop yields); *In re Enewally*, 368 F.3d 1165, 1173 (9th Cir. 2004) (homeowner may testify to the value of home). The fact that a typical juror may not share a lay witness's particular "experience and knowledge," *Gadson*, 763 F.3d at 1208, does not preclude the witness from drawing on their personal background when they testify or require them to do so as an expert. *See, e.g.*, *United States v. Durham*, 464 F.3d 976, 982–83 (9th Cir. 2006) (witness's "familiarity with marijuana-in both its fresh and burnt forms" permitted her to offer lay opinion that burnt residue was or contained marijuana).

When a witness does testify as an expert pursuant to Rule 702, then the Court has a "gatekeeping" duty to screen the proffered evidence and determine whether it is relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S 579, 589 (1993). "Relevancy simply requires that the evidence logically advance a material aspect of the party's case." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188–89 (9th Cir. 2019) (citations and quotations omitted). "[R]eliability," in turn, "requires that the expert testimony have a 'reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 136, 149 (1999)). The test "is not the correctness of the expert's conclusions but the soundness of his methodology, and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,

---

matters that relate to their business affairs. . . . Indeed, an officer or employee of a corporation may testify to industry practices and pricing without qualifying as an expert.") (citations omitted); *Teen-Ed, Inc. v. Kimball Intern., Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) ("personal knowledge of appellant's balance sheets . . . was clearly sufficient under Rule 602 to qualify him as a witness eligible under Rule 701 to testify to his opinion of how lost profits could be calculated and to inferences that he could draw from his perception of Teen-Ed's books.").

*Government's Consolidated Response & Opposition*
*to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

752 F.3d 807, 814 (9th Cir. 2014) (quotation and citations omitted). At its core, *Daubert* and Rule 702 require the district court to 'act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

The district courts are endowed under Rule 702 and *Daubert* with "broad discretion when discharging their gatekeeping function." *United States v. Alatorre*, 222 F.3d 1098, 1101 (9th Cir. 2000) (quoting *United States v. Hankey,* 203 F.3d 1160, 1164 (9th Cir. 2000)). As part of this broad discretion, no pretrial hearing is required to determine relevance or reliability. *Id.* at 1102 (citing *Kumho Tire,* 526 U.S. at 141–42); *see also United States v. Gadson*, 763 F.3d 1189, 1202 (9th Cir. 2014) (a "separate pretrial hearing on reliability is not required, and a *voir dire* procedure can be sufficient" under Rule 702) (internal citations omitted). The Supreme Court has repeatedly emphasized that the Rule 702 analysis is "a flexible one." *Daubert*, 509 U.S., at 594; *Kumho Tire Co.*, 526 U.S. at 150 (the district court has "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability"). Consistent with this flexibility, in addition to there being no requirement to hold a pretrial *Daubert* hearing, there is also no "definitive checklist or test" that a district court must consult to conduct its Rule 702 analysis. *Alatorre*, 222 F.3d at 1101.

          b.  <u>Professor Rexford's Expert Testimony is Relevant, Reliable, and Helpful</u>

Professor Rexford's qualifications are indisputable: she earned a BSE degree in electrical engineering in 1991 from Princeton University, and MSE and PhD degrees in computer science and engineering in 1993 and 1996, respectively, from the University of Michigan. She has taught at Princeton since 2005 and, prior to that, conducted industrial research at AT&T Research for eight years regarding "Internet and Networking Systems." According to her C.V.,[9] her research focuses on Internet routing, network measurement, and network management. Among other accolades, she has served on the National Science Foundation's advisory council of the Computer and Information Science and Engineering

---

[9] https://www.cs.princeton.edu/~jrex.

*Government's Consolidated Response & Opposition to Defendants' Motions in Limine Nos. 1-10*         *18cr4683-GPC*

directorate, the FCC's Open Internet Advisory Committee, and is a member of the National Academy of Science, the National Academy of Inventors, and the National Academy of Engineering. In 2018, she received a lifetime contribution award from the Association for Computing Machinery for "her fundamental and practical contributions to making the Internet more reliable and predictable."[10] She has published a textbook, *Web Protocols and Practice: HTTP/1.1, Networking Protocols, Caching, and Traffic Measurement*, which describes the technical details for how the worldwide web works on the Internet. Her course listings show that she regularly teaches students aspects of how the Internet works, including a graduate seminar devoted to Internet routing.[11] Her publications include *A Survey of BGP Security Issues and Solutions*, in the PROCEEDINGS OF THE IEEE, Vol. 98, No. 1, January 2010, which discussed the hijacking of IP address blocks. In 2018, she was one of 51 distinguished computer scientists to join an Amicus brief, *Brief for 51 Computer Scientists*, in support of Microsoft's litigation against the United States in *United States v. Microsoft Corp.*. No. 17-2 (Jan. 17, 2018).[12]

The courts have repeatedly found that computer science professors like Professor Rexford are "well qualified in the area of computer networking." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 362–63 (N.D. Cal. 2018) (computer science professor could testify based on research and knowledge); *Grace v. Apple, Inc.*, 328 F.R.D. 320, 350 (N.D. Cal. 2018) (computer science professor could testify reliably regarding information security issues); *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 384 (4th Cir. 2017) (computer science professor can "rel[y] on his experience to inform his testimony, rather than any particular scientific method" and such testimony "would help the jury understand the evidence.").

[10] *See* https://www.sigcomm.org/awards/sigcomm-awards.

[11] *See, e.g.*, *id.* & https://www.cs.princeton.edu/courses/archive/fall20/cos461/561.html.

[12] Available at https://www.supremecourt.gov/DocketPDF/17/17-2/28101/20180117133756823_FILE-Amicus%20Brief-US%20v%20Microsoft%20No.%2017-2.pdf.

Based on this record and precedent, neither Professor Rexford's expertise nor her impartiality can reasonably be challenged, and her testimony would therefore be reliable. *See Ruvalcaba-Garcia*, 923 F.3d at 1188–89 (reliability only "requires that the expert testimony have a 'reliable basis in the knowledge and experience of the relevant discipline'") (citing *Kumho Tire Co*, 526 U.S. at 149).[13] Instead, while defendants concede that her proposed testimony "may cover relevant terminology like 'netblock', 'ISP', and 'LOA,'" they argue Professor Rexford's testimony is nonetheless "irrelevant, likely to confuse the jury, and covers a broad list of topics that are vaguely related to the relevant facts." [ECF No. 359-1 at 11.]

The government will first address defendants' argument regarding relevance. To prevail on the wire fraud counts charged in this case, the government must show how the defendants fraudulently identified, took control of, and used IP netblocks that did not belong to them. To prevail on the CAN-SPAM counts, the government must show the defendants falsely represented themselves to be the registrant, or legitimate successor in interest to the registrant, of five or more IP addresses that were then used to send spam. This evidence will involve technical terms and concepts with which a normal juror is unfamiliar. These terms and concepts fall into three general categories: 1) how IP addresses work; 2) how email works; and 3) how IP netblocks are allocated and registered.

The government will need to begin its case by explaining what an IP address is and how it works so that the jury can understand how the defendants took control of IP netblocks using LOAs and what they did with the IP netblocks once they controlled them. The defendants used the hijacked IP netblocks to send spam and, before sending the spam, they routinely arranged to configure the netblock to reduce the risk that the block's IP addresses would be blacklisted. The government's evidence will show that the defendants repeatedly acquired large netblocks through Daniel Dye whose size (65,536 IP addresses) was referred to by the defendants and co-conspirators Dye and Tarney in their emails to

---

[13] Defendants have also raised no discernible objection to the reliability of her testimony (e.g., "Rexford's academic credentials are undisputed" [ECF No. 359-1 at 11]).

and from each other as "Class B" or "/16" netblocks. Once under the conspiracy's control, the defendants repeatedly arranged for these "Class B" netblocks to be divided into smaller "Class C" or "/24" netblocks (256 IP addresses). One benefit for the conspiracy of using these smaller Class C netblocks to send spam was that, if that smaller IP netblock was blacklisted for sending spam, other Class C netblocks within the conspiracy's Class B pool of IP addresses would not also be blacklisted. Another benefit was that the conspiracy could send smaller volumes of spam from a broader array of Class C netblocks, which was less likely to trigger a spam filter than sending a large volume of spam from a single netblock, while still permitting them to send millions of emails a day. The defendants' emails that discuss these terms and techniques, which are evidence of them conspiring to misappropriate the hijacked netblocks and use the netblocks to send spam, will not make any sense if the jury lacks the background to understand defendants' references to IP netblocks' size, use, and configuration.

The government will also need to educate the jury on how email generally works so the jury can understand the charged conduct. For example, with the wire fraud counts, defendants' control of certain domains (e.g., sura.net) enabled them to impersonate a netblock's rightful registrant (e.g., J.B.H.) by sending email from what appeared to be the registrant (e.g., j[redacted]@sura.net). With the CAN-SPAM counts, the defendants constantly needed to obtain new and unsullied IP netblocks to deliver commercial mail messages because webmail providers like Yahoo routinely blocked messages from IP addresses associated with spam. To understand this evidence, the jury first needs to understand basic concepts like how IP addresses can send and receive email and that IP addresses can be blocked.

The third category, which involves how IP netblocks are allocated and registered, requires understanding terms like "WHOIS," the widely used, publicly available database that listed the netblocks' rightful registrants, which defendants routinely consulted during their scheme and bears on their intent and knowledge, when misrepresenting themselves as the rightful registrants in the wire fraud counts. The CAN-SPAM counts also require the

*Government's Consolidated Response & Opposition to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

jury to understand how IP addresses were allocated and registered so that the jury can determine who the rightful registrant was and whether defendants misrepresented themselves as either this registrant or the registrant's rightful successor.

Defendants have failed to explain or show how expert testimony regarding these topics would confuse or mislead the jury. If anything, defendants seem to argue that Professor Rexford's testimony both risks being too straightforward (e.g., it's unnecessary "to have an expert explain 'the Internet' or 'web addresses' to a jury in 2022"), [ECF No. 359-1 at 11], and would be helpful ("this case will focus on the correct meaning and interpretation of technical terms and processes such as netblocks, ISPs, domains, IPv4, IP announcements, and blacklisting" and "deals with exceedingly technical concepts"). [ECF No. 357-1 at 3, 4.]

As an impartial expert on how the Internet works, with specialized knowledge of how IP addresses are announced and hijacked, Professor Rexford is qualified to testify regarding the three technical categories described above. Because expert testimony regarding these three categories would "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, Professor Rexford's proffered testimony is relevant and admissible. *See Ruvalcaba-Garcia*, 923 F.3d 1183, 1188–89 (relevancy "simply requires that the evidence logically advance a material aspect of the party's case.") (citations and quotations omitted). Given the Court's broad discretionary powers to evaluate expert testimony, and the lack of dispute over Professor Rexford's qualifications, no *Daubert* hearing is needed. *Alatorre*, 222 F.3d at 1101. The Court's ability to make a *Daubert* finding either on the record or during voir dire is even more pronounced where, as here, the *Daubert* factors (peer review, publication, potential error rate, etc…) are inapplicable and the testimony instead "depends heavily on the knowledge and experience of the expert." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

c.  <u>The ISP Employees Can Testify as Lay Witnesses</u>

Defendants' motion repeatedly warns that designating a witness as an expert gives the witness outsize power and influence. [ECF No. 359-1 at 7-9 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 82 n.7 (1985) and *United States v. Gallion*, 257 F.R.D. 141, 152 (E.D. Ky. 2009)).] The government does not intend to call any of the six employees at issue (John Curran, Sean Zadig, Michael Ward, Reid Zulager, Peter Holden, and the GoDaddy Custodian of Records) as experts. Each of these six witnesses was expressly noticed "in an abundance of caution" because, while they are being called to testify to matters that are within their personal experience and arise from their employment, their employment is with a technology organization and may therefore arguably involve specialized knowledge under Rule 702.

It is well established that lay witnesses like these six may testify both to facts and opinions based on a combination of their personal observations of the subject matter at issue and skills, knowledge, or experience obtained through their vocation. *See e.g., Gadson*, 763 F.3d at 1208 (the "personal knowledge requirement in Rule 701 is not a requirement that a witness be personally present or involved in every interaction that he or she is testifying to"); *Crawford*, 239 F.3d at 1090-91; *Joshua David Mellberg LLC v. Will*, 386 F. Supp. 3d 1098, 1101–02 (D. Ariz. 2019). The courts have also recognized that "the distinction between 'fact' and 'opinion' [has] proved to be unworkable in practice" because "[w]itnesses often find difficulty in expressing themselves in language which is not that of an opinion or conclusion." *Gadson*, 763 F.3d at 1206 (quoting Fed. R. Evid. 701 Advisory Committee Notes regarding 1972 Proposed Rules). For these reasons, the government plans to present all six witnesses as lay witnesses and only noticed them in case defendants later object that the witnesses' testimony required advance notice under Rule 702 insofar as it involved "specialized knowledge" connected with their employment. Unless and until defendants object that any of these lay witnesses should be testifying as experts, their motion to preclude or limit these witnesses' expert testimony is arguably moot.

Nonetheless, in an abundance of caution and to forestall any argument that the government waived its right to present these witnesses as experts, if the defendants object at trial and the Court agrees that one or more of these witnesses should be so designated, these witnesses could testify as experts if required to do so and the necessary record could be established at trial through voir dire.

### 1. *John Curran*

Mr. Curran is ARIN's President and CEO. He is expected to testify regarding records maintained by ARIN that reflect and relate to the current and past registrants of the IP netblocks that defendants acquired via Danie Dye. Given that defendants have repeatedly cited Mr. Curran's prior sworn statement and submitted ARIN documents for judicial notice in support of their repeated motions to dismiss the wire fraud counts, they cannot reasonably now claim that Mr. Curran's testimony regarding ARIN is irrelevant or unreliable. While the government intends to offer ARIN's registry documents as business records pursuant to a Certificate of Authenticity under Rules 902(11) and 902(13), the documents may require context that only a testifying witness can provide. Such testimony regarding business records is permissible lay testimony. For example, in *Cooper*, 375 F.3d at 1045-47, the Tenth Circuit held in 2004 that an FDIC custodian of records could testify regarding historical and current FDIC recordkeeping practices without being designated as an expert witness, even though the bank in question's records went back to 1934. Similarly, testimony regarding an organization's historical policies is also admissible lay testimony. In *Carpenter*, a UCLA employee testified in 1999 to the university's "policies for acquiring and disposing of property" regarding a painting given to a UCLA affiliated association in 1928. 239 F.3d at 1089-90.

In both *Cooper* and *Carpenter*, the witnesses permissibly testified to evidence arising in connection with their employment as lay witnesses even though they were not percipient witnesses to all the relevant evidence (e.g., the original 1934 FDIC documents or 1928 bequest to UCLA's predecessor). Defendants' objection that Mr. Curran must be qualified as an expert to testify regarding ARIN's predecessors-in-interest [ECF No. 359-

1 at 9-10] is flatly contradicted by this precedent permitting lay testimony on these issues. Furthermore, unlike the witnesses in *Cooper* and *Carpenter*, Mr. Curran has direct experience with ARIN's predecessors-in-interest. His C.V. shows, for example, that, between 1990 and 1997, he was the Chief Technology Officer for BBN Planet, where he advised his employer's technical leadership on the company's "transition to commercial Internet services." [ECF No. 342 at 2.]  From 1997 to April 2009, he served as Founder and Chairman of ARIN. His employment record shows that, during the 1990s, he was directly involved with ARIN's predecessor entities and responsible for taking over their responsibilities. Based on this direct knowledge, he submitted a sworn declaration in July 2019 that outlined his detailed knowledge of how ARIN's predecessors were established and what they did. [ECF No. 107-1 at 1-2, 7.] Having repeatedly cited and relied on this declaration, defendants cannot plausibly now claim that Mr. Curran lacks sufficient knowledge or expertise to testify as either an expert or a reliable lay witness. Their motion to limit his testimony based on a "fail[ure] to establish that he is qualified" should therefore be denied. [ECF No. 359-1 at 10.]

To the extent defendants seek to limit Mr. Curran's "anticipated testimony" because it "will touch upon topics about legal questions," *id.*, their motion should be denied as speculative and premature. Mr. Curran, like the UCLA employee in *Crawford*, may testify, "based on his experience with [his employer's] policies, how [his employer] used [a] term" that may also be given a legal definition. 239 F.3d at 1091.

Finally, given the relevance of IP netblock registries to the wire fraud and CAN-SPAM charges here at issue, as well as Mr. Curran's direct involvement with founding and leading ARIN, his personal knowledge of and involvement with ARIN's fellow Regional Internet Registries ("RIRs"), and his direct knowledge of how the RIRs pool their registry information to maintain databases, like WHOIS, that document past and present IP netblock registrants, he is qualified to offer relevant and reliable testimony as an expert in the event the defendants challenge his ability to testify as a lay witness.

*Government's Consolidated Response & Opposition*
*to Defendants' Motions in Limine Nos. 1-10*                    *18cr4683-GPC*

### 2.  *Sean Zadig*

Mr. Zadig is the Chief Information Security Officer at Yahoo. He is expected to testify that Yahoo received commercial mail messages from Company A during the period of the conspiracy, which will corroborate and provide context to Company A's own records, known as BlackMail reports, showing that the hijacked netblocks acquired by defendants were used to send spam to Yahoo.[14] Mr. Zadig is also expected to testify to practices that Yahoo employs to filter spam messages, including the use of blocklists like the Spamhaus Block List (which defendants regularly reviewed and discussed), and will likely explain that Yahoo blocks or filters commercial email messages sent from IP addresses associated with spam. This testimony will corroborate and provide context to Company A records, including emails sent and received by the defendants, that discuss attempts to bypass Yahoo's spam filter and efforts to evade detection so that the IP addresses acquired by defendants would not be blocked. These records are relevant to defendants' motive for needing to acquire the hijacked netblocks, and relevant to their discussions about whether the hijacked netblocks could send spam that bypassed the provider's spam filters, which, in turn reflect their understanding that the hijacked netblocks would be used to send spam. The proffered testimony is therefore directly relevant to the charged conduct, arises from Mr. Zadig's employment, and is admissible lay testimony.

Regarding Mr. Zadig's anticipated testimony regarding the costs Yahoo incurred as a result of defendants' actions, the government anticipates, based on prior defense

---

[14] For example, Counts 7 and 8 charge defendants with violating § 1037(a)(5) based, in part, on the transmission of 2,500 or more commercial electronic mail messages in a 24-hour period from the IP netblocks 167.87.0.0/16 (MooreSolutions) and 207.152.0.0/18 (Telalink), respectively. Grand Jury Exhibits 203 and 204, which are the automated daily BlackMail reports that Company A software generated to track mail deliverability, show that on, November 24, 2013, the MooreSolutions netblock was used to send over 1.8 million commercial emails to Yahoo, and that, on November 25, 2013, the Telalink netblock was used to send well over 3 million commercial emails to Yahoo. Yahoo's webmail system was thus directly involved in and affected by the charged conduct.

arguments, that defendants will seek to portray the charged conduct as a victimless crime and one where no reasonable person could have anticipated the charged conduct was criminal. Mr. Zadig's testimony regarding the costs of responding to the millions of email messages sent to Yahoo from the hijacked netblocks, as well as the negative impact on Yahoo's business of dealing with IP addresses being hijacked, will address these defense arguments. Mr. Zadig's testimony arising from his employment with Yahoo is therefore relevant lay testimony. Should his testimony be found to require specialized knowledge, the government submits that Mr. Zadig's extensive professional experience at Yahoo, Google, and NASA, along with his background teaching computer forensics and digital investigations at the University of Maryland and his Certification as a Certified Information Systems Security Practitioner, qualifies him as an expert regarding the noticed testimony.

3.  *Michael Ward, Ried Zulager, & Peter Holden*

Mr. Ward was previously the Director of Network Services at ViaWest, Inc. (since rebranded as Flexential), which operates data centers and offers cloud-based IT services. Mr. Zulager is the Corporate Secretary for Cogent Communications, which is an internet service provider whose services include Internet access, data transport, and colocation in data centers. Peter Holden is the CEO of Hostwinds, which provides web hosting, cloud hosting, and dedicated servers.

The defendants' motion lumps Mssrs. Ward, Zulager, and Holden together under the general argument that these witnesses are lay witnesses and the government's disclosures show they are "wholly in the lay witness camp." [ECF No. 359-1 at 14.] The government agrees that all three witnesses are testifying as lay witnesses. That is why they were only noticed "in an abundance of caution," should the technical nature of their employment be found to require "specialized knowledge." The fact that they are testifying as lay witnesses is not, however, a basis to exclude their testimony. If defendants reverse course and object at trial that these witnesses' testimony, which touches on how their employers "announce" and route IP addresses (including the use and review of LOAs), does, in fact, require specialized knowledge, then the government will have given the requisite notice under Rule

702 that these witnesses would be testifying regarding technical topics like autonomous system numbers, internet service, LOAs, IP "announcements," and ARIN. As Professor Rexford will have already testified as an expert regarding what these terms mean and how the interrelate, there will be no need for these lay witnesses to lay this foundation and the jury will be prepared to understand their testimony. If, however, defendants object at trial that these witnesses cannot use or discuss these technical terms unless first qualified as experts, the government submits that the witnesses' professional experience and training renders them sufficiently knowledgeably to qualify as experts regarding use of these terms and that this record can be adequately established and addressed through voir dire.

### 4. *GoDaddy Custodian of Records*

Well before March 10, 2022, the government served a trial subpoena on GoDaddy.com for a custodian of records who could authenticate business records showing that Daniel Dye purchased the domain names he later sold to defendants for a fraction of the price paid by defendants and their employer. (The records themselves, which were also obtained from and authenticated by Dye's employer, were produced to the defense early in the case.) As with the ARIN business records, the government anticipates that the GoDaddy custodian can offer context for these business records that will corroborate that Dye paid the fair market value at the time he purchased the domains from GoDaddy. Given the attack the defendants are expected to make on Dye's credibility, as well as their intent to blame him for the defendants' submitting forged LOAs, this independent evidence is relevant and material insofar as it will forestall an argument that Dye manufactured the billing records or that defendants reasonably believed the domains (rather than the IP netblocks they could control) were worth the vastly inflated prices they paid.

The government believes that the GoDaddy Custodian's testimony can and should be offered as lay testimony. Cases like *Cooper*, 375 F.3d at 1045-47, show, however, that occasionally defendants object that such testimony requires expert notice. In an abundance of caution that testimony about domain names could arguably require specialized

1   knowledge, the government has provided notice pursuant to Rule 702. As soon as GoDaddy
2   identifies the Custodian, the government will notify the defense.

3   **10. (Def. MIL #10) The Government's Netblock Evidence Should Not Be Limited**

4       In addition to Motions in Limine Nos. 1 through 9, Defendants also filed an
5   unnumbered motion *in limine* to "limit the government's case in chief evidence to the
6   Eleven Netblocks, and to LOAs and domains relating to the Eleven Netblocks; or
7   alternatively, to just the Eleven Netblocks and the 2(a) netblocks." [ECF No. 354-1 at 10.]
8   The defense request is, at its core, that the court limit the government's proof at trial to the
9   eleven domains and associated netblocks described in Grand Jury Exhibit 251. Without
10  any legal authority, the defense appears to be arguing that the court should pre-emptively
11  order the government not to admit evidence that might later be argued to be a variance
12  from the indictment and representations made by the government in response to the
13  defense motions for a bill of particulars.[15]

14      The United States Attorney, as part of the executive branch, has "nearly unlimited
15  discretion" to determine how "to prepare his case for trial." *United States v. Paiva*, 294 F.
16  Supp. 742, 747 (D. D.C 1969). In this case, the United States does not intend to argue that
17  the defendants committed illegal acts related to any netblocks other than the eleven
18  domains and associated netblocks the defendants acquired from Dye (with evidence of the
19  three AFRINIC netblocks noticed as 404(b) evidence offered as proof of criminal intent).
20  However, evidence of other netblocks may be relevant for other reasons. For example, one
21  of the government's experts will provide an opinion regarding the value of the hijacked
22  netblocks and will discuss her experiences with the sales of other netblocks, while another
23  expert will discuss the calculation of revenue, which will also involve mention of other

---

25  [15] A variance occurs when the government's evidence at trial proves facts materially
26  different from those alleged in the indictment and will only be reversed if it prejudices a
    defendant's substantial rights. *United States v. Von Stoll*, 726 F.2d 584, 586-7 (9th Cir.
27  1984); *see also* Fed.R.Crim.P. 52(a). Pretrial challenges for a variance are premature.
    *United States v. Carmona-Bernacet*, 539 F.Supp. 3d 253, 260 (D.P.R. 2021); *United States*
28  *v. Tocco*, 581 F.Supp. 379,381 (N.D. Ill. 1984).

netblocks. An order preventing the United States from presenting evidence related to anything other than the eleven netblocks identified by the defense would unfairly limit the government's case and exclude such evidence. Moreover, the United States has no indication of how the defense intends to proceed with its cross-examination or the presentation of evidence in its case in chief. For example, Daniel Dye offered other netblocks for sale besides the eleven that were purchased, which is an area the defense is likely to explore. It may be that a response from the government would be required that involves evidence relating to other netblocks. It would be unfair and unjust to prematurely limit the government's ability to respond, without any knowledge of what might be produced by the defense. This is especially true since no meaningful reciprocal discovery has been provided by the defense.

The defense argues that any evidence of additional netblocks should be excluded under Rule 403, making the wildly exaggerated claim that such evidence would "likely double, or perhaps triple, the scope of the trial." [ECF 354-1, p.8.] The government is not seeking to expand the scope of the trial by introducing evidence of "any random netblock mentioned within millions of pages of discovery," id., but instead simply wants to retain its ability to react to the defense presentation without the imposition of premature limits on its evidence. Based on the foregoing, the court should deny this motion.

**11. Defendants' Sealed *Ex Parte* Motion**

The docket indicates that, on March 24, 2022, defendants filed a sealed *ex parte* motion along with their ten unsealed motions in limine. [ECF No. 348.] Based on communications with defense counsel, the government anticipates that this motion will pertain to two expert accounting witnesses identified by the government whom Company A retained in 2019 to determine how much revenue was generated by the company's use of the GetAds netblocks to send commercial email. Company A's outside counsel has repeatedly assured the government that neither of these two expert witnesses used or relied on privileged information to calculate that Company A earned approximately $4.9 million in revenue through use of the hijacked netblocks. The

1  government has additional information regarding the admissibility of these experts'

2  methods and findings and asks for an opportunity to be heard on any motion to limit or

3  exclude the two witnesses.

4  **CONCLUSION**

5  For the reasons discussed above, the United States respectfully submits that

6  Defendants' Motions in Limine Nos. 1-5 and 7-9, as well as their unnumbered motion,

7  should be denied and the government should have an opportunity to respond to any sealed

8  *ex parte* motions bearing on the government's case-in-chief.

9

10

11  DATED: March 31, 2022          Respectfully submitted,

12                                 RANDY S. GROSSMAN
13                                 United States Attorney

14                                 /s/Melanie K. Pierson
15                                 Assistant United States Attorney

16                                 /s/Sabrina L. Fève
17                                 Assistant United States Attorney

18                                 /s/Candy Heath
19                                 Senior Counsel
20                                 Computer Crime and Intellectual Property Section
                                   U.S. Department of Justice

21

22

23

24

25

26

27

28