RANDY S. GROSSMAN
United States Attorney
MELANIE K. PIERSON
SABRINA L. FEVE
Assistant U.S. Attorneys
California Bar No. 112520/226590
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Fax: (619) 546-0631
Email:Melanie.Pierson@usdoj.gov/Sabrina.Feve@usdoj.gov

CANDINA S. HEATH
Senior Counsel
Texas Bar No. 09347450
Computer Crime and Intellectual Property Section
U.S. Department of Justice
Washington, D.C. 20005
Tel: (202) 307-1049
Email: Candina.Heath2@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 18cr4683-GPC |
| Plaintiff, | **GOVERNMENT'S TRIAL MEMORANDUM** |
| v. | |
| JACOB BYCHAK (1), MARK MANOOGIAN (2), ABDUL MOHAMMED QAYYUM (3), and PETR PACAS (4), | Date: May 23, 2022 Time: 9:00 a.m. Place: Courtroom 2D Judge: Hon. Gonzalo P. Curiel |
| Defendants. | |

COMES NOW the plaintiff, United States of America, by and through its counsel, Randy S. Grossman, United States Attorney, and Assistant United States Attorneys Melanie K. Pierson, Sabrina L. Fève, and Computer Crime and Intellectual Property Section Senior Counsel Candy Heath, and hereby files its Trial Memorandum in this case.

# I.

## STATUS OF THE CASE

### A. INDICTMENT

On October 31, 2018, a federal grand jury in the Southern District of California returned an indictment against defendants Jacob Bychak, Mark Manoogian, Abdul Mohammed Qayyum and Petr Pacas. The defendants are charged with Conspiracy, in violation of Title 18, United States Code, Section 371; five counts of Electronic Mail Fraud, in violation of Title 18, United States Code, Section 1037(a)(5) (the CAN-SPAM Act); five counts of wire fraud, in violation of Title 18, United States Code, Section 1343; and Criminal Forfeiture, in violation of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and 1037(c) and Title 28, United States Code, Section 2461(c). The Conspiracy count alleges that, between December 2010 and September 2014, defendants conspired with each other and with others, including two named coconspirators, Daniel Dye and Vincent Tarney, both of whom were charged elsewhere.

### B. RELATED CASES

Daniel Dye is charged in matter 18cr0822-GPC. On February 2, 2018, Dye pled guilty to a one-count information charging him with Conspiracy to Commit Electronic Mail Fraud, in violation of Title 18, United States Code, Section 1037(a)(5) and (b)(2)(E). [18cr0822-GPC, ECF 4, 6.] The court accepted Dye's guilty plea on March 9, 2018, and Dye's sentencing is set for August 22, 2022. [*Id.*, ECF 14, 43.]

Vincent Tarney is charged in matter 18cr3469-GPC. On August 7, 2018, Tarney pled guilty to a one-count information charging him with Conspiracy to Commit Electronic Mail Fraud, in violation of Title 18, United States Code, Section 1037(a)(5) and (b)(2)(E). [18cr3469-GPC, ECF 4, 11.] The court accepted Tarney's guilty plea on January 8, 2019, and Tarney's sentencing is set for August 22, 2022. [*Id.*, ECF 19, 35.]

### C. TRIAL STATUS

The trial is scheduled to commence on May 23, 2022, at 8:30 a.m. The Court has granted each side 52 hours to conduct its direct examinations and cross examinations of

adverse witnesses. Accordingly, the case should conclude on or about June 22, 2022. (This date assumes a 3-day trial week the first week, and 4-day trial weeks thereafter.)

D. <u>STATUS OF COUNSEL</u>

Defendant Jacob Bychak is represented by David Wiechert, Jessica Munk, and Jahnavi Goldstein of the firm Wiechert, Munk & Goldstein, PC. Defendant Mark Manoogian is represented by Randy K. Jones, Daniel Goodrich, and Ryan Dougherty of the firm Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC. Defendant Mohammed Abdul Qayyum is represented by Thomas Bienert, James Riddet, Whitney Bernstein, and Carlos Nevarez of the firm Bienert, Katzman, Littrell & Williams, PC. Defendant Petr Pacas is represented by Gary Lincenberg, Alexis Wisely, and Darren Patrick of the firm Bird, Marella, Boxer, Wolpert, Nessim, Drook, Lincenberg & Rhow, PC.

E. <u>CUSTODY STATUS</u>

All defendants are released on bond.

F. <u>INTERPRETER</u>

None of the witnesses for the United States will require the services of an interpreter.

G. <u>JURY WAIVER</u>

No jury waiver has been filed by any of the defendants.

H. <u>PRETRIAL MOTIONS</u>

1. <u>Pretrial Motions</u>

a. <u>Motions Regarding Discovery</u>

On November 20, 2018, defendant Qayyum filed a motion to compel discovery [ECF 36] and a day later defendant Bychak filed a motion for a Bill of Particulars. [ECF 38.] On March 15, 2019, defendants filed a motion to compel discovery related to a confidential informant. [ECF 71.] The court denied the motion for discovery regarding the informant on April 30, 2019. [ECF 93.] On July 30, 2021, the defense filed an additional motion to compel discovery regarding the informant. [ECF 257.] On August 20, 2021, this motion was granted in part, and denied in part, with the court directing the government to ask the informant to identify the documents the informant provided to the government that

the informant received from CY, but denying the request for all additional discovery. [ECF 275.] Defendants' oral request for records related to "Anon-1" was also denied. *Id*. On September 20, 2021, the defendants filed a motion to compel further discovery regarding the informant [ECF 281], and a motion to have the court reconsider its previous order [ECF 93], which had denied discovery regarding the informant. [ECF 282]. On November 18, 2021, the court orally denied the defendants' motions to compel disclosure of the informant's identity and to turn over all information regarding government cooperation with Spamhaus in other investigations. [ECF 313, 314 at 72.] The court did, however, direct the parties to submit supplemental briefing regarding the scope of a potential *in camera* hearing regarding the informant. *Id.* The parties submitted their supplemental briefing on December 3, 2021, and December 10, 2021. [ECF 315, 316.] On January 18, 2022, the court reiterated its earlier rulings denying the defense motions for additional discovery regarding the informant's identity and Spamhaus's contacts with the federal government and further ruled that no *in camera* hearing was justified. [ECF 318, 319 at 9-11.]

On February 1, 2019, the government filed a motion for a protective order regarding the discovery. [ECF 56, 57.] At a hearing on February 14, 2019, the court ordered the government to provide an amended protective Order to the defense. [ECF 62.] On March 6, 2019, the court granted the government's motion for a protective order. [ECF 67.] On March 29, 2019, defendants filed a motion to modify the protective order. [ECF 77.] The court granted the motion to modify the protective order on June 11, 2019. [ECF 106.]

   b. <u>Motions to Dismiss</u>

On March 15, 2019, defendants filed two motions to dismiss. The first motion was to dismiss Counts 6 through 10 (the CAN-SPAM counts) as void for vagueness as to the term "registrant." [ECF 69.] The second motion was to dismiss the indictment for misadvisement of the grand jury. [ECF 70.] At a hearing on October 24, 2019, the court denied the motion to dismiss for misadvisement of the grand jury and took the motion to dismiss the CAN-SPAM counts under advisement. [ECF 135.] After supplemental

briefing, the court issued a written order on February 28, 2020, denying the motion to dismiss the CAN-SPAM counts. [ECF 154.]

On January 23, 2020, defendants filed a motion to dismiss the wire fraud counts (Counts 2 through 5) for failure to state an offense. [ECF 149.] The Court issued a written order denying this motion on April 8, 2020. [ECF 160.]

On May 28, 2020, defendants filed a motion to dismiss the wire fraud counts for violating the Fifth Amendment Due Process and Sixth Amendment Fair Notice Protections, arguing that Internet Protocol (IP) addresses did not constitute property for purposes of wire fraud. [ECF 169.] After multiple rounds of briefing, and a hearing on July 16, 2020, the court took the motion under advisement. [ECF 202.] Additional briefing was submitted, and a hearing was held on December 17, 2020, where the court again took the motion under advisement. [ECF 225.] On February 25, 2021, the court issued a written order denying this motion to dismiss the wire fraud counts. [ECF 232.]

On February 18, 2022, defendants filed a motion to dismiss for outrageous government conduct based on an alleged pattern of invasion of the defense camp by the informant. [ECF 329.] The motion to dismiss based on outrageous government conduct was denied orally by the court on April 26, 2022. [ECF 396.] Also on February 18, 2022, the defense filed a motion to dismiss and suppress under the Fourth Amendment, based on the alleged illegal acquisition of internal Company A documents by the informant. [ECF 330.] On May 13, 2020, the Court issued a written order, denying that motion and finding that no hearing was warranted. [ECF 418.]

  c.  Motion to Suppress

On May 15, 2020, defendant Qayyum filed a motion to suppress statements he made to the FBI. [ECF 162.] After additional briefing and telephonic hearings, the government withdrew its opposition and agreed not to use the statements in its case-in-chief at trial.

  d.  Motions for Depositions

On June 23, 2021, the government filed a motion to take depositions of two witnesses (SAD and LWT) under Rule 15 of the Federal Rules of Criminal Procedure.

[ECF 242.] On July 8, 2021, the court granted the motion as to witness LWT, and denied without prejudice the motion as to SAD. [ECF 254.] After supplemental briefing was submitted under seal, on August 20, 2021, the court granted the motion for the deposition of witness SAD. [ECF 275.] The Court has since reviewed the deposition transcripts and ruled on the portions that are to be admitted in the government's case-in-chief. [ECF 396.]

2. Motions In Limine[1]

a. Gov. MIL to Set Time Limits

On January 26, 2021, the government filed a motion to set time limits on the parties for trial. [ECF 228.] On April 26, 2022, the court granted the motion and allowed each side 52 hours to conduct the direct examination of its witnesses and the cross examination of adverse witnesses. [ECF 396.]

b. Gov. MIL to Admit 404(b) Evidence

On April 26, 2022, the court granted in part, and denied in part, the government's motion to admit 404(b) evidence. [ECF 350, 396.] In particular, the court granted the motion to admit evidence regarding the 11 domains and associated netblocks acquired from GetAds, an affiliate marketing firm, including evidence related to netblocks not charged in substantive counts. The court requested additional briefing regarding the AFRINIC netblocks, for which the defendants had submitted a false LOA that was unconnected to GetAds or any cooperating defendant. [ECF 396.] The government submitted a Supplemental 404(b) Notice on April 29, 2022. [ECF 398.] The court denied the government's motion on May 6, 2022. [ECF 406].

c. Gov. MIL to Exclude Certain Evidence Elicited at Depositions

As mentioned, the court ruled on the parties' respective objections to the deposition transcripts on April 26, 2022. The government's motion to exclude certain evidence elicited at the witness depositions [ECF 351] was granted in part and denied in part. [ECF 396]. The court admitted all the exhibits offered by the government and excluded three exhibits [A, B, and C] offered by the defense. *Id.* The court also ruled on specific objections

---

[1] Unless otherwise indicated, all Motions in Limine were filed on March 24, 2022.

made during the depositions, and the government has conformed the deposition videos to be presented to the jury in compliance with the court's rulings.

### d. Gov. MIL to Exclude Witnesses from the Courtroom

The government's motion to exclude witnesses from the courtroom [ECF 352-5] was granted in part and denied in part. The court ruled that each party may have one case agent in the courtroom, and all other witnesses will be excluded. [ECF 382.]

### e. Gov. MIL to Exclude Evidence of Immigration Status & Punishment

On April 22, 2022, the government's motion to exclude evidence of immigration status and punishment [ECF 352-7] was granted, but the court ruled that defendants are free to present evidence of their country of origin. [ECF 382.]

### f. Other Gov. MILs Deferred Until Trial

The following government motions in limine were deferred until trial: motion to admit co-conspirators statements [ECF 350]; motion to exclude the testimony of undisclosed defense experts [ECF 352-1]; motion to exclude defendants' undisclosed reciprocal discovery [ECF 352-2]; motion to exclude evidence of the law [ECF 352-3]; motion to exclude evidence of advice of counsel [ECF 352-4]; and a motion to exclude improper use of FBI reports and notes [ECF 352-6]. On January 26, 2021, the government filed a motion to preclude speaking objections. [ECF 228]. On April 11, 2022, the court determined that this motion was moot. [ECF 382.]. During a hearing on May 12, 2022, when discussing the first round of reciprocal discovery provided by the defense that consisted of case law and other legal filings, the court directed the defense to provide briefing to explain the admissibility of such documents. [ECF 419.]

### g. Def. MIL to Exclude Evidence of Nortel Transaction

On March 24, 2022, defendants filed a motion to exclude evidence related to the bankruptcy sale of the Nortel netblock to Microsoft in 2011. [ECF 349.] At a hearing on April 11, 2022, the court denied this motion. [ECF 382.]

h. <u>Def. MIL to Preclude Reference to "Spam" and "Spammers"</u>

On April 11, 2022, the defense motion to preclude reference to "spam" and "spammers," [ECF 353], was denied in part and granted in part. The term "spam" may be used, but the government shall not refer to the defendants as "spammers." [ECF 382.]

i. <u>Def. MIL to Preclude Evidence that Defendant Manoogian is an Attorney</u>

On April 11, 2022, the defense motion to preclude evidence that defendant Manoogian is an attorney [ECF 353] was denied. [ECF 382.]

j. <u>Def. MIL to Exclude Evidence Beyond the GetAds Netblocks</u>

On April 11, 2022, the defense motion to preclude evidence of netblocks other than the netblocks acquired via GetAds [ECF 354] was denied. [ECF 382.]

k. <u>Def. MIL to Exclude Reference to Identity Theft</u>

On April 11, 2022, the defense motion to exclude references to identity theft [ECF 355] was denied. [ECF 382.]

l. <u>Def. MIL to Preclude Government Argument Regarding the Use of DBAs</u>

On April 11, 2022, the defense motion to preclude the government from framing its evidence and argument to suggest that the use of DBAs, post office boxes and email addresses under different names is illegal conduct and for a clarifying instruction [ECR 356] was denied. [ECF 382.]

m. <u>Def. MIL for Attorney Voir Dire</u>

On April 11, 2022, the uncontested defense motion for attorney voir dire [ECF 357] was granted. [ECF 382.]

n. <u>Def. MIL to Preclude Reference to "Victims"</u>

On April 11, 2022, the defense motion to preclude references to certain individuals as "victims" [ECF 358] was denied. [ECF 382.]

o. <u>Def. MIL to Preclude Expert Testimony and Hold a *Daubert* Hearing</u>

On April 11, 2022, the defense motion to preclude allegedly irrelevant and unfairly prejudicial expert testimony, or alternatively, request a *Daubert* hearing [ECF 359] was deferred to trial. [ECF 382.]

p.  <u>Def. MIL to Exclude 404(b) evidence</u>

On April 26, 2022, the defense motion to exclude 404(b) evidence related to the AFRINIC netblocks [ECF 360] was reserved and the court directed the government to submit additional briefing [ECF 396], which it filed on April 29, 2022. [ECF 398.] On May 6, 2022, the court granted the defendant's motion. [ECF 406.]

q.  <u>Def. MIL re Accounting Experts (Under Seal)</u>

Defendant Bychak filed a notice of motion to file documents *ex parte* and under seal relating to a sealed motion in limine to preclude the government from calling accounting experts retained by Company A to testify at trial. [ECF 348, 400 at 4-13.] On April 26, 2022, the court directed defendant Bychak to provide a redacted copy of the briefing to the government by April 29, 2022, for the government to respond by May 6, 2022, and for the defense to file a reply by May 11, 2022. [ECF 400 at 13-14.] On May 2, 2022, the government submitted a limited unsealing order permitting it to share the redacted briefing with Company A, which the court granted. [ECF 401.]  The government has submitted a sealed response and the matter is set for an evidentiary hearing on May 18, 2022. [ECF 419.]

r.  <u>Def. MIL to Preclude References to "Hijacking"</u>

On April 15, 2022, the defense filed a motion to preclude references to "hijacking" or "hijacked" with respect to the netblocks. [ECR 387.] On May 6, 2022, the court denied this motion. [ECF 406.]

I.  <u>COURTROOM COMPUTER SYSTEM</u>

The United States will be using a projection-based evidence presentation system, that will utilize the technology in the courtroom. It will display exhibits admitted into evidence on monitors at the bench, counsel table, witness stand, and before the jury.

J.  <u>STIPULATIONS</u>

The parties have stipulated that the videos of the depositions of witnesses SAD and LWT may be presented in lieu of their testimony in court, due to their unavailability based on health concerns. No other stipulations have been entered into to date.

K.  <u>NOTICES OF INTENT TO PRESENT EVIDENCE</u>

The government filed three expert notices on March 10, 2022: The first notice discussed the testimony of Jennifer Rexford, a Princeton computer science professor who will explain relevant technical terms and concepts regarding the internet and IP addresses, and Sandra Brown, an IP broker who will testify regarding the fair market value of the GetAds netblocks at the time defendants acquired them. [ECF 340.] The second notice described the testimony of David Benkert and Jeffrey Kinrich, two Company A forensic accountants who calculated the revenue that Company A earned via use of the GetAds netblocks. [ECF 341.] The third notice described the anticipated testimony of seven individuals who are percipient witnesses or custodians of records whose testimony may potentially draw upon specialized knowledge due to their employment in a technical industry.[2] [ECF 342.] Their testimony was provided in an abundance of caution under Federal Rule of Evidence ("FRE") 702, despite the government's belief that the witnesses will properly testify under FRE 701.

On March 18, 2022, the government filed notice of its intent to present evidence pursuant to FRE 404(b), as well as summaries of voluminous evidence pursuant to FRE 1006, and its intent to authenticate documents pursuant to FRE 902(11) and (13). [ECF 347.]

On April 29, 2022, the government filed an amended notice of intent to authenticate documents pursuant to FRE 902(11) and (13), which specified the precise trial exhibits to be authenticated as business and electronic records, along with the certificates of authenticity provided by the record holders. [ECF 397.]

On May 5, 2022, defense counsel requested that the government identify the unindicted coconspirators so that the defense could review the government's trial exhibits and related testimony for coconspirator hearsay exception purposes and know in advance

---

[2] The seven individuals are John Curran (ARIN – who has since been replaced by John Sweeting, who will testify for ARIN), Sean Zadig (Yahoo), Michael Ward (formerly of Via West), Ried Zulager (Cogent), Peter Holden (Hostwinds), and a custodian of records from GoDaddy.

to whom the government would seek the apply the exception. On May 6, 2022, the government provided the defense with the names of Dye, Tarney, and two Company A employees (uncharged coconspirators 1 and 2, or "CC-1" and "CC-2"). On May 9, 2022, the government supplemented its notice and provided the defense with the name of the individual identified as "Person-1" in Dye's Plea Agreement ("CC-3").

II.

STATEMENT OF FACTS

A. BACKGROUND ON IP ADDRESSES

To consider the evidence in this case, the jury will need a basic understanding of what IP addresses are and how they work. IP addresses are the beginning or ending points for sending electronic messages and data over the internet. IP addresses[3] consist of four "fields" of numerals, separated by periods (e.g., 165.152.0.0). Because IP addresses can be difficult to remember, they are often assigned to an alphanumeric domain name (e.g., uscourts.gov or example.com), which web users can type into a browser to access a website in lieu of specifying the website's IP address.

A discrete bundle of IP addresses in numeric order is known as a netblock. The size of the netblock is denoted by the number following a forward slash (/). Counterintuitively, as the number following the slash increases, the number of individual IP addresses within the netblock decreases. In this case, most of the netblocks at issue are what are known as "Class B" netblocks, represented as a "/16" (e.g., 165.152.0.0/16) and which contain 65,536 IP addresses. This number results from each .0 field having 256 possible combinations. A "Class C" netblock, represented as a "/24" (e.g., 165.152.255.0/24), contains only 256 IP addresses. There are also blocks of IP addresses (e.g., 207.152.0.0/18) that fall in-between. For historical reasons, not every size netblock is assigned to a Class, but because the defendants in this case referred to netblocks both by Class and by the slash size, the jury will need to be familiar with both forms of describing a netblock's size.

---

[3] This case deals exclusively with IPv4 IP addresses, meaning there are four "fields" of numbers separated by a dot.

*Government's Trial Memorandum*                    *18cr4683-GPC*

Because there are a finite number of IP addresses, IP addresses became scarce and steeply increased in value as the internet gained in popularity. A Class B netblock allocated at no cost to the registrant in the early 1990s was worth approximately $650,000 during the period of the conspiracy and as much as $3.3 million today.

Beginning in December of 1997, the management of all IP addresses was transferred from the government to one of five non-profit, non-governmental organizations throughout the world known as regional internet registries (RIRs). The American Registry of Internet Numbers (ARIN) now manages the distribution of IP addresses in the United States, Canada and many Caribbean and North Atlantic Islands. ARIN and the other RIRs each maintain a directory known as "WHOIS" of the authorized registrants who were allocated IP addresses within their region's ranges and track the transfer of such allocations. The records of each of these registries are cross-referenced, so that a query to ARIN's WHOIS for an IP address assigned to RIPE (the RIR for Europe) will return a result.

The RIRs' WHOIS registries, which are publicly available on the internet, provide current information regarding the identity of an IP block's registrant, as well as the registrant's known contact information.[4] ARIN's WHOIS registry contains the registration information for all netblocks within ARIN's region, including those that were allocated prior to when ARIN was created.

For IP addresses to work, they must first be "announced" by an entity known as an "autonomous system," which is commonly an internet service provider (ISP) or hosting company. The announcement process is how IP addresses are activated and can have internet traffic routed to and from them (similar to having a phone number activated, which allows it to send and receive calls). Before announcing IP addresses, ISPs and hosting companies often check WHOIS to confirm that the party seeking the announcement is the listed registrant. If the party seeking to announce the IP addresses is not the listed registrant,

---

[4] This contact information includes the name of the individual designated as the point of contact, their email address, and telephone number.

one means of claiming authorization is a document known as a "Letter of Authority" or "LOA."

IP addresses can be leased temporarily, as well as permanently transferred. To validate the use of a block of IP addresses by a company or domain other than the IP block's registrant, hosting companies and ISPs generally request a LOA from the registrant stating that the user is authorized by the registrant.

ISPs such as Microsoft and Yahoo routinely employ filters to block unwanted commercial email (spam) from reaching a recipient's inbox and to redirect such email to a junk mail or spam folder. These filters also often also block other emails associated with suspected junk mail or spam, including emails sent by the same person or company, or by the same IP address or domain. The ISPs subscribe to various services to obtain the information used in determining which IP addresses or domains to filter, including the services Spamhaus and SpamCop.

A larger netblock can be broken up into smaller netblocks utilizing a process called SWIP to reassign blocks of IP addresses. SWIP is an acronym for the Shared WHOIS Project, which established a process used to submit, maintain, and update information on WHOIS records, reflecting the names and contact information for the authorized users of various subnetblocks of IP addresses. If a smaller subnetblock with a distinct SWIP registration was blocked by the spam filter of an ISP, it would not necessarily affect the remaining IP addresses in the larger netblock assigned to a different SWIP entry, and the IP addresses for that different SWIP entry could therefore continue to be used to send mail. By trying to register SWIPs associated with DBAs, false contact names, and domains and post office boxes associated with the DBAs (but controlled by the defendants), the defendants attempted to conceal their association with the hijacked netblocks, as well as their identity as the senders of spam.

B. PURCHASE AND UNAUTHORIZED USE OF THE GETADS NETBLOCKS

Between December 2010 and September 2014, the four defendants, Jacob Bychak, Mark Manoogian, Abdul Mohammed Qayyum, and Petr Pacas worked together to acquire

and use netblocks registered to other organizations and people so that their employers Company A and Company B, which were both affiliate marketing companies owned and overseen by CC-1, could use those netblocks to send millions of commercial mail messages. They were joined in this conspiracy by coconspirators that included Daniel Dye and Vincent Tarney, who are charged separately.[5] Dye and Tarney helped the defendants acquire and use these netblocks by providing forged or fraudulent LOAs that, Dye, Tarney, and the defendants submitted to various internet service providers.[6] CC-2 and CC-3 helped facilitate the scheme by discussing the sale of the netblocks with Dye (CC-2 and CC-3) and by coming up with the initial proposal that Dye brought to Company A (CC-3).

In particular, in December 2010, Pacas, Company A's then-Director of Operations, received an email from a co-worker stating, "Hey man, Very hush hush, but get ads has 7 /16's that they are not using." The co-worker provided Pacas with the contact information for Daniel Dye at a company called GetAds. At the time, both Dye and his employer GetAds were involved in the affiliate marketing industry, which included sending bulk commercial mail messages and placing digital ads both for themselves and for other affiliate marketers, including Company A.

In January 2011, Pacas, along with CC-1, received an email from Dye with the WHOIS registry information for four Class B netblocks, none of which were registered to Dye or GetAds, which Dye was selling for $125,000/each. In the email, Dye wrote, "You would be purchasing the full [IP] block, domain name, etc. It is not a lease." The offering price was roughly equal to the price that Company A paid to lease a netblock of equal size

---

[5] Both Dye and Tarney have pled guilty to conspiring with the defendants to violate the CAN-SPAM Act and will be testifying as witnesses for the government.

[6] Manoogian and Qayyum also prepared and modified forged or fraudulent LOAs sent to various internet service providers.

for two months. Pacas, in turn, forwarded Dye's email to his coworkers Bychak and Qayyum, and asked them to research the IPs, which Qayyum did.[7]

In January and February 2011, Dye exchanged multiple emails and phone calls with Pacas, including a February 2011 conference call that included Bychak and CC-3. During this call, the conspirators discussed the plan to control and use older netblocks by impersonating the organizations to which the netblocks were registered. On March 2, 2011, Pacas's employer, Company A, wired $125,000 to GetAds (Dye's employer). The wire transfer indicated it was for the IP netblock 168.129.0.0/16, which Pacas, Bychak, and Company A would take control of through the domain "openbusinesssystems.net" (the "OBS" netblock).

To help Pacas and his coconspirators take control of the OBS netblock, Dye sent an email introducing Pacas to Tarney. Tarney ran a small internet hosting company that had a reputation for tolerating spam complaints and Dye believed Tarney would be willing to announce the OBS netblock based on the LOA provided. The ensuing email chain between Dye, Pacas, and Tarney included an email from May 4, 2011, in which Tarney told Pacas and Dye that he wanted to discuss the "best way to attack this entire block and how we should announce it to keep it under the radar." In a separate email chain from this same period, Pacas, Tarney, and Qayyum also exchanged emails regarding Company A's use of SWIPs registered with false and misleading contact information to hide that Company A was the one using the hijacked IPs to send commercial mail messages.

On March 7, 2011, Dye emailed Pacas the passwords and information needed to control the OBS domain along with a "sample LOA – you will use this 'LOA' when announcing moving or managing any of the space." The LOA sent by Dye was unsigned, and contained a signature block for "Richard Hillis," CTO of Open Business Systems, authorizing the announcement of a portion of the netblock, on January 20, 2011.

---

[7] In this and all the emails from his Company A-issued email account, Qayyum went by the name, "Abdul Mohammed."

In May 2011, in an email to his supervisors, Qayyum noted that they were unable to fully customize the OBS netblock according to their needs. In particular, the SWIPS could not be perfected because to do so required contact with ARIN, and the defendants did not possess the rights of the OBS netblock's true ARIN registrant. When CC-2 sent Dye an email citing these rights as a "material inducement" and demanding a refund, Dye refused, noting "the space was delivered as promised and is usable." Rather than washing their hands of Dye or GetAds, four days later, on May 31, 2011, Bychak listed one of his top goals as to "come up with a plan to utilize the GetAds space." Thereafter, defendants used the OBS netblock for three years to send millions of commercial electronic mail messages. For example, an internal Company A software system used to track email delivery known within the company as "Blackmail" reported that, on or about April 10, 2012, the OBS netblock sent over a million commercial electronic mail messages in conjunction with email marketing campaigns that included, "BigBeautifulWomen_BigLove," "iPhone4S Promos – Tasty", and "LatinLoveCPC-ChokeHold." For the January 25, 2014, conduct charged in Count 9, a Blackmail report similarly documented that the OBS netblock again sent over 1 million commercial electronic mail messages on that day.

Despite threatening Dye with legal action in May 2011 because defendants had not, in fact, purchased the IP addresses, but rather only the domain through which they could impersonate the IP addresses' rightful registrant, defendants and their employers went on to purchase ten additional netblocks from Dye and GetAds over the next three and a half years – but at roughly a third of the price paid for the initial GetAds IP block. These subsequent purchases were accompanied by a nearly identical three-page contract for the purchase of a domain name, with no mention of IP addresses, and an invoice from GetAds, which also referenced only the purchase of a domain name. Two additional netblocks were purchased by Pacas while he was at Company B[8] (where he arranged for Qayyum to work one day a week). Typically, Dye provided the passwords needed to access a domain that controlled the netblocks, and often included a LOA. The LOAs provided by Dye were

---

[8] Which was co-owned by CC-1.

*Government's Trial Memorandum*                                                      *18cr4683-GPC*

modified by the defendants, who changed the dates, the names of the hosting companies, and sometimes signed the name appearing in the signature block portending authorization by the registrant to use the netblock but knowing that the actual registrant was unaware of the LOA and did not authorize the transaction. For example, in February 2013, Qayyum sent a LOA for the EDUCOM netblock (164.253.0.0/16) acquired via GetAds to defendant Mark Manoogian with instructions to "print and sign." About an hour later, the signed LOA was sent to the hosting company.

In February 2013, Pacas purchased the domain cdnair.ca for Canadian Airlines from Dye, with the aim of controlling the associated netblock (142.147.0.0/16). In March 2013, just two weeks after Pacas began using the netblock to send mail, Canadian Airlines' successor-in-interest, Air Canada, reclaimed its netblock. None of the conspirators ultimately challenged Air Canada's claims to its successor's assets. After a conversation with Dye, Pacas emailed his co-workers, stating that he now fully understood there was the risk of someone reclaiming the IPs, but that if they could "monetize" the netblock for six months he would consider it a success. He further noted that he now knew what to look for when accepting such a deal, and that maybe they could look for the similar type of allocations themselves. Also in February 2013, Tarney forwarded to Manoogian an email rejecting the LOA for the EDUCOM IP block, explaining in detail why the LOA lacked legitimacy. Rather than address the issues of legitimacy, the defendants simply decided to announce the EDUCOM netblock with another company. Similarly, in January 2014, Manoogian sent an email to a group that included Bychak and Qayyum letting them know the EDUCOM netblock had been blocked and flagged as a "Hijacked IP block," but telling them "[w]e can continue use for now." When the EDUCOM netblock was ultimately reclaimed by the rightful registrant, the defendants stopped using it and never protested that they were the true registrant.

In May 2013, Dye offered the TrinityMicro netblock (63.79.40.0/21) for $1700 to Bychak, who had Manoogian and Qayyum investigate its history. In response, Qayyum wrote, "I agree it's risky but according to whois records it is not fully owned by them.

Might as well take a chance." The defendants ultimately decided to purchase the domain used to control the TrinityMicro netblock from GetAds. Echoing Qayyum's view that claiming ownership was risky, Manoogian sent the TrinityMicro LOA to the hosting company with the message, "Fingers crossed."

Later in May 2013, Dye offered the defendants smaller blocks, including one associated with paxny.com (208.199.68.0/21), to Bychak. Bychak asked if they could announce first and pay later, because "We just want to make sure they don't get marked as hijacked right away." When Dye sent over the LOA, Bychak asked him to send it in Word format, because "it's a bit easier for us that way." At the end of the month, Manoogian asked Tarney to announce several small subnetblocks acquired from Dye and GetAds. Tarney angrily replied that the list included ranges that belonged to him and added, "I can guarantee I didn't give you authority to use them."

In June 2013, Dye offered to sell a Class B netblock to Bychak at a discount for $10,500, in part to make up for problems associated with the May 2013 sale of the smaller blocks. Bychak accepted the offer and the defendants proceeded with the purchase of the domain associated with the Moore netblock (167.87.0.0/16), which they in turn arranged to have send millions of commercial email messages on November 24, 2013 (as charged in Count 7).

In July 2013, Bychak wrote to CC-1 to address CC-1's concern about purchasing IPs from GetAds, because Pacas and Company B had been "burned" in the Canadian Airlines deal. Bychak advised that the GetAds IPs were "some of the cheapest IPs around," noting that purchasing a Class B netblock from GetAds involved a single payment of $50,000, whereas most of the other Class B netblocks were leased on a month-to-month basis for about $85,000. Bychak ultimately convinced CC-1 that continued purchases of GetAds IPs were profitable and in Company A's interest.

On October 7, 2013, Manoogian, Bychak, and Qayyum discussed trying to sell two of the GetAds netblocks (SierraSemi and Telalink) and Qayyum noted, "I would try and avoid questions related to how or why we have these IPs." Later that month, the three

defendants discussed acquiring another GetAds netblock, the ECT netblock (165.192.0.0/16), and Bychak wrote, "I'm willing to take the risk if it isn't any more than any other GetAds block." After purchasing the related domain from GetAds for $50,000, the three defendants participated in an email chain in which they confirmed that an email address set up to impersonate a former ECT employee, D.L., "has been configured to forward all emails to us."

C. <u>OTHER INDICIA OF FRAUD</u>

In addition to the fact that the GetAds netblocks were purchased below fair market value, the fact that some LOAs were rejected for lack of authenticity, the fact that two of the netblocks were reclaimed by the true registrants, and the fact that the defendants lacked the normal ability afforded to a rightful registrant to use SWIPs with the netblocks, other red flags were constantly raised regarding the GetAds netblocks. Specifically, the netblocks were repeatedly listed on the Spamhaus Block List (SBL). The defendants regularly discussed the fact that the netblocks were "SBL'd" in their internal emails, as it dramatically affected their ability to deliver emails. The SBL notices set forth the reasons for each listing, which frequently included the fact that the netblock was believed to be "hijacked." These warnings did not deter the defendants from using the netblocks, but instead prompted them to use different platforms where they would not be blocked.

D. <u>REVENUE FROM MAILING FROM THE GETADS NETBLOCKS</u>

The motive for the fraudulent use of the netblocks was to increase profits. There are numerous emails among the co-conspirators and their co-workers discussing the economics of using the GetAds IPs, as opposed to other available IPs. The accountants who calculated the revenue generated from the use of the GetAds IPs during the period of the conspiracy will testify that the revenue obtained from use of the GetAds IPs was approximately $4.5-$5 million.

E. <u>COCONSPIRATOR ADMISSIONS</u>

In his plea agreement, Dye admitted that, in 2010, his former boss (CC-3) approached Dye to ask for help selling several netblocks because CC-3 had a reputation in

their industry for sending spam. CC-3 suggested that Dye offer the netblocks to Company A, which Dye understood was involved in sending commercial electronic mail messages, and Dye agreed to help CC-3 attempt to sell the netblocks to Company A. Dye contacted Company A in late 2010 and, over the course of the conspiracy, Dye and his employer GetAds sold Company A access to the domain names and IP address blocks associated with the registrants Open Business Systems, Sierra Semiconductor, EDUCOM, InterNex, Telalink Corp., Trinity Microsystems, CPS Net, Moore Products Co., and Educational & Corporate Technologies without the consent of the registrants or their successors in interest. To facilitate the use of these netblocks, Dye provided Company A with forged and unauthorized LOAs. In some cases, Dye provided Company A with electronic versions of the LOAs to enable Company A employees to edit or alter the LOAs, the edited versions of which Company A employees would have needed to sign. Dye admitted to knowing that Company A would use these netblocks to intentionally initiate the transmission of multiple commercial electronic mail messages. [18cr0822-GPC, ECF 6 at 3-10.]

In his plea agreement, Tarney admitted to agreeing with Dye and Company A employees to use false LOAs to make it appear that Company A had authorization to use netblocks that it had acquired via Dye. The false LOAs were submitted to Tarney's company's upstream service provider to enable Company A to use the netblocks to send commercial electronic mail messages. During his dealing with Company A employees, Tarney understood that Company A employees were trying to use netblocks that had been stolen from their owners. [18cr3469-GPC, ECF 11 at 3-6.]

III.

EXHIBIT LIST

The United States filed its exhibit list on April 25, 2022. [ECF 395.] The government reserves the right to supplement the exhibit list during trial, as the evidence is admitted. Any changes will be brought to the attention of counsel and the Court promptly and any additional exhibits will be provided. The list below provides a general description of the

types of exhibits that the United States will seek to admit in its case-in-chief, which include, but are not limited to:

1.   Records regarding the registration of IP netblocks, including a summary chart.

2.   Letters of Authorization (LOAs) to use IP netblocks.

3.   Records of the purchase of domain names associated with IP netblocks.

4.   Records of the registration/transfer of domain names.

5.   Records of payment for the purchase and hosting of IP netblocks.

6.   Records of the use of IP netblocks, including a summary chart.

7.   Emails regarding the purchase and use of IP netblocks.

8.   Records of DBAs and mailing addresses associated with the use of IP netblocks.

9.   Summaries of financial records related to the use of IP netblocks.

10.  Video depositions of two witnesses.

IV.

WITNESS LIST

The United States filed its witness list separately on April 22, 2022. [ECF 393.] The government reserves the right to supplement the witness list during trial, as the evidence is admitted. Any changes will be brought to the attention of counsel and the Court promptly. The list below provides a general description of the categories of witnesses that the United States will call in its case-in-chief, which include, but are not limited to:

1.   Experts regarding the workings of the internet, the fair market value of the GetAds IP addresses, and the revenue earned via the use of these IP addresses.

2.   Representatives of internet service providers and hosting companies who were asked to announce the GetAds IP addresses or to route internet traffic to or from these IP addresses.

3.   An ARIN representative.

4.   Representatives of the true registrants of the GetAds IP netblocks.

5. Two cooperating defendants (charged elsewhere) who participated in the conspiracy.

6. Present and former co-workers of the defendants.

7. An agent of the Federal Bureau of Investigation.

8. Various custodians of records.

V.

LEGAL ISSUES

A. CONSPIRACY

Pursuant to 18 U.S.C. § 371 (Conspiracy), it is unlawful for "two or more persons to conspire to commit any offense against the United States," with "one or more of such persons" performing "any act to effect the object of the conspiracy." The elements of the conspiracy offense, as charged, are as follows:

1. Beginning on or about December 2010, and ending on or about September 2014, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

2. The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3. One of the members of the conspiracy performed at least one overt act on or after October 31, 2013, for the purpose of carrying out the conspiracy.

A person can be a member of a conspiracy even though they do not know all the purposes of or participants in the scheme. *United States v. Escalante*, 637 F. 2d 1197, 1200 (9th Cir. 1980). The law of conspiracy does not require the government to prove that all the defendants met together at the same time and ratified the illegal scheme. *United States v. Perry*, 550 F.2, 524, 528 (9th Cir. 1997). "The agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (citing *United States v. Romero,* 282 F.3d 683, 687 (9th Cir. 2002)).  A conspiracy may exist even if some members of the

conspiracy cannot complete the offense, so long as the object of the conspiracy is that at least one conspirator complete the offense. *Ocasio v. United States*, 136 S. Ct. 1423, 1429-32 (2016).

So long as the jurors agree that the government has proven each element of a conspiracy, they need not unanimously agree on the particular overt act that was committed in furtherance of the agreed upon conspiracy. *United States v. Gonzalez*, 786 F. 3d 714, 718-719 (9th Cir. 2015). A defendant can be held liable for the substantive offenses committed by co-conspirators so long as the offense occurred within the course of the conspiracy, was within the scope of the agreement, and could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement. *United States v. Alvarez-Valenzuela*, 231 F. 3d 1198, 1202 (9th Cir. 2000).

B. <u>CAN-SPAM ACT CHARGES</u>

Section 1037(a)(5) provides that "Whoever, in or affecting interstate or foreign commerce, knowingly… falsely represents oneself to be the registrant or the legitimate successor in interest to the registrant of 5 or more Internet Protocol addresses, and intentionally initiates the transmission of multiple commercial electronic mail messages from such addresses, or conspires to do so…" is guilty of a felony. For this charge, the government must prove the following elements beyond a reasonable doubt:

1. The defendant knowingly falsely represented himself to be the registrant or the legitimate successor in interest to the registrant of five or more IP addresses;

2. The defendant intentionally initiated the transmission of multiple commercial electronic mail messages from those IP addresses;

3. The volume of the electronic mail messages transmitted in furtherance of the offense exceeded 2,500 during any 24-hour period, 25,000 during any 30-day period or 250,000 during any 1-year period; and

4. The offense was in or affecting interstate commerce.

The term "multiple" is defined as more than 100 electronic mail messages during a 24-hour period, more than 1,000 electronic mail messages during a 30-day period, or more

than 10,000 electronic mail messages during a 1-year period. 18 U.S.C. § 1037(d)(3). All other terms have the meaning given to them by Section 3 of the CAN-SPAM Act of 2003, pursuant to § 1037(d)(4). *See* 15 U.S.C. § 7702. These definitions include the definition for "commercial electronic mail message," which is "any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service (including content on an Internet website operated for a commercial purpose)." 15 U.S.C. § 7702(2)(A).

C. <u>WIRE FRAUD</u>

Section 1343 of Title 18 of the United States Code states that "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretense, representations or promises, transmits or causes to be transmitted by means of wire…communication in interstate or foreign commerce, any writing, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" shall be guilty of a felony. The elements of this offense are as follows:

1. The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts. Deceitful statements or half-truths may constitute false or fraudulent representations;

2. The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

3. The defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and

4. The defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

[Ninth Circuit Model Criminal Jury Instruction 15.35, 2021 Ed.]

As discussed in the briefing regarding defendants' multiple motions to dismiss the wire fraud counts [ECF 176, 222], the Supreme Court has ruled that "property," for

purposes of the wire and mail fraud statutes, is "something of value" or a "valuable entitlement." *Pasquantino v. United States*, 544 U.S. 349, 355, 357 (2005). Regardless of whether it is tangible or intangible, property, for purposes of the mail and wire fraud statutes, is given its "ordinary or natural meaning" and includes "every species of valuable right and interest." *Id.* at 544 U.S. at 355-56 (citations omitted). By focusing on the qualities of what makes something property, this definition accommodates technological innovation. *See Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698 (9th Cir. 2010) (domain names, the "alphanumeric shorthand for IP addresses," are "a species of property"); *United States v. Ali*, 620 F.3d 1062, 1067-68 (9th Cir. 2010) (software licensing is property). The government therefore bears the burden of proving at trial that, under the wire fraud statute's first essential element, defendants' scheme to obtain IP addresses by means of false or fraudulent representations involved obtaining something of value or a valuable entitlement.

Materiality is an essential element of the crime of mail or wire fraud. *Neder v. United States*, 527 U.S. 1 (1999). Materiality of statements or promises must be established, *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981), but the jury need not unanimously agree that a specific material false statement was made. *United States v. Lyons*, 472 F.3d 1055, 1068 (9th Cir. 2007). Materiality is a question of fact for the jury. *United States v. Carpenter*, 95 F.3d 773, 776 (9th Cir. 1996). The common-law test for materiality in the false-statement statutes, as reflected in the second element of this instruction, is the preferred formulation. *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008).

A defendant's "intent to defraud may be established by circumstantial evidence." *United States v. Milwitt*, 475 F.3d 1150, 1162 (9th Cir. 2007) (quoting *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003)); *United States v. Bucher*, 375 F.3d 929, 934 (9th Cir. 2004) ("Culpable intent can be inferred from the defendant's conduct and from the surrounding circumstances"). "[T]he scheme itself may be probative circumstantial evidence of an intent to defraud." *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (citing *United States v. Plache*, 913 F.3d 1375, 1381 (9th Cir. 1990)).

Under a vicarious liability theory, if "the defendant was a member of a scheme to defraud and [] the defendant had the intent to defraud, the defendant may be responsible for other co-schemers' actions during the course of and in furtherance of the scheme, even if the defendant did not know what they said or did. For the defendant to be guilty of an offense committed by a co-schemer in furtherance of the scheme, the offense must be one that the defendant could reasonably foresee as a necessary and natural consequence of the scheme to defraud."  Ninth Circuit Model Crim. Jury Instr. § 15.33 (Scheme to Defraud-Vicarious Liability) (citing *United States v. Stapleton*, 293 F.3d 1111, 1115-18 (9th Cir. 2002) and *United States v. Green*, 592 F.3d 1057, 1070-71 (9th Cir. 2010)).

The United States need not "prove that [the defendant] personally made fraudulent misrepresentations or omissions."  *See United States v. Namvar*, 498 Fed. App'x. 749, 750 (9th Cir. 2012) (unpublished) (citing *United States v. Farris*, 614 F.2d 634, 638-39 (9th Cir. 1979)); *Pasquantino*, 336 F.3d at 336 ("the mere fact that defendant did not personally make the telephone call . . . is of no import" because the call was reasonably foreseeable to defendant in the execution of the fraud scheme).

That a victim was "gullible or negligent" is no defense in a fraud case.  *See United States v. Ghilarducci*, No. 05-10499, 220 Fed. App'x. 496, 499-500 (9th Cir. 2007) (unpublished); *United States v. Sun-Diamond Growers of California*, 138 F.3d 961, 971 (D.C. Cir. 1998) ("[W]hen an individual is swindled, the offender does not escape mail or wire fraud liability just because the victim was unwary, or even gullible.").

D. <u>FORFEITURE</u>

"[T]rial courts should bifurcate forfeiture proceedings from ascertainment of guilt, requiring separate jury deliberations and allowing argument of counsel." *United States v. Feldman*, 853 F.2d 648, 662 (9th Cir. 1988). "[T]he court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." Fed. R. Crim. P. 32.2(b)(5)(A).

If there is a timely request for a separate jury determination of forfeiture, the United States will "submit a proposed Special Verdict Form listing each property subject to forfeiture and asking the jury to determine whether the government has established the requisite nexus between the property and the offense committed by the defendant." Fed. R. Crim. P. 32.2(b)(5)(B). The Court also has discretion to allow further evidence before forfeiture deliberations. "If the defendant can show, by affidavits or otherwise, that a hearing is required on the extent of his or her assets subject to forfeiture, the court should allow evidence on the issue. Evidence received at this phase may not be used on appeal or at retrial to sustain the conviction, nor in post-trial motions." *Feldman*, 853 F.2d at 662 (citation omitted).

Here, the United States will request a separate forfeiture proceeding, and will provide the Court with proposed jury instructions and special verdict form.

E. EVIDENTIARY ISSUES

At the April 11, 2022, hearing, defendants acknowledged that they have subpoenaed Company A's outside counsel, LG, to testify and signaled that they would seek to compel the government to immunize this witness. On May 6, 2022, defendants filed a joint witness list. This list included both LG and Company A's former in-house counsel, JH. [ECF 404.] Both witnesses would involve two sets of complex evidentiary issues, attorney-client privilege, and Fifth Amendment concerns, which should be addressed via a FRE 104 hearing in advance of trial to ensure there is no undue delay, waste of time, confusion of the issues, or unfair prejudice. The government also anticipates that evidentiary issues will arise that involve the use of electronic evidence, coconspirator statements, and testimony regarding Company A compliance with CAN-SPAM provisions other the provision charged in this case. These topics are addressed below.

1. Attorney-Client Privilege

For LG or JH's testimony to be relevant, it will likely relate to advice that either LG or JH gave to Company A or its employees regarding the GetAds netblocks and related transactions. If the advice was business advice (without any inference by the defense that

the same was legal advice), it will not be privileged – but it will also not support an advice of counsel defense for defendants to claim they believed their conduct was lawful. If the advice was legal advice, then it would be privileged. To proceed with testimony involving the advice of counsel, defendants must first waive the attorney-client privilege to all communications containing any disclosures of material facts or advice from counsel that relates to their defense. "The privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co*., 974 F.2d 1156, 1162 (9th Cir. 1992), citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991). If the defense puts forth any assertion or claim that their clients' conduct was approved (implicitly or explicitly) by an attorney, the privilege is deemed waived. *Id.* The Ninth Circuit has further held that a defendant claiming to have relied upon the advice of counsel cannot selectively waive the attorney-client privilege with respect to communications that tend to show that he relied upon advice of counsel while simultaneously refusing to disclose other communications pertaining to the same subject. *United States v. Ortland,* 109 F.3d 539, 543 (9th Cir. 1997) (quotations omitted).

The problem here, however, is that defendants do not hold the privilege because, as they have previously recognized, Company A retained LG and employed JH, and Company A alone holds the privilege to both attorneys. *See United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1143 (D.Mont. 2006) (company's current management controls the waiver) (citing *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348 (1985)). Defendants' intention to call LG and JH, coupled with their decision not to file timely pre-trial briefing to (a) compel a waiver, (b) permit Company A an opportunity to be heard, (c) ensure adequate time to research and brief the issue and, (d) perhaps most importantly, grant *both* sides equal access to the materials no longer covered by the privilege, is brinksmanship that runs afoul of FRE 403. *See Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (party seeking to argue his "activities [were] based on the advice of his attorney, while at the same time" preventing opposing counsel from obtaining the "relevant communications with counsel

until the 'eleventh hour'" was properly precluded from raising the issue based on his having engineered the delayed disclosure); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) ("The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.") (*citing Taylor v. Illinois*, 484 U.S. 400 (1988)).

*Murdock v. Castro*, 365 F. 3d 699, 704 (9th Cir. 2004) illustrates the complex issues the court will confront in the middle of trial if defendants try to compel LG or JH to testify regarding advice of counsel. In *Murdock*, the court found error where the defendant had been prohibited from using a letter written by the informant to the informant's attorney, exonerating the defendant in a murder, to cross-examine the informant at trial, which was blocked by the informant's claim of attorney-client privilege.

In examining *Murdock* and other Supreme Court precedent regarding attorney-client privilege and the Sixth Amendment Confrontation Clause, the court in *W.R. Grace* confronted the collision between the attorney-client privilege and the defendant's right to present evidence and determined that a balancing test was appropriate. The *W.R. Grace* court balanced the nature and content of the privileged evidence against the purposes served by the attorney-client privilege to determine whether any of the documents were of such value as to require the company's rights under the attorney-client privilege to yield to the individual defendant's Sixth Amendment right to present evidence. *W.R. Grace*, 439 F. Supp. 2d at 1142. In balancing these competing interests, the *W.R. Grace* court considered the integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process, along with the need for the defendant to present the disputed evidence, and the rights of the privilege holder. *Id.* The *W.R. Grace* court further required the defense to submit each piece of evidence *in camera* so the court could perform the appropriate balancing test as the evidence proceeded at trial. This type of careful consideration is incompatible with the demands and obligations of a complex multi-week fraud trial.

2. <u>Fifth Amendment Concerns</u>

Defendants have also recognized that LG may invoke the Fifth Amendment if compelled to testify and should anticipate that JH will also raise this concern. Compelling such testimony, particularly when the witnesses are more likely to invoke on cross-examination, would result in unreliable testimony that should be excluded. "Where a defense witness refuses to answer questions that go to the heart of the direct testimony on a central issue, however, the truth-seeking function of the court is impaired." *Denham v. Deeds*, 954 F.2d 1501, 1503–04 (9th Cir. 1992). "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) (quoting *United States v. Noble*, 422 U.S. 224, 241 (1975)). On this basis, the Ninth Circuit has repeatedly found it proper to preclude the defense from calling witnesses who would not answer cross-examination questions on non-collateral matters. *United States v. Guess*, 472 Fed.App'x 546, 547-48 (9th Cir. 2012) (relying on *Deeds*, 954 F.2d at 1504 and *United States v. Klinger*, 128 F.3d 705, 709 (9th Cir. 1997)).

Compelled immunity for LG or JH is also improper. Compelled immunity is appropriate only when "(1) the witness's testimony would have been relevant, and (2) the prosecution refused to grant the witness use immunity with the deliberate intention of distorting the fact-finding process." *United States v. Straub,* 538 F.3d 1147, 1156 (9th Cir. 2008) (quoting *Williams v. Woodford,* 384 F.3d 567, 600 (9th Cir. 2002)). To satisfy the second prong, namely the government's "deliberate intent" to distort the fact-finding process, the defendants must show the government either "intimidate[d] or harasse[d] the witness to discourage the witness from testifying" or denied immunity to a defense witness who would have directly contradicted an immunized government witness. *Id.* at 1157-58. Defendants cannot make such a showing here, and immunity is therefore unwarranted.

//

3.  <u>Electronic Evidence</u>

The government's case-in-chief will include electronic evidence in the form of emails, database search results, automated records, and electronic business records. The government is seeking to authenticate this evidence via FRE 901(b)(1) testimony and FRE 902(11) & 902(13) certificates that were previously produced and noticed, and to admit the records as either non-hearsay under FRE 801(a), as business records under FRE 803(6), or as coconspirator/party opponent statements under FRE 801(d)(2) (discussed in a separate section below).

a.  *Authenticating Electronic Evidence*

In general, a "proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FRE 901(a). To support such a finding, the proponent "need only make a prima facie showing of authenticity" and "establish a connection between the proffered evidence and the defendant." *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000). Disputes over authentication should be about whether it is reasonably likely that the evidence is what the proponent says (e.g., a Company A email), not over the evidence's probative value. The courts can therefore properly "admit[] evidence that meets the minimum requirements for authentication under the Federal Rules of Evidence" and let opposing counsel "argue that the jury should give the evidence minimal weight." *United States v. Ortiz*, 776 F.3d 1042, 1045 (9th Cir. 2015).

The seminal electronic evidence case, *Lorraine v. Markel American Ins. Co.*, 241 F.R.D. 534 (D.Md. 2007), which catalogued the myriad ways in which electronic evidence may be admitted and was written prior to  enactment of FRE 902(13) in December 2017, noted at the time that the most common methods for authenticating email are FRE 902(b)(1) (person with personal knowledge), 901(b)(3) (comparison with authenticated exemplar), 901(b)(4) (distinctive characteristics, including circumstantial evidence),[9] and 902(11) (business records certifications).  *Id.* at 554-55.

---

[9] FRE 901(b)(4) also encompasses the "reply doctrine," which holds that, once an email "is shown to have been mailed, sent or made," an email "shown by its contents to be in

More recently, the courts have tended to rely on FRE 902(11) certifications to authenticate email records.  *See, e.g., United States v. Gal*, 606 Fed. Appx. 868, 874-75 (9th Cir. 2015) (email properly authenticated under FRE 902(11) and the certification did not violate the Confrontation Clause) (citations omitted); *United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) (same); *United States v. Denton*, 944 F.3d 170, 183-84 (4th Cir. 2019) (same); *United States v. Way*, 1:14cr00101-DAD-BAM-1, 2018 WL 2470944, *1-2 (E.D. Cal. June 1, 2018).

Even when the proffered electronic communications are from social media, where the courts have been somewhat more conservative regarding the authentication of an account's *contents* via FRE 902(11), the courts have still been inclined to accept the FRE 902(11) certification to authenticate *records* about the content (e.g., metadata showing times or dates of transmission or IP addresses) under FRE 901(a) and to hold there was no Confrontation Clause issue. *See, e.g., United States v. Farrad*, 895 F.3d 859, 879-80 (6th Cir. 2018); *United States v. Browne*, 834 F.3d 403, 413-15 (3rd Cir. 2016); *United States v. Hunt*, 534 F.Supp.3d 233, 254-58 (E.D.N.Y. 2021); *see also* Advisory Committee Notes to 901(a) ("significant inroads upon the traditional insistence on authentication and identification have been made by accepting as at least prima facie genuine items of the kind treated in Rule 902").

Other electronic business records, like Company A's Blackmail reports, ARIN's WHOIS registry, or GoDaddy's domain registration records, are more conventional business records that fall within FRE 902(11) and 902(13). *See, e.g., United States v. Ray*, 20cr110 (LJL) 2022 WL 558146 (S.D.N.Y. Feb. 24, 2022) (GoDaddy records may be authenticated under FRE 902(11)); *Dienes v. FCA US LLC*, 16cv1812-AJB, 2017 WL 11672443 (S.D. Cal. Jan. 10, 2017) (business reports properly authenticated under FRE 902(11)). FRE 902(13) applies to records created via an electronic process, such as archival data that is collected automatically by a website. *Western Towboat Co. v. Vigor Marine*,

_____

reply is authenticated without more." *United States v. Frantz*, 2004 WL 5642909, n. 25 (C.D. Cal. 2004) (citations omitted).

LLC, 2021 WL 2641521, *4-5 (W.D. Wash. 2021); *see also* Wright and Miller § 7147. The Advisory Committee Notes to the 2017 Amendments that codified FRE 902(13) note the shared public policy underlying both FRE 901(11) and 902(13): "As with the provisions on business records in Rules 902(11). . ., the Committee has found that the expense and inconvenience of producing a witness to authenticate an item of electronic evidence is often unnecessary."

### b.  *Hearsay Exclusions and Exceptions for Electronic Evidence*

The government's case-in-chief will include records produced by Company A's automated Blackmail software that tracks the volume of emails delivered in a 24-hour period. The government anticipates that current and past employees of Company A who testify will lay the foundation for what this software does and how it operates. This foundation will show that the Blackmail reports are admissible machine statements that are automatically computer and do not fall within the category of "statements" subject to FRE 801, which only applies to "a *person*'s oral assertion, written assertion, or nonverbal conduct." FRE 801(a). "[M]achine statements aren't hearsay." *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015). Machine or automated statements are also not subject to the Confrontation Clause. *Id.*; *United States v. Cazares*, 788 F.3d 956, 979 (9th Cir. 2015). In this vein, GPS coordinates automatically generated by software tools like Google Earth and "Reverse Look-Up Reports" of cell phones associated with tracking numbers are non-hearsay and not subject to the Confrontation Clause. *Id.*; *Unites States v. Gonzalez*, 615 Fed.Appx. 405 (9th Cir. 2015).

Electronic business records that are human generated, while hearsay, are commonly subject to an exemption under FRE 803(6), which applies to reports, records, and data compilations made as a regular practice of a business activity. *See United States v. Lishewski*, 860 Fed.Appx. 512, 516 (9th Cir. 2021) (emails properly admitted under FRE 803(6)); *United States v. Wilkins*, 538 F.Supp.3d 49, 67 (D.D.C. 2021) (records from online advertising websites, social media websites, cellular telephone companies, and internet service providers admissible non-hearsay under FRE 803(6) and 902(11)).

1    4. Coconspirator Statements

2        The government intends to introduce statements made by the defendants and their

3    coconspirators during the conspiracy, primarily in the form of emails and testimony

4    involving one or more of the coconspirators. Rule 801(d)(2)(E) provides that such

5    statements are not hearsay if they are offered by the opposing party and were "made by the

6    party's coconspirator during and in furtherance of the conspiracy." For the statements to

7    be admissible as coconspirator statements, the government must demonstrate by a

8    preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the

9    declarant were members of the conspiracy; and (3) the statements were made during the

10   course of, and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S. 171,

11   175 (1987); *see also United States v. Liera*, 585 F.3d 1237, 1245-46 (9th Cir. 2009); *United*

12   *States v. Castaneda*, 16 F.3d1504, 1507 (9th Cir. 1994). Admission of coconspirator

13   statements does not violate the Confrontation Clause. *Crawford v. Washington*, 541 U.S.

14   36, 56 (2004); *United States v. Bridgeforth*, 461 F.3d 864, 869 n.1 (9th Cir. 2006). To

15   establish a declarant's connection to the conspiracy, the prosecution must provide only

16   "slight evidence" that the declarant was connected to the conspiracy. *United States v.*

17   *Perez*, 658 F.2d 654, 658 (9th Cir. 1981).

18       Defendants' and their uncharged coconspirators' email messages and statements

19   regarding the netblocks the GetAds netblocks satisfy *Bourjaily*'s three-part test. First,

20   Count 1 outlines the preliminary evidence that a conspiracy existed, and the factual bases

21   of Dye and Tarney's plea agreements further flesh out the existence of a conspiracy. The

22   government's grand jury exhibits, produced in early discovery, further show that, in

23   furtherance of the conspiracy, the defendants communicated with Dye, Tarney, each other,

24   and other uncharged coconspirators to obtain control and use of the GetAds netblocks to

25   send commercial mail messages. These communications included emails about performing

26   due diligence prior to the purchase of the netblocks' associated domain name, setting up

27   the email accounts to control the domain name associated with the netblocks, creating the

28   LOAs, and sending them to hosting companies. They also include communications about

problems sending commercial emails using the netblocks, including communications indicating that GetAds netblocks had been blacklisted by various spam watchdog organizations, and occasions where the netblocks were reclaimed by the rightful registrants, and communications regarding the revenue that was earned from sending commercial emails using the GetAds netblocks. The evidence shows the coconspirators' communications were intended to "keep a person abreast of the conspirators' activities, to induce continued participation in the conspiracy, or to allay fears." *United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir. 1987). Thus, a conspiracy existed.

Second, the declarants involved are the defendants named in this case, along with Dye, Tarney, and the three individuals previously identified to the defense. The evidence discussed herein establish by a preponderance of the evidence that defendants, Dye, Tarney, CC-1, CC-2, and CC-3 were members of the conspiracy to violate the CAN-SPAM Act and commit wire fraud by fraudulently acquiring and using the GetAds netblocks. Their declarations made in furtherance of this conspiracy fall within the scope of Rule 801(d)(2)(E). "An individual need not be indicted to be considered a coconspirator for the purposes of rule 801(d)(2)(E)." *United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993).

Third, the statements relating to the GetAds netblocks were made by the defendants, Dye, Tarney, CC-1, CC-2, and CC-3 during and in furtherance of the conspiracy. In *United States v. Nazemian*, 948 522, 529 (9th Cir. 1991), the Ninth Circuit provided the following examples of admissible coconspirator statements:

> [S]tatements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities.

Statements that serve a necessary part of the conspiracy by concealing it are also statements made in furtherance of the conspiracy. *United States v. Blakey*, 960 F. 2d 996, 998 (11th

Cir. 1992), cited within *Hawkins v. Bunnell*, 16 Fed. Appx 656, 658 (9th Cir. 2001).  These are the types of statements made in relation to the GetAds netblocks by the defendants, Dye, Tarney, and the uncharged coconspirators.  Their electronic and oral communications relating to the acquisition and use of the GetAds netblocks are therefore admissible co-conspirator statements under Rule 801(d)(2)(E).[10]

5.    Statements re Compliance with Uncharged CAN-SPAM Provisions

It is anticipated that the defendants will attempt to elicit evidence that their commercial email messages were "CAN-SPAM compliant," as related to other provisions of the CAN-SPAM statute relating to header information. Such evidence should be excluded because it calls for a legal conclusion, is not relevant to the charges in this case, and would involve self-serving hearsay. It should further be excluded under FRE 403 because it could confuse the jury and lead to undue delay, wasting time on a mini-trial within the trial on uncharged conduct.

Amongst the discovery in this case are documents that suggest that Company A employees were instructed to advise their commercial partners that Company A was "CAN-SPAM compliant," and did not send illegal "spam" emails. Evidence of this type that presents a legal conclusion is inadmissible, as it invades the province of the court. *United States v. Scholl*, 166 F. 3d 964, 973 (9th Cir.1999). From the context of these statements, they are directed towards the provisions of the CAN-SPAM Act related to false header information, false email addresses and emails which mislead recipients regarding their true origins. Such matters involve potential violations of Title 18, United States Code, Section 1037(a)(2), (3) and (4), not the section of law charged in this case [§1037(d)(5)]. Accordingly, they lack relevance under FRE 401, as they would not tend to make a fact needed to adjudicate this case more or less probable. Only relevant evidence may be admitted at trial. *United States v. Vallejo,* 237 F.3d 1008, 1015 (9th Cir. 2001).

---

[10] In some cases, members of the conspiracy responded to or forwarded emails to each other from individuals who were not members of the conspiracy.  These portions of longer email chains are admissible as adoptive admissions under FRE 801(d)(2)(B) or for their effect on the listener. *See United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991).

To the extent that co-conspirators made claims that the activities of Company A were "CAN-SPAM compliant," such statements must be excluded as self-serving hearsay. Because they are the proponent of the evidence and the evidence is not being offered against them, the defendants cannot rely on FRE 801(d)(2) [statement of a party opponent] to admit such evidence. *United States v. Fernandez*, 839 F. 2d 639,640 (9th Cir.1988). Nor can defendants rely on FRE 810(d)(1)(B) to admit such evidence as a prior consistent statement, since a prior consistent statement is not admissible in the absence of impeachment. *United States v. Navarro-Vareles*, 541 1331, 1334 (9th Cir. 1976).

Such evidence should further be excluded under FRE 403 because it might confuse the jury and waste time with a mini trial-within-a trial on whether the emails sent by Company A did, in fact, mislead recipients regarding their true origin. When hearing that Company A claimed its email activities were "CAN-SPAM compliant," the jury could be confused and mistakenly infer that the defendants' actions in this case were also in compliance with the CAN-SPAM Act. Moreover, evidence with remote probative value that would result in a mini trial on a tangential issue should be excluded.  *United States v. Ulahannan*, 414 Fed. Appx. 988 (9th Cir.2011).

The government had previously agreed to limit its presentation of evidence regarding the use of DBAs by Company A to only those DBAs used in connection with the netblocks at issue. However, if the defense were permitted to elicit evidence that Company A emails were all "CAN-SPAM Act compliant," the government would be required to rebut that statement with evidence regarding the hundreds of DBAs used by the company when sending commercial emails, and how they were utilized to conceal Company A as the sender. This would result in undue delay, and wasted time, and thus such evidence should be excluded.

//

//

## VI.

## JURY INSTRUCTIONS

The government has filed its proposed jury instructions separately. [ECF 413.]


DATED: May 16, 2022


Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

/s/Melanie K. Pierson
Assistant United States Attorney

/s/Sabrina L. Fève
Assistant United States Attorney

/s/Candy Heath
Senior Counsel
Computer Crime and Intellectual Property Section
Department of Justice, Criminal Division